1

## COMMONWEALTH OF MASSACHUSETTS

Suffolk ,ss                                                    Civil Action:

                                                                03-1685

Terri Pechner-James
Sonia Fernandez


V


City of Revere, Thomas Ambrosino, Mayor
City of Revere, Police Department, Terrence Reardon, Chief
Bernard Foster, Salvatore Santoro, Roy Colannino, Frederick Roland,
Thomas Doherty, John Nelson, James Russo, Michael Murphy and Steven Ford

### VERIFIED COMPLAINT

### PARTIES

Plaintiffs

A. The Plaintiff, Terri Pechner-James was at all relevant times and for all relevant purposes a Police Officer in the Revere Police Department and an employee of the City of Revere, Massachusetts.

B. The Plaintiff, Sonia Fernandez, is and for all relevant purposes remains an Police Officer in the Revere Police Department and an employee of the City of Revere, Massachusetts.

C. All parties to this action are subject to the jurisdiction of this Court.

Defendants

1. The Defendant, Thomas Ambrosino, is the Mayor of the City of Revere. The City of Revere was at all relevant times and for all relevant purposes the employer of the Plaintiffs; the Mayor and his predecessors were at all relevant times and for all relevant purposes supervisors of the Plaintiffs.

2. The Defendant, Terrence Reardon, is the Chief of the Revere Police Department  He and his predecessors were at all relevant times and for all relevant purposes supervisors of the Plaintiffs.

3. The Defendants, Bernard Foster and Steven Ford, were at all relevant times a ranking officers (Lieutenants) in the Revere Police Department and a supervisors of the Plaintiffs.

4. The Defendant, Salvatore Santoro, was at all relevant times a ranking officer in the Revere Police Department and a supervisor of the Plaintiffs.

5. The Defendant, Roy Colannino, was at all relevant times a ranking officer in the Revere Police Department and a supervisor of the Plaintiffs.

6. The Defendant, Fredrick Roland, was at all relevant times a ranking officer in the Revere Police Department and supervisor of the Plaintiffs.

7. The Defendant, Thomas Doherty, was at all relevant times a ranking officer in the Revere Police Department and a supervisor of the Plaintiffs.

8. The Defendant, John Nelson, was at all relevant times a ranking officer in the Revere Police Department and a supervisor of the Plaintiffs.

9. The Defendant, James Russo, was a Chief of Police and at all relevant times a ranking officer in the Revere Police Department and a supervisor of the Plaintiffs.

10. The Defendant Michael Murphy, was at all relevant times a ranking officer in the Revere Police Department and a supervisor of the Plaintiffs.

**Satisfaction of Prerequisites**
11. The Plaintiffs filed a complaint with the MCAD on or about March 12, 2001. On or about February 28, 2003, the Plaintiffs served upon the Defendants a Notice of Claim pursuant to M.G.L.c. 258 § 4. The Plaintiffs have satisfied the prerequisites for filing this cause of action.

**Applicable Law:**
12. Employers owe a duty to protect their employees from workplace harms including sexual harassment. The source of this duty is both the common law of agency which imposes obligations on employers, like the City of Revere, and the 1964 Civil Rights Act, which prohibits sexual harassment in employment. The duty is **nondelegable** because the duty is based on the special relationship between an employer and employee and because this special relationship is afforded statutory protection. The Defendants willfully violated the statutory protections provided by M.G.L.c. 151B § 4; M.G.L.c. 214 § 1; M.G.L.c. 12 § 11 *I* and the statutory protections provided by 42 U.S.C. § 2000 (e)-2 by discriminating against the Plaintiff with respect to compensation, terms, conditions, and privileges of employment. Such discrimination was based on sex, race and national origin. Plaintiffs have filed this cause of action pursuant to 42 U.S.C § 1983 and the General Laws of the Commonwealth of Massachusetts.

13. The Commonwealth of Massachusetts has stated the **nondelegable** nature of this duty, emphasized its statutory protection and established the Commonwealth's policy of

**strict liability** for employer violation of these statutes in **College Town, Div. of Interco, Inc. v Massachusetts Commission Against Discrimination**, 508 N.E.2d 587, 400 Mass. 156 (1987) and several subsequent cases. Federal law has likewise established a policy of strict liability for similar violations of 42 U.S.C. § 2000 (e)-2. See **Burlington Indistries, Inc. v Ellerth**, 524 U.S. 742; **Faragher v City of Boca Raton**, 524 U.S. 775 (1990). See also **Suders v Easton** No. 01-3512 (April 16, 2003.) 3rd Circuit.)

**Background:**
14. Plaintiffs were sworn in as Revere Police Officers on September 21, 1995. They have held the title of patrol officer since that time. Plaintiffs were part of a group of seven female officers who were hired by the Revere Police Department at that time. Four of these officers have left the Department and three have filed complaints with the Massachusetts Commission Against Discrimination. Plaintiffs experienced a prolonged, severe, pervasive, hostile, and abusive work environment during their almost six years of employment. They also experienced discrimination based on their sex and race, in the case of Sonia Fernandez. They experienced intimidation, humiliation, and stigmatization. The conduct of the Defendants, all of whom were supervisors, posed formidable barriers to both Plaintiffs full participation in the workplace. These barriers were so formidable, the hostility of the work environment so prolonged, severe and pervasive that both Plaintiffs were diagnosed with Post Traumatic Stress Disorder and were constructively discharged from their employment. A Medical Panel of the Public Employee Retirement Administration Commission unanimously adjudicated, on July 28, 2003, that the Plaintiff, Terri Pechner-James, was emotionally disabled by Post Traumatic Stress Disorder and had been constructively discharged from her employment at the Revere Police Department  A subsequent medical opinion, requested by the City of Revere, substantiated that Sonia Fernandez also suffers from Post Traumatic Stress Disorder and is incapable of returning to work at the Revere police Department.

15. The Defendants, City of Revere, and the Revere Police Department permitted the supervisors named in this complaint to create a hostile and intolerable work environment and to engage in racial and sexual discrimination and harassment toward the Plaintiffs, Terri Pechner-James and Sonia Fernandez. The Defendants are strictly liable to the Plaintiffs for damages because of the hostile environment they created and because they constructively discharged the Plaintiffs from their employment.

**FACTS: Terri Pechner-James**
The facts that give rise to the claim of Terri Pechner-James incorporate the paragraphs stated above and the events described below:

16. Plaintiff, Terri Pechner-James, was a competent police officer. She received several letters of commendation. She also received an Official Citation from the Massachusetts State Senate. The last day that the Plaintiff was able to work at the Revere Police Department was March 13, 2001.

### Lieutenant Bernard Foster

17. Lieutenant Foster was one of Plaintiff, Terri Pechner-James' supervisors. He was consistently hostile and punitive. He treated Plaintiff in a harsh and demeaning manner. He intentionally deprived her of full participation in the work of the Revere Police Department.

18. Lieutenant Foster routinely allowed male officers to watch television while working in the radio room. On or about July 5, 1997, he approached Plaintiff while she was working inside the radio room. He demanded that she turn off the television.

19. On or about August 24, 1997, Lieutenant Foster became extremely and inappropriately angry with the Plaintiff and screamed at her for several minutes. He called Plaintiff into the booking area and shut the door. He stated, "I have done a lot for you and you turn around and stab me in the back. I am putting you on walking route until further notice. I don't want to see your face inside this station and you are not to go inside the substation while on route. Do not bother to speak to me and you can disregard the invitation to my daughter's wedding."

20. Plaintiff asked Lieutenant Foster to tell her what she had done to offend him or how his reaction was related to her job performance. He did not respond. He stated: "I have nothing else to say to you. Go to your assignment and make sure you are there because I will be checking."

21. Lieutenant Foster's conduct clearly deprived the Plaintiff of her full participation in the work of the Revere Police Department. His decision was not based on the public interest. His order to the Plaintiff had no relationship to the bona fide occupational qualifications of the plaintiff or the requirements of the job. His conduct was personal not professional; it was demeaning and caused Plaintiff great emotional distress and made her physically ill.

22. On August 26, 1997, the Plaintiff was experiencing great emotional stress because of Lieutenant Foster's "punishment program" of excessive walking assignments and denial of opportunity to work, ride with and learn from experienced professionals. These kind of assignments are well-known within the Department as "punishment." She felt constantly humiliated, she became physically ill and was unable to perform her professional duties and was forced to leave work early.

23. During the next several weeks, Plaintiff tried to survive Lieutenant Foster's punishment program and perform her professional duties. Plaintiff survived by switching shifts with other officers and by taking her sick days in order to avoid Lieutenant Foster. She experienced headaches, sleeplessness, and loss of appetite. She was diagnosed with Irritable Bowel Syndrome.

24. Plaintiff attempted to seek a remedy from the clearly humiliating and hostile environment created by her supervisor, Lieutenant Foster. He learned of her efforts to seek assistance and redress and retaliated against her.

4

25. On or about September 2, 1997, Lieutenant Foster and Lieutenant Ford called Plaintiff into the guardroom of the Police Station. Lieutenant Foster asked the Plaintiff: "Who do you think you are jumping the chain of command and going to Captain Colannino?" Lieutenant Ford added: "Yes, and I can't stand your voice on the radio either." This statement was personal and not professional.

26. Lieutenant Foster also made several other humiliating remarks to the Plaintiff. He accused her of smoking marijuana during her vacation. Plaintiff confronted him and requested a drug test. Lieutenant Foster denied her request even though this was a serious allegation that could have caused her to lose her job. He also failed to otherwise substantiate this false and misleading allegation.

27. Captain Colannino, Foster's superior, failed to remedy Lieutenant Foster's punishment of the Plaintiff. Foster's punishment of the plaintiff was well known within the Department. It had become a department scandal. Lieutenant Foster's "punishment program" of excessive walking routes and menial assignments humiliated Plaintiff. Lieutenant Foster denied Plaintiff full participation in the work of the Revere Police Department.

28. Plaintiff's punishment continued through the end of September 1997, and beyond. On or about October 12, 1997, Plaintiff escaped Lieutenant Foster's "punishment" when she was transferred.

29. The transfer provided the Plaintiff with only temporary relief.

30. On or about August 4, 1999, the Plaintiff became sick on the job because of the stressful conditions created by Lieutenant Foster. She went to the City Nurse. Plaintiff continued to feel ill. She left ten minutes before the end of her shift. Lieutenant Foster called Plaintiff at home and ordered her back to the Station. When she arrived, he berated and demeaned her in the presence of the entire shift of mostly male officers.

31. On or about August 7, 1999, Lieutenant Foster made Plaintiff work inside as punishment. His decision was based on his anger at the Plaintiff and not on the bona fide qualifications of the Plaintiff or the public interest.

32. On or about August 12, 1999, several members of the Department approached Plaintiff and told her that Lieutenant Foster made the following statement in their presence: "Pechner is going to be assigned inside until further notice because she left early and that only certain people when assigned inside are going to be allowed to operate the radio."

33. On or about August 13, 1999, Plaintiff was working in the radio room. She experienced an act of disparate treatment. A male officer turned on the television. The Lieutenant on duty did not reprimand him or ask him to turn off the television. Lieutenant Foster had previously ordered the plaintiff not to watch the same television.

### Lieutenant Michael Murphy

34. On or about June 26, 2001, Plaintiff asked Lieutenant Murphy for a vacation day so that she could spend a holiday with family. Lieutenant Murphy responded in a condescending and demeaning manner. He told Plaintiff that she should have been a secretary if she wanted to take off holidays.

### Lieutenant Salvatore Santoro

35. Lieutenant Santoro played a pivotal role in creating the hostile environment experienced by Plaintiff and other female officers.

36. On or about December 11, 1998, Plaintiff was working the midnight to 8:00 a.m. shift. Plaintiff was assigned to the patrol car. During this period, the Department had arrested John Barker and Christopher Daley on outstanding warrants.

37. Lieutenant Santoro ordered the Plaintiff to return to the station. When Plaintiff arrived, Lieutenant Santoro ordered her to go to the cell block because someone wanted to talk to her.

38. Plaintiff went to the cell block. She saw John Barker who had just been arrested on an outstanding warrant. The plaintiff knew John Barker because they had attended school together. The Plaintiff talked to the prisoner.

39. During the conversation, John Barker told the Plaintiff that Lieutenant Santoro had asked him if he was having sex with the Plaintiff. The prisoner did not respond to Lieutenant Santoro.

40. The Plaintiff also learned that the other prisoner, Christopher Daley, overheard Lieutenant Santoro's remarks.

41. The Plaintiff, Terri Pechner-James, was emotionally devastated. She experienced his conduct as offensive and abusive. She became emotionally distraught and physically ill. This humiliating experience forced her to withdraw from her work environment. She went to the bathroom where she cried and became sick to her stomach. This remark by a supervisor was sexually and professionally inappropriate.

42. Plaintiff reported the incident to Captain Roland and Captain Chaulk. Lieutenant Santoro's conduct diminished the stature of the Plaintiff. It undermined her effectiveness. The rumor affected the prisoner to whom it was made. It affected the prisoner who overheard the remark. It affected members of the Revere Police Department who became aware of the rumor.

43. Lieutenant Santoro routinely subjected females in the Department to sexually offensive behavior. He made daily remarks about the length and size of his penis. He also made disparaging comments about the bodies of female officers in the Department.

44. On several occasions, Plaintiff and other female officers complained to Lieutenant Santoro about the sexually offensive remarks made by other male officers. Lieutenant Santoro did not take the complaint seriously and took no remedial action. His behavior contributed to the hostile work environment that the Plaintiff experienced.

45. On or about March 12, 2001, the Plaintiff was working the 4:00p.m. to 12:00a.m. shift. She was instructed to prepare warrants for the arrest of Christopher Daley. Shortly after Daley's arrest, he was placed in the cell block. He asked for a blanket. Plaintiff provided the blanket. She asked Daley if he remembered the conversation between John Barker and Lieutenant Santoro the last time he was at the station. The prisoner looked embarrassed and answered, "Yes." He then added that the Detective upstairs just asked him if he ever screwed the Plaintiff. The prisoner did not answer and then remarked: "What's up with this place, anyway? Why are these people so concerned with whom you have been with."

46. The incident confirmed the Plaintiff's earlier experience with Lieutenant Santoro. She returned to her post but she was emotionally disabled. She was too upset to perform her duties. She reported the incident to her supervisor. He authorized her to leave because she was physically, emotionally disabled, and unable to finish her shift.

47. Other ranking officers contributed to the climate of sexual innuendo and hostility that permeated the work environment in the Revere Police Department.

**Acting Chief Colannino and Captain Roland**

48. At all relevant times, Roy Colannino held the title of Captain and Acting Chief of Police of the Revere Police Department. Frederick Roland held the title of Captain in the Revere Police Department.

49. The Plaintiffs, Terri Pechner James and Sonia Fernandez, met with the mayor of the City of Revere. They met with Captain Roland. They complained that the prolonged, severe, pervasive, hostile, and abusive work environment had caused them injury. They requested leave of absence with pay. These Defendants offered the Plaintiffs leaves without pay. This decision constituted disparate treatment of Plaintiff. By this action, the Defendants constructively discharged the Plaintiffs.

50. The denial of leaves with pay was not an isolated act of disparate treatment. The Plaintiffs experienced for many years that these superior officers practiced a double standard on their dealings with the Plaintiffs and other female officers.

51. The Plaintiffs made their supervisors aware this environment posed a formidable barrier to their full participation in the work of the Revere Police Department. Their superiors officers took no remedial action. The response of these superior officers did

7

not discourage male officers and supervisory personnel from perpetuating a hostile and discriminating work environment. As a result of this failure of leadership, the Plaintiff experienced intimidation, humiliation, and stigmatization.

**Sergeant Thomas Doherty**

52. Other ranking officers practiced the double standard toward females that helped to create the hostile environment that the Plaintiff experienced. Sergeant Doherty was one of those ranking officers. The Plaintiff also knows from personal experience that Sergeant Doherty deliberately embarrassed female officers, screamed at them, made remarks about their abilities and conduct and did not treat them in the same manner he treated male officers.

53. Sergeant Doherty's double standard was well known as it pertains to the use of profanity. One officer at the January 7, 1999, meeting, reported that Sergeant Doherty was in the habit of saying: "Young lady, you will not use that kind of language in front of me. If you do, I will send you home. My wife and my daughter never use that kind of language and neither will you."

54. Sergeant Doherty did not make the same kind of remark, make the same kind of comparison with his son or father, or threaten male officers with dismissal for using profanity. The Plaintiffs and other female officers found Sergeant Doherty's double standard had a negative impact on the terms and conditions of their employment of the female officers.

55. On or about April 18, 1997, three female officers, Curcio, Fish, and Malatesta, colleagues of the Plaintiff, responded to a call regarding a loud group of male youths on Broadway and Revere. Some of the youths later came to the station to complain about Officer Curcio's use of profanity.

56. Sergeant summoned the three police officers who responded to the call. He then subjected them to a line-up. He paraded them past the front door of the office without explaining to them the purpose of the line-up. As each officer walked past the door, he would ask the youths: "Is that the one?" The youths finally identified Officer Curcio.

57. Sergeant Doherty then took Officer Curcio into the "Captain's Room." The youths were on the other side of the wall. They could hear everything that the Sergeant Doherty said to Officer Curcio. Sergeant Doherty did not speak to Officer Curcio in a normal tone of voice. The youths on the other side of the wall could hear everything he said.

58. Sergeant Doherty berated all three females within hearing distance of the youths. His attack on these three females in this manner constituted a form of public humiliation. This attack severely undermined these officers and their ability to deal effectively with the public. It destroyed any confidence or respect these youths may have had in these officers. The Plaintiffs know of no occasion in which Sergeant Doherty treated male officers in a similar manner for similar conduct.

59. At the time of the Super Bowl in 1998, Sergeant Doherty made several sexually offensive remarks in a loud and distinctly hostile manner. There was a female sports commentator who was involved in the game.

60. Sergeant Doherty made the following remarks about the commentator and the game. He said: "She was no fucking good and women should not be allowed to comment on sports events and this bitch probably gave sex or a blow job to someone for the job. Anyway, she was probably related to someone and that's how she got the job. There were several female officers present during Sergeant Doherty's tirade against the female sports commentator.

61. Sergeant Doherty's comments were loud, demeaning, deeply offensive, and humiliating to the female officers in the Department, including Plaintiff. Sergeant Doherty's loud, public, and unequivocal degradation of the female sports commentator reflected a misogynistic opinion of female professional abilities in general. As a superior officer of the Revere Police Department, Sergeant Doherty's negative opinion of female professional abilities, including the professional abilities of the Plaintiffs, heightened the hostility, humiliation, and degradation that permeated the workplace environment.

**Sergeant John Nelson**
62. Sergeant John Nelson, another ranking officer and supervisor in the Revere Police Department also contributed to the pervasiveness of the hostile environment that the Plaintiff experienced.

63. On one occasion, Office Malatesta female was at the window talking to a member of the public. While she was talking, Sergeant Nelson held up a magazine centerfold of a naked woman and made loud comments about her breasts and crotch area. Sergeant Nelson's conduct was demeaning and humiliating, not just to Officer Malatesta, but to the other females of the Revere Police Department.

64. Sergeant Nelson's lewd and offensive conduct constituted a form of public humiliation and stigmatization. This kind of public humiliation stigmatized female police officers. It had a negative effect on the terms and conditions of their employment. It affected their effectiveness with the public and their status within the Department.

**Chief James Russo**
65. Chief Russo's treatment of female officers gave permission to his male subordinates to treat female officers in a demeaning and humiliating manner. His comments and conduct stigmatized female officers, including the Plaintiff. His demeanor created the impression that female officers, including the Plaintiff, were less than capable, competent, members of the Department.

66. The Citizens Police Academy is a public relations forum in which the Chief and other ranking officers introduce subordinate officers to the general public. On or about February 23, 1997, Chief Russo held such a forum. The audience included several

officer and members of the public. Part of the program required that the Chief introduce Sergeant Papasodora and Officer Mangino-female-to the audience.

67. The Chief spoke at great length in praise of Sergeant Papasodora. He appeared to forget Officer Mangino. When he was made aware of the situation, he remarked that Officer Mangino and O'Hara were the first females he hired. He then continued: "These are not the good old days when we didn't have to hire females." This comment stigmatized the female officers. It clearly implied that female officers were not at welcome as male officers.

68. The Plaintiff and other female officers present experienced the Chief's remarks as demeaning and offensive. There were members of the public present at this meeting. They heard the remarks made by the Chief. The Chief's remarks and behavior did not communicate the same enthusiasm and support for the female officers' employment as it did for male officers' employment.

69. The Chief is the highest ranking officer in the Department. On one occasion, he saw four (4) female officers behind the station engaged in conversation. He walked by and commented: "What is this, a WIC meeting?" The obvious reference to the program for pregnant welfare mothers was not lost on the officers. This comment stigmatized the officers. It portrayed them, not as the competent, able police officers they were, but as females on welfare receiving public assistance.

**The Report & Underwear Incident**
70. On or about January 7, 1999, the female officers, in response to their experiences in this hostile environment, requested a Department meeting. The subject of the meeting was sexual harassment, the Department policy on harassment, working conditions, and Department maternity policy. At the time the Department had no policy on sexual harassment or maternity leave and was in violation of M.G.L.c 151 § 3(a)(1)(2).

71. On or about January 14, 1999, Captain Chaulk and Captain Roland produced a report of the meeting. **(See Attached Department Report)** The report substantiated that the female officers were experiencing an environment of intimidation. It stated among other things that the female officers wanted a collective meeting because of the fear of reprisal and punishment from superior officers. The report also noted that the Department had taken no action to remedy the conditions that they had found abusive and offensive. The Report documented a fear of reprisal and punishment.

72. Despite the meeting on January 7, 1999 and the report and recommendations of January 14, 1999, the Revere Police Department took no action. It failed to remedy the hostile environment about which the female officers had complained.

73. The environment seemed to become more hostile as a result of the meeting and the subsequent report. The Plaintiffs and other females in the Department began to fear for their physical safety after an automobile assigned to females was vandalized in the parking lot that belonged to the local International House of Pancakes.

74. On or about February 26, 2001, a pair of women's underwear was hung on the bulletin board in the guard room of the Revere Police Department. **(See Attached Fist Report)** This room is accessible to members of the Department as well as the general public. The underwear was placed in prominent position where it was visible to both the general public and the members of the Department.

75. The underwear remained on display until March 2, 2001. No one, including the ranking officer in charge, removed the offending article for several days. **(See Attached Second Report)** This incident was consistent with the culture of degradation, humiliation, and hostility that the Plaintiffs and other females experienced during the period the were employed by the Revere Police Department.

76. The Revere Police Department did not respond promptly. It did not investigate. It took no remedial action. It had no policy for dealing with complaints for sexual harassment. It had no maternity leave policy.

77. The Plaintiffs experienced the "underwear incident" as retaliation against them and the females who complained. Retaliation creates fear. The Plaintiffs and other female officers found the incident offensive, demeaning and intimidating. It constituted a form of public humiliation that had a negative impact on the terms and conditions of the female officers and their effectiveness with the public.

78. The Plaintiff, Terri Pechner-James, was diagnosed with Post-Traumatic Stress Disorder. The Division of Administrative Law Appeals made a final adjudication and recommended consideration of her condition to a Medical Panel. The Regional Medical Panel of the Public Employee Retirement Administration Commission on July 28, 2003, unanimously confirmed this diagnosis. **(See Attached Medical Panel Decision).** She has been unable to work at the Revere Police Department since March 13, 2001. At the time of her constructive discharge in 2001, the Plaintiff was earning approximately $40,000 annually. She filed a request for benefits. Despite the diagnosis, Mayor Ambrosino denied Plaintiff's request for benefits pursuant to M.G.L.c 41 § 111F. Again in 2003, despite the unanimous decision of the Medical Panel on July 28, 2003, the City of Revere and its Retirement Board has continued to deny the Plaintiff, Terri Pechner-James, her disability retirement benefits. The Plaintiff has been unpaid since March 13, 2001.

79. The barriers created by the Defendants were so formidable that the Plaintiff, Terri Pechner-James, has been unable to work at the Revere Police Department since March 13, 2001. On March 12, 2001, the Plaintiff filed the requisite Complaint with the Massachusetts Commission Against Discrimination.

**Facts: Sonia Fernandez**
The facts that give rise to the claim of Sonia Fernandez incorporate the paragraphs stated above and events described in detail below:

80. Plaintiff, Sonia Fernandez, was sworn in as a Revere Police Officer on September 21, 1995. Plaintiff was one of seven female officers who were also hired at the same time. She has taken several courses and has improved her professional competence during her tenure.

81. During the years of her employment, Plaintiff experienced intimidation, humiliation, and stigmatization. The conduct of the Defendants posed a formidable barrier to the Plaintiff's full participation in the workplace.

82. The Defendants, City of Revere, Revere Police Department, and the supervisors and ranking officers created a hostile environment. The Defendants are strictly liable for the damage they caused the Plaintiff and for the Plaintiff's constructive discharge from her employment.

83. On or about May 1996, Captain Roland called Plaintiff at home and asked her to respond to the Shirley Avenue area. Plaintiff responded. The call involved a homicide. The Captain instructed Plaintiff not to wear her Police uniform or carry a firearm. He told her he only needed her to translate. Plaintiff arrived at the scene dressed in a baseball cap and wearing jeans. One of the Revere Police officers looked at her and asked her if she was working as an undercover hooker that night. Plaintiff was humiliated. Her supervisor had devalued her professional skills and abilities. Other officers at the scene commented on her diminished status.

84. On many occasions during 1996 and 1997, Lieutenant Ford routinely made personal and hostile comments about Plaintiff's physical appearance, hair, and weight. In addition to personal attacks, Plaintiff experienced hardship and stress because of the working conditions at the Revere Police Station. OSHA filed a formal report about the poor working conditions at the Revere Police Department. The report documented, among other things, the lack of a bathroom for females.

85. The Plaintiff experienced repeated emotional trauma as a result of her working environment. On June 24, 1997, Plaintiff went to the hospital. She was experiencing loss of appetite, sleeplessness, and crying spells. The hospital recommended she be excused from work for the next four days. Again, on or about November 11, 1997, the Plaintiff went to the hospital suffering from work-related stress. The hospital prescribed Valium and recommended counseling.

86. The Plaintiff is currently being counseled by the North Suffolk Counseling Services of Chelsea, Massachusetts. She is currently being treated for Post Traumatic Stress Disorder and Panic Disorder. She is also physically disabled and is unable to "perform the essential tasks of a Police Officer without posing a risk to herself, her fellow officers and/or the public at large." **(See Sonia Fernandez Medical Package including Medical Opinion addressed to Chief Reardon.)**

87. In the winter of 1997, the Plaintiff was placed on "walking routes more frequently than male members of the Department. On or about December 15, 1997, Captain Chaulk

assigned Plaintiff to a walking route at the Northgate Shopping Center. The Captain then sat in an unmarked cruiser to monitor Plaintiff's activities. On one occasion, that winter, the Captain ordered Plaintiff out of a cruiser and placed her on walking route without work related justification. The Plaintiff found the walking route "punishment" very upsetting. She repeatedly retreated to the ladies locker room to compose herself because of the physical and emotional strain of the job.

88. As a direct and proximate cause of the Defendant's conduct the Plaintiff was forced to withdraw from the Revere police Department. Prior to her withdrawal, she requested a leave of absence with pay. The Defendants offered the Plaintiff leave without pay. This decision constituted disparate treatment of Plaintiff. The Defendants constructively discharged the Plaintiff. Even though the Plaintiff returned to work temporarily, she was unable to return to her usual work in an environment free from sexual hostility.

89. On or about January 7, 1999, Plaintiff attended a meeting at the Revere Beachmont substation. The female patrol division requested the meeting. The purpose of the meeting was to discuss sexual harassment and the distress caused by such harassment within the Department.

90. Plaintiff, Sonia Fernandez, experienced with great distress the conduct of her supervisors and coworkers referring to Hispanics as "Spics" and African-Americans as "Niggers". The Defendant's attitude was clearly demonstrated by the following incident. In common circulation within the Revere Police Department, was a booking photograph of an African-American. The photograph had been altered to include a grass skirt, spear, flies emanating from his head and other offensive and stereotypical features.(**See Attached Booking Photograph.**) The Plaintiff experience stress, fatigue, loss of appetite and sleeplessness as a direct result of this of this offensive and discriminatory environment.

91. At the time of the meeting, the Department had no policy on sexual harassment, no maternity leave policy, and was in violation of M.G.L.c. 151B § 3(a)(1). On or about January 14, 1999, Captain Chaulk and Captain Roland produced a report of the meeting requested by the female patrol division. **(See Attached Department Reports)**

92. The report substantiated that the female officers were experiencing an environment of intimidation. It stated, among other things, that the female officers wanted a collective meeting because of the fear of reprisal and punishment from supervisors. The report also noted that the Department had taken no action to remedy the conditions that they found abusive and offensive. The Report documented a fear of reprisal and punishment.

93. Despite the meeting on January 7, 1999, the Revere Police Department took no action to remedy the hostile environment. On the contrary, the environment seemed to become more hostile. The Plaintiff and the other females in the Department began to fear for the physical safety after a cruiser assigned to females was vandalized in the parking lot belonging to a local International House of Pancakes.