**Retirement Board: Please** ~~your address~~ ~~hone~~ **number here.**

Revere Retirement Board
281 Broadway
City Hall
Revere, MA 02151
(781) 286-8173

To: [ Revere ] Retirement Board

This is an application to involuntarily retire the member named below. Attached is an explanation of the member's rights to a hearing and to appeal, and a brief statement of the member's retirement options. The member should contact his/her retirement board for further information or assistance.

A fair summary of the reasons for filing this application is below. The retirement board will review this application, together with information supplied by the employer and, if desired, by the member. If appropriate, the retirement board may then request a regional medical panel be convened. Based on the information gathered and the medical panel's opinion, the board will vote whether to approve or deny this application. The application will then be forwarded to the Public Employee Retirement Administration Commission for review and approval.

Pursuant to G.L. c. 32, §16(1), I respectfully request that [ Terri Pechner-James ] (name of member), whose Social Security Number is [ 017 - 56 - 5959 ], be retired on the basis of (please check one):

[ ] Ordinary Disability    [✓] Accidental Disability    [ ] Superannuation

I offer the following fair summary of facts as the basis for my opinion that the member should be involuntarily retired:

[ ✓ see fair summary of facts attached ]

I am submitting this form and the following attachments to the member's retirement board:

- A description of the member's job that includes all of his/her duties and responsibilities. I have specified those duties that are considered to be essential.

- Copies of all applicable medical information and accident reports.

- I will send a copy of this application form, a brief statement of the member's retirement options, and a statement of the member's rights to a hearing and review to the member by certified mail. I will then file a notice of delivery, including the certified mail return receipt, with the member's retirement board.

| Terence K. Reardon | Chief of Police |
|---|---|
| Name of Department Head (print) | Title of Department Head |
| _(signature)_ | 07/17/02 |
| Signature of Department Head | Date |

COMMONWEALTH OF MASSACHUSETTS | PUBLIC EMPLOYEE RETIREMENT ADMINISTRATION COMMISSION
WEB | WWW.MASS.GOV/PERAC

'Chapter 32: Section 16 of the General Laws of Massachusetts Involuntary Retirement; Right to a Hearing; Right of Review or Appeal.

## on 16 (1): Involuntary Retirement and Right to a Hearing

 y head of a department who is of the opinion that any member employed therein should be retired for superannuation, ordinary disability or accidental disability, in accordance with the provisions of section five, six, or seven, as the case may be, may file with the board on a prescribed form a written application for such retirement. Such application shall include a fair summary of the facts upon which such opinion is premised.

The applicant shall forthwith deliver to such member by registered mail, with a return receipt requested, a true copy of such application, together with a brief statement of the options available to such member on his retirement and a statement of his right, if any, to request a hearing with regard to such retirement and of the right, if any, of review available to him, as provided for in this section, in case he is aggrieved by any action taken or decision of the board rendered or by failure of the board to act upon his request or to render a decision within the time specified in this subdivision. Upon such delivery to such member the head of the department, or one acting in his behalf, shall file with the board under the penalties of perjury a written notice of such delivery, including the date thereof.

(b) Any member in service classified in Group 1, Group 2 or Group 4 who has attained age fifty-five and completed fifteen or more years of creditable service, or any member in service so classified who has not attained age fifty-five but who has completed twenty or more years of creditable service, for whom an application for his retirement is filed by the head of his department as provided for in paragraph (a) of this subdivision, may, within fifteen days of the receipt of his copy of such application, file with the board a written request for a private or public hearing upon such application. If no such request is so filed, the facts set forth in such application shall be deemed to be admitted by such member; otherwise such hearing shall be held not less than ten nor more than thirty days after the filing of the request. The board, after giving due notice, shall conduct such       g in such manner and at such time or times as the best interests of all parties concerned may require.       oard shall prepare and file with its clerk or secretary a certificate containing its findings and decision,       s of which shall be sent to the proper parties within fifteen days after completion of such hearing.

(c) If the board finds that any member should be retired under the provisions of this subdivision, he shall receive the same retirement allowance as he would have received had the application been made by himself. If the board finds that such member should not be retired, he shall continue in his office or position without loss of compensation, subject to the provisions of sections one to twenty-eight inclusive, as though no such application had been made.

There is no subdivision (2))

## Section 16 (3): Right of Review by District Court

a) Any member classified in Group 1, Group 2 or Group 4 who has attained age fifty-five and completed fifteen or more years of creditable service, or any member so classified who has not attained age fifty-five but who has completed twenty or more years of creditable service, or any such member who is a veteran and has completed ten or more years of creditable service, and who is aggrieved by any action taken or decision of a board or the public employee retirement administration commission rendered with reference to his involuntary retirement under the provisions of subdivision (1) or to his removal or discharge as set forth in subdivision (2), or any member who is aggrieved by any action taken or decision of a board or the public employee retirement administration commission rendered with reference to his dereliction of duty as set forth in section fifteen, may, within thirty days after the certification of the decision of the board, bring a petition in the

**Section 16 (3): Right of Review by District Court (Continued)**

district court within the territorial jurisdiction in which he resides praying that such action and decision be reviewed by the court.

such notice as the court deems necessary, it shall review such action and decision, hear any and all evidence and determine whether such action was justified. If the court finds that such action was justified the decision of the board or the public employee retirement administration commission shall be affirmed; otherwise it shall be reversed and of no effect. If the court finds that such member was unjustifiably retired, removed or discharged from his office or position he shall be reinstated thereto without loss of compensation. The decision of the court shall be final.

(b) Any member whose office or position is subject to chapter thirty-one or to the rules and regulations made under authority thereof, who is aggrieved by any action taken or decision of a board or the public employee retirement administration commission rendered as described in paragraph (a) of this subdivision shall, for the purposes of sections one to twenty-eight, inclusive, have and retain such of the rights provided by sections orty-two A, forty-two B, forty-three and forty-five of chapter thirty-one as applied to his particular office or position, and the court shall, in addition to the matters it is required to review under such sections of chapter thirty-one, affirm or disaffirm the decision of the board or the public employee retirement administration ommission as provided for in paragraph (a) of this subdivision.

**(4): Right of Appeal to Contributory Retirement Appeal Board**

here shall be an unpaid contributory retirement appeal board which shall consist of three members as follows: n assistant attorney general who shall be designated in writing from time to time by the attorney general who shall act as chairman, the public employee retirement administration commission or an assistant who shall be esignated in writing, from time to time, by the said commission, and a member appointed by the governor or a term of five years. In the event the matter before the contributory retirement appeal board deals with ny matter related to disability retirement or interim benefits as awarded by the division of administrative law , the commissioner of public health or his designee shall substitute for the public employee retirement stration commission.

e members of the contributory retirement appeal board shall be compensated for any expenses incurred in e performance of their official duties. On matters other than those subject to review by the district court as rovided for in subdivision (3), or other than those which would have been subject to review had the requirent for the minimum period of creditable service been fulfilled, any person when aggrieved by any action en or decision of the retirement board or the public employee retirement administration commission endered, or by the failure of a retirement board or the public employee retirement administration commission act, may appeal to the contributory retirement appeal board by filing therewith a claim in writing within een days of notification of such action or decision of the retirement board or the commission, or may so peal within fifteen days after the expiration of the time specified in sections one to twenty-eight, inclusive, hin which a board or the commission must act upon a written request thereto, or within fifteen days after expiration of one month following the date of filing a written request with the board or the commission if time for action thereon is specified, in case the board or the commission failed to act thereon within the e specified or within one month, as the case may be. The contributory retirement appeal board, after giving notice, shall, not less than ten nor more than sixty days after filing of any such claim of appeal, assign such peal to the division of administrative law appeals for a hearing. The division of administrative law appeals maintain the official records of the contributory retirement appeal board. After the conclusion of such ing, the division of Administrative Law Appeals shall submit to the parties a written decision which shall final and binding upon the board involved and upon all other parties, and shall be complied with by such

## Section 16 (4): Right of Appeal to Contributory Retirement Appeal Board (Continued)

board and by such parties, unless within fifteen days after such decision, (1) either party objects to such decision, in writing, to the contributory retirement appeal board, or (2) the contributory retirement appeal board, in writing, that said board shall review such decision and take such further action as is appropriate and consistent with the appeal provided by this section. The contributory retirement appeal board shall then pass upon the appeal within six months after the conclusion of such hearing, and its decision shall be final and binding upon the board involved and upon all other parties, and shall be complied with by such board and by such parties. Any person, upon making an appeal involving a disability retirement allowance, shall be permitted to retire for superannuation retirement, if otherwise eligible, pending the decision of the contributory retirement appeal board, but in no event shall such action prejudice the person from receiving any further benefits which the contributory retirement appeal board may grant in its decision nor shall the person upon a finding in favor of the employer be required to reimburse the employer for payments made prior to the decision of the contributory retirement appeal board.

On appeals involving disability or where medical reports are part of the proceedings, the contributory retirement appeal board may request further information from the members of the appropriate regional medical panel, or may employ a registered physician to advise them in determination of an appeal.

The contributory retirement appeal board shall have the power to subpoena witnesses, administer oaths and examine such parts of the books and records of the parties to a proceeding as relate to questions in dispute. Fees for such witnesses shall be the same as for witnesses before the courts in civil actions, and shall be paid from the Appropriation Fund of the division of administrative law appeals.

The contributory retirement appeal board, acting through the division of administrative law appeals, shall arrange for the publication of its decisions and the cost of such publication shall be paid from the Appropriation Fund of the division of administrative law appeals.

Contributory retirement appeal board shall establish a fee structure for appeals brought under this section, which shall be subject to the approval of the commissioner of administration.

The division of administrative law appeals shall submit to the contributory retirement appeal board on an annual basis a report on the status of all cases that have been assigned to the division of administrative law appeals for a hearing.

## (5): Provisions Not Applicable to Certain Members

The provisions of this section relative to the right of any member to a hearing or to the right of review by the district court shall not apply in the case of the removal or discharge of any state official or of any official of any political subdivision of the commonwealth for which provision is otherwise made in any general or special law, anything in this section to the contrary notwithstanding. The provisions of this section relative to the right of any member to a hearing or to the right of review by the district court shall not apply to any teacher or principal or superintendent of schools employed at discretion or any superintendent employed under a contract, for the duration of his contract, or any principal or supervisor, who has been dismissed, demoted, or removed from a position by a vote of a school committee under the provisions of section forty-two, forty-two A or section sixty-three of chapter seventy-one. The provisions of this section shall not apply to any member classified in Group 3.

## Information About Retirement Options

Your retirement board will provide you with a Choice of Retirement Option Form, and will assist you in making an informed selection about selecting the option that is best for you, but a brief description of the options available to you is included here. Any public employee who retires on the basis of ordinary or accidental disability or superannuation may elect to have his or her retirement allowance paid according to one of the three following Options. If you fail to select an Option, the allowance will be paid under Option B.

## Option A

Election of Option A means that you will receive the full retirement allowance in monthly payments as long as you live. Allowance payments will cease upon your death and no benefits will be provided to your survivors.

## Option B

Option B provides you with a lifetime allowance which is 3% to 5% less per month than Option A. The annuity portion of your allowance will be reduced to allow a benefit for your beneficiary. If your death occurs before the total payments of the annuity portion of your allowance equal your total accumulated deductions at your retirement, the unexpended balance of your total accumulated deductions will be paid to your surviving beneficiary of record, (or, if there is no beneficiary living, the person or persons who appear to be entitled in the judgement of your retirement board).

## Option C

Selecting Option C means that the allowance payments that you receive during your lifetime will be approximately 20% less than those you would have received under Option A. Upon your death, your designated beneficiary will be paid a monthly allowance for the remainder of his or her lifetime. That allowance will be equal to two-thirds of the allowance which was being paid to you at the time of your death. Only your spouse, former spouse who has not remarried, child, father, mother, sister or brother may be your beneficiary.

## Spousal Acknowledgment

A retirement option election of any married member is not valid unless the signature of the member's spouse indicating the member's spouse's knowledge and understanding of the retirement option selected accompanies it.



THE CITY OF REVERE, MASSACHUSETTS

POLICE DEPARTMENT
Terence K. Reardon • CHIEF OF POLICE
23 PLEASANT STREET, REVERE, MA 02151

(781) 284-1212  FAX (781) 286-8328

07/17/02

Certified Mail Return Receipt Requested
Receipt No. 7001 1140 0003 0342 4185

Officer Terri Pechner-James
63 Lancaster Avenue
Revere, MA 02151

RE:  Involuntary Application for Accidental Disability Retirement

Dear Officer Pechner-James:

I have prepared, and am hereby providing you with your copy of the Application for Involuntary Accidental Disability Retirement, in accordance with the provisions of M.G.L. Chapter 32, Section 16.

I am also enclosing a copy of M.G.L. Chapter 32. Section 16 for your records. I have been advised that the Revere Retirement Board will be sending, directly to you, a letter with your particular financial data as well as options forms, etc..

In the interim, should you have any questions, comments, or concerns, please do not hesitate to contact the Revere Retirement Board.

Sincerely,

Terence K. Reardon
Chief of Police



**POLICE DEPARTMENT**

**Terence K. Reardon • CHIEF OF POLICE**

23 PLEASANT STREET, REVERE, MA 02151

(781) 284-1212  FAX (781) 286-8328

07/17/02

Carolyn M. Russo
Revere Retirement Board
281 Broadway
City Hall
Revere, MA 02151

      RE:  Notice of Delivery – Terri Pechner-James

Dear Ms. Russo:

Please be advised that I have sent, as of this date, via
Certified Mail, Return Receipt Requested, a copy of the
Attached, Involuntary Application for Accidental Disability Retirement
to the above referenced individual.

is my understanding that you will be mailing
Directly to Officer Pechner-James, the financial information which she
will require in order to make informed decisions with regard to her various options. I
would ask that you also send to her, the various other options forms including the
beneficiary form etc.....

In addition, the individual was provided with her rights in
accordance with the applicable provisions of Massachusetts
General Law, Chapter 32.

Should you have any questions, comments, or concerns, please feel
free to contact me at your convenience.

Sincerely,

Terence K. Reardon
Chief of Police

Addendum Sheet
To the
Involuntary Retirement Application

In the Matter of:

Terri Pechner-James
SS# 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

See Fair Summary of Facts Hereunder

## Fair Summary of Facts
### Terri Pechner-James
### 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

Terri Pechner-James is employed by the Revere Police Department in the capacity of Police Officer.   On April 19th, 2001, Officer Pechner-James filed a Public Safety Injury Report along with applications for indemnification of wages for any lost time, as provided by M.G.L. Chapter 41, Section 111F, and for indemnification of medical bills as provided for by M.G.L. Chapter 41, Section 100. (Copies attached.) In her injury report, Officer Pechner-James indicated that her disability first began on 3/14/2001, and resulted from a "cumulative condition". In a letter accompanying her report, Officer Pechner-James attached a letter from Dr. Eric Keroack, indicating that Officer Pechner-James was suffering from "significant emotional stress". Further in his letter, Dr. Keroack explains that this condition resulted from a combination of environmental stressors that exist in the internal arena of her employment. He further stated that she had revealed to him that she had been subjected to significant episodic sexual harassment and persistent emotional pressure from fellow male officers. (Copy of Letter attached.) Officer Pechner-James' report also made reference to two additional doctors, however, no additional medical information was included with her initial report.

Given the above circumstances, then Chief Roy Colannino consulted with the City's Third Party Claims Administrator, Meditrol, Inc., for the purpose of obtaining Meditrol's guidance as to whether or not Officer Pechner-James' claim should be treated as duty related, or, in the alternative, as a personal illness. Meditrol, Inc., recommended, and Chief Colannino followed a recommendation of, contacting Officer Pechner in writing, and indicating that her claim was under review and that, given the fact that additional doctors were involved, to seek additional information from any other doctor who might have a bearing on Officer Pechner's claim. (Copy of letter attached dated 4/25/01.)

On or about April 27, 2001, Officer Pechner provided a letter to the Revere Police Department from Dr. Susan Rudman, Licensed Psychologist, indicating that Officer Pechner first came to see her on March 21, 2001, concerning work related stressors. Officer Pechner had reported physical as well as psychological difficulties related to the work setting and dealings with colleagues. (See copy attached.)

After careful review and consideration of the medical data available, Meditrol, Inc., recommended a denial of the claim for recognition as injured in the line of duty. Said denial was based on the criteria as set forth in M.G.L. Chapter 41, Section 100, and took into consideration interpretive case law as well as guidelines provided through the Police Chief's Guide to Handling Injured on Duty Claims. (See copy of pertinent section of Atty. Collins Treatise attached, as well as letter of denial to Officer Pechner dated June 1, 2001.)

On or about June 15th, 2001, The Revere Police Department received additional correspondence from Dr. Eric J. Keroack.. In his letter, Dr. Keroack, further stated that "I

am sure that you would agree that this brain disability could potentially place her "at-risk on the streets", and such a risk is too high to take." While Dr. Keroack's letter was optimistic in terms of a prognosis, it nonetheless did not provide any insight as to when a ...rn to work might be possible. (Copy of Letter Attached.)

On July 11th, 2001, based on a recommendation from Meditrol, Inc., the Revere Police Department sent a letter of acknowledgment to Dr. Keroack pertaining to his June 15th letter, along with a request for additional information pertaining to Officer Pechner-James' status at that point in time.

Dr. Keroack responded on July 17th, 2001, by making his entries and comments directly onto the July 11th letter. (See copy attached.) In his response, Dr. Keroack questioned the meaning of "foreseeable future" as it pertained to a possible return to work scenario.

On August 13th, 2001, based on a recommendation from Meditrol, Inc., Capt. Frederick Roland of the Revere Police Department sent a clarifying letter to Dr. Kerouac, attempting to address his comments pertaining to a possible return to work in the "foreseeable future". Dr. Keroack responded on or about the 17th of August, 2001. A copy of his response is attached.

During October of 2001, based on a recommendation by Meditrol, Inc., Capt. Roland wrote to Dr. Keroack to obtain an update as to Officer Pechner-James status at that point in time. Dr. Keroack responded on October 29th, 2001.

In the second paragraph of his letter, Dr. Keroack states:

> *"On a less encouraging note, Officer Pechner-James continues to experience debilitating symptoms associated with any type of encounter that requires her to interact with the Revere Police Department (such as official meetings, filling out forms in the precinct, contact with the persons that initiated her PTSD reactions, and even chance encounters with persons that remind her of these events.)"*

Further in his letter, Dr. Kerouac goes on to state that:

> *"Officer Pechner-James should not return to work at the Revere Police Department at any foreseeable time in the future. Such a situation will only serve to destroy her chances for a complete recovery from PTSD and her return to a productive professional life."*

During April of 2002, in an effort to determine Officer Pechner-James status at that point in time. I wrote to Dr. Keroack, and asked that he provide me with an update as to her condition. Dr. Keroack responded on June 3rd, 2002. A copy of his letter is attached.

In his response to me, Dr. Keroack stated that:

> *"At present, Officer Pechner-James seems to be doing well on medication for her PTSD. She is taking Paxil at 20mg. per day, and she has no significant problems with this treatment. Her "panic attacks" are well controlled, and her overall level of functioning is markedly improved. She is essentially on "maintenance management" of her PTSD and I do not expect that her present life circumstances should exacerbate her steady recovery. This is, however, a lifestyle that does not include performing the duties of a Revere Police Officer… a challenging and demanding job."*

Further in his letter, Dr. Keroack states the following:

> *"One will not be able to guarantee that Officer Pechner-James is "immune" to a possible relapse of PTSD (as only the return to the exact environment can predict the potential for relapse of PTSD, i.e., Vietnam veterans can acutely relapse during trips to Vietnam……………"*

Given the above, coupled with the fact that Officer Pechner-James has been unable to report for duty, as needed and as required in the public safety interests and operational needs of the City of Revere, I hereby respectfully request that consideration be given to providing this individual with a retirement which would then allow me to fill her slot with an individual capable of reporting for duty on a regularly scheduled basis. As the Chief of Police, I have concerns, given Dr. Keroack's assessment that, under certain circumstances, Officer Pechner could "snap" should she have a relapse while on duty. Should that occur, she could imperil herself, her fellow officers and/or the public at large.

While I have been advised that to date, no appellate court decision has recognized a purely psychological disability as coming under M.G.L. Chapter 41, Section 111f, I have also been advised that decisions relative to retirements are not always held to the same standard.

As such, again, I respectfully request that consideration be given this individual for an appropriate form of retirement and that a three physician medical panel be scheduled on her behalf for the purpose of opining as to whether or not, in their best medical opinion, this individual is disabled; whether or not her disability is likely to be permanent, if in fact she is disabled; and, if so, whether or not her disability, if she is disabled, is deemed to be duty related or, in the alternative, the result of a personal illness.

Thanking you in advance for your consideration with regard to this matter, I remain

Respectfully,

Terence K. Reardon
Chief of Police

**Addendum Sheet**
**To the**
**Involuntary Retirement Application**

**In the Matter of:**

**Terri Pechner-James**
**SS# 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**

Medical Data filed hereunder

# Eric J. Keroack, M.D., FACOG

Gynecology and Counseling

(781) 289-2683
Fax: (781) 284-1167
Office Hours: M,T,Th,F 9-5

103 Broadway
Revere, Massachusetts 02151

Police Chief Terence K. Reardon
City of Revere Police Department
23 Pleasant St.
Revere, Massachusetts 02151

June 3, 2002

RE: Officer Terri Pechner-James

Dear Chief Reardon,

I am sorry that this letter is late in coming, but my schedule has been quite hectic these days. I hope that the following information will still be useful to your decision making process.

I last saw Officer Pechner-James on 5/16/02 and her next appointment is scheduled for 6/10/02. At present, Officer Pechner-James seems to be doing well on medication for her PTSD. She is taking Paxil at 20mg. Per day, and she has no significant problems with this treatment. Her "panic attacks" are well controlled, and her overall level of functioning is markedly improved. She is essentially on "maintenance management" of her PTSD and I do not expect that her present life circumstances should exacerbate her steady recovery. This is, however, a lifestyle that does not include performing the duties of a Revere Police Officer...a challenging and demanding job.

I know that you have shared my concerns for her ability to perform in The Revere Police Department and that you do not want to place any of your officers in harm's way. With that in mind, I have addressed the option of "returning to work" with her and we have explored the potential risks and benefits of such a plan. She informs me that there have been leadership changes since her disability began, and that these have been a positive force within the department. She seems to have especially high regard for your abilities and had supported your promotion to Police Chief. Those are clearly good signs with regards to her potential relapse into PTSD upon a return to work. Although there is no way to absolutely predict her response to reentry into the precinct, these changes seem to be important to her sense of trust and safety within the Police Department.

In addition, Officer Pechner-James expresses a real desire to return to police work. She feels that she is a police officer at heart and wants to regain this position in her life. She states that she has worked hard to become a good police officer and that she is not prepared to end her career at this time. She believes that, if the previous conditions that potentiated her illness have been addressed and rectified, then she can resume her duties as a Revere Police Officer. I can support this position.

Consequently, I have begun to adjust our treatment strategy towards "management of returning to work" and preparing to confront the potential stresses of such a move. I believe that Officer Pechner-James will be able to return to work in 2-3 months if all goes well with this phase of her treatment. There is only one condition that

I will ask you to keep in mind. One will not be able to guarantee that Officer Pechner-James is "immune" to a possible relapse of PTSD (as only the return to the exact environment can predict the potential for relapse of PTSD, i.e. Vietnam veterans can acutely relapse during trips to Vietnam—not a great comparison, but it makes the principle clear). Consequently, I believe that during her first 90 days back on duty, she should have evaluations of her PTSD performed on at least an every 30 days basis. In that way, if she *is* beginning a subtle relapse, it can be discovered before any lives are at risk. I think this may be a bit "conservative" but in police work there isn't always a chance to "have a second opportunity" to review problems.

In essence, I believe that Terri Pechner-James will be able to successfully return to duty late August/mid September providing that we all stay alert to her initial entry back into police work. I do not foresee Officer Pechner-James failing to traverse the road back to her position, I merely wish to take all the necessary precautions to insure her safety and the safety of all of those involved with her. If you have any questions, please feel free to contact me.

Sincerely,

Eric J. Keroack, M.D.

Eric J. Keroack M.D. FACOG
Gynecology and Counseling

(781) 289-2683
Fax (781) 284-1167
Office Hours: M,T,Th,F 9-5

103 Broadway
Revere, Massachusetts 02151

October 29, 2001

Dear Chief Colannino;

I am writing to you in order to bring you up-to-date on the condition of Officer Terri Pechner-James. As you are well aware, Officer Pechner-James has been attempting to recover from Post-Traumatic Stress Disorder (PTSD) since being diagnosed in March 2001. Her present condition is a combination of good news and bad news. On the positive side, in matters that do not involve interaction with the Revere Police Department, Officer Pechner-James has shown substantial improvement. Her overall anxiety level has diminished, her ability to function has partially normalized, and her general prognosis is encouraging. I am sure that her recent heroic efforts to rescue injured motorists exemplify the level of improvement that her "ordinary" life has achieved. Certainly, a person who had the level of brain trauma she displayed 3-4 months ago would not have been able to react so calmly under these demanding conditions. I am pleased that she has progressed in this area of her life.

On a less encouraging note, Officer Pechner-James continues to experience debilitating symptoms associated with any type of encounter that requires her to interact with the Revere Police Department (such as official meetings, filling out forms in the precinct, contact with the persons that initiated her PTSD reactions, and even chance encounters with persons that remind her of these events). These types of circumstances cause her to have severe physical reactions as well as mental ones—typical symptoms seen in the category of "PTSD-signs" known as "re-experiencing" reactions. The intensity of these reactions has not significantly decreased for Officer Pechner-James over the previous 3-4 months and I am concerned that there may not be any further progress in this arena for some time to come.

To this end, I began a discussion with Officer Pechner-James and her spouse concerning potential options for enhancing her recovery from PTSD. After the tragic events of 9/11/2001 at The World Trade Center, much attention has been focused on the debilitating effects of PTSD. In connection with this, about 4 weeks ago, I began to suggest to Officer Pechner-James that in order to recover from the effects of PTSD, in her case, she might have to seriously consider dropping her harassment case against The Revere Police Department. And while her initial reaction was not very flexible, I have spent hours explaining that continued exposure to the "place of her trauma" could prolong her recovery from PTSD and perhaps even prohibit it. Her reluctance to "drop" the case was based on her firm conviction that she has been wronged and that no appropriate punitive measures have been meted out to the culprits of her trauma. And although I will not argue with her position from a moral standpoint, on a medical basis, I must advise her of the course of action that I believe is in the best interest of her health. And I believe, even though her claims are potentially justified, this process of vindication is undermining her physical and mental well-being. In short, the "stand-off" between The Revere Police Department and Officer Pechner-James is exacerbating this specific disabling aspect of her PTSD.

consequently, I have suggested that, regardless of the outcome of this dispute, Officer Pechner-James should not return to work at The Revere Police Department at any foreseeable time in the future. Such a situation will only serve to destroy her chances for a complete recovery from PTSD and her return to a productive professional life. In light of my opinion, I advised Officer Pechner-James to apply for 111F Disability for PTSD (a well established cause for disability in most major Massachusetts Police Forces). In addition to applying for 111F Disability, I have also strongly requested her to withdraw her grievances against the RPD and move on with her life. It is my belief that if 111F Disability were an option for Officer Pechner-James, then she would in fact cease her harassment case. Such a withdrawal would be done in order to facilitate the recovery of her health and would not represent a belief that the events had not occurred as she has claimed. She continues to confidently assert that persons within the Department did indeed harass her on many occasions, but she concedes that her health should take precedence over the justice of these events. I believe that this willingness to place health over "being proven right" is a wise decision and I support it fully. Please contact me to let me know how we can work together to achieve this end. I believe that an outcome that accomplishes the two objectives of preserving the integrity of the Revere Police Department and encouraging the recovery of Officer Pechner-James, a fine public servant, will benefit all of the parties involved in this unfortunate sequence of events. I look forward to your perspective on this opinion. I realize that I am not a lawyer or a law enforcement expert and that my position might not even make sense in these realms. However, as a physician, who is responsible for the care of this courageous police officer, I believe that "good old common sense" can prevail. When a problem has two possible solutions, and one of the two solutions will cause harm to both participants while the alternative will spare both persons involved from harm, wisdom demands choosing the path of least resistance. I would very much like to see these events fade away into the past and I am willing to expedite this in any way that I can. I am certain that you must feel similarly to this as well.

Sincerely,

Eric J. Keroack, M.D., FACOG

POLICE DEPARTMENT

ROY J. COLANNINO • ACTING CHIEF OF POLICE

23 PLEASANT STREET, REVERE, MA 02151

(781) 284-1212   FAX (781) 286-8328

THOMAS G. AMBROSINO
Mayor

August 13, 2001

Dr. Eric J. Keroack, M.D.
103 Broadway
Revere, MA  02151

RE:   Your Patient, Revere Police Officer, Terri Pechner

Dear Dr. Keroack:

Thank you for your letter dated July 11th, 2001, wherein you addressed my concerns in connection with Officer Pechner's current status.

In my letter to you, I had asked if, in your opinion, Officer Pechner would, in fact, be able to return and perform the essential tasks of a Police Officer in the forseeable future. Apparently, my letter was confusing in that I did not clarify or define "forseeable".  In order to clarify, I will re-phrase the question as follows:

If, in your best medical opinion, Officer Pechner will, in fact, be able to return and perform all of the essential tasks of a police officer, including the ability to interact with her peers and superior officers, without experiencing "panic attacks" which could result in her posing a risk to herself, her fellow officers, or the public at large, would you expect her return within the next six months?

Once again, thank you for taking the time to provide me with this information.

Sincerely,

Frederick Roland
Captain in Charge

CC: Officer Pechner
      Atty. James Dilday
      File

*[Handwritten note:]* I expect this Time frame IS quite Reasonable and possible, but I cannot guarantee it. None the less this would be a distinct possibility. EJK

POLICE DEPARTMENT
ROY J. COLANNINO • ACTING CHIEF OF POLICE
23 PLEASANT STREET, REVERE, MA 02151

ᴬS G. AMBROSINO
Mayor

(781) 284-1212   FAX (781) 266-8328

July 11, 2001

Dr. Eric J. Keroack, M.D., FACOG
103 Broadway
Revere, Massachusetts 02151

COPY

RE: Your Patient, Revere Police Officer, Terri Pechner

Dear Dr. Keroack:

On behalf of the Revere Police Department, please accept our sincerest thanks for taking the time to articulate, in laymen's terms, the characteristics and nature of "occupational burn out" and "emotional stress". Your letter was informative, and provides us with a better sense as to Officer Pechner's current status.

In your letter of explanation dated June 15th, 2001, you state that:

> "Presently, Officer Pechner is responding to the medications used to aid her Serotonin, but she persists in experiencing "panic attacks" whenever she interacts with the police precinct. This indicates that the re-writing of her brain is still incomplete. Consequently, I cannot in good faith allow her to return to work in this environment (especially in light of the life threatening nature of police work). I am sure that you would agree that this brain disability could potentially place her "at-risk on the streets", and such a risk is too high to take. After all this is not a desk job, it is a job that requires people to endanger their lives in order to protect us. Police Officers must be in peak condition in order to respond correctly to various situations that can unpredictably arise in the course of their daily duties."

Given the above, I am interested in learning of the following:

1.    In your best medical opinion, what is Officer Pechner's prognosis?

*prognosis is an expected full recovery from Her PTSD.*

3.   When was she last seen by you?  7/17/01        *Stressas*  (see my letter)

4.   When is her next scheduled appointment? —7/31/01

*To be okee*

5.   In your best medical opinion, will Officer Pechner ever be able to return and perform all of the essential tasks of a Police Officer, including the ability to interact with her peers and superior officers, without experiencing "panic attacks" which could result in her posing a risk to herself, her fellow officers, or the public at large? See essential task list attached to assist in your evaluation?   *Yes she w be Able To Do this At Some Time*

*5 yrs + time*

6.   If, in your best medical opinion, Officer Pechner, will, in fact, be able to return and perform all of the essential tasks of a police officer, including the ability to interact with her peers and superior officers, without experiencing "panic attacks" which could result in her posing a risk to herself, her fellow officers, or the public at large, is this return to duty in the foreseeable future?   *what DOes this me*

7.   On the other hand, if, in your best medical opinion, Officer Pechner will not be able to return and perform the essential tasks of a police officer, including the ability to interact with her peers and superior officers, without experiencing "panic attacks" which could result in her posing a risk to herself, her fellow officers, or the public at large, would you consider her condition likely to be permanent?   *NO,*

Given the public safety interests of the City of Revere, coupled with the operational needs of the Revere Police Department, manning levels are of utmost concern to us. I would ask that you respond to the above no later than Friday, July 20th, 2001, in anticipation of reviewing and scheduling our manpower requirements for the Fall/Winter 2001 time frame.

Please feel free to merely place your response beside the question appearing hereinabove. Upon completion, please sign in the area afforded you below.

A signed Medical Release Authorization is enclosed herewith for your records.

*The Foreseeable Future contains an Environment within The police Department that does not include the stress or abuse, harassment, or interpersonal conflict of a [?] nature then Officer Pechner will be able [to] be exposed to ...*

Conditions and thus would be able to function fully as a Police Officer. Just when such conditions will exist is impossible to accurately predict, perhaps you could assist me in such an assessment.

COPY

Gynecology and Counseling

(781) 269-2683
Fax: (781) 284-1167
Office Hours: M,T,Th,F 9-5

103 Broadway
Revere, Massachusetts 02151

June 15, 2001

Dear Police Chief Colannino,

I was recently asked to review your letter to Officer Terri Pechner dated June 1, 2001. It appears that my use of the laymen's terms of "occupational burn out" and "emotional stress" have perhaps caused a misunderstanding concerning Officer Pechner's medical condition. I had hoped that these relatively common terms might make it easier to grasp the extent of Officer Pechner's neurochemical disorder, but they seem to have accomplished the opposite result. We are all aware that lay-terminology with its vague, yet commonly understood meanings, is often utilized in medical practice in order to convey the nature of complex physiologic concepts to non-medical individuals (i.e. "stomach flu" is used to describe a wide array of gastrointestinal infections and conditions, and "lock-jaw" is used to explain the intense titanic muscle contractions of the mandibular muscles due to the tetanus bacteria). However, these terms can occasionally under-emphasize the importance of the illness being discussed. As the Chief of Police, responsible for the safety and security of your subordinate officers, your position warrants a more thorough explanation of Officer Pechner's disability. Without the following crucial information, it would be unreasonable to expect you to make the important decisions concerning the officer under your command. I apologize for failing to realize the exact nature of this inquiry earlier, and I hope that the following explanation will clarify any questions or concerns that you may have about Officer Pechner.

The majority of the terminology used to describe brain disorders (mental illness, "psychological" diseases) was developed well before today's advanced understanding of brain chemistry and physiology. Consequently, terms like "panic attacks" and "post-traumatic stress disorder" do not accurately explain the complex nature of the Central Nervous System (CNS) Disorders that they represent. Nonetheless, these terms are still in use because they are easier to convey than the newer medical terms might be (i.e. MedioCorticoLimbic Imbalance of the Serotonin/Norepinephrine Axis resulting in a Synaptic Re-alignment and Hyper-responsive Neuronal Pathways controlling the Sympathetic Responses of the Human Body—*a real mouthful*). But in order to understand the causes and treatments of these conditions, a general understanding of the nature of brain function is required. I will try not to bore you with too many details.

When Norepinephrine is released in the CNS, it results in a host of physical responses that dramatically affect a person's existence (increased heart rate, rapid/shallow breathing, dry mouth, constriction of the pupils to increase proximate visual acuity, increased sweating especially of the palms, hyperactive reflex time, muscle tightening, increased metabolic rate, and heightened awareness)— the "fight or flight" response. The release of Norepinephrine in the brain is brought about by external stimuli that are carried to the brain by the peripheral nervous senses (pain, heat, sight, noise, smell, taste). The nature of the stimulation will determine the amount and the time-frame of Norepinephrine release. These external stimuli are typically threatening, frightening,

abusive as harassing. Traumatically severe events that are, exemplified by an assault, torture or witnessing an atrocity (by either hearing the screams or seeing the event) will cause a sudden high-volume release of Norepinephrine and this can result in what is commonly known as "shock". Lesser traumas such as verbal threats, emotional abuse, "close-calls" with danger, or situational conflicts will release smaller amounts of this neurotransmitter.

The brain's neurochemical responses to this release of Norepinephrine are somewhat complex. They include the release of a counteracting neurotransmitter called Serotonin (which is designed to dilute the synaptic responses to Norepinephrine). Serotonin causes the physical reactions of slower breathing, slower heart rates, drowsiness, relaxation, and decreases alertness. Thus, these two chemicals are a good balance for the reactions to "stressful" stimuli. When they are kept in balance, a person will be seen as having "normal" responses to pressures.

The other interesting event that occurs when Norepinephrine is released is that the synaptic "wiring" system of the brain is re-aligned in order to increase the speed and efficiency of the impulses generated by Norepinephrine (i.e. creating faster reflexive responses to persistent, repetitive danger). Consequently, a brain that is frequently over-stimulated to release Norepinephrine will actually redesign itself to "adapt" to this threatening environment and change its physiologic properties. Such a restructuring of the brain is much like other body organs that attempt to absorb injuries (i.e. ligament tears, ruptured discs, concussions).

Furthermore, any environment that involves consistent exposure to abusive or threatening stimuli will result in a depletion of the brain's ability to manufacture adequate amounts of the "counter-transmitter" Serotonin. This deficiency of Serotonin will make it more difficult for the brain to alter the Norepinephrine response to stimuli and thus smaller stimuli will have longer and larger brain effects (due to the unopposed actions of Norepinephrine). This combination of neurological events (Serotonin deficiency and Norepinephrine induced synaptic hyper-responsiveness) is the disorder commonly referred to as Post-traumatic Stress Disorder.

The existence of this neurochemical abnormality and this synaptic "re-wiring" will also make the patient susceptible to acute over-reactions brought about by larger stressors and their subsequent release of larger amounts of unopposed Norepinephrine. These over-reactions begin in the Central Nervous System but are manifested in a physical response that is commonly called a "panic attack" due to its similarity to the previously described "fight or flight" response.

With these basics in mind, one can more easily understand the disorder that Officer Pechner is suffering from. According to her descriptions (corroborated by her husband), she has been in a persistently hostile, abusive and harassing interpersonal environment while within the confines of the precinct and while inside of police patrol cars. She states that the performance of her "public" duties are not the inciting stressors and that her "official, administrative, and interdepartmental" duties are the stimuli that have caused her to feel personally threatened. And while I was not a direct witness to these events (and thus I cannot validate them), I have no reason to suspect that they did not occur as she has perceived. I feel confident that this conclusion is reasonable because Post-traumatic Stress Disorder cannot occur *de novo* (out of thin air). The fact that her identical twin sister shows no signs of this brain disorder confirms this suspicion.

traumatic event is the proximate cause of this disorder, and she did not have a previously diagnosed mental health disorder. It appears that this chemical imbalance was most likely the result of her experiences within the precinct while performing her duties as a Police Officer. Since PTSD must be the result of the aftermath of a traumatic event (as described by the person involved) and it cannot appear on its own, the most likely suspect in this instance is the harassment in Officer Pechner's workplace environment. However, I believe that as her commanding officer, you are probably in a better position to judge the validity of her observations. Nonetheless, her perception of this environment has indeed resulted in the symptoms of the previously described brain disorder.

Since I am certain that you are concerned for her well-being, I will explain the nature of the healing process for this brain injury. There are several crucial elements:

1. The threatening or abusive stimuli must be reduced or better yet eliminated so that the brain can be rewired to its original physiologic state.
2. Her Serotonin must be repleted. (Here is where the use of medications has revolutionized the recovery process. Instead of being institutionalized, patients today can use medicines to increase the efficiency of their existing Serotonin molecules, while their brain "factories" regenerate the Serotonin supply).

These steps require time, and each individual case is different depending upon the length of Norepinephrine exposure and the depth of Serotonin deficiency.

Presently, Officer Pechner is responding to the medications used to aid her Serotonin, but she persists in experiencing "panic attacks" whenever she interacts with the police precinct. This indicates that the re-wiring of her brain is still incomplete. Consequently, I cannot in good faith allow her to return to work in this environment (especially in light of the life-threatening nature of police work). I am sure that you would agree that this brain disability could potentially place her "at-risk on the streets", and such a risk is too high to take. After all this is not a desk job, it is a job that requires people to endanger their lives in order to protect us. Police Officers must be in peak condition in order to respond correctly to various situations that can unpredictably arise in the course of their daily duties. I am sure that as her commanding officer, you would not wish to have any unnecessary harm come to one of your subordinate officers.

I will try to keep you up to date on the extent of her progress in this matter, and when her present disability has resolved, I am sure she will be capable to return to work as a dedicated public servant. I thank you for your concern about Officer Pechner, it reveals a deep commitment to protecting your junior officers. Officer Pechner has always spoken highly of you, and I can now see why she does.

Sincerely,

Eric J. Keroack, M.D., FACOG

April 3, 2001

To Whom It May Concern:

    I began taking care of Terri Pechner (D/O/B 4/29/73) on 2/5/01. At that visit, it was clear that Ms. Pechner was suffering from significant emotional stress. As we pursued these issues, it became apparent that she was indeed suffering from a form of Posttraumatic Stress Disorder due to constant chronic stress. This condition has resulted from a combination of environmental stressors that exist in the internal arena of her employment, as well as in the field environment that all Police Officers must face. She has revealed to me that much of her work within the precinct has involved significant episodic sexual harassment and persistent emotional pressure from fellow male officers. Although I cannot validate these accusations, it is clear that she is exhibiting the symptoms of PTSD. She is presently responding fairly well to a trial of Effexor XR with occasional supplemental Xanax for bouts of severe anxiety. The ultimate goal of this intervention will be to have her on only Effexor XR. She has also made some progress with decreasing her internal stresses through the therapeutic settings that have been set before her. Nonetheless, she has a fairly long row to hoe. Occupational "Burn-Out" (which is the lay term for PTSD from chronic stress) is quite difficult to recover from...especially if returning to your career can be an actual physical threat to one's life. I cannot, at this time, predict exactly how long her disability will last. But, I suspect that at least 4-6 months will be the minimum. If you have any further questions, please feel free to contact me.

Sincerely,

Eric J. Keroack, M.D.