# EXHIBIT B

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
                           FOR THE
 2                   DISTRICT OF MASSACHUSETTS

 3
    TERRI PECHNER-JAMES and
 4  SONIA FERNANDEZ,
              Plaintiffs
 5
    VS.                        C.A. NO. 03-12499-MLW
 6
    CITY OF REVERE, THOMAS
 7  AMBROSINO, MAYOR CITY OF
    REVERE, POLICE DEPARTMENT,
 8  TERRENCE REARDON, CHIEF,
    BERNARD FOSTER, SALVATORE
 9  SANTORO, ROY COLANNINO,
    FREDERICK ROLAND, THOMAS
10  DOHERTY, JOHN NELSON, JAMES
    RUSSO, MICHAEL MURPHY, and
11  STEVEN FORD,
              Defendants
12

13

14      DEPOSITION of TERRI PECHNER-JAMES, taken at

15   the request of the Defendants Foster, Santoro,

16   Colannino, Roland, Doherty, Nelson, Russo, Murphy

17   and Ford, pursuant to Rule 30 of the Federal

18   Rules of Civil Procedure, before Michael Gruber,

19   a notary public in and for the Commonwealth of

20   Massachusetts, on January 10, 2006, commencing at

21   10:20 a.m., at the offices of Reardon, Joyce &

22   Akerson, Esqs., 397 Grove Street, Worcester,

23   Massachusetts.

24
```

Page 2

```
 1   A P P E A R A N C E S:

 2
     FOR THE PLAINTIFFS:
 3
     JAMES S. DILDAY, ESQ.
 4   GRAYER & DILDAY, LLP
     27 School Street  Suite 400
 5   Boston, Massachusetts 02108

 6
     FOR THE DEFENDANTS CITY OF REVERE, AMBROSINO,
 7   REARDON:

 8   PAUL CAPIZZI, ESQ., CITY SOLICITOR
     WALTER H. PORR, JR., ESQ., ASST. CITY SOLICITOR
 9   OFFICE OF THE CITY SOLICITOR
     CITY HALL
10   281 Broadway
     Revere, Massachusetts 01251
11
12   FOR THE DEFENDANTS FOSTER, SANTORO, COLANNINO,
     ROLAND, DOHERTY, NELSON, RUSSO, MURPHY AND FORD:
13
     MICHAEL J. AKERSON, ESQ.
14   REARDON, JOYCE & AKERSON, P.C.
     397 Grove Street
15   Worcester, Massachusetts 01605

16

17

18

19

20

21

22

23

24
```

Page 3

```
 1                    I N D E X

 2          DEPONENT: TERRI PECHNER-JAMES

 3                                              PAGE

 4   EXAMINATION BY MR. AKERSON                 13

 5

 6

 7

 8

 9                    EXHIBITS

10                                              PAGE

11

12    1       21 Pages, Typewritten             90

13    2       One Page, Typewritten            126

14

15

16

17

18

19

20

21

22

23

24
```

Page 4

```
 1        MR. AKERSON: My name is Michael
 2   Akerson. I'm an attorney for a variety of
 3   individual defendants in the above-captioned
 4   matter.
 5        I have scheduled this deposition of
 6   Ms. James -- Terri Pechner-James -- on a variety
 7   of occasions prior to today, none of which of
 8   those depositions have gone forward.
 9        This deposition that we're at today,
10   January 10, 2006, was set for earlier this month
11   in January, but it was continued due to Mr.
12   Dilday's unavailability. We scheduled it here
13   today at my office in Worcester.
14        All the parties -- relevant parties,
15   that is -- are present here with respective
16   counsel, along with the stenographer that our
17   firm has hired for the deposition.
18        Present in the conference room prior
19   to my beginning this on-the-record dissertation
20   were Attorney City Solicitor Paul Capizzi;
21   Assistant City Solicitor Walter Porr; Michael
22   Akerson, of the firm of Reardon, Joyce & Akerson;
23   Mr. Dilday, of Grayer & Dilday; Terri
24   Pechner-James; and Carlton Dasent, who is no
```

Page 5

1 longer an attorney of record in this case, or at
2 all with the Mass. Bar.
3        We spoke a few moments ago, Mr.
4 Dilday. Just to make sure I'm clear -- you
5 correct me if I'm mistaken; I put that burden on
6 you, sir -- I asked what Mr. Dasent's involvement
7 with this case was, and this deposition, given
8 his presence here today. I asked point blank if
9 he's employed by your firm, and you said no, he's
10 not employed by your firm.
11        MR. DILDAY: That's correct.
12        MR. AKERSON: I understand he's
13 currently actively not a lawyer in Massachusetts.
14 Correct?
15        MR. DILDAY: That is also correct.
16        MR. AKERSON: Okay. You had indicated
17 that Mr. James, the deponent's husband, had
18 planned to come to the deposition today, but was
19 unable to come, correct?
20        MR. DILDAY: That's correct.
21        MR. AKERSON: And as a result of that
22 you indicated that yesterday it was decided that
23 Mr. Dasent would be here to support and befriend
24 Ms. James during the course of the deposition,

Page 6

1 correct?
2        MR. DILDAY: That is correct.
3        MR. AKERSON: Now, given that Mr.
4 Dasent is not a lawyer with an appearance on this
5 case, he's not an employee of your firm --
6 therefore he has no connection to this case other
7 than as a friend to Ms. James -- I voiced my
8 objection off the record, and I'm echoing the
9 same objection now, while the record is being
10 produced.
11        MR. PORR: And for the record, the City
12 of Revere and the city defendants that the city
13 solicitor's office represents joined and do join
14 in that objection.
15        MR. AKERSON: Okay.
16        MR. DILDAY: And, for the record, from
17 Ms. Pechner-James' side, it's her opinion that
18 she wanted to have somebody here for moral
19 support. Her husband could not come. She has a
20 bond with Mr. Dasent. She wanted him just to be
21 sitting here. Mr. Dasent will take no part in any
22 of the activities at the deposition, and his
23 sitting in the room would in no way be
24 detrimental to the deposition, and it's her

Page 7

1 conclusion that if she cannot have somebody with
2 her for moral support she will not take part in
3 the deposition.
4        MR. AKERSON: Okay. And I would like to
5 further say, Mr. Dilday, are you her counsel of
6 record in the civil suit?
7        MR. DILDAY: Clearly I am her attorney
8 of record.
9        MR. AKERSON: Okay. This may seem
10 obvious, but you're sitting here in the
11 conference room across from me and next to Ms.
12 James.
13        MR. DILDAY: Absolutely.
14        MR. AKERSON: Okay. I don't think it's
15 proper -- what I said before, on the record, and
16 for other reasons -- that Mr. Dasent sit in on
17 the deposition, given that he's not a lawyer,
18 he's not an employee of your firm. In my
19 understanding as an attorney, in 15 years,
20 friends are not allowed into depositions, which
21 is sworn testimony in a serious legal matter. If
22 Ms. James want to take periodic breaks in order
23 to befriend or talk to Mr. Dasent I would allow
24 that. We have a kitchen area where Mr. Dasent

Page 8

1 could sit down with a bottle of water, which
2 we'll be happy to provide, and then Ms. James can
3 go speak with him during the breaks in the
4 proceedings. That's my offer to you.
5        MR. DILDAY: I understand. And I will
6 confer with her one more time.
7        MR. AKERSON: Okay. Because taking it
8 the next step, if you will, today is the day for
9 the deposition, and if we don't go forward today
10 we'll have to ask Judge Sorokin for his input on
11 how to handle discovery matters.
12        Thank you.
13        MR. DILDAY: If we don't go forward
14 today doesn't mean that we cannot go forward. As
15 I stated clearly for the record, Ms. James is
16 concerned about being here without some moral
17 support other than her counsel. As I told you
18 before, she had hoped to have her husband with
19 her. He could not come because of some
20 baby-sitting duties.
21        Now, my question to you is, if she
22 brought her husband would you move to exclude him
23 also?
24        MR. PORR: I would, because he may very

Page 9

well be a material witness. He's a former officer of the same police department. He himself filed a complaint against that police department. And so I would certainly object to his presence because of that. I would not want his testimony tainted.

MR. DILDAY: He would have access to her grand jury minutes anyway once she gets them. He would be able to read them with her, so he would have access to her testimony regardless of whether he would be here or not. So your objection doesn't mean much.

MR. PORR: It does in the context, though, that during the course of the deposition if he was present during breaks and whatnot he could potentially influence her testimony, given what he's learning from her sitting in the chair.

I understand he could read the transcript later. I fully understand that, and I'm aware of that. So I can't create a fail-safe situation that's going to protect from the potential that witnesses will influence each other's testimony. But at least in the deposition

Page 10

context, while it is ongoing, the whole purpose, as I understand the rules, is to provide at least some basis of integrity for the system so that the witness who is testifying is testifying without the potential for undue influence by others with no real standing in the case and no real legal authority to impact the case.

So I would have an objection to Mr. James' presence, given those considerations which aren't present at the moment, because he's not here, so it's academic.

MR. DILDAY: Your objection goes beyond Mr. Akerson's possible objection.

MR. AKERSON: It's a different issue. Mr. Porr was just referencing if Mr. James was here at the deposition.

MR. PORR: Mr. James and Mr. Dasent are in entirely different categories.

MR. DILDAY: True.

MR. PORR: So my objection on a general level is the same as to both in terms of their presence in the deposition context.

Mr. James goes even farther, given his

Page 11

own prior employment with the City of Revere and all the issues related to him, and the fact that he, unlike Mr. Dasent, may very well be a witness in this case, just depending on how things shape up when the client goes to trial, as soon as it does.

MR. AKERSON: I believe, also, Mr. James may be a witness to the purported damage claim, given that he's the spouse of the deponent today.

MR. PORR: So your question in the hypothetical, if we reconvene at another date would we object to Mr. James, and my answer to that is yes, for the same reasons we object to Mr. Dilday's presence --

MR. DILDAY: Dasent.

MR. PORR: I'm sorry. Mr. Dasent's presence -- my apologies -- plus the other reasons already articulated.

MR. DILDAY: Let me go off the record and speak to Ms. James again, and I'll be back.

MR. AKERSON: Okay. Go off the record, then.

(Short recess.)

Page 12

MR. DILDAY: We're going to go forward.

MR. AKERSON: Just note for the record that we're going to move forward with the deposition today, January 10. Mr. Dasent is not in the room.

Mr. Dilday, do you know where he went? Did he leave the building?

MR. DILDAY: No, he's still in the building.

MR. AKERSON: I just was going to take a quick break. I'll -- if he's --

MR. DILDAY: I don't know what he's going to do.

MR. AKERSON: Okay.

(Short recess.)

Page 13

STIPULATION

The parties stipulate that all objections except as to the form of the question and all motions to strike are reserved until the time of trial. The deponent reserves the right to read and sign the transcript.

TERRI PECHNER-JAMES, having been satisfactorily identified by the production of her State-issued photo identification, and duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY MR. AKERSON:

Q. Good morning. Can you please state your full name for the record?
A. Terri James.
Q. Do you prefer to be called Ms. James?
A. Yes.
Q. I introduced myself earlier this morning. That's the name you -- you said your

Page 14

name is Terri James, so I'll call you Ms. James in this deposition, unless there's an objection from you.
    As I mentioned earlier, I represent a variety of individual defendants who you've brought -- you and Sonia Fernandez have brought a lawsuit against. Are you aware of that?
A. Mm-hmm.
Q. Just general background. To help the stenographer, you need to answer with words.
A. Okay.
Q. It's difficult -- I understand it's difficult -- to take down mm-hmm or a head shake. If I remind you, please don't think I'm being a pain. It's to get the stenographic record accurate, okay?
A. Sure.
Q. Couple of other ground rules generally.
    If you don't understand a question I'm asking or you want me to repeat it or say it louder please let me know, and I will do so. And I will also assume that you understand my question unless you tell me you don't.

Page 15

Is that acceptable?
A. Yes.
Q. If you need to take a break, we have a bathroom here and, as I mentioned earlier, we have some water. Please let me know if you need to take a break, okay?
A. Sure.
Q. I'm going to ask you some general background questions, if you could just bear with me, to try to get some of it on the record.
    Where are you currently living?
A. Georgetown. Georgetown.
Q. Georgetown, okay. Do you own a home in Georgetown?
A. No.
Q. Just to be clear, that's a town in Massachusetts, Georgetown, Mass.?
A. Yes.
Q. Who are you living with currently in Georgetown?
A. My husband and my children.
Q. Are you renting an apartment there?
A. Yes.
Q. You mentioned your husband. I believe

Page 16

his name is Mark James?
A. Yes.
Q. When did you get married?
A. May of 2001.
Q. Do you recall the date?
A. Twelfth?
Q. Twelfth?
A. Thirteenth? Twelfth.
    MR. DILDAY: It's okay. It will be okay.
Q. Okay, you mentioned you have two children. What are their names and ages, please?
A. I have three children.
Q. Excuse me, three children.
A. Kenisha is my daughter's name, K-e-n-i-s-h-a. She's 16. Ricky is my middle son. He's 14. And Katelyn is my youngest. She's three. K-a-t-e-l-y-n.
Q. K-a-t-e-l-y-n?
A. Yes.
Q. Thank you for spelling that.
    Your husband, Mark James, he's the father of Katelyn?
A. Yes.

Page 37

1 may have. I think I may have taken a course.
2 Q. What was that?
3 A. Pat Rogers, at a seminar. I believe
4 that was --.
5 Q. It's also a seminar where you leave
6 with some study materials?
7 A. Right.
8 Q. Okay.
9 A. The second one I didn't -- I didn't
10 take any courses.
11 Q. I'd like to talk about your working
12 career with the Revere police.
13 After you graduated the Norwood
14 academy, which you believe was approximately
15 January of 1996, you said you then became a
16 patrol officer for Revere. What was your
17 assignment when you first started at the Revere
18 P.D.?
19 A. Patrol.
20 Q. Any particular assignment or shift?
21 A. Day shift.
22 Q. Would that be cruiser patrol?
23 A. Yes.
24 Q. In Revere do they have one-man

Page 38

1 cruisers or two-man?
2 A. When we first got on they had two men,
3 because you had --.
4 Q. On-the-job training?
5 A. Yes.
6 Q. So once you started at Revere --
7 A. Field training officer.
8 Q. Okay. Who was your FTO, field training
9 officer?
10 A. Kenny Bruker.
11 Q. Could you say that --
12 A. Kenneth Bruker.
13 Q. Is he still with the Revere P.D.?
14 A. Yes.
15 Q. Could you spell his last name?
16 A. B-r-u-k-e-r.
17 Q. How long was the field training with
18 Officer Bruker?
19 A. I believe it was six weeks.
20 Q. And did you do it for the six weeks?
21 A. Yes, I did.
22 Q. I'm going to gather that after the
23 six-week field training officer stint was done
24 you then rode alone in a cruiser?

Page 39

1 A. Yes.
2 Q. And that's actually what happened
3 after your first six weeks on the job, you had a
4 cruiser for yourself?
5 A. Yes.
6 Q. How long were you in the patrol
7 function before you were assigned to another
8 unit?
9 A. Probably at least a year. Probably.
10 I --
11 Q. Okay.
12 A. I could look and get the exact, you
13 know -- the temporary assignment to CID. Just to
14 -- it may have been a year.
15 Q. I know you mentioned CID. What does
16 that stand for, please, for the record?
17 A. Criminal investigation division.
18 Q. How did you get assigned to the CID
19 unit?
20 A. They put an order out that anybody who
21 wanted to work a temporary assignment to learn
22 how the criminal investigation division works was
23 to sign up for the CID position.
24 Q. And I gather you put your name in to

Page 40

1 be in the running for a temporary assignment to
2 the CID unit?
3 A. Yes.
4 Q. What prompted you to sign up for that
5 unit?
6 A. I liked the work.
7 Q. Okay. So would that have been roughly
8 in the early part of 1997?
9 A. No, I'm thinking, looking -- got an
10 accommodation. For some reason I'm thinking it
11 was in '96. I may have it. If I can take a
12 minute, I may have the exact dates.
13 Q. If you have something that would help
14 you refresh your memory.
15 (Witness examining documents.)
16 A. June of '97.
17 Q. If I can ask you, what are you looking
18 at to help you refresh your memory?
19 A. My general -- my personnel order that
20 comes out. Anytime I had an assignment I
21 photocopied -- it just has my assignment on it.
22 (Handed to Mr. Akerson.)
23 MR. DILDAY: Do you want to keep that
24 as an exhibit?

Page 41

1  A. Or photocopy it. I would still like to
2  keep my paperwork together.
3  Q. Certainly. We'll leave this here for
4  now.
5  A. It was in '97.
6  Q. Looking at the personnel --
7  A. It was actually in '97. I was right
8  with the year, looking.
9  Q. So, personnel order number -- of the
10 Revere police, I should say -- number 97-17, it
11 says effective date of June 8 of 1997. That's
12 when you started in the CID?
13 A. Yes.
14 Q. It says on there Officer Terri Pechner
15 to two months special assignment to CID?
16 A. Yes.
17 Q. Other than the fact that you thought
18 you would like to work in the detective unit, was
19 there any other reason you went to that
20 assignment?
21 A. No. Not that I know of.
22 Q. During your first, roughly, year and a
23 half, for the years of 1996 through June of 1997
24 who would have been your supervisor when you were

Page 42

1  working patrol on the day shift?
2  A. Lieutenant Foster.
3  Q. Did you know Lieutenant Foster before
4  starting at Revere P.D.?
5  A. No.
6  Q. When you started the job in patrol
7  days in roughly -- I know you said you're not
8  sure of the exact start date, but roughly January
9  of 1996, after your graduation from the Norwood
10 Police Academy, how did you get along with
11 Lieutenant Foster?
12 A. Great.
13 Q. And at some point that relationship
14 with Lieutenant Foster changed?
15 A. Yes, when I got out of CID.
16 Q. Okay. You made a gesture with your
17 hand.
18 A. So, June -- August.
19 Q. Okay. It appears you were in CID for
20 most of June and all of July, and going into the
21 first week of August? Is that your memory now?
22 A. Yes.
23 Q. Okay. So you're saying your
24 relationship with Lieutenant Foster changed when

Page 43

1  you returned to patrol in roughly August of 1997.
2  I don't mean to interrupt you if
3  you're thinking, but I didn't know if you were
4  answering the question with a head gesture.
5  A. No, I'm trying to -- I'm at a brain
6  freeze. Can I look at my notes?
7  Q. If you have something that would help
8  your memory, I would rather you be accurate if
9  you can.
10 (Witness examining documents.)
11 A. Can you ask your question again, sir?
12 Q. Certainly. My question was, at some
13 point in time your relationship with Bernard
14 Foster changed from being that you got along
15 great to something less than great, I gather, is
16 that correct?
17 A. Yes.
18 Q. So my question was specifically, when
19 did that relationship change, in your mind?
20 A. When I went back to his shift.
21 Q. When would that be?
22 A. I went back to the day shift, I
23 believe, sometimes toward -- sometime toward the
24 end of August of '97.

Page 44

1  Q. You went back to the day shift,
2  leaving the CID unit, and that was because it was
3  a temporary assignment to CID?
4  A. Going back days, it may have been --
5  it may have been August 9 that I went back to the
6  day shift. It changed before I left CID. Somebody
7  had told me that he had a problem with me.
8  Q. Okay --
9  A. So I -- it changed before I actually
10 -- before I got back to his shift. In my mind.
11 Q. During the time you were in CID for
12 the two months -- and I'll say for the two months
13 of the summer of 1997 -- did you have any contact
14 with Lieutenant Foster during that time period?
15 A. Regular hello, goodbye, how are you.
16 I was good friends with his daughter. I went to
17 her wedding shower. Spoke to him at -- you know,
18 spoke to him at family functions. Went over his
19 house.
20 Q. Again, this would be during the summer
21 of 1997? Is that what you're referencing, ma'am?
22 A. I don't remember what days I went over
23 to his house. I was friends with his daughter, so
24 I -- I don't remember the summer. I don't have

Page 45

1 what I did on my personal time, but --
2    Q. Okay. You're looking at a document
3 which appears to be a small calendar.
4    A. Mm-hmm.
5    Q. What is the purpose of the calendar,
6 ma'am?
7    A. Had a calendar since I got out of --
8 one thing they taught us in the academy is to
9 carry a book with you so that you can put dates
10 and times.
11    Q. By that do you mean in terms of when
12 you are scheduled to work any extra jobs or
13 training classes you have?
14    A. Yes.
15    Q. Are there any other personal items or
16 diary-like notations in the calendar you have in
17 front of you for the year 1997?
18    A. There's personal notes in here. Is
19 that --?
20    Q. Are there notations in the diary
21 regarding, in this case, Lieutenant Foster and
22 his interactions and treatments with you?
23    A. Yes.
24    Q. There are.

Page 46

1    A. Yes.
2    Q. And you indicated that was something
3 you learned at the police academy, to keep a
4 calendaring system when you're working as a
5 police officer?
6    A. Yes.
7    Q. That's the only reason you keep the --
8    A. I started doing it --
9    Q. -- I'll call it a little black book --
10    A. I've got one for pretty much every
11 year.
12    Q. Every year?
13    A. I guess if I learned something, I
14 learned to keep track of the days of the year,
15 week. Still do it.
16    Q. You mentioned Lieutenant Foster, your
17 relationship changed with him. What did you learn
18 during the summer of 1997 which made you believe
19 that relationship of Lieutenant Foster had
20 changed?
21    A. Supposedly, I said something about
22 him. That's all I knew.
23    Q. What are you supposed to have said
24 about the lieutenant, Lieutenant Foster?

Page 47

1    A. I have no idea. I don't know to this
2 day.
3    Q. Did you ask Lieutenant Foster what you
4 supposedly said about him --
5    A. Yes.
6    Q. -- that made him, toward you, the
7 relationship change?
8    A. I did.
9    Q. And did he respond?
10    A. Yeah.
11    Q. Did he tell you what you supposedly
12 said about him?
13    A. No.
14    Q. So as you sit here today you don't
15 know what it's alleged you said about Lieutenant
16 Foster?
17    A. No, to this day I don't know.
18    Q. Do you know the gist or the general
19 nature of what it was you supposedly said about
20 Lieutenant Foster?
21    A. Don't know.
22    Q. You have to answer -- okay.
23    A. Don't know.
24    Q. I'm assuming you spoke with Lieutenant

Page 48

1 Foster's daughter, Bernadette Foster, inasmuch as
2 you said you were friendly with her.
3    A. Mm-hmm.
4    Q. Right?
5    A. Yes.
6    Q. What did she say to you when you asked
7 her about why the change in the relationship with
8 her dad, Lieutenant Bernie Foster?
9    A. We really never got into my -- I mean,
10 I don't remember a conversation, how it was kept
11 -- our relationship was kind of kept outside of
12 his. I don't --
13    Q. Okay. Do you recall when it was that
14 you said something to Lieutenant Foster about
15 why --
16    A. See, I'm sorry --
17    Q. -- the relationship changed?
18    A. Can I answer that? I did ask
19 Bernadette, when I got back on, why her father
20 was mad at me.
21    Q. Okay. When did you ask Bernadette
22 Foster?
23    A. I don't remember the date. I remember
24 it was behind the police station. We were going

Page 49

1 to our cars, leaving the shift. But I don't
2 remember getting, again, you know, I don't
3 remember getting why he was mad. Somebody said I
4 said something. That was -- it was -- you know,
5 the rumor mill. Bingo hall.
6     Q. I was just trying to place that
7 conversation with Bernadette Foster in a time
8 line. Do you remember when that was? Was that
9 while you were in the CID unit?
10    A. No, it wasn't. It was when I got back
11 to the shift.
12    Q. Do you recall what Bernadette Foster
13 said to you as to why her father was mad?
14    A. Couldn't have been much, because I
15 don't remember.
16    Q. So you don't remember anything else
17 she said about that topic.
18    A. No.
19    Q. Did you ask anybody else why
20 Lieutenant Foster was mad at you?
21    A. Asked everybody.
22    Q. Okay. Could you define "everybody"? I
23 don't know who you mean.
24    A. Captain Roland, Roy Colannino, Russo.

Page 50

1     Q. Okay, well --
2     A. Kevin Millerick.
3     Q. I'll take a step back, if I can.
4         What made you believe that Lieutenant
5 Bernard Foster was upset or angry with you? What
6 did he do or give or say to you?
7     A. Before I left the CID unit a couple of
8 people approached me. I have -- if I can look
9 back in my notes, again I have who it was, a lot
10 of stuff. If you don't mind me taking a second --
11    Q. Sure, but as you're sitting here right
12 now you don't remember who approached you and
13 said things to you about why Foster was mad at
14 you?
15    A. I think I remember one of them being
16 Kathy Fish. Again, that's without looking at my
17 notes.
18    Q. Just one second, if I may. We'll get
19 to the name in the minute.
20        What did these individuals say to you
21 about why Lieutenant Foster was mad at you?
22    A. They didn't say anything. They just
23 said, "Watch your back. Bernie is out to get
24 you." That was --.

Page 51

1     Q. Do you recall anything else that these
2 individuals said to you before you left the CID
3 unit as to why Lieutenant Foster was upset at
4 you?
5     A. Unless I look in my notes, I don't
6 want to --
7     Q. Okay, but as you sit there right now
8 you don't remember anything else that was said to
9 you about why Lieutenant Foster was upset with
10 you.
11    A. No.
12    Q. What notes are you speaking of that
13 you could look at which would refresh your memory
14 of what individuals told you Lieutenant Foster
15 was upset with you?
16    A. My own personal notes.
17    Q. If you want to look at them now you
18 may look at them. Your choice.
19    A. It was August 9 -- I don't -- August 9
20 of '97 Officer Fish told me, but I didn't -- I
21 wrote I was unsure as to why and what I did
22 wrong, so --.
23    Q. Okay --
24    A. I don't have --

Page 52

1     Q. You referenced a moment ago that you
2 wanted to look at your own personal notes.
3     A. Mm-hmm.
4     Q. And I believe you just did, and you
5 mentioned that Kathy Fish had mentioned something
6 to you on August 9, is that correct?
7     A. Mm-hmm.
8     Q. Is that a "yes"?
9     A. Yes, sir.
10    Q. And that would be August 9 of the
11 year --
12    A. 1997.
13    Q. You're looking at some documents.
14 There appears to be a stack of documents, maybe
15 three-quarters of an inch thick, and a variety of
16 stapled packets.
17    A. These are all the same.
18    Q. Okay. What is it you're looking at,
19 ma'am?
20    A. My calendar, my copies of -- these are
21 my -- these are my calendars. Notes that I put on
22 my calendars, just composed into one page.
23    Q. In making your own personal notes that
24 you have in front of you, why did you do that?

Page 53

1    A. Because I can't remember anything in
2 chronological order.
3    Q. So it's something you decided to do on
4 your own because it would be helpful to you?
5    A. Pretty much.
6       MR. AKERSON: I would like to take a
7 copy of those notes before we leave.
8       MR. DILDAY: Mm-hmm.
9       I should have said "yes". You know
10 what I said.
11      MR. AKERSON: I got the hint. I know
12 it's hard.
13   Q. Ms. James, now having looked at your
14 notes, do you recall anything else that was said
15 to you about why Lieutenant Foster was upset at
16 you? Again, this would be in the summer of 1997.
17   A. (Shaking head.)
18   Q. No?
19   A. I don't recall.
20   Q. I know you're shaking your head.
21   A. No.
22   Q. Thank you.
23      Again, in the summer of 1997 did you
24 have any direct conversations with Lieutenant

Page 54

1 Foster about this information you had from Police
2 Officer Kathy Fish?
3    A. Did I have direct communication with
4 him?
5    Q. Yes. Did you speak to Lieutenant
6 Foster in any way about what Kathy Fish had
7 mentioned to you?
8    A. On August 24 of '97.
9    Q. Just for the record, again, you seem
10 to be looking at your own personal notes.
11   A. Yes, sir.
12   Q. August 24 of 1997, you spoke with
13 Lieutenant Foster?
14   A. Yes.
15   Q. What happened on that occasion?
16   A. He called me into the booking room.
17 The booking room of the Revere police station.
18   Q. "He" being Lieutenant Foster?
19   A. Yes.
20   Q. Okay. Do you recall what time of day
21 it was?
22   A. No, I don't.
23   Q. And did you go to the booking room?
24   A. Yes.

Page 55

1    Q. What occurred, if anything, in the
2 booking room on that August 24, 1997 occasion?
3    A. He just started screaming at me. Said
4 he's done a lot -- he's done a lot for me and I
5 stabbed him in his back. And he's putting me on a
6 walking route until further notice. He didn't
7 want to see my face inside the station or the
8 sub-station. Told me not to bother to speak with
9 him, and disregard the wedding invitation to his
10 daughter's wedding. I asked him what I had done
11 so wrong to him. He stated that -- he told me he
12 had nothing else to say to me. To go to my
13 assignment and make sure I'm there, because he's
14 going to be checking on me. And that was after I
15 had went to his daughter's wedding shower at
16 Weylu's restaurant on June 29, '97.
17   Q. It appears you just read something.
18   A. Yes, sir.
19   Q. And those are from your own personal
20 notes?
21   A. Yes.
22   Q. When did you make the notes that you
23 have in front of you?
24   A. When I started getting tortured.

Page 56

1    Q. I'm sorry --
2    A. My notes --
3    Q. I'm not trying to be cute. What do you
4 mean, when you started being tortured?
5    A. My calendars go from when I was in the
6 academy. I started -- when I worked in CID one of
7 the things I learned from my superior officers in
8 CID was to always keep a personal book of
9 incidents that happened on the job.
10   Q. A personal diary, if you will?
11   A. Correct.
12   Q. Who in CID told you to do that?
13   A. Sergeant Pisano, Sergeant Borgioli.
14   Q. So you started keeping, if I may call
15 it a diary, of all your personal notes, after
16 your temporary assignment to CID?
17   A. No, before that. Before my temporary
18 assignment.
19   Q. Did you keep a journal for your first
20 year and a half on the Revere Police Department?
21   A. Yes.
22   Q. What is the method in which you kept
23 notes? Did you do it on a daily occasion, to
24 prepare these notes you're referencing, your

## Page 57

1 personal notes?
2    A. When I worked? Is that -- I mean --
3    Q. I'm just trying to figure out --
4    A. There was really no rhyme --
5    Q. Every night would you sit down at a
6 computer or note pad and write them out? That's
7 what I'm trying to figure out. What were the
8 methods of your note-taking?
9    A. When I went to school I wrote down
10 when I had school. If I took a day off I wrote
11 down when I took a day off. Got in an accident, I
12 wrote down about my accident. I'm -- I keep all
13 my -- I like to say, my files in order. So I, you
14 know, would write it down. If something happened
15 I'd write it down. I've got '96 in here, so I
16 mean --
17    Q. So when do your notes begin, the
18 earliest date in time?
19    A. March of '96.
20    Q. That's a few months after you started
21 in the Revere police, as an officer on the
22 street?
23    A. Yes.
24    Q. The notes you have in front of you,

## Page 58

1 which you indicated, ma'am, started in March of
2 1996, were they always computerized?
3    A. No.
4    Q. Back in March of '96 were they
5 handwritten or on computer?
6    A. Handwritten.
7    Q. At some point you changed the format
8 and typed your handwritten notes?
9    A. Yes.
10    Q. When was that done?
11    A. 2001, when I filed a complaint with
12 MCAD.
13    Q. Do you still have your handwritten
14 notes?
15    A. My calendars.
16    Q. You have in your hand what looks like
17 a monthly calendar for the year of 1997, which is
18 about two -- say three inches by five inches.
19    A. Here's my other one, so --.
20    Q. Okay. I guess, ma'am, what I'm just
21 trying to find out is, you took information from
22 your daily planners or calendars, and then you,
23 in 2001, created it into a --
24    A. And notebooks.

## Page 59

1    Q. -- a typewritten --
2    A. And notebooks. I didn't have any rhyme
3 or reason. I just --.
4    Q. Okay. And you still have the
5 notebooks?
6    A. My notebooks?
7    Q. That's what I'm asking. The notebooks
8 you're referencing --
9    A. Not here, but --
10    Q. -- which came to be or turned into the
11 typewritten memo you have in front of you or, as
12 you called them, your personal notes.
13    A. Yeah.
14    Q. You still have some of them, but not
15 with you currently, is that correct?
16    A. Mm-hmm.
17    Q. Yes?
18    A. Yes.
19    Q. Okay.
20    A. It's much easier to reference pages
21 rather than going -- sometimes I have to, but --.
22    Q. Okay.
23    A. My life in a book.
24      MR. AKERSON: Can we take a short

## Page 60

1 break? I'll make some copies of those for
2 counsel.
3      MR. DILDAY: Sure.
4      (Five-minute recess.)
5      MR. DILDAY: Let me say that during the
6 break I caucused with my client, and I talked to
7 Carlton Dasent, and it's my understanding that
8 this document that she's been reading from her
9 notes was prepared at the request of Mr. Dasent
10 when he was drafting the Complaint, and so, now
11 that I know that, I would object, and we will not
12 turn it over, as it's something that was prepared
13 in preparation of litigation.
14      MR. AKERSON: Well, just for the
15 record, I think everything that was just said is
16 contrary to everything on the record already in
17 this deposition regarding the documents, and also
18 they were requested under document requests and
19 not produced, and there was no objection stated.
20 Thereby, the objection is waived. So at this
21 conference right now, the Rule 7.1, in advance of
22 filing a motion for the documents, Mr. Dilday,
23 are you saying that there's a stack of documents
24 which, in essence, is a diary or personal notes

Page 61

1  of Ms. James that you're not agreeing to produce?
2  Is that correct?
3      MR. DILDAY: Let me state that I'm not
4  agreeing to produce these papers which I've
5  recently found out were prepared in preparation
6  for litigation and prepared in the process of
7  drafting a Complaint, and it's absolutely clear
8  that I will not produce them today.
9      MR. AKERSON: What Complaint are you
10 referencing?
11     MR. DILDAY: The Complaint that we have
12 in court today, why we're here for this --
13     MR. AKERSON: The court case.
14     MR. DILDAY: Yes, the case in the
15 federal court.
16     MR. AKERSON: I understand you're not
17 producing them today. We'll have to take that up
18 to Judge Sorokin.
19     Second topic: In terms of the original
20 notes, we want a copy of the original notes made
21 by Ms. Pechner-James which she indicated were in
22 handwritten fashion beginning in March of 1996.
23 We want a copy of those.
24     MR. DILDAY: Those handwritten notes

Page 62

1  might be a different matter. What I mean by that,
2  those handwritten notes were not requested and
3  prepared in preparation of litigation. And so the
4  handwritten notes I, at this time, am not
5  objecting to. I reserve my right to object later
6  on, but I'm not objecting to them at this time.
7      MR. AKERSON: Let's move on.
8      MR. PORR: I believe she has the
9  diaries, the calendars that have the handwritten
10 notes, with her?
11     MR. DILDAY: I talked to her about
12 those diaries, and some of the issues in those
13 diaries are strictly personal and have absolutely
14 nothing to do with these proceedings. I would
15 like to go through the diary with her, redact
16 what's personal, and I have no problem giving
17 those to you.
18     MR. AKERSON: I have a hard time
19 understanding that inasmuch as there's a very
20 broad, if you will, emotional damage claim, broad
21 in scope, in terms of time, and anything of a
22 personal nature which may adversely impact one's
23 personal well-being certainly is --
24     MR. DILDAY: If her diary said she's

Page 63

1  going on a date with Robert Smith, that has
2  nothing to do with this lawsuit, and you should
3  not be privy to that.
4      MR. AKERSON: But having gone on a date
5  with Robert Smith, dated Robert Smith for a while
6  and then had a harsh break-up, and that's
7  memorialized in there, that certainly would
8  impact on the damages in terms of limiting these
9  issues.
10     (Counsel and witness conferring.)
11     MR. DILDAY: We'll deal with that
12 later.
13     Like I said, I want to go through it
14 with her. I've never seen these diaries.
15     MR. AKERSON: The handwritten diaries
16 referenced earlier.
17     MR. DILDAY: The handwritten diaries.
18 I've never seen them. As I said, at this time I
19 have no objection giving them to you, but I would
20 like to go through them with Ms. Pechner-James
21 and see what personal things should be redacted.
22     Let's say, for example, she said she
23 had sex with John Smith. That's none of your damn
24 business. Do you think it is, in relationship to

Page 64

1  this lawsuit?
2      MR. AKERSON: I have no idea what's in
3  the diaries.
4      MR. DILDAY: I don't either, but --
5      MR. AKERSON: To be honest with you,
6  frankly, given the nature of the claim here, in
7  terms of Ms. Pechner-James' -- correct me if I'm
8  mistaken: Her allegation is that she's sensitive,
9  and she felt that these incidents of underwear
10 hanging on the wall, somebody showing a dirty
11 magazine, those are her allegations, and those
12 adversely affected her personally in terms of her
13 emotional and physical well-being. I think the
14 issue of having sex with somebody certainly is in
15 play for this type of case.
16     MR. DILDAY: I respectfully disagree.
17     MR. AKERSON: Well, let's move on with
18 the deposition. I'll note my objection, and I'll
19 further note that we have had a Rule 7.1
20 conference on this matter on the record, so we
21 can go forward. Okay, Mr. Dilday?
22     MR. DILDAY: Mm-hmm.
23     MR. AKERSON: Mr. Porr, anything to
24 add?

Page 65

1  MR. PORR: No, I think we've covered
2  it.
3  MR. AKERSON: Likewise, the 7.1
4  conference?
5  MR. PORR: Yes, I'll be joining any
6  motion that's filed.
7  Q. Okay, Ms. James. Again, I'm going to
8  direct your attention to the time period 1997.
9  You indicated your relationship with
10 Bernard Foster had changed from a great
11 relationship to a less than great relationship.
12 Is that correct?
13 A. Mm-hmm.
14 Q. You had indicated you mentioned this
15 change of relationship, I gather, to several
16 different people. You mentioned Roy Colannino,
17 Captain Roland, Chief Russo -- Deputy Chief --
18 and Kevin Millerick. Do you recall stating that?
19 A. Mm-hmm.
20 Q. When did you talk to -- that's a
21 "yes"?
22 A. Yes.
23 Q. When did you speak to Roy Colannino
24 and what did you say to him?

Page 66

1  A. I spoke to Kevin Millerick on August
2  26, 1997.
3  Q. Ma'am, how, as you sit here today, are
4  you so certain of that date?
5  A. Yes.
6  Q. No. How is it that you're so certain
7  of that date that you spoke with Kevin Millerick?
8  A. Because I went home sick that day
9  after speaking with Kevin.
10 Q. One other point. Have you looked at
11 some documents --
12 MR. DILDAY: I'm sorry. Can I take one
13 more break for a second? I apologize to you.
14 MR. AKERSON: Certainly.
15 (Short recess.)
16 Q. Ms. James, I just asked you a question
17 a moment ago. You mentioned a conversation with
18 Kevin Millerick that took place on August 26,
19 1997. My question is, how are you so certain of
20 that date?
21 A. It's in my calendar. I worked the
22 shift with him.
23 Q. To be more clear, you were looking at
24 a calendar when you testified to that date, is

Page 67

1  that correct?
2  A. Yes.
3  Q. Were you looking at a calendar or were
4  you looking at your personal notes?
5  A. My notes --
6  Q. That we talked about earlier in the
7  depo.
8  A. My notes.
9  Q. What did you say to Kevin Millerick on
10 August 26 of 1997 about Lieutenant Foster?
11 A. "What did I did wrong?" I was still --
12 I was still upset. Just feel --
13 Q. Anything else -- I'm sorry.
14 A. I just feel the animosity. What did I
15 do wrong. He knew I was upset and he told me to
16 go home. Told me to go home early.
17 Q. The "he" being Kevin Millerick?
18 A. Kevin Millerick.
19 Q. What was his rank at that time?
20 A. Sergeant.
21 Q. Can you tell me anything further in
22 your memory about that conversation with Sergeant
23 Millerick?
24 A. No.

Page 68

1  Q. But as you sit here today your memory
2  is exhausted of what you said to him and what
3  Sergeant Millerick said to you on that August 26,
4  1997 date about Lieutenant Foster?
5  A. I don't remember Sergeant Millerick
6  ever telling me anything. He -- you know, he said
7  he didn't know.
8  Q. You said he also told you to go home.
9  A. Right, because I was upset. Physically
10 upset from the prior incident still.
11 Q. Did you say "physically" or "visibly"?
12 I just couldn't hear you.
13 A. Both.
14 Q. What did you say a moment ago?
15 A. "Physically".
16 Q. "Physically", okay. And how were you
17 physically upset on August 27, 1997 that Sergeant
18 Kevin Millerick told you to go home?
19 A. Just felt -- it's feelings. Is that
20 what you -- just felt a little intimidated.
21 Q. You felt intimidated based on your
22 conversation with Sergeant Millerick?
23 A. Whatever happened from the roll call
24 to the period I went over there. I don't remember

Page 69

 1  what happened.
 2  Q. Did something happen on August 26 with
 3  regard to you and Lieutenant Foster on that day?
 4  A. I was being assigned to a walking
 5  route.
 6  Q. Okay. A little bit about the City of
 7  Revere Police Department. Back in August of 1997
 8  did the City of Revere have walking routes?
 9  A. Yes, they did.
10  Q. What are the walking routes? Are there
11  certain names for the parts of the city? What
12  were they called? A certain sector?
13  A. I don't -- I mean, there was certain
14  -- it was Shirley Ave., Broadway. I don't know if
15  there was any more.
16  Q. So there were at least two walking
17  routes, again as of August of '97, in Revere?
18  A. Yes.
19  Q. Okay. There were officers assigned to
20  these walking routes periodically?
21  A. Yes.
22  Q. Every day officers were assigned to --
23  A. No.
24  Q. -- one of these two walking routes,

Page 70

 1  correct?
 2  A. No.
 3  Q. No?
 4  A. No.
 5  Q. Okay. And you felt, because you were
 6  assigned to a walking route, that was punishment?
 7  Is that correct?
 8  A. I was told it was punishment.
 9  Q. My question was, you felt it was
10  punishment, correct?
11  A. No, I was told it was punishment.
12  Q. Okay. So are you telling me you did
13  not feel that it was a punishment by your being
14  assigned to a walking route?
15  A. When you are told by somebody that
16  you're being punished, you're going to be walking
17  Shirley Ave., then you are led to believe that
18  you're being punished. So I guess it's a question
19  that --.
20  Q. Okay. And Lieutenant Foster was the
21  OIC in charge of the day shift, correct?
22  A. I don't know who it was in charge.
23  Q. Okay.
24  A. I know actually Sergeant Millerick

Page 71

 1  must have been in charge, because that's who sent
 2  me home, so --
 3  Q. Are you guessing that or do you know,
 4  ma'am?
 5  A. Guessing what? Who was in charge?
 6  Q. Yes.
 7  A. I don't know who was in charge.
 8  Q. Lieutenant Foster, he was the one who
 9  did the scheduling for the day shift, is that
10  correct, in a patrol capacity?
11  A. Yes.
12  Q. At that point you had been on the job
13  a year and eight months or so?
14  A. Mm-hmm. Yes.
15  Q. And you didn't feel you should be
16  doing walking assignments, is that correct?
17  A. Usually the assignments in the police
18  department -- again I'll say "usually" -- are by
19  seniority basis. Up until you get punished. Then
20  when you get punished you don't have seniority
21  anymore because you're assigned where the OIC
22  puts you.
23  Q. Okay. So in this case you felt that it
24  was improper for Lieutenant Foster to assign you

Page 72

 1  to a walking beat. Again, this would be August of
 2  '97.
 3  A. Yes.
 4  Q. And how long was it that you were
 5  assigned to a walking beat? Again, time frame of
 6  August of 1997.
 7  A. 'Til I was transferred off the shift.
 8  Q. Okay. Well, when were you transferred?
 9  We haven't talked about that yet.
10  A. I don't remember the exact date.
11  Q. Is there anything which could refresh
12  your recollection as to when you were transferred
13  off the shift?
14      MR. DILDAY: Would your calendar
15  refresh you? The calendars that you have.
16      THE WITNESS: It's okay to use my
17  calendar?
18      MR. DILDAY: Yes.
19      The calendars I'm going to give you,
20  so I don't have a problem with that.
21  Q. We were talking about, ma'am, you said
22  you were transferred off the shift, which I
23  believe means the day shift, correct?
24  A. Mm-hmm.

Page 73

1  MR. DILDAY: Yes.
2  Q. Is that a "yes"?
3  A. Yes.
4  Q. Okay.
5  (Witness examining documents.)
6  MR. DILDAY: August of '97.
7  A. What was the question?
8  Q. You indicated, ma'am, you had
9  transferred off of the day shift, whereupon you
10 stopped working a walking route for the Revere
11 P.D.. My question is, when was that transfer?
12 A. Sorry, I can't read my own writing.
13 October 12, 1997.
14 Q. What about October 12 of 1997?
15 A. That's when I was transferred to
16 nights.
17 Q. Did you request the transfer from the
18 day shift to the night shift?
19 A. Yes.
20 Q. Just to define, what hours were the
21 night shift that you were transferred to?
22 A. Midnight to eight, four to midnight.
23 Split shift.
24 Q. You had put the request in writing, or

Page 74

1  could you tell me what the process is to get
2  transferred?
3  A. I didn't put it in writing.
4  Q. But it was a request on your part to
5  be moved from the day shift and go to the night
6  shift?
7  A. Yes.
8  Q. Upon your request for the transfer did
9  you advise anyone of the reason why you wanted to
10 be transferred from days to the night shift?
11 A. Yes.
12 Q. Who was that?
13 A. Captain Colannino. Captain Roland.
14 Russo. Chief Russo. It wasn't a secret.
15 Q. What wasn't a secret?
16 A. That I wanted to get transferred off
17 of the day shift. Most of the supervisors knew.
18 Q. Okay, let's talk about the first one.
19 Captain Colannino.
20 A. Mm-hmm.
21 Q. When was it that you told him that you
22 wanted to be transferred off of the day shift?
23 A. When was it? August 30, 1997.
24 Q. You're looking at a calendar, correct?

Page 75

1  A. Yes.
2  Q. And what does it say in your calendar
3  to remind you that on August 30, 1997 you spoke
4  with Captain Colannino?
5  A. "Told Roy about Bernie."
6  Q. What did you tell Roy about Bernie on
7  that occasion?
8  A. That he's got some type of a problem
9  with me, and I've been told by people that he was
10 out to get me. I have no idea why.
11 Q. And that would be -- I'm sorry, go
12 ahead, please.
13 A. That he was following me, he was
14 coming down the walking route and driving by,
15 telling me put my hat on. Just trying to
16 intimidate me.
17 Q. Those are the things you told to
18 Captain Colannino on August 30, 1997?
19 A. Mm-hmm.
20 Q. You mentioned --
21 MR. PORR: Is that a "yes"?
22 THE WITNESS: Yes.
23 Q. You mentioned one thing, he was
24 following you. You mean Lieutenant Foster was

Page 76

1  following you on your shift?
2  A. He would just keep driving around. The
3  Shirley Ave. route was just Shirley Ave.. At that
4  meeting with me -- there was a sub-station, so
5  officers went into the sub-station on Shirley
6  Ave. to do reports, make phone calls, and, you
7  know, he was making sure that I wasn't sitting in
8  the sub-station, making sure that I wasn't at the
9  restaurant at the end of the street. Just making
10 sure that I had my hat on.
11 Q. Can officers do anything else at a
12 sub-station other than use the phone or write
13 reports?
14 A. Watch television. I don't know if
15 there was a sub -- I don't know if there was a
16 television in the sub-station.
17 Q. Officers could also, at the
18 sub-station, hang out and socialize with other
19 officers?
20 A. Yes.
21 Q. Have coffee?
22 A. Yes.
23 Q. Your concern, Ms. James, is that
24 Lieutenant Foster was following you in your

Page 77

1 walking path, and making sure you were not
2 hanging out at the sub-station. Is it fair to
3 summarize your concern, ma'am?
4   A. My concern is that he told me that he
5 was going to be watching me, so my concern was,
6 why am I being watched? What am I doing wrong? A
7 fear that whatever I was going to do was not
8 going to be the right thing for him.
9   Q. What type of vehicle was Lieutenant
10 Foster in when he was driving around?
11   A. Police cruiser.
12   Q. How was he dressed?
13   A. As a police officer.
14   Q. Uniform? Revere police uniform?
15   A. Right.
16   Q. Was it a marked cruiser?
17   A. Yes, it was a marked cruiser.
18   Q. Were they during the hours of
19 Lieutenant Foster's shift that he was following
20 you when you were walking, and visiting, when he
21 went to the sub-station?
22   A. Yes.
23   Q. When Lieutenant Foster told you to put
24 on your hat, did you not have your hat on?

Page 78

1   A. Probably not.
2   Q. Is the hat part of the police
3 officer's uniform?
4   A. It is part of the officer's uniforms,
5 yes.
6   Q. You told us what you said to Captain
7 Colannino on that August 30, 1997 date. Can you
8 remember anything else that you said to him?
9   A. I have to refresh my memory.
10      (Witness examining document.)
11   Q. I'm sorry, I didn't quite follow that.
12 You said you're not -- what did you say, ma'am?
13   A. I was going to refresh my memory.
14   Q. I'm trying to find out, can you tell
15 us as you sit here today, is there anything else
16 that you can recall that you said to Captain
17 Colannino?
18   A. Not at this time.
19   Q. Could you tell me, on August 30, 1997,
20 what Captain Colannino said to you?
21   A. He'd take care of it.
22   Q. That's what he told you?
23   A. Yeah.
24   Q. Did Captain Colannino say anything

Page 79

1 else?
2   A. Not that I can remember.
3   Q. Was anyone else present during the
4 conversation other than you and Captain Colannino
5 on August 30?
6   A. No. I don't believe so.
7   Q. Transferring from one shift to
8 another, are there certain times of the year when
9 you can request or bid to do that?
10   A. Yes.
11   Q. What times of the year are those, if
12 you know?
13   A. I'm not sure. I don't remember.
14   Q. Do you know, again back at the time
15 when you were employed for the Revere P.D., was
16 there a collective bargaining agreement between
17 the patrolmen and the city?
18   A. Yes.
19   Q. Were you a member of that collective
20 bargaining agreement?
21   A. Yes.
22   Q. Did that provide time periods when job
23 transfers could be made?
24   A. I don't understand the question.

Page 80

1   Q. Sure. Is it your understanding that
2 the collective bargaining agreement, which
3 protected the patrolmen in its relationship with
4 the city, did that provide for any rules or
5 regulations on when you could request transfers?
6   A. I'm not sure.
7   Q. Other than the August 30, '97
8 conversation with Captain Colannino, did you have
9 any further conversations with him -- or I should
10 say after that date -- regarding Lieutenant
11 Foster's actions toward you?
12   A. Yes.
13   Q. Tell me about that.
14   A. Tell you about the conversation with
15 Captain Colannino?
16   Q. Yes. You've told us everything you
17 said you know about the August 30, 1997
18 conversation. My question was, were there any
19 subsequent meetings with Captain Colannino
20 regarding Lieutenant Foster's actions toward you?
21      (Counsel and witness conferring.)
22   A. There was. I don't remember what the
23 date was.
24   Q. Do you recall the substance of the

Page 81

1 conversation with Captain Colannino?
2    A. Yes.
3    Q. Would you be good enough to tell me
4 about that?
5    A. That Lieutenant Foster was harassing
6 me.
7    Q. Do you have any documents which would
8 indicate or refresh your memory as to the date of
9 that meeting?
10    A. Probably.
11    Q. Okay. Would you see if you could
12 refresh your memory?
13       MR. DILDAY: Look at your calendar.
14       THE WITNESS: I don't have my calendar.
15 This one, anyway.
16    Q. I'm sorry, I can't hear you.
17    A. It's not on my calendar.
18    Q. Do you have any documents other than
19 your calendar for 1997 which could refresh your
20 memory as to when you, again, spoke with Captain
21 Colannino and told him that Lieutenant Foster was
22 harassing you?
23    A. Yes, I do.
24    Q. Would you look at that and see if your

Page 82

1 memory can be refreshed?
2       MR. DILDAY: I've advised her not to
3 make any more comments regarding that document,
4 because I found out that it was drafted in
5 preparation of drafting the litigation, and in my
6 response to her, my directive to her is not to
7 make any more statements or answers from that
8 document.
9    Q. In your document, Ms. James -- you
10 called them earlier your personal notes -- does
11 that have a date on it when you met with Captain
12 Colannino? Again, after your August 30, 1997
13 meeting.
14    A. Yes.
15    Q. It does. Would you take a look at that
16 document, see if your memory can be refreshed as
17 to the date?
18       MR. DILDAY: The date is fine.
19       Better still, I won't let her use this
20 document anymore for the purposes of this
21 deposition.
22       So you can put that away.
23       MR. AKERSON: Mr. Dilday, as I
24 mentioned earlier, we're going to have to talk to

Page 83

1 the judge about that.
2       MR. DILDAY: I understand. I have no
3 problem with that.
4    Q. So you told Captain Colannino that
5 Lieutenant Foster was harassing you, correct?
6    A. Yes.
7    Q. Did you give him details as to how you
8 came up with the conclusion that he was harassing
9 you?
10    A. It was well known in the police
11 department before I got out of CID that, you
12 know, he had obviously made comments that he was
13 out to get me. Other than the fact of being --
14 having, you know, sometimes three, four, five
15 junior officers -- like I said, you know, again,
16 seniority was, you know -- seniority was a big
17 thing in the police department, so you worked the
18 sector based on your seniority.
19    Q. Okay.
20    A. I -- I told him I couldn't eat, I
21 couldn't sleep. At one point, I don't know if I
22 was, you know -- that occasion or -- I requested
23 to see the city -- city doctor, psychiatrist,
24 because I couldn't sleep.

Page 84

1    Q. Again, that was in 1997?
2    A. I don't -- I don't -- I don't know if
3 it was '97. I don't recall the date. May have
4 been.
5    Q. Who was the city doctor that you
6 requested to see?
7    A. The same one that we went when we got
8 hired. Dr. Barry.
9    Q. How many times did you see Dr. Barry?
10    A. Five or six times.
11    Q. I know you said you saw him initially
12 when you were hired for the police job. You saw
13 him five or six times after that initial visit
14 with him?
15    A. Yes.
16    Q. Who requested to see Dr. Barry? Did
17 you request it or did the department request that
18 you see him?
19    A. No, I requested from the chief.
20    Q. Which chief?
21    A. From -- I think I might have requested
22 it from both. From Russo and the chief.
23    Q. Chief Colannino?
24    A. Yeah.

Page 85

1  Q. I know there was a period when there
2  was Chief Russo and then Chief Colannino. So is
3  it your understanding that five to six times you
4  requested of the chiefs, whether it's Russo or
5  Colannino, to see Dr. Barry?
6  A. I requested once or twice, and I just
7  followed up on my own. They didn't know --
8  Q. You mentioned assignments were based
9  on seniority. Where were you getting that from?
10 Was that a rule of the department or collective
11 bargaining agreement?
12 A. I don't remember.
13 Q. But you believe that assignments were
14 based on seniority in the department? That's --
15 A. That's what I was told.
16 Q. Is that your understanding, ma'am,
17 that's the sole measuring stick of how
18 assignments are given out?
19 A. Yes.
20 Q. Now --
21 A. Or patrol assignments.
22 Q. For patrol.
23 A. Correct.
24 Q. People of patrolman's rank, correct?

Page 86

1  A. Yes.
2  Q. In your second meeting, a date unknown
3  to us, because you won't look at your personal
4  notes, did Captain Colannino respond to you in
5  any way?
6  A. Yeah, he told me again he was going to
7  take care of it.
8  Q. Do you recall Captain Colannino saying
9  anything else?
10 A. I recall him telling me a story about
11 when he first got on the job, and --
12 Q. Do you recall what the story was or
13 what point he was trying to make?
14 A. Yeah, "Toughen up." That was the
15 point.
16 Q. Did you ever talk to -- again, this is
17 the August of 1997 period -- did you ever talk to
18 Lieutenant Foster and tell him you did not want
19 to work a walking assignment?
20 A. I was called back in after I went to
21 Roy Colannino, I was called back in to the roll
22 call room by Lieutenant Foster --
23     MR. AKERSON: Let's take a one-minute
24 break. I'll get some, Jim.

Page 87

1      (Whereupon, at 12:25 p.m., a luncheon
2  recess was taken.)
3
4
5
6
7        A F T E R N O O N   S E S S I O N
8             (1:40 p.m.)
9
10 CONTINUED EXAMINATION BY MR. AKERSON:
11
12 Q. Ms. James, we're going to go back on
13 the record now. I want to take a step back.
14     Before we broke for lunch I asked you
15 about who did you complain to at the Revere P.D.
16 about the fact that you wanted to be transferred
17 off the day shift to another shift. One person
18 you had mentioned was Captain Colannino. Do you
19 remember?
20 A. Yes.
21 Q. You mentioned on August 30, '97 you
22 met with Captain Colannino regarding your
23 complaints, and you mentioned there was a second
24 date. Is that correct?

Page 88

1  A. Yes.
2  Q. Do you know the date of that second
3  complaint to Captain Colannino?
4  A. It was -- it wasn't Captain Colannino.
5  It was Chief Russo.
6  Q. I'm --
7  A. It was somewhere after -- I would say
8  somewhere after June 30.
9  Q. Okay. What was somewhere after June
10 30? I don't follow you.
11 A. Instead of going to Colannino, because
12 Colannino, instead of handling it, I had spoke --
13 you asked what I had said to Colannino. After
14 refreshing my notes, I asked him to have a
15 meeting with the three of us so I could find out
16 what it is that Bernie is so upset about --
17 Lieutenant Foster -- and instead of having the
18 meeting with the three of us he called in
19 Lieutenant Foster and had a conversation with
20 Lieutenant Foster, which I wasn't there, and just
21 made the situation worse, at which time I was
22 telling you I was called in by Lieutenant Foster
23 after Captain Colannino spoke with him.
24 Q. If I could stop you right there. Just

Page 89

1 inasmuch as you used the pronoun "he" on a few
2 occasions, you've lost me, so let me take you
3 back.
4       Did you speak with Captain Colannino
5 on August 30, 1997 regarding your complaints and
6 the reasons why you want to be transferred off
7 days?
8    A. Yes.
9    Q. And you, earlier in this deposition,
10 explained what that conversation entailed. At
11 this point in time do you have anything else to
12 add about that August 30, 1997 conversation with
13 Captain Colannino?
14    A. Again, I don't know if I said I -- you
15 know, I asked him to find out what it was that
16 made Lieutenant Foster so angry. I asked if the
17 three of us could resolve -- have this issue
18 resolved quickly. I told him that I wasn't
19 sleeping. I wasn't eating. And at that point he
20 reassured me that it would be handled properly.
21    Q. You appear to be reading, Ms. James.
22 Where are you reading from?
23    A. From my notes.
24    Q. If you could direct my attention to

Page 90

1 what page you're talking about in your notes.
2    A. Page 5. August 30.
3       MR. AKERSON: If I may mark this as an
4 exhibit to the deposition.
5       MR. DILDAY: Yes, no problem.
6    Q. I'll place a document in front of you,
7 ma'am. Take a look, take a flip through it, and
8 tell me if you know what it is.
9       (Handed to witness.)
10    A. If I know what this document is?
11    Q. Yes.
12    A. A list of my notes.
13    Q. Okay --
14    A. Of the incidents that occurred while I
15 was on the job.
16    Q. It appears to be a 21-page document.
17 Is that your understanding, as well?
18    A. Yes. Twenty-one pages.
19    Q. That's a document that you created?
20    A. Yes.
21       MR. AKERSON: May I have this marked
22 number 1?
23       (Document marked.)
24    Q. I'm going to place in front of you,

Page 91

1 ma'am, something that's been marked as Exhibit 1
2 to this deposition. Though we may have covered a
3 little bit previously, I want you to tell me how
4 this document, which appears to be 21 pages,
5 primarily single-spaced typewritten text, how
6 this came to be created.
7    A. Just after talking the first time I
8 put this document together for Carlton Dasent,
9 because it gave the -- as you can see on there,
10 it gave the structure of the police department,
11 what the ranks were, the officers' names, who may
12 or may not be -- you know, I -- again, these are
13 mine -- who was the chief at the time -- I mean
14 -- at the time, people that were named in the
15 complaint, just to make it a little bit easier
16 for Carlton to get together documents, I guess.
17    Q. As --
18    A. My -- he wanted to know what my
19 training was on the job.
20    Q. Okay. This document marked as Exhibit
21 1, when was it created?
22    A. I think, sometime in 2001. I don't
23 have a date on it.
24    Q. I didn't notice a date. That's why I

Page 92

1 was asking.
2    A. Yeah, I believe it was 2001.
3    Q. Was this document created all at the
4 same time?
5    A. Well, I think it took me a little
6 while to put together.
7    Q. Okay.
8    A. Twenty-one pages.
9    Q. I guess that's what I'm trying to
10 figure out. On how many occasions was it put
11 together?
12    A. I don't remember.
13    Q. Were there earlier versions of this
14 document marked as Exhibit number 1, although in
15 slightly different presentation?
16    A. I guess I don't understand the
17 question.
18    Q. Sure, that's fair. Fair response to a
19 bad question.
20       MR. DILDAY: I understood it.
21       THE WITNESS: Explain it to me.
22    Q. This 21-page document marked as
23 Exhibit 1, that you have before you, were there,
24 prior to this Exhibit 1's existence, were there