## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **TERRI PECHNER-JAMES** and | : | |
| **SONIA FERNANDEZ,** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **C.A. No.: 03-12499MLW** |
| | : | |
| **CITY OF REVERE, THOMAS AMBROSINO,** | : | |
| **Mayor, CITY OF REVERE POLICE** | : | |
| **DEPARTMENT, TERRENCE REARDON,** | : | |
| **Chief, BERNARD FOSTER, SALVATORE** | : | |
| **SANTORO, ROY COLANNINO, FREDERICK** | : | |
| **ROLAND, THOMAS DOHERTY, JOHN** | : | |
| **NELSON, JAMES RUSSO, MICHAEL** | : | |
| **MURPHY** and **STEVEN FORD,** | : | |
| | : | |
| **Defendants.** | : | |

_____:

## NOTICE OF APPEAL PURSUANT TO RULE 72 OF ORDER ON PLAINTIFFS REQUEST TO ENLARGE TIME FOR DISCOVERY

Plaintiffs, Terri Pechner-James and Sonia Fernandez, hereby appeal the following recommendations of the Magistrate-Judge entered on May 1, 2006 as Docket No. 181 in the above entitled action.

In Docket 181, the Magistrate, ALLOWS in part and DENIES in part the Plaintiffs Request To Enlarge Time. The Plaintiffs hereby appeal as much of Docket 181 as denies the Plaintiffs request for enlargement of time.

## Introduction:

The question presented by the relevant pleadings is,  in light of Judge Wolf's ruling in Docket No. 136,  whether the period of discovery should be extended to permit Plaintiffs

to serve interrogatories, serve request for production of documents and conduct depositions of the following Defendants, City of Revere, Thomas Ambrosino, Mayor, and Terrence Reardon, Chief of Police.

## Background:

On October 6, 2003, the Plaintiffs, two female officers of the City of Revere, filed a verified complaint in Suffolk Superior Court asserting claims for hostile work environment based upon sexual and racial harassment (Count I), constructive discharge (Count II), disparate treatment (Count III), and infliction of emotional distress (Count IV).

The Defendants filed no answer, and asserted no defenses or counterclaims while the action was pending in the Suffolk Superior Court. On December 11, 2003, more than two months later, the Defendants moved the case to the Federal Court. The Notice of Removal was the first response to the Plaintiffs cause of action. See Docket No.1.

The State Court record showed that Thomas Ambrosino was served on November 11, 2003, answer due December 1, 2003, Terrence Reardon served on November 11, 2003, answer due December 1, 2003. Docket No.2. No answer, defense or counterclaim was filed in the State court.

On February 12, 2004, Plaintiff, Terri Pechner-James filed a Motion For Partial Summary Judgment on Count 1 and Count 2 only pursuant to Fed. R. Civ. P. 56 (c ). The Defendants did not file a response to this motion. On February 25, 2004, the Defendants filed a motion for extension of time to March 15, 2004 to file Response/Reply to Plaintiff's Motion For Partial Summary Judgment.

On February 27, 2004, more than four months after the Plaintiffs filed their complaint, the Defendants filed a general denial to the Palintiffs complaint. On June 2, 2004, the Court ordered a scheduling conference for June 24, 2004 at 3:30 p.m. in Courtroom 10 on

the 5th Floor. This scheduling conference was cancelled by the Court. On August 19, 2004, the scheduling conference was set for September 23, 2004 at 3:00 pm in Courtroom 10. This conference took place and on September 24, 2004, the court issued the following scheduling order: Docket No 26.

1. Final pretrial conference set for 11/17/2005 in Courtroom 10.
2. Status conference set for 10/25/2005
3. Amended pleadings due by 10/8/2004
4. Discovery due by 9/30/2005
5. Jury Trial set for 11/28/2005

Almost six months after the scheduling conference, on February 14, 2005, the Defendants filed a Notice of Substitution of Counsel. Ira H. Zaleznik was replaced, as counsel of record, by Paul Capizzi and Walter Porr. Docket No 28.  On March 1, 2005, the Defendants filed a motion for summary judgment by Terrence Reardon, Docket No. 29; a statement of fact and ten exhibits was filed on the same day. Docket No. 30.

Six weeks later, on April 12, 2005, the Defendants filed a motion for summary judgment by Thomas Ambrosino, Docket No. 37 and a statement of facts filed on the same day Docket No. 39. On October 12, 2005, seven months later, the magistrate recommended to the judge that the Court allow the Defendants Motion For Summary Judgment as contained in Docket Nos 29 and 37. No depositions were held by either Defendants or Plaintiffs prior to or on the date of that recommendation.

On March 20, 2006, Judge Mark L. Wolf, entered an Order, Docket No. 136,  that rejected the Magistrate's recommendation and denying the Defendants motions as filed in Docket Nos. 29 and 37.  This appeal is based upon that Order.

**History of Depositions:**

The first deposition in this case was held on January 10, 2006. Terri Pehner-James was deposed at the offices of Reardon, Joyce & Akerson, P.C 397 Grove Street Worcester, MA 01605. Present at that deposition were City Solicitor, Paul Capizzi, Walter Porr,

Michael Akerson, James Dilday and Terri Pechner-James.  Neither the Defendants nor the Plaintiffs had conducted any depositions prior to January 10, 2006.

Since January 2006, the Plaintiffs have completed almost four hundred interrogatories, they have been deposed on several occasions in Worcester, Massachusetts and their deposition schedule for May is as follows:

> May 5, 2006 from 10:00 a.m. to 5 p.m. in Worcester – Terri James
> May 11. 2006 from 1 p.m. to 5 p.m. at Revere City Hall-Terri James
> May 12, 2006 from 10 a.m. to 5 p.m. in Worcester-Sonia Fernandez
> May 16, 2006 from 1 p.m. to 5 p.m. at Revere City Hall-Sonia Fernandez
> May 18, 2006 from 10 a.m. to 5: p.m. in Worcester – Sonia Fernandez
> May 19, 2006 from 1 p.m. to 5 p.m. at Revere City Hall – Terri James
> May 25, 2006 from 10 a.m. to 5 p.m. in Worcester – Terri James
> May 26, 2006 from 10 a.m. to 5 p.m. in Worcester – Sonia Fernandez
> May 30 2006 from 10:30 a.m. to 5 p.m. at Revere City Hall-Terri James

The "normal fashion" in which depositions are scheduled requires more than eleven days notice. Fed. R. Civ. P 30 (b)(1) requires reasonable notice to the parties  affected. The parties in this action have usually provided a fifteen to thirty day notice for depositions. In addition, the Plaintiffs did not have eleven days.

**(1) The Magistrate's decision appears calculated to frustrate the Judge's decision in Docket No. 136.**

On March 20, 2006, Judge Mark L. Wolf entered an Order denying Docket No. 29 and 37. He stated in his opinion that:

> In a single paragraph, without citation to any case law, the Magistrate Judge in his October 12, 2005, Report and Recommendation recommends that the claim against Ambrosino and Reardon in their official capacities be dismissed because the City of Revere is also a defendant and the monetary relief plaintiffs are seeking can be obtained from the City.

The Judge then stated:

> The Magistrate Judge's recommendation is not persuasive. As this court has written:
>
> > [A] City is not liable on a respondeat superior basis for the constitutional torts of its employees. Rather [a] City is liable under 42 U.S.C § 1983 only if its proven that the unconstitutional conduct of its employees implements or executes a municipal policy or custom. This means that the actions of

> subordinate officials alone cannot create municipal liability. Rather, [a] City is potentially liable only for the conduct of its final policymaker or policymakers concerning the conduct in question.

The Judge concluded that:

> If municipal liability remains an issue in this case, the court will have to identify the final policy maker or policymakers for the City of Revere..At this point, Ambrosino, Reardon or both could be an official policymaker…It is, however, not possible to make this determination on the present record. Therefore, it is not appropriate to dismiss Ambrosino or Reardon in their official capacities.

The Judge entered this Order on the record on March 20, 2006. March 20, 2006 was a Tuesday. The entry was not immediately served by electronic means to all parties. March 24, March 25, and March 31 were weekend days. Depositions are generally not conducted on the weekends. The time available to give reasonable notice and conduct depositions of both the Mayor and the Chief is eight days or less. Fed. R. Civ. P. 30(b)(1) requires reasonable notice. During this period the parties were conducting the following depositions:

> Sonia Fernandez on March 21, 2006 in Worcester
> Sonia Fernandez on March 24, 2006 in Worcester

This reduces to six days, the time available to notice and conduct depositions of the Mayor and the Chief of Police. There is no bright line rule as to what is reasonable notice but it has been held that six days notice was not reasonable. See In re Stratosphere Corp Securities Litigation, 183 F.R.D. 684, 687 (D. Nev. 1999). The expectations of the Magistrate are not reasonable.

The Judge noted in his Memorandum and Order that it was not possible to determine whether one or both were policymaker[s] based on the present record.  He stated: "it is premature to decide if either or both can be held liable in their official capacities..."  The Plaintiffs Motion to Enlarge Time was designed to improve the present record so that when the Judge tries Phase Two of this case more information will be available for the critical determination of whether one or both are official policymakers for the purpose of municipal liability.

The Magistrate's recommendation violates the spirit and intent of the Judge's Order. The Plaintiffs sought the extension of time so that the deposition of the Mayor and the Chief could be conducted in the normal and usual manner. Since January 2006, the Defendants have developed their record by propounding three hundred and eighty-eight interrogatories upon the Plaintiffs and placing those interrogatories on the record; they have pursued extensive document requests, they have already conducted a total of six depositions, three on each Plaintiff; they have ten more depositions scheduled in May 2006 between both Plaintiffs.

The critical inquiries in a municipal liability claim are the policy and customs of the municipality and its official policymakers, in this case, the Mayor and the Chief of Police. The City Council could also be considered a policymaker in a City with a Plan B charter, like the City of Revere. The Magistrate's Order Docket 181 effectively prohibits the plaintiffs from conducting the discovery necessary to support their claim, in the same manner he has allowed the Defendants to use the discovery process to develop their defenses.

The Magistrate states that a court "is free to enforce its discovery rules by ordering compliance, sanctions, or any other appropriate remedy." Samos Imex Corp. v Nextel Communications, Inc. 194 F. 3d 301. The Plaintiffs do not question the court's discretion, however, the Plaintiffs have the right to uncover, through discovery, facts necessary to support their claims. "Judicial economy may not take precedence over the right of parties to conduct discovery." Wakham v Burgess, 2006 U.S. Dist. 9254 (S.D.N.Y. 2006).

The Plaintiffs do not seek to propound four hundred interrogatories upon these two Defendants, they are not requesting seven or eight days of depositions; the Plaintiffs seek to depose each Defendant one at the most two days. They do not seek voluminous and wide ranging documents, they seek only to obtain the documents that relate to the custom and practice of he municipality and its  history of investigating matters of sexual and racial discrimination.

The Plaintiffs have attached as **Exhibit A** a list of one hundred questions addressed to the Mayor. These questions will highlight the failure to investigate and the absence of an investigatory mechanism that is central to the issue of municipal liability. They have also attached as **Exhibit B** a list of one hundred questions addressed to the Chief of Police. These questions also highlight the Department's custom and practice over many decades. This deposition is particularly important because Terrence Reardon, Chief of Police has held many official positions in the Revere Police Department and would be familiar with the policy and customs of the Department and the City.

The Plaintiffs have also attached as **Exhibit C** a list of one hundred questions addressed to a member of the City Council. The City Council confirms the appointment of the Chief of Police in a Plan B Charter city like Revere. They have oversight and budgetary responsibilities.

## Conclusion:

Municipal liability remains an issue in this case. It is necessary for the court to identify the final policymaker or policymakers for the City of Revere. <u>Gonsalves v City of New Bedford,</u> 939 F. 2d 916 (D.Mass. 1995) citing <u>Monell v Department of Social Services</u>, 436 U.S. 658, 691-94 (1978); <u>City of St. Louis v Praprotnik</u>, 485 U.S. 112, 123 (1988). The Magistrate's denial of discovery in Docket No. 188 frustrates the intent of the Judge's ruling in Docket No 136.  Due process, fairness and justice require that the Magistrate's denial of discovery in Docket No. 181 be rejected. That recommendation is unfortunately based on the same misunderstanding of municipal liability that was evident in his recommendation in Docket No. 88. Identifying the policymakers,  through interrogatories and depositions, are an essential part of  the doctrine of municipal liability.

As Judge Wolf pointed out in his Memorandum and Order, the Magistrate's decision was based on the erroneous theory that "because the City of Revere is also a defendant and the monetary relief plaintiffs are seeking can be obtained from the City" the policymakers are unnecessary. This erroneous assumption is also present in his denial of discovery in

Docket No. 181. Without citation to case law the Magistrate has recommended that the Defendants may answer interrogatories but that Plaintiffs cannot, as the Defendants have since January 2006, then pursue depositions and build the record identified by the Judge Wolf in Docket No. 136. The undeniable effect of the Magistrate's ruling is to force the Plaintiffs into a trial without the record necessary to establish municipal liability. To restrict the Plaintiffs to interrogatory responses alone, while permitting the Defendants an exceedingly broad scope of discovery, including 400 interrogatories and seven full days of depositions seems patently unfair.

It is not the kind of discovery intended by the Federal Rules of Civil Procedure.  The Magistrate's recommendation must be rejected. Judicial economy may not take precedence over the right of [Plaintiffs] to conduct adequate discovery. The Magistrate's recommendation does not represent judicial economy. It not only denies Plaintiffs the right to depose the policymakers but it also requires them to bring motions to compel in order to obtain discovery material essential to municipal liability and vital to Phase Two of Plaintiffs trial.

Terri Pechner-James and
Sonia Fernandez
By their attorney

/s/ James S. Dilday, Esq.
James S. Dilday, Esq.

**EXHIBIT A**

## DEPOSITION QUESTIONS FOR THE MAYOR

1. What date did you become Mayor of the City of Revere?

2. Please explain the powers and responsibilities of the Mayor and the City Council.

3. Please explain the powers and the responsibilities of the Chief of Police.

4. Did you have any training in how to train, supervise and discipline police officers?

5. Did you have any training in how to conduct internal affairs and how to investigate complaints?

6. Does your authority as Mayor include general oversight of each executive department including the police department?

7. Please describe what you did to exercise your authority over the police department during the first year after you became Mayor of the City of Revere?

8. Please describe what you currently do to exercise your authority over the police department.

9. Are you familiar with the state law that governs your authority and responsibilities as mayor over the police department.

10. Are you familiar with the city ordinance that governs your authority and responsibilities over the police department?

11. Is it fair to say that you have general executive authority over the department in that you could direct the chief of police.

12. Is it fair to say that you have general executive authority over the department but in your absence the chief has full control over both the department, the policies and its operations?

13. Is the position of the chief of police created by state law or city ordinance.

14. Can the chief of police discharge you from your employment?

15. Can you discharge the chief of police from his position as chief of police of the city of revere?

16. Does the city council of the city of revere have any power over the chief of police? What are those powers?

17. Can the city council discharge the chief from his position as chief of police?

18. Did you appoint Terrence Reardon as chief of police?

19. Did you need the approval of the city council to confirm his appointment?

20. What was the date of his appointment?

21. Prior to Terrence Reardon, who was chief or acting chief of police?

22. Did you consider more than one applicant?

23. Did the other candidates have equal qualifications?

24. In what way was Terrence Reardon a better choice than the other candidates ?

25. Is Terrence Reardon, still chief of police ?

26. Has Terrence Reardon been chief for the entire time that you have been mayor of the city of revere?

27. Were there other chiefs or acting chiefs during your tenure as mayor?

28. Does the police department have a sexual or racial harassment policy?

29. Did the police department have a sexual harassment policy when you took office?

30. Have you changed or updated the current policies since taking office ?

31. Have you read the sexual harassment policy?

32. What steps have you taken to ensure that the city of revere, including the police department comply with the state and federal requirement that the workplace be free from racial and sexual harassment?

33. Have you reviewed the sexual harassment policies with chief Reardon?

34. Have you reviewed the racial harassment policies with chief Reardon?

35. How many times did you conduct such a review?

36. What  are the chief's obligation to you with regard to complaints of either sexual or racial harassment?

37. How often did you meet with chief Reardon to review these policies?

38. How often did you meet with chief Reardon to review complaints made under these policies?

40. How did you handle complaints brought to you by the chief?

41. Did the chief inform about the complaints of discrimination filed by Sonia Fernandez?

42. Did you personally review that complaint ?

43. Did you determine who was responsible for the investigation of those complaints?

44. Were you personally satisfied with the investigation of those complaints?

45. Did the chief inform you about the complaints of discrimination filed by Terri Pechner-James ?

46. Did you personally review that complaint?

47. Did you determine who was responsible for the investigation of those complaints?

48. Were you personally satisfied with the investigation of those complaints?

49. What advise did you give the chief and what steps did you take to assist him in handling the complaints of Sonia Fernandez and Terri Pechner-james?

50. If the chief did not enforce the policies of the department, what action did you take as a result of that failure?

51. Did you ever take action against chief Reardon for failure to enforce sexual harassment or any other law, policy or rule?

52. Can you review the disciplinary decisions of the chief ?

53. Did you ever review,  reject or overrule any of the chiefs disciplinary decisions?

54. How many decisions were affected and what were the dates of your actions?

55. State the reasons that you reviewed, rejected or overruled the chiefs decisions?

56. Did you ever seek more information as a result of  your dissatisfaction with the chief's decisions?

57. Did you ever talk to officers or other witnesses about the complaints of Sonia Fernandez?

58. Is it fair to say that you were satisfied with the chief's handling of that complaint?

59. Did you ever talk to officers or other witnesses about the complaints of Terri Pechner-James?

60. Is it fair to say that you were satisfied with the chief's handling of that complaint?

61. Did you prepare any reports or make conclusions as a result of talking with officers and witnesses?

62. Did you followup the information you gained from talking to officers and witnesses about Sonia Fernandez.

63. Did you followup the information you gained from talking to officers and witnesses about Terri Pechner-James?

64. Were you personally involved in gathering information on both Sonia Fernandez and Terri Pechner-James or did you delegate that responsibility.

65. What action did you take as a result of the information you received during you followup?

66. Does the city of revere have a Plan B form of government?

67. Can you explain you understanding of a Plan B form of government?

68. Does the mayor have centralized power and more control than the council members under a Plan B form of government?

69. Do you have any training in police administration?

70. Prior to taking office as mayor, did you have any training in  how to train, supervise and discipline police officers?

71. Prior to taking office as Mayor, did you have any training in how to conduct internal affairs investigations, sexual harassment investigations, racial harassment investigations or investigations of unlawful discrimination?

72. Prior to taking office as Mayor, did you have any training in how to investigate cases of sexual harassment, racial discrimination or other forms of discrimination?

73. Prior to taking office as Mayor, did you have any training at all in criminal justice?

74. Since taking office as Mayor, have you taken any training in how to train, supervise and discipline police officers?

75. Since taking office as mayor, have you taken any training in how to conduct internal affairs investigations and/or complaints of discrimination based on sex, race, disability or other grounds?

76. Since taking office as mayor, have you taken any training in how to investigate cases of sexual harassment, racial discrimination or other forms of discrimination?

77. Since taking office as mayor, have you taken any training in how to train, supervise and discipline police officers?

78. Did you ever make any rules or regulations for the training, supervision or discipline of police officers?

79. Did you ever make any rules or regulations for the conduct of internal affairs investigations?

80. Did you ever make any rules or regulations for the investigation of officer complaints against the department that involved discrimination based upon race, sex, disability or other forms of discrimination?

81. Did you review any rules or regulations made by the chief on these subjects?

82. Do you keep a record of discrimination complaints?

83. Do you keep a record of complaints of discrimination made by police officers against the department.

84. Have you ever been a defendant in a lawsuit or cause of action based upon unlawful discrimination on the basis of sex, race, national origin or other suspect classifications?

85. Are you familiar with what police officers refer to as 111F benefits?

86. Can you describe those benefits?

87. Are you familiar with what police officers refer to as section 7 benefits?

88. Can you describe those benefits?

89. Did Sonia Fernandez meet with you about 111F benefits?

90. What was the substance of your discussion?

91. Did Sonia Fernandez meet with you about section 7 benefits?

92. What was the substance of your discussion?

93. Did you meet Terri Pechner-James about 111F benefits?

94. What was the substance of that discussion?

95. Did you meet with Terri Pechner-James about section 7 benefits?

96. What was the substance of that discussion?

97. Did you ever bring any departmental matter that involved discrimination based on sex, race or other suspect classifications to the attention of the city council.

98. Describe the facilities available to female police officers at the revere police department.

99. Did the Commonwealth of Massachusetts ever find that these facilities failed to comply with state standards?

100. Did they order compliance?

101. Did the city of revere comply; if yes state date of compliance.

**EXHIBIT B**

## DEPOSITION QUESTIONS FOR CHIEF

1. What date did you become Chief of the City of Revere?

2. Explain the powers and responsibilities of the Chief of Police?

3. When were you appointed by the Mayor?

4. When were you confirmed by the city council?

5. When did you first become a member of the revere police department?

6. How many years were you a member of the revere police department before you became chief?

7. What was your rank within the revere police department before you became chief?

8. have you had any training in how to train, supervise and discipline police officers?

9. Have you had any training in how to conduct internal reviews of departmental affairs and how to investigate complaints?

10. Does your authority as chief of police include the day-to –day management of the revere police department and its officers?

11. What are your responsibilities to the mayor ?

12. What are your responsibilities to the city council?

13. Are you familiar with the city ordinance that created your position and that governs your authority over the police department?

14. Is it fair to say that the mayor has general executive authority over the department, even though you are responsible for the day-to-day affairs of the department?

15. Is it fair to say that the mayor has an obligation to  provide direction to you, as chief?

16. Is your position as chief created by state law or city ordinance?

17. Can you discharge the mayor from his position?

18. Can the mayor terminate your employment as chief of police?

19. How often does the chief report to the city council?

20. Did your appointment need the confirmation of the city council?

21. Prior to your appointment, was there an acting chief of police?

22. What was the name of that individual?

23. Who was the last appointed chief of police prior to your appointment?

24. Did you serve as a ranking officer under the acting chief named in 21 and the appointed chief named in 23.

25. How many employees were there in the revere police department in 1995?

26. How many employees were there in the revere police department at present?

27. How many female officers were employed by the revere police department when you became police chief?

28. How many female police officers were employed by the revere police department when you first joined the department?

29. Was there an increase in the number of female police officers employed in the department in 1995.

30. What steps did the department take to prepare you and the other officers of the revere police department for the arrival of the female officers?

31. How many African-American officers were employed by the revere police department when you joined the department?

32. How many Hispanic officers were employed by the department when you became chief?

33. How many African-American officers were employed by the revere police department when you became chief?

34. How many Hispanic officers were employed by the department when you joined the department?

35. Did the department have a sexual harassment policy when you joined the department?

36. Did the department have a sexual harassment policy in 1995?

37. Have you read the current sexual harassment policy?

38. What steps have you taken to ensure that the revere police department is in compliance with the state and federal requirement that the workplace be free from racial and sexual harassment?

39. Before you became chief, did you receive any training designed to ensure that the revere police department was free from racial and sexual harassment?

40. Have you reviewed the current sexual harassment policy with the mayor or the city council?

41. Have you requested assistance from the mayor and/or city council to update or change the policies against sexual and racial discrimination?

42. What is the role of the mayor with regard with regard to complaints of sexual and racial harassment?

43. What is the role of the city council with regard to complaints of either sexual or racial harassment/discrimination.

44. Have you provided the members of your department with any training designed to ensure that the revere police department was free from racial and sexual harassment?

45. Describe the administrative system for ensuring that the revere police department was free from racial and sexual harassment that pre-existed your appointment.

46. How often do you meet with the mayor to review complaints made under the department policies?

47. Do you ask the mayor to review your decisions?

48. Does the mayor ever request you to review complaints made under the department policy?

49. Has the mayor ever disagreed with your recommendation or overruled your decision?

50. Prior to becoming chief, were you aware of the seven female officers who joined the department in 1995?

51. Were you aware of the discrimination complaints of Sonia Fernandez and Terri Pechner-James?

52. After you became chief, what action did you take to handle the complaint of Sonia Fernandez?

53. After you became chief, what action did you take to handle the complaint of Terri Pechner-James?

54. Did you enforce the policies of the department in your dealing with the matters of Sonia Fernandez and Terri Pechner-James?

55. What advice did you give the mayor about the handling of the complaints of Terri Pechner-James and Sonia Fernandez?

56. Did you change, alter or reverse any of the decisions made by your predecessors on the cases of Sonia Fernandez and Teri Pechner-James?

57. Did you play a role in the involuntary disability retirement of Sonia Fernandez?

58. Did you play a role in the involuntary disability retirement of Terri Pechner-James?

59. Describe your understanding of post traumatic stress as it is used in the involuntary disability retirement application of Terri Pechner-James?

60. Describe your understanding of post traumatic stress disorder as it is used in the involuntary disability application of Sonia Fernandez?

61. What is involuntary disability retirement?

62. How did post traumatic stress disorder contribute to the involuntary disability retirement of Sonia Fernandez and Terri Pechner-James?

63. Prior to becoming chief, did you have any training in police administration, in how to train, supervise and discipline officers?

64. Prior to becoming chief, did you have any training in how to conduct reviews of internal complaints, how to conduct investigations of sexual harassment, racial discrimination and other forms of unlawful discrimination?

65. Prior to becoming chief did you have any training at all in criminal justice?

66. During the period of your employment at the revere police department, how many training sessions in sexual harassment or other kinds of unlawful discrimination did the department require you to attend?

67. Prior to 1995 how many such sessions did you attend?

68. Between 1995 and 2000 how many such sessions did you attend?

69. Since becoming chief how many such sessions have the mayor and the city council required you to attend?

70. Since becoming chief, how many such training sessions have you organized or required the personnel under your supervision to attend?

71. Describe the administrative structure that you have created within the revere police department to handle complaints of racial, sexual and other forms of discrimination?

72. State how this structure is different from that used by you predecessors?

73. Describe the administrative structure that you have created to train the personnel in your department in combatting racial, sexual and other forms of discrimination?

74. Does your department keep a record of discrimination complaints made by members of the department?

75. Are you familiar with the benefits that police officers refer to as section 111F benefits?

76. Have you ever been a defendant in a lawsuit or cause of action based upon unlawful discrimination on the basis of sex, race, national origin or other suspect classification?

77. Can you describe section 111F benefits?

78. Are you familiar with what police officers refer to as section 7 benefits?

79. Can you describe those benefits?

80. What was you involvement with section 111F benefits for Sonia Fernandez?

81. What was your involvement with section 7 benefits for Terri Pechner-James?

82. What was your involvement with section 111F benefits for Terri Pechner-James?

83. What was your involvement with section 7 benefits for Sonia Fernandez?

84. Did you deny or recommend denial of Section 111F benefits for Sonia Fernandez?

85. Did you deny or recommend denial of Section 7 benefits for Terri Pechner-James?

86. What policy did you rely upon in making your recommendation of denial of section 111F benefits for either or both candidates.   ?

87. What was the basis of your recommendation on their section 7 benefits?

88. Have you relied upon the policy you applied to the Terri Pechner-James and Sonia Fernandez to deny section 111F benefits to any other members of the department?

89. Did you ever bring the complaints of Sonia Fernandez and Terri Pechner-james to the mayor or the city council?

90. Did the mayor or city council ever request from you information about the complaints of Sonia Fernandez and Terri Pechner-James?

91. Describe the facilities available to female police officers when you first joined the revere police department?

92. Describe the facilities available to female police officers in 1995?

93. Describe the facilities available to female police officers at the time you became chief?

94. Describe the facilities available to female police officers since you became chief.

95. Did the Commonwealth of Massachusetts make findings about the facilities of the revere police department and the possible impact on the health of female police officers?

96. Did the Commonwealth order compliance?

97. Does the revere police department now have facilities for the exclusive use of women, as required by the Commonwealth?

98. What steps have you taken, as chief, to implement the order of the Commonwealth?

99. Have you approached the mayor and the city council about bringing the department into compliance with the order of the Commonwealth?

100. Have the mayor and/or the city council approached you about bringing the department into compliance with the order of the Commonwealth?

**EXHIBIT C**

## <u>DEPOSITION FOR MEMBER OF CITY COUNCIL</u>

1. How long have you been a member of the city council of the city of revere?

2. Does the city council set policy for the police department?

3. Is the city council the legislative body of the city of revere?

4. Does the city council have a duty to make rules, regulations and ordinances for the government and management of the police department?

5. It is fair to say that one of the duties of the city council was to know how the police department?

6. It is fair to say that another of the duties of the city council was to know how the police treated the civilian public as well as members of the department and whether their treatment broke local state or federal laws?

7. Is it fair to say that the city council has the authority to obtain and review records of the police department?

8. Does the city of revere have a public safety officer or committee?

9. What was your relationship to the public safety committee?

10. Does the council have the authority to initiate investigations of the police department?

11. Did the city council ever have occasion to initiate an investigation into the police department?

12. Can members of the city council directly approach the chief of police?

13. Can members of the city council ask the chief to investigate matters that affect other police officers?

14. have you ever asked the chief to investigate matters that affected members of the public or other police officers?

15. Did the city council ask the chief to investigate the discrimination that caused the lawsuit filed by these Plaintiffs?

16. Did the city council make a deliberate choice not to be involved in the complaionts filed by the Plaintiffs?

17. What role does the city council play in the appointment of the chief of police?

18. Is it fair to say that the city council actively participates in the budgetary affairs of the police department?

19. Is it fair to say that the city council routinely takes an active role in the reviewing of budgetary matters ?

20. What are the factors that would cause the city council to take an active role in reviewing other kind of matters within the police department?

21. How often does the chief of police report to the city council?

22. How often does the city council request reports from the chief of police?

23. Did the chief of police report the discrimination complaints of Sonia Fernandez to the city council?

24. Did the city council request a report from the chief of police on the discrimination complaints of Sonia Fernandez?

25. Did the chief of police report the discrimination complaints of Terri Pechner-James to the city council?

26. Did the city council request a report from the chief of police on the discrimination complaints of Terri Pechner-James?

27. Would you agree that discrimination based on sex and race is unlawful?

28. If there was an act or several acts of unlawful discrimination within the police department, would the city council consider that event a serious matter?

29. Did the chief of police bring to the attention of the city council any acts of unlawful discrimination within the revere police department?

30. Did the city council request that the chief of police bring to their attention any acts of unlawful discrimination within the police department?

31.Did the chief of police ever request that the city council take disciplinary action against a member of the police department because of unlawful discrimination within the police department?

32. Did the city council request reports on the number of complaints of unlawful discrimination within the police department?

33. Did any police officer ever make a complaint directly to the city council or to you personally about unlawful discrimination within the police department?

34. How many complaints of unlawful discrimination, to the best of your knowledge, were made to the chief of police by members of the police department?

35. Did the city council customarily review the department's internal affairs including its handling of unlawful discrimination within its ranks?

36. As a member of the city council, did you know how many complaints of unlawful discrimination were pending against the city, at any time during your tenure as a member of the city council?

37. Did the chief ever provide you with the names of police supervisors who had multiple complaints of unlawful discrimination lodged against them?

38. Is it fair to say that the members of the city council left it to the chief to determine if the rules and regulations of the department, including prohibition against discrimination were being carried out?

39. And, is it not fair to say that, according to your personal knowledge, leaving the chief, unsupervised,  to determine if the rules and regulations of the police department were being carried out,was the custom and practice of the city council.

40. Do you know if the police department interviewed all witnesses when female officers made a complaint of discrimination?

41. Do you know if the police department interviews all witnesses when it investigated any complaint made to the police department?

42. As a member of the city council, do you know if the police department routinely confronts its officers with conflicts between their statements and the physical evidence when addressing a discrimination complaint?

43. Do you know if officers are interviewed separately or are allowed to collaborate during the investigation of a complaint?

44. Do you know if interviews are taped?

45. Based upon your experience as a councilor, can you state how matters of discrimination are handled within the police department?

46. During your time on the city council, did a female police officer ever come to the council to complaint about sexual discrimination within the police department?

47. During you time on the city council, were you aware of any reports of unlawful discrimination within the police department?

48. During your time on the city council, did any police officer ever come to the council to complain about unlawful discrimination based on race within the police department?

49. Did the city council ever ask the chief to investigate a complaint that was brought to its attention and to make a report back to the council?

50. Did the city council adopt motions?

51. Have you ever participated in a motion that was made by a member of the city council, approved by the council and the mayor and sent to the chief of police?

52. Is it fair to say that the established custom by which the council communicated its directions to the chief of police was through motions approved by the council and the mayor?

53. Is it fair to say that the city council, on many occasions, communicated directions to the chief of police using the established custom?

54. Did the city council use this established custom to communicate with the chief of police on the matter of Sonia Fernandez?

55. Did the city council use this established custom to communicate with the chief of police on the matter of Terri Pechner-James?

56. Did the chief of police inform the city council that three female police officers had filed complaints with the Massachusetts Commission Against Discrimination?

57. Have you reviewed the current sexual harassment policy used by the revere police department?

58. Did the city council review the current sexual harassment policy?

59. Did the city council review the current sexual harassment policy with the mayor and the chief of police?

60. What was the role of the city council with regard to complaints of either sexual or racial discrimination within the police department?

61. Did the revere police department have a sexual harassment policy in 1995?

62. Did the revere police department have a sexual harassment policy prior to April 1, 1999?

63. How many reports has the chief provided to the city council under the current sexual harassment policy?

64. Describe the facilities available to female police officers in 1995?

65. Describe the facilities available to female police officers in the revere police department in 2001?

66. Did the Commonwealth of Massachusetts make findings about the facilities of the revere police department and their possible impact on female police officers?

67. Did the city council review this report?

68. Did the city council review this report with the mayor?

69. Did the Commonwealth order compliance on the violations it identified?

70. What actions did the city council take to correct the violations identified by the Commonwealth of Massachusetts?

71. Is the revere police department now in compliance with the order of the Commonwealth?

72. Did the city council use the established custom to communicate with the mayor and the chief of police about the demands of the Commonwealth?

73. Was the city council aware in 1995   that the police department had hired seven female police officers?

74. How many police officers were employed by the revere police department prior to 1995?

75. What steps did the police department take to prepare its members for the employment of the group of seven female officers?

76. What actions did the city council take to prepare for the employment of the seven female officers?

77. Did the city council review the employment of the seven female officers with the mayor prior to the employment of the officers?

78. Did the city council review the employment of the seven female officers with the chief of police prior to their employment?

79. Did the city council review the report dated January 14, 1999 produced  by the revere police department on sexual harassment within the department?

80. What action, if any, did the city council take as a result of the department's report of January 14, 1999.

81. On December 11, 1998, two cruisers assigned to two female officers had all eight tires slashed; did the chief communicate this vandalism of city property to the city council?

82. What communication, if any, did the city council have with the chief about this event?

83. What communication, if any, did the city council have with the mayor about this event?

84. Three female police officers hired on September 21, 1995 filed complaints of sexual discrimination with the Massachusetts Commission Against Discrimination; did the chief of police communicate these events to the city council?

85. Did the city council communicate with the mayor about these events?

86. Did the city council communicate with the chief of police about these events?

87. Did the mayor communicate with the city council about the action of the female officers?

88. Two of the seven female officers hired on September 21, 1995, filed lawsuits against the city of revere; did the chief of police communicate with the city council about this lawsuit?

89. Did the city council communicate with the chief of police about the lawsuit?

90. Did the city council communicate with the mayor about this lawsuit?

91. Did the mayor communicate with the city council about the lawsuit filed by the female officers?

92. What action, if any, did the city council and the mayor consider as an appropriate response to the complaint of the female officers?

93. What responses, if any, did the city council and the mayor consider appropriate to the lawsuit filed by the female officers?

94. What action, if any, did the city council and the mayor take in response to the lawsuit filed by the female police officers?

95. Did the city council request and receive a copy of the complaint filed by the two femaleofficers against the city of revere?

96. How many lawsuits based on unlawful discrimination based on race, sex or other suspect classifications have been brought against the city of revere since 1995.

97. Does the city council receive periodic update on this lawsuit that is pending against the city?

98. Has the city council requested updates on this lawsuit from the  chief of police?

99. Has the city council requested updates on this lawsuit from the mayor of the city of revere?

100. Does the city council have the power and the responsibility to raise municipal revenues for the city of revere?