# EXHIBIT A

1

```
 1            UNITED STATES DISTRICT COURT
               DISTRICT OF MASSACHUSETTS
 2

 3

      TERRI PECHNER-JAMES
 4    And SONIA FERNANDEZ,,

 5        Plaintiffs,

 6    VS.                    C.A. NO. 03-12499-MLW

 7

      CITY OF REVERE; THOMAS
 8    AMBROSINO, MAYOR; CITY OF
      REVERE POLICE DEPARTMENT,
 9    TERRENCE REARDON, CHIEF;
      BERNARD FOSTER, SALVATORE
10    SANTORO, ROY COLANNINO,
      FREDERICK ROLAND, THOMAS DOHERTY,
11    JOHN NELSON, JAMES RUSSO,
      MICHAEL MURPHY, and STEVEN FORD,

12        Defendants.

13

14

15        ATTORNEY CONFERENCE before Dawn J. Cormier

16    Bourn, a notary public in and for the

17    Commonwealth of Massachusetts, on May 12, 2006,

18    commencing at 10:00 A.M. at the offices of

19    Reardon, Joyce & Akerson, 397 Grove Street,

20    Worcester, Massachusetts.

21

22

23

24                                ORIGINAL
```

1    A P P E A R A N C E S :

2

      FOR THE PLAINTIFF:

3

      JAMES S. DILDAY, ESQ.
4     GRAYER & DILDAY
      27 School Street
5     Boston, Massachusetts   02108

6

      FOR THE DEFENDANT, CITY OF REVERE; THOMAS
7     AMBROSINO, MAYOR; CITY OF REVERE POLICE
      DEPARTMENT, TERRENCE REARDON, CHIEF:

8

      WALTER H. PORR, JR., ESQ., and
9     PAUL CAPIZZI, ESQ.
      Office of the City Solicitor
10    City Hall, 281 Broadway
      Revere, Massachusetts   01251

11

12    FOR THE DEFENDANTS, BERNARD FOSTER, SALVATORE
      SANTORO, ROY COLANNINO, FREDERICK ROLAND,
13    THOMAS DOHERTY, JOHN NELSON, JAMES RUSSO,
      MICHAEL MURPHY AND STEVEN FORD:

14

      MICHAEL AKERSON, ESQ., and
15    JOHN VIGLIOTTI, ESQ.
      REARDON, JOYCE & AKERSON
16    387 Grove Street
      Worcester, Massachusetts   01605

17

18

19

20

21

22

23

24

3

1

2

3

4                           I N D E X

5

6                                                    PAGE

7      PROCEEDINGS                                     4

8

9

10

11

12                          EXHIBITS

13                                                   PAGE

14     1   MAY  9TH  LETTER                           17

15     2   MAY  10TH  LETTER                          17

16     3   MAY  10TH  LETTER                          17

17     4   MAY  11TH  LETTER                          17

18

19

20

21

22

23

24

<u>P R O C E E D I N G S</u>

- - - - -

MR. AKERSON:  It's just 10:00 on the nose on 12th of May here at my office.  My name is Michael Akerson for the record.  Mr. Dilday is here with Ms. Fernandez for a continuation of her deposition.

I just wanted to address a couple of the comments that came up in a letter that you had sent out yesterday, Mr. Dilday, May 11th of 2006, received in our firm mid afternoon on May 11th.  A couple of comments.

I think I need to state for the record that, first off, we had scheduled for May 10th -- excuse me -- May 11th, for Terri Pechner-James here, and you did indicate Ms. Fernandez would be substituted.  We didn't know why, and that's why Mr. Vigliotti had called your office on the 9th, to inquire, you know, is there a problem?  Is there something?  Or what the situation is.

We didn't hear from you, so we weren't sure, given your request and in turn Mr. Vigliotti's request for the reasons why we needed substitution, and that was -- and also in

1    your letter dated May 11th you put in there that

2    we agreed to substitute Ms. Fernandez.  We

3    actually didn't agree to that.  I know

4    Mr. Vigliotti and myself did not, and my

5    understanding is the City didn't as well,

6    inasmuch as I was taking the laboring or trying

7    to coordinate the depositions just to get them

8    done in accord with Judge Sorokin's court order.

9            But did somebody agree to substitute

10    Ms. Fernandez, Jim?

11            MR. DILDAY:  Well, it was my

12    understanding that it would be done.  You know, I

13    sent my letter out on the 9th to try to give you

14    adequate time and let you know that Ms. Fernandez

15    would be available, that Ms. Pechner-James would

16    not.  She had some personal issues she called me

17    about with her child.

18            MR. AKERSON:  The letter from you on

19    May 9th did not indicate in any sense why.

20            MR. DILDAY:  And I understand that

21    because that letter was drafted on the run when I

22    called my secretary to draft it and send it to

23    you.

24            MR. AKERSON:  Okay.  We wanted some

1  clarification because of a couple things.  One,

2  who is doing the deposition.  I think I mentioned

3  to you earlier --

4           MR. DILDAY:  I know, you do Pechner.

5           MR. AKERSON:  I was doing Terri and

6  John Vigliotti was doing Sonia.  Just because of

7  the dynamics here in our office, we found that

8  would be easier, to address it that way.  So from

9  our perspective we needed to know in advance

10  about who -- in terms of prepping, who was going

11  to need to be available for the deposition, which

12  is why Mr. Vigliotti had called your office to

13  confirm.

14           MR. DILDAY:  Let me respond to that by

15  saying that I understand how you two are doing

16  it, and I thought that since we blew the May 4th

17  depo, that the preparation for Sonia wouldn't be

18  that extensive because that preparation had been

19  done prior thereto, and I just knew that Terri

20  Pechner-James had called me and left three or

21  four messages that she could not do it on the

22  11th.

23           And I was in court everyday this week,

24  except for today, and so I had the letter sent

1    out to you.  You'll probably notice that they're

2    all sent out and my actual signature is on none

3    of them.

4              MR. AKERSON:  Yeah, there are some

5    initials.  And also, in terms of our firm, we do

6    call you back --

7              MR. DILDAY:  I know you do.

8              MR. AKERSON:  -- and try to

9    communicate and reach out to you.

10              MR. DILDAY:  You know, that's clear,

11    and when I tried to get to John I was in court

12    and there was miscommunication because he didn't

13    get my cell phone number.

14              MR. AKERSON:  Yeah, the last few

15    digits were inaudible, and that's why he promptly

16    called your office back to say he couldn't get

17    through.  What he got was a voice mail from your

18    office.

19              But you also say that you were never

20    consulted about -- in your May 9th letter you

21    were never consulted about what individuals would

22    be deposed which days.  You and I had spoken and

23    we had agreed on the dates, and though Judge

24    Sorokin's order indicates from 10:00 in the

1   morning to 5:00 p.m., I know you said you were

2   busy in court, so as an accommodation I said

3   we'll do them in the afternoon and our firm would

4   travel to Revere to do the deposition.  So I

5   think we had accommodated your scheduling in

6   allowing for that to happen.

7          MR. DILDAY:  Well, yes and no.  On

8   that issue I say yes and no because those dates

9   that were the afternoon dates were dates that you

10  and I talked about where I said I will do these

11  dates and I need to do them in the afternoon

12  because each date that I've given you is a date

13  that I'm in court in the morning.

14          Normally, when I go to court in the

15  morning, I try not to do a deposition or

16  something else and be out of the office all day,

17  but trying to make this thing work, I said okay,

18  I'll schedule these on my court dates.

19          MR. AKERSON:  Rather than following a

20  court order which was 10:00 in the morning till

21  5:00 in Worcester.

22          MR. DILDAY:  Otherwise, if we had to

23  follow that court order from 10:00 to 5:00, we

24  would never get anything done except those that

| | |
|---|---|
| 1 | we expressly agreed upon earlier and the May 30th |
| 2 | that you and I had talked about. |
| 3 | MR. AKERSON:  I agree.  We did bend |
| 4 | because our firm is the one who is now travelling |
| 5 | despite us taking the laboring of establishing |
| 6 | and setting up these depositions, so it was an |
| 7 | imposition on our office as well. |
| 8 | MR. DILDAY:  I understand that, and |
| 9 | let me say this, Michael.  I don't have a problem |
| 10 | with that because you guys have been more than |
| 11 | accommodating. |
| 12 | MR. AKERSON:  The other thing is, you |
| 13 | indicated that we didn't consult with you which |
| 14 | individuals would be deposed on the afternoon |
| 15 | dates, and my memory is clear that in the |
| 16 | conversation with you I raised it up to you once |
| 17 | we had locked in some afternoon dates.  Once I |
| 18 | had raised to you and we spoke on the telephone |
| 19 | that we'd talk about who you wanted to do, which |
| 20 | plaintiff you wanted to do which afternoons, |
| 21 | given the time limitations Judge Sorokin has |
| 22 | imposed on this case, you had indicated to me |
| 23 | that, you know, they're not working so, whichever |
| 24 | plaintiff, you'll get them there. |

```
 1              MR. DILDAY:  That's true, and I don't

 2   disagree with that.  My only issue is that there

 3   was a problem with Terri doing the 11th.

 4              MR. AKERSON:  As John Vigliotti's

 5   letter to you of the day before, that would be

 6   May 10th, indicates, you know, sometimes

 7   circumstances do arise, but sometimes if you just

 8   explain them a little bit, that Ms. Pechner had

 9   another obligation, a doctor's appointment, a kid

10   thing, whatever, then we'd make an accommodation.

11              We don't need to know the great detail

12   what it is, but just substituting without any

13   discussion on it or at least information, it made

14   it difficult for us to know what lawyer to make

15   available or to juggle other things around,

16   because we actually, I affirm to you here today,

17   Mr. Dilday, we do have other cases here in the

18   office.

19              MR. DILDAY:  Oh, I know you do.  If

20   this were your only case, you'd be in trouble.

21              MR. AKERSON:  Indeed.

22              MR. DILDAY:  That was a little bit of

23   sarcasm, you know.

24              MR. AKERSON:  Your letter did indicate
```

1    that --

2              MR. DILDAY:  Disregard that.

3              MR. AKERSON:   -- you have a busy

4    schedule, but suggested that we didn't have much

5    cases, but I assure you we have many other

6    things, which is part of the reason why John

7    Vigliotti and myself decided to split them up, to

8    make ourselves available, so we could get this

9    thing going.

10             The other thing that you mentioned in

11   here in terms of if you and your colleagues are

12   serious about getting this case to trial instead

13   of stalling and creating non-issues to run to

14   Magistrate Sorokin about, I don't think that our

15   firm has done that at all.  In fact, the stuff we

16   have brought to Judge Sorokin he has allowed,

17   meaning he's agreed with us, so I would have to

18   strongly disagree with that.

19             In fact, I don't think we have

20   anything pending right now in front of Judge

21   Sorokin.  Our last filing with Judge Sorokin was

22   on 4/21/06 in compliance -- let me finish,

23   please -- in compliance with the judge's order

24   when we were in court on April 11th, and he

1    followed up with a written order on April 12th.

2    The judge ordered us to give him a list of

3    deposition dates.  He wanted to know where.

4            So I took the laboring on that to

5    create a document that I filed on April 21st,

6    which has a list of a variety of depo dates in

7    May, May 4, 5, 11, 12, 16, 18, 19, 25, 26 and 30.

8    So I took the laboring to comply with the order

9    in that case.  So I don't think we're stalling or

10   creating non-issues in running to him about.  In

11   fact, as of this moment, I don't think we have

12   anything pending before the judge for him to make

13   any determination, so I also have to disagree

14   with that.

15           Moreover, I didn't know that you would

16   have gone -- your letter of May 11th says you

17   would have gone till 6:00 p.m.  I didn't know

18   that.

19           MR. DILDAY:  Because I had talked to

20   Sonia.  She and I both agreed we'd go until 6:00.

21   That's my miscommunication to you guys.  That's

22   just miscommunication because I called from the

23   court to tell them about what was going on, and

24   when you got the letter, it said 2:00 to 5:00,

1    but we would have gone from 2:00 to 6:00.

2              MR. AKERSON:  Again, I didn't know

3    that, is what I'm saying.

4              MR. DILDAY:  You didn't know it

5    because it didn't state that.

6              MR. AKERSON:  And you also say

7    something regarding any uncertainty about who is

8    to be deposed on May 11th in the letter to

9    Mr. Vigliotti.  Any uncertainty you had was all

10   in your mind because my correspondence was clear.

11             Actually, it wasn't clear.  You asked

12   for permission if you could delete Terri from the

13   May 11th deposition and insert Sonia, requesting,

14   meaning, subject to your approval; thereupon,

15   Mr. Vigliotti called to discuss that with you.

16   So we did not know that for sure that

17   Mr. Fernandez was coming as opposed to

18   Mr. Pechner for the May 11th deposition.

19             You also say that the current

20   deposition schedule was modified to accommodate

21   our requests as defense counsel.  That's not

22   true.  We just want to get it done.  I would have

23   been happy to do ten to five deposition days just

24   to get it done so we can have fewer appearances,

1    fewer times, fewer travel time for all around,

2    for everybody.  So I don't necessarily -- .

3            And you also indicate that you've been

4    extraordinarily accommodating to those demands in

5    this case in spite of the discourteous and

6    disrespectful correspondence and general attitude

7    that you have received.  And I need to say on the

8    record that I know Mr. Vigliotti, having known

9    him integrally for a couple of years, having

10   worked closely together on a variety of cases,

11   and he's probably the most respectful and least

12   discourteous person I've met as a lawyer.  So I

13   do have to say I do take offense to that comment.

14           MR. DILDAY:  Let me comment on that.

15   That comment was drafted not based upon what you

16   and John have done.  Let me say clearly and

17   unequivocally I think the two of you have been

18   courteous and respectful.  That comment is

19   directly related to Mr. Porr, who in my opinion

20   has been discourteous and disrespectful, and I

21   apologize to the two of you for that because that

22   is not the two of you.

23           MR. AKERSON:  In fact, after a couple

24   of Ms. Pechner's depositions you've grabbed me to

1    in essence thank me for my demeanor, which I

2    think was very polite and caring. I was neither

3    rude nor agressive, yet still wanted her to

4    answer the questions, but you did say those

5    things after the first couple of days of

6    depositions to me?

7            MR. DILDAY: I did.

8            MR. AKERSON: You have a doctor's

9    appointment on May 18th. Again, I'm looking at

10   your May 11th letter.

11           MR. DILDAY: What I'm trying to do on

12   May 18th is see if I can schedule somebody to

13   come with Terri on that date so we don't lose it.

14           MR. AKERSON: That's fine. I was

15   going to say, if we need to work that out, we

16   can, but you need to give us some alternative

17   dates and availability.

18           MR. DILDAY: What I'm going to try to

19   do is, by Monday, I should able to give you a

20   pretty good perspective of what we can do for the

21   18th.

22           MR. AKERSON: Okay. From my view, my

23   perspective, that's fine. I would appreciate if

24   you could let me know or, again, if we need to

1  get it done on another date, I'd be willing to,

2  you know, if you get me a few dates, we can work

3  that out.

4          MR. DILDAY:  I would like to do it

5  then.  My only concern is I would like to do it

6  with Dawn, but Dawn does not drive.

7          MR. AKERSON:  Who is Dawn?

8          MR. DILDAY:  Dawn is the young lady

9  that I had in court with me the last time, the

10  new lawyer.  She doesn't drive, and I've got to

11  coordinate how she would get here.  I may have

12  her take the bus like I did that one day when my

13  car was in the shop, but then I'd have to have

14  Terri pick her up at the bus station.

15          MR. AKERSON:  Lastly, in the

16  paragraph -- last paragraph of the May 11th

17  letter you indicate that you hope that you can

18  bring this acrimony and discourteousness, which

19  is unnecessary, to a close.  If that's happened

20  from myself or Mr. Vigliotti, I want to know

21  about it.

22          MR. DILDAY:  Okay.  And it hasn't.

23          MR. AKERSON:  Okay.  Just for this

24  mini record that we're creating, I just want to

1    put in May 10th -- excuse me -- your May 9th

2    letter, May 10th, Mr. Vigliotti's May 10th

3    letter, and your response of May 11th, and mark

4    those as Exhibits 1, 2, 3 and 4, please.

5                (Deposition Exhibit Nos. 1 through 4

6    marked.)

7                MR. AKERSON:  Just going on, I'll end,

8    Jim, I just want to get a couple of things clear.

9    I think Judge Sorokin made it clear that he wants

10   everything on the record if there's any dispute.

11               What's now been marked as Exhibit 4 to

12   this attorney conference of May 12th, you

13   indicate that you did not get -- it's indicated

14   in here, if I can find it -- you indicate,

15   Mr. Dilday, that you received deposition notices

16   for the morning dates, but only a scheduled

17   drawing for the defense counsel as to people

18   scheduled on the various afternoon dates without

19   your input or agreement.

20               I gather that's in part as to about

21   the May 4th date why you and Ms. Pechner,

22   Ms. James -- excuse me -- Ms. Fernandez didn't

23   show.  I gather that you didn't receive

24   deposition notices from us.

1              I just want to show you a document,

2     April 28th.  That's a cover letter from my

3     secretary, Donna Cormier, to you saying,

4     "Enclosed with reference to the above-case,

5     please find five deposition notices all scheduled

6     in May at Revere City Hall."

7              And there were -- I have attached here

8     some documents, one of which I've showed you,

9     which is a May 4th deposition of Sonia Fernandez.

10             MR. DILDAY:  I see them, but I don't

11    have any recollection of getting them.  They

12    could have come in, but I don't have any

13    recollection of seeing this.  It's not to say

14    that they didn't come.  I just don't have any

15    recollection of ever seeing them.  I remember

16    seeing all the other deposition notices, but not

17    those.

18             MR. AKERSON:  Okay.  Mr. Porr?

19             MR. PORR:  I was just going to say

20    from my part, for the record, we received our

21    copies of those in the mail on May 1st.

22             MR. AKERSON:  If there's a problem

23    from my end in my office, I'd like to know.  It

24    indicates 27 School Street, Suite 400, Boston,

1    Mass, 02108, okay.  If we had your address wrong,

2    we want to make sure --

3          MR. DILDAY:  The address is correct.

4    I just don't have any recollection of seeing

5    them.  I'm not saying they didn't come in.  I

6    don't have any recollection of getting them.

7          MR. AKERSON:  I understand per your

8    letter you or, rather, excuse me, per your recent

9    filing of your opposition to the City of Revere's

10   request for sanctions, which included dismissal

11   requests, you had indicated that you were going

12   to pay Mr. Vigliotti 500 and --

13          MR. DILDAY:  Something.  I forgot what

14   what it was, yeah.

15          MR. AKERSON:  -- for May 4th.  Okay.

16   I'm all set.

17          MR. PORR:  All right.  From my part

18   I'd like to cover a couple issues, if we can.

19          First off, late yesterday afternoon we

20   got a call from our auditor, city auditor, that

21   she had received yet another fax from your

22   office, Mr. Dilday.  The day before, on May 10th,

23   my secretary spoke with you to advise you of our

24   correct fax number because the May 9th fax had

1    also been sent down to the auditor.

2              I notice on the fax cover sheet for

3    your May 11th letter that you had my right fax

4    number on it originally, but then it was

5    scratched off and the auditor's number put in its

6    place.

7              The city solicitor's letterhead, and

8    you have received a boatload of letters from me

9    in the last going on, what, three years, has the

10   city solicitor's fax number on it.  My secretary

11   called you on May 10th and gave you that fax

12   number, and I don't understand why yesterday's

13   letter, which had the right fax number on it, had

14   that scratched off and this letter was faxed

15   downstairs.

16             But for the record, Mr. Dilday, the

17   fax number for the city solicitor's office is

18   (781) 286-8205 as was originally indicated on

19   your fax of May 11 and for some inexplicable

20   reason to me scratched off.  So if we could get

21   that problem corrected, I would sincerely

22   appreciate it.

23             Next, I'm not going to get into who

24   said what to whom when in terms of your

1    perception of my being discourteous or

2    acrimonious or whatever else you want to describe

3    or whatever label you want to place on it.  I

4    will simply stand on the records of the pleadings

5    I have filed in the court and of the

6    correspondence and of my conduct at the

7    depositions as recorded by the court reporter.

8         You are free at any time to lodge any

9    and all of that documentation with the court if

10   you feel that there's any reason to do so, but I

11   don't think I need to defend myself beyond that.

12        Now, I'd like to turn our attention

13   for a moment to a 7.1 conference concerning last

14   Friday and Ms. Pechner.  In that regard, last

15   Friday morning, off the record, we did a 7.1

16   conference concerning Sonia Fernandez.

17        I notice in your opposition pleading

18   which I saw this morning that your recollection

19   of that conference and mine must vary

20   substantially, because while I did, in fact, ask

21   about dismissing Ms. Fernandez's case and asked

22   for sanctions for the non-appearance, that was

23   not the only thing I asked for.

24        When you indicated that you did not

1    incline to agree with me to dismiss her case, I

2    proposed some evidentiary sanction.  In other

3    words, Sonia, since she didn't show up for her

4    deposition, the issue there is her testimony, so

5    an alternative sanction I proposed was then,

6    fine, Sonia simply won't testify at trial because

7    we can't get her to testify at depositions.  You

8    rejected that as well.

9         I then asked you if you knew of any

10   other type of sanction, intermediate sanction,

11   something less than dismissal, something less

12   than evidentiary sanction that might be

13   appropriate.  I could think of none.  You could

14   think of none.  Your opposition to my mind

15   doesn't fairly reflect the full tenor of what we

16   discussed last Friday.

17        So today's 7.1 I'm doing on the record

18   concerning both Ms. Pechner's failure to appear

19   yesterday and last Friday's deposition, and here

20   is my position on that.

21        The failure to appear yesterday I

22   think is inexcusable given the correspondence,

23   the pleadings, all the documents.  All of this

24   was rehearsed in my motion for sanctions

1     concerning Ms. Fernandez.  It all applies here.

2     And so the failure to appear I think is

3     inexcusable.

4            Ms. Pechner's conduct at the last

5     deposition was also inexcusable.  I was

6     professional.  I was courteous.  I asked

7     straightforward, very simple questions.

8            She was argumentative.  She was

9     combative.  She was nonresponsive.  She mocked

10    me.  And then she brought my wife into the

11    deposition in terms of comments about my wife, or

12    directed to my wife.

13           Nothing that I did during the course

14    of the deposition invited any of that behavior.

15    Twice during the deposition, once in the morning

16    session and once in the afternoon session, on the

17    record I appealed to you to bring the witness

18    under control, and you declined both invitations.

19    It's on the record.

20           So I have prepared and I'm ready to

21    file a motion for sanctions somewhat similar to

22    the one I filed concerning Ms. Fernandez with

23    respect to Ms. Pechner that were obligated to me.

24           I'm proposing Ms. Pechner's case be

1    dismissed given her discovery violations and what

2    I perceive is a continuing pattern.  I suspect

3    you'll be disinclined to agree to that.  I would

4    then suggest that Ms. Pechner simply not be

5    allowed to testify at trial as an intermediate

6    sanction.  I suspect you'll be inclined to

7    disagree with that as well.

8            I don't know what other sanction to

9    propose as an intermediate sanction, though I'm

10   more than willing to listen to any suggestions

11   you might have, but I believe some sanction must

12   be imposed for her conduct, and if we can't agree

13   on a sanction, then by definition I have to file

14   my motion.

15           Now, with respect to attorney's fees,

16   Friday's deposition session was a complete

17   disaster.  And I have the record.  I have gone

18   through the record in excruciating detail.  I

19   have prepared exhibits to show the judge her

20   misconduct.

21           So what I want to do in that regard

22   is, first off, I want to be paid for the time

23   spent in deposition all day last Friday to put up

24   with that abuse.  I want to be paid for the time

1    spent yesterday preparing the motion, which I

2    probably will have to file because I suspect we

3    will not reach agreement, and I want to be paid

4    for the transcript that I had to order so that I

5    could prepare an adequate motion. And we need to

6    be reimbursed for the costs of driving out here

7    in addition to our time. Now, I'm only billing

8    or asking for compensation for one lawyer's time

9    even though two lawyers from the City are here.

10            So I'm asking for $5,800 in sanctions,

11   which breaks down as $5,000 for my time, 10 hours

12   wasted last Friday, another eight hours spent

13   preparing the motion and all the ancillary

14   exhibits and documents, and another two hours

15   which may be necessary for a hearing in court.

16   I'm also asking for $750 for the deposition

17   transcript, and I'm also asking for $50 for our

18   costs in travel. So that's where the 5,800 comes

19   from.

20            Finally, if the court does not agree

21   to dismiss the case, I'm seeking a protective

22   order, and I would like a protective order that

23   would say a couple things. One, Ms. Pechner will

24   simply answer the questions without mocking me,

1    without taunting me, without raising issues as to

2    my wife or to other people that's not collateral.

3    She will not be argumentative.  She will simply

4    answer the question responsively, and if she

5    doesn't answer the question responsively, you for

6    your part will ask for a recess, take her out in

7    the hallway, explain to her her obligation to do

8    so, and she will answer the questions

9    responsively.

10           If she doesn't answer the questions

11   responsively, as I tried to explain to you a week

12   ago, I have to re-ask the question.  The

13   deposition transcript is longer.  It's more

14   expensive.  The deposition session is longer and

15   less productive, and I am being deprived of my

16   time that has been somewhat limited to get the

17   answers I'm entitled to.

18           So another thing I want in terms of a

19   protective order is I want last Friday's day to

20   not count as one of my days given my Judge

21   Sorokin, and I want an additional day to make up

22   for last Friday's day.

23           And I believe that covers all the

24   things that concern me in terms of a proposed

```
 1    motion in a 7.1 conference, and I welcome your
 2    interactive response in working something out.
 3              MR. DILDAY:  You're right in that I
 4    will not agree to your first two, and as far as
 5    the striking of the entire deposition, I couldn't
 6    agree to that, Walt.
 7              MR. PORR:  I didn't ask for that.  I
 8    didn't ask to strike the entire deposition
 9    transcript.
10              MR. DILDAY:  You're saying striking
11    the day.
12              MR. PORR:  I don't want it counted
13    against me.  Because of her behavior, because I
14    had to constantly re-ask questions, because she
15    went off the handle and everything else, I didn't
16    get my full day, so I don't want that day to
17    count against the allotment Judge Sorokin has
18    given me.
19              MR. DILDAY:  See, I would disagree
20    with that, and the reason why I would disagree
21    with that is because she answered the questions
22    as best I think she could.
23              Now, you asked her questions that were
24    very emotional and questions that went deeply
```

```
 1   into her personal life and background that
 2   basically had no relevancy and materiality to the
 3   issues that took place at the police station.
 4              MR. PORR:  I would respectfully
 5   disagree with that.
 6              MR. DILDAY:  I understand that.  For
 7   one thing, you asked her had she ever had an
 8   abortion.
 9              MR. PORR:  I never asked that
10   question.  I've got the transcript.  I never even
11   mentioned the word.
12              MR. DILDAY:  Yes, you did.
13              MR. PORR:  I did not, sir.  I will
14   stand by that record, sir.  I know that record
15   like the back of my hand.  I spent all day
16   yesterday in that record.  The only person to
17   mention that word was Ms. Pechner at the end of
18   the day when she blew up and left.
19              MR. DILDAY:  I don't have the record,
20   but it's my understanding you mentioned something
21   to her about an abortion.
22              MR. PORR:  I did not, sir.  I did not.
23              MR. DILDAY:  Then if you didn't, then
24   I stand corrected, but that's what I remember.
```

1          MR. PORR:  I invite you to review that

2     record.  I know it like the back of my hand, and

3     I did not, sir.

4          MR. DILDAY:  And, you know, some of

5     the things that you asked her I let go which I

6     thought were not appropriate, and I think that

7     because you were asking her issues about who she

8     had sex with when she was in high school and

9     things of that nature, which go long beyond even

10    the medical history that Judge Sorokin gave us,

11    which is from 1990, I think that they were

12    inappropriate and irrelevant, and so -- I know

13    you and I have different attitudes toward that

14    regard --

15          MR. PORR:  Sure.

16          MR. DILDAY:  -- which is appropriate

17    because we're on different sides of the aisle,

18    but I think that she did the best she could.  I

19    think that you got a lot of information out of

20    that deposition, and to ask for an additional

21    date I think is inappropriate.

22          MR. PORR:  How about a half day?

23          MR. DILDAY:  A half day, I can go

24    along with that.

1                MR. PORR:  All right.  So we agree to

2    an additional half day.

3                MR. DILDAY:  I can go along with that.

4                Now, on the whole issue of the

5    monetary damages, you're looking for, what,

6    $5,000?  Are you looking to bill your hours --

7    your time at 250 an hour?

8                MR. PORR:  That's probably a low rate

9    for Boston.

10               MR. DILDAY:  I understand the rate

11   you're billing at, but you are paid a salary by

12   the City of Revere.

13               MR. PORR:  And the case law suggests

14   that's not the relevant measuring indicator.  My

15   salary is irrelevant.

16               MR. DILDAY:  Let me finish.  You're

17   paid a salary by the City of Revere.  The time

18   that you spend working on this case is not paid

19   at the rate of 250 an hour by the City of Revere.

20               So what you're asking the plaintiff to

21   do is to supplement Revere's payment of its

22   salary to you and to increase what it pays you,

23   and so you looked at what I agreed to pay

24   Mr. Vigliotti for his time.  He's private

1    counsel.  He's billing his clients at an hourly

2    rate, and he's not asking for nearly that much.

3            And I think when you look at the two

4    and weigh them together, then it's kind of

5    impractical to say that you should be compensated

6    at a rate that's maybe 10 times the rate of him,

7    who is doing a private attorney process and

8    billing at an hourly rate, when you are being

9    paid a salary for whatever you do.

10           If you can remember one time in court

11   when we were talking about whether or not we

12   could have some of the depositions in Revere

13   because Sonia Fernandez has a phobia about long

14   travelling, and today when she came in, she took

15   some pills to calm herself down, your statement

16   on the record was that you were on salary, that

17   they were on an hourly rate, and so you didn't

18   want to have their hourly rates run up because

19   you were getting paid the same no matter what.

20   And I tie that right in to what you're saying

21   now.

22           MR. PORR:  And I understand that, but

23   the legal standard for reasonable attorney's fees

24   awarded as sanctions is the prevailing market

1    rate regardless of my salary.  So as a matter of

2    law, I'm entitled to prevailing market rate

3    regardless of what the City of Revere pays me.

4            Mr. Vigliotti could have asked for

5    prevailing market rate regardless of what he

6    bills his client if he so chose.  That he chooses

7    not to do so is his choice.  I choose to ask for

8    what the law says I can ask.  That's a legal

9    issue.  That's not a factual issue.

10           But I'll meet you halfway.  Since

11   you're willing to give me an additional half day

12   of deposition to make up for arguably a half day

13   last Friday that was not productive, then instead

14   of 5800 I'll take 2900, which is half.

15           MR. DILDAY:  I love you.  I'm still

16   going to decline on that.

17           MR. PORR:  Well, I think then, unless

18   you have any other suggestions or comments, I

19   think I've exhausted the 7.1 process in terms of

20   the issues as I see them flowing out of last

21   Friday and yesterday.

22           MR. DILDAY:  So if I understand you,

23   what you're looking for -- now, see, yesterday,

24   understand that we were ready, willing and able

1    to conduct a deposition.  We gave notice that we

2    would substitute Sonia Fernandez for Terri

3    Pechner-James.  It's not us who cancelled it.

4    The letter from Mr. Vigliotti said, "I consider

5    the deposition cancelled."

6              Let me finish.

7              MR. PORR:  I'm sorry.

8              MR. DILDAY:  If we are in such a hurry

9    to conclude these depositions, and on May 4th

10   Ms. Fernandez was supposed to be deposed, clearly

11   we would have been prepared to depose her or

12   should have been prepared to depose her

13   yesterday.

14             MR. PORR:  The position of the

15   defense, I think --

16             MR. VIGLIOTTI:  I'll address it.

17             MR. PORR:  Let me just, from my point

18   of view, the problem is multi-fold.  One, the

19   schedule has been set.  It's been set by court

20   order.  It's been set by agreement.  It's been

21   set by documentation.  It's been set by notice.

22   All of that is addressed in both my motion from

23   last week and the motion I intend to file related

24   to Ms. Pechner.

1          My problem with what happened over the

2    last couple days is the unilateral decision to

3    change it without a communication of good cause

4    or reason to change it.  Because given the

5    accommodations made and the tightness of the

6    schedule, one change in one location potentially

7    wrecks the rest of the schedule, particularly

8    since you've asked for an accomodation for the

9    18th, particularly since the deposition of the

10   4th was missed.  It is my belief that we had no

11   choice but to cancel the deposition given the

12   confusion created and the inability to speak with

13   you directly.

14          Now, Mr. Vigliotti can add in terms of

15   his position, but the problem is, given the

16   tightness of the schedule and the way it's been

17   put together, you pull one, if you will, stick

18   out from the bottom and the rest of it tends to

19   come right down on top of it.

20          MR. DILDAY:  That's my concern.  The

21   tightness of the schedule means that when I tell

22   you that one can't make it, the other one will,

23   then, yeah, it's two days in advance, but

24   realistically, if the people here truly wanted to

1    depose Sonia Fernandez, she could have been

2    deposed.

3            You're sitting at the table -- let me

4    finish, John.  You're sitting at the table today

5    to depose Ms. Fernandez.  Now, yesterday you

6    would have been able to depose Ms. Fernandez had

7    you chosen to.

8            MR. PORR:  But Mr. Vigliotti and

9    Mr. Akerson's firm are the ones that have taken

10   the labor in terms of scheduling and conducting

11   depositions, and I'm deferring to them in that

12   context.

13           I'm just telling you my perception of

14   what happened over the last couple days is that I

15   agree with them, that the way this went down,

16   they had no choice but to cancel the deposition.

17   It's not -- constructively, I would say you

18   cancelled it.  Practically, they cancelled it.

19           MR. DILDAY:  I would disagree.

20   Practically and constructively, they cancelled

21   it.

22           MR. VIGLIOTTI:  Well, I would

23   disagree, and, again, my voice message to you

24   when I received the initial letter was clear,

1    that I need to discuss with you based on the fact

2    that it depends on who you're deposing who is

3    going to be there, myself or Mr. Akerson.

4           Believe it or not, I do have other

5    cases on the schedule, and that's why we picked

6    the days we picked, because they didn't conflict

7    with my schedule, whether I had another case I

8    had to do something on or get done.

9           So to unilaterally say I'm going to

10   put Sonia in for Pechner affected me, because for

11   me to go out there that day was a burden because

12   I had other motions I was working on. I had

13   other discovery issues I was working on. So it

14   does affect who can get out there for the

15   depositions. So that's why I left the voice

16   message for you on the 9th saying I need to

17   discuss it with you, because of that.

18          Obviously, I acknowledge you called me

19   on the cell phone, but like I said, I couldn't

20   make out the number. That's why I immediately

21   called your office again. I believe that was

22   detailed enough in my voice message on the 9th

23   saying I couldn't agree with you to the

24   substitution until I spoke to you because of

1    those issues.

2              Therefore, not being able to speak

3    with you directly, I felt, based on not knowing

4    exactly who is going to be there, my schedule,

5    that the time frame involved -- and, again, we

6    only had knowledge that it was going to go from

7    2:00 to 5:00 -- that it was not financially

8    viable or productive to go out to Revere for less

9    than three hours of scheduled deposition time.  I

10   know you said you would have went to 6:00.  I

11   know you acknowledged that.  It wasn't

12   communicated to us, so we didn't know that.

13             And we can agree or disagree.  There's

14   no question in my letter I said I was cancelling

15   the deposition.  I don't disagree with that.

16   It's in writing.  But the facts that led me to

17   make that decision was the inability to speak

18   with you directly and the uncertainties we had

19   about who was going to be there, because we never

20   agreed to substitution in the scheduling.

21             It was Terri's deposition that was

22   scheduled.  As you know, Mr. Akerson has been

23   doing that.  He was supposed to go out there.  By

24   substituting Sonia, that means I would have had

1    to go out there when I was working on discovery

2    issues that I have a deadline on.  And that was

3    one of the reasons why we picked the days.

4              And I'll tell you, me and Mr. Akerson

5    discussed this prior to that schedule who we were

6    going to send out depo notices for, because of

7    our schedules.  As you know schedules, there are

8    certain things on certain days you have to be at,

9    and I just want to make it clear that is one of

10   the main reasons why I felt it was in the best

11   interests to send you that letter cancelling that

12   deposition, not to be discourteous, not to be

13   non-accommodating as I state in my letter, but

14   because of scheduling and uncertainties and the

15   time frame involved.  I just want to make that

16   clear.

17             MR. DILDAY:  And I understand.  That

18   was clear in your letter, but, you know, so we

19   don't beat this dead horse, when we look at the

20   scheduling process, there's basically three

21   lawyers doing the depositions.  There's you,

22   Mr. Akerson and Mr. Porr.

23             Now, the last time that we were in

24   Worcester, Mr. Porr deposed Ms. Pechner-James.

1    Today we're in Worcester.  Mr. Porr is deposing

2    Ms. Fernandez.  And so all I'm saying is that

3    there may have been some uncertainty in your

4    position and in your mind as to who was going to

5    be deposed, and there may have been a logistical

6    problem between you and Mr. Akerson as to what

7    you needed to do, but there was always the

8    constant, and that constant is Mr. Porr, who

9    deposed Ms. Pechner-James last Friday prior to

10   Mr. Akerson finishing his deposition of her, and

11   now we have Mr. Porr deposing Ms. Fernandez prior

12   to you completing your deposition of her.  So

13   Mr. Porr was always available to conduct the

14   deposition.

15           MR. VIGLIOTTI:  Okay.  I understand

16   that, but, again, I'm not going to beat a dead

17   horse.  Logistically, from our point, I think we

18   stated it in the letter.  I stated it on the

19   record, and I'm going to leave it at that in

20   regards to our firm and our obligations to be

21   there, and we'll leave it at that.

22           (Conference concluded at 10:40 a.m.)

23

24

CERTIFICATION

1

2

3

4

5      I, Dawn J. Cormier Bourn, hereby certify the

6   foregoing to be a true and complete transcript of

7   the oral evidence presented at the subject

8   hearing.

9

10

11

12

13

14

15

16   DATED: ___S-15-06___

17

18

19   THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT

20   DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME IN

21   ANY RESPECT UNLESS UNDER THE DIRECT CONTROL

22   AND/OR SUPERVISION OF THE CERTIFYING REPORTER.

23

24