# EXHIBIT A

Terri Pechner-James

Deposition Answers Which Were Non-Responsive,
Evasive, Argumentative and/or Combative

1.    Page 926-927:

18    Q.    While you were meeting with

19    captains Chaulk and Roland.  Did you raise the

20    mountain bike -- I'll call it the mountain

21    bike issue for lack of a better term.

22    A.    Well, when I got skipped over in

23    1997 for the mountain bike, I received the

24    e-mail confirmation from Captain Chaulk that

1    stated I was on -- I was going to receive the

2    mountain bike.  I was sent down to the church

3    on Revere Street for training.

4        It was my understanding that I was

5    going to be assigned to the bike unit, and

6    then I found out shortly thereafter that

7    Captain Colannino never received my request

8    for the bike unit, but I went through the

9    training, so I don't know what your

10    question -- I forget what your question was

11    but --

12    Q.    Well, my question is, Did you raise

13    this passover or skipover, or call it what you

1

14  will, in the January 1999 meeting with

15  captains Chaulk and Roland?

16      A.   Where was it going to get me?

17      Q.   That wasn't my question.  My

18  question is, Did you raise it?

19      A.   I raised it with Captain Colannino

20  when it happened.  I e-mailed Captain

21  Colannino just like my notes say.  No, I

22  didn't -- I didn't -- I didn't make a stink of

23  it then, no.

2.      Pages 929-934:

17      Q.   Okay.  Was it your understanding

18  that the reason you ultimately didn't get

19  assigned to the bike patrol was there was some

20  sort of clerical error?

21      A.   Yeah.  On behalf of Roy for his kid

22  again.

23      Q.   And what do you mean by that?

24      A.   A clerical error -- what are you --

1  because Roy told me that he didn't get my

2  paperwork for putting in for the bike unit.

3      Q.   So somewhere from you to mister --

4  or to -- was he acting chief?  Oh, no.

5  Captain Colannino.

6         Paperwork got lost in the shuffle.

7  Human error?  Clerical error?

8      A.   Not when I'm sent for training for

9  something.  Captain Chaulk sends me for

10  training.  That's not a clerical error.

11  That's an error on behalf of the

12  administration to communicate to one another.

13  Not my error.

14      Q.   Well, I'm not saying it is.

15      A.   Not my job.

16      Q.   No, no.  I understand.  I'm saying

17  somewhere between --

18      A.   That was because they didn't want

19  to give me the bike unit.

20      Q.   Who didn't want to give you the

21  bike unit?

22      A.   Roy Colannino.

23      Q.   And why do you say that?

24      A.   Because Roy had made statements,

1  when we were fighting for seniority, that the

2  females weren't going to get anything on that

3  job.

4      Q.   And when did he say that?

5      A.   I don't remember.

6      Q.   Were you present when he said it?

7      A.   He said it directly to Officer

8   Malatesta.

9      Q.   Do you recall when?

10     A.   No, I don't remember the date.

11     Q.   When did you first learn about

12   that?

13     A.   I don't recall.

14     Q.   What did Officer Malatesta tell

15   you?

16     A.   That Roy Colannino told her that

17   she'll never make any special assignment as

18   long as he's in that department.

19     Q.   That who would never make any

20   special assignment?

21     A.   Lynn.

22     Q.   So that wasn't a reference to you

23   at all then?

24     A.   No.  He made reference to my

1   husband who was in the union.

2      Q.   Okay.  What did he say about your

3   husband?

4        A.   He didn't say anything about my

5   husband.  He said something about the females

6   on the job.

7        Q.   I thought you just said that he

8   made reference to your husband who was in the

9   union?

10       A.   Well, he made reference to my

11  husband who was in the union about the females

12  on the job.

13       Q.   Oh.  This is a comment that he made

14  to Mr. James?  Not a comment that he made to

15  Lynn Malatesta?

16       A.   He made two comments.  He made

17  comments to my husband regarding the females

18  on the job, and he made a comment to Lynn

19  Malatesta because we filed a grievance,

20  because he put his kid on the job and he

21  didn't know how to speak Spanish, that she

22  would never get any special assignments.

23            So, shortly thereafter, none of us

24  got any special assignments.  However, I

1   believe his son got that special assignment

2    for whatever reason why I was skipped over on

3    it.

4        Q.    So you're saying that Kevin

5    Colannino got a bike -- a mountain bike patrol

6    assignment?

7        A.    I don't know who got the bike at

8    this time.  I don't remember who got it.

9        Q.    What did Roy Colannino say to your

10   husband, Mark James?

11       A.    I don't recall.

12       Q.    When did he say it?

13       A.    You'll have to ask him.

14       Q.    When did Mr. James tell you about

15   the comment?

16       A.    I don't remember.

17       Q.    So all's you know is Roy Colannino

18   made some unspecified comment to Mark James at

19   some unspecified time?

20       A.    Right.

21       Q.    All right.  And can you give me any

22   idea of the gist of the comment?  The

23   substance of the comment?  The topic?

24       A.    Female officers.

1    Q.   Okay.  And what about female

2    officers?

3    A.   I don't remember.  That's all I

4    remember.

5    Q.   So was that comment made sometime

6    around February to April of '97?

7    A.   I don't know when the date was.

8    Q.   Can you tell me if it was before or

9    after the mountain bike references here?

10    A.   I don't know when the date was.

11    Q.   And you don't recall when Mark told

12    you?

13    A.   No.

14    Q.   Was it before or after you were

15    married?

16    A.   I don't remember.

17    Q.   Before or after the January 1999

18    meeting?

19    A.   I don't remember.

3.    <u>Pages 935-936</u>:

1    Let me ask you to take a look at

2    the complaint again and specifically

3    paragraphs 55 to 58.

4    A.   (Looks at document.)

5    Q.   All right.  You've had a chance to

6  review paragraphs 55 to 58?

7    A.   Yes.

8    Q.   And as I understand it, you weren't

9  present when this incident occurred?

10    A.   No.

11    Q.   Okay.  When did you first learn

12  about it?

13    A.   I don't remember.

14    Q.   Did you learn about it sometime in

15  April of '97?

16    A.   Shortly after it happened.

17    Q.   Okay.  Within a week?

18    A.   Yes.

19    Q.   Who did you learn about it from?

20    A.   Officer Curcio, Officer Malatesta,

21  and Officer Fish.

22    Q.   Okay.  Did they talk to you all at

23  the same time, or did you have conversations

24  with them individually?

1    A.   Individually.

2    Q.   Okay.  Who did you talk to first?

3    A.   Probably Lyn Curcio.

4    Q.   Okay.  What did she tell you?

5    A.   What it says.

6    Q.   Well, did she tell you absolutely

7  everything that's recorded beginning with the

8  first sentence of paragraph 55 through the

9  last sentence of paragraph 58?

10    A.   No.

11    Q.   Okay.  What did she tell you?

12    A.   Can you ask that question again?

13    Q.   What did Lyn Curcio tell you about

14  this April 1997 incident?

15    A.   I don't remember.

4.    <u>Page 967</u>:

9    Q.   And when you say marching, I'm

10  thinking of a group in step and in

11  formation --

12    A.   Right.

13    Q.   -- walking down the street?

14    A.   Yeah, a police funeral.

15    Q.   Okay.

16    A.   You worked there.

17    Q.   How far was it from the police

18   department to the funeral home?  How far was

19   that?

20      A.   Too far.

5.    Page 971:

5      Q.   Okay.  Your notes on page 5 have a

6   reference to August 27 and being assigned to a

7   walking route?  And you reference three junior

8   officers.  Do you see that?  I'm looking at

9   your notes, page 5.

10      A.   I'm sorry.  I thought you were

11   talking --

12      Q.   No.  The notes.

13      A.   Okay.  Page 5.  What am I -- what

14   am I --

15      Q.   The August 27 entry, the walking

16   route on Shirley Ave. with three officers,

17   junior.  See that?

18      A.   I see that.

19      Q.   Who are the three officers you're

20   referring to there?

21      A.   I don't know.

22      Q.   Okay.

23      A.   Look at the roster.

6.    Pages 971-974:

24    Q.   And you reference that Lieutenant

1    Foster's put you on the walking route as

2    punishment?

3    A.   Correct.

4    Q.   And in paragraph 22 of the

5    complaint you also make reference to

6    punishment.  What do you mean by that?

7    A.   That when Lieutenant Foster told me

8    that he's putting me on a walking assignment

9    till further notice because he was upset at me

10   for some personal reason that he decided to

11   make my life a living hell on the job.

12   Q.   Did you perceive what Lieutenant

13   Foster was doing on August 24 through

14   August 27 as discipline?

15   A.   Discipline because of what?

16   Q.   Well, that's my question.  Did you

17   perceive it as him disciplining you for some

18   act of misconduct?

19   A.   I was told to watch my back because

20   Lieutenant Foster was out to get me.

21   Q.   Okay.  My question to you --

22      A.   It was -- I'm answering your

23  question.

24      Q.   No, you're not being responsive.

1      A.   I'm being responsive.  You want an

2  answer.  I'll give it to you.

3      Q.   Did you perceive the August 24 to

4  August 27 walking assignments as being

5  discipline for some act of misconduct?  Yes or

6  no.

7      A.   I was never reprimanded for any act

8  of misconduct.

9      Q.   Okay.  So you did not perceive the

10  August 24 to August 27 assignments as being

11  discipline for misconduct?

12      A.   Again, I was never reprimanded for

13  any misconduct.  I've answered your question.

14      Q.   Okay.

15         MR. PORR:  Mr. Dilday.

16         MR. DILDAY:  Mm-hmm.  Yes, I should

17  say.

18         MR. PORR:  My question is really

19  much more simple than I think the witness is

20  making it.  I'm asking for her perception.  I

12

21  know she wasn't disciplined for misconduct.

22  That's a different answer to a different

23  question.  All right?

24      MR. DILDAY:  You're looking for a

1  yes or no on that one?

2      MR. PORR:  I want to know, did she

3  perceive Lieutenant Foster's putting her on

4  walking routes from August 24 to August 27 as

5  an act of discipline for some act of

6  misconduct on her part.

7      MR. DILDAY:  So what he wants from

8  you is a yes or no on that one.

9    Q.   It's just a yes or no.

10    A.   No.

7.    Page 978:

13    Q.   Is the 30th the first time you

14  began swapping shifts?

15    A.   To get away from Bernie?

16    Q.   Yeah.

17    A.   I don't know.

18    Q.   I'm sorry?

19    A.   Could have been.

20    Q.   Do you have any other indication in

21   your calendars that you were swapping shifts

22   before that to get away from Bernie?

23        A.   No.

8.       Pages 979-981:

7        Q.   Okay.  In the notes here for

8   August 30th, you indicate that you told

9   Captain Colannino that you were not sleeping?

10        A.   Right.

11        Q.   When did you start having trouble

12   sleeping?

13        A.   Somewhere before I went back to the

14   day shift.

15        Q.   I'm sorry?  Before you went back --

16        A.   Before I went back to the day

17   shift.

18        Q.   So that would have been back

19   sometime between June and August?

20        A.   I don't know.  That's -- I don't

21   remember the exact date.

22        Q.   Okay.

23        A.   I mean, I --

24        Q.   You were having -- but my

1   understanding was you didn't have any problems

2   with the Criminal Investigation Division

3   temporary assignment?

4       A.   No.  There may have been nights

5   that I didn't sleep because I may have had a

6   hanging, you know,  that I didn't --

7       Q.   I'm sorry.  Because you had?

8       A.   Because I had somebody hanging from

9   a tree.  I mean, I had quite a few incidents

10  that were pretty traumatizing in CID, but I

11  really took that as part of my job and --

12      Q.   Okay.  Well, I guess my question

13  was,  The August 30 entry where you told

14  Captain Colannino you were not sleeping, I

15  took that to be that you were telling Captain

16  Colannino you were not sleeping because of

17  what Lieutenant Foster was doing?

18      A.   Correct.

19      Q.   When did you start having trouble

20  sleeping because of what Lieutenant Foster was

21  doing?

22      A.   Before I got back to his shift.

23      Q.   Before you got back to the shift?

24      A.   Mm-hmm.

1    Q.   But Lieutenant Foster hadn't done

2  anything before you got back to the shift.

3    A.   I was threatened before I got back

4  there.  How would you feel if you were

5  threatened by somebody and then you had to go

6  and work for the guy and then look -- you

7  know, look what happened.  I was put on a

8  walking route, called in a couple times by him

9  and Lieutenant Ford, so I'd rather know when

10  I'm going to be stabbed than not know.

11    Q.   My understanding, from reading your

12  notes here on page 5 and from the questions

13  we've been going over today, is that you were

14  not told to watch your back until sometime

15  around August 9th.

16    A.   Right.

17    Q.   Okay.  And Lieutenant Foster, the

18  first time you ever had a run-in of any kind

19  with him was August 24th?

20    A.   Right.

21    Q.   Did you begin losing sleep sometime

22  between August 9 and August 24?

23    A.   I don't remember.

9.     Pages 984-985:

21     Q.   All right.  Did you go see a doctor

22   on August 31st of '97?

23     A.   I don't know.  Look at my medical

24   notes.  Take a look, you tell me.  Help me out

1   here.

10.     Pages 985-987:

2     Q.   Now, on the 1st you did -- I'm

3   looking at both your calendar and page 5 of

4   your notes.

5          On the 1st you did a shift swap

6   with Officer Macaskill, correct?

7     A.   Correct.

8     Q.   So you didn't have to work for

9   Lieutenant Foster that day either?

10     A.   No.

11     Q.   So the last day you worked for

12   Lieutenant Foster was a partial day, a half

13   day, on the 27th?

14     A.   I worked September 2nd, and that's

15   when he called me into the guard room.

16     Q.   I'm using September 1 as my point

17   of reference here.  So looking back from

18  September 1, the last day you had worked for

19  Lieutenant Foster was a half day on the 27th.

20      A.   No.  I worked for Lieutenant Foster

21  on September 2nd.

22      Q.   I'm using September 1 as my point

23  of reference in looking back.  I'm not looking

24  forward from September 1.  I'm looking back.

1      A.   Okay.  And your question?

2      Q.   So the last day you had worked for

3  Lieutenant Foster, as of September 1, was a

4  half day on the 27th of August?

5      A.   I don't recall.

6      Q.   Well, you didn't work for

7  Lieutenant Foster on the 28th or 29th, those

8  were your days off?

9          THE WITNESS:  Can we take a break?

10          MR. PORR:  Sure.  By all means.

11          (Recess taken from 12:00 P. M. to

12  12:15 P. M.)

13      Q.   What I was trying to establish as a

14  lead in to some follow-up questions is, On

15  September 1, when you traded shifts with

16  Officer Macaskill and you worked a PM shift,

17  that enabled you to work a shift without being

18  under Lieutenant Foster's supervision,

19  correct?

20      A.  Correct.

21      Q.  All right.  So the 28th was your

22  day off, of August, the 29th of August was

23  your day off, the 30th you swapped shifts so

24  you didn't have to work for Lieutenant Foster,

1   the 31st of August you called in sick, and the

2   1st of September you swapped a shift so you

3   didn't have to work for Lieutenant Foster.

4           So when you came back to work on

5   September 2nd, the last time you had worked

6   for Lieutenant Foster was August 27th, a half

7   day, correct?

8       A.  Correct.

11.    Pages 992-994:

5       Q.  Okay.  Well, the point I'm getting

6   at is the only way Lieutenant Foster could

7   have pictures is either you gave them to him,

8   Lyn Curcio gave them to him, or Dawn Hagan

9   gave them to him.

10      A.  Lyn Curcio is his buddy.  Maybe Lyn

11  gave it to him.

12      Q.   I'm sorry?

13      A.   Lyn Curcio is his buddy so maybe

14  Lyn Curcio gave him some pictures.  But

15  there's no pictures of me smoking marijuana

16  so...

17      Q.   Lyn Curcio is Lieutenant Foster's

18  buddy?

19      A.   Correct.

20      Q.   Why do you say that?

21      A.   Because I say it.

22      Q.   Okay.  But what do you base that

23  upon?

24      A.   Lyn's a "yes" person.

1      Q.   Okay.  And when did you perceive

2  that Lyn Curcio became Lieutenant Foster's

3  buddy?  When did that become apparent to you?

4      A.   It's always been apparent.

5      Q.   I'm sorry?

6      A.   It's always been apparent.

7      Q.   Were you and Lyn, when you came

8  from the academy, on the same shift together

9  in February of '96 under Lieutenant Foster?

10     A.   I don't recall.

11     Q.   I'm assuming that when you say it's

12  always been apparent, this is something you

13  have personally observed yourself?

14     A.   Right.

15     Q.   Okay.  So do you have reason to

16  believe that Lyn Curcio may have given some

17  pictures of you to Lieutenant Foster from the

18  Mexico vacation?

19     A.   I don't know why anybody would give

20  it to him.

21     Q.   A minute ago, you suggested they

22  were buddies.

23     A.   They're buddies, but there is no

24  picture, Attorney Porr, so I don't know if you

1  want to go on to the next -- we could sit here

2  and debate this all day long.  There is no

3  picture of me smoking marijuana.  I mean, if

4  he got a picture from somebody, then more

5  power to him.

6     Q.   Okay.

7     A.   If he got a picture, then I should

8  have been reprimanded, and I was never

21

9   reprimanded.  I requested that there be a drug

10   test, and I was never drug tested because

11   there is no picture, and that was just his bad

12   tactics of harassing me.

12.   <u>Pages 1001-1005</u>:

5      Q.   In paragraph 27 of the complaint,

6   take a look at that, you allege that "Captain

7   Colannino failed to remedy Lieutenant Foster's

8   punishment of the plaintiff."  What do you

9   mean by that?

10      A.   By him putting me on a walking

11   route.

12      Q.   Okay.  But a walking route, of

13   course, is an assignment that any police

14   officer can be expected to undertake from time

15   to time, correct?

16      A.   The walking route is assigned to

17   Harry DeFreitus, Ray Maniff, two officers that

18   have been on the job for over 20 years.

19         You worked for a police department.

20   I'm sure you're very well aware that

21   assignments may not -- it may not be in the

22   contract, but assignments are based on

23  seniority.

24        And for Lieutenant Foster to put

1  me on a walking route on Shirley Ave., it was

2  a punishment program, and it was very well

3  known in the department.

4    Q.   So it violated your seniority

5  rights?

6    A.   There was nothing in the contract

7  about seniority where you were going to work.

8    Q.   So it didn't violate your seniority

9  rights?

10      A.   It was harassment.

11      Q.   Why do you say that?

12      A.   Because Lieutenant Foster was upset

13  about something and he made it a personal

14  vendetta, and he used his power of being a

15  lieutenant to punish me and belittle and

16  harass me.

17      Q.   But as I understand it, a walking

18  route is a valid assignment for an officer in

19  a police department.

20      A.   Attorney Porr, you've worked for a

21  police department.  You can understand it any

22  way you want.  As a police officer, with

23  seniority, on the job, you can go there today,

24  you can go there tomorrow, you can go back six

1  months ago, you can go back six years ago, 600

2  years ago, if you look at the officers that

3  are on the walking routes that are assigned to

4  the police department -- even the day that I

5  was on the walking routes, that if there were

6  enough men, they would assign a walking route.

7          Even if there weren't, if there

8  were senior officers -- again, like I said,

9  DeFreitus, Ray Maniff, any of those officers,

10  they would walk their walking route.

11          That's where they were assigned.

12  That was okay with them.  That's where they

13  wanted to be.  Regular officers, the only time

14  an officer was assigned a walking route was

15  for a punishment program.

16          Officer Fish was assigned there

17  after maybe because she didn't write enough

18  tickets.  So it became Lieutenant Foster's

19  punishment program to assign officers down to

20  Shirley Ave.

21      Q.    So it was a disciplinary measure,

22   then?

23      A.    Disciplinary?  There is no

24   disciplinary.  There's no order out that you

1   have to write that many tickets.  Lieutenant

2   Foster liked to harass the female officers.

3   That's the bottom line.

4      Q.    What I'm hearing, though, is that a

5   walking route is an assignment that is part of

6   the job of being a police officer, just like a

7   driving route, just like a cruiser?

8      A.    What about the officers that are

9   involved in all sorts of things?  I won't

10   mention -- we won't get into that because I'm

11   sure you're fully aware of what's going on.

12   What about those officers?

13        Why don't you look now and see if

14   they're assigned to a walking route and answer

15   your own question?  That was Lieutenant

16   Foster's revenge for a personal vendetta that

17   he had against me.  I can't answer it any

18   other way.

19      Q.    Okay.  And his revenge was to

20   assign you to a valid assignment as an officer

21   of the Revere Police Department, correct?

22       A.   Can you ask that question again?

23       Q.   His revenge was to assign you to a

24   valid assignment as an officer of the Revere

1    Police Department, correct?

2            MR. DILDAY:  I will object to the

3    form.

4            MR. PORR:  Fine.

5            THE WITNESS:  I don't even know

6    what he asked.

7            MR. DILDAY:  He can repeat it for

8    you.

9        Q.   An assignment to a walking route is

10   a valid assignment as an officer of the Revere

11   Police Department?

12       A.   Yes, it is.


13.    <u>Pages 1020-1021</u>:

20       Q.   Prior to January of '99, did you

21   ever call it the terror shift?

22       A.   I worked on it.

23       Q.   I know you worked on it.  My

24   question was,  Did you ever call it the terror

1  shift?

2      A.   No.

3      Q.   I'm sorry?

4      A.   No.

14.    <u>Pages 1036-1037</u>:

8      Q.   Okay.  Well, I ask because you've

9   signed two documents under the pains and

10   penalties of perjury and they're not

11   consistent, they cannot be reconciled, and I'm

12   trying to figure out if you can explain that

13   to me.

14      A.   The gist of what happened can be

15   reconciled.

16      Q.   Okay.

17      A.   Maybe the captains that did the

18   report should have put, you know, when this

19   happened.  Maybe they should have did a better

20   investigation and there would have been a

21   proper date in there.

22      Q.   So it's your fault that --

23      A.   In 1999, when we told Captain

24   Roland and Captain Chaulk about the incident,

1   if they took that and looked at it, at the

2    time of the Super Bowl last year, maybe they

3    should have went and found out what the date

4    was and what the time, and there would have

5    been an investigation done.  We wouldn't be

6    sitting here wondering whether it was during

7    the Super Bowl or during the Kentucky Derby.

8    He said it and that was it.

9        Q.   So it's Captain Roland and Captain

10   Chaulk's fault that one of your statements

11   under oath is wrong?

12       A.   Right.  It was their fault that

13   they didn't do a proper investigation.

14   Therefore, we would have known the date and

15   time back in 1997, not 2006.

15.    <u>Pages 1038-1047</u>:

16       Q.   Okay.  Now, looking at

17   paragraph 61, in the last sentence, you allege

18   that "this heightened the hostility,

19   humiliation and degradation that permeated the

20   workplace."  Do you see that?

21       A.   Yes, I see.

22       Q.   What hostility are you referring to

23   there?

24    A.   I don't know.

1    Q.   You don't know?

2    A.   (Shakes head.)  No.

3    Q.   You're shaking your head no, okay.

4    A.   I don't know.

5    Q.   Did you know what hostility you

6  were referring to when you signed this

7  complaint under oath in 2003?

8    A.   Yes.

9    Q.   Okay.  Has something happened

10  between now and then that you've forgotten?

11    A.   Yeah.  My brain is not functioning.

12    Q.   Okay.  Is it not functioning to the

13  point where you can't continue to answer

14  questions to the best of your ability during

15  the course of this deposition?

16    A.   No.  Ask me another question.

17    Q.   Okay.  Can you point to any act of

18  hostility that we've discussed from

19  February of '96, when you showed up after the

20  academy, to October of '97?  Can you identify

21  any?

22    A.   That make my career, my job, a

23  hostile working environment?  This was a

24  '99 -- let me just give you an example so you

1  understand the hostility.

2      Q.    I'd like an answer to my question.

3          MR. PORR:  Counsel, I'm entitled to

4  an answer to the question asked.

5          MR. DILDAY:  What was the original

6  question, ma'am?

7          MR. PORR:  Can you identify any --

8          MR. DILDAY:  No, no.  You gave a

9  secondary question after that.  What was the

10  secondary question when she said she didn't

11  remember?

12          THE WITNESS:  He asked from the

13  time I got on the job.

14          MR. PORR:  Right.

15          THE WITNESS:  I tried to give him

16  an answer.

17          MR. PORR:  Any acts of hostility

18  from February of '96 after she finished the

19  academy until October of '97 during the World

20  Series.

21          MR. DILDAY:  Okay.  I think she

22   said she was going to give you an example of

23   that.

24          MR. PORR:  Well, she started off in

1   a direction that suggested to me she was going

2   to talk about something outside that time

3   period.

4          MR. DILDAY:  Well, I don't know.  I

5   just thought she said she was going to give

6   you an example.

7          MR. PORR:  Okay.  I'm listening.

8      A.   Okay.  We spoke earlier in the

9   deposition about Lieutenant Foster, with him

10   assigning me to the walking route.

11     Q.   Okay.  That's the August and

12   September of '97.

13     A.   Correct.

14     Q.   All right.

15     A.   While I was assigned down there, I

16   recall an incident where I had to issue a

17   parking ticket to a gang member, and the kid

18   came after me and I requested backup -- this

19   was at 3:30 in the afternoon -- and backup was

20   very far away.  I remember Sergeant Randall

21   responding to my request for help in his

22   personal vehicle as he was on his way home.

23        I remember on several occasions

24   where I wasn't receiving backup.  I remember

1   when I complained about certain television

2   shows being on the TV, that it made my

3   environment a lot more stressful, every time I

4   said that there was a problem, when there was

5   something wrong.  So there was quite a few

6   hostile situations.

7      Q.   When did the parking ticket

8   incident you just mentioned occur?

9      A.   I don't know.  When I was on the

10   walking route.

11      Q.   Do you have a reference to it in

12   your notes?

13      A.   No.  I just --

14      Q.   Is there a reference to it on your

15   calendar?

16      A.   No.

17      Q.   Did you make any reference, any

18   notation of that incident at all?

19      A.   Well, during these depositions,

20    you're asking me questions and you're asking

21    me questions about my job, you're asking me

22    questions about being put down on Shirley Ave.

23    on a walking assignment that is supposed to be

24    an assignment by the -- you know, the police

1    department, which it absolutely is.

2            However, when you are put under the

3    position that I was in, that I'm worried about

4    my lieutenant, never mind the people that are

5    out on the street, that could possibly kill

6    you.  So, to me, that's hostile.

7        Q.   Okay.  My question is,  Do you have

8    any documentation concerning this parking

9    ticket incident you just mentioned now?

10       A.   Speak to Sergeant Randall.  I'm

11    sure he'll remember it.

12       Q.   It's not referenced in your MCAD

13    complaint, is it?

14       A.   No.

15       Q.   Not in the amended MCAD complaint?

16       A.   It's not part of the complaint.

17       Q.   Okay.

18       A.   You asked me if I had some hostile

19  conditions, so I'm telling you that that was

20  possibly my life that I had to worry about,

21  where my backup was.  So you asked a question.

22  I answered it.

23      Q.   All right.  Well, by identifying an

24  act of hostility, this is an act of hostility

1  that you're referring to in paragraph 61.

2  You're making it a part of the complaint.

3       So I'm just trying to see if I can

4  find out if there's anything that you know of

5  in writing that documents this parking ticket

6  incident with the gang member.

7      A.   Why don't you give me the

8  definition for hostility, Attorney Porr?

9  Maybe I can understand -- maybe that's my

10  problem.  Maybe I don't understand what the

11  hostility -- what the word means.  Let me

12  know -- let me --

13      Q.   Well, I'm just going to take your

14  complaint at face value and have to ask you

15  the questions that occur to me.

16      A.   Right.  Well, my attorney filled

17  out this, just like yourself.  So I just want

18  to know, as an attorney, what does it mean?

19  What does hostility mean?

20      Q.    But you signed it under penalty of

21  perjury.

22      A.    Right.  I signed it.

23      Q.    Okay.  So you had to have some idea

24  of what you were referring to when you signed

1  it, I assume.

2      A.    I'm asking you for the definition

3  so I can maybe answer your question a little

4  better.

5      Q.    What definition were you using when

6  you signed the complaint?

7      A.    Again, my attorney drafted up this

8  complaint.

9      Q.    I understand.  But did you have a

10  definition in mind of hostility when you

11  signed the complaint?

12      A.    Yeah.  I live it every day.

13      Q.    Well, no.  That's a snide remark.

14  That's not an answer to the question.

15          Did you have a definition of

16  hostility when you signed the complaint?

17    A.   Yes, I did.

18    Q.   Okay.  And what was that

19  definition?

20    A.   I don't remember.

21    Q.   Okay.  Did you have acts of

22  hostility in mind when you signed the

23  complaint?

24    A.   Yes, I did.

1     Q.   What acts of hostility did you have

2   in mind?

3     A.   The way you're talking to me right

4   now.

5     Q.   And what's wrong with the way I'm

6   talking to you right now?

7     A.   Because you're talking down to me

8   like I'm --

9     Q.   I haven't raised my voice, have I?

10    A.   What -- what are you trying -- I

11  mean, why don't you just ask the question and

12  get on with the deposition instead of wasting

13  time?

14    Q.   Okay.

15    A.   Next question.

16    Q.    What acts of hostility did you have

17  in mind as related to paragraph 61 when you

18  signed the complaint?

19    A.    I've answered the question.

20    Q.    Okay.  So the acts of hostility

21  were the events with Lieutenant Foster in

22  August and September, correct?

23    A.    Mm-hmm.

24    Q.    All right.  That's a yes?

1    A.    Yes.

16.    <u>Page 1048</u>:

8    Q.    Okay.  That's your second

9  complaint, not receiving backup.  When did you

10  begin experiencing the fact that you were not

11  receiving backup?

12    A.    Quite a few times.

13    Q.    When did you start noticing that

14  you were not getting backup?

15    A.    Quite a few times.

16    Q.    No, no.  When did it start

17  happening?

18    A.    I don't recall.

17.     <u>Pages 1051-1053</u>:

15    Q.   All right.  Now, how did Sergeant

16  Doherty's comment about the sports commentator

17  heighten the problem with not getting backup?

18    A.   Because, basically, his lack of

19  respect towards females on the police

20  department showed just that.  That that's what

21  he thought.  That's what he thought of

22  females.  That's how we got on the job, you

23  know, that was Sergeant Doherty.

24    Q.   So how did Sergeant Doherty's lack

1  of respect for females cause other individuals

2  not to back you up?

3    A.   Because the other individuals were

4  getting away with doing whatever they wanted

5  because supervisors like that stood around and

6  did nothing.

7    Q.   I'm trying to make the connection,

8  though, between how that resulted in a lack of

9  backup, how that created a problem with a lack

10  of backup.

11    A.   Because if he can say that and get

12  away with that, then they don't have to back

13  us up.

14      Q.   And did any officers tell you that

15  that's how they felt and how they responded to

16  his comments?

17      A.   Oh, yeah.  They came right up to me

18  and said, I'm not going to back you up at a

19  call when you arrest a murder suspect because

20  of that.

21      Q.   Who did?  Who said that?

22          MR. DILDAY:  That was sarcasm.

23      Q.   If it's sarcasm, tell me it's

24  sarcasm.

1      A.   Yeah, it is a sarcasm.

18.    Pages 1053-1054:

9          Prior to the Super Bowl or World

10  Series comment, whichever it is, what

11  incidents had occurred that had humiliated

12  you?  I'm, again, referring to paragraph 61 of

13  the complaint where you talk about

14  humiliation.

15      A.   The fact that my son's picture was

16  hanging up.

17      Q.   Okay.

18    A.    The fact that I was put lower on

19   the list because of the chief's -- Captain

20   Colannino's boy had seniority over us.

21    Q.    Was that the seniority issue --

22    A.    Yes.

23    Q.    -- that was humiliating?

24    A.    Yes, it was humiliating.

1    Q.    Okay.  But you ultimately prevailed

2   on that, correct?

3    A.    After a fight like now.

19.    Pages 1056-1059:

4    Q.    Okay.  Because what I'm trying to

5   figure out is your complaint alleges that

6   Sergeant Doherty's comment heightened the

7   hostility, humiliation, and degradation that

8   permeated the workplace.

9        So I'm trying to find out what

10   hostility, humiliation and degradation

11   permeated the workplace at the time you made

12   the comment, and then how the comment

13   heightened that.

14        So there was your son's picture,

15   the seniority grievance, being looked down

16   upon by, I guess, at least Lieutenant Foster

17   and maybe Lieutenant Santoro.  Anything else?

18        A.   Sexual assault.

19        Q.   When did that occur?

20        A.   I discussed that.

21        Q.   Let me ask you to look at page 8 of

22   your notes.  See the entry for November 19,

23   1998?

24        A.   Yeah.

1        Q.   Is that the sexual assault you're

2   referring to?  Is that when it occurred?

3        A.   Yeah.

4        Q.   Okay.  So that hadn't happened by

5   the time of Sergeant Doherty's comment, had

6   it?

7        A.   I don't know.

8        Q.   What do you mean you don't know?

9        A.   I don't know.

10        Q.   Well, you just told me that the

11   November 19, '98 entry is the entry you just

12   referred to as the sexual assault, correct,

13   involving Todd Randall?

14        A.   Right.

15    Q.   So you described that at a prior

16  deposition, correct?

17    A.   Right.

18    Q.   So, by definition, that could not

19  have happened as of January of '98 or

20  October of '97, that was still nearly a year

21  in the future?

22    A.   You know, with all due respect, if

23  you want an incident, I'll give you an

24  incident, but the dates are very confusing to

1  me.

2    Q.   Well, these dates aren't confusing.

3  We have them on paper.

4    A.   Okay.  Well, maybe if you ask the

5  question in a different manner that I can

6  fully understand, then I could answer your

7  question.

8    Q.   All right.  I'm trying to get an

9  understanding of the acts or incidents of

10  hostility, humiliation, and degradation that

11  were permeating the workplace at the time of

12  Sergeant Doherty's sports commentator comment.

13       I want to know what you are talking

14  about.  Because you go on to say that his

15  comment heightened those things that permeated

16  the workplace.

17       So I'm trying to get the baseline

18  in terms of what was preexisting his comment

19  and then find out how that baseline was

20  heightened, because that's what your complaint

21  says happened.

22     A.   Well, I think that Russo, the

23  police chief, with his comments that, you

24  know, it was before the females got on the job

1  that Russo had a big bearing on the

2  humiliation.  I mean, I just --

3     Q.   All right.  So Russo's comments you

4  took as humiliating.

5     A.   Yeah.

6     Q.   All right.  Your son's picture was

7  humiliating?

8     A.   Yeah.

9     Q.   The seniority grievance issue you

10  found humiliating?

11     A.   The underwear hanging on the --

12     Q.   It happened in 2001.

13    A.    Okay.

14    Q.    I'm trying to talk about --

15    A.    It happened.

16    Q.    -- what was happening in '96 and

17   '97.

18    A.    Okay.

19    Q.    So anything else in '96, '97 that

20   you found humiliating?

21    A.    I don't recall.


20.    Page 1061:

1    Q.    Okay.  I'd like to go back to

2    page 7 of your notes.  All right.  We started

3    talking about this big paragraph in the

4    middle, and the first, roughly speaking, half

5    of the paragraph deals with the sports

6    commentator comment, and we determined that we

7    could break the paragraph slightly more than

8    halfway down, and that a different incident

9    begins when you say, "Sergeant Doherty, on

10   several occasions, has yelled at me for using

11   fowl language."  I think you mean f-o-u-l as

12   opposed to f-o-w-l.

13    A.    Like I said, attorney, I didn't go

44

14   to school as long as you did, and my English

15   skills aren't as good as yours, so I apologize

16   for my long paragraphs.  And if you have a

17   problem with that, then you shouldn't have

18   requested my notes.

19        Q.   No.  That's okay.

20        A.   That's just what they are.  Notes.

21   I didn't use Spell Check, and I didn't care

22   about my English language in my notes.

21.    Pages 1065-1066:

21        Q.   Okay.  Did you report it to him

22   once or more than once?

23        A.   They would sit there in the control

24   room and watch this whole thing go on, so they

 1   were fully aware on several occasions that

 2   this was going on.  Not just with us.  It

 3   happened at a Christmas party one year with

 4   Sergeant Doherty.

22.    Pages 1067-1072:

17        Q.   All right.  Looking at the top of

18   page 4 of Exhibit 9 there, the Roland and

19   Chaulk report, if you look at lines 134 to

20   136, you were talking about him reprimanding

21   the female officers for language while a male

22   officer was present using even worse language.

23       Who's the male officer you're

24   referring to?

1       A.   Ninety-eight percent of the police

2   department.

3       Q.   Should that be plural, then, while

4   male officers were present?

5       A.   Yes.

6       Q.   Okay.  All right.  And what "worse

7   language" were male officers using that they

8   were never stopped from saying?

9       A.   Lieutenant Santoro talking about

10   his body parts.

11       Q.   We're talking about swearing now.

12   We're not talking about body parts.  We're

13   talking about swearing.

14       A.   It was plenty.  There was quite a

15   bit of swearing.

16       Q.   Well, I understand.

17       A.   You represent the police

18   department, Attorney Porr.  Come on.  I mean,

19   walk into the police department today.  Okay?

20   I mean, I think there's a lot more to be held

21   up except for, you know, someone using foul

22   language I admitted to saying.  I went as far

23   as not to say a swear word because I knew it

24   bothered Sergeant Doherty so I didn't do it.

1       Q.    Okay.  But my question is,  As

2   captains Chaulk and Roland put it here, you're

3   making an allegation that male officers,

4   plural, used worse language, and my question

5   is what worse language did they use?  What did

6   they say that was worse?

7       A.    I don't remember.

8       Q.    Okay.  Well, in your Lexicon, is

9   there anything worse than the "f" word?

10          MR. DILDAY:  Objection.

11      A.    Yes.

12      Q.    Okay.  What's worse than the "f"

13   word?

14      A.    Yes.

15      Q.    All right.  And what is worse than

16   the "f" word?

17      A.    I'm not going to sit here and get

18   into a discussion.  This another completely

19   unacceptable.

20        Q.   No.  I want to know what male

21   officers said that was worse than using the

22   "f" word.  You made an allegation that they

23   did so --

24        MR. DILDAY:  It's not saying she

1   made the allegation.  It's saying what was

2   stated to captains Roland and Chaulk.

3        MR. PORR:  She's the one that

4   stated it.

5        A.   I was not the only one.  I was not

6   -- Officer Malatesta also complained about the

7   same incident.  The same exact thing was said

8   to Office Malatesta.  It was said to Officer

9   Curcio.

10        Speak to them two officers and

11   they'll both tell you that Sergeant Doherty

12   told both of them for saying swear words the

13   same exact thing that he said to me.

14        Q.   All right.  Paragraph 53 of the

15   complaint says only one officer spoke up at

16   the meeting.

48

17      Are you saying that more than one

18  officer spoke up about Sergeant Doherty's

19  double standard here?

20    A.  Yes.

21    Q.  Okay.  How many officers at the

22  January 7, 1999 meeting spoke up about Officer

23  Doherty's double standard?

24    A.  I know for a fact myself, Officer

1  Curcio, and Officer Malatesta spoke up.  I

2  don't remember anybody else.  I know what they

3  went through with Sergeant Doherty.

4    Q.  So it was three officers, not one?

5    A.  Correct.

6    Q.  All right.  And when you signed the

7  complaint under oath, were you aware of the

8  fact that the other two officers that you had

9  just mentioned had spoken up at the January 7,

10  1999 meeting?

11    A.  I just remembered.

12    Q.  Okay.  Was it one of the other

13  officers that complained that the male

14  officers used worse language, or was that you?

15    A.  I don't remember.

16     Q.   I see.

17     A.   But, again, if there was a proper

18   investigation done, you wouldn't be looking at

19   worse language, you'd be looking at a

20   completed investigation from Captain Roland

21   and Captain Chaulk, not a halfway, partially

22   completed investigation.

23     Q.   Well, we'll get to that in a

24   minute.

1     A.   I'm sure we will.

23.     Pages 1077-1081:

17     Q.   Okay.  Ask you to turn to page 2 --

18         MR. DILDAY:  Of this one?

19         MR. PORR:  Right.  Right.  Of the

20   exhibit, 21.

21     Q.   Ask you to look at paragraph D.

22     A.   (Looks at document.)

23     Q.   See paragraph D?

24     A.   Yes.

1     Q.   Is paragraph D a reference to

2   Sergeant Doherty?

3     A.   I don't know.

4     Q.   Okay.  It sounds an awful like what

5   you allege in paragraphs 53 and 54 of the

6   complaint.

7        You want to take a look at the

8   complaint, again, at those paragraphs?

9       A.   You're asking me if there's a

10   report not written by me?

11       Q.   Correct.

12       A.   And you're asking me who -- I don't

13   know.  That was their investigation and I'm

14   not on here.  I wasn't at this meeting.  This

15   was Colannino, Chaulk, Callahan, Carey, and

16   O'Hara.

17       Q.   Was there any other supervisor,

18   other than Sergeant Doherty, that singled out

19   female officers and made derogatory comments

20   about foul language and lectured them about

21   that?

22       A.   I don't recall.

23       Q.   Isn't Sergeant Doherty the only one

24   paragraph D could be referring to?

1       A.   No.

2       Q.   Who else could it be referring to?

3       A.   I don't know.  I wasn't the one

4   that made the statement.

5       Q.   I know you're not the one that made

6   the statement.  The question is not did you

7   make the statement or who made the statement.

8           The question is,  Could the

9   statement have been made by anyone other than

10  Sergeant Doherty?

11      A.   Yes.  And I answered it.

12      Q.   Okay.  Who else could it be

13  referring to?

14          MR. DILDAY:  You have to give him a

15  word answer.

16      A.   I don't know.  Quite a few

17  officers, you know, superior officers singled

18  out females and made derogatory comments about

19  'em.

20      Q.   About foul language?

21      A.   Yeah.

22      Q.   Who else?

23      A.   Well, according to you, I had foul

24  language, so it could be anybody.

1       Q.   No.  Please read paragraph D

2   carefully.  It says, "A certain supervisors"

3   -- "a certain" and "supervisors" is a conflict

4   in singular versus plural -- "singles out

5   female officers and makes derogatory comments

6   about foul language and lectures the female

7   officers about such conduct.

8        "This supervisor" -- consistently

9   single there -- "does nothing to stop male

10  officers from using profanity and foul

11  language."

12        Now, that, to me, sounds like a

13  description of Sergeant Doherty from

14  paragraphs 53 and 54 of your complaint.

15     A.   Yes.

16     Q.   Would you agree?  All right.  It

17  also sounds to be consistent with the January

18  '99 report, Exhibit 9 to your deposition,

19  page 4, lines 127 to 136, correct?

20     A.   Correct.

21     Q.   And it also seems to be consistent

22  with your notes at page 7 in the second half

23  of the big paragraph related to October of

24  '97.  Correct?

1      A.   Correct.

53

2    Q.   All right.  So it seems to me that

3    paragraph D could only be speaking of Sergeant

4    Doherty, unless you can tell me that it might

5    also refer to somebody else.

6         MR. DILDAY:  Objection as to form.

7    A.   Sure.

8    Q.   Sure what?

9    A.   If that's what your assumption is.

10   I didn't write the report.  I'm not going

11   to --

12   Q.   It has nothing to do with writing

13   the report.  Do you know of any other

14   supervisor, other than Sergeant Doherty, who

15   singled out female officers and made

16   derogatory comments about foul language and

17   lectured them about such conduct?

18   A.   I don't recall.


24.   Pages 1090-1095:

10        There's a side note on the

11   left-hand side for March 23.  Do you know what

12   that says?

13   A.   March 23rd, "Cook got arrested."

14   Q.   What does that refer to?

15     A.   That refers that Jerry Goodwin went

16   and arrested my son's father on warrants and

17   had a field day with his drugs -- I mean, he

18   arrested my son's father for a default

19   warrant.

20     Q.   Okay.  Who are you referring to?

21   Your son's father.  Who's that?

22     A.   My son's father, Luis Ortiz.  His

23   nickname is Cookie.

24     Q.   Oh, okay.

1     A.   And he lived in Revere and he had a

2   default warrant, and Sergeant Goodwin went

3   over to his home address at 209 Revere Street

4   and arrested him.

5     Q.   And then you said something about

6   him having a field day with his drugs?

7     A.   Yeah.

8     Q.   What do you mean by that?

9     A.   You'd have to speak to him.

10     Q.   No.  No.  You obviously meant

11   something when you said it.  What did you

12   mean?

13     A.   Sarcasm.

14      Q.    What did you mean by the sarcasm?

15   Ms. Pechner, I'm entitled to an answer.

16   Ms. James, sorry, I'm entitled to an answer.

17      A.    It means that just recently when I

18   spoke to my son's father and he informed me

19   that when he was arrested by the Revere Police

20   Department that Sergeant Goodwin did not log

21   in all the drugs that he was arrested for.

22      Q.    And when did the husband of your

23   son tell you this?

24         MR. DILDAY:  Father.

1         MR. PORR:  I'm sorry.  Yeah.

2   Sorry.  Correct.

3      Q.    When did the father of your son

4   tell you this?

5      A.    About three months ago.

6      Q.    Okay.  And what drugs, in

7   particular, did he tell you that didn't get

8   logged in?

9      A.    He didn't tell me.

10      Q.    Okay.  Did you report this to any

11   law enforcement agency?

12      A.    Come on, Walter.  Reported it to

13  Revere police so they could do something about

14  it.

15      Q.   Okay.  Did you?  When?

16      A.   No, I didn't.  I didn't report it.

17      Q.   Why not?

18      A.   Sergeant Goodwin just assaulted his

19  girlfriend.  He assaulted a police officer on

20  the job, Attorney Porr, and it was swept under

21  the carpet.

22      Q.   How do you know that?

23      A.   How do I know?  Because it was --

24  Officer Joseph Rizutti was there, and there

1  was an assault that took place, and Officer

2  Rizutti told me that he was there and he did a

3  report just like all the reports that were

4  swept under the carpet, just like everything

5  that happened to me on the job.

6      Q.   So back to --

7      A.   So Sergeant Goodwin can get away

8  with an assault and battery on his girlfriend

9  and he can get away with assaulting a police

10  officer.  Did anybody go to the attorney

11  general's with that?  Did anybody go to the

12    state police to have Sergeant Goodwin

13    arrested, Attorney Porr?

14        Q.    Were you there when it happened?

15        A.    No, I wasn't.  I'm telling you.

16    You asked me a question.  You asked me who he

17    was, and I'm telling you what he told me.  No,

18    I wasn't there.

19        Q.    Okay.  I'm referring to this

20    allegation that lieutenant -- I guess he's now

21    Lieutenant Goodwin assaulted his girlfriend.

22    Were you there when it happened?

23        A.    No, I wasn't there.

24        Q.    Okay.  Have you talked to any of

1    the principals about that incident?

2        A.    I talked to Officer Rizutti.

3        Q.    Was he there when it happened?

4        A.    Yes, he was.

5        Q.    All right.  And was he the officer

6    that got assaulted?

7        A.    No, he wasn't.

8        Q.    Who was the officer that got

9    assaulted?

10        A.    Officer Chapman.

11    Q.   Did you talk to him about it?

12    A.   No, I haven't.

13    Q.   Okay.  And when did this happen?

14    A.   I'm sure you're fully aware of it.

15    Q.   The question is, When did this

16  happen?

17    A.   I don't know.

18    Q.   This year?

19    A.   Yes.

20    Q.   Okay.  How long is the statute of

21  limitations on a charge of assault?

22         MR. DILDAY:  Objection.

23    A.   I don't know.

24    Q.   So the answer to the other

1  question, then, you did not report to any law

2  enforcement agency what your son's father told

3  you about then Sergeant Goodwin taking and not

4  booking in all the drugs, correct?

5    A.   Correct.

6    Q.   All right.  But you just learned

7  that about three months ago?

8    A.   Correct.

25.  <u>Page 1131</u>:

    7    Q.  Now, do you know what Captain

    8  Chalulk did in terms of trying to get back at

    9  Mr. Goodwin?

   10    A.  Yeah.  He created a humiliating

   11  work environment for me.

   12    Q.  In an effort to get back at Jerry

   13  Goodwin?

   14    A.  I don't know.  Whatever.

26.  <u>Pages 1133-1134</u>:

   15    Q.  Okay.  Did you seek any care or

   16  treatment from a health care provider as a

   17  result of the revelation in June of '98 that

   18  allegations were being made about you and the

   19  lieutenant and sergeant?

   20    A.  I never took medication before I

   21  got on the job.  I never took an

   22  antidepressant.  I never took a sleep

   23  medication.  I didn't have this problem until

   24  all this started.  So doctors, I mean, I never

    1  saw doctors like I did when I got on the job.

    2  I never had a problem with sleep, anxiety,

    3  nightmares.

4    Q.   But with respect to this specific

5  incident, June of '98, did you see a medical

6  professional about that incident?

7    A.   I don't know.  You have my medical

8  reports.  I don't remember.

27.    Pages 1141-1144:

13    Q.   Okay.  So you were more offended by

14  the posting of your son than you were by the

15  drawing of the penis.

16    A.   Well, let me ask you, if somebody

17  called your child a "spic" or a "nigger" -

18  okay? - and they hung bulletin boards about

19  your children -- hung pictures, you went back

20  to your office and there were pictures hung up

21  about your child, I think that would have a

22  bigger effect than the penis drawn on the

23  bulletin board.

24        However, like I just said to you,

1  that's disgusting, just like the underwear

2  hanging up on there, just like everything else

3  that went on and nobody did anything about.

4        The chief had to walk by that.  The

5  chief's office, he had to walk back and forth

6    all day long.  Did the chief do anything about

7    it?  If the chief didn't do anything about it,

8    what are the Indians going to do?

9        Q.   Did you see the chief walk by --

10        A.   Did the Indians have anything to

11    say when the chief is the ultimate person in

12    charge?  You worked for a police department.

13        Q.   Did the chief walk by the drawing

14    of the penis?

15        A.   Ask him.

16        Q.   Do you know for a fact whether or

17    not the chief walked by the drawing of the

18    penis?

19        A.   I know for a fact that the chief's

20    office, in order to get to his office, you

21    need to walk by that bulletin board.

22        Q.   Okay.  That's fine.  That's not the

23    question I asked, so let me ask the question I

24    asked again.  Do you know --

1        A.   I can't place the chief there, no.

2        Q.   So you don't know one way or the

3    other?

4        A.   No.  I know that quite a few people

5    saw it.

6    Q.   Okay.  But by the same token --

7    A.   I know Officer Malatesta saw it.  I

8    know Patty Carey saw it.  It was openly

9    discussed.

10    Q.   And none of you erased it?

11    A.   No.

12    Q.   Did anything prevent you from

13    erasing it?

14    A.   No.

15    Q.   Okay.  So why did you leave it up?

16    A.   Maybe we were hoping that something

17    would result out of it.

18    Q.   So you made a tactical decision it

19    was better to leave it up than erase it?

20        MR. DILDAY:  Objection.

21    A.   I wouldn't.  I wouldn't say it was

22    tactical.

23    Q.   Okay.  Then what would you say it

24    was?  Deliberate?  You made a deliberate

1    decision to leave it up?

2        MR. DILDAY:  Objection, again.

3    A.   Yeah, that was deliberate.

4    Q.   I'm sorry?

5    A.   Yeah.  That was deliberate.  That

6   was sarcasm for the record.  I've answered

7   your question so  --

8    Q.   Who did you talk --

9    A.   -- find something else.

28.    Pages 1145-1146:

10    Q.   So back to my other question.  As I

11   understand it, then, the picture of your son,

12   which you did take down, was more offensive to

13   you than the chalk drawing of the penis which

14   you did not erase, correct?

15    A.   They were both offensive to me.

16    Q.   I understand they were both

17   offensive.  My question is, "Was the picture

18   of your son, which you did take down, more

19   offensive as opposed to the drawing of the

20   penis which you did not erase?

21        MR. DILDAY:  Objection.  This has

22   been asked and answered.

23        MR. PORR:  It's been asked.  It's

24   not been answered.

1        MR. DILDAY:  Well, it was answered.

64

2  She said more offensive.

3    Q.  Is that accurate?

4    A.  Correct.