# EXHIBIT E

Deposition of Terri Pechner-James
June 7, 2007
Argumentative, Combative, Evasive, Non-responsive, Sarcastic Answers

1.    <u>Pages 1373 – 1374</u>:

21    Q.   How long did this go on?

22    A.   Far too long.

23    Q.   I'm sorry?

24    A.   Far too long.

1    Q.   Well, I'm sure the first time he tried

2    that it was far too long, but can you give me an

3    estimate of actually how long this transpired?

4    A.   Five minutes.  I just remember the

5    radio call.


2.    <u>Pages 1374 – 1375</u>:

19    Q.   Okay.  How drunk was Officer Randall

20    when he was doing this?

21    A.   Like he is every day.

22    Q.   I'm sorry?

23    A.   I don't know.

24    Q.   I thought you said like he is every

1    day; is that correct?

2    A.   Yeah, you're correct.

1

3.    Page 1376:

    9    Q.   Okay.  A moment ago you said like he

   10   is every day.  Is Todd Randall an alcoholic in

   11   your opinion?

   12   A.   I don't know.

   13   Q.   Did he often show up at work drunk?

   14   A.   I don't know.

4.    Pages 1384 – 1391:

    8    Q.   Why were you afraid of Todd Randall?

    9    A.   Because Todd Randall was protected on

   10   that job, protected by his brother.

   11   Q.   Who's his brother?

   12   A.   Sean.

   13   Q.   And how did Sean Randall protect his

   14   brother Todd?

   15   A.   The kid was thrown out of the academy

   16   for leaving his vehicle drunk on the Tobin

   17   Bridge.

   18   Q.   Who was thrown out of the academy?

   19   A.   Todd Randall.

   20   Q.   When did that happen?

2

21      A.   I don't know, while he was in the

22   academy.

23      Q.   How do you know it happened?

24      A.   The whole police department knew that

1   it happened.

2      Q.   How did you know that it happened?  I

3   don't care how the whole police department knew,

4   I want to know how you knew.

5      A.   I don't remember.

6      Q.   Well, presumably you were told by

7   somebody?

8      A.   Yes.

9      Q.   Okay.  Did you read it in any reports,

10   any newspapers, any magazines?

11      A.   I don't remember.

12      Q.   So most likely you were told?

13      A.   Right.

14      Q.   Do you know who told you?

15      A.   No.

16      Q.   Do you know when they told you?

17      A.   No.

18      Q.   Okay.  And the substance of what they

19   told you was supposedly Todd Randall had left his

20    vehicle on the Tobin Bridge because he was drunk

21    at the time he was in the academy?

22        A.    Him and Evan Franklin, yes.

23        Q.    Him and who?

24        A.    Evan Franklin.

1     Q.    Evan Franklin?

2     A.    Yes.

3     Q.    Did Evan Franklin leave his vehicle in

4     the Tobin Bridge or was he in the same vehicle

5     with Todd Randall?

6     A.    I don't remember.

7     Q.    Well, are we talking about two

8     separate incidents or one incident involving two

9     people?

10        A.    One incident.

11        Q.    Okay.  And how did Sean Randall

12    protect his brother Todd Randall after he left

13    his vehicle in the Tobin Bridge while drunk?

14        A.    Well, he got on the job.  He ended up

15    going through another academy.  The Mass.

16    Criminal Justice Training Council threw him out

17    and he went into another academy.

18        Q.    Okay.  So Todd Randall was disciplined

19    for this event by being thrown out of the academy

20    he was in at the time?

21        A.    Right.

22        Q.    And then he was subsequently able to

23    reapply and go to a later academy, correct?

24        A.    Correct.

1        Q.    Okay.  How did Sean Randall --

2        A.    Politics.

3        Q.    Okay.  And explain to me the politics.

4        A.    Well, I guess it would be similar to

5    how Sergeant Goodwin would assault somebody and

6    not be arrested by his fellow officers and not be

7    fired or demoted, so I guess the politics are the

8    same, just as this is.

9        Q.    What politicking did Sean Randall do

10    to get his brother into a subsequent academy?

11        A.    I don't know what Sean Randall did.

12        Q.    So he may have done nothing?

13        A.    Absolutely.

14        Q.    Okay.  So is there any other way that

15    Sean Randall allegedly protected his brother Todd

16    Randall?

17        A.    No.

18    Q.   So why did the fact that Todd Randall

19  got into a subsequent academy after being kicked

20  out the first time make you afraid to report this

21  incident?

22    A.   I was afraid of him.

23    Q.   Okay.  Were you afraid that he would

24  physically harm you?

1    A.   I don't know what he was capable of

2  doing after that.  I still don't know.

3    Q.   Did you have circumstances after this

4  incident where you were on the same shift with

5  Todd Randall?

6    A.   Yes.

7    Q.   Okay.  Were you frequently assigned to

8  the same shift with Todd Randall after this

9  incident?

10    A.   Yes.

11    Q.   Did you ever have any other further

12  problems with Todd Randall?

13    A.   No.

14    Q.   Did Todd Randall ever threaten you?

15    A.   No.

16    Q.   Had Todd Randall ever done anything

17    like this to you before November 19th of '98?

18        A.   No.

19        Q.   Had he ever done anything like that

20    since November of 1998?

21        A.   No.

22        Q.   To your knowledge, had he ever done it

23    to any other woman officer of the Revere Police

24    Department?

1         A.   I hope not.

2         Q.   I'm sorry?

3         A.   I hope not.

4         Q.   Well, I hope not, too.  But my

5     question was do you know if he's ever done it to

6     any other woman officer in the Revere Police

7     Department?

8         A.   I don't know.

9         Q.   Do you know if he's ever done it to a

10    female not an officer of the police department?

11        A.   I hope not.

12        Q.   Did he ever even mention the incident

13    to you after it happened?

14        A.   I remember calling my now husband on

15    the a.m. and asking him what to do.

16    Q.    So you're referring to Mark James?

17    A.    Yeah.  He told me to confront him.  I

18  remember confronting him.

19    Q.    When did you confront Todd Randall?

20    A.    I think it may have been the p.m. when

21  I went back in the shift.

22    Q.    Okay.  So this was an a.m. shift, so

23  you got off at 8:00 in the morning?

24    A.    Correct.

1    Q.    Went home and then came back on duty

2  at 4:00 in the afternoon?

3    A.    Correct.

4    Q.    Do you recall when and where you

5  confronted Todd Randall about this incident?

6    A.    In the back of the police station by

7  the bay in the garage.

8    Q.    Did you confront him before going on

9  shift, during shift, after shift was over?

10    A.    I don't remember what time it was.

11    Q.    Was anybody present besides you and

12  Mr. Randall?

13    A.    No.

14    Q.    What did you say?

15    A.   That this will never happen again.

16    Q.   And what did he say?

17    A.   Nothing.

18    Q.   Not a word?

19    A.   No.

20    Q.   Like "What are you talking about" or

21   -- I'm sorry, he didn't say anything?

22    A.   I don't -- I don't remember.

23    Q.   Okay.  Is it possible that Mr. Randall

24   didn't even remember the incident because he was

1   drunk?

2    A.   That would be a good excuse, huh?

3    Q.   Well, it could either be an excuse or

4   it could be true, I don't know.  I'm asking you.

5    A.   I don't know what's possible.

6    Q.   Okay.  Do you think the incident was

7   caused by the fact that he was drunk?

8    A.   I don't know.

5.    Pages 1395 – 1398:

9    Q.   Why would the fact that Captain Chaulk

10   thought you were having an affair with either

11   Santoro or Goodwin or both have prevented you

12    from discussing this criminal assault against

13    your person by Todd Randall?

14        A.   Can you ask that question again?

15        Q.   Yeah.  Well, actually I'll ask madam

16    reporter to read it back.  I think she can do a

17    better job than I can.

18            (The record was read as requested.)

19        A.   Because I was afraid.

20        Q.   Okay.  What were you afraid of at the

21    January of '99 meeting?

22        A.   That this shall, too, be covered up.

23        Q.   Okay.  As of that date, what had been

24    covered up?  What prior things had been covered

1    up as of that date?

2        A.   Nobody in there has ever lost a bar on

3    their shoulder, nobody in there has ever been

4    reprimanded.

5        Q.   But you said --

6        A.   Why are we sitting here?  Why are we

7    sitting here today, if something was spoken to

8    these supervisors in the Revere Police

9    Department, why would we be sitting here today?

10           If something was done to stop the

11    madness back in '97, '98, then we wouldn't be

12    sitting here in 2006.

13        Q.    You said because things had been

14    covered up.  What had been covered up prior to

15    the January '99 meeting?

16        A.    Lieutenant Foster's actions towards

17    me.

18        Q.    And how were they covered up?

19        A.    Because he retaliated against me, the

20    only thing they did was move me off my shift.

21    They never reprimanded him.

22        Q.    All right.  But that wasn't covered

23    up?

24        A.    That was just a favor to move me off

1    my shift, I suppose, instead of reprimanding

2    Lieutenant Foster for the harassment.

3        Q.    But the supervisors above Lieutenant

4    Foster knew about what you were complaining

5    about, correct?

6        A.    Correct.

7        Q.    And they decided that it didn't

8    deserve a reprimand?

9        A.    Right, they decided that because

11

10    Bernie Foster had skeletons in Captain

11    Colannino's closet.

12        Q.    What skeletons did Bernie Foster have

13    in Captain Colannino's closet?

14        A.    Because his daughter was sexually

15    harassed by Captain Colannino.

16        Q.    Oh, this is the grabbing the thigh?

17        A.    Right.

18        Q.    How do you know that was the reason

19    why Lieutenant Foster wasn't reprimanded?

20        A.    How do I know that was -- just the way

21    that it was.

22        Q.    In other words, you don't know?

23        A.    No, that's just the way that it was.

24        Q.    Did somebody tell you that the reason

1    why Lieutenant Foster's actions were not found

2    worthy of a reprimand was because he was holding

3    this skeleton over Captain Colannino's head?

4        A.    Right.

5        Q.    Is that a yes?

6        A.    Yes.

7        Q.    Who told you that?

8        A.    I don't remember.

9      Q.   When did they tell you that?

10     A.   I don't remember.

11     Q.   Was anybody else present when you were

12   told?

13     A.   I don't remember.

14     Q.   Where were you when you were told

15   that?

16     A.   Don't remember.

17     Q.   Was it ever reduced to writing?

18     A.   I don't know.


6.    Pages 1399 – 1401:

2      Q.   So your definition of coverup is

3   things that someone thinks are wrong are

4   reported, the people responsible for determining

5   whether or not they were wrong disagree and don't

6   discipline the people you think should be

7   disciplined, and that's a coverup?

8      A.   No.  That when there is a report

9   that's filed and somebody goes and fails to

10   investigate a matter, that is considered to me a

11   coverup.

12     Q.   So tell me what reports were filed and

13    there was no follow-up investigation?

14        A.    You have the banker boxes.  I mean,

15    you should know.

16        Q.    As of January of '99, please tell me

17    what reports you're referring to were filed and

18    not investigated.

19        A.    I don't remember.

20        Q.    Can't remember one?

21        A.    No.

22        Q.    All right.

23        A.    Here's one right here.

24        Q.    Okay.  This is from August of '99

1    though, this isn't January of '99.

2          The reason you gave for not reporting

3    this incident at the January '99 meeting was you

4    knew that Captain Chaulk had a negative opinion

5    of you, not shared apparently by Captain Roland,

6    and that you were afraid.  And I asked why were

7    you afraid, and you said because they covered

8    things up.

9          So now I'm trying to find out what

10    things had been covered up prior to the January

11    '99 meeting.  And you talked about Lieutenant

14

12    Foster's actions and Santoro and Sergeant

13    Doherty, and I suggested to you that these things

14    had been reported and that management had decided

15    that they weren't worthy of a reprimand, and

16    that's what you considered to be a coverup.

17        A.    Well, you're saying they're not worthy

18    of a reprimand.  How do you know that there was

19    anything done and who's to say it wasn't worthy?

20        Q.    How do you know there wasn't?

21        A.    Because the actions kept on going.

22        Q.    What actions kept on going?

23        A.    Lieutenant Santoro's, sergeant -- I

24    mean, it just kept happening.  Lieutenant

1    Santoro's comments with the prisoner, it's just

2    the way they responded to us.

3        Q.    We haven't got to Santoro's comments

4    with the prisoner, but that happened only once,

5    correct?

6        A.    Santoro's comment with the prisoner?

7        Q.    Yes.

8        A.    Yes.

9        Q.    Okay.

10        A.    Do you represent the individual

15

11    officers?

12        Q.    Well, it doesn't matter who I

13    represent.  As far as Lieutenant Foster's

14    concerned --

15        A.    Why doesn't it matter?


7.    Page 1412:

10        Q.    All right.  There's a quote attributed

11    -- do you know how Barker knew Lieutenant

12    Santoro?

13        A.    No, maybe they hung out together.


8.    Page 1414:

10        Q.    So Barker was telling you that he lied

11    to the lieutenant?

12        A.    Correct.

13        Q.    All right.

14        A.    Can you blame him?

9.    <u>Pages 1417 – 1418</u>:

24    Q.    Third sentence, "Terri told the

1    arresting officers that I was a good guy and

2    asked them if I could turn myself in the next

3    morning," true statement?

4    A.    It's his statement.

5    Q.    Did you tell the arresting officers

6    that Mr. Barker was a good guy and did you ask

7    the arresting officers if Mr. Barker could turn

8    himself in the next morning?

9    A.    I don't remember.

10    Q.    Okay.  Don't remember one way or the

11    other?

12    A.    No.

13    Q.    So that could be a true statement?

14    A.    I don't remember.

15    Q.    Meaning of course it could be a true

16    statement or a false statement?

17    A.    I don't remember what I said.

10.    Pages 1419 – 1420:

  6    Q.   Okay.  Next paragraph, sixth

  7  statement, "About one hour after I was booked,

  8  Terri came in to see me," is that true?

  9    A.   I don't remember.

10    Q.   Okay.  Is what you not remember the

11  reference to an hour time frame or that you

12  didn't come in to see him or both?

13    A.   Both.

14    Q.   You don't remember going to see him?

15    A.   No.

16    Q.   Haven't we just been talking about the

17  fact that you went down to see him and took him

18  out --

19    A.   Well, you're talking about one hour

20  after he was booked.  I don't remember going down

21  there an hour after he was booked.

22    Q.   Okay.  So you're not sure about the

23  time frame, but after he was booked, you did go

24  in and see him?

  1    A.   Right.

11.    Pages 1430 – 1431:

20    Q.    And that meeting was held on December

21    18th at the Beachmont substation at 4:00 o'clock

22    in the afternoon?

23    A.    That's what it says.

24    Q.    Well, is that accurate?

1    A.    That's what it says.

2    Q.    I know that's what it says, but I

3    assume you know that that in fact happened?

4    A.    Yes.

12.    Pages 1434 – 1436:

9    Q.    Okay.  And it talks about lieutenants

10    and sergeants doing nothing to stop them.  What

11    lieutenants and sergeants did you have in mind?

12    A.    Lieutenant Santoro never stopped

13    Sergeant Doherty.

14    Q.    Okay.

15    A.    Lieutenant Santoro never stopped

16    Sergeant Goodwin.

17    Q.    Lieutenant Santoro never stopped

18    Sergeant --

19     A.   Goodwin.

20     Q.   Jerry Goodwin?

21     A.   Jerry Goodwin.

22     Q.   From doing what?

23     A.   He had problems with other female

24  officers.

1     Q.   What problems and who, with who?

2     A.   He responded to their calls.  I know

3  he had a problem with --

4     Q.   You said he would respond to their

5  calls?

6     A.   Right.

7     Q.   Okay.  As a supervisor, he's well

8  within his rights to respond to their calls,

9  correct?

10     A.   Right.  But he'd respond to their

11  calls and completely undermine them.

12     Q.   In other words, he would use his rank

13  to tell them what to do?

14     A.   No, he would just undermine them.

15     Q.   What do you mean by undermine them?

16     A.   You'd have to speak to the officers

17  that were involved with him.

18    Q.   You obviously have something in mind

19  when you say that, so what do you have in mind?

20    A.   I just recall an incident, I don't

21  remember everything that happened.

22    Q.   What incident do you recall?

23    A.   An incident that Sergeant Goodwin

24  responded to and undermined Officer Curcio.

1    Q.   What did he do to undermine Officer

2  Curcio?

3    A.   I don't remember.

4    Q.   And --

5    A.   But Sergeant Goodwin's not named in

6  this anyways as a defendant.


13.    Page 1437:

7    Q.   Okay.  C, certain duty supervisors

8  always called a female officer to the station

9  whenever a female prisoner's being booked, do you

10  see that?

11    A.   Correct.

12    Q.   Who are the certain duty supervisors

13  being referred to?

14      A.   I don't know.

15      Q.   Okay.  Were their names discussed at

16   the meeting prior to O'Hara going to meet with

17   Captains Chaulk and Roland?

18      A.   You're acting like I was the only

19   person here.  I don't know.  I went and

20   transported them.  That wasn't my -- that wasn't

21   my gripe.


14.    Pages 1441 – 1442:

17      Q.   Okay.  Aside from this December 29,

18   '98 entry in your notes, is there any other note

19   in here referencing your name being whited out of

20   a vacation book?

21      A.   Is that a trick question?  Is there?

22      Q.   No, I don't recall seeing one, and

23   they're your notes, you prepared them.

24      A.   I take your word on it then.  No, it's

 1   not in there.

15.    Pages 1444 – 1446:

5    Q.   Okay.  You go on to say in the next

6    paragraph, "On several occasions, female

7    officers' names were removed from either the

8    vacation book or the detail book," okay.  Can you

9    tell me on what other occasions this had happened

10   prior to December of '98?

11       A.   I didn't write them down.

12       Q.   What other females had had their names

13   removed from the vacation book or detail book?

14       A.   I know Michelle Mangino had her name

15   removed.  I don't know who else.  I don't

16   remember.

17       Q.   And you were told this by Michelle?

18       A.   Yes.

19       Q.   Do you recall when her name had been

20   removed?

21       A.   It happens all the time.

22       Q.   What do you mean by it happens all the

23   time?

24       A.   That's what I mean.

1    Q.   Okay.  I see only one instance of it

2    in your notes here and in your calendars.  It's

3    not referenced in the complaint, is it?

4       A.   No.

5       Q.   It's not in the MCAD complaint?

6       A.   No.

7       Q.   Not in the amended MCAD complaint?

8       A.   No.

9       Q.   And you can't remember any of the

10   other dates?

11      A.   No.  New Year's Eve was pretty

12   significant that I remember.

13      Q.   Well, I mean did you ever complain

14   about this happening all the time?

15      A.   Yes.

16      Q.   Okay.  When did you complain about it?

17      A.   When this happened.

18      Q.   On December 29th of '98?

19      A.   Right.

20      Q.   Is this the only time you complained

21   about it?

22      A.   I don't remember.

23      Q.   Okay.  Is this the first time it had

24   happened?

1       A.   No.

2    Q.    Okay.  Can you tell me how many times

3    it had happened prior to this?

4    A.    No.

5    Q.    Can you tell me how many times it had

6    happened prior to this to the other female

7    officers?

8    A.    No.

9    Q.    To your knowledge, had any of them

10   ever complained?

11   A.    I don't know.


16.    pages 1454 – 1455:

16   Q.    Okay.  After the meeting, after the

17   January '99 meeting, did Lieutenant Santoro

18   continue to make sexually-oriented remarks about

19   the bodies of the female officers in the police

20   department?

21   A.    Yes.

22   Q.    Okay.  Can you tell me when?

23   A.    That question was asked already and I

24   previously answered it in a prior deposition.

1    Q.    That's okay, I can ask it again, it's

2    a legitimate question.  When after the January

3    '99 meeting did Lieutenant Santoro again make

4    sexually oriented remarks about female officers'

5    bodies?

6        A.    I don't remember.


17.    <u>Page 1457</u>:

11        Q.    Okay.  Did you complain to anybody

12    about the fact that Lieutenant Santoro was still

13    commenting about his body parts after the January

14    '99 meeting?

15        A.    Why, was something going to get done

16    the second time around?

17        Q.    My question was did you complain to

18    anyone about the fact that Lieutenant Santoro was

19    still talking about his body parts after the

20    January '99 meeting?

21        A.    I don't remember.


18.    <u>Pages 1459 – 1460</u>:

19        Q.    Lines 55 to 59 concern the incident

20    involving John Barker, correct?

21     A.   Correct.

22     Q.   After the January '99 meeting, did

23   Lieutenant Santoro ever engage in similar conduct

24   with any other prisoner?

1     A.   You'd have to ask him.

2     Q.   To your knowledge, after the January

3   '99 meeting, did Lieutenant Santoro ever engage

4   in any such incident with any other prisoner?

5     A.   Not that I'm aware of.


19.   <u>Pages 1460 – 1461</u>:

12     Q.   Okay.  The female officers at this

13   meeting complained about Sergeant Jeremiah

14   Goodwin belittling and embarrassing them in

15   public and in front of other officers, ridiculing

16   their performance, and telling the public that

17   they screwed up, do you see that?  Line 60 to 64.

18     A.   Yes.

19     Q.   After the January '99 meeting, did

20   Sergeant Jeremiah Goodwin do that ever again?

21     A.   He didn't do it to me in the first

22   place.

23     Q.   Okay.  And to your knowledge, after

24   the January '99 meeting, did he engage in conduct

1   belittling and embarrassing as described in line

2   60 to 64 to your knowledge?

3       A.   I don't know.


20.       Pages 1461 – 1462:

4       Q.   Okay.  There's a reference in line 65

5   to 70 about a call at Walgreen's.  Do you see

6   that?

7       A.   Yes.

8       Q.   Who was the female officer at the

9   scene that was being talked about in line 65 to

10   70?

11      A.   Officer Curcio.

12      Q.   Was she the one that brought this

13   issue up during the course of the meeting in

14   January of '99?

15      A.   I don't know.

16      Q.   To your knowledge, after the meeting

17   of January of '99, did Sergeant Goodwin engage in

18   conduct similar to what's described in paragraph

19   65 to 70?

20      A.   You'd have to ask Officer Curcio,

21    because she transferred off the shift as well.

22        Q.   But with respect to any of the female

23    officers, to your knowledge, did Sergeant Goodwin

24    engage in similar conduct as described in

1    paragraph 65 to 70?

2        A.   I don't remember -- I don't remember.


21.    <u>Page 1467</u>:

3        Q.   Do you recall if Sergeant Goodwin's

4    name was mentioned at the meeting the women

5    officers had prior to Amy O'Hara's meeting with

6    Captains Chaulk and Roland in December of '98?

7        A.   Quite a few times.

8        Q.   And what was said about Sergeant

9    Goodwin at that meeting?

10       A.   I didn't say anything.

11       Q.   Well, I know you didn't.  But you said

12    somebody said something quite a few times, and I

13    was asking what was said at that meeting.

14       A.   I don't remember.  I just remember his

15    name.

22.     <u>Page 1473</u>:

2     Q.   To your knowledge, after the January

3     '99 meeting, did Sergeant Doherty embarrass or

4     scream at any of the other female officers?

5     A.   I can't answer for them.

6     Q.   Well, I'm not asking you necessarily

7     to answer for them as to so much tell me if you

8     know of any instances when he did that after the

9     January '99 meeting.

10     A.   I don't know.


23.     <u>Page 1475 – 1482</u>:

8     Q.   Okay.  Lines 159 to line 167 involve

9     the comments attributed to Sergeant Doherty

10     concerning the female sports commentator.  After

11     the January '99 meeting, are you aware of him

12     ever making comments about a female sports

13     commentator like those attributed to him at the

14     meeting?

15     A.   Okay to look at my notes?

16     Q.   Sure.

17     A.   On April 4th of '99, there was the

18    incident with Officer Mannara.

19        Q.    I'm focusing on Sergeant Doherty.

20        A.    Right.  Sergeant Doherty didn't speak

21    up until Officer Mannara shut the radio off, if

22    that's what you're -- he was there to -- however,

23    he was there after I was humiliated, you know, to

24    console me.

1        Q.    How were you humiliated by the April

2    4, '99 incident as described on page 11 of your

3    notes?

4        A.    Because it was after this report had

5    come out, and it was a --

6        Q.    To your knowledge, is April 4 of '99

7    the only time you ever heard the word patrolwoman

8    used by a Revere police officer?

9        A.    Yes.

10        Q.    And prior to April 4 of '99, had you

11    ever had any indication that Officer Franco

12    Mannara in any way had a problem with women

13    officers on the force?

14        A.    I don't remember.

15        Q.    Is there any reference to Officer

16    Mannara and any harassing conduct towards female

17   officers in any of your --

18       A.   That left a landmark.  I don't want to

19   interrupt you, I just -- by looking at my note

20   and referring to that, I didn't necessarily write

21   every single incident that happened, so when you

22   say -- when I'm saying to you that I don't

23   remember, it's because a lot of things I can't

24   recall that happened.  The things that --

1    Q.   Okay.  I don't see a reference to

2    Officer Franco Mannara being made at the January

3    '99 meeting.

4        A.   That was after -- oh, you mean as far

5    as --

6        Q.   Right.  I see nothing in the records

7    that have been produced relative to this case to

8    suggest that Officer Franco Mannara prior to at

9    least April 4 of '99 ever said or did anything

10   that would in any way be construed as harassing

11   of the women of the Revere Police Department.

12   Are you aware of any such conduct?

13       A.   I don't remember.

14       Q.   Okay.  So three months after the

15   January '99 meeting, in relationship -- in

16    reference to Officer Lynn Malatesta, he uses the

17    word patrolwoman, and you found that humiliating?

18        A.   And offensive.

19        Q.   Okay.  Why?

20        A.   Because we had filed a complaint about

21    harassment, and he wasn't named, like you said,

22    and the superior officers were telling the patrol

23    officers that we had filed a complaint, so they

24    put everybody on edge with the female officers.

1            Franco was just -- like Jerry simply

2    stated, he was -- I don't think he did anything

3    intentionally, that was maybe his upbringing.  I

4    don't know.  I don't know, he never did anything

5    directly other than that day to me so I --

6        Q.   Okay.  Now, my question was in

7    relationship to Sergeant Doherty and lines 159 to

8    167 of the January '99 report, and I was asking

9    if subsequent to the January '99 meeting, if he

10    ever made any similar comments about any female

11    sports commentator, and you then made reference

12    to this April 4, '99 incident, and I don't see

13    the connection between Sergeant Doherty's conduct

14    as related in lines 159 to 167 and the April 4,

33

15  '99 incident.

16      A.   My connection is the television, the

17  program that was on the television was the Howard

18  Stern show, that's my connection to it.

19      Q.   The Howard Stern show was on TV on

20  April 4, '99?

21      A.   I don't -- I don't know, my brain's --

22  my brain's not -- I'm not looking at the dates,

23  Attorney Porr, I'm just recalling incidents that

24  happened.  I can't --

1      Q.   Well, your note of April 4, '99 says

2  that Mannara asked you "Will it offend you if I

3  watch the Howard Stern show?"

4      A.   Okay.

5      Q.   And you were offended by the tone of

6  his voice.  But did you ever tell him one way or

7  the other whether or not it would offend you if

8  he put on the Howard Stern show?

9      A.   It was one of those like, you know,

10  bunny ears, the room was full.  I don't remember,

11  I was just so furious as to everything that was

12  transpiring in the radio room that, you know,

13  that's what insulted me.

14    Q.    So you were furious that Mannara had

15    used the word patrolwoman?

16    A.    That started, that was -- that was the

17    beginning of that whole incident.  First it was

18    the patrolwoman, then it was the show on the

19    television, and it was just a very long night,

20    needless to say, if that helps you a little.

21    Q.    And then why do you make reference to

22    Mannara talking to Spadoni about Paul Hamel,

23    what's the significance there?

24    A.    He was being sarcastic.

1    Q.    Okay.

2    A.    Asking him how I knew him.

3    Q.    So you knew it was sarcasm when he

4    said it?

5    A.    It was sarcasm, but yet a little

6    degrading, just because I knew -- another one,

7    just because I knew him, didn't necessarily mean

8    I knew him as a boyfriend.

9    Q.    Sure, I follow what you're saying.  I

10    mean, I follow your innuendo, but my

11    understanding was when he said it, you knew he

12    was being sarcastic when he said it?

13    A.   Yes.

14    Q.   So he wasn't really expecting you to

15    answer the question, it was a rhetorical

16    question?

17    A.   I don't know what he was expecting.  I

18    know that I was shaken up.

19    Q.   By his sarcasm?

20    A.   By his insults.

21    Q.   I see.  Did you complain to anybody

22    about Mannara apparently having a bad day?

23    A.   Yes, Sergeant Doherty.

24    Q.   And Sergeant Doherty let you take,

1    what, the rest of the evening off?

2    A.   Yes.

3    Q.   Okay.  And did you ask Sergeant

4    Doherty to do anything when you complained to him

5    about it?

6    A.   I shouldn't have to ask a superior.

7    He was sitting in the room when everything there

8    transpired, so was Sergeant Goodwin.  As a matter

9    of fact, I believe Sergeant Goodwin wrote Officer

10    Mannara up.

11    Q.   For this incident these days?

12    A.    Right.

13    Q.    Okay.  Isn't that what you wanted to

14    happen?

15    A.    Yes.

16    Q.    Okay.  And do you know what came of

17    the writeup?

18    A.    No.

19    Q.    Okay.  Did Mannara ever engage in this

20    kind of conduct again after April 4 of '99?

21    A.    No.

22    Q.    Did he ever speak to you about the

23    fact that Goodwin had written him up for this

24    conduct?

1    A.    No.

2    Q.    Again, my question is though related

3    to Sergeant Doherty, in lines 159 to 167 of the

4    meeting report, after the January of '99 meeting,

5    did Sergeant Doherty ever use these kinds of

6    words or this language about a female sports

7    commentator, or any female personality for that

8    matter, be it an athlete, be it a news anchor, be

9    it a politician?

10    A.    No.

37

24.    Pages 1486 – 1489:

13      Q.   Okay.  Now, there is -- there's a

14   reference beginning at line 183 that there's some

15   suspicion that Crevoiserat was the author of at

16   least one harassing flier or anonymous letter

17   being circulated against Officer Mangino.  What

18   is that reference to?

19      A.   I don't know.

20      Q.   You have no idea what that's in

21   reference to?

22      A.   No.

23      Q.   Did you ever see the harassing fliers

24   being referenced there?

1      A.   I don't remember.

2      Q.   Did you ever see any of the anonymous

3   letters being referenced there?

4      A.   No.

5      Q.   Did Officer Mangino ever tell you

6   about the fliers or letters?

7      A.   She's got a book, you'll have to ask

8   her.

9      Q.   My question was did she ever tell you

10   about it?

38

11    A.   I'm just trying to --

**12    Q.   That's a yes or no question, Miss**

**13  James.  It's a yes or no question.**

**14    A.   Take it easy, killer.  Take it easy.**

**15  Take it easy.**

16    Q.   Well, it's fine for you to --

17    A.   I'm just trying to give you an answer

18  that you could ask Officer Mangino, you know,

19  she's obviously the author of that.  I don't have

20  what she -- I have fliers that were hung up about

21  my son, so I would imagine that Officer Mangino

22  has the harassing fliers that refer to her.

23      And you're getting very upset at me,

24  Attorney Porr.  I'm sorry, that's my answer.

1    Q.   Let me explain something to you.  This

2  is my time to ask you questions, not your time to

3  ask me questions.

4    A.   I didn't ask you a question, I told

5  you something.

6    Q.   This is also my time to learn what you

7  know about this case.  It is not your time to

8  tell me what to do or what not to do.

9      I asked a simple yes/no question.  You

10    seem to have a very difficult time answering

11    them, and you're wasting a lot of my deposition

12    time because of it.

13        A.    And so are you right now.

14        Q.    It was a yes/no question.

15        A.    So stop talking down to me, I have a

16    disability so --

17        Q.    What's your disability?

18        A.    Posttraumatic stress disorder.

19        Q.    And is that posttraumatic stress

20    disorder making it difficult for you to answer

21    simple and direct questions?

22        A.    Yes.

23        Q.    Okay.

24        A.    Yes.

1        Q.    So from now on, if your PTSD is making

2    it hard for you to answer questions, come up

3    under the net and tell me that, all right?

4        A.    Okay.

5        Q.    But you have to understand that if

6    your PTSD is making it difficult for you to ask

7    questions, I may have to reask the very same

8    question to get the answer I need, all right?

9      A.   Okay.

10      Q.   And, yes, I will tell you that you

11   picked up my tone of voice quite accurately, I am

12   very frustrated and very sick and tired of asking

13   questions and not getting direct answers.

14         The question I asked was did Officer

15   Mangino ever talk to you about the fliers or

16   anonymous letters?

17      A.   I don't remember.

18      Q.   Fine, okay.  I didn't need a lecture

19   about asking her about the fliers and letters, I

20   just needed to know a yes or a no or you don't

21   remember, okay.

25.   Pages 1495 – 1496:

5      Q.   To your knowledge, did Lieutenant Ford

6   ever single out any female officers concerning

7   parking tickets after the January '99 meeting?

8      A.   Can you ask that question again.

9      Q.   Sure.  To your knowledge, did

10   Lieutenant Ford ever single out any female police

11   officers concerning parking tickets and the

12   number of parking tickets they were writing after

41

13    the January '99 meeting?

14        A.   He didn't single me out.

15        Q.   But this is another example, that's

16    not the answer to the question I asked.

17        A.   But you're asking me to answer for

18    somebody else.  And to my knowledge, he didn't do

19    it to me.

20        Q.   And to your knowledge, did he do it to

21    anybody else?

22        A.   I don't know.

23        Q.   That's all I need to know.

24        A.   I don't know what he did to anybody

 1    else.

 2        Q.   Well, you might know if somebody else

 3    told you.  If after this incident, for instance,

 4    he did the same thing to Officer Fernandez again,

 5    she may have told you about it, you may have been

 6    present when it happened.  There's all sorts of

 7    reasons why you might know if he did it to

 8    somebody else.  If you do, I need to know that.

 9    If you don't, I need to know that, too.  You

10     understand?

11        A.   I understand.

26.    Pages 1497 – 1498:

6      Q.    Okay.  So in other words, if the

7    department adopted a policy to protect against

8    claims of sexual assault by male officers on

9    female prisoners, to use only female officers,

10    that would still be in your mind an act of sexual

11    harassment?

12      A.    That's in your mind if the department

13    had a policy.  It was not the department's

14    policy.

15      Q.    How do you know that?

16      A.    Because I worked the shift.

17      Q.    No, my point is that the rationale for

18    the policy may have been to guard against

19    potential claims of sexual harassment by male

20    officers against female prisoners.

21      A.    Well, it's a good thing female

22    prisoners didn't put charges.

23      Q.    Well, my question is do you know for a

24    fact that that wasn't the policy or the rationale

1    for the policy?  Let me put it that way.

2      A.    I don't know what the policies were.

3      Q.    Okay.

4      A.   Because there's a policy, it doesn't

5      mean that it's followed.


27.      Page 1501:

5      Q.   Okay.  Returning to your notes, page

6      10, there's a notation for January 26, '99.

7      Superior officers had a meeting regarding the

8      complaints among the female officers.  What does

9      that relate to?

10      A.   They had a meeting.

11      Q.   Okay.  How did you know about the

12      meeting?

13      A.   I don't remember.

14      Q.   Did you attend the meeting?

15      A.   No.

16      Q.   Who told you about the meeting?

17      A.   I don't remember.

18      Q.   So other than what's printed on the

19      page here, can you tell me anything with respect

20      to this January 26th, 1999 meeting?

21      A.   No.

22      Q.   Can you tell me even why it's in your

23    notes?

24        A.    No.


28.    Pages 1507 – 1515:

9        Q.    All right.  So back to this February

10    p.m. roll call with Captain Roland where Captain

11    Roland is addressing the shift and talking about

12    rumors of people being followed on the job, what

13    did Captain Roland exactly say?

14        A.    Just what it says.

15        Q.    So he got up and said any rumors of

16    people being followed on the job are untrue?

17        A.    Right.

18        Q.    So I could put a quote beginning with

19    the word any and end it at the word untrue?

20        A.    Correct.

21        Q.    Did he say anything else?

22        A.    Not that I recall.

23        Q.    You go on to say that detective Amy

24    O'Hara was enraged by this comment.  Do you know

1    why she was enraged by this comment?

2        A.    Because now he had just addressed it

3    at roll call with the patrol officers, this was a

45

4    meeting that was supposed to be between the

5    superior officers that the females had issues,

6    and he went and addressed it at roll call with

7    the patrol officers, and in turn made the patrol

8    officers completely at ease that the fact that

9    the females were going to file a sexual

10   harassment complaint.

11       Q.   How does the comment any rumors of

12   people being followed on this job is untrue

13   relate back to the January '99 meeting?

14       A.   Because the superior officers had made

15   some suggestion that they were being followed.

16       Q.   What superior officers had said that?

17       A.   I don't know.

18       Q.   How do you know that superior officers

19   had said something about them being followed?

20       A.   I don't remember.

21       Q.   How do you connect superior officers

22   saying we think we're being followed with the

23   January '99 meeting?

24       A.   I don't remember.

1        Q.   Was it common knowledge that the women

2    met with Captains Chaulk and Roland in January of

3    '99?

4        A.    Common knowledge.

5        Q.    Throughout the department.

6        A.    No.

7        Q.    Was it common knowledge that O'Hara

8    had met with Captains Chaulk and Roland in

9    December of '98?

10        A.    No.

11        Q.    Was it the intention for these

12    meetings not to be common knowledge?

13        A.    Yes.

14        Q.    Okay.  To your knowledge, at some time

15    between the January 7, '99 meeting and this roll

16    call, had it become common knowledge that such a

17    meeting had occurred?

18        A.    Yes.

19        Q.    Okay.  And how does the fact that

20    Roland said any rumors of people being followed

21    on the job is untrue, how does that connect with

22    the January '99 meeting?  I still don't

23    understand that connection.

24        A.    I don't know.  I just remember Officer

1    O'Hara being upset.

47

2       Q.    Did you talk to her later about why

3    she was upset?

4       A.    Yes.

5       Q.    And what did she say?

6       A.    I don't remember.

7       Q.    Did she actually storm out of roll

8    call as you pit it here?

9       A.    Yes.

10      Q.    How did she do that?

11      A.    She stormed out.

12      Q.    Describe what she did, please.

13      A.    Bashed the door open to the roll call

14    room and stormed out.

15      Q.    Did she say anything?

16      A.    No.

17      Q.    Did she jump out of her chair?

18      A.    No chairs in roll call.

19      Q.    So you're all standing around?

20      A.    Yes.

21      Q.    Okay.  How close was she to the door

22    when Captain Roland said something about rumors

23    being untrue?

24      A.    I don't remember.

1      Q.   I mean, did she have to walk across

2   the room in front of everybody or was she right

3   there by the door and just turned around and went

4   on out?

5      A.   I don't remember.

6      Q.   Did anybody say anything about the

7   fact that she had left the room?

8      A.   I don't remember.

9      Q.   Okay.  You have a comment here I've

10   never heard a rumor addressed at roll call, okay.

11   Is there some reason why rumors can't be

12   addressed at roll call?

13      A.   No.

14      Q.   Okay.  And now everyone believes that

15   this is somewhat true because it came from

16   captain.  Everyone believed what was true?

17      A.   I'm just trying to put this in words

18   where -- you're scratching your head that you

19   don't understand this incident, what had

20   happened.

21      As I sit here now and I take the

22   couple minutes to think about this incident, I

23   believe the females were complaining, myself

24   being one of them, that certain officers were

1   parked at the Seven-Eleven or parked at a

2   drinking facility, and we made some complaints

3   about that, and that got trickled down to the

4   patrol officers that we had them watching them,

5   that's why Amy was furious.

6       Q.   So the rumor was that some of the

7   female officers had been following some of the

8   male officers?

9       A.   No.  That the male officers were being

10   followed because they were drinking on the job.

11       Q.   Oh, okay.

12       A.   So it was -- it was what it was,

13   that's all I can tell you is that there may have

14   been mention of some officers at a drinking

15   establishment to the superior officers, and like

16   I said, it was a trickle effect.  I can't answer

17   for why Captain Roland did what he did.

18       Q.   Now, to my knowledge, you can't get

19   alcohol at a Seven-Eleven.

20       A.   No.

21       Q.   Unless you tell me otherwise.

22       A.   No.

23    Q.   Okay.  And there weren't any

24    Seven-Elevens in Revere known for illegally

1    bootlegging alcohol, were there, or were there?

2    A.   No.

3    Q.   Okay.  Would they park at the

4    Seven-Eleven so they could go to a place where

5    they could get alcohol, is that it?

6    A.   I don't know.

7    Q.   Well, no, certain officers parked at a

8    Seven-Eleven is what you just told me a minute

9    ago.  I mean, who cares?  What's parking at a

10    Seven-Eleven got to do with anything?  Why is

11    that a problem, what's the issue there?

12    A.   Well, for instance, and this is not a

13    -- this was after the -- maybe after the meeting,

14    I don't remember, I don't know the dates, when

15    you have two patrol cars parked at Seven-Eleven

16    and Mickey Reardons next door, and I'm not saying

17    anybody was at Mickey Reardons, but the bar was

18    next door.  And there were times when people

19    would just go in Seven-Eleven and read magazines,

20    so whatever, you know, whatever they did.

21    Q.   So the reference to certain officers

51

22    parked at Seven-Eleven could be a reference to

23    the stereotype of an officer drinking coffee and

24    eating doughnuts, you've heard that, haven't you,

1    before, all they do is drink coffee and eat

2    doughnuts, meaning they're not doing their job?

3        A.    There was some type of departmental,

4    they were -- superior officers were looking into

5    some drinking on the job then.

6        Q.    Okay, so the reference to Seven-Eleven

7    would be more to parking at a Seven-Eleven where

8    you could then walk next door to a drinking

9    facility?

10        A.    Right.

11        Q.    Okay.  Were you one of the female

12    officers that complained about male officers

13    drinking on the job?

14        A.    I don't remember.

15        Q.    You don't remember if you ever

16    complained about a male officer drinking on the

17    job?

18        A.    No.

19        Q.    Do you know if any of the other female

20    officers complained about a male officer drinking

21   on the job?

22      A.   No.

23      Q.   But apparently if I understand you

24   correctly, somehow a rumor had gotten started

1   that one or more female officers had complained

2   about male officers drinking on the job, and that

3   now the male officers were being followed by

4   speakers, correct?

5      A.   Correct.

6      Q.   How does that rumor though in any way

7   relate back to the January '99 meeting?

8      A.   I don't know.


29.    Pages 1517 – 1518:

1      Q.   Okay.  So why do you say then and now

2   everyone believes that this is true?

3      A.   Because that's the way it worked

4   around there.  Somebody said a rumor, then

5   somebody would believe it was true.

6      Q.   Well, but what you're saying here is

7   that the captain's denial of the rumor caused

8   people to believe it to be true, that's how I'm

9   reading your note here.  Am I misreading it?

10    A.    If you read down the rest of the last

11    sentence, the supervisors that had attended the

12    meeting with the captains were so enraged that

13    they were spoken to that they began to run their

14    mouths by telling male officers that they were

15    having them followed.

16    Q.    That we were having them followed?

17    A.    That we were having them followed.

18    Q.    "We" being the female officers?

19    A.    Correct.

20    Q.    Okay.

21    A.    But it was not true.

22    Q.    Okay, let's deal with that.  The

23    supervisors that had attended the meeting with

24    the captains, is that the January 26, '99 meeting

1    referenced above in your note?

2    A.    Yes.

3    Q.    Okay.  So did Captains Roland and

4    Chaulk have a meeting on January 26th of '99 with

5    the lieutenants and sergeants?

6    A.    I don't know.

7    Q.    Okay.  Well, who were the enraged

8    supervisors that were running their mouths and

54

9    telling the male officers that they were being

10    followed?

11        A.   Sergeant Goodwin.  I don't remember.

12        Q.   Okay.  And what did Sergeant Goodwin

13    say when he ran his mouth?

14        A.   I don't remember.

15        Q.   Okay.  When did Sergeant Goodwin say

16    it?

17        A.   I don't remember that.

18        Q.   Were you present when he said it?

19        A.   No.

20        Q.   So you heard about it secondhand?

21        A.   Right.

22        Q.   From who?

23        A.   I don't remember.


30.    <u>Pages 1524 – 1528</u>:

5        Q.   Without any information concerning who

6    did it in terms of whether it was one or more

7    people, what their gender was, what their race

8    was, what their physical description was, is

9    there anything you think that the Revere Police

10    Department could have done to figure out who did

11   it?

12       A.   An investigation.

13       Q.   And what would they investigate?

14       A.   That it's probably retaliation.

15       Q.   And how would they do that?

16       A.   Because both of the cruisers -- how

17   would they what, do the investigation?

18       Q.   Yeah.  How would they investigate

19   whether or not it was retaliation?

20       A.   You're right, they wouldn't be able to

21   because -- they couldn't.

22       Q.   Well, you complain about the fact that

23   they didn't investigate, and I'm asking you what

24   should they have done.  What do you allege they

1   should have done with the information you gave

2   them?

3       A.   An investigation.

4       Q.   And what would they do, what do you

5   allege they should have done?

6       A.   That's why I was the patrol officer

7   and not the chief of police.  That's not my

8   decision to determine what type of investigation

9   would have been done.  Our police cruisers were

10    parked behind a dumpster.  If you know the IHOP

11    restaurant on 60, 107, our police cruisers were

12    positioned behind the dumpster at the IHOP

13    restaurant so that the person driving down Route

14    60, Squire Road, the normal person couldn't see

15    our cruisers so --

16        Q.    Okay.

17        A.    Understandably so it was a very busy

18    area, but the way we parked our cruisers was

19    behind the restaurant.

20        Q.    That's not in the report here?

21        A.    Right.

22        Q.    And it's not in your notes either?

23        A.    Right.

24        Q.    Did you tell anyone that you had

1    parked your cruisers so they couldn't be seen?

2        A.    I don't remember.

3        Q.    Okay.  So your report's not complete,

4    important details were left out?

5        A.    Who was that important to?

6        Q.    Well, it seemed to be important to

7    you, you just spent a few minutes telling me

8    about the fact that they were parked behind the

9    dumpster where nobody could see them.  Why is

10   that important?

11      A.   Just responding back to the fact that

12   you said 107 was a busy street.

13      Q.   Okay.  And what's the implication

14   behind my question that 107 is a busy street?

15      A.   That it was during the a.m. hours,

16   that there was nobody around.  Just like I said,

17   there was nobody around.  Officer Curcio was

18   there, there was nobody around.

19      Q.   So did you and Officer Curcio slash

20   your own tires?

21      A.   No.

22      Q.   But you have no idea who did it?

23      A.   Right.  There was never an

24   investigation done.

1    Q.   What's to investigate though?  I want

2    to know.

3       A.   That would be up to the chief of

4    police.  That's what the chief of police does.

5       Q.   What do you expect the chief to do

6    without any indication of who the possible

7    suspect could be?

58

8       A.   So do you just give up if there's a

9    murder suspect and you don't know who the suspect

10   is, do you just give up because somebody's

11   murdered and you don't have a suspect?  You just

12   give up on it, you wash your hands with it until

13   another incident happens, until another incident

14   happens, that's it?

15       Q.   So what did you believe the chief

16   should have done with this information in your

17   report?

18       A.   He should have done an investigation.

19       Q.   But what kind, how?

20       A.   That's not my job as the chief of

21   police.  He's specially trained, he should have

22   done the investigation.

23       Q.   So should he have called every single

24   officer on the Revere Police Department in to ask

1    them whether or not they vandalized the vehicle?

2        A.   I can't answer for what he should have

3    had done.

4        Q.   Well, you're alleging he should have

5    done something.

6        A.   Right, because he's the chief of

7   police.

8      Q.   Then what are you alleging he should

9   have done?

10      A.   He had eight tires slashed.

11      Q.   I understand that.

12      A.   Okay.

13      Q.   And on what basis do you say he should

14   have done something given this report?

15      A.   I answered that question.

Page 1534:

5      Q.   Is the reason that you believe that

6   this is retaliation, because that's what you want

7   to believe and choose to believe?

8      A.   No.

9      Q.   Do you have any evidence to support

10   that belief?

11      A.   Just that the police department didn't

12   investigate it.

13      Q.   In other words, the police department

14   didn't investigate a report that didn't tell him

15   who, what, where, when, why or how?

16      A.   Right.

31.    Pages 1529 – 1531:

24      Q.    Is there a reference in your notes to

1    Captain Colannino calling you in?

2      A.    Yeah, the following day we were called

3    in and ridiculed by Captain Colannino for the

4    incident.

5      Q.    Okay.  And how did he ridicule you?

6      A.    I don't remember.

7      Q.    Do you recall what he said?

8      A.    No.

9      Q.    Okay.  Did you complain to anybody

10    about the fact that Captain Colannino had

11    ridiculed you?

12      A.    No, we just transferred off the shift.

13      Q.    Well, Captain Colannino wasn't

14    involved with the shift, was he?

15      A.    He was involved with the whole

16    department.

17      Q.    Well, I understand that, my question

18    is did you complain to anyone about the fact that

19    Captain Colannino ridiculed you?

20      A.    Who do I complain to?  He's the acting

21    chief, who do I complain to?  Captain Colannino?

61

22    Q.   All right.  Did you complain to the

23  Mayor?

24    A.   No.

1    Q.   Did you file a complaint with MCAD?

2    A.   What would the Mayor do, tell me to go

3  to MCAD?

4    Q.   This is my time to ask you questions.

5  Miss James.

6    A.   I just answered it.  You asked me if I

7  complained to the Mayor, and I said what would

8  the Mayor do?

9    Q.   The question called for a yes, no, or

10  I don't remember answer.  And the answer was no,

11  you did not complain to the Mayor?

12    A.   Not on that date.


32.    Page 1536:

1    Q.   Do you know what triggered the

2  suggestion that they have another meeting?

3    A.   Maybe because two female police

4  officers, our cruisers were just -- just had all

5  of our tires slashed.

6    Q.   You said maybe.  I'm asking you, do

7    you know what triggered the decision to have

8    another meeting?

9        A.    The tires on our cruisers, that we

10   didn't feel safe working our shift anymore.

11       Q.    Okay.  So if the tire slashing was the

12   impetus for the meeting, was it you or Officer

13   Curcio were the moving force behind calling for

14   this meeting?

15       A.    It could have been me.  I don't

16   remember who called for it.


33.    Pages 1536 – 1539:


20       Q.    Okay.  In the second line, it says the

21   topic of the discussion was the repercussions of

22   mentioning the harassment to the superior

23   officers, Chaulk and Roland.  Do you see that?

24       A.    Yes.

1        Q.    What repercussions are you referring

2    to?

3        A.    Our tires being slashed.  The rumors.

4        Q.    The rumors about male officers being

5    followed?

6        A.    Yes.

7    Q.    Any other repercussions?

8    A.    Not that I can recall.

9    Q.    Okay.  So in the approximate 30 days

10   from January -- was it 7?  I think it was January

11   7 when you had the meeting of '99 to February 9

12   of '99, a rumor had started circulating that the

13   female officers had wanted the male officers

14   followed because they were drinking on the job

15   and your and Curcio's tires had been slashed?

16   A.    Right.

17   Q.    And because of those two incidents,

18   and only those two incidents, you guys decided --

19   the female officers decided to call a follow-up

20   meeting; is that correct?

21   A.    No.

22   Q.    What's incorrect about that?

23   A.    I don't remember.

24   Q.    How can you tell me something is

1    incorrect and then tell me you don't remember why

2    it would be incorrect?

3    A.    Because you just asked me a question

4    with an answer, so you said is that all, and I

5    said no.  And you asked me what, so --

6      Q.   Okay.  So what else?

7      A.   I don't remember, that's what I'm

8   telling you.

9      Q.   So there might not be anything else?

10      A.   There may, there may not be.

11      Q.   You don't know one way or the other?

12      A.   No.

13      Q.   So as you sit here today, the best you

14   can tell me is that the tires being slashed and

15   the rumors is the only two things that caused

16   this meeting to be called?

17      A.   It may have been the sexual assault, I

18   don't remember.

19      Q.   That was pre-meeting.

20      A.   It may not have been pre-meeting.

21      Q.   The Randall assault may not have been

22   before January of '99?

23      A.   Maybe I didn't tell them.  I don't

24   know when I told -- I don't remember when I told

1   the female officers.

2      Q.   But the Randall assault wouldn't be a

3   repercussion of the January '99 meeting if it

4   preceded the meeting?

5      A.   Maybe that's why I wanted to have a

6   meeting to talk to them.  I don't know.  I don't

7   know if I decided that I wanted to -- I don't

8   remember.


34.    Page 1541:

1      Q.   You go on to say that "Patrolman Carey

2   to my knowledge has never had any problems on the

3   job due to the fact she's been assigned with a

4   male partner for most of her career."  Who's the

5   male partner?

6      A.   Chucky Callahan.

7      Q.   And why is Patrolman Carey being

8   assigned a male partner Patrolman Callahan, why

9   has that protected her from having any problems

10   on the job?

11     A.   I don't know.


35.    Pages 1542 – 1545:

14     Q.   Okay, fair enough.  You go on to say

15   that "Carey has made it clear on several

16   occasions to other officer" -- is that supposed


66

17   to be other officers within the department?

18        A.   I don't know.

19        Q.   Okay.  "-- including Lynn Malatesta,

20   that she does not believe" -- Carey does not

21   believe that anything's ever happened to you?

22        A.   Right.

23        Q.   What are you referring to there?

24        A.    That when I told Patty Carey about

1   what Todd Randall did, she didn't believe me.

2        Q.   When did you tell Patty Carey?

3        A.   Or she didn't want to believe me.

4        Q.   Okay.  When did you tell Patty Carey?

5        A.   She was at the meeting with us.

6        Q.   So as you sit here now, is it your

7   recollection that it was the February 9, 1999

8   meeting when you told the female officers about

9   Randall?

10        A.   Yes.

11        Q.   And during the course of that meeting,

12   did Carey speak up and say I don't think that

13   happened?

14        A.   No.

15        Q.   When did she tell you that?

67

16      A.   She didn't tell me that, she told Lynn

17   Malatesta, and Lynn Malatesta told me.

18      Q.   And when did Lynn Malatesta tell you?

19      A.   I don't remember.

20      Q.   Okay.  What did Lynn Malatesta tell

21   you?

22      A.   That Patty doesn't believe a lot of

23   the stuff that happened to us females.

24      Q.   Did she give you any specifics?

1    A.   No.

2    Q.   So did you just assume that one of the

3    things that Patty didn't believe was the Randall

4    incident?

5    A.   Yes.

6    Q.   Okay.  The way you looked at me, I'm

7    troubled.  I'm not sure you believe the answer

8    you gave me.

9      A.   No, I remember having the conversation

10   with Lynn Malatesta, and that's why I answered it

11   that way.  She said Patty Carey didn't believe

12   some of the allegations, but Patty Carey didn't

13   work on that side of the house and didn't have

14   the problems that the other officers had.

15      Q.   A moment ago though you indicated to

16   me that Patty Carey said that she didn't believe

17   your relation about the Randall incident, your

18   statement about what happened to you and Todd

19   Randall.  And I asked you when she told you that,

20   and you said she didn't, she told Lynn Malatesta.

21         So when I asked you what she told Lynn

22   Malatesta, you said that Patty said she didn't

23   believe you generally, but not specifically with

24   respect to that incident.  And now you're telling

1   me that you assume that's what Patty meant.

2         So did she say it directly or did she

3   say something more general and you're just

4   assuming that's what she meant?

5      A.   I don't remember.


36.   <u>Pages 1551 – 1552</u>:


13      Q.   In this document, Sergeant Picardi

14   attributes the incident where Mannara called

15   Officer Malatesta a patrolwoman to the date of

16   April 2, '99, do you see that?

17      A.   Yes.

18      Q.   Would you believe that the April 2

19   date is a correct date as opposed to the April 4

20   date in your notes?

21      A.   All I know is that it happened.

22      Q.   Okay.  You know Sergeant Picardi?

23      A.   Correct.

24      Q.   As far as you know, Sergeant Picardi

1   does have a reputation for being honest,

2   truthful?

3      A.   Yes.

4      Q.   Would you have any reason to doubt the

5   veracity, the truthfulness of the report he's

6   written here to the chief?

7      A.   No.

8      Q.   As far as you know, Officer Mannara

9   calling an officer patrolwoman only happened

10   once?

11      A.   Right.


37.    Pages 1556 – 1557:


1      Q.   What had Sergeant Doherty done that

2   had humiliated you in front of the other officers

3   and the public?

4      A.   The way he spoke to me.

70

5      Q.   And what do you mean by that?

6      A.   When he had me call Pat Cappola to the

7   station.

8      Q.   Wait a minute, I thought that was --

9   that's an incident from August 30 of 2000.

10     A.   What was your -- what was your

11   question?

12     Q.   Is your PTSD giving you a hard time?

13     A.   Yeah.

14     Q.   Okay.  And I only ask because I

15   thought I asked a very simple question, and your

16   answer was very confused.  Now you're asking me

17   to restate the question.  Are you okay or do you

18   want to stop?

19     A.   I don't know.

20     Q.   Okay.  Your note here is sandwiched

21   between an April 4, '99 entry and a July 5, '99

22   entry, I'm looking at page 11, and you talk about

23   being humiliated in front of other officers and

24   the public, and so I was asking you who, and you

1   said Santoro, Doherty, Foster and Russo.

2        With respect to Doherty, my question

3   was how had he humiliated you in front of other

71

4    officers and the public?  You made reference to

5    the Cappola incident, but that's an incident that

6    occurred in August of 2000, according to page 17

7    of your notes, an incident that hasn't happened

8    for a year-and-a-half yet.

9        So as of sometime between April and

10    July of '99, how had Sergeant Doherty humiliated

11    you in front of other officers and the public?

12       A.    Between April of '99?

13       Q.    I'm saying that your note is

14    sandwiched between April of '99 and July of '99,

15    you can't give me a specific date when you

16    changed shifts, at least you couldn't earlier in

17    the deposition.  So prior to whenever this note

18    was written or whenever it relates to, I assume

19    the note is here in chronological order, correct?

20       A.    Right.

21       Q.    So sometime after April 4 of '99 but

22    before July 5 of '99, you finally decided that it

23    was getting to be too much with being humiliated

24    in front of other officers and the public, and

1    one of the people that had humiliated you in

2    front of the other officers and the public

72

3    according to what you told me a minute ago was

4    Sergeant Doherty, and how as of this time frame

5    had he done that was my question.

6        A.    With the sports commentator.

7        Q.    Okay.  And that's -- was there members

8    of the public present when that happened?

9        A.    You mean someone from outside?

10        Q.    Well, it says humiliated in front of

11    the other officers and the public, and I

12    understood the sports commentator comment to be

13    in the radio room.

14        A.    Right.

15        Q.    So there weren't any public present,

16    just other officers?

17        A.    I don't know what that means.

18        Q.    You don't know what that means?

19        A.    And the public.  I don't --

20        Q.    They're your notes.

21        A.    Right.

22        Q.    In any event, the sports commentator

23    comment was either the World Series of '97 or the

24    Super Bowl of '98.  In other words, at least a

1    year, if not a year-and-a-half, prior to this

2    time frame.

3         Anything else that Sergeant Doherty

4    had done that humiliated you in front of others,

5    other officers and/or the public?

6    A.   I don't remember.

38.   <u>Pages 1559 – 1563</u>:

7    Q.   Lieutenant Foster, what had Lieutenant

8    Foster done to humiliate you in front of others

9    and/or the public?

10     A.   We went through everything, so this is

11   -- this is just going back to what incident did

12   Lieutenant Foster do, what did Lieutenant Santoro

13   do, what did Sergeant Doherty --

14        MR. PORR:  Fine, bear with me a

15   second.

16     Q.   The last contact you had with Foster

17   that I see from your notes and from the complaint

18   was September 2 of '97, and then in October of

19   '97, you transferred off his shift.  So you

20   hadn't been on Lieutenant Foster's shift for at

21   least a year-and-a-half by the time we get to

22   what you're talking about here.

23     A.   You have me so -- either I'm very

24   confused about what you're looking for for a

1   question or I'm very tired, because I apologize,

2   I can't even --

3     Q.   All right.  Do you want me to try and

4   rephrase or would it be better just to stop for

5   the day?

6     A.   You can try and rephrase it.

7     Q.   Okay.  I'll be glad to.

8     A.   It could be --

9     Q.   I'll be glad to.  Give me a second to

10   provide some context.

11        From reviewing your notes and the

12   complaint, you had an incident with Lieutenant

13   Foster that started in August of '97 when you

14   went back to his shift, Lynn Malatesta I think

15   had warned you?

16     A.   Kathy Fish.

17     Q.   Fish, I'm sorry, had warned you that

18   he was out to get you, you went back to the

19   shift, and on August 24, there was an incident,

20   26, 27, 28, then in September, you were swapping

21   shifts.  On September 2nd he and Ford called you

22    in of '97, you swapped a bunch of shifts in

23    September of '97, and then on October 12 of '97

24    you transferred off of Foster's shift.

1      A.   Right.

2      Q.   And from October 12 of '97, up to the

3    time that we're looking at in these notes, you

4    were not working for Lieutenant Foster, you were

5    not on his shift.

6      A.   Correct.

7      Q.   I see nothing in your notes and

8    nothing in the complaint after September 2nd of

9    '97 when he and Ford chewed you out, for lack of

10   a better word, up through the time we're looking

11   at here indicating any incident with Lieutenant

12   Foster.  I'm unaware of any.  Are you with me?

13     A.   Yeah.

14     Q.   Okay.  So a moment ago, I read this

15   sentence to you from this paragraph, the

16   paragraph after the April 4 paragraph, where you

17   indicate you had finally decided that it was

18   getting to be too much on the split shift, and

19   one of the things that was too much was being

20   humiliated in front of others and the public.

21          And so I asked who had humiliated you

22    in front of others and the public, you gave me

23    four names, Santoro, Doherty, Foster and Russo.

24    So I'm just trying to go down that list of names

1    and ask what they had done in connection with

2    this entry in your notes that humiliated you in

3    front of others and the public.

4          I don't think Foster or Russo should

5    be on this list, because Foster wasn't the

6    supervisor for the split shift.

7    A.   Okay.  Well, your question I guess was

8    very broad, because it just seemed to me that you

9    were --

10    Q.   It's tied directly to this note.

11    A.   But there's no date on that.  I don't

12    have a date, I finally decided to -- so there's

13    no date on there, and when you just asked that

14    question, maybe madam reporter can read back to

15    where I got confused.

16    Q.   Okay.  We've established though that

17    this note is chronologically between April 4 of

18    '99 and July 5 of '99.  As of April 4 of '99, you

19    were still working the split shift, correct?

20     A.   Right.

21     Q.   As of July 5, '99, you had moved onto

22   the evening shift where Lieutenant Bernard Foster

23   was in charge.

24     A.   To me, maybe with all the dates, I'm

1   getting very confused.  If you ask me an incident

2   and ask me what happened -- I'm confused here.

3   So maybe we should just call it because --

4        MR. PORR:  Okay, then we'll do that.

5   We can go off the record.

6        (The deposition suspended at 4:44.)