# EXHIBIT G

Terri Pechner-James
May 30, 2006
Deposition Answers Which Were Non-Responsive,
Evasive, Argumentative and/or Combative

1.    Page 1193:

11    Q.    The same thing for the tires being

12    slashed.  Did you tell them that it was

13    done -- slashed by a Revere police officer?

14    A.    Again, I didn't know who it was.

15    Q.    Okay.  But my question was,  Did

16    you tell the doctors?

17    A.    I told them it was never

18    investigated.

19    Q.    Okay.  Did you tell the doctors

20    that your tires were slashed by a Revere

21    police officer?

22    A.    I told them I didn't know who it

23    was from.


2.    Page 1199:

10    Q.    How about any other superior

11    officers?  Did you hear them say, "Do not back

12    up Officer Pechner," which was your name at

13    that time?

1

14    A.   Have you ever heard that, Mike?

15    Q.   I don't know.  That's my question

16  to you.

17    A.   No.


3.    <u>Pages 1203-1205</u>:

10    Q.   You have Exhibit 14 in front of you

11  still, ma'am, correct?  Yes?

12    A.   Yes.

13    Q.   I just can't see it from where I'm

14  sitting.  There's a reference in the part

15  entitled "Medical Record Review."  It talks

16  about you were attempting to return to work in

17  September of 2002.  I'd like you to tell me

18  about what happened on that occasion.

19    A.   I don't remember.

20    Q.   Okay.  Did you attempt to return to

21  work in 2002?

22    A.   I don't -- I don't remember.

23    Q.   Okay.  I know March 13th of 2001

24  was the last day you actually worked in the

1  Revere PD.

2        At any point in time after that did

3   you make any efforts by talking to any of the

4   police management in Revere about coming back

5   to work?

6       A.   I spoke to Captain Murphy at

7   Marshalls while he was working a detail.

8       Q.   He was working a detail?

9       A.   Yes.

10      Q.   About your returning to the police

11  department?

12      A.   About him maybe doing an

13  investigation that was fair.

14      Q.   Okay.  What investigation -- I'm

15  sorry.  I didn't follow you.  What is the

16  investigation that you wanted Murphy to do

17  fairly?

18      A.   Regarding Brian Goodwin.

19      Q.   Okay.  But had you talked to any

20  Revere police management about you coming back

21  to work?  There's a reference to it in this

22  medical record, and I don't know anything

23  about it so I'd like to see if it's correct.

24          You're saying in September of '02

1   you didn't attempt to return to work, but

3

2  there's also a reference that says, "She was

3  not able to return after meeting with the

4  chief."  Did I read that correctly?

5      A.   (Looks at document.)  You read it

6  correctly.

7      Q.   Okay.  Did you have a meeting with

8  the chief about your returning to work?

9      A.   Chief Colannino, not Reardon.

10     Q.   This would have been in the year

11  2001, you think?

12     A.   I don't remember when.

13     Q.   Let's see if we can construct the

14  time frame.  You said March of 2001 you

15  stopped working, you were subsequently married

16  in May of 2001.

17        With these time frames laid out on

18  the table, any idea when you met with Chief

19  Colannino about your returning to work?

20     A.   No.

21     Q.   Would it have been before or after

22  you were married?

23     A.   I don't remember.

4.   Pages 1207-1208:

8         (Deposition Exhibit No. 23 marked.)

9    Q.   Ms. James, I present you what's

10  before you, what's been marked as Exhibit 23

11  to this deposition, which I represent to you

12  is a doctor's note of Dr. Eric J. Keroack

13  regarding you which I received from Judge

14  Sorokin's court clerk via U. S. mail after

15  Mr. Dilday had presented the documents to

16  Judge Sorokin for his review.

17         So could you please take a look at

18  Exhibit 23 and also up in the upper right-hand

19  corner it has a number 62 on the top which our

20  office did to Bates stamp them because many of

21  them were not dated and also were not in any

22  sort of chronological order.

23    A.   Go figure.

24    Q.   Have you taken a look at

1  Exhibit 23?

2    A.   Yes.

3    Q.   You just mentioned something a

4  moment ago when I mentioned that some of the

5  documents were not dated or not in order, what

6  did you mean by "go figure"?

7      A.   Occasionally, I have outbursts.  I

8  don't know.

9      Q.   Outbursts in what way?

10      A.   I said go figure, figure of speech.

11      Q.   Sarcastic?

12      A.   Right.

13      Q.   I'm gathering you to mean that

14  you're not surprised that Dr. Keroack provided

15  an undated office note and not in any order.

16          Is that what the "go figure"

17  reference is?

18      A.   (No response.)


5.    <u>Page 1210</u>:

9      Q.   The line under the postpartum

10  depression reference, it says, "Marriage is a

11  disaster."  Would that be accurate?  Again,

12  this is sometime after July of '02.  I can't

13  give you more reference because there's no

14  date on it.

15      A.   That's what he wrote.

16      Q.   Okay.  Well, was that something you

17  told him?

18       A.   My marriage has had its ups and

19  downs, so at that point it was probably a

20  disaster at the time.


6.       Pages 1211-1213:

10       Q.   You also discussed the incident

11  with Todd Randall in the police cruiser where

12  you testified previously you were sexually

13  molested?

14       A.   Correct.

15       Q.   It says down at the bottom here,

16  "To incident in police cruiser which perhaps

17  explains her PTSD."

18          Did I read that correctly from the

19  doctor's notes?

20       A.   That's his opinion --

21       Q.   Okay.

22       A.   -- on what caused the PTSD.

23       Q.   Okay.  All right.  And also I did

24  read or paraphrase correctly what the doctor

 1  had put in on Exhibit 23?

 2       A.   Yes.

3     Q.   Okay.  And it looks like a

4   signature on the bottom right corner.  Would

5   you recognize it as Dr. Keroack's?

6        MR. DILDAY:  Right here.

7        THE WITNESS:  Yeah.

8     Q.   If you don't know, ma'am, just

9   say --

10    A.   I don't know.

11    Q.   Okay.  So does this refresh your

12   memory of any conversations or discussions

13   with Dr. Keroack about the cause of the

14   posttraumatic stress disorder?

15    A.   Posttraumatic stress disorder was

16   spoken before 2002, if that's when -- you

17   know, when this happened.  I didn't go in

18   there originally discussing a sexual assault

19   when I was a child.

20        As a matter of fact, I didn't

21   recall the incident until I had the EMDR with

22   On-Site, and I did the EMDR with the assault

23   that happened with Officer Randall, and when

24   they did the EMDR, that's when it brought up

1   my childhood trauma so...

2    Q.   Okay.  My question was,  Having

3    read Exhibit 23, more specifically, the bottom

4    third of the document, does that refresh your

5    recollection about any conversations or

6    discussions you had with Dr. Keroack as to the

7    cause of the posttraumatic stress disorder?

8    A.   I don't remember.

9    Q.   So this doesn't -- Exhibit 23

10   doesn't refresh any recollection in your mind?

11   A.   No.


7.    Pages 1233-1234:

13   Q.   Okay.  When you go to work in, I

14   believe it was, the Georgetown school system

15   as a substitute, what do you do with your

16   youngest child?

17   A.   She goes to preschool.

18   Q.   Does Mark work, that is, Mr. James?

19   A.   No.

20   Q.   Has he worked since he has been

21   retired from the Revere PD?

22   A.   Yes.

23   Q.   What type of employment has he had?

24      A.   I'm not answering questions about

1   him.

2      Q.   I'm sorry?

3      A.   I'm not answering questions about

4   him.

5          MR. PORR:  Mark the record, please.

6          MR. AKERSON:  We'll get back to

7   him.  I'll move on to a new topic, Jim, okay?

8          MR. DILDAY:  Yes.


8.      Page 1253:

5      Q.   There's also a Charles Callahan.

6   He's also on this list.  Why would he be on

7   this list?

8      A.   To be perfectly honest with you,

9   both of them as my union representative should

10  have been representing me at the time.

11          I was a union-paying member of the

12  MPA.  Maybe you'd be sitting here next to me

13  instead of me having to pay for my counsel and

14  sitting over here and you're sitting on that

15  side of the table, Mike.

16          Maybe that should have been the way

17   that it went.  Maybe Charles and Patty should

18   have done something to stop this a long time

19   ago.

20      Q.   What about Charles Callahan?  Any

21   sense as to why his name is on this list?

22      A.   No.


9.    Pages 1270-1275:

19      Q.   Okay.  I had asked some questions

20   previously of you regarding your husband, Mark

21   James, his private life, and you indicated at

22   that point in time you were not going to

23   answer any questions regarding it.  Do you

24   recall saying that?

1      A.   Yes.

2      Q.   Is that still your position?

3      A.   I mean you just put a paper in

4   front of me that didn't -- a medical report in

5   front of me that didn't pertain to me.

6      Q.   You're pointing to Exhibit 34,

7   Ms. James?

8      A.   Correct.

9      Q.   At the top of the document, it has

10  your name on it?

11     A.   That's why we went in front of the

12  judge, because apparently he didn't

13  differentiate between whose name should be on

14  that.

15     Q.   I don't know what you're talking

16  about, Ms. James, but I know that Exhibit 34

17  has your name on top of it, which is why I was

18  asking you questions about it.  Mr. Dilday,

19  Ms. James, do you intend not to answer my

20  questions about Mark James as you indicated

21  earlier today?

22        MR. DILDAY:  Yes, because it seems

23   that most of these things regarding Mark come

24   after she left the police department, and so

 1  if they come after the police department, when

 2  she left them, then unless one can clearly

 3  show that Mark's issues tie in to her

 4  posttraumatic stress disorder, I see no reason

 5  to answer them.  What I suggest we do is you

 6  ask the questions and we'll deal with them one

 7  by one.

 8        MR. AKERSON:  I think it will be

9    easier like this.  When I started talking

10   about the damages earlier today, Ms. James

11   indicates she's got some lost wages and

12   eating, fearing, focusing, anxiety issues.

13   She had a laundry list of the damage claims.

14        She also mentioned her relationship

15   with her husband as part of the damage claim.
16   So if Mark James has some issues on his own

17   and those would affect the relationship with

18   Ms. James and she's claiming that as a damage,

19   I think it's certainly fair game in terms of

20   finding out what the -- the current word

21   called stressors existed as of -- during the

22   time of their relationship.

23        MR. DILDAY:  That's a good analogy.

24   However, even though she may have said that, I

1    don't think that we've ever talked about any

2    loss of consortium claim either for Mark or

3    for her in the lawsuit.

4        MR. AKERSON:  Well, independent of

5    her loss of consortium claim, Ms. James

6    indicated earlier today on the record that one

7    of the elements of her damages is her

8    relationship with her husband -- I'm going to

9   surmise here -- adverse change, downward

10  change of the relationship.

11       MR. DILDAY:  I understand.  And

12  what he's asking is if the stressors from the

13  police department adversely affected the way

14  that you interacted with your husband, those

15  questions, I think, would be appropriate for

16  you to answer if you can.

17       THE WITNESS:  Okay.

18     Q.   Let me see if I can capsulate this

19  part.  Ms. James, are you claiming here at

20  this deposition that your relationship with
21  your husband has adversely changed, a downward

22  change, due to what you believe are the

23  results of your mistreatment while employed by

24  the City of Revere?

1     A.   No.

2        MR. AKERSON:  So, for the record,

3   it appears, Mr. Dilday, that Ms. James is

4   saying that her relationship has not adversely

5   changed because of her relationship with her

6   husband.

7        MR. DILDAY:  Yes.

8        MR. AKERSON:  No.  The husband's

14

9  relationship hasn't changed.  No.  That's bad.

10  Her relationship with her husband has not

11  changed as a result of the Revere police

12  allegations she's making.

13          Because I'm going to need to go

14  into Mark James' details, specific details

15  regarding his relationship with her, the

16  details of the relationship, the stressors he

17  had in his life which may have spilled over

18  into Ms. James' life.

19          MR. DILDAY:  I understand and if

20  she says no --

21          MR. AKERSON:  Which she just did.

22          MR. DILDAY:  Right.  Then that

23  shouldn't matter what his stressors are now

24  based upon her answer there.

 1          MR. AKERSON:  All right.  I'm going

 2  to keep moving on.  Sounds good.


10.     Pages 1294-1296:


20      Q.   Okay.  As you look forward today to

21  the future, do you plan to have any treatment

22  to resolve the fact that you still have


15

23  problems eating?

24      A.    What am I going to do?

1      Q.    That was my question to you.  If

2  you have any known plans to see -- seek any

3  doctors or have any surgery to aid you along

4  in being able to eat?

5      A.    I don't think there's surgery for

6  stress.

7      Q.    Is that what -- that was my next

8  question, actually, you answered it.  But with

9  regard to the fact that you couldn't eat, were

10  you ever given a diagnosis of why you can't

11  eat?

12      A.    No.

13      Q.    Okay.  Have any doctors ever talked

14  to you about a prognosis, looking in the

15  future, in terms of your inability to eat?

16      A.    No.

17      Q.    When's the last time you saw a

18  doctor for the fact that you have -- your

19  stomach doesn't allow you to eat?

20      A.    That's one of my lesser problems.

21      Q.    Okay.  Well, if you could answer

22   the question.  Do you know when the last time

23   was that you saw a doctor for your stomach and

24   that you couldn't eat?

1     A.   No.


11.     Pages 1300-1301:

18     Q.   When you went to the emergency room

19   at Leominster Hospital in April of 2006, were

20   you there for anything else other than the

21   stomach and back pain you were suffering?

22     A.   Yeah.  I couldn't go to the

23   bathroom.

24     Q.   Were some medical procedures done

1   to help you along in that way?

2     A.   Yeah.  My own benefit.

3     Q.   Pardon me?

4     A.   Yeah.  I gave myself a medical

5   procedure.


12.     Page 1308:

3     Q.   Any of my clients -- I think you

4   know the names by now, don't make me repeat

5   them all -- but Colannino, Russo, Murphy,

6   Nelson, Foster, Ford, Santoro --

7          MR. PORR:  Roland.

8     Q.   Roland, thank you.  Did you have

9   any interactions with any of those folks?

10     A.   I don't think Joe would invite them

11   to his wedding.

12     Q.   My question was a little bit --

13     A.   I think you know that.  I think you

14   know that, Mike.

15     Q.   My question was a little bit

16   different.  Did you have any interactions with

17   them at the wedding?

18     A.   None of those were there.


13.    Pages 1316-1317:

5     Q.   You indicated that you can't be a

6   police officer.  By that, do you mean that

7   somebody has told you that you can't be a

8   police officer?

9     A.   Tell you what.  You take away

10   everything that's happened to me - okay? -

11   give me back my job as a police officer and

12    punish those guys for what they did wrong and

13    see if I can be a police officer.  Okay?

14            Because I certainly don't enjoy

15    sitting here, talking about this shit that

16    happened to me on the job.  Give me back my

17    job.  I'll take my job back in a heartbeat

18    rather than take this lawsuit and take this

19    pension.

20            I'd rather have my job back.  I'd

21    rather live normal like those guys are doing

22    on a regular basis.  That's normal.  They get

23    their pay.  They go to work.

24            Do you think I enjoy doing this?

1    Give me back my job.  Send me to the medical

2    panel.  Do what you've got to do.  Give me

3    back my job.  Punish those guys for what they

4    did wrong.

5        Q.   Would you want to continue to be a

6    police officer?

7        A.   I would love to have my job.  Do

8    you think I went to school, do you think I got

9    a degree, so that I could come this far to sue

10    the police department to walk away with a

11  pension, so that I can live with nightmares

12  and terrors, so that I could be sexually

13  assaulted on the job?

14      Who knows what Todd Randall has

15  done on the job.  Who knows what he's done to

16  other people that I have to live with.  You

17  see it, Mike.  You see it.

18      MR. AKERSON:  Jim, do you want to

19  take a break?

20      MR. DILDAY:  Yeah.  Let's walk

21  outside for a minute.

22      (Recess taken from 3:35 P. M. to

23  3:45 P. M.)


14.    Page 1319:

5    Q.   Has anybody told you that you can't

6  be a police officer at another community other

7  than Revere?

8    A.   I can't work for TJ Maxx.

9    Q.   I'm sorry.  I didn't follow you.

10  You can't work for TJ Maxx?  Just my question

11  was,  Did anyone tell you that you can't be a

12  police officer for some other community,

13   meaning not Revere?

14      A.   I don't know.

15      Q.   Do you have any understanding that

16   somebody has told you, or suggested to you,

17   that you can't be a police officer for other

18   communities?

19      A.   I don't know.


15.   <u>Pages 1327-1330</u>:

7        You also said something else that

8    you wanted to state on the record, that you

9    were afraid for your life?

10      A.   I am.

11      Q.   Is that because of the Todd Randall

12   statement you made about him having sexually

13   assaulted you, or was there something else, or

14   a combination of them?

15      A.   I feared for my life since I filed

16   this complaint.

17      Q.   I'd like to address that, if we

18   can.  The lawsuit, to my understanding, was

19   filed sometime in 2003.  Is that your memory

20   as well?

21      A.    Yup.

22      Q.    Okay.  Since 2003, Ms. James, other

23   than your filing the lawsuit, has anything

24   happened which has made you have to go on the

1   record here at the deposition and say that

2   you're afraid for your life?  My question is,

3   Has something else happened?

4      A.    No.

5      Q.    To my understanding, the only

6   contact you've had since 2003 with my clients,

7   a lot of the police supervisors, the only

8   contact you've had directly with the

9   supervisors has been when you went to the

10   Revere police station last fall to talk to

11   Captain Murphy; is that correct?

12      A.    That's correct.

13      Q.    Okay.  And on that occasion, you

14   went to Captain Murphy to speak with him,

15   correct?

16      A.    That's correct.

17      Q.    And in that meeting, you knew that

18   you had filed a lawsuit at the court and had

19   named Captain Murphy as a defendant, correct?

20     A.   Correct.

21     Q.   Okay.  But despite that, Captain

22  Murphy, I think you said, he was cordial and

23  polite to you, correct?

24     A.   Correct.

1     Q.   At no point in time did Captain

2  Murphy, in that November of 2005 meeting, in

3  any way intimate to you that you should be

4  fearful or in any way scared, correct?

5     A.   Correct.

6     Q.   So can you put any specific names

7  attached to the reasons you felt you had to go

8  on the record today to say that you were

9  afraid for your life?

10     A.   I don't understand your question.

11     Q.   Sure.  That's fine if you don't.

12  I'll repeat it.  You went on the record today

13  stating that you wanted to go on the record

14  because you were afraid for your life.

15        I'm trying to find out specifically

16  the names of any individuals you could give to

17  us as to the basis for your being afraid for

18  your life.

23

19      A.   Do you want me to dig my grave

20   faster, Mike?  (Indicates.)

21      Q.   I'm just trying to find out if you

22   have any names of any specific people which

23   make you afraid for your life.

24      A.   I just told you, Todd Randall.

1      Q.   Okay.  You did mention him.  Other

2   than Todd Randall, do you have any other names

3   of individuals who make you afraid for your

4   life?

5      A.   No.


16.   <u>Page 1338-1339</u>:

18      Q.   We're talking about emotional

19   distress.  Specifically, do you have any

20   emotional distress with regard to your current

21   financial situation?

22      A.   No.

23      Q.   Excuse me?

24      A.   No.

1      Q.   In part, that's because you're

2   receiving the accidental disability

3   retirement?

4    A.   If that's what you say.

5    Q.   No.  That was a question.

6    A.   Oh, was it?

7    Q.   Is the fact that you're not

8  having --

9    A.   I thought it was a comment.

10    Q.   Your not having stress stemming

11  from your finances, is that because of the

12  fact that you're receiving accidental

13  disability retirement pay?

14    A.   No.

15    Q.   Why are you not having any

16  financial stress?

17    A.   I don't know.

18    Q.   You mentioned earlier about

19  finances, in terms of looking for a job, that

20  TJ Maxx wouldn't even hire you.  What do you

21  mean by that, Ms. James?

22    A.   It means that I filed an

23  application with TJ Maxx and they didn't hire

24  me.