# EXHIBIT A

Case 1:03-cv-12499-MLW    Document 211-2    Filed 06/23/2006    Page 1 of 16

Terri Pechner-James

June 22 Deposition Excerpts - Competence

1.    Pages 1571 – 1575:

1    Q.   All right. And how are you
2    feeling?
3    A.   Fine.
4    Q.   I'm sorry?
5    A.   Fine.
6    Q.   Yesterday, when we took Sonia
7    Fernandez' deposition, she mentioned that she
8    had talked to you the night before and that
9    you were ill. Are you still ill or are you
10   okay?
11   A.   I'm still ill.
12   Q.   Okay. What are you suffering from?
13   A.   Posttraumatic stress disorder.
14   Q.   All right. Aside from that, are
15   you suffering from any physical illness today?
16   A.   Yes.
17   Q.   What?
18   A.   It's personal.
19   Q.   Okay. Is whatever you're suffering
20   from in any way going to affect your ability

1

21  to testify --

22     A.  No.

23     Q.  -- answer my questions?

24     A.  No.

1      Q.  Okay.  I'm sorry.  When I'm sitting

2  here looking at someone that's kind of staring

3  off into space, I'm getting a sense that I'm

4  not really in any way connecting here with you

5  and you're kind of off in la-la land.  Am I

6  mistaken?

7      A.  You've said that at every

8  deposition.  Just ask your questions.  You're

9  wasting time.

10     Q.  Ms. Pechner, let me explain

11  something to you, and I want to make this very

12  clear.

13         MR. DILDAY:  Let me say this.  If

14  she looks at the ceiling, it doesn't matter,

15  as long as she answers your questions, Walter.

16         MR. PORR:  Okay.  But I'm getting a

17  sense from the witness that she is not here.

18  I know her body is sitting across the table

19  from me, but the responses are flat, they are

20   monotone, she is staring off into space, her

21   voice is low.

22          I've asked her to bring it up a

23   couple times given the circumstances.  We

24   explained it before the deposition started.  I

 1   reiterated it after the deposition started.  I

 2   sense a vacancy in the stare.  All right?

 3          She's taken four different

 4   medications.  She's complaining about her

 5   posttraumatic stress, and she's got a physical

 6   illness that is personal and she doesn't want

 7   to talk about, which I respect, but I'm trying

 8   to make sure she's okay in terms of being

 9   deposed.

10          And so when I look at a witness

11   under those conditions, I'm concerned that

12   despite the answers I'm getting that maybe,

13   you know, there's an issue here.  So that's

14   what I'm trying to address to make sure that

15   she is okay to go forward today.

16          MR. DILDAY:  Well, she said she's

17   okay.

18          MR. PORR:  Well, that's fine.

19        MR. DILDAY:  One of the issues is
20   that she does not want to be here, but she's
21   ready to go, and, as she said, let's go
22   forward.
23        MR. PORR:  All right.  And that led
24   to the point that I'm the cross-examiner, not
 1   her.  I will ask the questions that I feel are
 2   necessary and appropriate to make sure that we
 3   have an effective deposition session.  So it's
 4   not for her to tell me what questions to ask.
 5        MR. DILDAY:  Don't point your pen
 6   at her, please.  You don't have to do that.
 7        MR. PORR:  Okay.
 8        MR. DILDAY:  Just make your point
 9   and start to ask your questions.
10        MR. PORR:  All right.  I'll do
11   that.
12   Q.   At the conclusion of the last
13   deposition session on June 7th, you were
14   complaining about your PTSD and how it was
15   impacting you.
16        Is your PTSD going to prevent you
17   from testifying this morning?

4

18    A.  No.

19    Q.  Okay. Have you seen any doctors

20  since the last deposition session on June 7th?

21    A.  Yes.

22    Q.  Who did you see and when?

23    A.  Dr. Gingrich, my primary care

24  doctor.

1    Q.  Okay. When did you see him?

2    A.  Last week. I don't know the day.

3    Q.  Did you see him for the condition

4  that's affecting you now?

5    A.  Yes.

6    Q.  Okay. Did you see any other

7  doctors for anything else?

8    A.  No.

9    Q.  Have you visited the On-Site

10  Academy since the last deposition session?

11    A.  No.

2.    <u>Pages 1596 – 1601</u>:

11    Q.  Okay. Referring to paragraph 59 of

12  the complaint, this involved Sergeant Doherty

13  and the sports commentator remarks. We've

14   established previously that that may have been

15   the World Series of '97, maybe the Super Bowl

16   of January of '98.  The date's not entirely

17   certain.

18        Did you have any incidents

19   involving Sergeant Doherty after the sports

20   commentator comment until the time you

21   transferred off the shift sometime between

22   April and July '99?

23        A.   Yes.

24        Q.   What other incidents did you have

 1   with Doherty?

 2        A.   I don't know.

 3        Q.   Ms. James, you understand my

 4   question was geared to the time frame of the

 5   sports commentator comment until April to

 6   July of '99, did you not?

 7        A.   No.

 8        Q.   Okay.  Then I'll reask the

 9   question.  Paragraph 59 of the complaint talks

10   about the sports commentator incident with

11   Sergeant Doherty, correct?

12        A.   Correct.

6

13    Q.   We previously established at prior

14  depositions that it may have been the Super

15  Bowl of January of '98, it may have been the

16  World Series of October of '97, whichever it

17  is, from the time of the sports commentator

18  incident until the time you transferred off

19  the shift sometime between April and July of

20  '99, did you have any other incidents

21  involving Sergeant Doherty?

22    A.   I had an incident. I don't

23  remember what the date was.

24    Q.   And what incident are you referring

1  to?

2    A.   The incident where I spoke before

3  about him asking me to call Pat Cappola into

4  the station for a detail.

5    Q.   Look at page 17 of your notes,

6  please, and the big paragraph in the top half,

7  August 30, 2000, is that the Pat Cappola

8  incident you're talking about with Sergeant

9  Doherty?

10    A.   Yes.

11    Q.   That's August 30, 2000. That's a

12   year beyond the time parameters I gave.

13      A.   Okay.

14      Q.   Are you having a hard time

15   focusing?

16      A.   No.

17      Q.   Okay.  Well, I'm just looking at

18   someone that's giving me a vacant stare.  I

19   asked a very simple question.  I defined the

20   time parameters very clearly and yet you gave

21   me the Pat Cappola answer today just like you

22   gave me back on June 7th, and I spent a good

23   bit of time this morning going over that

24   testimony, so I'm confused as to why you're

1   having a hard time.

2           MR. DILDAY:  She's not having a

3   hard time.  She's answering as best she can.

4           MR. PORR:  As best she can, she

5   just gave me an answer involving Pat Cappola,

6   which is a year beyond the time frame I

7   specified for my question --

8           MR. DILDAY:  I think it's

9   obvious --

10          MR. PORR:  -- and it's the same

11  problem.

12          MR. DILDAY: I think it's obvious

13  that the time frame that you're talking about

14  this incident didn't take place in.

15          MR. PORR: Why did she give it to

16  me as a response to my question?

17          MR. DILDAY: She probably doesn't

18  remember.

19          MR. PORR: Again, we just went over

20  that from the previous deposition session

21  except --

22          MR. DILDAY: Mr. Porr, I think we

23  understand what you're saying. If you have

24  another point to make, you should try it.

 1  Otherwise, she made an answer that doesn't

 2  chronologically relate.

 3          MR. PORR: And my concern is I'm

 4  sitting across the table from someone, and I'm

 5  getting just an absolute flat effect, blank

 6  stare, and I'm just concerned that she's here

 7  physically but mentally she's not. And I'm

 8  making that clear on the record because I

 9  don't want this to come back and bite me

10   somehow later, you know.

11          And when she gives a totally

12   nonresponsive answer like that, after we

13   already went through that she gave me the same

14   nonresponsive answer at the prior deposition

15   session, I'm concerned there's something

16   wrong, and so I'm raising my concern that

17   there's something wrong with the witness so it

18   can be addressed.

19          Because I'm stunned that I'm

20   getting the same nonresponsive answer when I

21   tried so carefully, you know, to make sure

22   that the witness was focused, the question was

23   clear, and I could get -- get, you know, a

24   decent answer.  So if you tell me your witness

1   is fine, I'll continue on.

2          MR. DILDAY:  I understand what

3   you're saying.  I don't know how to respond to

4   you on that issue.  I don't.

5          MR. PORR:  Okay.  You're her

6   attorney, and if you tell me your client is

7   able to continue, we'll continue.

8          MR. DILDAY:  We're going to

    9  continue until she says she can't.

   10        MR. PORR:  All right.

3. <u>Page 1646</u>:

   11   Q.  Are you okay, Ms. Pechner -- or

   12  Ms. James?  Excuse me.

   13   A.  Yes.

4. <u>Pages 1683 – 1684</u>:

   20   Q.  Okay.  You're sitting here with

   21  your head in your hands, your eyes closed,

   22  staring down.  Are you okay?

   23   A.  Yes.

   24   Q.  Are we okay to continue?

    1   A.  Yes.

5. <u>Pages 1693 – 1694 and 1696</u>:

   18        MR. PORR:  We're back on the

   19  record.

   20   Q.  And before we resume, Ms. Pechner,

   21  I notice -- I'm sorry.  Ms. James.  Please

   22  forgive me because I've looked at so many

23  records that have your maiden name versus your

24  married name, that's the name that sticks in

 1  my mind.

 2       Ms. James, I notice that you have

 3  put on your sunglasses, correct?

 4    A.   Correct.

 5    Q.   The last time you did that was at a

 6  deposition session at Mr. Akerson's office,

 7  and you did so because you were having a

 8  migraine at the time. Is that true now?

 9    A.   Yes.

10    Q.   I'll come back to that in a moment.

       [1696]

12    Q.   Now, Ms. James, back to your

13  migraine headache. Is your migraine headache

14  such that you can't continue today, or do you

15  think you can work through it?

16    A.   Work through it.

17    Q.   Okay. Let me know if for any

18  reason you think you cannot. All right?

19    A.   Yup.

12

6.  Pages 1723 – 1725:

10  Q.   Ms. James, you've got your hands in
11  front of your head and you've got your face
12  down, and madam reporter is really straining
13  to hear you, and it makes it difficult for her
14  to take down what you're saying given the
15  posture that you've adopted and your low
16  voice.
17       Can we do something about that?  I
18  mean, at lease out of respect for her, if you
19  could speak up so that she could hear you.
20  A.   Attorney Porr, this isn't a respect
21  thing.  Okay?  I have gone through nine
22  depositions.  Okay?  Nine.  This has nothing
23  to do with respect.  I've never had a problem
24  with Attorney Akerson.  I've answered the
1   questions.  I'm physically and mentally sick.
2   Okay?
3   Q.   Are you physically --
4   A.   I have a migraine.  I have a
5   migraine and it's taken -- this has taken a
6   toll on me.  Okay?
7   Q.   Are you physically and mentally

13

8  sick to the point where you can't continue?

9    A.   I need to finish this case and I

10  will do whatever it is that I have to, to

11  finish the case.  Okay?

12       If I can't speak up because I have

13  a migraine, that's what happens when I have

14  migraines.  Okay?

15       If I can't remember something that

16  you want me to answer in your way, it's

17  because I can't remember it.

18    Q.   Okay.

19    A.   I'm trying to do my best at this

20  deposition under the conditions.  Okay?

21    Q.   What conditions?

22    A.   Under the conditions.

23    Q.   What conditions?

24    A.   That this room here is where I was

1  sworn in as a police officer.  Okay?

2    Q.   Okay.  Would you prefer we move to

3  a different room?

4    A.   You know what?  I just want to get

5  the depositions over with.

6         MR. CAPIZZI:  I've raised this with

14

7  Mr. Dilday about not doing them here because

8  of the allegations made.  He prefers this for

9  his convenience.  That's why we're here.

10  Mr. Akerson's depositions are supposed to be

11  conducted in Worcester.

12        We're doing it here as a

13  convenience to both Mr. Dilday and his

14  clients.  I've had a brief discussion about

15  this in the past.  I just want that known on

16  the record.