**EXHIBIT D**

On September 24, 1995 I was sworn in as a Permanent Full Time Police Officer of the Revere Police Department. I went through a Pre-Screening for the Norwood Police Academy on August 28, 1995 and passed at which point I was sent to the Police Academy for 18 weeks of training. I graduated from the Norwood Police Academy, February of 1996. The city of Revere sent in a total of nine recruits including myself to this academy. A total of seven were female's officers who went through the academy and became full time officers of the Revere Police Department. (Two have since resigned from their positions.) Three out of seven have filed MCAD complaints reporting sexual harassment and hostile working conditions.

The Structure of the Revere Police Department is as follows: Chief of Police Department, Executive Captain, Captain, Lieutenant, Sergeant and Patrol. Several divisions are also within the department, Criminal Investigations Department that includes Major Crimes, Drug Control, Gangs and Domestic Violence Unit. The department works on a three Platoon, three group system. With this system there are several supervisors working at a given time. Each shift "usually" at a given time consists of, The officer in charge of the shift (which would be the highest ranking when possible) a street supervisor again usually ranking officer, sometimes there are several street supervisors at a time. Then the patrol units, which are divided up into, separate sectors in single person cruisers unless working a special unit.

1995: Chief of Police: Chief James Russo (retired now)
Executive Officer: Roy Colannino (retired now) **named in complaint**
    Captain Frederick Roland (retired now) **named in complaint**
    Captain William J. Gannon
    Captain Gerald Chaulk (retired now) **named in complaint**
    Lt. Salvatore Santoro **named in complaint**
    Lt. John Macdonald (retired now)
    Lt. Peter Bernard (retired now)
    Lt. Steven Wallace
    Lt. Terence Reardon (Chief of Police now) **CHIEF OF REVERE POLICE DEPARTMENT**
    Lt. Bernard Foster (retired now) **named in complaint**
    Lt. Michael Mclaughlin
    Lt. Michael Murphy (Captain now)
    Lt. James Guido (Captain now)
    Lt. Dennis Collyer (Captain now)
    Lt. Steven Ford **named in complaint**
    Sgt. Daniel Flynn
    Sgt. Salvatore Falzone (retired now)
    Sgt. Michael Cutillo (retired now)
    Sgt. Carl Borgioli
    Sgt. Thomas Doherty **named in complaint**
    Sgt. Steven Pisano
    Sgt. James Griffin
    Sgt. John Nelson **named in complaint**
    Sgt. Kevin Millerick (now a Lt.)
    Sgt. Peter Papasodora
    Sgt. Carl Ruggiero
    Sgt. John Azzari
    Sgt. Jeremiah Goodwin (now a Lt.) named **in complaint (witness)**
    Sgt. Joseph Cafarelli (now a Lt.) named **in complaint (witness)**
    Sgt. David Callahan (now a Lt.)
    Sgt. James Picardi **named in complain (witness)**
    Sgt. Sean Randall (now a Lt.)
    Sgt. John Goodwin

Sgt. Joseph Meoli
Sgt. Amy O'Hara
Sgt. Glen Malley
Sgt. Jeffery Graff
Sgt. Brian Chatman
Sgt. Theodore Michalski
Sgt. John Burke
Sgt. Jeffery Langone

Ptl. Ronald Thornton
Ptl. Patrick Cappola
Ptl. Mark James (retired)
Ptl. Christopher Giannino
Ptl. Patrick Hartigan
Ptl. Paul Crevioserat
Ptl. Gregory Tammaro
Ptl. John Cafarelli
Ptl. Michael Mason
Ptl. Joseph Rizutti
Ptl. Patricia Carey
Ptl. Michelle Mangino
Ptl. Anthony Macone
Ptl. Leo Macaskill
Ptl. David Pressley
Ptl. Thomas Malone (detective)
Ptl. Brian Goodwin (detective) **named in complaint**
Ptl. Corey Mccormack
Ptl. Kenneth Bruker
Ptl. Charles Callahan
Ptl. John Burns
Ptl. Paul Sobolewski (retired)
Ptl. David Wilson
Ptl. Gerard Salvati
Ptl. Lyn Malatesta witness
Ptl. Kevin Colannino
Ptl. Bernadette Downing (left the job)
Ptl. Lyn Curcio- Macaskill
Ptl. Katherine Fish (left the job and has a complaint with the MCAD)
Ptl. Antonio Arcos (detective)
Ptl. Sonya Fernandez **witness**
Ptl. Paul Lucero
Ptl. Franco Mannara
Ptl. Julieann Malvarosa
Ptl. Maria Lavita
Ptl. Evan Franklin
Ptl. Todd Randall
Ptl. Anthony Goodwin
Ptl. Edward Flood
Ptl. John Galiardi
Ptl. Douglas Zingali
Ptl. John Cannon
Ptl. Michael Dellorusso
Ptl. Martin Diliegro (detective)

My responsibilities of a police officer are to protect life and property, preserve the peace, prevent crime, detect and arrest violators of the law, enforce all laws coming within departmental jurisdiction, supervise public functions (such as parades or dances were the public order requires presence) respond to all public emergencies.

Throughout my career at the Revere Police Department I have gone through several trainings:
03/19/96 Community Policing training (4 hours)
06/07/96 Arrest and Procedures (8 hours)
02/13/97 Computer training (4 hours)
02/28/97 Search and Seizure Course (8 hours)
03/21/97 Firearms Law Course
06/12/97 C.P.S Domestic Violence Course (12 hours)
06/20/97 Domestic Violence Training
10/09/97 Firearms training nights (8hours)
10/20/97 Domestic Violence training that I taught through the AG's office
03/05/98 DEA course (40 hours)

I have an associate degree in Criminal Justice from North Shore Community College and also am halfway through my Bachelors Degree through Western New England College. I have done volunteer work for the Massachusetts Criminal Justice Training Council during the Applied Patrol Procedures segment of the recruits that were in training. I have received several letters of commendation throughout my career with the Revere Police Department. (01/18/87, 04/24/97,05/25/2000, 01/03/2001,10/29/2001) I also received an Official Citation on June 14, 2002 from the Massachusetts State Senate for saving females life after a near drowning, while off duty.

In February of 1996, I was assigned to the day shift under the direct supervision of Lt. Bernard Foster. The shift was Platoon 3,Group Two, which consisted of four days on, from 8am-4pm and two days off. This shift also consisted of several other superior officers, Lt. Steven Ford, Lt. Michael Mclaughlin, Sgt. Kevin Millerick, Sgt. Sean Randall.

On June 27, 1996, injured myself while chasing after a suspect. Went to the Whidden Memorial for treatment for an injury to my right knee. I was given Vicodin for the pain.

On July 14, 1996, I was involved in a motor vehicle accident in the cruiser while responding to a call. This accident was the fault of the other driver hitting my car while my sirens lights were on. My vehicle was struck very hard which left me with injuries to my neck and back. I responded to the Whidden Memorial Hospital for treatment and given x-rays. I was discharged from the hospital and give medication for the muscle pain. I was prescribed Flexural and Tylenol #3 and Ibuprofen. I was advised to seek further treatment from the emergency room Dr. Krause. I followed up treatment with Dr. Nastasia on July 18, 1996 and than with Dr. Hollander in November of 1996.

*mentioned in poles* 4

On August 21, 1996 newspaper article that was cut out and photo copied on white paper and was hung up in the Shirley Avenue Police Substation. The picture consisted of a picture of my son and Officer Mark James. (My now husband). On the picture it contained several captions which stated "NO I AM NOT YOUR DADDY!"      That was coming from Mark James mouth. A caption from my son states "YOUR NOT?" "THAN WHO IS?" This incident was reported to Captain Roland and Captain Chaulk. I was made aware that it was Officer John Burns that did this. I was very upset about this incident and confronted the officer involved. Officer Burns did apologize to me regarding the incident.

In January of 1997, I received a letter of Favorable Communication. I received this letter because of an arrest that I had made for a stolen MV. Lt. Santoro specifically ordered all sector cars to remain within their assigned area. I was working a shift swap for another officer and apparently there were some problems with the shift leaving their assigned area and I followed his direct order. Lt. Salvatore Santoro stated in his letter the following "It brings me great pleasure as a shift commander to see a young officer, while working a shift swap, have the ability to follow the orders of their superiors. The officer's actions bring credit to her shift commander, her fellow officers, and the department as a whole. It is hoped that her actions on the evening of 01/18/97 will inspire other officers to follow the commands of their superiors. If the officer had not followed the directions of her superiors the arrest would not have been possible. Let her actions and her discipline be an example for the entire department."

On February 23, 1997, Officer Michelle Mangino told several female officers including myself that she had problems with Chief James Russo and Captain Roy Colannino making sexist remarks and comments at citizens' police academy meeting while introducing her. Michelle took note of it and female citizens were shocked, as was she. They had stated "WHEN THE DEPARTMENT HAD ALL MEN.... THAT OF COURSE WAS BACK TO THE GOOD OLD DAYS...."

On February 26, 1997, I received an email confirmation from Captain Gerald Chaulk which stated the following: sub: MOUNTAIN BIKE PATROL
We intend to utilize the bikes again this year. The assignment has changed. There will be 3 officers days 4&2 (1Bike for each side) 6 officers PM'S 4&2 (2 bikes for each side) because YOU either volunteered, worked, or have been trained for this assignment; I am giving you first preference. We need to know right away if you accept and which shift. My reply:
ROGER CAPTAIN I WILL TAKE THE PM SHIFT.      *Skipped over on bike unit*

ON March 5, 1997, email from Captain Gerald Chaulk sub: BIKE PATROL
To all officers interested in the patrol, it has been decided that on the day shift, one officer will ride alone for each side east and west. On the P.M. shift there will be at least 2 officers per side east, west. Therefore for officer safety and visibility 2 may ride together. MY REPLY: Roger Captain very good.
I was told that I would be first pick for the unit but my name was never submitted or just completely forgotten about regarding this unit. I went and spoke with Captain Roy Colannino and he told me "I never got anything stating you wanted the bike unit" I explained the situation to him and the emails that I received and sent to Captain Chaulk for the assignment and Colannino said okay well just put it in writing and if a spot opens we will consider you just like all the other special assignments.

On April 4, 1997 I emailed Captain Roy Colannino and stated the following: Captain I am submitting this e-mail along with a letter indicating that I submitted my name for consideration for the bike control unit. It was my understanding I was not on that list that you received and would like for you to keep my name on that list for any further openings that may come along...thank you...

I also requested to go to Rape School on several occasions as well as the DARE program. Captain Colannino told me to get the information for the schools and that I did only for him to give the schools to others that were lower in seniority and also male officers.

Page 5

April 4, 1997, I received a Commendation from Chief James Russo.

On June 8, 1997, I was transferred to the Criminal Investigation Division for a temporary assignment. I worked under the direct supervision of Lt. Steven Wallace and Sgt. Borgioli. While in the unit I handled all the major crimes and followed up on reports from the patrol division under Sgt. Borgioli's supervision.

On June 29, 1997 I was invited to Officer Bernadette Foster (Downing) wedding shower which I attended at the Weyluis Chinese Restaurant, in Saugus, Ma. I attended this function with Officer Lyn Curcio. I also received an invitation to the wedding a short time latter. Officer Bernadette Downing is the daughter of Lt. Bernard Foster.

On August 9, 1997 I returned to the day shift with Lt. Bernard Foster being my direct supervisor. Several people made me aware that Lt. Bernard Foster was out to get me to watch my back. I was unsure as to why and what I had done wrong. Lt. Foster and myself had always had a great working relationship with one another in fact he trained me in traffic investigations and always seemed to look out for my best interest on the job.

*OFFICER FISH INFORMED me of this*

On August 24, 1997, Lt Bernard Foster called me into the booking area of the Revere Police Station and shut the door. Foster began screaming at me stating "I have done a lot for you and you turn around and stab me in my back, I am putting you on a walking route until further notice. I don't want to see your face inside this station and you are not to go into the sub-station while on the route. Do not bother to speak to me and you can disregard the invitation to my daughters wedding (Officer Bernadette Foster-Downing)." I then asked Lt. Foster what I had done that was so wrong? Lt. Foster than stated "I have nothing else to say go to your assignment and make sure you are there because I will be checking."

On August 26, 1997, I went into work on this day and was so upset that I could not function so I left the shift early and went home.

On August 27, 1997, I was assigned the walking route on Shirley Avenue with 3 officers Jr. The department does not have a policy except that any supervisor has the right of assignment. In past practice assignments of sectors were given to senior people. This being that Lt. Foster gave me this as a punishment. On this day once again I was being followed by Lt. Bernard Foster and left my tour of duty early and used a half of vacation day.

On August 30, 1997, I worked a swap with Officer Malley for the PM and he worked my day shift. I began to do shift swaps with officers from other shifts to be away from Lt. Foster because of the way he was acting towards this officer. I went into speak with Captain Roy Colannino regarding my working conditions. I told the Captain the story and stated that I want this resolved because I can not work the shift with Lt. Foster under these conditions. I told Captain Colannino that I was not sleeping and was very upset about this situation. Everyone in the department new what was going on and it was the running joke for a while. I also requested to know just what it was that I did to Lt. Foster that made him so angry. I asked if the three of us could meet to resolve this issue quickly. Captain Colannino reassured me that this would be handled properly.

On August 31, 1997, I called into work sick again, for lack of sleep and stress.

On September 1, 1997, I did a shift swap with Officer Macaskill and worked the PM shift and he worked my day shift.

On September 2, 1997, I worked the walking route. Lt. Foster and Lt. Ford called me into the guardroom of the Revere Police station. Lt. Foster stated to me the following: Who do you think you are jumping the

chain of command and going to Captain Colannino.  Listen here you are nothing but a time bomb waiting to blow up just like that Brian Chatman (who is also a police officer). Lt. Foster also stated that I was very unprofessional and Lt. Ford jumped in stating "yes and I can't stand your voice on the radio either!"  Lt. Foster than stated "I have pictures of you on a recent vacation of you smoking marijuana."    I never smoked marijuana and I was very insulted by this comment. Both Lt. Bernard Foster and Lt. Steven Ford make several humiliating remarks to me regarding how unprofessional that I am.

On September 5, 1997, I worked a sector car.

On September 6, 1997 I did a swap and worked the PM shift for Officer Malone and he worked my day shift.

On September 8, 1997, I took a day due.

On September 10,1997 I worked the PM shift for Officer Malone.

On September 11, 1997 I had a death in the family and was off for three days.

On September 14, 1997 I worked a swap and worked again the PM shift for Officer Colannino and he worked my day shift.

On September 17, 1997 I was again assigned the walking route this time with 5 patrol officers Jr. to me. Everyone in the station knew that this was a punishment by Lt. Foster and just gossiped about it.  I was very humiliated by this especially every time I had to watch Lt. Foster drive by and make sure I was walking back and forth strictly on Shirley Avenue.   At one point I was yelled at by Lt. Foster to get my hat on my head that I should not be carrying it in my hand.

On September 18, 1997 I worked a swap on the PM shift for Officer Macone and he worked my day shift.

On September 19, 1997 I was assigned the walking route again Shirley Avenue and once again followed by Lt. Foster.  I had occasion to speak with Sgt. Millerick who was also one of the supervisors on the shift. I asked him what was Lt. Foster's problem and he stated "I am not sure but he is angry with you."

September 20, 1997, I worked the 101 cruiser.

September 23, 1997, I called into work sick.

September 24, 1997, I worked the walking route on Shirley Avenue

September 23, 1997, I called into work sick.

September 24, 1997, I worked the walking route on Shirley Avenue.

September 25, 1997, I worked the PM shift for officer Macone and he worked my day shift.

September 26, 1997, I worked the 101 cruiser.

September 29, 1997, I worked the walking route on Shirley Avenue
September 29, 1997. Went to neurology doctor for my headaches because of MV accident in March of 96. Dr. Hollander made notes in my file that I was under increased stress at work.

September 30, 1997, I worked the walking route on Shirley Avenue

This continued until I went into the chief's office.  I spoke with Chief James Russo regarding everything

that was going on. I informed him that I could not eat, sleep and that I was being intimidated insulted and ridiculed by Lt. Bernard Foster. I told him that I could no longer work the shift. I used all my sick time and was doing shift swaps on a regular basis to get away from Lt. Foster. It was common knowledge within the police station as to what Lt. Foster was doing to me.

On October 12, 1997, I was transferred to Platoon 1, Group Two which is a split shift. (Also name by superior officers as **the terror shift**) The shift consisted of Two AM's and Two PM's under the direct supervision of Lt. Salvatore Santoro. There were several supervisors on this shift as well: Lt. Peter Bernard, Sgt. Jeremiah Goodwin, Sgt. Thomas Doherty, Sgt. Joseph Cafarelli, and Sgt. Carl Ruggiero.

October 20, 1997, I participated as a presenter in the Annual Police Training Conference, Domestic Violence: The Continuing Challenge for Law Enforcement. I received a certificate and also a written letter from Attorney General Scott Harshbarger thanking me for my assistance with the program.

In October 1997, I was assigned inside the station to work as the dispatcher. Sgt. Thomas Doherty was in charge of the shift. I had just returned back from a dinner break, Officer Lyn Malatesta had just covered my assignment on the radio. Several officers were standing around watching the World Series on television. Officer Patrick Cappola and call taker Robert Scott along with Duty supervisor Sgt. Thomas Doherty. Sgt. Doherty began to make several comments about their being a female as a commentator for the World Series. He went on in a tirade about females stating "that's a disgrace that they have a broad doing the game, she is no fucking good and women should not be allowed to comment on sports events and that this bitch probably gave sex or a blow job to someone for this job. What does she know about baseball, I'd like to see her try to play the game? I bet ya she's never even played, listen to her, they shouldn't have a broad doing this I can't even enjoy the game now." Sgt. Doherty than walked out of the room. When he left we all just shook our heads in disbelief because of his comments. On several occasions I spoke with Sgt. Jeremiah Goodwin regarding Sgt. Doherty and several other officers made complaints as well. Sgt. Jeremiah Goodwin stated "He knows that Sgt. Doherty doesn't like the females and shouldn't be a police officer in such a position because he is not fair to everyone. He stated that Doherty picks on the females just to make us look incompetent." Sgt. Doherty on several occasions has yelled at me for using fowl language and told me that he punishes his "girls/daughters" for swearing and it is not appropriate female behavior. I went as far as not to use any fowl language but I listened to Sgt. Doherty and other male officers use this language all the time. I would say out loud when a male officer would use this language that I did not like their behavior and Sgt. Doherty would never say anything to males only to the females. I am well aware of several incidents that have happened with other female officers as well. Officer Lyn Curcio and Officer Lyn Malatesta have had several problems with him as well. Sgt. Doherty has double standards when dealing with female officers. He is embarrassing and screams and makes comments about out abilities and our conduct on the job. He constantly berates and threatens that if and when any females including myself use fowl language he states" Young Lady you will not use that kind of language in front of me and if you do again I am sending you home. He did this to me on several occasions while male officers were carrying on with this language.

March 14, 1998, My cruiser was struck by another vehicle. I was injured when the other vehicle backed into my cruiser while it was stopped. I injured my rib, neck and back. I went to the Whidden Memorial Hospital for x-rays. I was treated by Dr. Saper. I had a tear in the ligaments and a severe sprain. I was given Ibuprofen and Percocet for the pain. I submitted a public safety injury report so that I would receive 111f benefits while out injured. On March 13, 1998 I went to my primary care physician for more treatment because of my back and rib injuries. I was referred to physical therapy and had a follow up appointment with Dr. Bret Taylor from the orthopedic outpatient unit at the MGH Boston. This doctor put me out of work until April 30, 1998.



In June 1998, while working on the split shift was called to the station by Lt. Santoro. When I arrived Lt. Santoro and Sgt. Jeremiah Goodwin were in the supervisors vehicle. They advised me to get into the car with them and we went for a ride. They advised me that Captain Gerald Chaulk and Captain Roy Colannino seem to think that there is something more than a professional relationship going on between the three of us. Sgt. Jeremiah Goodwin stated that he was serious and that Roy Colannino had even called him to his residence to speak to him about this matter. I was very appalled by this whole conversation. Goodwin also stated to me that if this did not stop that they would move me to another shift. Lt. Santoro stated "Captain Chaulk is the one who stated this whole rumor now just because he is in charge of the night shift." Both officers told me not to worry about this they would handle this situation. I was very upset and ashamed that I was being looked at like a piece of meat because I had a good working relationship with my supervisors. I decided not to do anything regarding this because who was I suppose to report this to if it was my senior Captain Roy Colannino and also he was playing the role of Acting Police Chief for the department while James Russo was out using his sick time before he was to take his retirement.

July 21, 1998 went to see doctor regarding stomach problems due to stress.

On August 6, 1998, I went to see Dr. Pietro Andres, M.D. from the G.I. clinic for ongoing stomach problems. I was sent in to have a flexible sigmoidoscopy done because of the pain and severity of bowel habits. The results came back that I had Irritable Bowel Syndrome

On November 19, 1998, An incident happened during the AM hours with another patrol officer, which I have never reported to the department. Several female officers were advised of the situation. On that evening I confronted the officer and nothing else was made of the incident, to my knowledge.

On the weekend of December 12, 1998, I worked 4pm-12pm on that evening doing a swap with Officer Anthony Cesso (now a state police trooper) and following that shift I worked 12AM to 8AM on December 13 and returned again on the PM to work a 4PM to 12PM shift. During this weekend I had responded to a call of a fight at Rays' Sunoco at Broadway Circle in Revere. Units had already responded to the scene as well as myself. When I arrived Officers had two parties under arrest for warrants (John Barker and Christopher Daley) both parties were know to this officer. They were taken to the station and booked. Latter on during the AM hours Lt. Santoro called me to the station from my sector which I was working a cruiser at the time. Lt. Santoro stated "Go take care of your friend Barker he was asking for you." I went down to the cell block and took John Barker into the booking area where I let him make a phone call and gave him something to drink. During the brief conversation with prisoner John Barker he made statements to me that the Lt. (Santoro) had questioned him as to how he knew me. I asked Barker what he said to him. Barker stated that he had grown up with me in Lynn and we dated during high school. Barker also stated that the Lt. (Santoro) said "man to man was she a good fuck?" Barker told me he was taken back by the question and did not respond and just tried to ignore him. Barker stated that Lt. Santoro just kept drilling him and began questioning him about Luis Ortiz (Luis Ortiz is my sons father). Barker told me he responded with "I don't even know him" John Barker has been friends with Luis Ortiz for about fifteen years but refused to get into the conversation with this LT. Barker than stated "well the Lt. told me you had a baby by him." I was outraged by this conversation. Barker was put back into the cell and I immediately went upstairs to the radio room where Lt. Santoro was assigned as the duty supervisor of the shift. Several officers were in the radio room at the time including Officer Todd Randall. I began by stating to Lt. Santoro "who do you think you are asking a prisoner if I was a good fuck? What is it any of your business what my relationship was with this person. I can not believe you would humiliate me like this in front of the whole cellblock." Let it be know that Prisoner Christopher Daley overheard this whole conversation between Barker and Lt. Santoro. Lt. Santoro's response to that was "Oh, you are going to believe some scumbag prisoner over me, come on I would never ask something like that." I wished that I could have believed Lt. Santoro but knowing his comments on a regular basis about his sexual life and about his penis comments, I was insulted and humiliated. I came home from the

shift I could not sleep, had major anxiety that I could not control and called in sick for my next shift on the 15 of December.

On December 29, 1998, I noticed that my name was whited out in the vacation book and John Burns name was written in. I signed the vacation book in March of this year when it had first come out under the first in the book who was Lt. Santoro. In order to receive a vacation day a supervisor has to sign off on it. My name was on the second line with the signature of Lt. Santoro. On that evening when I was just about to go out because of plans I had made well in advance I received a phone call from the station questioning where I was? I was very upset and made it clear to the supervisor that my name was in that book. I went into the station on New Years Eve just to find that my name had been crossed out with white out and Officer John Burns name was over mine. My feeling regarding this is that it was probably Paul Crevioserat who was the last person to enter his name in the book and only four officers could take that evening off. It was never proven but he has had many problems with females being on this job. This was reported to superior officers for further investigations.

On several occasions female officer's names were removed from either the vacation book or the detail book. This not only happened to myself but to others.

On January 7, 1999, Captains Roland and Captain Chaulk attended a meeting request by all of the female officers employed by the Revere Police Department. The subject of the meeting was sexual harassment, working conditions and the department maternity policy, which we still don't have to date (1/10/2003). The meeting was held at the beachmont substation at 4:00pm 16:00 on Thursday January 7, 1999. Present at the meeting were as follows:

> Captain Frederick Roland
> Captain Gerald Chaulk
> Officer Charles Callahan (union Rep)
> Officer Patricia Carey
> Officer Julie Malvarosa
> Officer Lyn Curcio (Macaskill)
> Officer Terri Pechner (James)
> Officer Cathy Lavita (Fish)
> Officer Lyn Malatesta
> Officer Michelle Mangino
> Officer Bernadette Foster (Downing)
> Officer Sonya Fernandez
> Officer Amy O'Hara
> Officer Maria Lavita

At the start of the meeting the females informed the captains that we had previous meetings at our residences to speak about the many issues of ongoing harassment on the job. The meetings were at a point that it was out of our control and that we had to inform the superior officers of just what was going on. Both captains were aware already of the many incidents but never did anything to stop until we all got together and still did nothing to stop this behavior but instead made some remarks themselves.

On at least two occasions I was called by Chief Russo to meet and have lunch with him. He would take turn calling the females for either a ride along or lunch. I was called to the station to pick the Chief James Russo up and we went to lunch at DELI on Washington Street in Revere. The chief never asked any males to join him in this practice. All the females felt intimated by this and requested that this practice stop.

On many occasions while working inside the police station on radio duty I would along with other female officers (Curcio, Malatesta) would listen to Lt. Santoro make sexually oriented remarks on a regular basis.

Santoro spoke about his penis and how big and long it was. On many occasions I told him that I did not want to hear about his penis and that I did not really care how big it was. On several occasions Sgt. Doherty humiliated me and nothing was ever said to my knowledge. When I reported incidents of harassment to Lt. Santoro about other officers it was a game. Lt. Santoro made this an object of ridicule. Santoro would go directly to the officer we complained about and the situation again was a laughing matter on many occasions and the person that felt the heat was the officer that complained.

Another question from all of the female officers was "when are we going to have a Maternity Policy?" Officer Bernadette Downing was pregnant and we were all very concerned for her health and safety while working inside at the Revere Police Station. The police station has been condemned on several occasions and the air quality in there is not safe especially for someone carrying an unborn child. Officer Downing was given special duty do to the fact that she was Lt. Bernard Foster's daughter. It was well know among the whole police department that at times he would not even come into work but rather stay at her parents home for the day in Revere. When this was finally addressed that she could no longer stay at her residence she was assigned to the Revere High School where she never really bothered to show up either. Several complaints were made and she was made to work inside at the police station. However her second pregnancy went well for her as well while on the job because her DAD Lt. Bernard Foster worked as the supervisor of her shift and she was aloud every day to leave early because she had to commute to Framingham everyday. This was okay for his daughter to do but the day that I left 15 minutes early because I was sick I was written up. Lt. Foster also has double standards when it comes to his daughter.

On January 8, 1999, While responding to a call at 5:30am I fell over several tires that were in the garage and my fingernail came out of the bed. Officer Curcio took this officer to the Whidden Memorial Hospital was I received treatment. I was out of work injured for two weeks.

On January 26, 1999, Superior Officers had a meeting regarding the complaints among the female officers.

On January 30, 1999 at 12:30 am while leaving my shift Sgt. John Nelson called me a RAT. He did not give me any explanation as to why he called me it he just walked away from me. I am assuming it was because of the meeting with the superior officers and he was named in one of the complaints.

In February during a PM roll call Captain Fredrick Roland addressed the shift by stating that any rumors of people being followed on this job is untrue. Detective Amy O'Hara is enraged by this comment at role call and storms out of role call. I have never heard a rumor addressed at roll call, and now everyone believes that this is someone true because it came from a captain. The supervisors that had attended the meeting with the captains were so enraged that they were spoken to they began to run there mouths telling the male officers that we were having them followed.

On February 7, 1999, While working the AM shift Officer Lyn Curcio and myself had an early breakfast at the IHOP restaurant. We entered the restaurant at approximately 5:00am there was not a sole in sight. The restaurant was very quite as well as the radio that morning. The two of us spend about 30 minutes inside eating and when we returned to our cruisers, both of our cruisers had all four tires slashed. I was operating the spare car and had all my belongings in the cruiser (i.e., flashlight, cellular phone, and brief case.) The door to the cruiser was unlocked and nothing was taken out of the cruiser. We called the station and advised Sgt. Jeremiah Goodwin. When both officers returned to the station we met with Goodwin and informed him that this is not a normal person from the street that would have done this to two police cruisers. We advised him that we believe this is direct retaliation from the complaints that females made just several weeks prior. He stated "no, no I don't think anyone would do something like that." Goodwin was also very upset with the females because of the complaints. The following day we were called in and ridiculed by Captain Colannino for the incident. Officers Todd Randall and Officer Ronald Thornton both had their cruiser vandalized while at the August Moon Restaurant and an issue was

not made like it was to us. Both Officer Curcio and myself decided that the conditions on the night shift were really not safe for us. Myself especially I noticed that the male officers became very cold and made some humiliating statements.

On February 9, 1999, Female Patrol Officers decided to have another meeting. This meeting was held at my residence. The topic of the discussion was the repercussions of mentioning the harassment to the superior officers Chaulk and Roland. It was decided to consult with various attorneys and attempt to contact MCAD for advice and to file a claim. Ptl Patricia Carey contends that she would also make the teamsters #25 aware of our intentions as well. Ptl Patricia Carey to my knowledge has never had any problems on the job due to the fact she has been assigned with a male partner for most of her career at the department. Ptl Patricia Carey had made it very clear on several occasions to other officer within the department including Officer Lyn Malatesta that she does not believe that anything has ever happened to me therefore her being in the union and her partner Charles Callahan never did a thing to help this officer when I needed it but instead lied and said I never asked for the help.

On March 22, 1999, Revere Police Memorandum was put out ordering the entire department (including civilians and police personnel) to attend mandatory "sensitivity training". Ralph Vaccari of Vaccari & Associates, inc taught this training. He is a certified instructor for the Massachusetts Criminal Justice Training Council.

→ APRIL 1, 1999 Sexual Harassment Policy Put into affect.

On April 4, 1999, Officer Franco Mannara refers to Officer Lyn Malatesta as "Patrolwoman Malatesta" It made me very upset by the tone of Mannara's voice and that he did this over the radio. This remark sounded so "gender biased" that I contacted Sgt. Goodwin. The response that I received from Goodwin was that, "Officer Mannara is a "GRECO-ROMAN" type PATRIARCH. Officer Malatesta did not file a complaint against Mannara. I am fully aware that for some it may take a little longer to become politically correct but there is a difference between being politically correct and just plan ignorance. Latter during the same evening while working inside with Officer Franco Mannara he stated to me "WILL IT OFFEND YOU IF I WATCH THE HOWARD STERN SHOW?" I replied "Listen it is your tone of voice that is so humiliating that is what is bothering me. Mannara continued and put the program on. Sgt. Doherty was in the room and heard what was going on but just ignores things like that. Several minutes latter Officers Kevin Colannino and Paul Lucero walked into the radio room. Officer Paul began making motions behind my back regarding the show. Also the same evening Dante Spadoni who dated Officer Lyn Malatesta came to the station to see her. Spadoni's was speaking to Officer Mannara about Paul Hamel who just happened to be Officer Mannara's cousin. Officer Mannara asked me how I knew Hamel and I told him from seeing him at Cellular Depot (Dante Spadoni's business). Officer Mannara again asked "NO TERRI, HOW DO YOU KNOW PAUL?" I took this as an innuendo along with everyone else that was there in the room. I was very upset with all the incidents that happened and left the room went up stairs to the detective office and lost control, I was crying and very upset Sgt. Doherty came up stairs and asked what was wrong with me. I left that evening an took two hours time that I had because I could not take the innuendos no longer.

I finally decided that the while working this split shift that it was getting to be too much with the sexist remarks, insults and being humiliated in front of other officers and the public had to stop. I felt that when I needed back up I had to listen to the male officers complain about us needing back up. When we did not call for back up and there was a serious call, the call never went to the female that was in the sector but to a male officer because several of the males on the shift did not believe we could handle the calls. Officer Curcio and myself put in for the day shift and were transferred shortly there after.
I was given the mountain bike patrol, which I worked under the direct supervision of Lt. Steven Ford.

On July 5, 1999, Just after moving from the evening shift Lt. Bernard Foster was in charge of the shift. Lt. Foster called me into the OIC'S office and spoke to me just after he had done roll call. Lt. Foster asked me if I had any problem with being assigned inside to the radio room. I replied "no not at all it does not matter to me where I work I get paid either way." Lt. Bernard Foster than came into the radio

room and humiliated me in front of everyone in the room. I was sitting in the corner of the radio room where the general public could not see me and I had my feet up in the corner (Like everyone else in the place does) also make note on the AM shift supervisors sleep on cots behind the petition in the radio room. The television was turned on when I entered the room for my tour of duty. I never shut the television off because that is not part of my job and I did not turn it on. The officers from the AM shift had it on before I came in. Lt Bernard Foster started screaming at me and insulting me. He stated "Why don't you get your feet down from the desk, shut the television off and act like a professional." I looked at Officer Lyn Curcio with disbelief. I could not believe the way he just spoke to me.

On August 4, 1999, I returned to the station at 3:30 pm and at that time I put my brief case into my personnel vehicle and went into the station to the traffic department where I began to enter my citations for the day. I began to feel very faint and told Francis Casoli. Francis Casoli told me to go over to the nurse's office next door and have her take your blood pressure. I informed the supervisors who were all hanging around the OIC'S office that I wasn't feeling well and was going across the street to see nurse (Peggy Ressca). Peggy Ressca took my blood pressure and did a physical exam and I returned to the station. This was about 15 minutes before my shift was to end. Most of the supervisors were gone for the day shift. There were three officers (Officers Curcio, Lavita and Officer Sobolewski) in the dispatch area who I informed that I was leaving I did not feel very well. They stated that they would cover for me if a call came in. As I was leaving the station Officer Lyn Malatesta informed me latter that afternoon that when Lt. Bernard Foster seen me drive away a couple of minutes early he had flames coming from him. Lt. Foster stated "was that Pechner that just left?" Captain Roland who was in the rear of the station called me on the radio to speak with me. I had just pulled away from the rear of the station and turned around to speak with him. Several officers from the shift were standing in the rear of the station because it was shift change and officers tend to gather there before leaving or arriving to there shifts. Lt. Bernard Foster walked over to my vehicle and stated "did I give you permission to leave your shift early? "Did Sgt. Millerick give you permission to leave your shift?" Well than park that vehicle and return to your sector now! Everyone from the shift saw this occur and I was very humiliated. I pulled my vehicle over and watched while several of the other officers left the shift and not a word was said to anyone of them. Lt. Bernard Foster wanted me to return to my sector 10 minutes before my shift was to end it would have taken me 10 minutes to get back to my sector. After Lt. Bernard Foster walked away I looked at Captain Roland and told him "see he is still harassing me".

On August 5, 1999, I came into work and was assigned to the station in the control room. Sgt. Millerick told me that Lt. Foster wanted you assigned inside because you left early yesterday. I got so upset that I felt very dizzy and went into the bathroom and got sick to my stomach throwing up. Sgt. Kevin Millerick approached me and told me to go home. He had realized that I was visibly upset and that I just could not deal with the stress. I informed Millerick to put me in for the sick time and left.

On August 7, 1999, I was again assigned inside for my tour of duty.
On August 10, 1999, 8:00 A.M. I was assigned to work inside again for my tour of duty. While working inside the station I was approached by several officers (Lyn Malatesta, Brian Chatman, John Macrae). They informed me that Lt. Bernard Foster stated the following "Pechner is going to be assigned inside until further notice because she left early and that only certain people when assigned inside are going to be aloud to operate the radio." This is because Lt. Bernard Foster did not want to hear my voice. At this time I was again upset and very sick to my stomach.

On August 10, 1999 at 10:45 A.M. I was called to the chief's office. Acting Chief Roy Colannino and Captain William Gannon called me into the office. I contacted Officer Amy O'Hara to go into this meeting with me because I was tied of being intimated by these officers and not having anyone present to witness these conversations. Chief Colannino stated to me that Lt.Bernard Foster had written me up for violation of the department rules and regulations. I was already made aware by several officers that Lt. Bernard Foster was looking for a way to get back at me for transferring off his shift in 1997.
The chief told me the reason for being written up was one because I had left my shift 30 minutes early and the second because I was watching the television in the control room. The chief also stated Lt. Bernard

Foster thinks that your behavior is negative. I was very upset in the chiefs office after he advised me why I was in his office and written up by Foster. On several occasions before this I had reported the problems to Acting Chief Roy Colannino that I had with Foster. Officer Amy O'Hara questioned the chief as to why this did not go through the chain of command. Officer O'Hara was also upset that a matter like this was so foolish that it should have been on the Chiefs desk. I informed the chief why I had left early and told him there were records that I was at the city nurses office and I apologized for leaving a couple of minutes early. The chief is aware that people leave the shift early all the time (officers going to and from details are often late or leave the shift early). I explained to the chief that I wanted a copy of this report because I felt Lt. Bernard Foster once again singled me out and this was just a pattern of continued harassment. The chief stated that he would have to think about it. I informed the chief that I was tied of this harassment and that I was considering going to MCAD. I asked the chief why is was okay for Lt. Fosters daughter to leave the shift early (some times 2 hours early) so that she can drive home to Framingham everyday and nothing is said to her. This happened on a regular occasion everyone on the shift including superior officers aloud this to happen because she was "Lt Foster's daughter. The chief told me that I would be assigned inside the station until Lt. Bernard Foster tells me different.

See an incident happened with Lt. Bernard's daughter Officer Downing on March 31, 1997 where acting Chief Roy Colannino approached Downing and grabbed her thigh and stated "yeah, I guess you can handle driving the bicycle." Officer Malatesta was involved and took several notes regarding this incident and will testify to this fact that at some point there was a complaint made by Lt. Bernard Foster and his daughter Officer Bernadette Downing. My understanding was that a day due was given to her regarding this incident. The chief at the time Chief James Russo and acting chief Roy Colannino wanted to keep this hush hush. This is why on several occasions when I reported the harassment to Acting Chief and at the time Captain Roy Colannino nothing was ever done to stop Lt. Bernard Foster from this.
I am sure that the majority of the department knows about this situation and understands why Lt. Bernard Foster gets away with harassing not only me but also several other people within the department. Three other officers have filed MCAD complaints against Lt. Bernard Foster.

On August 10, 1999 at 1:00pm I was again called out of the radio room. Lt. Bernard Foster and Sgt. Kevin Millerick called me into the OIC'S office and told me to shut the door. At this time I stated "I want a union rep with me because this ridicules. I called on the radio for Officer Amy O'Hara so that I would not be by myself. I have learned over time that Lt. Bernard Foster likes to humiliate me and intimate me so I finally decided that I would not do this alone. Lt. Foster started by saying "already Pechner you are running around telling people that I wrote you up for leaving a couple of minutes early." I interrupted him and stated "NO several people have came to me telling me how you are punishing me." Lt. Foster than stated "You left 30 minutes early because I seen you put your bag into your vehicle at 3:30 P.M." I then stated "you and the other supervisors were sitting in this very room when I informed you that I wasn't feeling well and was going to the nurses office." I stated to him, "yes I was wrong I left and it was less than 15 minutes early and should have just said I was leaving. I also told him I informed Officer Curcio that I was leaving so she would not dispatch me to a call. I also stated to him "In regards to my negative behavior, I don't know what you are talking about, I thought we took care of that when you called me in and asked if I had a problem working inside. I never had a problem working inside and he knew that I was not the one that turned the television on. Lt. Bernard Foster than stated "well I will let you know how long you will have to work inside. Also he stated, "there are have been other officers that have come to me and said they did not want to work inside with you." I then stated well, the feeling is mutual and that I never felt the need to report this to a superior officer I just lived with it. I had one incident with Officer Anthony Macone where he was just rude and interrupted a conversation that I was having and I had words with him. This incident was supposed to be resolved and I had spoken through the chain of command to Sgt. Kevin Millerick. It was not me with the problem, Officer Macone just could not handle the fact I said some thing back to him when he interrupted a conversation that Officers Sonya Fernandez, Officer Harold Defratis and myself were having. When a female sticks up for herself it becomes a problem with some of the male officers. I also asked him why the television was such an issue when the department supplies it and that it is okay when certain officers are aloud to watch it. Lt. Bernard Foster replied "that is going to be taken care of."

On August 10, 1999, at 3:00P.M. Lt Bernard Foster came into the radio room in the presence of Officer Lyn Curcio and myself and stated "you will go back to regular duty tomorrow and left the room." Gee, I find this interesting that after going through several meetings in one day and being told by the Chief and by Lt. Bernard Foster I was inside until further notice that this changed after I told them I would go to MCAD to file a complaint.

On August 12, 1999, While standing in the rear of the station with several officers before shift change I made notice to Officer John Goodwin that gee there goes Officer Anthony Macone 15 minutes early from the shift and nothing was said to him.

On August 13, 1999, I was assigned to the station again along with Officer Lyn Curcio. Lt. Steven Ford was in charge of the station that day. I observed officer Lyn Curcio turn the television on. I than told Officer Curcio that I was written up for the television so could you please turn it off. Lt. Steven Ford stated "it is okay because I told her she could have it on. I then asked Lt. Steven Ford to speak with him alone. I explained to him that I did not feel very comfortable with it on because Lt. Bernard Foster had written me up for it. Ford stated "I am in charge and if I say it is okay than it is." That was the end to his conversation. I than proceeded to the chief's office. It was 12:15 P.M. I asked the chief if it was okay to speak with him and he stated "yes go ahead." I explained the situation to the chief and he stated, "It is up to Lt. Ford if he wants to watch the television." I told the chief that this was not fair and he knows that I am being singled out her by Lt. Bernard Foster and he than stated "listen you need to go through the chain of command. (This chain of command is only use to the departments benefit.)

On August 24, 1999, at approximately 10:00A.M. I had a conversation with Captain Frederick Roland with regards to the letter of reprimand. I also asked Captain Roland if he remembered what time he had seen me leave on August 4, 1999. Roland stated "about 15 minutes before shift was to end." Captain Roland stated that he would get me a copy of the reprimand and that this is not going to go any further. I once again informed Captain Roland about Lt. Bernard Foster's actions towards me. He told me not to worry this incident is not going into your file. Latter that afternoon Captain Roland gave me a copy of Lt. Bernard's complaints against me.

November 23, 1999, Went to see doctor with regards to stomach problems that keep persisting and the stress regarding harassment on the job.  Doctor Wald explained to me that I should seek counseling and how to access it through MGH.



December 6, 1999, I went in to speak with Chief Roy Colannino regarding my personal well being.  I explained that I could not take this harassment no longer.  I told him that I could not sleep, that I was going back and forth to doctors for stomach problems which was like to be IBS due to stress and that I was continuing to have migraines. The chief gave me some stories about when he was just a patrol officer and the situations that he endured.  I explained to him that it was all well and good but I could not handle it any more and requested to see Dr. Barry the city physiologist. Chief Roy Colannino stated that is fine you can go and see him and gave me his number.

On December 7, 1999, I contacted Dr. Barry at (438-6966) in regards to the on going stress from the harassment.  I met with him on December 13, 1999 at 12:00 P.M. at 290 Main Street in Stoham Ma. On January 6, 2000 I met with Dr. Barry again regarding the department.


February 17, 2000, Doctor Wald for IBS.

On March 9, 2000, I was humiliated by Captain Gerald Chaulk infrount of the evening shift.  Captain Chaulk looked me because I was wearing my bicycle uniform and stated "OH WHAT YOU THINK YOU ARE GOING TO BE DRIVING THE BIKE THIS EVENING, I THINK NOT."  I replied back to him that

Lt. Ford told me that it was okay and that several other officers have already been out on there bikes riding. Captain Chaulk said "OH I DON'T THINK SO." (Note: Officers Curcio, Ferendez, Sgt. Goodwin and Sgt. Doherty were present at the time.) After roll call was over I went to Captain Chaulk and the Chief Roy Colannino who were standing in the hall way and asked "why is okay for the men to ride there bikes and it isn't okay for me." The chief then walked away and did not want to hear any more. (Note: I went to Captain Chaulk two weeks prior and asked him about the bikes and he told me that he is not in charge of the bikes any longer and any questions I have should be asked to Lt. Ford. On this evening Captain Roland helped me bring my bike up from the cellular and never said any thing to me about not riding the bike. Lt. Ford was also aware that I was going to be riding.

On March 10, 2000, I spoke to Lt. Steven Ford regarding the situation with Captain Chaulk he stated that it was okay that I had driven the bike and that he is in charge of the unit. He told me that he would speak with Captain Chaulk regarding the incident.

On April 20, 2000, Officer Kathy Lavita (Fish) and myself were involved in an altercation in the garage area of the police station before the start of my shift. Lt. Santoro was the officer in charge of the shift and was aware of the situation along with Sgt. Thomas Doherty. I spoke to both supervisors that evening and told them the situation was resolved. Lt. Santoro told me that the chief Colannino was aware of the situation that evening and nothing else was said because both of us resolved it.

On May 3, 2000, I was called into the booking room at 1:00P.M. And instructed by Lt. Ford that I was being ordered to write a report regarding the incident on April 20, 1999. Lt. Steven Ford stated that he had nothing to do with this only that he was instructed to do an investigation.

On May 25, 2000, Officer Kathy Fish and myself were both written up according to section G.2 under prohibited conduct, conduct unbecoming of a police officer. We were both reprimanded and a letter was to remain in our files for 6 months until November of 2000. I received this letter from the chief in the presence of union rep Officer Charles Patch. The chief stated that he had no bearing on this that it was Lt. Foster who wanted the investigation done regarding this. Once again I reported to the chief that doesn't he see this continued pattern from Lt. Bernard Foster. I have come to the understand that he just does not care and that he is afraid of what Lt. Bernard Foster has under his belt.....

On May 26, 2000, I went to my primary care doctor for help with the stress because of the stress. I could not sleep, eat and began to have anxiety attacks. I was a wreck worried about what Lt. Bernard Foster was going to try and get me for next. I was given Zolof for the anxiety and 50mg of trazodone to sleep at night.

June 3, 2000, 101 Unit, Officer John Burke Late for work, he was not spoken to, nor was there any disciplinary note in the superior officers comments or roster entry.

June 23, 2000, Back to doctor for anxiety and stress she went up on my dose of Zoloft. Doctor suggested that I find another job. I explained that this is a career for me not just a job.

June 2000, Sgt. James Griffin caught Officer Patrick Cappola in the women locker room/females bathroom at the main police station. Sgt. James Griffin warned Officer Cappola not to go back into the female's locker room again. This locker room was designated for the females to use and all the females were given a key to the door. Sgt. James Griffin approached me and advised me of the situation. I asked about having the lock changed and it was never done. Again a week latter Officer Patrick Cappola decided to enter the females locker room again only this time Call taker Kelli Mckenna had just finished putting her uniform on. This incident was reported to the chief and an investigation was done. Officer Patrick Cappola was never suspended. A short time after this Kelli Mckenna was threatened by Officer Patrick Cappola's wife. I am well aware of this incident because I was the reporting officer. The harassment went on from Cappola's wife for some time. Again the Chief Roy Colannino did nothing to stop this behavior and did not suspend Officer Cappola. I was afraid to use the bathroom due to the facts.

There were also rumors for a while that Officer Cappola had urinated all over the females bathroom.

On August 18, 2000, Officer Joseph Rizutti and Officer Douglas Zingali got into an altercation in the radio room at the station. Officer Joseph Rizutti came by my residence and explained what had happened to my husband Officer Mark James and myself. He related that both officers exchanged words and that he picked up a chair and was going to throw it at Officer Zingali but several officers stepped in to stop the altercation. (Lt. Santoro, Officer Paul Lucero and Officer Ronald Thornton) I was made aware that neither of these officers was reprimanded for their behavior like Officer Fish and myself were.

On August 30, 2000, at 10:20 P.M. While assigned inside to the radio I dispatched Officer Patrick Cappola to a domestic call on School Street. Sgt. Thomas Doherty was in charge of the shift that evening. Sgt. Doherty was toying with the detail list trying to get a job for the AM shift for the IHOP restaurant. Officer Patrick was the next person to get the detail. After dispatching Officer Cappola to his call, I was informed by Sgt. Thomas Doherty to call Officer Cappola on the radio and have him phone the station. One minute passed and Sgt. Doherty asked me again "did you have Cappola call the station?"(Note: if he had been listening to the transmissions on the radio or listened to me because I was sitting right next to him in the station he would of know that a domestic was in progress and that I had advised Cappola to call.)I stated to Sgt. Doherty, Officer Patrick Cappola is going to a domestic call in his sector and that no other units were available to take the call. Sgt. Doherty than said to me "**I DON'T GIVE A FUCK WHAT HE IS DOING TELL HIM TO COME TO THE STATION, WHAT YOU DID NOT HEAR WHAT I SAID TO YOU THE FIRST TIME I SPOKE.**"Several officers were present when he spoke to me like that (Officers Steven Moscato, Todd Randall, Call taker Robert Campbell and Lt. Santoro.) Sgt. Doherty completely humiliated me in front of everyone. So I did what was ordered of me once again and called Officer Patrick Cappola to the station and canceled him from going to the call. This was a safety issue for the victim of the domestic. Officer (deceased) James Hitaffer heard my voice and new there was something wrong. Officer Hitaffer took the call to the domestic and when he cleared he came to the station to speak with me. Officer Hitaffer needed assistance at the call and the units were tied up and Cappola was on his way to the station. Hitaffer asked me why I called Officer Cappola off the call when normally a domestic requires two units to respond. I explained to him the situation and he said he was going to speak with the Captain regarding this situation. Lt. Santoro being the senior officer in charge just stood there and shook his head in disbelief but never said anything to him.

September 2, 2000 went out on disability because of bicycle unit. I hurt myself riding for to long of periods of time. I was not properly trained on the bike and did a lot of riding. I had a popliteus strain to my right knee. This took some time with therapy to heal and I was out of work until January 6, 2001.

On February 26, 2001, I observed a pair of leopard female underwear hanging from the wall in the guardroom. The underwear was in plain view so that not only the department itself could see them but also the general public uses the room to file reports. Along side of the underwear was a piece of paper with writing on it. The writing stated "LANGONE'S JEALOUS" My shift rotation started on February 24 and went until February 27, 2001. I observed the underwear there for several days, as it was the subject of roll call because people thought it was funny. I filed a complaint with the MCAD regarding this and the department went and had Lt. Bernard Foster write a report regarding the underwear. Lt. Bernard Fosters' reported in his own words "on the morning of March 2, 2001 while conducting roll call, I observed female undergarments hanging from the bulletin board in the Guardroom. A note stating these belong to Jeff Langone was attached to the undergarments. I removed the garment and placed them in the trash. I worked the proceeding two days and did notice that the garment was not placed on the bulletin board. It is my opinion that they were placed there sometime after 1600 hours on March 1, 2001.

On February 28, 2000, Please refer to Revere Police Department Incident number 233983. Officer Paul Crevioserat made a long entry into the computer. The entry was in regard to the above statement. Officer Paul Crevioserat had also observed the underwear two days before Lt. Bernard Foster states "in his opinion that they were place there sometime after 1600 hours on March 1, 2001.

In my opinion Lt. Bernard Foster once again became involved in something he should have know about but overlooked and lied on a official report to the MCAD. If Lt. Bernard Foster was doing his job as the "Platoon Commanding Officer" He would of known that part of his duties and responsibilities were to: DUTIES **AND RESPONSIBILITIES 3.7.2 PLATOON OFFICER IN CHARGE.**
**A. CONSULT WITH THE OFF-GOING OFFICER IN CHARGE AND INSPECT THE DAILY LONG TO ASCERTAIN THE STATUS OF ON COMING PERSONNEL, PRISONERS, NEW ORDERS, POLICE VEHICLES AND OTHER EQUIPMENT, AND ALL OTHER MATTERS OF IMPORTANCE.**

If Lt. Bernard Foster had checked the prior shifts he would have noticed before putting in writing a false statement. The underwear were there for several days and yes at some point after my tour of duty was over he had taken them down. I was on a day off when I came into the station and Officer Malatesta asked me if I had seen the underwear hanging up at which point I said yes. Officer Lyn Malatesta told me that Lt. Bernard Foster put them in the barrel which I retrieved and gave to Officer Lyn Malatesta to hold on to them.

On February 26, 2001, I had conversation with Captain Roland in records department of the police station. Captain Frederick Roland asked this officer if I had contact with Sgt. Jeremiah Goodwin relating to a grievance matter. I replied no and did not know what he was talking about. Roland stated "Sometime ago Sgt. Jeremiah Goodwin and Lt. Salvatore Santoro were counseled on their behavior with you." I asked why and Captain Roland stated "well Captain Chaulk got information that Lt. Salvatore Santoro were eating dinner with me and coming to my house for coffee." I was made aware of this situation two years prior, when I was told that I was going to be transferred to another shift. Captain Roland stated "well this is between you and me and I just wanted to let you know about this. In my opinion this could be misconstrued because I am a female and it doesn't look too good." I than told Roland that what is the difference between me and my superior officers having dinner or coffee and Officer Paul Crevioserat having dinner with is superior officers (Lt. Peter Bernard and Sgt. Ruggerio) Captain Roland than stated "YOUR A FEMALE, HE IS NOT" I Then told him that there was also a rumor about me going to the 99 restaurant to have dinner with the two and that never happened. I was very upset with this conversation due to the fact that another superior officer brings this incident to my attention and wants it to be between us when it involves my personnel life and my character.

On March 12, 2001 I filed a complaint with the MCAD because these incidents were getting out of hand and none cared about my feelings and my well being on this job.

On March 13, 2001, I was assigned as a dispatcher on the P.M. shift for my tour of duty. Part of my duty is to monitor the prison cell area and check on the prisoners. While checking the cells I had contact with a prisoner (Christopher Daley). I have known Daley from prior incidents and from former acquaintances. Had been arrested on outstanding warrants by Detective Brian Goodwin. I had not seen Daley since his last arrest. I asked Daley if he had remembered the last time he was arrested with John Barker. Daley replied "Yes, I remember that, the Lieutenant asked John Barker if he fucked you. What is wrong with this place the detective, Goodwin, asked me if I ever fucked you too? Why are these people so concerned with whom you have been with? I was shocked and went upstairs to the detective bureau to see if Officer Brian Goodwin was there to confront him. He had left for the evening. I then returned back to the radio room and just was to upset to function. Sgt. Nelson was the officer in charge of the shift that evening. I felt more comfortable telling Sgt. Joseph Cafarelli what had happened so I radioed for him to come to the station. I met Sgt. Joseph Cafarelli and explained the situation. Sgt. Joseph Cafarelli explained that he would have to notify both superior officers on the shift so that they could do a proper investigation. Sgt.



Cafarelli radioed for Sgt. James Picardi to come to the station and Sgt. Nelson came from the radio room to the garage. I explained to both of them what had just happened and they assured me that they would take care of the situation. Sgt. Joseph Cafarelli excused me from my shift because I was an emotional wreck. Latter on that evening Sgt. James Picardi came by my residence and gave me a formal complaint form to fill out which I did. Sgt. Picardi explained that they had interviewed the prisoner who had corroborated my account of the incident and that he had written a statement. Sgt. Picardi stated that he could not give me that statement that I would need to get it from the chief. Sgt. Picardi also stated that Sgt. Cafarelli would be writing a written report to the chief as well.

On April 17, 2001, at 2:00 P.M. I had a meeting with the mayor, Thomas Ambrosino regarding my complaint with the MCAD. I had my best friend present with me (Ellen Wortman). I handed him a letter from my doctor, regarding my return back to work. I informed him of several of the incidents that had occurred including the one with Lt. Santoro and Officer Brian Goodwin. I informed him of the supposed affair I was supposed to be having with my superior officers as well. I informed the mayor that I was looking for a paid leave of absence. The mayor stated that he could not give me an answer right now but it was more probable than not that he would be able to give me a paid leave. He than explained that he had no faith in our administration at the police department and that I should just let MCAD handle the case. I left there with no answers from the mayor only to hear that he had no faith in the department heads.

On April 19, 2001 I filed an application for leave without loss of pay under Massachusetts General Laws Chapter 21, Section 111f.

On April 20, 2001, I met with Chief Roy Colannino to give him letters from my doctors. I informed him of the medications that I was on as well. I explained to the chief that I had no more vacation time or sick time left. I requested that I am paid while on leave and that I filed the 111f application. The chief asked if I was able to come to work and he would allow me to go over to the Boston Stress unit. Chief Colannino also stated that he offered Kathy Fish a special assignment to the evidence department if it would help her to relieve her stress, and said I will do the same for you if it will help. I than became very upset with the conversation and told him that this isn't about special assignments nor is this a case like Officer Kathy
Fish has. I stated to him all I want to do is come back to my regular shift and have people my there own business. I told the chief that as soon as I walked into the station today someone had already said something to me regarding a lawsuit, (that was Officer Charles Patch) and that the statement that he had made to me offended me. The chief asked me who made a statement and I said, "why does it matter you haven't done anything to this point so why bother now."

On April 25, 2001, I spoke to Chief Roy Colannino in regards to my 111F benefits. The chief stated that he is looking into the benefits and that in some cases it has taken up to six months to see if one would be eligible for benefits. I told him that I could not wait that long with two children. He stated that the attorneys are working on this claim and that he has never seen anyone get 111f for emotional stress and is not to sure how they would handle a case like mine. He stated that he could see the emotional stress in my face and that he really empathizes with me and stated he has gone through a lot himself with stress. He stated that maybe I will have to give the city attorneys more information, but he would get back to me by Friday to let me know.

On April 26, 2001, I went into the station to retrieve a letter that the chief called me at home and told me to pick up. At 12:30 P.M. I entered the rear of the police station where Captain Frederick Roland was just entering his vehicle with the chief's secretary Connie Anderson. Connie stated, "Oh, Terri I have the letter that the chief wanted you to have, you need to sign for it. We went in the station and retrieved the letter. After doing so I asked Captain Roland if I could speak with him. I then asked Captain Roland,

"Could I please have a copy of the letter that prisoner Christopher Daley wrote in regards to the incident with Officer Brian Goodwin?" Captain Roland replied in a very cold manner (due to the fact he was aware of my MCAD complaint I filed with him being a defendant) "I know nothing about any investigation or letter, you will have to speak with Captain Gerald Chaulk regarding this matter." I asked again, Captain, you know nothing about this incident and he stated "NO!" And walked away.

On April 26, 2001, Officer Mark James, (my husband) and I went to speak with Captain Chaulk regarding the matter. I asked Captain Chaulk if I could have a copy of the letter that was written by prisoner Daley regarding the incident with Officer Brian Goodwin. I explained that I had just asked Captain Roland and he told me he knew nothing about any investigation. Chaulk stated "I am aware of the report but you would have to speak with the chief about getting a coop of the report." Officer Mark James than asked, "isn't that public information?" Chaulk stated, "NO" Officer James stated "well everyone else seems to know about the incident except for Captain Roland."

On April 30, 2001, I contacted Chief Roy Colannino by telephone at 2:20 P.M. in regards to the investigation into the incident with Officer Brian Goodwin. I asked if I could have the letter that the prisoner wrote for my records. The chief stated "I don't have the file and that I would have to speak with Captain Chaulk regarding the investigation." I then stated to him that Captain Chaulk told me to ask you. The chief again stated well I don't know anything about this investigation or a letter that the prisoner wrote." He than stated, "I will get in touch with Captain Chaulk and find out what happened regarding the investigation. Colannino stated that Captain Chaulk is the primary investigator in the matter." I find this completely unprofessional, considering Captain Chaulk is one of the named offenders in my MCAD complaint.

On May 11, 2001, I got married to Officer Mark James.

On June 1, 2001, Chief Roy Colannino contacted me by phone at 10:00 A.M. in regards to a meeting that he wanted to have today. The chief stated that he wanted to have a meeting to discuss my 111f claim. I asked who would be at this meeting and he stated Captain Chaulk, Captain Roland and himself. I told him that I did not feel comfortable sitting at a table with the three of them without my attorney. I explained that I would get back to him. I than contacted Attorney Dilday's office and spoke with Michael Rinhart who informed me not to attend the meeting. Attorney Dilday also called me himself and told me not to attend without him. Chief Roy Colannino than called my residence and questioned me as to why I would not attend the meeting. I explained again that all he has to do is tell me over the phone weather or not I was denied for the 111F benefits and that I did not was to get all upset again over a meeting with the three of them. I then informed the chief that it is best just to speak with my attorney and stop calling my home because every time he does he disrupts my me and my family. Attorney Dilday wrote a letter to the department stating that all inquires should go through his office.

On June 18, 2001, The Revere Police Department started to harass my husband Officer Mark James who had a documented disability. Officer Mark James had doctor's notes and had been previously carried as disabled until my complaints were filed. The department stopped his pay on June 18, 2001my husband also had to go to MCAD and file a complaint against the department (Docket number: 01132261) which he has never heard anything about. The city finally after our household had not received any income reinstated his pay on September 5, 2001. At this time that gave him his back pay because they were wrong for taking it away in the first place. We believe that this was just another effort from the department to make our lives miserable.

On October 3, 2001, I wrote a letter to John Murphy from our union Local #25 regarding my injured pay.

On October 11, 2001, I sent a letter to Captain Roland requesting an appointment to be examined by the City of Revere's doctor. I also again requested to know about the investigation into my harassment complaints.



On October 24, 2001, Captain Roland sent a letter in reference to my grievance that was submitted by the union. His response back was that "I have been advised that Officer Pechner had spoken to Chief Colannino in late March or early April, and that she was informed that the Department's investigation resulted in a finding of "unsubstantiated". In addition, the City's Law Department responded to her charges by submitting its answer to the MCAD on April 12, 2001. An internal investigation had been conducted and a determination was made that there was lack of probable cause. Officer Pechner was provided with a cop of the City's response. To this date, to the best of my knowledge, the MCAD has taken no further action. Should Officer Pechner require additional information, she should seek it from the MCAD."

July 17, 2002, I was sent a package for involuntary retirement.

September 11, 2002 at 10:30A.M. Hearing at the Revere Retirement Board.

September 5, 2001 requested again in writing from Captain Roland who was acting as Chief at this time for any and all information pertaining to the investigation that occurred from the sexual harassment complaint against Officer Brian Goodwin.

October 23, 2002, Revere Retirement Board did not find substantial evidence to support the Department Head's application for the involuntary accidental disability.