# EXHIBIT E

Terri Pechner-James

June 22 Deposition Excerpts – Red Herrings

Argumentative, Combative, Refusal to Answer, Non-responsive, Evasive

1.    <u>Pages 1612 – 1614</u>:

22    Q.   Did you like working in the radio

23   room?

24    A.   Yeah.

1    Q.   What did you like about it?

2    A.   I don't know.

3    Q.   I'm sorry?

4    A.   Liked working my job, period, no

5   matter where it was.

6    Q.   Okay.  So the radio room portion of

7   that job was a part of it that you enjoyed?

8   I'm not saying exclusively, but you did enjoy

9   that part of the job?

10    A.   I enjoyed my whole job when I was

11   not under stress.

12    Q.   Okay.  And my question was,  What

13   in particular about working in the radio room

14   did you like?  What things that you did there

15   did you like doing?

16    A.   I don't know.

17     Q.   When you were working in the radio

18   room, you would be involved in dispatching,

19   correct?

20     A.   Correct.

21     Q.   And you would also be involved in

22   answering the phones?

23     A.   Correct.

24     Q.   Would you also be involved in

1   talking with citizens at the window?

2     A.   Yes.

3     Q.   Okay.  Did you enjoy all three of

4   those aspects of working in the radio room?

5     A.   Yes.


2.     Pages 1614 – 1619:

10     Q.   All right.  Let me put the

11   complaint back in front of you, Exhibit 3 to

12   the deposition, ask you to look at

13   paragraph 30, please.

14     A.   (Looks at document.)

15     Q.   Have you reviewed paragraph 30?

16     A.   Yes.

17     Q.   What stressful condition had

18   Lieutenant Foster created on August 4, '99?

19   I'm looking at the first sentence of

20   paragraph 30.

21       A.   I don't remember.

22       Q.   In the third line, at the far

23   right-hand side where it says Lieutenant

24   Foster, do you see that?  Lieutenant Foster,

1   sentence carries over to the next line.  Do

2   you see that?

3       A.   Yeah.

4       Q.   "Lieutenant Foster called plaintiff

5   at home and ordered her back to the station."

6           When he called you at home, did he

7   call you on your home phone or call you on

8   your radio?

9       A.   We've already discussed this.

10       Q.   Okay.  Well, I don't recall so --.

11   The answer to my question is what?

12       A.   He didn't call me on the phone.

13       Q.   So he called you on the radio?

14       A.   Captain Roland called me on the

15   radio.

16       Q.   So the complaint is inaccurate here

17    where it says Lieutenant Foster?

18        A.    Correct.

19        Q.    All right.  Now, looking at your

20    notes on page 12, I direct your attention to

21    your notes, page 12, the big paragraph at the

22    top half begins on August 4, 1999, do you see

23    that?

24        A.    Yes.

1         Q.    In your notes, you indicate that

2     you returned to the station at 3:30 P. M., you

3     put your briefcase into your car, you went

4     into the station to begin entering your

5     citations.  Do you see that?

6         A.    Yes.

7         Q.    It then states that you began to

8     feel very faint and told Francis Cassoli

9     (phon).  Do you see that?

10        A.    Yes.

11        Q.    Do you recall why you were feeling

12    faint at about 3:30 P. M. on August 4, '99?

13        A.    No.

14        Q.    Were you feeling faint because of

15    something that Lieutenant Foster had done that

16  day?

17      A.   I don't remember.

18      Q.   Were you feeling faint because of

19  something Lieutenant Foster had done some day

20  previously?

21      A.   I don't remember.

22      Q.   Okay.  Were you feeling faint

23  because of some stress related to the job?

24      A.   I don't remember.  Yes, I was sick.

1      Q.   Okay.  So is it fair to say that

2  the allegation in the first sentence of

3  paragraph 30 is incorrect?

4          MR. DILDAY:  Objection.

5      A.   No.

6      Q.   I'm sorry?

7      A.   No.

8      Q.   So as you sit here today, you're

9  telling me that, in fact, you were feeling

10  faint because of the stressful condition

11  created by Lieutenant Foster on August 4 of

12  '99?

13      A.   I don't remember.

14      Q.   So you can't tell me whether or not

15  the first sentence in paragraph 30 is true or

16  not, can you?

17  MR. DILDAY:  Objection.

18  A.   I don't remember what happened that

19  day.

20  Q.   Okay.  So the answer to my question

21  is correct.  You can't tell me whether or not

22  the first sentence of paragraph 30 is true or

23  correct?

24  MR. DILDAY:  Objection, again.

1  A.   No.

2  Q.   Is there anything in your notes

3  here, particularly the August 4 entry, which

4  in any way suggests that Lieutenant Foster

5  created a stressful condition that made you

6  feel faint?

7  A.   Created a stressful condition every

8  day I went to work with him.

9  Q.   Every single day?

10  A.   Every day.

11  Q.   Every day from '96 to '97 before

12  you transferred off?

13  A.   Yes.

14    Q.   And every day from when you got

15  back on his shift in July of '99 until

16  whenever?

17    A.  Yes.

18    Q.  Okay.  And so what had Lieutenant

19  Foster done as of August 4, '99 that made you

20  feel faint at 3:30 in the afternoon?

21     MR. DILDAY:  Asked and answered.

22    A.  What I --

23    Q.  And the answer is you don't know,

24  correct, or don't remember?

1    A.  I don't remember.


3.    <u>Pages 1625 – 1627</u>:

1    Q.  Do you understand the assignment to

2  the radio room to be an actual punitive

3  assignment for some violation that occurred

4  the day before?

5    A.  He allowed his daughter to leave

6  every single day early --

7    Q.  No.  Ms. Pechner, that's not the

8  answer to the question.

9    A.  No.  That's not the answer that you

10  don't want.

11      Q.   No.  Ms. Pechner --

12      A.   Okay?

13      Q.   The question --

14      A.   You asked me a question and I'm

15  answering it.

16      Q.   No, you are not answering it.

17          MR. PORR:  Mr. Dilday, that is not

18  responsive.  It isn't evenly remotely

19  responsive.

20          MR. DILDAY:  She's telling you how

21  she considers it to be punitive.  She's going

22  to tell you that he allowed his daughter to

23  leave early, but he never assigned her

24  anywhere differently.  But when she left early

1  because of illness, he assigned her to a

2  different shift.

3          MR. PORR:  Well, it's the same

4  shift.  He just assigned her to the radio

5  room.

6          MR. DILDAY:  I'm sorry.  You're

7  right.

8      Q.   So Mr. Dilday represents that what

8

9   you were going to tell me was, Lieutenant

10  Foster would let his daughter leave early, but

11  never assigned her to the radio room, but when

12  you left early, he assigned you to the radio

13  room, correct?

14      A.   Right.

15      Q.   And you considered that to be

16  punitive?

17      A.   Yes.

18      Q.   Okay.  Did you consider it to be

19  punitive in the sense of a disciplinary action

20  taken against you?

21      A.   Disciplinary because he only did it

22  to me as a female.  He did not do it to

23  anybody else when they left.  There were cars,

24  dates, there were cars, people would leave

1   early, people would go to their details 15

2   minutes early, people would go to the school

3   early.  This was another attack against me

4   from Lieutenant Foster.

5       Q.   Okay.

6       A.   All the other supervisors didn't

7   have a problem.  They knew I was leaving.

8      Q.   On August 5th, did you consider

9   this to be an attack against you by Lieutenant

10  Foster?

11     A.   Yes.

12     Q.   Okay.  The attack, did you consider

13  it to be a disciplinary attack in terms of

14  discipline for misconduct on your part?

15     A.   No.  It was to humiliate me.

16     Q.   So you didn't consider it to be a

17  disciplinary action for some act of

18  misconduct?

19     A.   No.


4.      Pages 1629 – 1630:

18     Q.   Why was it humiliating to be

19  assigned to the radio room?

20     A.   Because of the way Lieutenant

21  Foster stormed in there with the television.

22  Lieutenant Foster was intimidating me.  He was

23  humiliating me.  So find something else

24  because you have all the notes here and you

1   can grab everybody you want and talk to them

2    about the way Lieutenant Foster treated me.

3        Q.    Storming into the radio room was a

4    month before.

5        A.    There was no storming into the

6    radio room.  That's Lieutenant Foster's idea

7    of storming into the radio room.

8        Q.    No.  I thought you said he stormed

9    into the radio room on July 5th.

10        A.    No.  It says in there that I

11    stormed out of roll call into the radio room.

12    That's what Lieutenant Foster put.

13        Q.    My point is, why, on August 5th of

14    '99, was being assigned to the radio room

15    humiliating?

16        A.    And I've answered that question.

17        Q.    I'm sorry.  I didn't understand the

18    answer then.  If could you please restate it.

19        A.    I've already answered it.


5.    <u>Pages 1631 – 1632</u>:


15        Q.    Is it your contention that on

16    August 7th you were again assigned inside for

17    punishment?

18      A.    Whatever you'd like to call it.

19      Q.    No.  I'm asking, is it your

20   contention?

21      A.    That I was punished because I was

22   sick and I went to the nurse's office?  That's

23   mine.

24      Q.    My question is, was it -- is it

1   your contention that the August 7th assignment

2   to the radio room was punishment?

3      A.    Because I left sick?

4      Q.    For whatever reason.

5      A.    I don't know.  I don't know.

6      Q.    Well, it was my understanding you

7   considered the August 5th assignment to the

8   radio room to be punishment, correct?

9      A.    Whatever Lieutenant Foster did to

10   me was punishment.

11      Q.    So both the August 5th and the

12   August 7th assignments to the radio room were

13   punishment as far as you were concerned?

14      A.    (Looks at documents.)

15      Q.    Yes?  No?  Do you not understand

16   the question?

17     A.   (Looks at documents.)  No.  Can you

18  ask it again?

19     Q.   So both the August 5th and the

20  August 7th assignments to the radio room were

21  punishment as far as you were concerned?

22     A.   Yes.


6.     Pages 1650 – 1653:

14     Q.   Looking at the next entry, it's an

15  August 12 entry, indicates you're standing in

16  the rear of the station and you're standing

17  there with Officer John Goodwin and you

18  observed Officer Anthony Macone leaving 15

19  minutes early.  Do you see that?

20     A.   Yes.

21     Q.   Do you know why Officer Macone left

22  15 minutes early?

23     A.   No.

24     Q.   Do you know if he had cleared that

1  with any supervisor?

2     A.   No.

3     Q.   So as far as you know, he may have

4  been within his rights to have left 15 minutes

5   earlier that day?

6       A.   No.

7       Q.   I'm sorry?

8       A.   No.

9       Q.   Why do you say that?

10      A.   I'm not going to guess whether he

11  spoke to his supervisor or he didn't.

12      Q.   Right.  So you have no idea one way

13  or the other?

14      A.   I watched every day people leave

15  early.  They didn't speak with a supervisor.

16      Q.   I'm talking about the August 12th

17  entry in your notes and Officer Macone.

18      A.   Right.

19      Q.   You have no idea why he left 15

20  minutes early that day?

21      A.   Maybe went to a detail.

22      Q.   But you don't have any idea.  You

23  don't know, do you?

24      A.   No.

1       Q.   And you don't know whether or not

2   he got that cleared through his supervisor, do

3   you?

4     A.   I don't know.

5     Q.   So you don't know if it was totally

6  legitimate or not, do you?

7     A.   Don't know.

8     Q.   Did you write this in your notes

9  because you thought he didn't have permission

10  to leave early?

11     A.   I just wrote it in my notes.

12     Q.   I'm sorry?

13     A.   I just wrote it in my notes.

14     Q.   Why?

15     A.   I felt like it.

16     Q.   Why did you feel like it?

17        MR. DILDAY:  She's answered the

18  question.  She felt like it.

19        MR. PORR:  I'm asking if there was

20  a reason why she felt like it.

21     A.   Because I was being harassed for

22  leaving while I was sick and officers leave on

23  a regular basis early.  They come in late.  I

24  was never late.  I never left early.

1        I never had a problem coming in or

2  leaving, and, all of a sudden, I'm sick, and I

15

3 get written up for leaving 15 minutes early.

4  Q. All right.  And so on the 12th when

5 you saw Officer Macone leaving 15 minutes

6 early, you felt that he should have been

7 written up for doing it?

8  A. No.  I just felt I'd start taking

9 note of who leaves and comes early and late.

10  Q. Okay.  Well, you indicate here "and

11 nothing was said to him."

12  A. Right.

13  Q. So my expectation is the reason you

14 wrote that is because you felt something

15 should have been said to him?

16  A. Right.


7.  <u>Pages 1653 – 1660</u>:

23  Q. Okay.  There's an August 13th entry

24 on your notes here.

1  A. Yes.

2  Q. And this indicates that you were

3 inside the station along with Lyn Curcio.

4 And, again, I assume that's in the radio room?

5     A.   Correct.

6     Q.   Okay.  And Lieutenant Ford was in

7  charge of the station that day.  What do you

8  mean by that?

9     A.   He was in charge of the station.

10     Q.   Does that mean that Lieutenant

11  Foster was not on duty that day?

12     A.   I don't know what Lieutenant Foster

13  was doing.

14     Q.   Okay.  Would both Lieutenant Ford

15  and Lieutenant Foster have been on duty at the

16  same time in the station?

17     A.   All I know is that Lieutenant Ford

18  was the officer in charge of the station that

19  day.

20     Q.   And Lieutenant Foster is senior to

21  Lieutenant Ford, correct?

22     A.   I don't know.

23     Q.   You don't?

24     A.   No.

1     Q.   Isn't it true that Lieutenant

2  Foster was, in fact, senior to Lieutenant Ford

3  and by some years?

17

4    A.   Okay.  I don't know.  They were

5    lieutenants.  How do I know how long they've

6    been on the job for?

7    Q.   Is it your testimony that

8    Lieutenant Ford was a lieutenant when you

9    showed up in February of '96?

10    A.   Yes.

11    Q.   And you didn't know that Lieutenant

12    Foster was senior to him?  You never learned

13    that in the number of years you worked there?

14    A.   I don't know.

15    Q.   In any event, if Lieutenant Ford is

16    in charge of the station, what does that mean?

17    A.   That he's the officer in charge.

18    Q.   Okay.  But what does it mean to be

19    the officer in charge?

20    A.   That he's in charge of the shift

21    that day.

22    Q.   Okay.  So you would report to him

23    as the supervisor in charge of the shift?

24    A.   Correct.

1    Q.   All right.  So it indicates here

2    that you observed Lyn Curcio turn on the

3    television set?

4        A.   Right.

5        Q.   And then you told Lyn that you had

6    been written up for the television so you

7    asked her to turn it off?

8        A.   Right.

9        Q.   Okay.  And then Lieutenant Ford

10   said, "It's okay.  I told her she could leave

11   it on."  Correct?

12       A.   Correct.

13       Q.   So then you apparently had a

14   discussion with Lieutenant Ford about the

15   problems you were having with Lieutenant

16   Foster related to the TV, right?

17       A.   Right.

18       Q.   Okay.  But Lieutenant Foster wasn't

19   the OIC that day.  Lieutenant Ford was, right?

20       A.   Right.

21       Q.   Okay.  So Ford says, "I'm in charge

22   and if I say it's okay, then it's okay"?

23       A.   Right.

24       Q.   Okay.  Because he was the OIC that

1    day, right?

2     A.   Right.

3     Q.   All right.  Why did you go to the

4  chief's office after Lieutenant Ford, who was

5  in charge of the station that day said it was

6  okay for Lyn Curcio to turn on the TV?

7     A.   Why did Lieutenant Foster go to

8  captain -- to acting chief Colannino when he

9  wrote me up?

10        MR. PORR:  Mr. Dilday, that's not

11  responsive.

12        THE WITNESS:  No.  I'm answering

13  the question.

14        MR. PORR:  That's not an answer.

15  It's a question back.  It's a sarcastic

16  question back.  It's not related to my

17  question.

18        MR. DILDAY:  Try to let her

19  explain, and then you might get your answer as

20  it comes through.  I don't know what her

21  answer's going to be.

22        MR. PORR:  It was a question.

23        MR. DILDAY:  I don't know why she

24  went to Foster -- to Colannino.  You don't

1  know why she went to Colannino.

2    A.   Because I was just written up for

3  watching the TV, and they didn't follow the

4  chain of command when I was written up for

5  watching TV.

6        Had they followed the chain of

7  command, Lieutenant Foster would have went to

8  Captain Roland, and Lieutenant Foster did not

9  go to Captain Roland because I was watching

10  TV.  He skipped that and he went to Chief

11  Colannino.

12        Therefore, instead of me going to

13  Captain Roland, because Chief Colannino was

14  already involved in this, I walked outside of

15  the radio room and told Chief Colannino what

16  had happened.

17    Q.   And why did you bother going to the

18  chief at all when Lieutenant Ford said, "I'm

19  the OIC today and I say it's okay"?

20    A.   Because maybe I'm a little

21  confused.  What one OIC says is okay but the

22  other OIC is different.  Double standard for

23  every single supervisor in that place.  So

21

24  Bernie says you can't watch TV but Ford can.

1     Q.    All right.

2     A.    Okay?  So past practice.

3     Q.    So what's wrong with that?

4     A.    You know, the television should be

5  allowed to be on for everybody, whether it's

6  Bernie in charge of it, whether it's Ford in

7  charge of it.

8         The television is supplied by the

9  City of Revere, it should be allowed to be

10  turned on, and certain individuals should not

11  be picked out and written up for watching

12  television.

13     Q.    Now, who says it should be allowed

14  to be turned on simply because the City

15  provides it?

16     A.    Well, why is it in there, Attorney

17  Porr?  Why do you have --

18         MR. PORR:  That's not responsive,

19  Mr. Dilday.

20     A.    You're in the radio room of a

21  police department, and a control room where

22  all the operations take place, and there's a

22

23  television in there.

24         MR. PORR:  It's not responsive,

 1  Mr. Dilday.

 2         MR. DILDAY:  I believe she's

 3  answering the best she can.  It's not the

 4  answer you want, but she's telling you that if

 5  you can't watch the TV --

 6         MR. PORR:  I don't want the

 7  nonresponsive answer.

 8         MR. DILDAY:  -- there's no reason

 9  for it to be there.

10         MR. PORR:  You're right.  I don't

11  want the nonresponsive answer.

12         THE WITNESS:  That's responsive.

13         MR. DILDAY:  And I'm not going to

14  tell her to answer it any other way, Mr. Porr.


8.    Pages 1660 – 1661:

15     Q.   Do you think it is your prerogative

16  to determine that if there's a TV provided, it

17  has to be on, you should be allowed to watch

18  it?

19         MR. DILDAY:  Objection.

23

20        MR. PORR:  Fine.  Noted.

21        (Cell phone rings.)

22    Q.   Do you understand the question?

23    A.   No.

24    Q.   You're a patrol officer, right?

1  That's all you were is a patrol officer?

2    A.   That's all I was.

3    Q.   You didn't set policy for the

4  Revere Police Department, did you?

5    A.   No.

6    Q.   That policy was set by the chief,

7  correct?

8    A.   There was no policy.

9    Q.   Whatever policies existed were set

10  by the chief, correct?

11    A.   There was no policy.

12    Q.   To the extent any policies existed,

13  they were set by the chief, correct?

14    A.   Correct.


9.    Pages 1661 – 1666:


18    Q.   So what difference does it make to

19  you if one lieutenant says you can watch the

20  TV and another lieutenant says you can't?

21      A.   Because it's harassment.

22      Q.   Why is that harassment?

23      A.   Because Bernie Foster allowed

24  anybody he wanted to watch TV except for me,

1  and he wrote me up for it.

2      Q.   But on the other question --

3      A.   Because he didn't like me.

4      Q.   Okay.  That's one issue.  But on

5  the issue of one lieutenant letting people

6  watch TV and another lieutenant not letting

7  them watch TV, that's not harassment, that's

8  just a difference in lieutenants, correct?

9      A.   I was given an order not to watch

10  the television.

11      Q.   When you were on duty with

12  Lieutenant Foster, correct?

13      A.   Correct.

14      Q.   That order didn't apply when you

15  were on duty with some other supervisor,

16  correct?

17      A.   To me, it would.

18      Q.   Why?

19      A.   Because I was written up for

20   conduct unbecoming for watching the

21   television.

22      Q.   By Lieutenant Foster?

23      A.   It doesn't matter who I was written

24   up by.  I was written up for something by a

1   superior officer, they both have the same

2   rank, they both should be on the same page.

3   They meet with each other, they concur of

4   what's going on, on that shift.

5      Q.   Who says they both should be on the

6   same page?

7      A.   Because that's the administration.

8   But, you're right, the administration is never

9   on the same page.

10      Q.   Who says that two lieutenants have

11   to agree about whether or not the TV is on or

12   off?

13      A.   Well, they certainly agreed when

14   they were assigning me on walking routes down

15   Shirley Ave.  They agreed on that.  That was

16   okay.

17      Q.   But who says -- is there a law, is

18   there a regulation, or is there anything that

19   you can think of that says two lieutenants

20   have to agree on whether or not the TV is on?

21        MR. DILDAY:  Objection.

22     Q.   Can you identify anything?

23     A.   There's no policy in the Revere

24   Police Department regarding the television.

1     Q.   So it's up to the discretion of the

2   individual lieutenants who are OICs, correct?

3        MR. DILDAY:  Objection, again.

4     A.   No.

5     Q.   It wasn't?

6     A.   No.

7     Q.   Then who was it up to?  You?

8     A.   Good question.  The mayor.  The

9   mayor of the City of Revere should have never

10   allowed for a television to be put into the

11   radio control room where all 911 calls and the

12   communication was being coming through in the

13   radio room.  Okay?

14     Q.   And what do you base that upon?

15     A.   That's your answer.  Because it

16   shouldn't have been in there.

27

17    Q.   And what do you base that upon?

18    A.   It shouldn't have been in there.  I

19  base that upon it shouldn't have been in there

20  in the first place.

21    Q.   Why?

22    A.   Then we wouldn't have had this

23  problem.  We wouldn't have had the problem

24  where Terri James wasn't allowed to watch the

1  television because it shouldn't have been in

2  there in the first place.

3    Q.   And Lieutenant Foster was the only

4  one that ever did that to you?

5    A.   Correct.

6    Q.   Correct?

7    A.   Correct.

8    Q.   And the only time he ever did that

9  to you was on July 5 of '99?

10    A.   Correct.

11    Q.   And I have to assume that on other

12  shifts at other times with Lieutenant Foster

13  you watched the TV and he knew about it?

14    A.   I didn't have a choice.  I tried to

15  stop them from watching TV after I was

16  reprimanded.  I followed his orders.  I told

17  them to shut the TV off because that was an

18  order I was given by Lieutenant Foster.  I

19  followed my rules --

20      Q.   While he was on duty?

21      A.   No, it wasn't for when he was on

22  duty.  It was --

23      Q.   How would Lieutenant Foster have

24  any ability to determine what other

1  lieutenants would do when they were in charge

2  of the station?

3          MR. DILDAY:  Objection.

4      A.   Because he should have moved the TV

5  out of the radio room.  Because if it's not

6  good for one person, if it's not good for me

7  and he just wants to harass me about the

8  television, then it should have been removed

9  from the radio room.

10      Q.   All right.

11      A.   You worked for a sheriff's

12  department.  Did they allow a TV in there?

10.     Page 1666 – 1669:

18      Q.   All right.  And then you complained

19   to the chief, "Well, it's not fair because

20   Foster is singling me out and saying I can't

21   watch TV and now Ford is saying it's okay to

22   watch TV"?

23      A.   Right.

24      Q.   And the chief's basic response to

1   you was, "If Ford says it's okay, it's okay"?

2      A.   Right.

3      Q.   "And if Foster says it's not okay,

4   it's not okay"?

5      A.   He said, "Go through your chain of

6   command."  That's what he said.

7      Q.   And in talking with the chief, you

8   walked away with the understanding that if

9   Ford says it's okay, it's okay.  Right?

10      A.   No.

11      Q.   You didn't walk away with that

12   understanding?

13      A.   My understanding was that I should

14   go through the chain of command.

15      Q.   When the chief said to you, and you

16  have it in quotes, it is up to Lieutenant Ford

17  if he wants to watch the television, period,

18  unquote.

19         You understood that to mean that

20  the chief was telling you if Lieutenant Ford

21  says it's okay to watch TV, it's okay to watch

22  TV?

23      A.   Right.  That's how he runs his

24  police department.

1      Q.   Okay.  And, conversely, you also

2  understood the chief to be telling you, if not

3  certainly in words, by implication, that if

4  Lieutenant Foster says it's not okay to watch

5  TV, it's not okay to watch TV?

6      A.   So if Lieutenant Foster walked in

7  on that shift and I was watching television

8  and Lieutenant Ford said it was okay, he could

9  still write me up because he's the supervisor.

10  That's okay.

11      Q.   Did that ever happen?

12      A.   That's okay.

13      Q.   Did that ever happen?

14      A.   I wasn't going to wait for that to

15  happen.  I wasn't going to wait for that to

16  happen.  You see the dates?  I simply wasn't

17  going to wait for Lieutenant Foster to walk in

18  and the television be on and I be sitting

19  there and I get an earful again.

20      Q.   Okay.

21      A.   Because nobody else was ever

22  written up about the television.  Nobody.

23      Q.   And when the chief --

24      A.   Why do you think Chief Colannino

1  turned around and took me out of the position

2  of being assigned back into the radio room

3  because Bernie Foster was wrong for writing me

4  up for watching the television in the first

5  place.

6      Q.   So when the chief told you that it

7  is up to Lieutenant Ford if he wants to watch

8  the television, didn't that communicate to you

9  that if Lieutenant Ford said it was okay, and

10  when Lieutenant Ford was the OIC, that it

11  didn't matter what Lieutenant Foster thought

12  at that time?

13      A.   I don't know what the chief's, you

14   know, I don't know what --

15       Q.   Okay.

16       A.   -- the chief's position was.


11.       Pages 1669 – 1673:

21       Q.   Now, we've been talking about this

22   August 13th date from page 14 of your notes,

23   and paragraph 33 also refers to a date of on

24   or about August 13.  Do you see that?

1       A.   Yup.

2       Q.   And you were working in the radio

3   room?

4       A.   Yup.

5       Q.   And you indicate that you

6   experienced an act of disparate treatment.  Do

7   you see that?

8       A.   Yup.

9       Q.   It goes on to say a male officer

10   turned on the television?

11       A.   Yeah.

12       Q.   Your notes say Lyn Curcio turned on

13   the television?

14    A.   Okay.

15    Q.   Lyn Curcio is, of course, a female

16  officer?

17    A.   Right.

18    Q.   So the complaint is wrong when it

19  says a male officer turned on the television,

20  isn't it?

21    A.   No.  Because I shut the television

22  off and Lieutenant Ford turned it back on.

23    Q.   Oh, where does it say that in your

24  notes?

1    A.   It doesn't say it.

2    Q.   Oh.  So the male officer who turned

3  the television on is actually Lieutenant Ford?

4    A.   Correct.

5    Q.   And he's a supervisor?

6    A.   Right.

7    Q.   And, in fact, on that date in

8  question, he was the officer in charge of the

9  whole station?

10    A.   I don't know about the whole

11  station, but his shift.

12    Q.   Well, your notes say Lieutenant

34

13   Steven Ford was in charge of the station that

14   day.

15        A.    Yeah.  The station, his men that

16   are assigned to his tour of duty.

17        Q.    And you were one of those men?

18        A.    Yes.

19        Q.    Okay.  So the lieutenant on duty

20   who did not reprimand him or ask him to turn

21   off the television is Lieutenant Ford, right?

22        A.    No.  Roy Colannino.

23        Q.    Roy Colannino wasn't a lieutenant.

24        A.    He's the captain.

1        Q.    Your complaint says, "The

2   lieutenant on duty did not reprimand him or

3   ask him to turn off the television."

4            The lieutenant on duty was Steven

5   Ford, right?

6        A.    Right.

7        Q.    And the male officer who turned on

8   the television was Lieutenant Steven Ford?

9        A.    Right.

10        Q.    So what you're saying is Lieutenant

11   Steven Ford did not reprimand himself or tell

12  himself to turn off the television?

13      A.   I don't know.

14      Q.   I'm sorry?  You're shaking your

15  head.  What do you mean by that?

16      A.   I don't know.

17      Q.   I'm just putting the names in for

18  the descriptors you've used in your complaint

19  here.  I'm just filling in the names for the

20  vague descriptors.

21          The way your complaint reads when

22  you put the names in, based upon your

23  testimony, is that Lieutenant Ford was on duty

24  and didn't reprimand himself or ask himself to

1  turn off the television.

2          Once you put the names in, isn't

3  that how it reads?

4      A.   There was a male -- another -- John

5  Burke was in there too, I believe.

6      Q.   Any reference to John Burke in your

7  notes of August 14th?

8      A.   No.

9      Q.   Did John Burke turn on the

10  television?

11    A.   Somebody turned it on.

12    Q.   Well, your notes say Lyn Curcio

13  turned it on.

14    A.   Right.

15    Q.   And then your complaint says a male

16  turned it on.  And when I asked you about

17  that, you told me that Lyn Curcio turned it

18  on, you turned it off, and Lieutenant Ford

19  turned it back on; is that correct?

20    A.   That's correct.

21    Q.   Is that what, in fact, happened?

22    A.   Yes.


12.    <u>Pages 1692 – 1693</u>:

15    Q.   Okay.  Between December 7, when you

16  first contacted Dr. Barry, and then your

17  appointment on the 13th and then your

18  appointment on January 6th of 2000, had there

19  been any further incidents of harassment

20  involving Lieutenant Foster?

21    A.   I'm sure.  I don't remember.

22    Q.   I'm sorry?

23    A.   I don't remember.

24    Q.   Did you say "I'm sure"?

1     A.   Yeah.  I'm sure.  I don't remember.

2    I don't remember what occurred.

3     Q.   Okay.  But I want to make sure I

4    understand you.  Are you saying "I'm sure"

5    meaning "I'm sure there must have been other

6    events, but I don't remember," or are you just

7    saying "I don't remember"?

8     A.   I don't remember.

13.    Pages 1708 –1709:

7     Q.   Okay.  When you went to roll call,

8    did you tell Lieutenant Santoro about what had

9    happened out in the hallway with Captain

10   Chaulk -- or, I'm sorry, in the radio room, I

11   guess it was?

12     A.   Well, sergeant -- I mean, if you

13   look at my notes, Sergeant Goodwin and

14   Sergeant Doherty were standing there.  After

15   roll call, I went over to Captain Chaulk and

16   Chief Roy Colannino standing in the hall and

17   asked why it's okay for the men to ride the

18   bikes --

19       THE REPORTER:  I'm sorry.  I can't

20   hear you.

21       A.   I'm sorry.  Did you want me to read

22   this?

23       Q.   No.  No.  My question was, Did you

24   tell Lieutenant Santoro what had just happened

1   with Captain Chaulk, and I think your answer

2   was no, and then you started making reference

3   to the fact that Sergeant Goodwin and Sergeant

4   Doherty had seen that interaction occur?

5       A.   Right.


14.    <u>Pages 1715 – 1717</u>:

2       Q.   Okay.  And then there is, I think,

3   three entries that go together: April 20,

4   2000, May 3rd of 2000, and May 25 of 2000.

5   This involves an altercation between you and

6   Officer Kathy Lavita Fish, correct?

7       A.   Correct.

8       Q.   What exactly was the nature of the

9   altercation?  What happened?

10      A.   We discussed that in prior

11   depositions.

12        Q.   Okay.  Well, just to refresh my

13   recollection so I can move on with some

14   follow-up questions, what was the nature of

15   the altercation in the garage?

16        A.   Again, you asked that.  I refuse to

17   answer it.  Go by the answer I said in the

18   previous depositions.

19        Q.   And, Ms. Pechner, I'll tell you

20   that we're on like Volume VIII or IX of your

21   deposition.  Each volume is several hundred

22   pages in length.  And, in fact, we just

23   reviewed earlier today pages 1550 to 1560 to

24   get this deposition going.

1          I don't have 1500 pages of

2    deposition testimony committed to memory.  All

3    right?  I'm trying to ask a series of

4    follow-up questions and move through your

5    notes chronologically, so in order to do so --

6        A.   You've already done that

7    chronologically, Attorney Porr.  You've

8    already asked me that at a prior deposition.

9    So I'm just trying to help you get through

40

10    this deposition so we can finish it, because

11    we've already discussed it, and I've already

12    given you the answer.

13        Q.   I don't recall ever asking you

14    questions about these three events.  I have

15    been going through the complaint and your

16    notes chronologically for the sessions I've

17    had.  I have not, to my recollection, asked

18    you about this.

19            So in order to work through these

20    notes, so if I could get a brief description

21    again of the altercation so we can go forward,

22    again, I would appreciate it.

23            Are you continuing to refuse to

24    give me a description of the altercation?

1        A.   Yes.


15.    <u>Pages 1717 – 1718</u>:


17        Q.   Okay.  Did you grieve or otherwise

18    appeal the discipline being imposed upon you

19    because of this reprimand?

20        A.   No.

21     Q.   Why not?

22     A.   Wouldn't get me anywhere.

23     Q.   And why do you say it wouldn't get

24   you anywhere?

1     A.   I don't know.

2     Q.   I'm sorry?

3     A.   I don't know.

16.     Pages 1718 – 1727:

23     Q.   Your note on May 25, in the last

24   sentence, says, "I have come to the

1   understand" -- I think you mean understanding

2   -- "that he," which is a reference back to the

3   chief, "just does not care and that he's

4   afraid of what Lieutenant Bernard Foster has

5   under his belt..."  Do you see that?

6     A.   Yes.

7     Q.   Is that a reference back to the

8   incident involving Bernadette?

9     A.   Quite a few incidents.

10     Q.   Okay.  What other incidents, in

11   addition to the incident involving Bernadette,

12   are you referring to?

13     A.   The way he put his son on the job.

14    Q.   The way who put whose son on the

15   job?

16    A.   The way Roy Colannino put his son

17   on the job.

18    Q.   How did Roy Colannino put his son

19   on the job?

20    A.   He put him on as a Spanish-speaking

21   officer.

22    Q.   Okay.  This is back in '96,

23   correct?  February.

24    A.   Correct.

1    Q.   And what was Roy Colannino's rank

2   back in February of '96?

3    A.   Captain.

4    Q.   Okay.  And if I understand it, to

5   get appointed as a police officer in the

6   Commonwealth of Massachusetts, you have to

7   pass a Civil Service test, correct?

8    A.   Correct.

9    Q.   And then you have to complete an

10   academy, correct?

11    A.   Correct.

12    Q.   Okay.  And did Captain Colannino

13  have anything to do with Kevin Colannino

14  passing the Civil Service test?

15      A.   Well, he applied for a

16  Spanish-speaking officer's position.

17      Q.   Okay.  And who did he apply to for

18  that Spanish-speaking officer position?

19      A.   I don't know.

20      Q.   Isn't that part of the Civil

21  Service process?

22      A.   The exam was given at the Revere

23  High School.

24      Q.   Okay.  By who?

1      A.   Spanish teacher.

2      Q.   Okay.  All right.  And do you have

3  any knowledge to suggest that Captain

4  Colannino had anything to do with the giving

5  of that exam or its outcome?

6      A.   Yeah.  That Kevin got the job and

7  he can't speak Spanish.

8      Q.   Okay.  Aside from the fact that,

9  according to you, anyways, that Kevin can't

10  speak Spanish and nonetheless got the job, do

11  you have any knowledge of Captain Colannino

44

12  having anything to do with the exam given at

13  Revere High School?

14      A.   No.

15      Q.   Okay.  And with respect to Kevin

16  Colannino's completing the academy, did he go

17  to the same academy you went to?

18      A.   Yes.

19      Q.   Did Captain Colannino have anything

20  to do with him successfully completing that

21  academy?

22      A.   I don't know.

23      Q.   Okay.  So how is it that Captain

24  Colannino got his son appointed to the

1  Spanish-speaking position with the Revere

2  Police Department?

3      A.   The same way that he got his son

4  seniority over the female officers.

5      Q.   And how did he do that?

6      A.   I don't know.

7      Q.   So you don't know that he did that,

8  correct?  You have no direct knowledge that he

9  did any of these things?

10      A.   Yes.  I have knowledge.

45

11      Q.   Okay.  And what knowledge do you

12  have?

13      A.   That he went by scores, and he put

14  his son above people that scored higher.

15      Q.   How did he do that?

16      A.   I don't know.

17      Q.   Okay.  So you don't know that he

18  did that at all, do you?

19      A.   He did do it.

20      Q.   And how do you know that?

21      A.   Because the list came out and Kevin

22  was on top of the list.

23      Q.   Okay.

24      A.   And officers that scored higher

1  than Kevin Colannino were below him.

2      Q.   Who publishes the list?

3      A.   Chief Colannino.

4      Q.   He wasn't chief at the time.

5      A.   He was acting.

6      Q.   Not in '96, he wasn't.

7      A.   Then his boy Russo did it.

8      Q.   Why do you say "his boy Russo"?

9      A.   Because that's his boy.

46

10    Q.   Ms. James, you've got your hands in

11   front of your head and you've got your face

12   down, and madam reporter is really straining

13   to hear you, and it makes it difficult for her

14   to take down what you're saying given the

15   posture that you've adopted and your low

16   voice.

17        Can we do something about that?  I

18   mean, at lease out of respect for her, if you

19   could speak up so that she could hear you.

20    A.   Attorney Porr, this isn't a respect

21   thing.  Okay?  I have gone through nine

22   depositions.  Okay?  Nine.  This has nothing

23   to do with respect.  I've never had a problem

24   with Attorney Akerson.  I've answered the

1   questions.  I'm physically and mentally sick.

2   Okay?

3    Q.   Are you physically --

4    A.   I have a migraine.  I have a

5   migraine and it's taken -- this has taken a

6   toll on me.  Okay?

7    Q.   Are you physically and mentally

8   sick to the point where you can't continue?

9      A.   I need to finish this case and I

10   will do whatever it is that I have to, to

11   finish the case.  Okay?

12           If I can't speak up because I have

13   a migraine, that's what happens when I have

14   migraines.  Okay?

15           If I can't remember something that

16   you want me to answer in your way, it's

17   because I can't remember it.

18      Q.   Okay.

19      A.   I'm trying to do my best at this

20   deposition under the conditions.  Okay?

21      Q.   What conditions?

22      A.   Under the conditions.

23      Q.   What conditions?

24      A.   That this room here is where I was

1   sworn in as a police officer.  Okay?

2      Q.   Okay.  Would you prefer we move to

3   a different room?

4      A.   You know what?  I just want to get

5   the depositions over with.

6           MR. CAPIZZI:  I've raised this with

7   Mr. Dilday about not doing them here because

48

8   of the allegations made.  He prefers this for

9   his convenience.  That's why we're here.

10  Mr. Akerson's depositions are supposed to be

11  conducted in Worcester.

12          We're doing it here as a

13  convenience to both Mr. Dilday and his

14  clients.  I've had a brief discussion about

15  this in the past.  I just want that known on

16  the record.

17      Q.   Okay.

18          (Off-the-record discussion between

19  Mr. Dilday and the witness.)

20      Q.   I'm trying to nail down because I'm

21  entitled to nail down the basis for your

22  statement that Captain Colannino got Kevin

23  Colannino's name at the top of the list, and

24  you said because "his boy Russo" did it, and I

1   want to know the basis for your statement "his

2   boy Russo."

3       A.   There's no basis.

4       Q.   Okay.  All right.  So given the

5   fact that I am asking you questions and you

6   are under oath and obligated to answer them

49

7   truthfully - all right? - I now have to back

8   up and reask a series of questions because

9   you've now told me that there's no basis for a

10   statement you just made.

11        The Civil Service list that is

12   produced, isn't it produced through the state

13   Civil Service system?

14      A.   I don't know how the Civil Service

15   is produced.  I was hired as a female officer.

16   Kevin Colannino was hired as a

17   Spanish-speaking officer as well as Sonia

18   Fernandez and Antonio Arcos.

19        All I know is that I was requested

20   by Chief Russo to submit my grades because

21   Lynn Malatesta and Patty Carey had put in a

22   grievance and called in the feds because Roy

23   Colannino had his son put on the job as a

24   Spanish-speaking officer.

1     Q.   And my question to you is,  How do

2   you know that Roy Colannino was able to do

3   that and, in fact, did do so?

4     A.   I don't know.

5     Q.   Okay.  So while you believe that to

50

6  be true, you have no basis in fact for it?

7  You cannot --

8      A.   Well, I have facts that Patty Carey

9  and Lynn Malatesta and the rest of the females

10  won their seniority based on that.

11     Q.   I understand you won your

12  grievance.  My point is you have no basis in

13  fact for alleging that Roy Colannino got his

14  son Kevin put at the top of the list?

15     A.   No.

16     Q.   You have no idea how that happened?

17     A.   No idea.

18     Q.   And you have no idea whether or not

19  Roy Colannino had anything to do with it?

20     A.   No.


17.    <u>1729 – 1733</u>:

2      Q.   Okay.  And what is the Zayre tent

3  sale event or incident that you're referring

4  to?

5      A.   Roy Colannino stealing stuff from

6  there.

7    Q.   Okay.  And how do you know that?

8    A.   Just like the rest of the city

9  knows.  My father-in-law was on the job.

10        MR. AKERSON:  I'm sorry.  I didn't

11  hear the first part of it.

12        MR. DILDAY:  Just like the rest of

13  the city knows.

14        MR. AKERSON:  Is that correct,

15  Ms. James?

16        THE WITNESS:  Yes.

17    Q.   And who's your father-in-law?

18    A.   Richard James.

19    Q.   And how would Richard James have

20  information that Roy Colannino was stealing

21  from the Zayre's tent sale?

22    A.   My father-in-law has a lot of

23  information.  He was almost killed on the job

24  because he was an honest cop.

1    Q.   Richard James was a Revere police

2  officer?

3    A.   Yes.

4    Q.   Okay.  From when to when?

5    A.   I don't know.

6     Q.   Can you give me a rough estimate of

7  time?

8     A.   No.

9     Q.   Was he on the job when you showed

10  up?

11     A.   No.

12     Q.   Okay.  Do you have some idea of how

13  long he had been off the job when you showed

14  up?

15     A.   No.  He was hit off the head with a

16  rock in the '70s and there was an order put

17  out not to investigate that.

18     Q.   Back up a second.

19     A.   Not to look into that.

20     Q.   He was hit on the head with a rock

21  in the '70s?

22     A.   Yes, while working a detail.

23     Q.   How do you know that?

24     A.   Because he told me.

1     Q.   Okay.  And how do you know an order

2  was put out not to investigate that?

3     A.   He told me.

4     Q.   Okay.  And is that the only source

5   of knowledge you have concerning this

6   hit-on-the-head-with-the-rock incident is

7   Richard James?

8       A.   No.

9       Q.   Okay.  What other source of

10  knowledge do you have on that?

11      A.   Spoke to other officers in the

12  department.

13      Q.   Who?

14      A.   This has nothing to do with my

15  case.

16      Q.   Who?  You make these broad-based

17  allegations and I'm entitled to chase them

18  down, Ms. James, so who?

19      A.   Speak to Richard James.  He'll tell

20  you what happened to him.

21      Q.   I am speaking to you.  You're here

22  at a deposition under oath.  Who?

23      A.   I don't remember.

24      Q.   Do you know when in the '70s this

1   occurred?

2       A.   No.

3       Q.   Now, what information, to your

4    knowledge, does Richard James have about Chief

5    Colannino stealing from the Zayre's tent sale?

6        A.   Roy stole from it.

7        Q.   Okay.  What did he steal?

8        A.   I don't know.

9        Q.   When did he steal it?

10       A.   I don't know.

11       Q.   What was the value of what he

12   stole?

13       A.   I don't remember.

14       Q.   Did he steal it alone or in

15   conjunction with somebody else?

16       A.   I don't remember.

17       Q.   Did Mr. Richard James tell you that

18   he witnessed him stealing these -- whatever he

19   stole?

20       A.   I don't remember.

21       Q.   Do you know how Richard James came

22   to know that Chief Colannino had stolen from

23   the Zayre's tent show -- tent sale?

24       A.   I'll ask him again.  I haven't

1    spoke about it in years.

2        Q.   Okay.  So as you sit here now, you

3   have absolutely no knowledge yourself

4   concerning Roy Colannino stealing anything

5   from the Zayre tent sale or anything else for

6   that matter?

7       A.   No.

8       Q.   And I think I was asking who the

9   other officers you spoke to were, and you said

10  what?  You don't remember?

11      A.   I think I spoke to Peter Bernard.

12      Q.   That's Lieutenant Bernard?

13      A.   Lieutenant Peter Bernard.

14      Q.   When did you speak to him about

15  this?

16      A.   Working the shift one night.

17      Q.   What did he tell you?

18      A.   I don't remember.

19      Q.   Why do you say that you know what

20  everyone else in Revere knows?  On what basis

21  did you make that statement?

22      A.   I don't know.  Finish up with what

23  you have to do with me.  You'll learn.  You

24  haven't been here long enough.

18.    <u>Pages 1734 – 1736</u>:

    5    Q.   Okay.  Do you know if Lieutenant

    6  Foster knew anything about this allegation of

    7  Chief Colannino stealing from the Zayre tent

    8  sale?

    9    A.   I don't know.

   10    Q.   So he may not have known about that

  11  at all?

  12    A.   His book is bigger than mine.

  13    Q.   Whose book is bigger than yours?

  14    A.   Lieutenant Foster.

  15    Q.   And what do you mean by that?

  16    A.   The corruption that went on in

  17  there.  People took note of it.

  18    Q.   Are you saying Lieutenant Foster

  19  has kept a book or a log or notes like your

  20  notes of perceived corruption with the Revere

  21  Police Department?

  22    A.   Yes.

  23    Q.   Have you seen that log, book,

  24  notes, whatever it is?

    1    A.   I don't remember.

    2    Q.   Then how do you know he has such a

3  book?

4      A.   I don't remember.

5      Q.   What corruption are you referring

6  to?

7      A.   I don't know.

8      Q.   Do you have some other set of

9  notes, other than the ones we're looking at

10  here, detailing corruption on the part of the

11  Revere Police Department?

12      A.   No.

13      Q.   Do you believe that these notes

14  detail acts of corruption on the part of the

15  Revere Police Department?

16      A.   No.

17      Q.   Have you personally witnessed any

18  acts -- corrupt acts by any officer of the

19  Revere Police Department?

20      A.   I don't remember.

21      Q.   Have you reported to any state law

22  enforcement agency your belief that there has

23  been corruption with the Revere Police

24  Department?

1      A.   No.

2     Q.   Have you reported to any federal

3   agency your belief that there has been

4   corruption with the Revere Police Department?

5     A.   No.


19.     Pages 1736 – 1743:

11     Q.   There's a June 3rd entry, June 3rd

12   of 2000.  Do you see that entry?

13     A.   Yes.

14     Q.   Okay.  You indicate that Officer

15   John Burke was late for work.  Do you know why

16   he was late for work?

17     A.   No.

18     Q.   Do you know if he had talked to his

19   supervisor about why he was late for work?

20     A.   No.

21     Q.   So you don't know whether or not he

22   was late for good reason that was excused by

23   the department or not, do you?

24     A.   Certain officers, when they're

1   late, there's a log entry put into the

2   computer.  There was no log entry in the

3   computer that Officer Burke was late.

4       Q.   How do you know that?

5       A.   Once again, it's a double standard.

6       Q.   How do you know that?

7       A.   Because I know.

8       Q.   And how do you know?

9       A.   Because I looked at the roster.

10      Q.   And what roster did you look at?

11      A.   The date he was late.

12      Q.   When did you do that?

13      A.   I don't remember.

14      Q.   Were you working the same shift

15  with Officer Burke?

16      A.   Apparently, I was if I wrote it in

17  here that he was late for work.

18      Q.   Okay.  And I assume that you were

19  timely and at roll call, and he was late, and

20  then after the roll call you accessed the

21  City's computer to determine whether or not a

22  late entry had been made with respect to him,

23  correct?

24      A.   Correct.

1       Q.   Were you authorized to do so?

2     A.   Look at the rosters.

3     Q.   My question was, were you

4    authorized to do so?

5     A.   I was never unauthorized to do so.

6     Q.   Were you explicitly authorized to

7    check Officer Burke's records in this regard?

8     A.   It's not Officer Burke's records.

9    It would be on the roster for the day.  Or

10   there would be a log entry just like

11   Lieutenant Foster made a log entry about me

12   leaving 15 minutes early.  So that's public

13   information.

14    Q.   I see.  Okay.  And if an officer

15   had a legitimate reason for being late or

16   leaving early, would there necessarily be a

17   log entry reflecting that?

18        MR. DILDAY:  Objection.

19    A.   I had a legitimate reason to leave

20   and I got a log entry.

21    Q.   Apparently, Lieutenant Foster

22   didn't think it was legitimate, did he?

23    A.   That's Lieutenant Foster.

24    Q.   And, apparently, when you talked to

1   the chief about it --

2       A.   But Lieutenant Foster hangs out and

3   drinks beer and they're buddy buddy with John

4   Burke so...  But if you ask Officer Malatesta,

5   she was noted for being late on quite a few

6   occasions.  See, I didn't have that problem

7   because I was always on time for work.  I

8   wasn't a tardy person.

9       Q.   Was Lieutenant Foster on duty as

10  the OIC on June 3rd of 2000 when Officer Burke

11  was late for work?

12      A.   I don't know.

13      Q.   And so back to my question.  If an

14  officer was either late or left early but did

15  so with permission and good cause, would that

16  necessarily be recorded in the log?

17          MR. DILDAY:  Objection.

18      A.   Are you asking like when

19  supervisors let officers go and get law

20  degrees while they're working?  I'm quite

21  confused.  If you can fix that question.

22          Because, you know, you're looking

23  at somebody who was late but yet -- so some

24  officers it's okay for, you know, officers to

1   go and get their degree while they're working

2   in the Revere Police Department.

3           Other officers are written up for

4   leaving sick.  Okay?  I'm answering your

5   question.  It's not practice.  If he was late,

6   it should have been logged into the roster.

7           Whether he was late for reason,

8   whether he wasn't late for a reason, it didn't

9   make a difference.  He was late.  He should

10  have been logged in just like everybody else

11  did.  Whatever his excuse was, he should have

12  been logged in.

13          When somebody leaves early, if they

14  leave early for a detail and they're getting

15  paid for a detail and they leave 15 minutes

16  early, they're getting paid from the City and

17  then they're getting paid for a detail.

18      Q.   Okay.  So can you give me examples

19  of officers who left early to go on a detail

20  and basically got paid double time?

21      A.   That's why you'll have to look at

22  the records.  You have those records.

23    Q.    So you can't give me one?

24    A.    You have those records.

1    Q.    But you can't give me one as you

2    sit here now?

3    A.    No.

4    Q.    Okay.  Now, with respect to Officer

5    Burke here, my question is,  Other than the

6    fact that he was late, you have no idea

7    whether or not that tardiness was excused or

8    maybe there was a valid reason work related

9    that you're unaware of?

10    A.    I already answered the question.

11    Q.    And your answer was?

12    A.    Certain people were allowed to

13    leave early and come in late.

14    Q.    So is John Burke one of these

15    persons that was allowed to come in late?

16    A.    Yes.

17    Q.    Okay.  And why do you say that?

18    A.    Because he was Lieutenant Foster's

19    buddy, drinking partner.

20    Q.    Okay.  And so Lieutenant Foster had

21    a special relationship with Officer Burke that

22  allowed him to come in late?

23     A.   Right.

24     Q.   How often did Officer Burke come in

1  late pursuant to that special relationship?

2     A.   I don't know.

3     Q.   Did you complain about this special

4  relationship to anybody?

5     A.   No.

6     Q.   To your knowledge, did anybody else

7  complain about this special relationship to

8  anybody?

9     A.   I don't know.

10     Q.   Did Officer Burke have this special

11  relationship with any of the other supervisors

12  in the Revere Police Department?

13     A.   I don't know.

14     Q.   Did Lieutenant Foster have a

15  special relationship with any other officers,

16  other than Officer Burke, that allowed them to

17  come in late or leave early?

18     A.   Officer Ciampoli came in when he

19  felt like it.

20     Q.   What shift did Officer Ciampoli

21  work on when you observed this conduct?

22      A.  Day shift.

23      Q.  And who was the supervisor?

24      A.  I don't know.

1      Q.  And how do you know that Officer

2  Ciampoli could come in when he felt like it?

3      A.  I seen him come in after roll call.

4      Q.  And did you know why he was coming

5  in after roll call?

6      A.  Because he was allowed to do that.

7      Q.  But on the days that you saw him

8  coming in late for roll call, did you know

9  why?

10      A.  No.

11      Q.  So the only thing you knew is that

12  he was late for the scheduled time for roll

13  call?

14      A.  Right.

15      Q.  Okay.  And you have no idea whether

16  he was late because he was just slow getting

17  out the door and getting to work or he was

18  late because the chief had him doing something

19  else and made him late?

20      A.   Yeah.

20.     <u>Pages 1747 – 1749</u>:

2       Q.   Okay.  Now, you note here that

3   Officer Patrick Cappola was never suspended.

4   What's the significance to that note?

5       A.   Because nothing's ever done.

6       Q.   Do you think him going into the

7   women's locker room warranted a suspension?

8       A.   Absolutely.

9       Q.   And why do you say that?

10      A.   What if she was naked?  It's a

11  women's locker room.   I have never heard of

12  one of the females walking into the males'

13  locker room in that Revere Police Department.

14  Whether there's a sign on there or there isn't

15  a sign, not one time in the whole time I

16  worked in that police department did I ever

17  walk into the males' locker room.

18      Q.   Okay.  So, at a minimum, you

19  felt --

20      A.   What if she was standing there

21  naked?  What if that was your daughter

22  standing there naked?

23      Q.   So, at a minimum, you felt he

24  should have been suspended?

1      A.   Absolutely.

2      Q.   How many days?

3      A.   I don't know.  Then his wife was

4  threatening her.  His wife was threatening

5  her.

6      Q.   Not there yet.  How many days do

7  you think he should have been suspended?

8      A.   I'm not the chief.  I'm a patrol

9  officer.

10      Q.   I understand you're a patrol

11  officer.

12      A.   I'm an Indian.  I don't make those

13  decisions.  That's what the superior officers

14  are supposed to do.  They're supposed to make

15  the decisions when incidents like this

16  happened to us.

17      Q.   Okay.

18      A.   Do I know what happened?  Probably

19  nothing, just like nothing happened with my

20  incidents.

21    Q.   Well, something happened with the

22   incident from August of '97.  You got

23   transferred to another shift, correct?

24    A.   Right.

1    Q.   Okay.  Now, you put in your notes

2   here Officer Patrick Cappola was never

3   suspended.  And realizing that you're an

4   Indian, you nonetheless expressed the opinion

5   that he should have been suspended.

6       My question is, How many days?

7   What do you think that was worth?

8    A.   It's not -- I don't have an

9   opinion.

10    Q.   Okay.  Do you think it was an

11   offense that warranted termination?

12    A.   I don't have an opinion.

21.   <u>Pages 1749 – 1750</u>:

13    Q.   Okay.  Now, you indicate here a

14   short time after this Kelly McKenna was

15   threatened by Officer Pat Cappola's wife.  How

16   do you know that?

17    A.   She told me.

18     Q.   Kelly McKenna told you?

19     A.   Correct.

20     Q.   You weren't present when this

21   alleged threat occurred?

22     A.   I don't remember.

23     Q.   Okay.  And what did Kelly tell you

24   about this alleged threat?

1     A.   I don't remember.

2     Q.   Well, wait a minute.  It says, "I

3   am well aware of this incident because I was

4   the reporting officer."  Do you see that?

5     A.   There you go.  You answered your

6   own question.

**Questions by Attorney Michael Akerson**

22.     <u>Pages 1755 – 1756</u>:

19     Q.   Do you recall anyone else who was

20   present when Mr. Richard James allegedly told

21   you that Roy Colannino allegedly stole stuff

22   from Zayre's tent sale?

23     A.   No.  But that was also -- that was

24   also a rumor in the police department.

1     Q.   Do you recall my question?

2     A.   Was there anybody else present?

3     Q.   That was my question.

4     A.   And I said I don't know if my

5  husband was there.  That was -- that was it.

6  That was my answer.

7     Q.   I know you said you're not sure if

8  your husband was there.  Was anyone else

9  present?

10     A.   No.


23.     <u>Pages 1756 – 1757</u>:

11     Q.   Do you know if Richard James told

12  you that he had reported Roy Colannino's

13  actions specifically with regard to allegedly

14  taking property from the Zayre's tent sale to

15  any law enforcement entities?

16     A.   I'm not sure what he reported and

17  who he reported it to.

18     Q.   All right.  Is your --

19     A.   But he almost lost his life for his

20  integrity.  So I can't sit here and speak for

21  what my father-in-law did while he was on the

22  job.

23      Q.   Okay.  My question was,  Did

24  Mr. James inform you that he had reported Roy

1  Colannino's alleged theft of stuff from the

2  Zayre tent sale to any law enforcement entity?

3      A.   No.