**Exhibit 2. Page 468 from DSM IV-TR**

**Diagnostic criteria for
309.83 Posttraumatic Stress Disorder** *(continued)*

B. The traumatic event is persistently reexperienced in one (or more) of the following ways:

   (1) recurrent and intrusive distressing recollections of the event, including images, thoughts, or perceptions. **Note:** In young children, repetitive play may occur in which themes or aspects of the trauma are expressed.
   (2) recurrent distressing dreams of the event. **Note:** In children, there may be frightening dreams without recognizable content.
   ✓ (3) acting or feeling as if the traumatic event were recurring (includes a sense of reliving the experience, illusions, hallucinations, and dissociative flashback episodes, including those that occur on awakening or when intoxicated). **Note:** In young children, trauma-specific reenactment may occur.
   (4) intense psychological distress at exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event
   (5) physiological reactivity on exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event

C. Persistent avoidance of stimuli associated with the trauma and numbing of general responsiveness (not present before the trauma), as indicated by three (or more) of the following:

   (1) efforts to avoid thoughts, feelings, or conversations associated with the trauma
   (2) efforts to avoid activities, places, or people that arouse recollections of the trauma
   (3) inability to recall an important aspect of the trauma
   (4) markedly diminished interest or participation in significant activities
   (5) feeling of detachment or estrangement from others
   (6) restricted range of affect (e.g., unable to have loving feelings)
   (7) sense of a foreshortened future (e.g., does not expect to have a career, marriage, children, or a normal life span)

D. Persistent symptoms of increased arousal (not present before the trauma), as indicated by two (or more) of the following:

   (1) difficulty falling or staying asleep
   ✓ (2) irritability or outbursts of anger
   ✓ (3) difficulty concentrating
   (4) hypervigilance
   (5) exaggerated startle response

E. Duration of the disturbance (symptoms in Criteria B, C, and D) is more than 1 month.

F. The disturbance causes clinically significant distress or impairment in social, occupational, or other important areas of functioning.

*Specify* if:

   **Acute:**    if duration of symptoms is less than 3 months
   **Chronic:**  if duration of symptoms is 3 months or more

*Specify* if:

   **With Delayed Onset:**  if onset of symptoms is at least 6 months after the stressor

**Exhibits 3-14: Excerpts from May 5, 2006 Deposition of Terri Pechner-James.**

```
                IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS


TERRI PECHNER-JAMES
and SONIA FERNANDEZ,
    Plaintiffs
                                        VOLUME IV
VS.                             C.A. NO. 03-12499-MLW

CITY OF REVERE; THOMAS
AMBROSINO, MAYOR; CITY OF
REVERE POLICE DEPARTMENT,
TERRENCE REARDON, CHIEF;
BERNARD FOSTER, SALVATORE
SANTORO, ROY COLANNINO,
FREDERICK ROLAND, THOMAS DOHERTY,
JOHN NELSON, JAMES RUSSO,
MICHAEL MURPHY, and STEVEN FORD,
    Defendants
```

CONTINUED DEPOSITION of TERRI PECHNER-JAMES taken at the request of the defendants pursuant to Rule 30 of the Federal Rules of Civil Procedure before Nancy A. Diemdowicz, Registered Merit Reporter, a notary public in and for the Commonwealth of Massachusetts, on May 5, 2006, commencing at 10:15 A.M. at the offices of Reardon, Joyce & Akerson, 397 Grove Street, Worcester, Massachusetts.

COPY

```
 1   A P P E A R A N C E S :

 2
     FOR THE PLAINTIFFS:
 3
     JAMES S. DILDAY, ESQ.
 4   GRAY & DILDAY LLP
     27 School Street
 5   Boston, Massachusetts 02108

 6
     FOR THE DEFENDANTS. CITY OF REVERE: THOMAS
 7   AMBROSINO, MAYOR: CITY OF REVERE POLICE
     DEPARTMENT. TERRENCE REARDON, CHIEF:
 8
     WALTER PORR, ESQ.
 9   PAUL CAPIZZI, ESQ.
     Office of the City Solicitor
10   City Hall, 281 Broadway
     Revere, Massachusetts  01251
11

12   FOR THE DEFENDANTS, BERNARD FOSTER. SALVATORE
     SANTORO. ROY COLANNINO. FREDERICK ROLAND.
13   THOMAS DOHERTY. JOHN NELSON, JAMES RUSSO.
     MICHAEL MURPHY AND STEVEN FORD:
14
     MICHAEL AKERSON, ESQ.
15   REARDON, JOYCE & AKERSON, P. C.
     397 Grove Street
16   Worcester, Massachusetts 01605

17

18

19

20

21

22

23

24
```

QUESTIONS WITNESS REFUSED TO ANSWER

Page 663 - Lines 2-4

Page 664 - Lines 14-15

Page 664 - Lines 22-23

Page 678 - Lines 7-10

Page 678 - Lines 20-22

Page 679 - Lines 3-5

Page 681 - Lines 7-9

Page 721 - Lines 7-9

Page 721 - Lines 14-15

Page 730 - Lines 5-9

Page 744 - Lines 4-5

# I N D E X

DEPONENT:   TERRI PECHNER-JAMES

|     |                              | PAGE |
| --- | ---------------------------- | ---- |
|     | EXAMINATION BY MR. PORR      | 554  |

### EXHIBITS

|     |                              | PAGE |
| --- | ---------------------------- | ---- |
| 8.  | 1996 Calendar                | 594  |
| 9.  | Memorandum dated 1/14/99     | 597  |
| 10. | Photocopy of Photograph      | 617  |
| 11. | Affidavit of Compliance, MCAD | 652' |
| 12. | 1997 Calendar                | 744  |
| 13. | Answers to Interrogatories   | 756  |

school with him.

Q. All right. How long before you got pregnant with Kenisha had you met Mr. Todd? How long had you known him?

A. None of your business. How do you like that for an answer?

Q. Well, I'd prefer a factual answer that's responsive to the question. Are you refusing to answer?

A. I'm refusing to answer.

MR. PORR: Madam reporter, would you please mark the record.

Q. Is Mr. Todd on Kenisha's birth certificate?

A. Yes, he is.

Q. Okay. Has he provided child support for her?

A. Sometimes.

Q. Were you and he ever married?

A. No.

Q. How old was Mr. Todd when Kenisha was born? Was he your age? A little older? A little younger?

A. I don't know.

    Q.    Okay. If my math holds out, you got pregnant, then, sometime in February of '89 with Kenisha?

    A.    That's good math.

    Q.    Okay. So you were 15 years old at the time you got pregnant?

    A.    Sure.

    Q.    All right. Were you living at home at the time?

    A.    Yes, I was.

    Q.    Okay. Were you able to stay in school after you got pregnant?

    A.    Sure.

    Q.    How soon after you met Mr. Todd did you and he engage in sexual intercourse?

    A.    I already told you I'm not answering that question.

    MR. PORR: Madam reporter, would you mark the record.

    A.    It has nothing to do with this case.

    Q.    Was Mr. Todd the first individual that you had intercourse with?

    MR. DILDAY: Objection to that one.

1        MR. PORR: Objection is noted,
2  counsel.
3        A.    I'm refusing to answer it.
4        MR. PORR: Madam reporter, would
5  you mark the record.
6        Q.    Did you and Mr. Todd continue in a
7  relationship after Kenisha was born?
8        A.    No.
9        Q.    Okay. Did you ever live with his
10 family?
11       A.    No.
12       Q.    Did he ever live with your family?
13       A.    No.
14       Q.    Did you and Mr. Todd and Kenisha
15 ever live together as a family unit?
16       A.    No.
17       Q.    Your middle child, it's a boy,
18 right?
19       A.    Correct.
20       Q.    And it's the boy that's in the
21 photograph marked as Exhibit 10?
22       A.    Yup.
23       Q.    Okay. What is his name?
24       A.    Who's that? My son?

A.  I don't remember.

Q.  Okay. When you dated, did you tend to date one person exclusively, or would you date a number of different people at the same time?

A.  Can you ask that question again?

Q.  Sure. When you dated, did you tend to date one person exclusively, or would you date a number of different men at the same time?

MR. DILDAY: And I'm going to tell her --

A.  Would you ask Brian that? Because Brian was actually cheating on his girlfriend.

MR. DILDAY: I'm going to tell her'" not to answer to that because it's totally irrelevant.

MR. PORR: Madam reporter, would you mark the record.

Q.  In your dating relationship with Brian Goodwin, did you and he ever engage in sexual intercourse?

MR. DILDAY: Again, she doesn't have to answer. It's irrelevant.

```
 1              MR. PORR:  Madam reporter, would
 2   you mark the record.
 3        Q.   In your dating with Ray Thompson,
 4   did you and he ever engage in sexual
 5   intercourse?
 6              MR. DILDAY:  Again, advising her
 7   not to answer.
 8        Q.   Ms. Pechner, are you going to
 9   follow your counsel's advice and not answer
10   those questions?
11        A.   Yes, I am.
12              MR. PORR:  Madam reporter, would
13   you mark the record.
14        A.   Because now all you want to know is
15   my sex -- I went through this with the police
16   department.  You're supposed to be
17   representing the mayor and the chief.  What my
18   sexual preference and my sexual -- who I had
19   sex with has nothing to do with you.  It's
20   none of your business.  It's none of this
21   case's business.  Because I was sexually
22   harassed on the job instead of doing an
23   investigation as to why I was sexually
24   harassed -- not only sexually harassed but
```

and he live together?

A.   I don't remember.

Q.   You don't remember?

A.   No.

Q.   How can you not remember that?

A.   Don't remember.

Q.   Prior to getting married on May 11 of 2001, did you and he engage in sexual intercourse?

A.   I'm not answering that question.

MR. PORR:  Madam reporter, would you mark the record.

Q.   Did you date any other police officers of the Revere Police Department aside from Mark James and Brian Goodwin?

A.   No.

Q.   Did Mark James date any of the female officers on the Revere Police Department?

A.   No.

Q.   Was Mark James married prior to his marriage to you?

A.   No.

Q.   Did he have any children. from

1   Q.   Okay. All right. I think that's
2   all for that exhibit. Before I move on to, if
3   you will, 1997, as you can gather, I'm trying
4   to move in a chronological fashion. We talked
5   earlier about your children. We got a few
6   details about that.
7        Have you had any other pregnancies
8   other than the ones that resulted in the birth
9   of your three children?
10  A.   I'm going to refuse to answer that
11  question.
12       MR. PORR: Okay. Would you mark
13  the record, please.
14  Q.   How many other such pregnancies did
15  you have?
16  A.   No one said I had any, but I don't
17  think it's relevant to the case, so I'm going
18  to refuse to answer any --
19       MR. PORR: Would you mark the
20  record, please.
21  Q.   From October -- I'm sorry --
22  September of '95, when you were sworn in as a
23  police officer, until March 13 of 2001, when
24  you walked off the job, were you pregnant

1  intentionally try to keep your relationship a
2  secret?
3       A.   Again, it's not anybody's business
4  who I date.
5       Q.   Okay. I understand that,
6  Ms. Pechner. My question is, Did you and
7  Officer James intentionally, deliberately,
8  purposely attempt to keep your relationship a
9  secret?
10      A.   Maybe.
11      Q.   I mean, did you or didn't you?
12      A.   Maybe.
13           MR. PORR:  Mark the record.
14      Q.   All right. So if I understand
15 correctly, there was the seniority issue
16 grievance from February '96 and there was
17 Officer Burns' behavior from August of '96.
18           During calendar 1996, did anything
19 else happen that is in any way related to this
20 case?
21      A.   I don't recall.
22      Q.   Okay. How were you feeling as a
23 Revere police officer as you completed your
24 first year on the job in 1996?

1   your notes, of 2001 attribute a different quote
2   to the chief, the complaint of 2003 attributes
3   the quote from the notes of 1999 to the chief.
4           My question to you, Which one is
5   accurate?
6           MR. DILDAY:   Objection.
7           MR. PORR:   Noted for the record,
8   counsel.
9       A.   Asked and answered.
10          MR. PORR:   Mark the record, please.
11  Would you mark this as the next in order.
12
13          (Deposition Exhibit No. 12 marked.)
14      Q.   Let me hand you what I've had
15  marked as Exhibit 12 and ask you to review
16  that, please, and when you've finished, look
17  up.
18      A.   (Looks at document.)   All set.
19      Q.   All right.   The exhibit we've had
20  marked as number --
21          MR. DILDAY:   12.
22      Q.   -- 12, thank you, you recognize
23  that as your calendar for calendar year 1997,
24  correct?