**Exhibit 15. May 25, 2006 Deposition of Terri Pechner-James-Excerpts**

1       IN THE UNITED STATES DISTRICT COURT
2         FOR THE DISTRICT OF MASSACHUSETTS
3
4   TERRI PECHNER-JAMES
    and SONIA FERNANDEZ,
        Plaintiffs
5                                    VOLUME VI
    VS.                          C.A. NO. 03-12499-MLW
6
    CITY OF REVERE; THOMAS
7   AMBROSINO, MAYOR; CITY OF
    REVERE POLICE DEPARTMENT,
8   TERRENCE REARDON, CHIEF;
    BERNARD FOSTER, SALVATORE
9   SANTORO, ROY COLANNINO,
    FREDERICK, ROLAND, THOMAS DOHERTY,
10  JOHN NELSON, JAMES RUSSO,
    MICHAEL MURPHY, and STEVEN FORD,
11      Defendants

12
13
14
15         CONTINUED DEPOSITION of TERRI
16  PECHNER-JAMES taken at the request of the
17  defendants pursuant to Rule 30 of the Federal
18  Rules of Civil Procedure before Nancy A.
19  Diemdowicz, Registered Merit Reporter, a
20  notary public in and for the Commonwealth of
21  Massachusetts, on May 25, 2006, commencing at
22  10:08 A.M. at the offices of Reardon, Joyce &
23  Akerson, 397 Grove Street, Worcester,
24  Massachusetts.

COPY

McCARTHY REPORTING SERVICE   WORCESTER, MA
(508)753-3889 (IN MASS)   800-564-3889

A P P E A R A N C E S :

FOR THE PLAINTIFFS:

JAMES S. DILDAY, ESQ.
GRAYER & DILDAY LLP
27 School Street
Boston, Massachusetts 02108


FOR THE DEFENDANTS, CITY OF REVERE; THOMAS AMBROSINO, MAYOR; CITY OF REVERE POLICE DEPARTMENT, TERRENCE REARDON, CHIEF:

WALTER H. PORR, JR., ESQ.
Office of the City Solicitor
City Hall
281 Broadway
Revere, Massachusetts  01251


FOR THE DEFENDANTS, BERNARD FOSTER, SALVATORE SANTORO ROY COLANNINO, FREDERICK ROLAND, THOMAS DOHERTY, JOHN NELSON, JAMES RUSSO, MICHAEL MURPHY AND STEVEN FORD:

MICHAEL J. AKERSON, ESQ.
REARDON, JOYCE & AKERSON, P. C.
397 Grove Street
Worcester, Massachusetts 01605

1

# I N D E X

2    DEPONENT:   TERRI PECHNER-JAMES

3                                                        PAGE

4

5    CONTINUED EXAMINATION BY MR. PORR            901

6

7

8

9

10                    EXHIBITS

11                                                       PAGE

12   15.   Patient History & Physical Exam        910

13   16.   Affidavit - Exhibit 18                 922

14   17.   Affidavit - U.S. District Court        923

15   18.   Photocopy of Photograph                1007

16   19.   Photocopy of Photograph                1011

17   20.   Photocopy of Photograph                1013

18   21.   Memorandum dated 12/21/98              1073

19   22.   Sonia Fernandez Supplementation        1136

20         of Interrogatories

21

22

23

24

```
 1              MR. PORR:  We're back on the record
 2    with the deposition of Terri Pechner.
 3    CONTINUED EXAMINATION BY MR. PORR:
 4         Q.   Good morning, Ms. Pechner.
 5         A.   Good morning.
 6         Q.   You understand that you're still
 7    under oath?
 8         A.   Yes, I do.
 9         Q.   Okay.  Have you taken any
10    medication this morning?
11         A.   Yes, I have.
12         Q.   What have you taken?
13         A.   Synthroid and Paxil.
14         Q.   The Synthroid, is that an
15    artificial thyroid type medication?
16         A.   Yes.
17         Q.   All right.  And the Paxil you take
18    for what condition?
19         A.   PTSD.
20         Q.   Okay.  How are you feeling this
21    morning?
22         A.   Lousy.
23         Q.   Okay.  And when you say "lousy,"
24    what do you mean by that?
```

1     A.    Tired.

2     Q.    Okay. Anything else?

3     A.    No.

4     Q.    All right. We're scheduled to be here until five o'clock this afternoon.

           Do you feel up to testifying today and answering questions and going through a deposition session?

9     A.    As much as I can.

10    Q.    All right. The last time I had an opportunity to ask you questions at deposition was on May 5th, which was 20 days ago.

           Did you see any doctors after the end of that deposition session?

15    A.    Yes, I did.

16    Q.    Who did you go see?

17    A.    I saw Dr. Gingrich.

18    Q.    Where did you see him?

19    A.    Her. A new primary care physician.

20    Q.    Where?

21    A.    Yesterday. Georgetown.

22    Q.    So the first time you saw Dr. Gingrich in Georgetown was yesterday?

24    A.    The day before. I'm sorry.

1   Q.   That's okay.
2   A.   Tuesday. Tuesday I saw her.
3   Q.   It's a her?
4   A.   Yes.
5   Q.   Okay. Let me back up, if you
6   would, please, to May 5th, though. At the end
7   of the deposition on the afternoon of May 5th,
8   did you go see any health care provider that
9   day?
10  A.   No.
11  Q.   So from May 5th until Tuesday, the
12  23rd, is it fair to say you did not see any
13  health care provider?
14  A.   Correct.
15  Q.   Did you see Dr. Gingrich -- what'
16  did you see Dr. Gingrich on the 23rd for?
17  What did you go in for?
18  A.   Because these depositions are
19  making me sick again.
20  Q.   And how so?
21  A.   Because I'm reliving what I went
22  through when I first left the job.
23  Q.   All right. ,And how is that making
24  you sick? How is the sickness manifesting

1  itself?
2      A.   I can't eat, I can't sleep, my
3  brain's in a cloud, I'm tired all the time,
4  and I'm having nightmares again.
5      Q.   When did you start having
6  nightmares again?
7      A.   I don't remember.
8      Q.   Did you have one last night?
9      A.   No.
10     Q.   Have one the night before?
11     A.   I don't remember.
12     Q.   Did you have one this week?
13     A.   Yes.
14     Q.   Okay.  What was the nightmare
15 about?
16     A.   I don't remember.
17     Q.   Did Dr. Gingrich do anything in
18 terms of treatment?
19     A.   Yes.  She put me on Paxil and Xanax
20 to sleep.
21     Q.   Is Xanax a sleep medication?
22     A.   Sleep and anxiety.
23     Q.   Earlier, you mentioned that you had
24 -- one of the ways the depos are making you

1   sick is you feel like your brain is in a
2   cloud?
3          A.    That's my thyroid not functioning
4   correctly.
5          Q.    I see. How long have you had a
    thyroid problem?
           A.    I don't know.
8          Q.    When did you start taking
9   medication for the thyroid?
10         A.    I don't recall.
11         Q.    This year? Last year? Two years
12  ago?
13         A.    Two years ago. I don't -- I don't
14  remember when.
15         Q.    Does the thyroid medication work?
16         A.    It helps, yes.
17         Q.    Okay. Is your brain in a cloud
18  right now?
19         A.    I'm tired.
20         Q.    Okay. I interpreted your response
21  earlier, when you said your brain is in a
22  cloud and you're tired all the time, as
23  describing two different phenomena that you
24  are experiencing. Are they the same?

1   A.   I don't know.

2   Q.   Okay. So I understand that you're
3  tired right now, but would you also say that
4  your brain is in a cloud right now?

5   A.   No.

6   Q.   Okay. Ms. Pechner, the reason I'm
7  asking the questions is because I need to make
8  sure that you're in a frame of mind that you
9  can hear and understand and respond to my
10 questions accurately so that at a later date
11 there isn't a claim being made that for some
12 reason you were not able to testify, you know,
13 appropriately today and somehow would claim
14 that your testimony today is not valid. Do
15 you understand?

16  A.   I understand.

17  Q.   Okay. So I want to make sure that
18 if there's any reason why we can't go forward
19 today, that you'll tell me; otherwise, I'll
20 assume that you can and I'll expect that your
21 answers today are answers that can be relied
22 upon at trial. Do you understand?

23  A.   I understand. Until the
24 depositions are over, or the trial or whatever

1  is over, I can't begin to recover from the
2  stress induced, which is what this is related
3  to.
4      Q.    Okay.  And sometimes people
5  experience stress to the point where it
6  incapacitates them, and I just want to make
7  sure that if that's happened here that I know
8  that, and if it hasn't happened here I know
9  that as well.  You follow?
10     A.    I follow.
11     Q.    Okay.  Have you reviewed anything
12 related to this case between the last time I
13 got to question you on May 5th and today?
14     A.    Can you ask that again?
15     Q.    Have you reviewed anything related
16 to this case between May 5th, the last time I
17 got to question you, and today?
18     A.    I've taken a look at your
19 deposition that you claim you didn't ask
20 whether or not I had an abortion.
21     Q.    So that was the May 5th deposition
22 transcript?
23     A.    Correct.
24     Q.    When did you look at that?

1   A.   I don't -- I don't know when I got
2  it.
3   Q.   A week ago?  Two weeks ago?
4   MR. DILDAY:  I don't know when I
5  gave it to you to look at.
6   Q.   If you don't recall, that's fine.
7  I'm just asking --
8   A.   I don't recall when he gave it to
9  me.
10   Q.   And, again, let me explain.  When a
11  witness says they don't recall, attorneys,
12  like myself, will frequently ask a follow-up
13  question designed to see if we can help
14  trigger recall or if we can give you some
15  parameters that you can say, you know, it was
16  last week but it wasn't two weeks ago, or
17  something to that effect.
18   And that's all I'm doing is I'm
19  just trying to see if I can get some
20  definition, some more clarity, when I ask
21  those kind of questions.  Did you read the
22  whole transcript?
23   A.   No.
24   Q.   Okay.  What did you read for?  Were

1  you looking for something in particular?
2      A.   Yeah.  The fact that you -- your
3  line of questioning was completely
4  unacceptable.
5      Q.   Okay.
6      A.   And the fact that you said you told
7  Sonia that -- and Jimmy that you did not say
8  that ▊ had an abortion.
9      Q.   All right.  Did you find in the
10 deposition transcript where ▊ asked that
11 question?
12     A.   ▊ found where you asked had ▊ had
13 any other pregnancies, other than the three
14 that ▊ now have.
15     Q.   Okay.  And why did you interpret
16 that as a question about abortion?
17     A.   Because one would lead that to
18 believe that if you have seven children,
19 Attorney Porr, and you either have a miscarry
20 or you have an abortion.  So, you know, ▊
21 think that's absolutely none of your business
22 and has nothing to do with the case.
23     Q.   Have you had any miscarriages?
24     A.   I'm not answering that question.

1     MR. DILDAY: I would like to go on
2 the record that this is a question that the
3 judge said was out of line for Mr. Porr to be
4 asking.
5     MR. PORR: I read the order,
6 Mr. Dilday. The question that the judge said
7 was out of line were questions about sexual
8 relations. I didn't ask a question about
9 sexual relations today.
10     MR. DILDAY: Well, she will not
11 answer any questions about whether she had
12 miscarriages or abortions at all, and that
13 would be along the same lines that the judge
14 was talking about on the question that
15 Ms. Pechner-James just answered or made
16 reference to regarding whether or not she had
17 any pregnancies that did not lead to a birth.
18     MR. PORR: Mark that as next in
19 order.
20
21     (Deposition Exhibit No. 15 marked.)
22  Q.   Let me put in front of you what
23 I've had marked as Exhibit 15. See at the top
24 where it indicates that this is a record from

1    Dr. Keroack?
2        A.    I see that.
3        Q.    All right. And the date of this
4    record looks to be February 5th of '01. Do
5    you see that?
6        A.    I do.
7        Q.    Across the top has your name. Do
8    you see that?
9        A.    I do.
10       Q.    At the far right, it has your age
11   of 27?
12       A.    Yes.
13       Q.    Do you see the G and P, between
14   your name, and the H?
15       A.    Yeah, I do.
16       Q.    Do you know what they stand for?
17       A.    No idea.
18       Q.    If I'm reading this record
19   correctly - and I believe I am - the G stands
20   for grava and the P stands for para. Grava is
21   an indication of the number of pregnancies;
22   Para is an indication of the number of live
23   births.
24              There's a claim in this case,

1  repeated in a number of documents that you've
2  signed under oath, that part of the sexual
3  harassment complaint being made is that there
4  was no maternity leave policy when you were an
5  officer with the Revere Police Department; is
6  that correct?
7       A.    That's correct.
8       Q.    All right.  And are you claiming
9  that the absence of a maternity leave policy
10 was an example of the sexual harassment that
11 you experienced while you were an officer with
12 the Revere Police Department?
13      A.    I'm claiming there was never a
14 sexual harassment policy there.
15      Q.    I'm talking about the maternity
16 leave policy.  My question was, Are you
17 claiming that the absence of a maternity leave
18 policy is an example of the sexual harassment
19 you allege you experienced while you were an
20 officer with the Revere Police Department?
21      A.    Yes.  Because there still isn't
22 one.
23      Q.    All right.  And so my question is,
24 The two pregnancies that did not result in

1  live births as of February 5 of '01, did they
2  occur while you were a member of the Revere
3  Police Department?
4      A.  Well, you -- you --
5      MR. DILDAY: Objection. She's not
6  answering that.
7      MR. PORR: Well, Mr. Dilday, she's
8  making a claim that the absence of a maternity
9  leave policy is an example of the hostile
10  environment, and so if she was never pregnant
11  while she was an officer with the Revere
12  Police Department, then the maternity leave
13  policy may not be germane, and that's one way
14  of dealing with it.
15      But if she was - okay? - then
16  perhaps the maternity leave policy does come
17  into play, and I think I'm entitled to know
18  the answer to that question.
19      MR. DILDAY: I think this whole
20  issue of the maternity leave policy is a
21  policy that goes to the whole gravamen of the
22  practices., procedures and operations of the
23  Revere Police Department.
24      Regardless as to whether or not she

1  experienced a pregnancy during that time
2  frame, it goes to the issue as to whether or
3  not such a policy was in place.
4           It doesn't mean that this policy
5  had a direct impact on her individually.  What
6  it means is that there was a general policy
7  that the police department had.
8           MR. PORR:  But if it had no impact
9  on her, I fail to see how you can make a claim
10 that she's entitled to damages for it.
11          MR. DILDAY:  Because it's the
12 general policy with the Revere Police
13 Department.  It shows how the Revere Police
14 Department did not treat women in the same
15 manner that it treated the male officers.
16          MR. PORR:  Who can't get pregnant?
17 I mean, that makes no sense to me.  But all
18 right.  Very well.
19          MR. DILDAY:  You caught me with
20 water in my mouth.
21          MR. PORR:  That's okay.  The
22 exhibits are on record; the questions are on
23 record.  We'll move on.,,
24      Q.   Did you review anything else, any

1  other deposition transcripts, any other
2  documents, between May 5th, when your
3  deposition was last taken by me, and today?
4      A.   Not that I recall.
5      Q.   Okay. Have you talked to Sonia
6  Fernandez between May 5th and today?
7      A.   Yes, I did.
8      Q.   How many times?
9      A.   Twice.
10     Q.   Okay. When was the first time?
11     A.   I don't recall the days.
12     Q.   All right. Was it the day of your
13 deposition, May 5, '06?
14     A.   I don't -- I don't remember.
15     Q.   Was it prior to your deposition
16 session in Revere with Attorney Akerson on
17 May 19th, '06?
18     A.   Yes.
19     Q.   Were both conversations with Sonia
20 prior to the May 19th deposition session?
21     A.   No.
22     Q.   So one before and one after?
23     A.   Yes.
24     Q.   Did she call you or did you call