UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TERRI PECHNER-JAMES and SONIA FERNANDEZ,<br>　　　　　Plaintiffs,<br><br>v.<br><br>CITY OF REVERE, THOMAS AMBROSINO, MAYOR, CITY OF REVERE POLICE DEPARTMENT, TERRENCE REARDON, CHIEF OF POLICE, BERNARD FOSTER, SALVATORE SANTORO, ROY COLANNINO, FREDERICK ROLAND, THOMAS DOHERTY, JOHN NELSON, JAMES RUSSO, MICHAEL MURPHY and STEVEN FORD,<br>　　　　　Defendants, | )<br>)<br>)<br>)<br>)　C.A. No. 03-12499-MLW<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**CITY DEFENDANTS' OMNIBUS REPLY TO
PLAINTIFFS RESPONSE TO MOTION FOR SANCTIONS**

**NOW COME** Defendants, City of Revere, City of Revere Police Department, Mayor Thomas Ambrosino and Police Chief Terence Reardon (City Defendants), and hereby submit their Omnibus Reply to Plaintiffs' Response (Docket Nos. 216, 218 and 219)[1] to their motions for sanctions.

**I.**

**BACKGROUND**

The following motions are currently pending and awaiting decision:

1. City Defendants' motion for sanctions - Fernandez (Docket Nos. 182-185); opposed (Docket No. 187); supplemented (Docket Nos. 195-196); under advisement (Docket No. 199).

2. City Defendants' motion for sanctions - Pechner (Docket Nos. 188-191 & 194); opposed (Docket No. 197); under advisement (Docket No. 199); supplemented

---

[1] Here it must be noted that although Docket No. 216 is entitled "Plaintiff<u>s</u> Response to Docket Nos. 188 and 209," by the very nature of the case and by the content of the pleading itself, it is only Plaintiff Pechner who is responding.

(Docket. No. 201); second supplement (Docket No. 209); third supplement (Docket No. 211); Plaintiff's response (Docket Nos. 216, 218 and 219).[2]

The following motions have been withdrawn by the Plaintiff, but the City Defendants' sanctions requests are still pending and awaiting decision:

1. Motion to Compel Defendant Thomas Ambrosino to Answer Interrogatories (Docket No. 202); opposed (Docket Nos. 206-207); withdrawn (Docket No. 208).

2. Motion to Compel Defendant Terence Reardon to Answer Interrogatories (Docket No. 203); opposed (Docket Nos. 204-205); withdrawn (Docket No. 208).

## II.

## CITY DEFENDANTS' MOTIONS FOR SANCTIONS

**A.   Plaintiff Pechner:**

1.   The Initial Opposition.

In her opposition filed herein on May 18, 2006, Plaintiff Pechner asserts that the transcript excerpts submitted by the City Defendants in support of their motion for sanctions "reveal no behavior that warrants the sanctioning of Ms. Pechner-James or her counsel." Docket No. 197, page 2, last sentence of carry-over paragraph. In response, City Defendants would simply state that the record filed in support of its motion speaks for itself.

Plaintiff Pechner next asserts the well-worn, but as of yet unsubstantiated, claim that "Attorney Porr fails to acknowledge or accept his contribution to whatever hostility may develop during the depositions in which he cross-examines the plaintiff." Docket No. 197, page 2, first full paragraph. "This argument is hardly promising but in any event it is not seriously developed- -not a

---

[2] Here it should be noted that on its face, Plaintiff Pechner's response only appears to address the underlying motion for sanctions, Docket No. 188, and the second supplemental memorandum in support thereof, Docket No. 209. It further appears, therefore, that Plaintiff Pechner has not explicitly addressed the matters raised in the first supplemental memorandum in support, Docket No. 201, nor the third supplemental memorandum in support, Docket No. 211. Normally, such a failure results in a waiver. See *United States v. Dietz*, 950 F.2d 50, 55 (1st Cir. 1991) ("in connection with sentencing as in other contexts, . . . arguments not seasonably addressed to the trial court may not be raised for the first time in an appellate venue").

single citation to either relevant law or the record is provided--and is therefore waived. Mass. Sch. of Law at Andover v. Am. Bar Ass'n, 142 F.3d 26, 43 (1st Cir. 1998)." *Sunoco, Inc. v. Makol*, 372 F.3d 31, 39 (1st Cir. 2004).

Plaintiff Pechner also asserts that "the transcript also indicates that Attorney Porr refuses to accept that when Ms. Pechner-James responds that she does not know the answer to a relevant question. (sic) She must repeatedly state that she does not know or recall the answer because he refuses to accept her response, and continues to push the question." Docket No. 197, page 2, second full paragraph. This is a clear mischaracterization of what was/is happening. Examining Counsel does <u>not</u> have to take an "I don't know" or an "I don't remember" answer at face value. Follow-up questions to prod the Deponent's memory <u>or</u> to test the assertion of lack of knowledge or lack of recall are entirely appropriate. See e.g., Docket No. 218, Exhibit 15[3], pages 11 - 12 (Deposition Volume VI, page 907, line 15 – page 908, line 23):

> Q. Have you reviewed anything related to this case between May 5th, the last time I got to question you, and today?
>
> A. I've taken a look at your deposition that you claim you didn't ask whether or not I had an abortion.
>
> Q. So that was the May 5th deposition transcript?
>
> A. Correct.
>
> Q. When did you look at that?
>
> A. I don't -- I don't know when I got it.
>
> Q. A week ago? Two weeks ago?

---

[3] City Defendants must here confess some confusion with respect to Plaintiff Pechner's Exhibits filed as Docket No. 218. They are identified respectively as Exhibit "A", "1", "2", "3" and "15." One would initially be inclined to think that there should be more than five exhibits. This inclination is supported by the reference to Exhibits 4-14 on page 7 of Docket No. 216. However, this inclination is dispelled by the fact that in Docket No. 219, Plaintiff Pechner explicitly states that she is only filing five (5) exhibits. Thus, the only logical conclusion is that the Exhibits are what they are, their unconventional numbering scheme and the reference to phantom Exhibits 4-14 notwithstanding.

  MR. DILDAY:  I don't know when I gave it to you to look at.

  Q. If you don't recall, that's fine.  I'm just asking --

  A. I don't recall when he gave it to me.

  Q. And, again, let me explain.  When a witness says they don't recall, attorneys, like myself, will frequently ask a follow-up question designed to see if we can help trigger recall or if we can give you some parameters that you can say, you know, it was last week but it wasn't two weeks ago, or something to that effect.  And that's all I'm doing is I'm just trying to see if I can get some definition, some more clarity, when I ask those kind of questions.  Did you read the whole transcript?

  A. No.

Finally, in what is yet another gross mischaracterization of the truth, Plaintiff asserts that "Defense counsel seeks to have [her] claim dismissed for daring to express emotion during these depositions and answering questions in a manner that he subjectively, rather than objectively, deems unsatisfying."  Docket No. 197, page 3, last paragraph.  NO, Defense Counsel seeks to have her claim dismissed for a long-standing pattern of discovery abuse, as more fully set forth in the motion and the supplemental memoranda filed in support thereof.

  2. The Recent Response.

    i. More of the Same.

Picking-up where she left off, Plaintiff asserts in her most recent filing that "[t]he abusive and confrontational manner of the Assistant City Solicitor has forced the Plaintiff to reexperience the trauma of her employment at the Revere Police Department."  Docket No. 216, page 4, last paragraph.  Once again, no evidence is cited in support of the contention that the cross-examiner has been "abusive and confrontational."  "Ordinarily, we would not address this argument because of appellant's failure to support such a critical factual assertion with a reference to the appendix or record.  (Citations omitted)."  *Mendez v. Belton*, 739 F.2d 15, 18 (1st Cir. 1984).

4

Plaintiff continues this pattern of misdirection by asserting that she "was retraumatized and the Assistant City Solcitior was distressed." Docket No. 216, page 5, first paragraph. There follows a truncated and completely contra-contextual citation from the deposition record. Plaintiff then asserts that "[t]he Defendants denial and refusal to acknowledge the effects of post traumatic stress disorder for purposes of this trial, has created misinterpretations of the responses of the Plaintiff, Terri Pechner-James." Docket No. 216, page 5, second paragraph, citing Exhibit 1.

To put the cited response in perspective and to demonstrate the utter lack of merit to Plaintiff's claims, City Defendants provide a more complete excerpt from said deposition.

Pechner, Deposition Vol. IX, pages 1570 – 1575 (Exhibit 1 of the Response):

MR. PORR:  We're back on the recordwith Ms. James' continuing deposition.

EXAMINATION BY MR. PORR:

Q.    Good morning, Ms. James.

A.    Good morning.

Q.    How are you this morning?

A.    Good.

Q.    I'm sorry?

A.    Good.

Q.    You're going to have to speak up, please, both because of the air conditioners that are running and so madam reporter can hear you and also so I can hear you.

A.    Okay.

Q.    Is that going to be a problem?

A.    No.

Q.    It might help if you take your hands down from your mouth, too.  It's just a suggestion.  Are you on any medication today?

5

A.  Yes.

Q.  What have you taken?

A.  Klonopin, Xanax, Paxil, and Synthroid.

Q.  All right. And how are you feeling?

A.  Fine.

Q.  I'm sorry?

A.  Fine.

**Q.  Yesterday, when we took Sonia Fernandez' deposition, she mentioned that she had talked to you the night before and that you were ill. Are you still ill or are you okay?**

**A.  I'm still ill.**

**Q.  Okay. What are you suffering from?**

**A.  Posttraumatic stress disorder.**

Q.  All right. Aside from that, are you suffering from any physical illness today?

A.  Yes.

Q.  What?

A.  It's personal.

Q.  Okay. Is whatever you're suffering from in any way going to affect your ability to testify --

A.  No.

Q.  -- answer my questions?

A.  No.

Q.  Okay. I'm sorry. When I'm sitting here looking at someone that's kind of staring off into space, I'm getting a sense that I'm not really in any way connecting here with you and you're kind of off in la-la land. Am I mistaken?

A.  You've said that at every deposition. Just ask your questions. You're wasting time.

6

Q.  Ms. Pechner, let me explain something to you, and I want to make this very clear.

MR. DILDAY:  Let me say this.  If she looks at the ceiling, it doesn't matter, as long as she answers your questions, Walter.

MR. PORR:  Okay.  But I'm getting a sense from the witness that she is not here.  I know her body is sitting across the table from me, but the responses are flat, they are monotone, she is staring off into space, her voice is low.  I've asked her to bring it up a couple times given the circumstances.  We explained it before the deposition started.  I reiterated it after the deposition started.  I sense a vacancy in the stare.  All right?  She's taken four different medications.  **She's complaining about her posttraumatic stress**, and she's got a physical illness that is personal and she doesn't want to talk about, which I respect, **but I'm trying to make sure she's okay in terms of being deposed**.  **And so when I look at a witness under those conditions, I'm concerned that despite the answers I'm getting that maybe, you know, there's an issue here.  So that's what I'm trying to address to make sure that she is okay to go forward today**.

MR. DILDAY:  Well, she said she's okay.

MR. PORR:  Well, that's fine.

MR. DILDAY:  One of the issues is that she does not want to be here, but she's ready to go, and, as she said, let's go forward.

MR. PORR:  All right.  And that led to the point that I'm the cross-examiner, not her.  I will ask the questions that I feel are necessary and appropriate to make sure that we have an effective deposition session.  So it's not for her to tell me what questions to ask.

MR. DILDAY:  Don't point your pen at her, please.  You don't have to do that.

MR. PORR:  Okay.

MR. DILDAY:  Just make your point and start to ask your questions.

MR. PORR:  All right.  I'll do that.

**Q.  At the conclusion of the last deposition session on June 7th, you were complaining about your PTSD and how it was impacting you.  Is your PTSD going to prevent you from testifying this morning?**

**A.  No.**

Q.  Okay.  Have you seen any doctors since the last deposition session on June 7th?

A.  Yes.

7

> Q. Who did you see and when?
>
> A. Dr. Gingrich, my primary care doctor.
>
> Q. Okay. When did you see him?
>
> A. Last week. I don't know the day.
>
> Q. Did you see him for the condition that's affecting you now?
>
> A. Yes.
>
> Q. Okay. Did you see any other doctors for anything else?
>
> A. No.
>
> Q. Have you visited the On-Site Academy since the last deposition session?
>
> A. No.

Emphasis added.

Far from being "distressed," the cross-examiner was concerned about Plaintiff Pechner's mental state and whether or not she could proceed with a meaningful deposition. Rather than "denying" and "refusing" "to acknowledge the effects of post traumatic stress disorder," the cross-examiner was concerned that the effects of PTSD allegedly being experienced by Plaintiff Pechner could/would prevent her deposition from going forward. See also Docket No. 211, Exhibit "A" and Docket No. 218, Exhibit 15, pages 903 to 907, Deposition Excerpt from May 25, 2006:

> Q. Did you see Dr. Gingrich -- what did you see Dr. Gingrich on the 23rd for? What did you go in for?
>
> A. Because these depositions are making me sick again.
>
> Q. And how so?
>
> A. Because I'm reliving what I went through when I first left the job.
>
> Q. All right. And how is that making you sick? How is the sickness manifesting itself?

A.  I can't eat, I can't sleep, my brain's in a cloud, I'm tired all the time, and I'm having nightmares again.

Q.  When did you start having nightmares again?

A.  I don't remember.

Q.  Did you have one last night?

A.  No.

Q.  Have one the night before?

A.  I don't remember.

Q.  Did you have one this week?

A.  Yes.

Q.  Okay. What was the nightmare about?

A.  I don't remember.

Q.  Did Dr. Gingrich do anything in terms of treatment?

A.  Yes. She put me on Paxil and Xanax to sleep.

Q.  Is Xanax a sleep medication?

A.  Sleep and anxiety.

Q.  Earlier, you mentioned that you had -- one of the ways the depos are making you sick is you feel like your brain is in a cloud?

A.  That's my thyroid not functioning correctly.

Q.  I see. How long have you had a thyroid problem?

A.  I don't know.

Q.  When did you start taking medication for the thyroid?

A.  I don't recall.

Q.  This year? Last year? Two years ago?

A.       Two years ago.  I don't -- I don't remember when.

Q.       Does the thyroid medication work?

A.       It helps, yes.

Q.       Okay.  Is your brain in a cloud right now?

A.       I'm tired.

Q.       Okay.  I interpreted your response earlier, when you said your brain is in a cloud and you're tired all the time, as describing two different phenomena that you are experiencing.  Are they the same?

A.       I don't know.

Q.       Okay.  So I understand that you're tired right now, but would you also say that your brain is in a cloud right now?

A.       No.

Q.       Okay.  Ms. Pechner, the reason I'm asking the questions is because I need to make sure that you're in a frame of mind that you can hear and understand and respond to my questions accurately so that at a later date there isn't a claim being made that for some reason you were not able to testify, you know, appropriately today and somehow would claim that your testimony today is not valid.  Do you understand?

A.       I understand.

Q.       Okay.  So I want to make sure that if there's any reason why we can't go forward today, that you'll tell me; otherwise, I'll assume that you can and I'll expect that your answers today are answers that can be relied upon at trial.  Do you understand?

A.       I understand.  Until the depositions are over, or the trial or whatever is over, I can't begin to recover from the stress induced, which is what this is related to.

Q.       Okay.  And sometimes people experience stress to the point where it incapacitates them, and I just want to make sure that if that's happened here that I know that, and if it hasn't happened here I know that as well.  You follow?

A.       I follow.

      ii.  What is Plaintiff Pechner Trying to Say About Her Mental State???

  "The Defendants failure to recognize post traumatic stress disorder for purposes of this case, the insistence of the Assistant City Solicitor that the Plaintiff respond as if she is not a victim of a disability have presented the court with a distinct problem.  The Assistant City Solicitor wants the court to use its coercive powers to compel the Plaintiff, Terri Pechner James, to act as though she is not a victim of post traumatic stress disorder.  He is, in effect, requesting that the court punish and sanction the Plaintiff for her disability.  The Assistant City Solicitor is attempting, by his many requests for sanctions, to make the court a party to a kind of discrimination to which his clients have subjected the Plaintiff."  Docket No. 216, page 7, last paragraph.

  What does Plaintiff Pechner mean by all of this???  Aside from the fact that it is totally unsupported by any evidence, particularly an affidavit from a mental health care provider which substantiates the claims being made, it totally mischaracterizes the truth.  Counsel for the City Defendants is simply trying to get answers to very basic questions, yet he keeps meeting with unbridled hostility, defiance and resistance in return.  The many deposition excerpts attached to the motion and its supplements bear this claim out.

  Is Plaintiff Pechner trying to assert that her PTSD justifies her behavior and therefore she is entitled to continue behaving that way?  Her response certainly seems to suggest so.  "The Assistant City Solicitor is likely to experience more not less distress in future depositions."  Docket No. 216, page 5, last sentence before the heading to subsection 2.

  On the other hand, is Plaintiff Pechner trying to assert that her PTSD has somehow incapacitated her and that she in unable to answer simple questions without becoming combative, hostile and abusive because the examination process itself is retraumatizing her?  If the latter is the case, how is she going to withstand the rigors of trial?

In either case, Plaintiff Pechner presents neither fact nor law which would excuse her behavior and allow her to take her case to trial despite her widespread and ongoing discovery abuses.

      iii.      The May 5, 2006, Deposition is Old News.

Plaintiff Pechner harps on the issues arising out of the May 5, 2006, deposition session. Docket No. 216, pages 5-7. As the Court recognized at the June 27, 2006, Status Conference, this is old news.

      iv.      The May 25, 2006, Deposition.

Plaintiff asserts that "[d]uring the May 25, 2006 deposition, *after a brief introduction*, the first substantive question that the Assistant City Solicitor asked the Plaintiff was "**Have you had any miscarriages?" Exhibit 15** p. 909."[4] Bold and italics added.

Notwithstanding the fact that Plaintiff Pechner attaches the relevant deposition pages as Exhibit 15 to Docket No. 218, she still misconstrues the record. The testimony for the deposition session of May 25, 2006, begins at page 901. See Docket No. 218, Exhibit 15, page 5. Page 901 through the middle of page 907 is devoted to Plaintiff Pechner's mental and physical health and determining whether or not she can proceed with the deposition itself. Beginning at page 907, line 11, the following examination ensues:

> Q.    Okay. Have you reviewed anything related to this case between the last time I got to question you on May 5th and today?
>
> A.    Can you ask that again?

---

[4] In her Opposition to City Defendants Unsolicited Sixth Status Report, Docket No. 214, Plaintiff Pechner asserted that "On May 25, 2006, Walter H. Porr *opened* that deposition with more questions about abortions and miscarriages. Despite the courts (sic) explicit instructions, Walter H. Porr asked the plaintiff specifically: 'Have you had any miscarriages?' " Emphasis added. Docket No, 214, page 3, paragraph no. 14. The Court will recall that at the Status Conference of June 27, 2006, Counsel for City Defendants began to respond to this, and many other, gross mischaracterizations of the record contained in Docket No. 214. The Court stopped Counsel and indicated that since there were no record citations to back-up the claim, the Court would not consider it. After the hearing and before they had left the courtroom, Counsel for the City Defendants approached Plaintiff's Counsel about this, and other mischaracterizations, in Docket No. 214. A letter memorializing this conversation was sent the next day. Thus, Plaintiff's change from "opened" in Docket No. 214 to "after a brief introduction" in Docket No. 216, is no accident. Yet it still misconstrues the record. See City Defendants Motion to Strike Docket No. 214 filed concurrently herewith.

12

Q. Have you reviewed anything related to this case between May 5th, the last time I got to question you, and today?

A. I've taken a look at your deposition that you claim you didn't ask whether or not I had an abortion.

Q. So that was the May 5th deposition transcript?

A. Correct.

Q. When did you look at that?

A. I don't -- I don't know when I got it.

Q. A week ago? Two weeks ago?

MR. DILDAY: I don't know when I gave it to you to look at.

Q. If you don't recall, that's fine. I'm just asking --

A. I don't recall when he gave it to me.

Q. And, again, let me explain. When a witness says they don't recall, attorneys, like myself, will frequently ask a follow-up question designed to see if we can help trigger recall or if we can give you some parameters that you can say, you know, it was last week but it wasn't two weeks ago, or something to that effect. And that's all I'm doing is I'm just trying to see if I can get some definition, some more clarity, when I ask those kind of questions. Did you read the whole transcript?

A. No.

Q. Okay. What did you read for? Were you looking for something in particular?

A. Yeah. The fact that you -- your line of questioning was completely unacceptable.

Q. Okay.

A. And the fact that you said you told Sonia that -- and Jimmy that you did not say that I had an abortion.

Q. All right. Did you find in the deposition transcript where I asked that question?

A. I found where you asked had I had any other pregnancies, other than the three that I now have.

Q. Okay. And why did you interpret that as a question about abortion?

> A. Because one would lead that to believe that if you have seven children, Attorney Porr, and you either have a miscarry or you have an abortion. So, you know, I think that's absolutely none of your business and has nothing to do with the case.
>
> Q. Have you had any miscarriages?
>
> A. I'm not answering that question.

Several things are evident here. First, it was the Plaintiff who chose to make an issue out of the question about the number of pregnancies she had experienced. Second, when confronted about why she interpreted the question the way she did, <u>as asking directly about abortions and only abortions</u>, she then indicated that the question could be interpreted as asking about miscarriages as well. But since the Plaintiff had interpreted the question as only asking about abortions, the next logical question in light of her miscarriage response was to ask if she had had any miscarriages – <u>the obvious inference being that she had not, given her reaction to the original question in the first instance</u>. Third, the Court had ordered that Plaintiff's medical records regarding her care and treatment by Dr. Kerouac, her Ob/Gyn, be released to the Defendants. These records reflected that Plaintiff Pechner had in fact, as of 2001, been pregnant four (4) times, though as of that time, she had only two children. Fourth, Plaintiff Pechner continues to harp upon the lack of a maternity leave policy as a fact/issue dispositive of her employment discrimination claim – "The Plaintiffs were hired into a Department that still does not have a maternity leave policy . . ." Docket No. 216, page 2, second paragraph. Fifth, points three and four identified immediately above were the immediate subject of discussion and testimony after the miscarriage question, see Docket No. 218, Exhibit 15, pages 14-18 (Deposition excerpt pages 910-914), a fact conveniently ignored by the Plaintiff.

Thus, under the circumstances there was, and is, nothing improper with the question. More to the point, Plaintiff's wrenching of the question out of context and mischaracterizing it to the Court is yet another example of the liberties she and her Counsel are willing to take with this litigation.

3. Conclusion.

Plaintiff Pechner has presented absolutely nothing worthy of consideration in response to the City Defendants' motion for sanctions, as supplemented, and the same should be granted as prayed.

**B.** **Plaintiff Fernandez:**

1. The May 4, 2006, Deposition.

In her opposition filed herein on May 11, 2006, Plaintiff Fernandez asserts that "[t]here has been no clear design to circumvent the court's order and counsel was truly unaware that there had been a deposition scheduled for May 4, 2006. Counsel was in error and did not realize that there was a deposition scheduled for May 4, 2006 . . ." Docket No. 187, page 2, second full paragraph. Nonetheless, Plaintiff's Counsel conceded that he "read the deposition notices for Worcester but did not notice the schedule for Revere, although he acknowledges that the schedule was in the April 28, 2006 letter." Docket No. 187, first full paragraph.

2. The May 18, 2006, Deposition.

<u>After</u> the City Defendants had electronically filed their Supplemental Memorandum of Law related to Plaintiff Fernandez's cancellation of the May 18, 2006, deposition (Docket Nos. 195 and 196), they received a facsimile letter at 4:15 p.m., which was itself a retransmission of the same letter purportedly transmitted at 2:05 p.m. the same day. This letter was the fourth page of a multi-page transmission, <u>the balance of which the City Defendants have yet to see</u>. The letter, which is one sentence, states: "This patient was evaluated today at the Beth Israel Deaconess Medical Care Center North for an acute medical problem." Given the timing and the paucity of information conveyed by the letter, City Defendants demanded that the underlying medical records for the supposed care and treatment be produced at the May 22, 2006, Status Conference. See Docket No. 198 and Exhibits "A" and "B" thereto. Plaintiff Fernandez refused.

At her deposition on May 26, 2006, Plaintiff Fernandez was questioned about her absence from the May 18, 2006, deposition. In particular, Plaintiff Fernandez was asked what she was suffering from and she responded that she had had a headache, diarrhea, vomiting, was probably getting a sinus infection and had been up all night. See Deposition excerpt for May 26, 2006, Sonia Fernandez, Volume V, attached hereto as Exhibit "A" and more particularly, transcript page 910, line 18 – page 911, line 8. As a result, she called Attorney Dilday's office at 5:50 a.m. and left him a message. Exhibit "A," transcript page 911, lines 9-18. Plaintiff Fernandez then tried to rest. Exhibit "A," transcript page 911, lines 23-24. Sometime <u>after</u> 11:30 a.m, which was <u>also well after</u> Docket Nos. 195 and 196 had been filed, Plaintiff Fernandez called her doctor to schedule an appointment. Exhibit "A," transcript page 912, lines 6-14. Plaintiff Fernandez presumably then called Attorney Dilday to report that she had scheduled a doctor's appointment. Exhibit "A,' transcript page 913, line 14 to page 914, line 9. Why? Why the need to call her Attorney to report that she had scheduled a doctor's appointment? Unless, of course, to confirm that she was following his instructions to schedule a doctor's appointment in the first place to cover for the non-attendance at the deposition.

Be that as it may, according to Plaintiff Fernandez, she was "diagnosed" with a viral infection, prescribed Flonase and sent home. Exhibit "A," transcript page 914, line 22 to page 916, line 21. Yet, such a diagnosis, with a prescription too boot, hardly seems to square with the doctor's one sentence report that Plaintiff Fernandez was "evaluated" for an acute medical condition.

Thus, in the absence of the medical records from this visit, there remains the appearance that the visit was orchestrated/contrived to cover Plaintiff Fernandez's decision to cancel the deposition for May 18, 2006.

16

      3.      Conclusion.

Plaintiff Fernandez has presented absolutely nothing worthy of consideration in response to the City Defendants' motion for sanctions, as supplemented, and the same should be granted as prayed.

## III.

## DISMISSAL IS WARRANTED

First, it took one (1) year to obtain interrogatory answers from both Plaintiffs, despite their stipulation and an order of the Court with respect thereto. Ultimately, the Court determined that it would be pointless to litigate the interrogatory issue further and directed the Defendants to rely upon deposition questioning to get the answers they needed.

Second, the Defendants have consistently encountered a situation where documents were not and have not been produced by the Plaintiffs, either at all or in a timely fashion. First, it was the Plaintiffs' medical records and the Herculean task imposed upon the Defendants to obtain releases; not the records, but only releases. Next, Plaintiff Pechner's notes and calendars showed up at a deposition session without having been produced in response to the individual officer defendants' production request. See Docket No. 116, City Defendants' Status Report, pages 3-4, and Exhibits "A" and "B." Plaintiff Fernandez's notes likewise showed-up at a later date. Then, Plaintiff Pechner used medical records from the On-Site Academy to support her most recent motion for summary judgment, despite the fact that these medical records had never been produced. See Docket No. 143, pages 1-2, second bulleted paragraph. Next, Plaintiff Pechner testified at deposition about her Private Investigator having obtained notes and a statement from Lynn Malatesta (Lynn Malatesta is a female officer with the Revere Police Department); neither of which has ever been produced. Attached hereto as Exhibit "B" is the excerpt from Plaintiff Pechner's deposition transcript related

thereto. Now, Plaintiff Fernandez has testified at her most recent deposition sessions about reviewing Lynn Malatesta's notes in the office of her Counsel, Attorney James Dilday. Attached hereto as Exhibit "C" is the excerpt from Plaintiff Fernandez's deposition transcript related thereto.

Now, the Plaintiffs, particularly Plaintiff Pechner, have made the deposition process a nightmare as well.

Three of the major and most frequently used forms of discovery have been consistently and knowingly abused by the Plaintiffs to the prejudice and detriment of the Defendants. The discovery abuse began nearly one and one-half years ago and continues unabated. Not only has it unjustly and unfairly impeded Defendants efforts to obtain discovery, but it has impeded their ability to have the case examined on summary judgment. The litigation, and its associated expense, has been unnecessarily prolonged and exacerbated.

The Court has been indulgent to the point where it is being taken advantage of at the cost of fairness and equity to these Defendants. Dismissal has been warranted for some time and the Court should exercise its considerable discretion to bring the abuse to an end.

                For the Defendants
                By their Attorneys,


                /s/ Walter H. Porr, Jr
                Paul Capizzi, Esq., City Solicitor
                BBO#: 646296
                Walter H. Porr, Jr., Esq.
                Assistant City Solicitor
                BBO#: 659462
                City Hall, 281 Broadway
                Revere, MA 02151
                781-286-8166

Dated: July 7, 2006.

**CERTIFICATE OF SERVICE**

      I, Walter H. Porr, Jr., Assistant City Solicitor and counsel of record for the Defendants, City of Revere, City of Revere Police Department, Mayor Thomas Ambrosino and Police Chief Terence Reardon, hereby certify that I have electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system. I caused to be served upon counsel of record, at the address stated below, via the method indicated, a true copy of same:

| | |
|---|---|
| James S. Dilday, Esq. | Michael J. Akerson, Esq. |
| Grayer & Dilday, LLP | Reardon, Joyce and Akerson, P.C. |
| 27 School Street, Suite 400 | 397 Grove Street |
| Boston, MA 02108 | Worcester, MA 01605 |
| Attorneys for the Plaintiffs | Attorneys for Defendants |
| Via CM/ECF e-mail | Bernard Foster, Salvatore Santoro, |
| | Roy Colannino, Frederick Roland, |
| | Thomas Doherty, John Nelson, |
| | James Russo, Michael Murphy, |
| | and Steven Ford |
| | Via CM/ECF e-mail |

                                                        /s/ Walter H. Porr, Jr.
                                                       Walter H. Porr, Jr.,

Dated: July 7, 2006