# EXHIBIT A

VOL. VI PG. 898

```
1              IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF MASSACHUSETTS

3
    TERRI PECHNER-JAMES
4   and SONIA FERNANDEZ,
        Plaintiffs
5                                         VOLUME VI
    VS.                    C.A. NO. 03-12499-MLW
6
    CITY OF REVERE; THOMAS
7   AMBROSINO, MAYOR; CITY OF
    REVERE POLICE DEPARTMENT,
8   TERRENCE REARDON, CHIEF;
    BERNARD FOSTER, SALVATORE
9   SANTORO, ROY COLANNINO,
    FREDERICK ROLAND, THOMAS DOHERTY,
10  JOHN NELSON, JAMES RUSSO,
    MICHAEL MURPHY, and STEVEN FORD,
11      Defendants

12

13

14

15          CONTINUED DEPOSITION of TERRI

16   PECHNER-JAMES taken at the request of the

17   defendants pursuant to Rule 30 of the Federal

18   Rules of Civil Procedure before Nancy A.

19   Diemdowicz, Registered Merit Reporter, a

20   notary public in and for the Commonwealth of

21   Massachusetts, on May 25, 2006, commencing at

22   10:08 A.M. at the offices of Reardon, Joyce &

23   Akerson, 397 Grove Street, Worcester,

24   Massachusetts.
```

McCARTHY REPORTING SERVICE   WORCESTER, MA
(508)753-3889 (IN MASS) 1-800-564-3889

VOL. VI PG. 899

```
 1

 2   A P P E A R A N C E S:

 3
     FOR THE PLAINTIFFS:
 4
     JAMES S. DILDAY, ESQ.
 5   GRAYER & DILDAY LLP
     27 School Street
 6   Boston, Massachusetts 02108

 7
     FOR THE DEFENDANTS, CITY OF REVERE; THOMAS
 8   AMBROSINO, MAYOR; CITY OF REVERE POLICE
     DEPARTMENT, TERRENCE REARDON, CHIEF:
 9
     WALTER H. PORR, JR., ESQ.
10   Office of the City Solicitor
     City Hall
11   281 Broadway
     Revere, Massachusetts  01251
12

13   FOR THE DEFENDANTS, BERNARD FOSTER, SALVATORE
     SANTORO ROY COLANNINO, FREDERICK ROLAND,
14   THOMAS DOHERTY, JOHN NELSON, JAMES RUSSO,
     MICHAEL MURPHY AND STEVEN FORD:
15
     MICHAEL J. AKERSON, ESQ.
16   REARDON, JOYCE & AKERSON, P. C.
     397 Grove Street
17   Worcester, Massachusetts 01605

18

19

20

21

22

23

24
```

VOL. VI PG. 900

1              I N D E X

2         DEPONENT:  TERRI PECHNER-JAMES

3                                          PAGE

4

5   CONTINUED EXAMINATION BY MR. PORR      901

6

7

8

9

10              EXHIBITS

11                                         PAGE

12  15.  Patient History & Physical Exam    910

13  16.  Affidavit - Exhibit 18             922

14  17.  Affidavit - U.S. District Court    923

15  18.  Photocopy of Photograph           1007

16  19.  Photocopy of Photograph           1011

17  20.  Photocopy of Photograph           1013

18  21.  Memorandum dated 12/21/98         1073

19  22.  Sonia Fernandez Supplementation   1136

20       of Interrogatories

21

22

23

24

McCARTHY REPORTING SERVICE   WORCESTER, MA
(508)753-3889 (IN MASS) 1-800-564-3889

VOL. VI PG. 901

```
 1            MR. PORR:  We're back on the record
 2    with the deposition of Terri Pechner.
 3    CONTINUED EXAMINATION BY MR. PORR:
 4         Q.   Good morning, Ms. Pechner.
 5         A.   Good morning.
 6         Q.   You understand that you're still
 7    under oath?
 8         A.   Yes, I do.
 9         Q.   Okay.  Have you taken any
10    medication this morning?
11         A.   Yes, I have.
12         Q.   What have you taken?
13         A.   Synthroid and Paxil.
14         Q.   The Synthroid, is that an
15    artificial thyroid type medication?
16         A.   Yes.
17         Q.   All right.  And the Paxil you take
18    for what condition?
19         A.   PTSD.
20         Q.   Okay.  How are you feeling this
21    morning?
22         A.   Lousy.
23         Q.   Okay.  And when you say "lousy,"
24    what do you mean by that?
```

VOL. VI PG. 902

```
 1      A.    Tired.
 2      Q.    Okay.  Anything else?
 3      A.    No.
 4      Q.    All right.  We're scheduled to be
 5  here until five o'clock this afternoon.
 6            Do you feel up to testifying today
 7  and answering questions and going through a
 8  deposition session?
 9      A.    As much as I can.
10      Q.    All right.  The last time I had an
11  opportunity to ask you questions at deposition
12  was on May 5th, which was 20 days ago.
13            Did you see any doctors after the
14  end of that deposition session?
15      A.    Yes, I did.
16      Q.    Who did you go see?
17      A.    I saw Dr. Gingrich.
18      Q.    Where did you see him?
19      A.    Her.  A new primary care physician.
20      Q.    Where?
21      A.    Yesterday.  Georgetown.
22      Q.    So the first time you saw
23  Dr. Gingrich in Georgetown was yesterday?
24      A.    The day before.  I'm sorry.
```

VOL. VI PG. 903

```
 1      Q.    That's okay.
 2      A.    Tuesday.  Tuesday I saw her.
 3      Q.    It's a her?
 4      A.    Yes.
 5      Q.    Okay.  Let me back up, if you
 6   would, please, to May 5th, though.  At the end
 7   of the deposition on the afternoon of May 5th,
 8   did you go see any health care provider that
 9   day?
10      A.    No.
11      Q.    So from May 5th until Tuesday, the
12   23rd, is it fair to say you did not see any
13   health care provider?
14      A.    Correct.
15      Q.    Did you see Dr. Gingrich -- what
16   did you see Dr. Gingrich on the 23rd for?
17   What did you go in for?
18      A.    Because these depositions are
19   making me sick again.
20      Q.    And how so?
21      A.    Because I'm reliving what I went
22   through when I first left the job.
23      Q.    All right.  And how is that making
24   you sick?  How is the sickness manifesting
```

VOL. VI PG. 904

```
 1   itself?
 2       A.   I can't eat, I can't sleep, my
 3   brain's in a cloud, I'm tired all the time,
 4   and I'm having nightmares again.
 5       Q.   When did you start having
 6   nightmares again?
 7       A.   I don't remember.
 8       Q.   Did you have one last night?
 9       A.   No.
10       Q.   Have one the night before?
11       A.   I don't remember.
12       Q.   Did you have one this week?
13       A.   Yes.
14       Q.   Okay.  What was the nightmare
15   about?
16       A.   I don't remember.
17       Q.   Did Dr. Gingrich do anything in
18   terms of treatment?
19       A.   Yes.  She put me on Paxil and Xanax
20   to sleep.
21       Q.   Is Xanax a sleep medication?
22       A.   Sleep and anxiety.
23       Q.   Earlier, you mentioned that you had
24   -- one of the ways the depos are making you
```

VOL. VI PG. 905

 1   sick is you feel like your brain is in a

 2   cloud?

 3       A.   That's my thyroid not functioning

 4   correctly.

 5       Q.   I see.  How long have you had a

 6   thyroid problem?

 7       A.   I don't know.

 8       Q.   When did you start taking

 9   medication for the thyroid?

10       A.   I don't recall.

11       Q.   This year?  Last year?  Two years

12   ago?

13       A.   Two years ago.  I don't -- I don't

14   remember when.

15       Q.   Does the thyroid medication work?

16       A.   It helps, yes.

17       Q.   Okay.  Is your brain in a cloud

18   right now?

19       A.   I'm tired.

20       Q.   Okay.  I interpreted your response

21   earlier, when you said your brain is in a

22   cloud and you're tired all the time, as

23   describing two different phenomena that you

24   are experiencing.  Are they the same?

VOL. VI PG. 906

1      A.    I don't know.
2      Q.    Okay.  So I understand that you're
3   tired right now, but would you also say that
4   your brain is in a cloud right now?
5      A.    No.
6      Q.    Okay.  Ms. Pechner, the reason I'm
7   asking the questions is because I need to make
8   sure that you're in a frame of mind that you
9   can hear and understand and respond to my
10  questions accurately so that at a later date
11  there isn't a claim being made that for some
12  reason you were not able to testify, you know,
13  appropriately today and somehow would claim
14  that your testimony today is not valid.  Do
15  you understand?
16     A.    I understand.
17     Q.    Okay.  So I want to make sure that
18  if there's any reason why we can't go forward
19  today, that you'll tell me; otherwise, I'll
20  assume that you can and I'll expect that your
21  answers today are answers that can be relied
22  upon at trial.  Do you understand?
23     A.    I understand.  Until the
24  depositions are over, or the trial or whatever

VOL. VI PG. 907

 1  is over, I can't begin to recover from the
 2  stress induced, which is what this is related
 3  to.
 4       Q.   Okay.  And sometimes people
 5  experience stress to the point where it
 6  incapacitates them, and I just want to make
 7  sure that if that's happened here that I know
 8  that, and if it hasn't happened here I know
 9  that as well.  You follow?
10       A.   I follow.
11       Q.   Okay.  Have you reviewed anything
12  related to this case between the last time I
13  got to question you on May 5th and today?
14       A.   Can you ask that again?
15       Q.   Have you reviewed anything related
16  to this case between May 5th, the last time I
17  got to question you, and today?
18       A.   I've taken a look at your
19  deposition that you claim you didn't ask
20  whether or not I had an abortion.
21       Q.   So that was the May 5th deposition
22  transcript?
23       A.   Correct.
24       Q.   When did you look at that?

VOL. VI PG. 908

```
 1      A.   I don't -- I don't know when I got
 2 it.
 3      Q.   A week ago?  Two weeks ago?
 4           MR. DILDAY:  I don't know when I
 5 gave it to you to look at.
 6      Q.   If you don't recall, that's fine.
 7 I'm just asking --
 8      A.   I don't recall when he gave it to
 9 me.
10      Q.   And, again, let me explain.  When a
11 witness says they don't recall, attorneys,
12 like myself, will frequently ask a follow-up
13 question designed to see if we can help
14 trigger recall or if we can give you some
15 parameters that you can say, you know, it was
16 last week but it wasn't two weeks ago, or
17 something to that effect.
18           And that's all I'm doing is I'm
19 just trying to see if I can get some
20 definition, some more clarity, when I ask
21 those kind of questions.  Did you read the
22 whole transcript?
23      A.   No.
24      Q.   Okay.  What did you read for?  Were
```

VOL. VI PG. 909

1   you looking for something in particular?

2       A.   Yeah.  The fact that you -- your

3   line of questioning was completely

4   unacceptable.

5       Q.   Okay.

6       A.   And the fact that you said you told

7   Sonia that -- and Jimmy that you did not say

8   that I had an abortion.

9       Q.   All right.  Did you find in the

10  deposition transcript where I asked that

11  question?

12      A.   I found where you asked had I had

13  any other pregnancies, other than the three

14  that I now have.

15      Q.   Okay.  And why did you interpret

16  that as a question about abortion?

17      A.   Because one would lead that to

18  believe that if you have seven children,

19  Attorney Porr, and you either have a miscarry

20  or you have an abortion.  So, you know, I

21  think that's absolutely none of your business

22  and has nothing to do with the case.

23      Q.   Have you had any miscarriages?

24      A.   I'm not answering that question.

VOL. VI PG. 910

 1          MR. DILDAY:  I would like to go on
 2     the record that this is a question that the
 3     judge said was out of line for Mr. Porr to be
 4     asking.
 5          MR. PORR:  I read the order,
 6     Mr. Dilday.  The question that the judge said
 7     was out of line were questions about sexual
 8     relations.  I didn't ask a question about
 9     sexual relations today.
10          MR. DILDAY:  Well, she will not
11     answer any questions about whether she had
12     miscarriages or abortions at all, and that
13     would be along the same lines that the judge
14     was talking about on the question that
15     Ms. Pechner-James just answered or made
16     reference to regarding whether or not she had
17     any pregnancies that did not lead to a birth.
18          MR. PORR:  Mark that as next in
19     order.
20
21          (Deposition Exhibit No. 15 marked.)
22       Q.   Let me put in front of you what
23     I've had marked as Exhibit 15.  See at the top
24     where it indicates that this is a record from

VOL. VI PG. 911

```
 1   Dr. Keroack?
 2        A.    I see that.
 3        Q.    All right.  And the date of this
 4   record looks to be February 5th of '01.  Do
 5   you see that?
 6        A.    I do.
 7        Q.    Across the top has your name.  Do
 8   you see that?
 9        A.    I do.
10        Q.    At the far right, it has your age
11   of 27?
12        A.    Yes.
13        Q.    Do you see the G and P, between
14   your name, and the H?
15        A.    Yeah, I do.
16        Q.    Do you know what they stand for?
17        A.    No idea.
18        Q.    If I'm reading this record
19   correctly - and I believe I am - the G stands
20   for grava and the P stands for para.  Grava is
21   an indication of the number of pregnancies;
22   para is an indication of the number of live
23   births.
24              There's a claim in this case,
```

VOL. VI PG. 912

1  repeated in a number of documents that you've
2  signed under oath, that part of the sexual
3  harassment complaint being made is that there
4  was no maternity leave policy when you were an
5  officer with the Revere Police Department; is
6  that correct?
7      A.   That's correct.
8      Q.   All right. And are you claiming
9  that the absence of a maternity leave policy
10 was an example of the sexual harassment that
11 you experienced while you were an officer with
12 the Revere Police Department?
13     A.   I'm claiming there was never a
14 sexual harassment policy there.
15     Q.   I'm talking about the maternity
16 leave policy. My question was, Are you
17 claiming that the absence of a maternity leave
18 policy is an example of the sexual harassment
19 you allege you experienced while you were an
20 officer with the Revere Police Department?
21     A.   Yes. Because there still isn't
22 one.
23     Q.   All right. And so my question is,
24 The two pregnancies that did not result in

VOL. VI PG. 913

 1   live births as of February 5 of '01, did they

 2   occur while you were a member of the Revere

 3   Police Department?

 4        A.    Well, you -- you --

 5             MR. DILDAY:  Objection.  She's not

 6   answering that.

 7             MR. PORR:  Well, Mr. Dilday, she's

 8   making a claim that the absence of a maternity

 9   leave policy is an example of the hostile

10   environment, and so if she was never pregnant

11   while she was an officer with the Revere

12   Police Department, then the maternity leave

13   policy may not be germane, and that's one way

14   of dealing with it.

15             But if she was - okay? - then

16   perhaps the maternity leave policy does come

17   into play, and I think I'm entitled to know

18   the answer to that question.

19             MR. DILDAY:  I think this whole

20   issue of the maternity leave policy is a

21   policy that goes to the whole gravamen of the

22   practices, procedures and operations of the

23   Revere Police Department.

24             Regardless as to whether or not she

VOL. VI PG. 914

 1   experienced a pregnancy during that time
 2   frame, it goes to the issue as to whether or
 3   not such a policy was in place.
 4              It doesn't mean that this policy
 5   had a direct impact on her individually.  What
 6   it means is that there was a general policy
 7   that the police department had.
 8              MR. PORR:  But if it had no impact
 9   on her, I fail to see how you can make a claim
10   that she's entitled to damages for it.
11              MR. DILDAY:  Because it's the
12   general policy with the Revere Police
13   Department.  It shows how the Revere Police
14   Department did not treat women in the same
15   manner that it treated the male officers.
16              MR. PORR:  Who can't get pregnant?
17   I mean, that makes no sense to me.  But all
18   right.  Very well.
19              MR. DILDAY:  You caught me with
20   water in my mouth.
21              MR. PORR:  That's okay.  The
22   exhibits are on record; the questions are on
23   record.  We'll move on.
24        Q.   Did you review anything else, any

*Eric J. Keroack, MD*
*Office Notes*

EXHIBIT 15
Pechner-Sme
McCARTHY REPORTING SERVICE
5/25/06  NAO

## Patient History and Physical Exam

Patient Name  Terri Pechner    G 4  P 2   Age 27
Date 2/5/01   DOB 4/29/73   Phone# _____
Address _____
City _____   State _____   Zip _____

LMP 1/30/01

**ALLERGIES**                           RXN:
Ø

MRI Ø Aneurysm

**Medications**
Zoloft 25mg qD

No prob w/ menses

**Past Surgical Hx:**          **Past Medical Hx:**
Ø                              * PAST Hx
Migraines                      * - No post partum Depress.
                               * PMS  - Anxiety
                                      - chocolate
                                      - Migraines

**Family Hx:**                  **ROS**
Colon CA  Ø    Breast CA  Ø     Chest Pain  Ø
Ovarian Cancer    Ø             Bowel Ssx   Ø
Thyroid DX  Ø    Diabetes (+)   Cough  Ø   SOB  Ø
High BP  Ø                      Headaches  (+)
CADx  Ø                         Urinary Ssx  Bladder Problem / Frequency
Cancer(other)  Ø                Gastric Ssx  yes (+)
Blood Clots  Ø                  Joint/Ext Pain  Knee
**HABITS**                      Mental Dx  Depression
Cigarettes (+) occ    **OTHER DX MISC**
ETOH  NOT really      Osteoporosis
Drugs  Ø              Early Menopause
Exercise - Treadmill  **Pregnancy Hx:**
Sleep - sleepy        ** TABx2 - After Daughter
Diet  lousy
                      ** Daughter age-11  > TABs
                      Son - age 9