VOL. VIII 1517

1        UNITED STATES DISTRICT COURT
           DISTRICT OF MASSACHUSETTS
2

3

TERRI PECHNER-JAMES
4   and SONIA FERNANDEZ,

5        Plaintiffs,
                                    VOLUME VIII
6   VS.                     C.A. NO. 03-12499-MLW

7

CITY OF REVERE; THOMAS
8   AMBROSINO, MAYOR; CITY OF
    REVERE POLICE DEPARTMENT,
9   TERRENCE REARDON, CHIEF;
    BERNARD FOSTER, SALVATORE
10  SANTORO, ROY COLANNINO,
    FREDERICK ROLAND, THOMAS DOHERTY,
11  JOHN NELSON, JAMES RUSSO,
    MICHAEL MURPHY, and STEVEN FORD,
12
        Defendants.
13

14

15    CONTINUED DEPOSITION of SONIA FERNANDEZ taken

16   at the request of the defendants pursuant to

17   Rule 30 of the Federal Rules of Civil Procedure

18   before Dawn J. Cormier Bourn, a notary public in

19   and for the Commonwealth of Massachusetts, on

20   June 21, 2006, commencing at 9:17 a.m. at the

21   Revere City Hall, 281 Broadway, Revere,

22   Massachusetts.

23

24                                    COPY

1    A P P E A R A N C E S :

2

     FOR THE PLAINTIFF:

3
     DAWNE H. THORNE, ESQ.
4    GRAYER & DILDAY
     27 School Street
5    Boston, Massachusetts  02108

6
     FOR THE DEFENDANT, CITY OF REVERE; THOMAS
7    AMBROSINO, MAYOR; CITY OF REVERE POLICE
     DEPARTMENT, TERRENCE REARDON, CHIEF:
8
     WALTER H. PORR, JR., ESQ., and
9    PAUL CAPIZZI, ESQ.
     Office of the City Solicitor
10   City Hall, 281 Broadway
     Revere, Massachusetts  01251
11

12   FOR THE DEFENDANTS, BERNARD FOSTER, SALVATORE
     SANTORO, ROY COLANNINO, FREDERICK ROLAND,
13   THOMAS DOHERTY, JOHN NELSON, JAMES RUSSO,
     MICHAEL MURPHY AND STEVEN FORD:
14
     JOHN K. VIGLIOTTI, ESQ.
15   REARDON, JOYCE & AKERSON
     387 Grove Street
16   Worcester, Massachusetts  01605

17

18

19

20

21

22

23

24

1

2

3

4                        I N D E X

5              DEPONENT:   SONIA FERNANDEZ

6                                               PAGE

7    FURTHER EXAMINATION BY MR. PORR        1520

8

9

10

11

12                      E X H I B I T S

13                                              PAGE

14    45    ANSWERS TO INTERROGATORIES        1531

15    46    HANDWRITTEN NOTES                 1533

16    47    JULY 6, 1998 NOTE                 1577

17    48    SEPTEMBER 11, 1998 NOTE          1585

18    49    SEPTEMBER 22, 1998 NOTE          1597

19    50    OCTOBER 2, 1998 NOTE             1599

20

21

22

23

24

1        <u>SONIA FERNANDEZ, PREVIOUSLY SWORN.</u>

2                    - - - - -

3            MS. THORPE:  I know we're 15 minutes

4    late, so do you want to go 15 minutes later?

5            MR. PORR:  Okay.

6                    - - - - -

7    FURTHER EXAMINATION BY MR. PORR:

8        Q.    So we're back on the record with

9    Ms. Fernandez.  Good morning.

10       A.    How are you?

11       Q.    Good, thank you.  How about yourself?

12       A.    Tired.

13       Q.    Having trouble sleeping?

14       A.    Yeah.

15       Q.    Still?

16       A.    Yeah.

17       Q.    Take any medication today?

18       A.    Nothing.

19       Q.    All right.  Aside from tired, are you

20   feeling okay?

21       A.    Yeah.  Yes, sorry.  Yes.

22       Q.    Madam reporter asked me before we

23   started to ask you to speak up.

24       A.    Okay.  I'm sorry.  You know what it

1   is?  Because sometimes I speak softly.

2        Q.    You do.

3        A.    I do.  Sometimes I speak very softly.

4        Q.    And when we set up this morning, the

5   council chambers here was warm, very warm, so

6   we've got air-conditioners running.

7        A.    Okay.

8        Q.    So you're competing with the air-

9   conditioners.

10       A.    Okay.

11       Q.    And it's important that you speak up

12  so that she can get an accurate record.

13       A.    Okay.

14       Q.    So that's important.

15             No hearing aids today?

16       A.    Not with you.

17       Q.    We're doing all right?

18       A.    Doing fine.

19       Q.    The last time I got to ask questions

20  was back on June 2nd.

21       A.    Right.

22       Q.    And then a week later Mr. Vigliotti

23  had a half-day session, I think.  I was gone.

24       A.    Right.

1        Q.    Have you reviewed any documents

2    between any of those deposition sessions and

3    today?

4        A.    No.

5        Q.    Looked at any of the transcripts of

6    your testimony?

7        A.    No.

8        Q.    How about Terri Pechner's testimony?

9        A.    No.

10       Q.    After last Friday's deposition

11   session, apparently a concern was raised.  You

12   were concerned that I had laughed?

13       A.    Laughed.

14       Q.    Okay.  And they were trying --

15   Mr. Vigliotti and Mr. Capizzi were trying to

16   explain it to me.  You seemed to be upset, they

17   thought, and so I want to clear the air on that.

18   What exactly --

19       A.    Remember when you asked me how my

20   grandmother was doing?

21       Q.    On the 2nd?

22       A.    Yeah.

23       Q.    Because we had ended a previous

24   deposition session early because she was not

1    well.

2        A.      Right.

3        Q.      Okay.  Yeah, all right.  I know I

4    asked you about that.

5        A.      In the morning you asked me how my

6    grandmother was doing.  I think it was a morning

7    session.

8        Q.      Right.

9        A.      And I saw you laugh, and I didn't know

10   if it was because maybe you thought that I used

11   that as an excuse to leave early.  My mind was

12   just racing.  I just couldn't -- and for the life

13   of me I couldn't figure out why in the world was

14   he laughing.  Was he laughing because maybe he

15   thought I used it as an excuse to leave my

16   deposition early.  And I couldn't sleep over that

17   because I didn't have the nerve to ask you that

18   day.

19       Q.      Okay.  I've got to confess, I don't

20   recall laughing about anything, and I certainly

21   wouldn't laugh about your grandmother.  I talked

22   to Mr. Vigliotti and Mr. Capizzi.  They didn't

23   seem to recall me laughing about anything either.

24               But be that as it may, let me assure

1   you that --

2        A.    I wasn't accusing you of anything.

3        Q.    Okay.  Okay.

4        A.    I just wanted to know, because it was

5   bothering me so much I couldn't sleep.

6        Q.    Well, and that's why I wanted to

7   address it, because you had expressed some

8   concern to them on the 9th.

9             Honestly, I wouldn't laugh about your

10  grandmother or anything about your family

11  situation that way.  Certainly not intentionally.

12       A.    Okay.

13       Q.    Now, maybe something else was going

14  through my mind.  I mean, I don't remember, but

15  in any event, I'd like to make sure we've cleared

16  the air here and that there's no lingering doubt

17  or concern on your part.

18       A.    Okay.

19       Q.    So are we okay on that?

20       A.    Okay.

21       Q.    How is your grandmother?

22       A.    The same.  One day she's okay or one

23  day she's not okay.

24       Q.    Now, is she at home or in the

1    hospital?

2         A.    Now she's home.  She's going to pass

3    in her house.

4         Q.    So regardless of what happens, she's

5    not going back to the hospital?

6         A.    No.  She has a DNR.

7         Q.    I'm sorry?

8         A.    A DNR, do not resuscitate, a DNR.

9         Q.    How many family members are nearby,

10   you know, related to your grandmother?  There's

11   yourself.

12        A.    Well, she had nine children.  Two

13   passed.  Right now with my grandmother it's my

14   mom and my uncle that she lives with, me, my aunt

15   who was here from California, but she went back

16   home, and another aunt, but we all rotate

17   sleeping with her at night.

18        Q.    Okay.  So the family is kind of

19   rallying around her right now?

20        A.    Yeah, we're just doing shifts.

21        Q.    Sure.

22        A.    One night I'll stay with her from

23   midnight till 7:00 to make sure she doesn't get

24   up and get out of bed.

```
 1        Q.     When is the last time you stayed with

 2   her?

 3        A.     When she came out of the hospital.  I

 4   think once when she came out of the hospital.

 5        Q.     This week?  Last week?  Two weeks ago?

 6        A.     About a week and a half ago.

 7        Q.     Speak up, if you can.

 8        A.     I'm trying.  I'm sorry.  I have a

 9   little bit of a sore throat.

10        Q.     Are you losing sleep over your

11   grandmother's condition?

12        A.     Nope.  Well, it's not easy going to

13   sleep either not knowing if that phone is going

14   to ring.

15        Q.     Sure.  Understood.

16               Okay.  Have you talked to Terri

17   Pechner since we last were across the table on

18   June 2nd?

19        A.     I did.

20        Q.     When did you talk to her last?

21        A.     Last night.

22        Q.     Okay.  And what did you and she talk

23   about?

24        A.     She called me to see how my
```

1   grandmother was.

2        Q.    Anything else?

3              They're working outside.

4        A.    Oh, okay.  Sorry.

5        Q.    It's okay.

6        A.    She was telling me how sick she was.

7        Q.    Terri is sick?

8        A.    Yeah, she's really sick.

9        Q.    Did she tell you what she had?  Flu,

10  pneumonia, broken leg, whatever?

11       A.    No, no, nothing like that.  Just that

12  she's feeling ill.

13       Q.    Did she say anything about her

14  deposition session tomorrow?

15       A.    She's coming.

16       Q.    Okay.  Other than that?

17       A.    No.

18       Q.    She asked about your grandmom, said

19  she was really sick, confirmed she was coming

20  tomorrow.  Anything else that you talked about?

21       A.    Give me a minute.  Just she was sick.

22  She was -- she sounded sick when she called me.

23  I asked her.

24       Q.    Okay.  Did she say what she had?

VOL. VIII 1528

1    A.    I think it has to do something with --

2    she's -- it's personal, I think.

3    Q.    Oh, okay.

4    A.    It's a female thing.  I don't know.  I

5    don't feel comfortable disclosing what she said

6    to me.

7    Q.    All right.  All right.

8    A.    But it has something to do with her

9    physically.

10    Q.    Okay.

11    A.    Is that all right?

12    Q.    We'll work with that.

13         (Discussion held off the record.)

14    Q.    Okay.  I want to pick up with the June

15    of '98 time frame.  We ended on June 2nd looking

16    at an East Boston Health Clinic note from May of

17    '98.

18    A.    Okay.

19    Q.    And if you notice, I've been trying to

20    move in a chronological fashion through the

21    events of your employment with the City of

22    Revere, Terri's employment, the issues in your

23    complaint and so forth.

24         So what I want to show you is -- it's

1    Exhibit 12.  These are Terri Pechner's notes.  At

2    Page 8, I'd like you to look at the big paragraph

3    at the top of the page.

4         A.    Can I read it?

5         Q.    Yeah, I'm handing it to you to look

6    at.

7         A.    (Pause in testimony while reviewing

8    document.)

9              Okay.

10        Q.    All right.  With respect to this June

11   '98 entry in Terri Pechner's notes, were you

12   aware that this incident that she described here

13   had occurred?

14        A.    I just remembered it.

15        Q.    Okay.  And when did you first learn

16   about what's described here as occurring in June

17   of '98?

18        A.    I don't remember.

19        Q.    Who told you?

20        A.    I don't remember.

21        Q.    Do you know if this June of '98

22   incident was discussed at the meeting in January

23   of '99?

24        A.    I don't think so.

1          Q.    Okay.  At the bottom of the note here,

2    as we get to the bottom of the note it talks

3    about Chief Russo was out on sick leave, using

4    sick leave before he retired.

5          A.    Okay.  Yeah.

6          Q.    Is that consistent with your

7    recollection, that as of June of '98 Chief Russo

8    was using sick leave and Roy Colannino was acting

9    as the police chief in his absence?

10         A.    To be honest with you, Mr. Porr, I

11    didn't pay any attention to that.

12         Q.    So you don't know one way or the

13    other?

14         A.    No.

15         Q.    Were there any rumors circulating

16    through the police department that Terri Pechner

17    was having an affair with either Sergeant Goodwin

18    or Lieutenant Santoro?

19         A.    I don't remember.

20         Q.    Did you hear about the incident that

21    is described here in these notes around June of

22    '98 or was it later?

23         A.    I don't know.

24         Q.    Just leave that there.  I'm going to

1    hand you Exhibit 2, which is the complaint in

2    this matter, and I'm going to open it up to

3    Paragraph 96 on Page 14.  And if you'd read

4    Paragraph 96 to yourself, I'm more concerned with

5    the second half of the paragraph --

6         A.    Okay.

7         Q.    -- than with the first.

8         A.    (Pause in testimony while reviewing

9    document.)

10              Okay.

11              MR. PORR:  All right.  Let me ask

12   madam reporter to mark this as next in order.

13              (Deposition Exhibit No. 45 marked.)

14        Q.    All right.  Let me show you what I've

15   had marked as Exhibit 45 for your deposition, and

16   if you'll notice, below the deposition sticker

17   there is a photocopy of an exhibit sticker from

18   when we were in court back on March 3rd.

19        A.    1989?

20        Q.    No, that's the case number.

21        A.    Oh, okay.  I'm sorry.

22        Q.    The date is there.

23        A.    I see it.

24        Q.    And I think we've looked at a couple

1    other sets of interrogatories, and you remember

2    we were in court on March 3rd and the judge had

3    you attest to your interrogatories?

4         A.    Yes.

5         Q.    Okay.  With respect then to these

6    interrogatories, what I want to do is -- bear

7    with me a second.

8              I want to turn to Page 8.

9    Interrogatory No. 73 asks for the date of the

10   incident concerning the chalkboard drawing as set

11   forth in Paragraph 96.  Do you see that?

12        A.    Yes.

13        Q.    And then your answer was an

14   approximation of July of 1998.  Do you see that?

15        A.    (Nods head.)

16        Q.    How did you come up with that

17   approximation?  What did you base that date upon?

18        A.    I think it was because of the time

19   frame between the chalkboard incident and the

20   underwear incident.  I'm not sure.

21        Q.    Okay.  What about the time frame

22   between those two -- what leads you to come up

23   with the July '98 date in relationship to the

24   underwear incident?

1          A.     I don't know.  I saw it.

2          Q.     Okay.

3          A.     I wasn't the only one who saw it.

4          Q.     I understand.

5          A.     I probably wrote it in one of the

6     notes that I gave to Attorney Dilday.  I'm not

7     sure.

8                 MR. PORR:  Let me mark that as next in

9     order.

10                (Deposition Exhibit No. 46 marked.)

11         Q.     Okay.  You made reference -- I only

12    have one copy, so bear with me.

13                So you made reference to some notes

14    you gave Attorney Dilday.  I've just had a

15    document marked as Exhibit 46.  Are those the

16    notes that you're referring to?

17         A.     Yes.  It was an educated guess, but I

18    guess I'm wrong.

19         Q.     Okay.  Could you look through those

20    notes and tell me if there's any reference to the

21    chalkboard drawing alleged in Paragraph 96?

22         A.     Okay.  (Pause in testimony while

23    reviewing document.)

24                No, I don't see it.

1        Q.     Are these notes that we're looking at,

2   Exhibit 46, are they in your handwriting?

3        A.     Yes.

4        Q.     And it looks like the original was on

5   standard school notebook paper?

6        A.     Yes.

7        Q.     When did you write these notes?

8        A.     I used it -- well, I wrote them when

9   they happened.

10       Q.     So did you keep a notebook where you

11  started recording notes of events that happened

12  concerning the Revere Police Department?

13       A.     You mean like a diary?

14       Q.     I guess I was asking, do these notes

15  all come from the same notebook?

16       A.     I don't know.  I don't think so.

17       Q.     Okay.  Are these all of your notes?

18       A.     Yes, I believe so.

19       Q.     All right.  So as you sit here now,

20  there's no reference to the chalkboard drawing

21  referred to in Paragraph 96 in the complaint in

22  these notes?

23       A.     I know where I saw it, the date.

24       Q.     Okay.  Where?

1          A.      Officer Malatesta, her notes.

2          Q.      You've seen Officer Lynn Malatesta's

3    notes?

4          A.      Yes, I have.

5          Q.      Where did you see those notes?

6          A.      In my attorney's office.

7          Q.      Mr. Dilday has them?

8          A.      I believe so.

9          Q.      When did you last see Officer Lynn

10   Malatesta's notes in Mr. Dilday's office?

11         A.      Years ago.

12         Q.      Can you be a little more precise in

13   terms of how many years ago?

14         A.      Two or three.

15         Q.      Do you know how Mr. Dilday came about

16   a copy of Officer Lynn Malatesta's notes?

17         A.      I don't know if she gave me a copy or

18   if she gave Officer James a copy.

19         Q.      Okay.  When you say Officer James, you

20   mean Terri?

21         A.      Terri.

22         Q.      The only reason I ask for the

23   distinction is because there's Officer Mark James

24   as well.

1          A.    Sorry.

2          Q.    Had you seen Lynn Malatesta's notes

3    prior to seeing them in Mr. Dilday's office?

4          A.    Yes.

5          Q.    When did you first see Lynn

6    Malatesta's notes?

7          A.    I don't remember.

8          Q.    What was the occasion that resulted in

9    you seeing Lynn Malatesta's notes the first time?

10         A.    I can tell you the reason she showed

11   me.

12         Q.    Sure.

13         A.    They were -- when I went and I didn't

14   know what to do with Lieutenant Foster, they told

15   me that they would be a witness for me if I

16   needed one.

17         Q.    Who is the "they" that you're talking

18   about here?

19         A.    Lynn Malatesta, Julie Malvarosa.

20         Q.    Was this at some sort of a meeting the

21   women were having?

22         A.    No, no, just a general conversation we

23   had at the station.

24         Q.    And Lynn had these notes with her at

1      the time?

2          A.     No, no.  I don't know if she brought

3      them to work and I read them in the cruiser or if

4      she gave me a copy of them.  I don't remember.

5          Q.     How many pages of notes did Lynn have?

6          A.     Lynn has a lot of pages.

7          Q.     More than 10?

8          A.     Yes.

9          Q.     More than 20?

10         A.     Possibly.

11         Q.     As many as 30?

12         A.     I don't know.

13         Q.     As many as 50?

14         A.     No, I don't think 50.

15         Q.     Okay.  So somewhere between 20 and 30?

16         A.     I think so.

17         Q.     Handwritten?

18         A.     I don't remember.

19         Q.     Because we've got 21 pages of notes

20     from Terri Pechner which are typed, and then we

21     have a few pages of notes from you which are

22     handwritten.

23         A.     I think she wrote them.  I think she

24     wrote them.

1        Q.      Eight-and-a-half by 11 size paper?

2    Normal size paper?

3        A.      Like your notebook.

4        Q.      Like my note pad?

5        A.      Yes.

6        Q.      Single spaced?

7        A.      Yes.  I would say yes.

8        Q.      Okay.  Do you recall the time period

9    that the notes covered?

10       A.      What do you mean?

11       Q.      The notes, were they in chronological

12   order?

13       A.      Yes.  She's very detailed like that.

14       Q.      And did they start, for instance, back

15   in September of '95 or February of '96 and go in

16   chronological order until some end date?

17       A.      Yes.

18       Q.      Do you recall the date the notes

19   started?

20       A.      No.  I don't remember.

21       Q.      Did they cover anything that occurred

22   at the academy?

23       A.      I don't know.

24       Q.      You went to the academy with Lynn;

1    correct?

2         A.    Yes, yes.

3         Q.    And that was roughly September of '95

4    until roughly February of '96?

5         A.    Yes.

6         Q.    And then you and Lynn and the rest of

7    those academy graduates went to work as police

8    officers for the city as opposed to being cadets

9    at the academy in February of '96?

10        A.    Right.

11        Q.    Assuming then that the notes picked up

12   with anything that may have happened once you got

13   here working for the City of Revere in February

14   of '96, and you indicated they seemed to go in

15   chronological order, do you know the end date for

16   the notes that you saw?

17        A.    They're probably still going.

18        Q.    All right.  So your recollection is

19   that Lynn showed you a copy of her notes at least

20   once while you were still working for the Revere

21   Police Department?

22        A.    Yes.

23        Q.    You have since seen the notes in

24   Attorney Dilday's office?

1      A.    I did.

2      Q.    Have you seen them any other time?

3      A.    No.

4      Q.    When you looked at Lynn's notes at

5 Attorney Dilday's office, were you looking at a

6 document that was consistent with what you had

7 seen before?

8      A.    Sorry.  No.

9      Q.    What was different?

10     A.    Oh, you mean when I saw her notes

11 again?

12     Q.    Yeah.

13     A.    They looked exactly the same.  I'm

14 sorry.

15     Q.    That's fine.

16           What I was looking for, had Lynn added

17 any additional pages since the last time you had

18 seen them?

19     A.    Oh, I don't remember.

20     Q.    Because presumably there's a gap in

21 time between when you first saw them and when you

22 next saw them?

23     A.    Right.

24     Q.    Do you know what that gap is?   A

```
 1    couple years?

 2         A.    Possibly.

 3         Q.    All right.  And that's what I'm

 4    getting at.  You said a moment ago Lynn is

 5    probably still taking notes.

 6         A.    Yes.

 7         Q.    So I would assume that when you first

 8    saw the notes they were complete up to that time?

 9         A.    Right.

10         Q.    And then a couple years later you saw

11    them in Attorney Dilday's office, and what I was

12    wondering is, did you see additional notes you

13    hadn't seen before covering that gap?

14         A.    No.  No.  If they were there, I didn't

15    read them.

16         Q.    So have you -- go ahead.

17         A.    If I did read them, I don't remember.

18         Q.    Okay.

19         A.    I'm being honest.

20         Q.    That's fine.

21               And let me back up and just double-

22    check.  Have you seen the notes more than twice?

23         A.    I saw them twice.

24         Q.    Lynn showed them to you once.
```

1    Attorney Dilday showed them to you once.

2         A.    I don't know if I brought them to him

3    or if Terri brought them to him.

4         Q.    No, I understand.

5         A.    I saw them in his office.

6         Q.    Right.  So, again, Lynn showed you her

7    notes once, and then next you saw them in

8    Attorney Dilday's office?

9         A.    Yes.

10        Q.    Okay.  And so it's your recollection

11   going back to Paragraph 96 that the date of this

12   incident, July of '98, you may be taking that

13   from Lynn's notes?

14        A.    Yes.

15        Q.    Okay.  Now, you indicated that you saw

16   this drawing?

17        A.    Yes.

18        Q.    Tell me the circumstances that led to

19   you seeing the drawing.  What was going on?

20        A.    You don't want me to describe it to

21   you?

22        Q.    I'm sorry?

23        A.    You don't want me to describe it, do

24   you?

1        Q.      I want you to tell me the

2    circumstances surrounding you seeing it.

3        A.      Oh, I was walking out of the guard

4    room and I was leaving.  It was inside the little

5    hallway adjacent to the radio room and a door

6    that leads into a long corridor into the roll

7    call room.  It was on a big chalkboard.

8        Q.      How big is the chalkboard?

9        A.      From here to here.

10       Q.      Okay.  So it's a couple feet wide?

11       A.      Yes.

12       Q.      And how tall is it?

13       A.      Maybe from where you are to where I

14   am.

15       Q.      Is it more of a square-shaped

16   chalkboard?

17       A.      Yes, yes.

18       Q.      As opposed to a long rectangular one?

19       A.      Right.

20       Q.      What day was it?  Do you know what day

21   it was?  Monday, Tuesday, Wednesday?

22       A.      No, I don't remember.

23       Q.      What time of day?

24       A.      I don't remember.  Maybe -- I don't

```
 1    know.  I don't know.

 2         Q.     And you were walking from the guard

 3    room?

 4         A.     To go down to the garage.

 5         Q.     Where is the guard room?

 6         A.     The guard room is the long -- where

 7    the long corridor is?

 8         Q.     Right.

 9         A.     The guard room is the roll call room.

10    Sorry.

11         Q.     Okay.  Were you at roll call or you

12    just happened to have been in the room for

13    something else?

14         A.     I don't know.  It's been such a long

15    time.  I don't know what I was doing there.  I

16    don't know if I was at roll call or I was working

17    an extra shift, if I was doing the morning shift.

18    I don't know what --

19         Q.     As you walked down the hallway then,

20    you walked past the drawing on the chalkboard?

21         A.     I looked at it and I put my head down

22    and kept going.

23         Q.     Was anybody with you?

24         A.     Nope.  Not that I remember.
```

1        Q.      What did you do after you walked

2   through the hallway?  You went to the garage, I

3   think you said?

4        A.      I did.

5        Q.      And what did you do there?

6        A.      I don't know.

7        Q.      Did you ever see the drawing again?

8        A.      No.

9        Q.      The drawing was in chalk?

10        A.      Yes.

11        Q.      On a chalkboard?

12        A.      Yes.

13        Q.      What was your reaction to seeing the

14   drawing?

15        A.      It didn't surprise me.

16        Q.      Okay.  Was that your only reaction,

17   didn't surprise me?

18        A.      I was disgusted, but it didn't

19   surprise me.  I just kept going.

20        Q.      Why didn't it surprise you?

21        A.      Just little things that were going on,

22   being said.

23        Q.      What little things?

24        A.      By this time all the racial slurs

1    were, you know, coming out and --

2         Q.    And by that you mean comments about

3    the spics at the Wonderland Ballroom?

4         A.    Yes.

5         Q.    Okay.

6         A.    And the other females complaining

7    about them being harassed.

8         Q.    What other females had complained

9    about harassment as of July of '98?

10         A.    I'm not sure, but I believe Maria

11    LaVita and I think she was working that night

12    with Lyn Curcio.  Just little stuff, girls being

13    picked on.

14         Q.    No, wait a minute.  You had said

15    something about other officers had complained

16    about being harassed.

17         A.    Yes.

18         Q.    So who had complained about being

19    harassed and what was the harassment they

20    complained about?

21         A.    Lyn and Maria complained about

22    Jeremiah Goodwin.

23         Q.    Was he a sergeant at the time?

24         A.    Yes.

1    at about 9:20, and it's now about 12:20, 12:25.

2    There's no way we can finish four additional

3    hours today, which is what I estimate the court

4    ordered two-and-a-half days it would take in

5    terms of completing those two-and-a-half days.

6           Ms. Thorne has obligations this

7    afternoon.  Mr. Dilday has obligations this

8    afternoon.  And so we're going to go ahead and

9    finish up for the day, and we'll reschedule the

10   remaining four hours later.

11          MR. VIGLIOTTI:  While we're on the

12   record, there was reference in the record to

13   notes in the possession of Mr. Dilday.  I believe

14   these individual defendants in discovery

15   requested any notes or correspondence relating to

16   the facts of this case, which those notes have

17   not been produced, nor was an objection filed.

18          I am asking for copies of those, if

19   you can bring it to Mr. Dilday's attention.  I

20   just want that on the record in regards to those

21   notes.

22          MR. PORR:  Lynn Malatesta's notes?

23          MR. VIGLIOTTI:  Lynn Malatesta's

24   notes, which it doesn't sound like there's an

1    attorney-client privilege.  Testimony was given

2    here today regarding those notes, so I'd ask you

3    to relay that message to Mr. Dilday that I am

4    requesting those notes.

5          MS. THORPE:  I will definitely relay

6    that message.  This is the first I've heard of

7    Ms. Malatesta's notes, so -- .

8          MR. VIGLIOTTI:  Me, too.

9          MR. PORR:  Good enough.  Thank you.

10         (Deposition concluded at 12:25 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24