# EXHIBIT B

Page 1517

```
 1              UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
 2

 3
    TERRI PECHNER-JAMES
 4  and SONIA FERNANDEZ,

 5       Plaintiffs,
                                    VOLUME VIII
 6  VS.           C.A. NO. 03-12499-MLW

 7

    CITY OF REVERE; THOMAS
 8  AMBROSINO, MAYOR; CITY OF
    REVERE POLICE DEPARTMENT,
 9  TERRENCE REARDON, CHIEF;
    BERNARD FOSTER, SALVATORE
10  SANTORO, ROY COLANNINO,
    FREDERICK ROLAND, THOMAS DOHERTY,
11  JOHN NELSON, JAMES RUSSO,
    MICHAEL MURPHY, and STEVEN FORD,
12
         Defendants.
13

14
15     CONTINUED DEPOSITION of SONIA FERNANDEZ taken
16  at the request of the defendants pursuant to
17  Rule 30 of the Federal Rules of Civil Procedure
18  before Dawn J. Cormier Bourn, a notary public in
19  and for the Commonwealth of Massachusetts, on
20  June 21, 2006, commencing at 9:17 a.m. at the
21  Revere City Hall, 281 Broadway, Revere,
22  Massachusetts.
23
24
```

Page 1518

```
 1  A P P E A R A N C E S:

 2
    FOR THE PLAINTIFF:
 3
    DAWNE H. THORNE, ESQ.
 4  GRAYER & DILDAY
    27 School Street
 5  Boston, Massachusetts  02108

 6
    FOR THE DEFENDANT, CITY OF REVERE; THOMAS
 7  AMBROSINO, MAYOR; CITY OF REVERE POLICE
    DEPARTMENT, TERRENCE REARDON, CHIEF:
 8
    WALTER H. PORR, JR., ESQ., and
 9  PAUL CAPIZZI, ESQ.
    Office of the City Solicitor
10  City Hall, 281 Broadway
    Revere, Massachusetts  01251
11

12  FOR THE DEFENDANTS, BERNARD FOSTER, SALVATORE
    SANTORO, ROY COLANNINO, FREDERICK ROLAND,
13  THOMAS DOHERTY, JOHN NELSON, JAMES RUSSO,
    MICHAEL MURPHY AND STEVEN FORD:
14
    JOHN K. VIGLIOTTI, ESQ.
15  REARDON, JOYCE & AKERSON
    387 Grove Street
16  Worcester, Massachusetts  01605
17
18
19
20
21
22
23
24
```

Page 1519

```
 1
 2
 3
 4                      I N D E X
 5         DEPONENT:  SONIA FERNANDEZ
 6                                             PAGE
 7  FURTHER EXAMINATION BY MR. PORR            1520
 8
 9
10
11
12                     EXHIBITS
13                                             PAGE
14  45    ANSWERS TO INTERROGATORIES           1531
15  46    HANDWRITTEN NOTES                    1533
16  47    JULY 6, 1998 NOTE                    1577
17  48    SEPTEMBER 11, 1998 NOTE              1585
18  49    SEPTEMBER 22, 1998 NOTE              1597
19  50    OCTOBER 2, 1998 NOTE                 1599
20
21
22
23
24
```

Page 1520

```
 1       SONIA FERNANDEZ, PREVIOUSLY SWORN.
 2                    - - - - -
 3       MS. THORPE:  I know we're 15 minutes
 4  late, so do you want to go 15 minutes later?
 5       MR. PORR:  Okay.
 6                    - - - - -
 7  FURTHER EXAMINATION BY MR. PORR:
 8    Q.   So we're back on the record with
 9  Ms. Fernandez.  Good morning.
10    A.   How are you?
11    Q.   Good, thank you.  How about yourself?
12    A.   Tired.
13    Q.   Having trouble sleeping?
14    A.   Yeah.
15    Q.   Still?
16    A.   Yeah.
17    Q.   Take any medication today?
18    A.   Nothing.
19    Q.   All right.  Aside from tired, are you
20  feeling okay?
21    A.   Yeah.  Yes, sorry.  Yes.
22    Q.   Madam reporter asked me before we
23  started to ask you to speak up.
24    A.   Okay.  I'm sorry.  You know what it
```

```
                                    1533                                                  1535
 1   A.   I don't know.  I saw it.                      1   A.   Officer Malatesta, her notes.
 2   Q.   Okay.                                         2   Q.   You've seen Officer Lynn Malatesta's
 3   A.   I wasn't the only one who saw it.             3 notes?
 4   Q.   I understand.                                 4   A.   Yes, I have.
 5   A.   I probably wrote it in one of the             5   Q.   Where did you see those notes?
 6 notes that I gave to Attorney Dilday.  I'm not       6   A.   In my attorney's office.
 7 sure.                                                7   Q.   Mr. Dilday has them?
 8        MR. PORR:  Let me mark that as next in        8   A.   I believe so.
 9 order.                                               9   Q.   When did you last see Officer Lynn
10        (Deposition Exhibit No. 46 marked.)         10 Malatesta's notes in Mr. Dilday's office?
11   Q.   Okay.  You made reference -- I only         11   A.   Years ago.
12 have one copy, so bear with me.                    12   Q.   Can you be a little more precise in
13        So you made reference to some notes        13 terms of how many years ago?
14 you gave Attorney Dilday.  I've just had a         14   A.   Two or three.
15 document marked as Exhibit 46.  Are those the      15   Q.   Do you know how Mr. Dilday came about
16 notes that you're referring to?                    16 a copy of Officer Lynn Malatesta's notes?
17   A.   Yes.  It was an educated guess, but I       17   A.   I don't know if she gave me a copy or
18 guess I'm wrong.                                   18 if she gave Officer James a copy.
19   Q.   Okay.  Could you look through those         19   Q.   Okay.  When you say Officer James, you
20 notes and tell me if there's any reference to the  20 mean Terri?
21 chalkboard drawing alleged in Paragraph 96?        21   A.   Terri.
22   A.   Okay.  (Pause in testimony while            22   Q.   The only reason I ask for the
23 reviewing document.)                               23 distinction is because there's Officer Mark James
24        No, I don't see it.                         24 as well.

                                    1534                                                  1536
 1   Q.   Are these notes that we're looking at,       1   A.   Sorry.
 2 Exhibit 46, are they in your handwriting?           2   Q.   Had you seen Lynn Malatesta's notes
 3   A.   Yes.                                         3 prior to seeing them in Mr. Dilday's office?
 4   Q.   And it looks like the original was on       4   A.   Yes.
 5 standard school notebook paper?                     5   Q.   When did you first see Lynn
 6   A.   Yes.                                         6 Malatesta's notes?
 7   Q.   When did you write these notes?              7   A.   I don't remember.
 8   A.   I used it -- well, I wrote them when         8   Q.   What was the occasion that resulted in
 9 they happened.                                      9 you seeing Lynn Malatesta's notes the first time?
10   Q.   So did you keep a notebook where you       10   A.   I can tell you the reason she showed
11 started recording notes of events that happened   11 me.
12 concerning the Revere Police Department?          12   Q.   Sure.
13   A.   You mean like a diary?                     13   A.   They were -- when I went and I didn't
14   Q.   I guess I was asking, do these notes       14 know what to do with Lieutenant Foster, they told
15 all come from the same notebook?                   15 me that they would be a witness for me if I
16   A.   I don't know.  I don't think so.           16 needed one.
17   Q.   Okay.  Are these all of your notes?        17   Q.   Who is the "they" that you're talking
18   A.   Yes, I believe so.                         18 about here?
19   Q.   All right.  So as you sit here now,        19   A.   Lynn Malatesta, Julie Malvarosa.
20 there's no reference to the chalkboard drawing    20   Q.   Was this at some sort of a meeting the
21 referred to in Paragraph 96 in the complaint in   21 women were having?
22 these notes?                                       22   A.   No, no, just a general conversation we
23   A.   I know where I saw it, the date.           23 had at the station.
24   Q.   Okay.  Where?                               24   Q.   And Lynn had these notes with her at
```

PECHNER-JAMES/FERNANDEZ vs. CITY OF REVERE, et al.
Case 1:03-cv-12499-MLW   Document 234-4   Filed 07/14/2006   Page 4 of 6
VOL. VIII - SONIA FERNANDEZ 6/21/06

1537

1 the time?
2  A. No, no. I don't know if she brought
3 them to work and I read them in the cruiser or if
4 she gave me a copy of them. I don't remember.
5  Q. How many pages of notes did Lynn have?
6  A. Lynn has a lot of pages.
7  Q. More than 10?
8  A. Yes.
9  Q. More than 20?
10  A. Possibly.
11  Q. As many as 30?
12  A. I don't know.
13  Q. As many as 50?
14  A. No, I don't think 50.
15  Q. Okay. So somewhere between 20 and 30?
16  A. I think so.
17  Q. Handwritten?
18  A. I don't remember.
19  Q. Because we've got 21 pages of notes
20 from Terri Pechner which are typed, and then we
21 have a few pages of notes from you which are
22 handwritten.
23  A. I think she wrote them. I think she
24 wrote them.

1538

1  Q. Eight-and-a-half by 11 size paper?
2 Normal size paper?
3  A. Like your notebook.
4  Q. Like my note pad?
5  A. Yes.
6  Q. Single spaced?
7  A. Yes. I would say yes.
8  Q. Okay. Do you recall the time period
9 that the notes covered?
10  A. What do you mean?
11  Q. The notes, were they in chronological
12 order?
13  A. Yes. She's very detailed like that.
14  Q. And did they start, for instance, back
15 in September of '95 or February of '96 and go in
16 chronological order until some end date?
17  A. Yes.
18  Q. Do you recall the date the notes
19 started?
20  A. No. I don't remember.
21  Q. Did they cover anything that occurred
22 at the academy?
23  A. I don't know.
24  Q. You went to the academy with Lynn;

1539

1 correct?
2  A. Yes, yes.
3  Q. And that was roughly September of '95
4 until roughly February of '96?
5  A. Yes.
6  Q. And then you and Lynn and the rest of
7 those academy graduates went to work as police
8 officers for the city as opposed to being cadets
9 at the academy in February of '96?
10  A. Right.
11  Q. Assuming then that the notes picked up
12 with anything that may have happened once you got
13 here working for the City of Revere in February
14 of '96, and you indicated they seemed to go in
15 chronological order, do you know the end date for
16 the notes that you saw?
17  A. They're probably still going.
18  Q. All right. So your recollection is
19 that Lynn showed you a copy of her notes at least
20 once while you were still working for the Revere
21 Police Department?
22  A. Yes.
23  Q. You have since seen the notes in
24 Attorney Dilday's office?

1540

1  A. I did.
2  Q. Have you seen them any other time?
3  A. No.
4  Q. When you looked at Lynn's notes at
5 Attorney Dilday's office, were you looking at a
6 document that was consistent with what you had
7 seen before?
8  A. Sorry. No.
9  Q. What was different?
10  A. Oh, you mean when I saw her notes
11 again?
12  Q. Yeah.
13  A. They looked exactly the same. I'm
14 sorry.
15  Q. That's fine.
16 What I was looking for, had Lynn added
17 any additional pages since the last time you had
18 seen them?
19  A. Oh, I don't remember.
20  Q. Because presumably there's a gap in
21 time between when you first saw them and when you
22 next saw them?
23  A. Right.
24  Q. Do you know what that gap is? A

1541

1 couple years?
2  A.  Possibly.
3  Q.  All right. And that's what I'm
4 getting at. You said a moment ago Lynn is
5 probably still taking notes.
6  A.  Yes.
7  Q.  So I would assume that when you first
8 saw the notes they were complete up to that time?
9  A.  Right.
10  Q.  And then a couple years later you saw
11 them in Attorney Dilday's office, and what I was
12 wondering is, did you see additional notes you
13 hadn't seen before covering that gap?
14  A.  No. No. If they were there, I didn't
15 read them.
16  Q.  So have you -- go ahead.
17  A.  If I did read them, I don't remember.
18  Q.  Okay.
19  A.  I'm being honest.
20  Q.  That's fine.
21   And let me back up and just double-
22 check. Have you seen the notes more than twice?
23  A.  I saw them twice.
24  Q.  Lynn showed them to you once.

1542

1 Attorney Dilday showed them to you once.
2  A.  I don't know if I brought them to him
3 or if Terri brought them to him.
4  Q.  No, I understand.
5  A.  I saw them in his office.
6  Q.  Right. So, again, Lynn showed you her
7 notes once, and then next you saw them in
8 Attorney Dilday's office?
9  A.  Yes.
10  Q.  Okay. And so it's your recollection
11 going back to Paragraph 96 that the date of this
12 incident, July of '98, you may be taking that
13 from Lynn's notes?
14  A.  Yes.
15  Q.  Okay. Now, you indicated that you saw
16 this drawing?
17  A.  Yes.
18  Q.  Tell me the circumstances that led to
19 you seeing the drawing. What was going on?
20  A.  You don't want me to describe it to
21 you?
22  Q.  I'm sorry?
23  A.  You don't want me to describe it, do
24 you?

1543

1  Q.  I want you to tell me the
2 circumstances surrounding you seeing it.
3  A.  Oh, I was walking out of the guard
4 room and I was leaving. It was inside the little
5 hallway adjacent to the radio room and a door
6 that leads into a long corridor into the roll
7 call room. It was on a big chalkboard.
8  Q.  How big is the chalkboard?
9  A.  From here to here.
10  Q.  Okay. So it's a couple feet wide?
11  A.  Yes.
12  Q.  And how tall is it?
13  A.  Maybe from where you are to where I
14 am.
15  Q.  Is it more of a square-shaped
16 chalkboard?
17  A.  Yes, yes.
18  Q.  As opposed to a long rectangular one?
19  A.  Right.
20  Q.  What day was it? Do you know what day
21 it was? Monday, Tuesday, Wednesday?
22  A.  No, I don't remember.
23  Q.  What time of day?
24  A.  I don't remember. Maybe -- I don't

1544

1 know. I don't know.
2  Q.  And you were walking from the guard
3 room?
4  A.  To go down to the garage.
5  Q.  Where is the guard room?
6  A.  The guard room is the long -- where
7 the long corridor is?
8  Q.  Right.
9  A.  The guard room is the roll call room.
10 Sorry.
11  Q.  Okay. Were you at roll call or you
12 just happened to have been in the room for
13 something else?
14  A.  I don't know. It's been such a long
15 time. I don't know what I was doing there. I
16 don't know if I was at roll call or I was working
17 an extra shift, if I was doing the morning shift.
18 I don't know what --
19  Q.  As you walked down the hallway then,
20 you walked past the drawing on the chalkboard?
21  A.  I looked at it and I put my head down
22 and kept going.
23  Q.  Was anybody with you?
24  A.  Nope. Not that I remember.

1685

1  which is sort of buried underneath there, if we
2  back up to Pages -- I'm sorry -- to Paragraphs 53
3  and 54 involving Sergeant Doherty, do they
4  likewise describe what we're looking at here in
5  2-D?
6      A.  Yes.
7      Q.  Okay.  No. 3 on the December '98 --
8  Exhibit 28; right?
9      A.  Uh-huh.
10     Q.  No. 3 involved the bathroom issue in
11 terms of the physical structure of the old
12 building, the police department.  Did you get a
13 female bathroom separate and apart --
14     A.  Yes, we did.
15     Q.  And did they also provide locker
16 facilities there?
17     A.  Yes.
18     Q.  And then No. 4 talks about matron
19 duties.
20     A.  Yes.
21     Q.  What about matron duties?
22     A.  Just providing the women with the
23 sanitary needs that they needed.
24     Q.  Does the Revere Police Department have

1686

1  female matrons?
2      A.  No.
3      Q.  So as of December of '98, in the
4  absence of having matrons on staff, who was
5  available to perform the matrons' duties, things
6  that matrons --
7      A.  The females.
8      Q.  And these are duties that are
9  specifically delegated that need to be performed
10 by females given the circumstances; correct?
11     A.  Correct.
12     Q.  So was the complaint here more in the
13 nature of you need to hire some matrons so that
14 we don't have to do those duties?
15     A.  Yes, I think so.
16     Q.  All right.
17         MR. PORR:  Go off the record for a
18 minute.
19         (Discussion held off the record.)
20         MR. PORR:  We just briefly had an
21 off-the-record discussion of the deposition
22 schedule.
23         Today we were supposed to go 9:00 to
24 noon.  As the record will reflect, we got going

1687

1  at about 9:20, and it's now about 12:20, 12:25.
2  There's no way we can finish four additional
3  hours today, which is what I estimate the court
4  ordered two-and-a-half days it would take in
5  terms of completing those two-and-a-half days.
6         Ms. Thorne has obligations this
7  afternoon.  Mr. Dilday has obligations this
8  afternoon.  And so we're going to go ahead and
9  finish up for the day, and we'll reschedule the
10 remaining four hours later.
11         MR. VIGLIOTTI:  While we're on the
12 record, there was reference in the record to
13 notes in the possession of Mr. Dilday.  I believe
14 these individual defendants in discovery
15 requested any notes or correspondence relating to
16 the facts of this case, which those notes have
17 not been produced, nor was an objection filed.
18         I am asking for copies of those, if
19 you can bring it to Mr. Dilday's attention.  I
20 just want that on the record in regards to those
21 notes.
22         MR. PORR:  Lynn Malatesta's notes?
23         MR. VIGLIOTTI:  Lynn Malatesta's
24 notes, which it doesn't sound like there's an

1688

1  attorney-client privilege.  Testimony was given
2  here today regarding those notes, so I'd ask you
3  to relay that message to Mr. Dilday that I am
4  requesting those notes.
5          MS. THORPE:  I will definitely relay
6  that message.  This is the first I've heard of
7  Ms. Malatesta's notes, so -- .
8          MR. VIGLIOTTI:  Me, too.
9          MR. PORR:  Good enough.  Thank you.
10         (Deposition concluded at 12:25 p.m.)