```
                IN THE UNITED STATES DISTRICT COURT
                            FOR THE
                    DISTRICT OF MASSACHUSETTS


TERRI PECHNER-JAMES and
SONIA FERNANDEZ,
         Plaintiffs

VS.                                    C.A. NO. 03-12499-MLW

CITY OF REVERE, THOMAS
AMBROSINO, MAYOR CITY OF
REVERE, POLICE DEPARTMENT,
TERRENCE REARDON, CHIEF,
BERNARD FOSTER, SALVATORE
SANTORO, ROY COLANNINO,
FREDERICK ROLAND, THOMAS
DOHERTY, JOHN NELSON, JAMES
RUSSO, MICHAEL MURPHY, and
STEVEN FORD,
         Defendants
```

DEPOSITION of TERRI PECHNER-JAMES, taken at the request of the Defendants Foster, Santoro, Colannino, Roland, Doherty, Nelson, Russo, Murphy and Ford, pursuant to Rule 30 of the Federal Rules of Civil Procedure, before Michael Gruber, a notary public in and for the Commonwealth of Massachusetts, on January 10, 2006, commencing at 10:20 a.m., at the offices of Reardon, Joyce & Akerson, Esqs., 397 Grove Street, Worcester, Massachusetts.

```
 1   A P P E A R A N C E S:

 2
     FOR THE PLAINTIFFS:
 3
     JAMES S. DILDAY, ESQ.
 4   GRAYER & DILDAY, LLP
     27 School Street  Suite 400
 5   Boston, Massachusetts 02108

 6
     FOR THE DEFENDANTS CITY OF REVERE, AMBROSINO,
 7   REARDON:

 8   PAUL CAPIZZI, ESQ., CITY SOLICITOR
     WALTER H. PORR, JR., ESQ., ASST. CITY SOLICITOR
 9   OFFICE OF THE CITY SOLICITOR
     CITY HALL
10   281 Broadway
     Revere, Massachusetts 01251
11

12   FOR THE DEFENDANTS FOSTER, SANTORO, COLANNINO,
     ROLAND, DOHERTY, NELSON, RUSSO, MURPHY AND FORD:
13
     MICHAEL J. AKERSON, ESQ.
14   REARDON, JOYCE & AKERSON, P.C.
     397 Grove Street
15   Worcester, Massachusetts 01605

16

17

18

19

20

21

22

23

24
```

1                          I N D E X

2              DEPONENT: TERRI PECHNER-JAMES

3                                                    PAGE

4    EXAMINATION BY MR. AKERSON                        13

5

6

7

8

9                          EXHIBITS

10                                                   PAGE

11

12          1        21 Pages, Typewritten            90

13          2        One Page, Typewritten           126

14

15

16

17

18

19

20

21

22

23

24

```
 1    what I did on my personal time, but --
 2         Q.    Okay. You're looking at a document
 3    which appears to be a small calendar.
 4         A.    Mm-hmm.
 5         Q.    What is the purpose of the calendar,
 6    ma'am?
 7         A.    Had a calendar since I got out of --
 8    one thing they taught us in the academy is to
 9    carry a book with you so that you can put dates
10    and times.
11         Q.    By that do you mean in terms of when
12    you are scheduled to work any extra jobs or
13    training classes you have?
14         A.    Yes.
15         Q.    Are there any other personal items or
16    diary-like notations in the calendar you have in
17    front of you for the year 1997?
18         A.    There's personal notes in here. Is
19    that --?
20         Q.    Are there notations in the diary
21    regarding, in this case, Lieutenant Foster and
22    his interactions and treatments with you?
23         A.    Yes.
24         Q.    There are.
```

```
 1        A.    Yes.
 2        Q.    And you indicated that was something
 3   you learned at the police academy, to keep a
 4   calendaring system when you're working as a
 5   police officer?
 6        A.    Yes.
 7        Q.    That's the only reason you keep the --
 8        A.    I started doing it --
 9        Q.    -- I'll call it a little black book --
10        A.    I've got one for pretty much every
11   year.
12        Q.    Every year?
13        A.    I guess if I learned something, I
14   learned to keep track of the days of the year,
15   week. Still do it.
16        Q.    You mentioned Lieutenant Foster, your
17   relationship changed with him. What did you learn
18   during the summer of 1997 which made you believe
19   that relationship of Lieutenant Foster had
20   changed?
21        A.    Supposedly, I said something about
22   him. That's all I knew.
23        Q.    What are you supposed to have said
24   about the lieutenant, Lieutenant Foster?
```

```
 1        A.    I have no idea. I don't know to this
 2   day.
 3        Q.    Did you ask Lieutenant Foster what you
 4   supposedly said about him --
 5        A.    Yes.
 6        Q.    -- that made him, toward you, the
 7   relationship change?
 8        A.    I did.
 9        Q.    And did he respond?
10        A.    Yeah.
11        Q.    Did he tell you what you supposedly
12   said about him?
13        A.    No.
14        Q.    So as you sit here today you don't
15   know what it's alleged you said about Lieutenant
16   Foster?
17        A.    No, to this day I don't know.
18        Q.    Do you know the gist or the general
19   nature of what it was you supposedly said about
20   Lieutenant Foster?
21        A.    Don't know.
22        Q.    You have to answer -- okay.
23        A.    Don't know.
24        Q.    I'm assuming you spoke with Lieutenant
```

```
 1   Foster's daughter, Bernadette Foster, inasmuch as
 2   you said you were friendly with her.
 3       A.    Mm-hmm.
 4       Q.    Right?
 5       A.    Yes.
 6       Q.    What did she say to you when you asked
 7   her about why the change in the relationship with
 8   her dad, Lieutenant Bernie Foster?
 9       A.    We really never got into my -- I mean,
10   I don't remember a conversation, how it was kept
11   -- our relationship was kind of kept outside of
12   his. I don't --
13       Q.    Okay. Do you recall when it was that
14   you said something to Lieutenant Foster about
15   why --
16       A.    See, I'm sorry --
17       Q.    -- the relationship changed?
18       A.    Can I answer that? I did ask
19   Bernadette, when I got back on, why her father
20   was mad at me.
21       Q.    Okay. When did you ask Bernadette
22   Foster?
23       A.    I don't remember the date. I remember
24   it was behind the police station. We were going
```

```
 1   to our cars, leaving the shift. But I don't
 2   remember getting, again, you know, I don't
 3   remember getting why he was mad. Somebody said I
 4   said something. That was -- it was -- you know,
 5   the rumor mill. Bingo hall.
 6       Q.   I was just trying to place that
 7   conversation with Bernadette Foster in a time
 8   line. Do you remember when that was? Was that
 9   while you were in the CID unit?
10       A.   No, it wasn't. It was when I got back
11   to the shift.
12       Q.   Do you recall what Bernadette Foster
13   said to you as to why her father was mad?
14       A.   Couldn't have been much, because I
15   don't remember.
16       Q.   So you don't remember anything else
17   she said about that topic.
18       A.   No.
19       Q.   Did you ask anybody else why
20   Lieutenant Foster was mad at you?
21       A.   Asked everybody.
22       Q.   Okay. Could you define "everybody"? I
23   don't know who you mean.
24       A.   Captain Roland, Roy Colannino, Russo.
```

```
 1        Q.    Okay, well --
 2        A.    Kevin Millerick.
 3        Q.    I'll take a step back, if I can.
 4              What made you believe that Lieutenant
 5   Bernard Foster was upset or angry with you? What
 6   did he do or give or say to you?
 7        A.    Before I left the CID unit a couple of
 8   people approached me. I have -- if I can look
 9   back in my notes, again I have who it was, a lot
10   of stuff. If you don't mind me taking a second --
11        Q.    Sure, but as you're sitting here right
12   now you don't remember who approached you and
13   said things to you about why Foster was mad at
14   you?
15        A.    I think I remember one of them being
16   Kathy Fish. Again, that's without looking at my
17   notes.
18        Q.    Just one second, if I may. We'll get
19   to the name in the minute.
20              What did these individuals say to you
21   about why Lieutenant Foster was mad at you?
22        A.    They didn't say anything. They just
23   said, "Watch your back. Bernie is out to get
24   you." That was --.
```

1    Q.    Do you recall anything else that these
2 individuals said to you before you left the CID
3 unit as to why Lieutenant Foster was upset at
4 you?
5    A.    Unless I look in my notes, I don't
6 want to --
7    Q.    Okay, but as you sit there right now
8 you don't remember anything else that was said to
9 you about why Lieutenant Foster was upset with
10 you.
11    A.    No.
12    Q.    What notes are you speaking of that
13 you could look at which would refresh your memory
14 of what individuals told you Lieutenant Foster
15 was upset with you?
16    A.    My own personal notes.
17    Q.    If you want to look at them now you
18 may look at them. Your choice.
19    A.    It was August 9 -- I don't -- August 9
20 of '97 Officer Fish told me, but I didn't -- I
21 wrote I was unsure as to why and what I did
22 wrong, so --.
23    Q.    Okay --
24    A.    I don't have --

1  Q.   You referenced a moment ago that you
2  wanted to look at your own personal notes.
3  A.   Mm-hmm.
4  Q.   And I believe you just did, and you
5  mentioned that Kathy Fish had mentioned something
6  to you on August 9, is that correct?
7  A.   Mm-hmm.
8  Q.   Is that a "yes"?
9  A.   Yes, sir.
10 Q.   And that would be August 9 of the
11 year --
12 A.   1997.
13 Q.   You're looking at some documents.
14 There appears to be a stack of documents, maybe
15 three-quarters of an inch thick, and a variety of
16 stapled packets.
17 A.   These are all the same.
18 Q.   Okay. What is it you're looking at,
19 ma'am?
20 A.   My calendar, my copies of -- these are
21 my -- these are my calendars. Notes that I put on
22 my calendars, just composed into one page.
23 Q.   In making your own personal notes that
24 you have in front of you, why did you do that?

```
 1         A.    Because I can't remember anything in
 2   chronological order.
 3         Q.    So it's something you decided to do on
 4   your own because it would be helpful to you?
 5         A.    Pretty much.
 6               MR. AKERSON: I would like to take a
 7   copy of those notes before we leave.
 8               MR. DILDAY: Mm-hmm.
 9               I should have said "yes". You know
10   what I said.
11               MR. AKERSON: I got the hint. I know
12   it's hard.
13         Q.    Ms. James, now having looked at your
14   notes, do you recall anything else that was said
15   to you about why Lieutenant Foster was upset at
16   you? Again, this would be in the summer of 1997.
17         A.    (Shaking head.)
18         Q.    No?
19         A.    I don't recall.
20         Q.    I know you're shaking your head.
21         A.    No.
22         Q.    Thank you.
23               Again, in the summer of 1997 did you
24   have any direct conversations with Lieutenant
```

54

1  Foster about this information you had from Police
2  Officer Kathy Fish?
3      A.  Did I have direct communication with
4  him?
5      Q.  Yes.  Did you speak to Lieutenant
6  Foster in any way about what Kathy Fish had
7  mentioned to you?
8      A.  On August 24 of '97.
9      Q.  Just for the record, again, you seem
10 to be looking at your own personal notes.
11     A.  Yes, sir.
12     Q.  August 24 of 1997, you spoke with
13 Lieutenant Foster?
14     A.  Yes.
15     Q.  What happened on that occasion?
16     A.  He called me into the booking room.
17 The booking room of the Revere police station.
18     Q.  "He" being Lieutenant Foster?
19     A.  Yes.
20     Q.  Okay.  Do you recall what time of day
21 it was?
22     A.  No, I don't.
23     Q.  And did you go to the booking room?
24     A.  Yes.

```
1        Q.    What occurred, if anything, in the
2   booking room on that August 24, 1997 occasion?
3        A.    He just started screaming at me. Said
4   he's done a lot -- he's done a lot for me and I
5   stabbed him in his back. And he's putting me on a
6   walking route until further notice. He didn't
7   want to see my face inside the station or the
8   sub-station. Told me not to bother to speak with
9   him, and disregard the wedding invitation to his
10  daughter's wedding. I asked him what I had done
11  so wrong to him. He stated that -- he told me he
12  had nothing else to say to me. To go to my
13  assignment and make sure I'm there, because he's
14  going to be checking on me. And that was after I
15  had went to his daughter's wedding shower at
16  Weylu's restaurant on June 29, '97.
17       Q.    It appears you just read something.
18       A.    Yes, sir.
19       Q.    And those are from your own personal
20  notes?
21       A.    Yes.
22       Q.    When did you make the notes that you
23  have in front of you?
24       A.    When I started getting tortured.
```

```
 1         Q.    I'm sorry --
 2         A.    My notes --
 3         Q.    I'm not trying to be cute. What do you
 4   mean, when you started being tortured?
 5         A.    My calendars go from when I was in the
 6   academy. I started -- when I worked in CID one of
 7   the things I learned from my superior officers in
 8   CID was to always keep a personal book of
 9   incidents that happened on the job.
10         Q.    A personal diary, if you will?
11         A.    Correct.
12         Q.    Who in CID told you to do that?
13         A.    Sergeant Pisano, Sergeant Borgioli.
14         Q.    So you started keeping, if I may call
15   it a diary, of all your personal notes, after
16   your temporary assignment to CID?
17         A.    No, before that. Before my temporary
18   assignment.
19         Q.    Did you keep a journal for your first
20   year and a half on the Revere Police Department?
21         A.    Yes.
22         Q.    What is the method in which you kept
23   notes? Did you do it on a daily occasion, to
24   prepare these notes you're referencing, your
```

```
 1    personal notes?
 2         A.    When I worked? Is that -- I mean --
 3         Q.    I'm just trying to figure out --
 4         A.    There was really no rhyme --
 5         Q.    Every night would you sit down at a
 6    computer or note pad and write them out? That's
 7    what I'm trying to figure out. What were the
 8    methods of your note-taking?
 9         A.    When I went to school I wrote down
10    when I had school. If I took a day off I wrote
11    down when I took a day off. Got in an accident, I
12    wrote down about my accident. I'm -- I keep all
13    my -- I like to say, my files in order. So I, you
14    know, would write it down. If something happened
15    I'd write it down. I've got '96 in here, so I
16    mean --
17         Q.    So when do your notes begin, the
18    earliest date in time?
19         A.    March of '96.
20         Q.    That's a few months after you started
21    in the Revere police, as an officer on the
22    street?
23         A.    Yes.
24         Q.    The notes you have in front of you,
```

```
 1    which you indicated, ma'am, started in March of
 2    1996, were they always computerized?
 3         A.    No.
 4         Q.    Back in March of '96 were they
 5    handwritten or on computer?
 6         A.    Handwritten.
 7         Q.    At some point you changed the format
 8    and typed your handwritten notes?
 9         A.    Yes.
10         Q.    When was that done?
11         A.    2001, when I filed a complaint with
12    MCAD.
13         Q.    Do you still have your handwritten
14    notes?
15         A.    My calendars.
16         Q.    You have in your hand what looks like
17    a monthly calendar for the year of 1997, which is
18    about two -- say three inches by five inches.
19         A.    Here's my other one, so --.
20         Q.    Okay. I guess, ma'am, what I'm just
21    trying to find out is, you took information from
22    your daily planners or calendars, and then you,
23    in 2001, created it into a --
24         A.    And notebooks.
```

```
 1          Q.      -- a typewritten --
 2          A.      And notebooks. I didn't have any rhyme
 3   or reason. I just --.
 4          Q.      Okay. And you still have the
 5   notebooks?
 6          A.      My notebooks?
 7          Q.      That's what I'm asking. The notebooks
 8   you're referencing --
 9          A.      Not here, but --
10          Q.      -- which came to be or turned into the
11   typewritten memo you have in front of you or, as
12   you called them, your personal notes.
13          A.      Yeah.
14          Q.      You still have some of them, but not
15   with you currently, is that correct?
16          A.      Mm-hmm.
17          Q.      Yes?
18          A.      Yes.
19          Q.      Okay.
20          A.      It's much easier to reference pages
21   rather than going -- sometimes I have to, but --.
22          Q.      Okay.
23          A.      My life in a book.
24                  MR. AKERSON: Can we take a short
```