## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **TERRI PECHNER-JAMES and SONIA FERNANDEZ,** | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **C.A. No. 03-12499-MLW** |
| | ) | |
| **CITY OF REVERE, THOMAS AMBROSINO, MAYOR, CITY OF REVERE POLICE DEPARTMENT, TERRENCE REARDON, CHIEF OF POLICE, BERNARD FOSTER, SALVATORE SANTORO, ROY COLANNINO, FREDERICK ROLAND, THOMAS DOHERTY, JOHN NELSON, JAMES RUSSO, MICHAEL MURPHY and STEVEN FORD,** | ) | |
| **Defendants.** | ) | |

### DEFENDANTS, CITY OF REVERE'S AND CITY OF REVERE POLICE DEPARTMENT'S, MOTION FOR SUMMARY JUDGMENT OR, IN THE <u>ALTERNATIVE, PARTIAL SUMMARY JUDGMENT</u>

The Defendants, City of Revere and City of Revere Police Department, hereby move for Summary Judgment or, in the alternative, partial Summary Judgment, in accordance with Fed. R. Civ. P. 56. Since the above-named Plaintiff, Terri Pechner-James, has recently settled all of her claims and is now out of the case, this motion is directed only to the claims asserted by the Plaintiff, Sonia Fernandez ("Plaintiff" or "Fernandez"). In addition, Fernandez has recently stipulated to the dismissal of all of the individual police officers, leaving the City of Revere, City of Revere Police Department, Mayor Thomas Ambrosino, and Chief of Police Terrence Reardon as the only defendants in the case. In addition to the instant motion on behalf of the City of Revere and City of Revere Police Department, the Mayor and the Chief of Police are reasserting their own previously filed motions for summary judgment, dated March 30, 2005, and February 28, 2005, respectively.

# I. OVERVIEW OF COMPLAINT

In her verified complaint, Plaintiff Sonia Fernandez alleges four claims for relief (denominated "counts"): hostile work environment/sexual harassment[1], constructive discharge, disparate treatment, and emotional distress.

## A.    The Title VII Claims

Although Plaintiff refers to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, throughout the complaint, she does not explicitly allege that she has filed a charge with the Equal Employment Opportunity Commission (EEOC) nor that she has received a right to sue letter from the EEOC.  Defendants have confirmed, however, that under the current rules and practice, a charge filed with the Massachusetts Commission Against Discrimination (MCAD) is automatically cross-filed with the EEOC (See *Davis v. Lucent Technologies, Inc.*, 251 F.3d 227, 231, fn. 1 (1st Cir. 2001)) and that the Plaintiff has indeed received a right to sue letter.  (Defendants' Separate Statement of Undisputed Material Fact (UMF) No. 1).  Thus, Defendants will address the Title VII allegations directly.

## B.    The 42 U.S.C. § 1983 Claim

Plaintiff alleges that she "[has] filed this cause of action pursuant to 42 U.S.C. § 1983" (Complaint, ¶ 12).  However, Plaintiff's claims under 42 U.S.C. § 1983 must fail since Title VII provides the exclusive remedy for the alleged violations of her Title VII rights.  *Middlesex County Sewage Authority v. National Sea Clammers*, 453 U.S. 1, 19-21, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981); *Prieto v. Rosa*, 894 F.2d 467, 469-470 (1990); *Day v. Wayne County Board of Auditors*, 749 F.2d 1199, 1204-1205 (6th Cir. 1984); *Saffer v. Town of Whitman*, 1986 U.S. Dist. LEXIS 17043 (D.Mass. 1986, Civil Action No. 85-4470-Z); *Christensen v. Lawrence F. Quigley Memorial*

---

[1] This claim includes a racial harassment component.

*Hospital*, 656 F.Supp. 14, 18-19 (D.Mass. 1985).[2]  Since Plaintiff's complaint alleges <u>no other</u> violations of federal law, it fails to state a claim for relief under 42 U.S.C. § 1983.

## C.     **The Disparate Treatment Claim**

Plaintiff has alleged a claim of disparate treatment on the two-fold basis that: (1) the Mayor allegedly denied her leave with pay when he allegedly granted similarly situated male employees leaves with pay; and, (2) that she was denied retirement benefits when she was otherwise qualified. (Complaint, ¶¶ 134–137).

Currently pending before the Court is the <u>unopposed</u> motion for summary judgment of Mayor Ambrosino in which he has submitted undisputed facts which demonstrate that he offered Fernandez leave of absence without pay on the same terms and conditions as similarly situated male officers.  (UMF No. 2).  In any event, Fernandez was subsequently awarded disability retirement benefits in a manner consistent with the retirement laws and, thus, in a non-discriminatory fashion. (UMF No. 4).

Thus, Plaintiff's claim of disparate treatment fails for the simple fact that she cannot show that she was treated differently than similarly situated male employees.

## D.     **The State Tort Emotional Distress Claims**

Plaintiff's state law emotional distress claim (her fourth claim for relief) sounds in intentional tort.  (See Complaint, ¶¶ 138 & 140).  A public employer, however, is immune from suits for intentional infliction of emotional distress. Mass. Gen. Laws ch. 258, § 1 (1984); *Spring v. Geriatric Authority of Holyoke*, 394 Mass. 274, 475 N.E.2d 727 (1985); *Morash & Sons v. Commonwealth*,

---

[2]  Massachusetts law mirrors federal law in this regard.  Mass. Gen. Laws Ch. 151B is the exclusive remedy for claims of sexual/racial harassment, etc., of the type alleged by Plaintiffs herein, and not the State equal rights act or civil rights act, Mass. Gen. Laws ch. 12, §§ 11H and 11I respectively.  *Evans v. T.J. Maxx*, 19 Mass. L. Rep. 129  (Mass. Super. Ct., 2005) and cases cited therein.

363 Mass. 612, 615, 296 N.E.2d 461 (1973); *Saffer v. Town of Whitman*, 1986 U.S. Dist. LEXIS

17043 (D.Mass. 1986, Civil Action No. 85-4470-Z).

Moreover, "[i]nsofar as the plaintiff's common law claims are merely recast versions of [her]

sexual harassment claims under c. 151B, they are barred by that statute's exclusivity provision.

(Citations omitted) . . . . [T]hose common law claims not barred by c. 151B, notably the claims for

intentional and negligent infliction of emotional distress, are barred by the exclusivity provision of

the workers' compensation act, G. L. c. 152, § 24 (1994 ed.)." *Green v. Wyman-Gordon Co.*, 422

Mass. 551, 558 (1996). Thus, Count IV of Plaintiff's causes of action, alleging infliction of

emotional distress, fails as a matter of law.

**E.    Conclusion**

1.    Viable Claims

Based upon the foregoing, the only viable claims for relief before the Court are Plaintiff

Fernandez's federal and state law claims for hostile work environment and sexual and/or racial

harassment, and constructive discharge (Plaintiff's first and second claims for relief), both of which

are brought under Title VII and Mass. Gen. Laws ch. 151B.

2.    Title VII's and Mass. Gen. Laws ch. 151B's Unitary Legal Standard

"General Laws c. 151B sets forth a comprehensive scheme for the resolution of

discrimination claims." *Thomas v. EDI Specialists, Inc.*, 437 Mass. 536, 540 & 542 (2002) (citations

omitted). So does Title VII. *Id.* at 542. Thus, it should come as no surprise that in interpreting

Mass. Gen. Laws ch. 151B, Massachusetts state courts may, and often do, look to the interpretation

of Title VII for guidance. *Id.*, citing *College-Town, Div. of Interco, Inc. v. Massachusetts Comm'n*

*Against Discrimination*, 400 Mass. 156, 163 (1987). See *Wheatley v. AT&T Co.*, 418 Mass. 394,

397 (1994) ("It is our practice to apply Federal case law construing the Federal anti-discrimination

statutes in interpreting [chapter] 151B.")  Thus, for purposes of this motion, the legal standard will be addressed singularly.[3]

## II.  OVERVIEW OF MOTION

This motion will demonstrate that Fernandez's federal and state law discrimination claims fail on both statute of limitations[4] and substantive grounds, and that her constructive discharge claim fails as a result of the failure of her discrimination claim.

Under Rule 56, "[a] court may grant summary judgment 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' Fed. R. Civ. P. 56(c)."  *McCarthy v. Northwest Airlines*, 56 F.3d 313, 315 (1st Cir. 1995).

Concerning "the pleadings," under Rule 56, "the trial court must 'view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor,' (citation omitted), but paying no heed to 'conclusory allegations, improbable inferences, [or] unsupported speculation,' (citation omitted).  *McCarthy*, 56 F.3d at 315.

In this context,

> in cases where civil rights violations are alleged, particular care is
> required to balance the liberality of the Civil Rules with the need to
> prevent abusive and unfair vexation of defendants.  (Citation
> omitted).  A civil rights complaint must "outline facts sufficient to
> convey specific instances of unlawful discrimination."  (Citation

---

[3]  "Lee-Crespo also brought pendent sexual harassment and constructive discharge claims under the comparable Puerto Rico statutes.  The district court held, and Lee-Crespo concedes on appeal, that the federal and Puerto Rico laws on sexual harassment and constructive discharge are very closely aligned.  We uphold the dismissal of Lee-Crespo's state law claims on the same grounds that we uphold dismissal of the federal claims."  *Lee-Crespo v. Schering-Plough Del Caribe, Inc.*, 354 F.3d 34, 47 (1st Cir. 2003).

[4]  "Issues of timely filing may be decided under Rule 56 if the relevant facts are sufficiently clear."  *Sabree v. United Bhd. Of Carpenters & Joiners*, 921 F.2d 396, 399 (1st Cir. 1990) citing cases.  "Preclusory time bars are appropriately examined under Rule 56 if the relevant facts are sufficiently clear.  *Mack v. Great Atlantic & Pacific Tea Co.*, 871 F.2d 179, 181 (1st Cir. 1989) citing cases.

> omitted). Put another way, a plaintiff may not prevail simply by asserting an inequity and tacking on the self-serving conclusion that the defendant was motivated by a discriminatory animus. The alleged facts must specifically identify the particular instance(s) of discriminatory treatment and, as a logical exercise, adequately support the thesis that the discrimination was unlawful. (Citations omitted). **Discrimination based on unprotected characteristics or garden-variety unfairness will not serve.**

*Correa-Martinez v. Arrillaga-Belendez*, 903 F.2d 49, 53 (1st Cir. 1990) (emphasis added).

Thus, "[c]omplaints based on civil rights statutes must do more than state simple conclusions; they must at least outline the facts constituting the alleged violation. Plaintiffs cannot be merely conclusory regarding the characterization of the defendant's motives; a subjective characterization of those motives will not suffice. The plaintiff must allege a series of facts which at the very least gives rise to an inference of discriminatory animus. It is not enough to allege a general scenario which could be dominated by unpleaded facts." *Johnson v. General Electric*, 840 F.2d 132, 138 (1st Cir. 1988) (citations and internal quotations marks omitted).

As demonstrated herein, the vast majority of Plaintiff's alleged acts of "discrimination" are time-barred and, in addition, many of the alleged acts involve unprotected characteristics or garden-variety unfairness, none of which were either of a sexual or racial nature.

### III. OVERVIEW OF STATUTES OF LIMITATION AND SUBSTANTIVE LEGAL STANDARD

**A.    Statutes of Limitation**

1.    Title VII

"Title VII requires that an aggrieved individual file a charge with the EEOC 'within one hundred and eighty days after the alleged employment practice occurred.' 42 U.S.C. § 2000e-5(e). That period is extended to 300 days in 'deferral states,' such as Massachusetts, if the 'person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice . . . .'" In such a deferral state, however, the complainant must file his

charges with the state agency within **240 days** of the alleged violation, in order to ensure a timely filing with the EEOC. *See Mohasco Corp. v. Silver*, 447 U.S. 807, 817, 65 L. Ed. 2d 532, 100 S. Ct. 2486 (1980); *Cajigas v. Banco de Ponce*, 741 F.2d 464, 467 & n.8 (1st Cir. 1984)." *Johnson v. General Electric*, 840 F.2d 132, 133 (1st Cir. 1988) (emphasis added); *Equal Employment Opportunity Commission v. Commercial Office Products*, 486 U.S. 107, 110-112, 108 S.Ct. 1666, 1668-1669, 100 L.Ed.2d 96 (1988).

    2.    <u>Mass. Gen. Laws ch. 151B</u>

Mass. Gen. Laws ch. 151B, section 5, requires a person who brings a charge of discrimination with the Massachusetts Commission Against Discrimination (MCAD) to do so within six months of the alleged unlawful act. A party who elects to file a complaint in the Superior Court after filing a complaint with MCAD must do so within **three years** of the alleged act of discrimination. Mass. Gen. Laws ch. 151B, section 9.

    3.    <u>Application of the Statutes of Limitation</u>

Plaintiff Fernandez filed her claim with MCAD on March 12, 2001 (UMF No. 5). As noted above, these charges were then automatically filed with the EEOC. Plaintiff filed the instant action in state court on October 6, 2003. (UMF No. 6).

Under Title VII, any alleged unlawful act of discrimination occurring before **July 16, 2000** (240 days prior to March 12, 2001) is time-barred.

Under Mass. Gen. Laws ch. 151B, any alleged unlawful act of discrimination occurring before **October 6, 2000** (three years prior to October 6, 2003) is time-barred.

"The limitations periods, while guaranteeing the protection of the civil rights laws to those who promptly assert their rights, also protect employers from the burden of defending claims arising

from employment decisions that are long past." *Sabree*, 921 F.2d at 401, quoting *Delaware State College v. Ricks*, 449 U.S. 250, 256-57, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980).

"Procedural requirements established by Congress for gaining access to the federal courts are not to be disregarded by courts out of a vague sympathy for particular litigants. . . . '[I]n the long run, experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law.'" *Baldwin County Welcome Center v. Brown*, 466 U.S. 147, 152, 104 S.Ct. 1723, 1726, 80 L.Ed.2d 196 (1984) quoting *Mohasco Corp. v. Silver*, 447 U.S. 807, 826 (1980).

**B.    Substantive Legal Standard**

1.    Racial and Sexual Harassment[5]

"Title VII of the Civil Rights Act of 1964 provides, in relevant part, that 'it shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.' [Title VII] not only covers 'terms' and 'conditions' in the narrow contractual sense, but 'evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment.' 'When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victims employment and create an abusive working

---

[5]    As indicated above (see fn. 1), Plaintiff Fernandez has included a claim of racial harassment in her first claim for relief. Claims of harassment, be they sexual or racial, are generally judged by the same legal standards. "Courts of Appeals in sexual harassment cases have properly drawn on standards developed in cases involving racial harassment. (Citation omitted). Although racial and sexual harassment will often take different forms, and standards may not be entirely interchangeable, we think there is good sense in seeking generally to harmonize the standards of what amounts to actionable harassment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787, fn. 1, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); see *AMTRAK v. Morgan*, 536 U.S. 101, 116 (U.S., 2002) ("Hostile work environment claims based on racial harassment are reviewed under the same standard as those based on sexual harassment.").

environment, Title VII is violated.'" *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 78, 118 S.Ct. 998, 1001, 140 L.Ed.2d 201 (1998) (citations omitted).

As applicable here, "sexual harassment" is defined as "verbal or physical conduct of a sexual nature [which has] the purpose or effect of unreasonably interfering with an individual's work performance by creating an intimidating, hostile, humiliating or sexually offensive work environment." Mass. Gen. Laws ch. 151B, § 1 (18).[6]

"In sexual harassment cases, 'the objective severity of harassment should be judged from the perspective of a reasonable person in the [employee]'s position considering all the circumstances.' *Oncale*, 523 U.S. at 81. **We caution, however, that Title VII was not meant to protect thin-skinned employees**. The statutory scheme 'forbids only behavior so objectively offensive as to alter the conditions of the victim's employment. **Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment . . . is beyond Title VII's purview**.' Id." *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 23 (1st Cir. 2003) (emphasis added).

Consistent with the foregoing, the First Circuit has stated that: "Work places are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action." *Blackie v. Maine*, 75 F.3d 716, 725 (1st Cir. 1996).

In light of these realities, it has been observed that, "Title VII is neither a civility code nor a general anti-harassment code. Title VII requires, rather, that the level of incivility or harassment must amount to either a tangible or a constructive employment action. Furthermore, the alleged harassment and the employment action must be causally related. **The discrimination must be**

---

[6] Sexual harassment necessarily requires conduct of a "sexual nature." *Melnychenko v. 84 Lumber Company*, 424 Mass. 285, 290 (1997). By a parity of reasoning, racial harassment necessarily requires conduct of a "racial nature."

**based on gender or some other prohibited category**." *Lee-Crespo v. Schering-Plough Del Caribe, Inc.*, 354 F.3d 34, 37 (1st Cir. 2003) (emphasis added).

Finally, "[c]hanges in duties or working conditions that cause no materially significant disadvantage . . . are insufficient to establish the adverse conduct required . . ." to demonstrate discrimination. *Harlston v. McDonnell Douglas Corporation*, 37 F.3d 379, 382 (8th Cir 1994); *see Noviello v. City of Boston*, 398 F.3d 76, 88 (1st Cir. 2005) ("Typically, an adverse employment action involves a discrete change in the terms and conditions of employment (say, a discharge, demotion, or reduction in pay)." *See also Blackie v. Maine*, 75 F.3d 716, 725 (1st Cir. 1996) ("Typically, the employer must either . . . take something of consequence from the employee, say, by discharging or demoting her, reducing her salary, or divesting her of significant responsibilities" or "withhold from the employee an accouterment of the employment relationship, say, by failing to follow a customary practice of considering her for promotion after a particular period of service."); *See also Hernandez-Torres v. Intercontinental Trading, Inc.*, 158 F.3d 43, 47 (1st Cir. 1998) ("As the First Circuit has explained, adverse employment actions in the context of Title VII include 'demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees.'").

2.    Hostile Work Environment

To establish hostile work environment, a plaintiff must show harassing behavior "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986); see *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 22, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993) ('[T]he very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their . . . gender . . . offends Title VII's broad

rule of workplace equality.')."  *Pa. State Police v. Suders*, 542 U.S. 129, ___, 124 S.Ct. 2342, 2347

(2004) (see also 124 S.Ct. at 2354:  "For an atmosphere of sexual harassment or hostility to be

actionable, we reiterate, see *supra, at ____, 159 L.Ed.2d, at 211*, the offending behavior 'must be

sufficiently severe or pervasive to alter the conditions of the victim's employment and create an

abusive working environment.'  *Meritor, 477 U.S., at 67, 91 L.Ed.2d 49, 106 S.Ct. 2399* (internal

quotation marks and brackets omitted)."

     In order to establish a claim of hostile work environment sexual harassment, a plaintiff must

show:

> (1) that she [ ] is a member of a protected class; (2) that she was
> subjected to unwelcome sexual harassment; (3) **that the harassment
> was based upon sex**; (4) **that the harassment was sufficiently
> severe or pervasive so as to alter the conditions of plaintiff's
> employment and create an abusive work environment**; (5) that
> sexually objectionable conduct was both objectively and subjectively
> offensive, such that a reasonable person would find it hostile or
> abusive and the victim in fact did perceive it to be so; and (6) that
> some basis for employer liability has been established.

*Crowley v. L.L. Bean, Inc.*, 303 F.3d 387, 395 (1st Cir. 2002), quoting *O'Rourke v. City of*

*Providence, 235 F.3d 713, 728 (1st Cir. 2001)* (emphasis added).

     Stray comments, however, do not rise to the level of sexual or racial harassment, nor do they

cause a hostile work environment.  In *Kosereis v. Rhode Island*, 331 F.3d 207, 216 (1st Cir. 2003),

the court held that "name calling by residents of the Training School and the teasing by the teachers

in the lunchroom [did] not rise to the level of 'severe or pervasive conduct' that [was] required for a

hostile work environment claim."  Similarly, the Supreme Court has held that "a hostile work

environment generally is not created by 'mere offensive utterance.'"  *Harris v. Forklift Systems, Inc*,

510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); nor does it arise from 'simple teasing,

offhand comments, and isolated incidents.'"  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788,

118 S.Ct. 2275, 141 L.Ed.2d 662  (1998).  Thus, the court has understandably stated that "[t]he

workplace is not a cocoon, and those who labor in it are expected to have reasonably thick skins,"

*Suarez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 54 (1st Cir. 2000). In other words, "the anti-discrimination

laws were not enacted to create or enforce a 'general civility code.'" *Noviello v. City of Boston*, 398

F.3d 76, 92 (1st Cir. 2005), quoting *Oncale v. Sundowner Offshore Servs., Inc*., 523 U.S. 75, 80, 118

S.Ct. 998, 140 L.Ed.2d 201 (1998).

    3.    <u>Constructive Discharge</u>

    With respect to Fernandez's claim for constructive discharge, the Supreme Court recently

stated as follows:

> The constructive discharge here at issue stems from, and can be regarded as an aggravated case of, sexual harassment or hostile work environment. For an atmosphere of sexual harassment or hostility to be actionable, we reiterate, the offending behavior "must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." (citations omitted). **A hostile-environment constructive discharge claim entails something more: A plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign**. See, e.g., Breeding v. Arthur J. Gallagher & Co., 164 F.3d 1151, 1160 (CA8 1999) ("[A]lthough there may be evidence from which a jury could find sexual harassment, . . . the facts alleged [for constructive discharge must be] . . . so intolerable that a reasonable person would be forced to quit."); Perry v. Harris Chernin, Inc., 126 F.3d 1010, 1015 (CA7 1997) ("[U]**nless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress**.") (emphasis added).

*Pennsylvania State Police v. Suders*, 542 U.S. 129, 146, 124 S.Ct. 2342, 2354, 159 L.Ed.2d 204

(2004).

    "To prove constructive discharge, a plaintiff must usually 'show that her working conditions

were so difficult or unpleasant that a reasonable person in [her] shoes would have felt compelled to

resign.' The standard is an objective one; an employee's subjective perceptions do not govern. It is

not enough that a plaintiff suffered 'the ordinary slings and arrows that workers routinely encounter

in a hard, cold world.'" *Lee-Crespo v. Schering-Plough Del Caribe, Inc.*, 354 F.3d 34, 45 (1st Cir. 2003).

Moreover, "the evaluation of a constructive discharge claim takes into account how the employer responded to the plaintiff's complaints and whether it was likely that the harassment would continue.  (citation omitted); see also Lindemann & Grossman, Employment Discrimination Law 657 (C.G. Weirich et al. eds., 3d ed. 2002 Supp.) ('Prompt remedial action that eliminates the allegedly intolerable working conditions operates as a complete defense to a claim of constructive discharge.')."  *Lee-Crespo*, 354 F.3d at 45.

## IV.  PLAINTIFF FERNANDEZ'S CLAIMS FAIL TO STATE GROUNDS FOR RELIEF

The following analysis addresses the alleged acts of sexual and racial harassment/hostile work environment directed at Plaintiff Fernandez (Complaint, paragraphs 80 to 104) in chronological order.  Alleged incidents which are barred by the statute of limitations (federal and state) are set forth in subsection A.  Alleged incidents which are not barred by the statute of limitations are set forth in subsection B.  All such incidents are addressed on their merits.

In addressing these allegations, "Courts are supposed to use 'common sense, and an appropriate sensitivity to social context,' to distinguish between [ ] innocuous behavior [name calling, teasing, mere offensive utterance, offhand comments and isolated incidents] and severely hostile or abusive conduct." *Kosereis v. State of Rhode Island*, 331 F.3d 207, 216 (1st Cir. 2003) citing *Oncale v. Sundowner Offshore Serv.*, 523 U.S. 75, 82, 140 L.Ed.2d 201, 118 S.Ct. 998 (1998); *Muzzy v. Cahillane Motors, Inc.*, 434 Mass. 409, 749 N.E.2d 691, 695 (2001) (same).

## A.    Alleged Incidents Barred by the Statutes of Limitation – Title VII 7/16/00 / 151B 10/6/00

1.    In the Fall of 1995, during Police Academy training, Chief Russo allegedly intimidated Officer Fernandez by requesting permission to record a conversation

about an anonymous letter which alleged that Plaintiff Fernandez was suicidal, using drugs, and that her family was known to police. (Complaint, paragraph 104).

Even if the claim were not time barred, it has nothing to do with gender or raced based discrimination. Frankly, requesting to record the conversation was probably prudent and no reasonable person should have been offended by the request under the circumstances. At best, this incident is nothing more than an example of "garden-variety unfairness" that does not constitute sexual or racial harassment. Moreover, this incident did not result in any adverse employment action.

2.      In May of 1996 Captain Roland called Officer Fernandez to a homicide scene to serve as an interpreter. Officer Fernandez was instructed to wear street clothes. When she arrived, a male officer allegedly asked her if she was working undercover as a hooker. (Complaint, paragraph 83).

Even if this incident were not time barred, the stray comment made by the male officer was merely an offensive utterance and nothing more. Moreover, this comment did not result in any adverse employment action.

3.      On February 23, 1997, during a Citizen's Police Academy public forum, Chief Russo[7] allegedly stated that "These are not the good olds days when we didn't have to hire females." (Complaint, paragraphs 66 – 67 and Exhibit "D", page 6, lines 228 - 235).

Even if this incident were not time barred, it amounts to nothing more than a stray comment that does not rise to the level of sexual harassment in the first instance. Moreover, this comment did not result in any adverse employment action or a hostile work environment for the Plaintiff.

4.      On many occasions in 1996 and 1997, Lt. Ford made personal and hostile comments about Plaintiff Fernandez's physical appearance, hair, and weight. (Complaint, paragraph 84).

---

[7] Chief Russo retired on February 28, 1999, over one year prior to both limitations periods applicable to this action. (UMF No. 7).

Even if this incidents were not time barred, the stray comments about Plaintiff Fernandez's appearance are not alleged to have been gender or racially based and therefore do not amount to sexual or racial harassment. Moreover, these comments did not result in any adverse employment action.

5.     On April 18, 1997, Sergeant Doherty received a complaint from three citizens that Officer Curcio (a female officer) had used profanity when she confronted them on the street. Sergeant Doherty then allegedly berated Officer Curcio and the other female officers involved within hearing distance of the citizens involved. (Complaint, paragraphs 55 – 58 and Exhibit "D", page 4, lines 138 - 158).

Even if this alleged incident were not time barred, it amounts to nothing more than "garden-variety unfairness." Moreover, Sergeant Doherty's "berating of Officer Curcio and the other female officers" did not result in any adverse employment action as to Plaintiff Fernandez. Indeed, Fernandez makes no allegation in her complaint that Sergeant Doherty ever treated her in this fashion. Thus, it appears that this is nothing more than an isolated incident not involving or affecting Fernandez.

6.     On or about September 1, 1997,[8] the booking photo of an African-American was adulterated with offensive and stereotypical features. (Complaint, paragraph 90, Exhibit "H").

Even if this incident were not time barred, the alleged incident does not rise to the level of racial based harassment. The photo was not directed at Plaintiff Fernandez, nor her race. Moreover, racial harassment involves "repeated racial slurs and management's tolerance and condonation of the situation." *Erebia v. Chrysler Plastics Products Corp.*, 772 F.2d 1250, 1256 (6th Cir. 1985). Instead of "repeated racial slurs," Plaintiff Fernandez identifies one isolated incident which was neither "severe" enough nor "pervasive" enough to be classified as harassment. "Courts addressing claims of hostile working environment have emphasized that **incidents of racial slurs must be**

**more than sporadic** and that the plaintiff must demonstrate that management failed to take adequate steps to remedy the situation. (Citation omitted)." *Erebia*, 772 F.2d at 1254. As such, this incident does not rise to the level of racial harassment causing a hostile work environment.

7.     In the Winter of 1997 Officer Fernandez was allegedly assigned to walking routes more frequently than male members of the Department. (Complaint, paragraph 87).

Even if this incident were not time barred, the alleged incident does not rise to the level of sexual or race based harassment. Moreover, since walking patrol is a normal incident of the job, being placed on walking patrol is not an adverse employment action. Moreover, a "change in duty or working conditions that cause[s] no materially significant disadvantage" does not constitute discrimination. Finally, this "single instance of favoritism, even if proved, falls considerably short of showing an ongoing pattern and practice" of discrimination. *Jensen v. Frank*, 912 F.2d 517, 523 (1st Cir. 1990).

8.     On December 15, 1997, during one of her walking routes, Officer Fernandez was monitored in an unmarked car by Captain Chaulk. (Complaint, paragraph 87).

Even if this incident were not time barred, the alleged actions of Captain Chaulk did not rise to the level of sexual or racial harassment. There is no gender or race based animus or conduct alleged in relation to this Superior Officer monitoring the performance of a subordinate. Moreover, since such monitoring is a normal incident of the job, it is not an adverse employment action. At best, this incident constitutes an instance of "garden-variety unfairness" that does not rise to the level of sexual or racial harassment.

9.     On January 25, 1998[9] during the Super Bowl Game Sergeant Doherty allegedly commented concerning a female sport announcer that "She was no fucking good and women should not be allowed to comment on sports events and this bitch probably gave sex or a blow job to someone for the job. Anyway, she was probably related to

---

[8]  The complaint provides no date for this incident. However, the booking photo in question was taken on September 1, 1997. UMF No. 20. Presumably, and by way of reasonable inference, the adulteration and circulation of the photo would have occurred around the time it was taken.

[9]  The complaint merely alleges that "[a]t the time of the Super Bowl in 1998, . . ." According to the official website of the NFL Super Bowl, www.superbowl.com, Super Bowl XXXII was played on January 25, 1998 (UMF No. 8).

someone and that's how she got the job." (Complaint, paragraphs 59 - 60 and Exhibit "D", page 4, lines 159 – 167.)

Sergeant Doherty denies ever making such a statement (UMF No. 9). Moreover, although the complaint alleges that there were "several female officers present" when this allegedly happened, Exhibit "D" to the complaint reflects that there were only two female officers present, neither of whom was the Plaintiff Fernandez. (Complaint, Exhibit "D", page 4, lines 159-167).

Finally, even if the alleged incident occurred and was not time barred, it amounts to nothing more than a stray comment or merely an offensive utterance not rising to the level of sexual harassment. Moreover, this comment did not result in any adverse employment action or hostile work environment as to these Plaintiffs.

10. On an undisclosed date in 1998, a penis was drawn on the chalkboard in the radio communication room. (Complaint, paragraph 96).

Even if this incident were not time barred, this isolated incident does not rise to the level of sexual harassment. The drawing of the penis on the chalkboard was merely "innocuous behavior" not "severely hostile or abusive conduct," which would rise to the level of sexual harassment resulting in a hostile work environment. *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 82 (1998).

11. On November 1, 1998, Lt. Ford allegedly said to Plaintiff Fernandez, "What are you? Spanish, Mexican, Cuban, you're all alike, a bunch of cockroaches." (Complaint, paragraph 98; see Complaint, Exhibit "D", page 5, lines 210 – 215, which states that on two occasions Lt. Ford had made racist remarks about Hispanics).

Even if this incident were not time barred, it does not rise to the level of racial harassment. Racial harassment involves "repeated racial slurs and management's tolerance and condonation of the situation." *Erebia v. Chrysler Plastics Products Corp.*, 772 F.2d 1250, 1256 (6th Cir. 1985). Instead of "repeated racial slurs," Plaintiff Fernandez identifies one alleged "stray comment," which was neither "severe" enough nor "pervasive" enough to be classified as harassment. "Courts

addressing claims of hostile working environment have emphasized that **incidents of racial slurs must be more than sporadic** and that the plaintiff must demonstrate that management failed to take adequate steps to remedy the situation. (Citation omitted)." *Erebia*, 772 F.2d at 1254. As such, this incident does not rise to the level of racial harassment causing a hostile work environment.

12.    Prior to January 7, 1999,[10] Chief Russo allegedly saw four female officers behind the Police Department and as he walked by allegedly commented: "What is this, a WIC meeting?" (Complaint, paragraph 69 and Exhibit "D", page 6, lines 236 - 239.)

Even if this alleged incident were not time barred, it amounts to nothing more than a stray comment or a mere offensive utterance that does not rise to the level of sexual harassment. Moreover, this comment did not result in any adverse employment action.

13.    Prior to January 7, 1999,[11] Sergeant Nelson allegedly held up a magazine centerfold photograph and made loud comments about the breasts and crotch area of the woman depicted therein while Officer Malatesta (a female) was talking to a member of the public. (Complaint, paragraph 63 and Exhibit "D", page 5, lines 194 – 203).

Sergeant Nelson denies ever engaging in this conduct (UMF No. 11). Finally, even if the alleged incident occurred and was not time barred, it was an isolated incident not involving either Plaintiff and thus does not rise to the level of sexual harassment. Moreover, this incident did not result in any adverse employment action.

14.    Prior to January 7, 1999,[12] Lieutenant Santoro made "daily" remarks about his penis and disparaging comments about the bodies of female officers in the Department. (Complaint, paragraph 43 and Exhibit "D", page 2, lines 44 – 54.)

Even if this alleged conduct were not time barred, the complaint does not allege that it continued after the January 7, 1999 meeting.

15.    On January 7, 1999, it was reported that, <u>previously</u>, Sergeant Doherty had allegedly stated "Young lady, you will not use that kind of language in front of me. If you do, I will send you home. My wife and daughter never use that kind of language and

---

[10]  The complaint provides no date for this incident. However, the incident is referenced in the report of the January 7, 1999, meeting (Exhibit "D" to the complaint), and thus it had to have occurred before that date.
[11]  See fn. 10.
[12]  See fn. 10.

neither will you."  (Complaint, paragraph 53 and Exhibit "D", page 4, lines 127 - 136.)

Even if this alleged incident were not time barred, it was a stray comment not rising to the level of sexual harassment.  Moreover, this comment did not result in any adverse employment action and the complaint does not allege that it continued after the January 7, 1999 meeting.

16.    On February 7, 1999,[13] an unknown person or persons allegedly vandalized two city patrol vehicles assigned to female officers.  (Complaint, paragraph 73 and 93; Pechner Motion for Partial Summary Judgment, Exhibit "19".)

The complaint does not allege that the vandalism was caused by an employee of the City Revere or its Police Department, and so the incident can not form the basis for liability on the part of the Defendants on any theory of fact or law.

Moreover, this incident cannot be compared to the incidents of "work sabotage" in cases like O'Rourke v. City of Providence, 235 F.3d 713 (1st Cir. 2001) and De Grace v. Rumsfeld, 614 F.2d 796 (1st Cir. 1980).  In both of those cases, the equipment which was "sabotaged" was located in a place where only fellow employees had access.  (O'Rourke, 235 F.3d at 722-723 – a locker which she brought to the station was glued shut; De Grace, 614 F.2d at 800 – "At two different times plaintiff found items of his firefighting gear broken, first his crash helmet and then his survival knife.  Although plaintiff believes the equipment was deliberately damaged, the district court disagreed and supportably found to the contrary.")

Here, the vandalism to the City vehicles (not the personal property of any female officers) occurred in the parking lot of a local IHOP between 5:00 and 5:30 a.m.  Thus, there is no factual or legal basis upon which to draw an inference that this incident constitutes "work sabotage."

17.    On February 28, 2000, Lt. Foster allegedly made derogatory remarks about Officer Fernandez's hair in front of other officers in the radio room.  (Complaint, paragraph 100).

---

[13]  UMF No. 12.

Even if this alleged incident were not time barred, the incident is an example of an isolated offensive utterance. Moreover, these comments did not result in any adverse employment action.

18. On February 29, 2000, Lt. Foster did not assign Officer Fernandez to the radio room for March, 2000, and she was not assigned to the radio room for April or May, 2000, either. (Complaint, paragraph 101).

Even if this alleged incident were not time barred, there is no allegation in the complaint that it was gender or racially based, or that Lt. Foster, or any one else for that matter, had an affirmative duty to assign Plaintiff Fernandez to the radio room in the first instance. In fact, in her MCAD Complaint, Fernandez stated:

> I have been continuously harassed by Lt. Foster due to my hearing problem. Lt. Foster has made inappropriate comments such as "turn up your hearing aide." "Why don't you put the phone in your good ear." For several months during 2000, I was not given dispatch duty. On or about 4/5/00 Lt. Foster took me off dispatch, and made hand gestures mocking me due to my hearing problem.[14]

Clearly, this conduct is <u>not</u> gender or race based and thus does not state a claim for sexual or racial harassment.

19. During roll call on July 1, 2000, Lieutenant Foster allegedly referred to people from Chelsea as "The sewerage people." (Complaint, paragraph 99).

Even if this alleged incident were not time barred, this incident is at best a "stray comment" about the people of Chelsea generally and is neither gender nor race based. Thus, it could not be causative of "an unreasonably abusive or offensive *work-related* environment" that would prevent a "*reasonable*" police officer from doing her job.

**B.** **The Remaining Timely Allegations Do Not State Actionable Claims For Racial/Sexual Harassment/Hostile Work Environment**

---

[14] UMF No. 16. Here it is worth noting that the allegation of the <u>verified</u> complaint states that Officer Fernandez was not assigned to radio room/dispatch in March, April, and May of 2000, whereas Officer Fernandez's <u>sworn</u> statement in her MCAD complaint indicates that she was taken off such duty in April 2000. Obviously, both of these statements cannot be true, although which one is false is any one's guess. Resolution of this discrepancy is not necessary here, as on either version of the facts Defendants are entitled to summary judgment.

1.     On January 23, 2001 Lieutenant Foster allegedly accused Officer Fernandez of not paying attention and stated, "Why don't you turn up those hearing aides?" (Complaint, paragraph 103).

This incident is neither gender nor race based. To the contrary, it appears to involve a personality conflict between Lieutenant Foster and Plaintiff Fernandez. At best, it is an example of an incident of "garden-variety unfairness." As such, it does not rise to the level of sexual or racial harassment resulting in a hostile work environment.

2.     Between February 28, 2001,[15] and March 2, 2001, women's underwear were hung up on the bulletin board in the guardroom. A note attached to the underwear stated "Lagone's Jealous." (Complaint, paragraphs 74-75, 94-95 & Exhibits "E" and "F.")

The placing of the underwear on the bulletin board was merely "innocuous behavior" not "severely hostile or abusive conduct," which would rise to the level of sexual harassment resulting in a hostile work environment. *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 82 (1998).

3.     On March 1, 2001 Lieutenant Foster allegedly told Officer Fernandez to "put the phone in your good ear." (Complaint, paragraph 102).

Like the similar alleged incident noted above, this incident is neither gender nor race based. To the contrary, it appears to involve a personality conflict between Lieutenant Foster and Plaintiff Fernandez. As such, it does not rise to the level of sexual or racial harassment resulting in a hostile work environment.

4.     On December 7, 2001 Officer Crevoiserat allegedly yelled at Officer Fernandez in an unprofessional manner over the radio. (Complaint, paragraph 103).

The mere fact that a co-worker is unprofessional does not give rise to a claim of sexual or racial harassment and a hostile work environment as a result thereof. Moreover, there is no race or gender based animus alleged in relation to this incident.

5.     On December 16, 2001 Officer Crevoiserat allegedly treated Officer Fernandez in an unprofessional manner. (Complaint, paragraph 103).

---

[15]  UMF No. 13.

Like the alleged incident immediately above, the mere fact that a co-worker is unprofessional does not give rise to a claim of sexual or racial harassment and a hostile work environment as a result thereof.  Moreover, there is no race or gander based animus alleged in relation to this incident.

**C.    Plaintiff Fernandez's Allegations Fail to State a Claim for Relief for Sexual/Racial Harassment/Hostile Work Environment or Constructive Discharge**

Shorn of the non-gender based garden-variety allegations of unfairness which lack any conceivable probative value[16], and further eliminating those events to which Plaintiff Fernandez was not a party (i.e., not present) and which have been affirmatively denied, Plaintiff Fernandez's complaint can be reduced to its essence and summarized as follows:

| Date | Event |
|---|---|
| 5/96 | Male co-worker utters stray "hooker" comment. |
| 2/23/97 | Chief Russo utters a stray comment about the good old days.[17] |
| 9/1/97 | Adulterated Booking Photo. |
| Winter, 97 | Fernandez assigned to walking routes more frequently than male officers.  By whom, the Complaint does not state. |
| 1998 | Male penis drawn on chalkboard in radio room. |
| 11/1/98 | Lt. Ford makes disparaging remark about Hispanics. |
| 1/7/99 (sometime prior thereto) | |
| | Chief Russo utters stray WIC comment.  [He retires 2/28/99.] |
| | Lt. Santoro makes offensive comments about his penis and female officers bodies. |

[16]  "The record contains evidence of the following incidents (the plaintiff recounts others, but we have omitted those that lack any conceivable probative value): . . ." *Noviello v. City of Boston*, 398 F.3d 76, 82 (1st Cir. 2005).  "Not all of plaintiff's evidence could be taken as evidence of sexual harassment.  The comments by Gonzalez, a new supervisor, to the effect that plaintiff worked for her and plaintiff should not go around Gonzalez to Gonzalez's boss are hardly evidence of sexual harassment.  The incidents that remain, even if taken as harassment, do not rise to the level of creating an intolerable environment."  *Lee-Crespo v. Schering-Plough Del Caribe, Inc.*, 354 F.3d 34, 45 (1st Cir., 2003).

[17]  In the preface to paragraph 80 to the Complaint, Plaintiff Fernandez "incorporate[s] the paragraphs stated above," meaning the allegations made by her former co-Plaintiff, Terri Pechner-James.  Thus, the Pechner allegations which are arguably probative are included here.

|       | Sgt. Doherty exhibits double standard about female officers swearing. |
|-------|-----------------------------------------------------------------------|
| **1/7/99** | **Capts. Chaulk and Roland meet with female officers concerning complaints of sexual harassment.** |
| **7/16/00** | **Title VII Statute of Limitations.** |
| **10/6/00** | **151B Statute of Limitations.** |
| 2/28/01 | The so-called "underwear incident." |

Several observations are here pertinent:

In the first place, during the nearly **three years** <u>prior</u> to January 7, 1999 (or perhaps even longer), there were only <u>nine</u> potentially complaint worthy incidents. Two stray comments from Chief Russo; Sgt. Doherty's swearing double standard (a double standard which apparently did not persist into the future); Lt. Ford's offensive comment about Hispanics (which did not persist into the future); Lt. Santoro's offensive utterances (which apparently did not persist into the future either); the penis on the chalkboard incident; the adulterated booking photo incident; the "hooker" stray comment; and the walking route assignment issue.

Second, during the **two plus years** <u>after</u> the January 7, 1999, meeting until the filing of the complaint with MCAD in March of 2001, there was only <u>one</u> potentially complaint worthy incident; the display of some underwear by an unnamed party. Notably, it appears that none of the individuals responsible for the pre-January 1999 conduct which led to the meeting with Capts. Chaulk and Roland engaged in any potentially actionable conduct after that meeting. In other words, there were no repeat offenders or offenses after the January 1999 meeting, and the incidents complained of were reduced from nine to one.[18]

---

[18]  Defendants would here note that the mere fact that Plaintiff complained about a perceived incident as constituting sexual harassment does not make it one. "In common parlance, there is a tendency to label any <u>unwanted sexual attention</u>, in any context, as 'sexual harassment.' For purposes of a hostile work environment claim under the statute, however, 'sexual harassment' means conduct of a sexual nature that has 'the purpose or effect of unreasonably interfering with an individual's work performance by creating an intimidating, hostile, humiliating or sexually offensive work environment." *Cuddyer v. Stop & Shop Supermarket* Company, 434 Mass. 521, 536, n.15 (2001) (emphasis

Moreover, it is important to note that after the January 1999 meeting, Captains Chaulk and Roland followed-up with a number of counseling sessions with those individuals against whom complaints and been made, and reported on this counseling follow-up to then Chief Roy Colannino on February 15, 1999. UMF No. 14.

Finally, only one incident occurred within the statute of limitations period, an incident which was not severe enough to permeate the work environment "with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the 'victim's' employment and create an abusive working environment." *Oncale*, 523 U.S. at 78.

Moreover, even taking all of the incidents into account demonstrates that the work place was not permeated with sufficiently severe or pervasive discrimination to alter the conditions of employment. Over the nearly five years from May 1996 until March 2001, there were five incidents of stray comments/offensive utterances by four people (or one comment per year); two incidents of allegedly disparate treatment (the walking route disparity, and Sgt. Doherty's swearing double standard); the adulterated booking photo incident; and the "underwear incident." Thus, whether the Court examines the one incident within the statute of limitations or all of the incidents over the nearly five year period, they do not "constitute[ ] an unreasonably abusive or offensive work-related environment [which would] adversely affect[ ] the reasonable employee's ability to perform the tasks required by the employer." *Davis*, 858 F.2d at 349. Rather, these incidents, spread over nearly five years, are on the order of those for which the employee is "expected to have [a] reasonably thick skin." *Suarez*, 229 F.3d at 54.

---

added). As demonstrated above, the vast majority of incidents alleged in this case involved stray comments or offensive utterances by different people, many of them co-workers, spread over a long span of time, none of which resulted in an adverse employment action. Moreover, none of these incidents involved "unwanted sexual attention."

Since these incidents do not rise to the level of sexual or racial harassment and/or hostile work environment discrimination, they could not possibly sustain the heightened burden announced in *Suders* for a constructive discharge. In this regard, it must be remembered that "the evaluation of a constructive discharge claim takes into account how the employer responded to the plaintiff's complaints and whether it was likely that the harassment would continue" and that "[p]rompt remedial action that eliminates the allegedly intolerable working conditions operates as a complete defense to a claim of constructive discharge." *Lee-Crespo*, 354 F.3d at 45.

Here, there was a meeting in January of 1999, which essentially caused a cessation of the discriminatory conduct complained of by Plaintiff Fernandez. The only potentially probative incident which occurred after that meeting was the display of some underwear over two years later. Thus, there can be no doubt that the employer adequately responded to Plaintiff Fernandez's complaints and took effective action to eliminate the allegedly intolerable working conditions.

Since these conditions were <u>not</u> beyond "ordinary" discrimination, Plaintiff Fernandez was "expected to remain on the job while seeking redress." *Suders*, 542 U.S. ___, 124 S.Ct. 2354. Accordingly, Plaintiff Fernandez's constructive discharge claim must fail.

Thus, Defendants are therefore entitled to judgment as a matter of law on Plaintiff Fernandez's first and second claims for relief.

### V.  THE CONTINUING VIOLATION THEORY DOES NOT SAVE PLAINTIFF'S CLAIMS FROM STATUTES OF LIMITATION BAR

### A.    Plaintiff Was on Notice of Her Alleged Claims of Discrimination as of the January 1999 Meeting and, Thus, Cannot Invoke the Continuing Violation Theory

"'A claim arising out of an injury which is "continuing" only because a putative plaintiff knowingly fails to seek relief is exactly the sort of claim that Congress intended to bar by the [300] day limitation period.' Roberts [v. Gadsden Memorial Hospital], 850 F.2d [1549] at 1550 [(11th Cir.

1988)]. . . .  A knowing plaintiff has an obligation to file promptly or lose his claim." *Sabree v. United Brotherhood of Carpenters & Joiners Local No. 33*, 921 F.2d 396, 402 (1st Cir. 1990).

"There are sound policy reasons for allowing a statute of limitations to cut off a plaintiff's claims; a plaintiff cannot sleep indefinitely on his rights with the knowledge that his rights are being violated.  Sabree alleges a long history of discrimination, but he admits that he knew that he was being wronged by the defendant.  He had an obligation to act promptly." *Sabree*, 921 F.2d at 405.

"In general, Title VII's temporal restrictions are measured from the occurrence of a triggering event; that the event's sequelae linger does not coterminously extend the limitation period.  In the rather modest garden where continuing violation jurisprudence may lawfully flourish, courts must be careful to differentiate between discriminatory acts and the ongoing injuries which are the natural, if bitter, fruit of such acts." *Jensen v. Frank*, 912 F.2d 517, 523 (1st Cir. 1990).

The rule under G.L. c. 151B is the same.  "The guiding principles to be applied by a judge deciding a motion for summary judgment (based on what a jury might conclude from the facts viewed in the plaintiff's favor and reasonable inferences there from [citation] are these:  a plaintiff who demonstrates a pattern of sexual harassment that creates a hostile work environment and that includes conduct within the six-month statute of limitations, may claim the benefit of the continuing violation doctrine and seek damages for conduct that occurred outside the limitations period, **unless the plaintiff knew or reasonably should have known that her work situation was pervasively hostile and unlikely to improve, and, thus, a reasonable person in her position would have filed a complaint with the MCAD before the statute ran on that conduct**." *Cuddyer v. Stop & Shop Supermarket Co.*, 434 Mass. 521, 539 (2001) (emphasis added).

In this case, on January 7, 1999, Fernandez was part of a group of female officers who met with Captains Chaulk and Roland of the Revere Police Department "in response to their experiences

in this hostile environment . . . .  The subject of the meeting was sexual harassment, the Department policy on harassment, working conditions, and Department maternity policy."  (Complaint, paragraph 70, page 10).  "The purpose of the meeting was to discuss sexual harassment and the distress caused by such harassment within the Department."  (Complaint, paragraph 89, page 13).

A report of meeting was prepared on January 14, 1999, a copy of which was attached to the Complaint as Exhibit "D".  (Complaint, paragraphs 71 and 91).  The report reveals, as demonstrated above, that many of the instances of alleged discrimination set forth in the Complaint were discussed at the meeting.

Fernandez alleges that "[d]espite the meeting on January 7, 1999 and the report and recommendations of January 14, 1999, the Revere Police Department took no action.  It failed to remedy the hostile environment about which the female officers had complained."  (Complaint, paragraphs 72 and 93).[19]  Plaintiff further alleges that after the January 7, 1999, meeting the environment became more hostile, referring to the February 7, 1999, vandalized cruiser incident.  (Complaint, paragraphs 73 and 93).[20]

Thus, Fernandez **knew** that her work situation was allegedly "pervasively hostile and unlikely to improve" and, therefore, she were obligated to file her complaint of discrimination at that time, rather than wait two additional years until March of 2001.

---

[19]    In point of fact, after the January 1999, meeting, Captains Chaulk and Roland followed up with a number of counseling sessions with those individuals against whom complaints had been made, and reported on this counseling follow-up to then Chief Roy Colannino on February 15, 1999.  UMF No. 14.  Moreover, as demonstrated by the analysis of Plaintiff's discrimination claims, after the meeting of January 7, 1999, the number of potential discrimination incidents was reduced to nearly zero and there were no repeat offenders, thus proving that the meeting accomplished what the Plaintiff was seeking.

**B.      The Continuing Violation Theory**

"There are two kinds of continuing violations: serial violations and systemic violations."

*Jensen v. Frank*, 912 F.2d 517, 522 (1st Cir. 1990), citing *Mack v. Great Atlantic & Pacific Tea Co.*,

871 F.2d 179 (1st Cir. 1989) at 183.

1.      No Serial Violation Occurred

[A serial] violation is composed of a number of discriminatory acts emanating from
the same discriminatory animus, each act constituting a separate wrong actionable
under Title VII . . . . Moreover, a serial violation, to be actionable, requires the
complaining party to demonstrate 'that *some* discriminatory act transpired within the
[limitation period]' . . . . [which] must constitute discrimination *as to the plaintiff*."

*Jensen*, 912 F.2d at 522, citing *Mack*, 871 F.2d at 183, and other cases.

Obviously, the serial violation theory not only requires a timely act of discrimination, but

non-timely acts of discrimination as well.  As demonstrated above, there are no timely acts of

discrimination upon which Plaintiff Fernandez could anchor an actionable serial violation claim.

Moreover, none of her time-barred claims would be actionable in any event.  Thus, none of the time-

barred claims can survive.

2.      No Systemic Violation Occurred

A systemic violation "need not involve an identifiable, discrete act of discrimination

transpiring within the limitation period . . . so long as the policy or practice itself continues into the

limitation period . . . ." *Jensen*, 912 F.2d at 523, citing *Mack*, 871 F.2d at 183, and other cases.

"Absent any probative evidence of an overarching policy or practice of discrimination, [the

systemic violation theory] cannot stay the swing of the summary judgment ax." *Id.* at 523 (emphasis

added).  The court added that:  "Because this case can be resolved on the paucity of appellant's

---

[20]   Again, the patrol vehicle vandalism can not be laid at the feet of the Defendants, and the analysis of the allegations
from Plaintiff's Complaint set forth in detail above disproves that after the January 7, 1999, meeting, the environment
became more hostile.  In point of fact, it indisputably became less, if it was ever hostile to begin with.

proffer, we need not speculate as to whether a discharge can ever form the basis of a continuing violation." *Id.* at 523 n.4.

Here, there was and is no "policy or practice" of discrimination which has "continued into the limitation period." Indeed, if it existed at all, it was stopped as a result of the January 7, 1999, meeting and the counseling conducted by Captains Chaulk and Roland following the meeting. The paucity of Plaintiff's allegations has been amply demonstrated above. In the absence of any "probative evidence" of a policy or practice of discrimination, Plaintiff Fernandez cannot avoid the swing of the summary judgment ax.

For the reasons stated herein, the Defendants, City of Revere and City of Revere Police Department, respectfully request that the Court allow their Motion for Summary Judgment as to all of Plaintiff's claims.

CITY OF REVERE and CITY OF REVERE POLICE
DEPARTMENT,
By their attorneys,

 /s/  Daniel E. Doherty_____
Paul Capizzi, City Solicitor
BBO#: 646296A
Daniel E. Doherty
Assistant City Solicitor
BBO#: 127010A
City Hall, 281 Broadway
Revere, MA 02151
(781) 286-8166

## CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, and that copies will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

 /s/  Daniel E. Doherty_____
Daniel E. Doherty

Dated:  January 23, 2008