**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

**CIVIL ACTION NO. 03-12499 MLW**

| | |
|---|---|
| **TERRI L. PECHNER-JAMES** | ) |
| and  **SONIA FERNANDEZ** | ) |
| Plaintiffs | ) |
| | ) |
| VS. | ) |
| | ) |
| **CITY OF REVERE, THOMAS** | ) |
| **AMBROSINO, MAYOR, CITY** | ) |
| **OF REVERE POLICE DEPT.)** | |
| **TERRENCE REARDON, CHIEF** | ) |
| **OF POLICE, BERNARD FOSTER)** | |
| **SALVATORE SANTORO, ROY** | ) |
| **COLANNINO, FREDERICK** | ) |
| **ROLAND, THOMAS DOHERTY** | ) |
| **JOHN NELSON, JAMES RUSSO** | ) |
| **MICHAEL MURPHY and** | ) |
| **STEVEN FORD** | ) |
| Defendants | ) |

## AFFIDAVIT OF SONIA FERNANDEZ

I, Sonia Fernandez, duly sworn depose and say that the following statements are based upon my personal knowledge, that I am over 21 years of age and I am competent to make the following statements:

1. I received a letter from the City of Revere dated September 14, 1995 and signed by Mayor Robert J. Haas, Jr. That letter stated "that I have appointed you as a Permanent Full time Police Officer, effective Sunday September 24, 1995. The letter also invited me "to be sworn into your new position on Thursday, September 21, 1995 at 10:00 a.m." **Exhibit B.**

2. I appeared on September 21, 1995, took the oath of office and before Notary Public John J. Henry "gave oath to the faithful performance of the duties of said office." **Exhibit B.**

3. I was motivated to succeed as a police officer by my personal ambition and my desire to provide a stable home and life for my family. I was also motivated to be a positive role model in my community. I successfully completed my Associate in Science Degree and received a Diploma from Bunker Hill Community College. **Exhibit A**.

4. I was one of a group of seven (7) police officers who were hired by the Revere Police Department at the same time. Most of my fellow female officers are no longer employed by the Revere Police Department. Three (3) female officers, including myself, filed discrimination complaints with the Massachusetts Commission Against Discrimination (MCAD) based on the hostile environment of the Revere Police Department.

5. I loved my work. I successfully completed the Police Academy and was sworn in as a Police Officer. **Exhibit B**. I devoted myself to my work. I sought and completed training that enhanced my skills and my expertise as a police officer. The following is a partial list of the education and training that I undertook in pursuit of my professional goal and my contribution to the community as result of the education I received: **Exhibit C.**

> **C.1** Advanced 1997 Search and Seizure Clinic sponsored by the Commonwealth Police Service, Inc: Date of Completion: February 28, 1997
>
> **C.2.** Rape Instruction: sponsored by the Massachusetts Criminal Justice Training Council held at MCJTC, Tewksbury from May 19, 1997 to May 23, 1997.
>
> **C.3**. Letter of appreciation from ERA Tri-City Associates signed by Ignazio Amato dated October 9, 1997.
>
> **C.4**. Gang Conference: sponsored by the National Law Enforcement Institute of Boston, MA from September 9 and 10, 1998.
>
> **C 5**. Investigative Interviewer Training For Spanish-Speaking Professionals sponsored by the Office of the District Attorney from June-September 1998.Certificate of Completion and Letter of Appreciation.
>
> **C 6**. Certification of Completion: Basic American Sign Language Course by the Revere Commission of Handicapped Affairs dated December 18, 1998.

**C.7** Letter of Appreciation from Bunker Hill Community College dated May 28, 1999 for being Featured Speaker at the Spring 99 Recognition Ceremony of the Revere Chance Project.

**C.8.** Certificate of Completion of the Teen Dating Violence Awareness Training Program sponsored by the Massachusetts Department of Education dated November 1999.

**C.9.** Certificate of Completion of the Restorative Justice & Peacemaking Circles sponsored by the Chelsea/Revere Peacemaking Planning Committee & ROCA, Inc. from August 20-13, 2000.

**C.10.** Panel member at training on Domestic Violence for care providers sponsored by Child Care Choices of Boston. Letter of Appreciation dated June 8, 2000.

**C.11.** Letter of Appreciation from the Area Director of Department of Social Services dated May 10, 2000 for work with the Department's clients.

6. I pursued my professional objectives in spite of the hostile work environment of the Revere Police Department.

7. The hostility of the Department began after I completed the Police Academy. One day, Chief Russo summoned me to his office.

8. I was a new recruit at the time of the meeting. Chief Russo confronted me with a letter from an anonymous party. That letter accused me of drug use, accused my family of criminal activities. I was alone during this meeting with the Chief. I had no legal representation at this meeting. I did not want to have my interrogation by the Chief to be recorded but the Chief decided to record it. **Paragraph 104 of Plaintiff's Verified Complaint.** The Chief never provided me with a copy of the interrogation.

9. I felt intimidated by the meeting and the interrogation; I feared for my new career. I knew that allegations of drug use and criminal conduct, even untrue, could derail my career and damage my reputation.

3

10. Chief Russo ended the interrogation by referring me to Dr. Barry who was a consultant for the Revere Police Department. Dr. Barry did not substantiate the allegations of Chief Russo.

11. Chief Russo was the highest ranking of my superiors in the Police Department. His conduct, as the Chief, affected my perception of myself and the hostility that I experienced in the Department.

12. The Citizens Police Academy is a public relations forum conducted by the Department. This forum gives the Chief and other supervisors an opportunity to introduce new and subordinate officers to the general public.

13. On February 23, 1997, the Department held such a forum. Chief Russo presided over the forum. The audience included several supervisors from the Department; several members of the general public were also present.

14. The Chief introduced Sergeant Papasodora to the audience, he spoke at great length in praise of the Sergeant; he forgot to introduce Officer Mangino to the audience. It became necessary to remind the chief that he had omitted Officer Mangino.

15. The chief responded to the reminder by noting, that Officer Mangino and O'Hara were actually the first females hired. He then stated: "These are not the good old days when we didn't have to hire females."

16. The Chief's remarks indicated to me, an indifference, if not direct hostility, to the hiring and to the presence of female police officers in the Revere Police Department.

17. His remarks were consistent with my personal experience and with the contents of Paragraph 69 of my Verified Complaint where the Chief commented: "What is this, a

WIC meeting?" (WIC is a welfare program for low-income pregnant women and their children) when he observed four (4) female officers talking together behind the station.

18. The lack of departmental support that is crucial to police work was absent from my relationship with the superior officers. Captain Roland was one of my superiors. On one occasion in May 1996, he called me at home and instructed me to appear at Shirley Avenue to translate. He did not inform me that I was being called to a homicide scene.

19. I arrived at the homicide scene wearing my causal clothing, a baseball cap and jeans.

20. Captain Roland's decision placed me, as a police officer, in danger by summoning to a homicide scene without proper information, uniform or weapon.

21. After I arrived at the homicide scene, I noted that Officer Arcos and Officer Kevin Colannino, both of whom the Department had certified as Spanish-speaking, had not been summoned to the scene as translators.

22. One officer at the scene commented that I looked like an undercover hooker.

23. Other supervisors commented on the inherent dangerousness of my position. Both Lieutenant Wallace and Sergeant Picardi agreed that Captain Roland placed me in a dangerous position at a homicide scene without a gun or uniform.

24. The Shirley Avenue incident is not the only occasion that a supervisor placed me in a dangerous situation without proper equipment or support.

25. During the winter months of 1997, Captain Chaulk assigned me to "walking routes" at the Northgate Shopping Center. One winter night he ordered me to exit the cruiser and to walk, unaccompanied and without peer support in the parking lot of the shopping center. **Paragraph 7 of Plaintiff's Verified Complaint**.

26. Lieutenant Ford, on many occasions in 1996 and 1997, made hostile comments about my physical appearance, my hair and my weight. **Paragraph 84 of Plaintiff's Verified Complaint.** In November 1998, Lieutenant Ford stated to me in the presence of Officer Burke, "What are you? Spanish, Mexican, Cuban, you're all alike, a bunch of cockroaches."

27. Racial insults against Latinos and African-Americans were a routine part of my experience at the Revere Police Department. I was present at a roll call conducted by Lieutenant Ford about July 1, 2000. At the end of the roll call, Lieutenant Ford commented that several of the people arrested and placed in police custody were from the City of Chelsea, which has a substantial Hispanic population. He characterized the arrestees as the "sewer people." **Paragraph 99 of Plaintiff's Verified Complaint.**

28. The hostility of the environment was not limited to the racial insults aimed at me; that hostility also included insults aimed at African-Americans; the insults and general hostility included the circulation of the offensive caricature of an African American attached to my **Verified Complaint as Exhibit H.** I do not recall any African-American personnel in the Revere Police Department. The offensive caricature was a booking photo that had been converted by adding a spear, grass skirt, flies buzzing about his head and poorly fitting footwear. **Verified Complaint as Exhibit H.**

29. The hostility I experienced was not limited the statements of Lieutenant Ford and the actions of Captain Roland, it included the actions of personal attacks by Lieutenant Foster.

30. I have hearing loss. This fact was known to the Department when I was employed. It has been confirmed by several medical authorities including Beth Israel Deaconess Medical Center; that Center stated in a report dated July 11, 2000: " <u>Additionally, the patient has decreased hearing in each ear which has been attributed to lead paint ingestion as a child. The left ear has a greater hearing loss than the right.</u> " **Exhibit D.**

31. Lieutenant Foster routinely disparaged my hearing disability by making remarks and using mock sign language and facial gestures. On March 1, 2001, Lt. Foster said, in the presence of other officers: "Why don't you put the phone in your good ear." (referring to my left ear.) **Paragraph 102 of my Verified Complaint.**

32. Lieutenant Foster not only disparaged my hearing loss but he routinely made comments as he did on January 23, 2001: "Why don't you turn up those hearing aides?"

33. Lieutenant Foster also made hostile remarks that were personal in nature. On February 28, 2000, he entered the radio room where I was working and told me, angrily, to "pick up my hair." He remarked: What do you think? You're special?" He further ordered me to get my hair off my shoulders or get it cut. I found his remark unrelated to my work, hostile in tone and personal in nature.

34. I was not the only female officer who experienced the hostility of the Revere Police Department. On January 7, 1999, I attended a meeting at the Revere Beachmont station. The female patrol division requested this meeting. The purpose of this meeting was to bring to the attention of the Department the collective experiences of the female patrol division.

35. The meeting confirmed that other female officers were experiencing hostility and harassment from supervisors at the Revere Police Department. On January 14, 1999, Captain Chaulk and Captain Roland prepared a written report of that meeting. **Verified Complaint Exhibit D.**

36. I read the report. The report reflected the content of the meeting. It documented that the other female officers were also experiencing hostility and harassment from the Revere Police Department.

37. After the meeting of January 7, 1999, I learned that two cruisers, one assigned to Terri Pechner-James and the other assigned to Lyn Curcio at night. The cruisers had been parked at the International House of Pancakes. All eight (8) tires had been slashed.

38. The report of this incident was traumatic. I felt intimidated by such a violent night attack on the automobile of fellow officers. My feeling of intimidation was increased because of the response of the Department.

39. I do not know the identities of the vandals. The Department also did not tell us that they investigated the incident or that they made a good faith effort to find the vandals. My feeling of insecurity and vulnerability as a female police officer was increased because the Department seemed indifferent to an obvious threat to lives of female police officers and deliberate damage to their property.

40. I experienced this indifference again on February 26, 2001. I observed a pair of women's leopard underwear on the bulletin board in the guardroom. They remained there for several days until March 2, 2001. I personally retrieved them and placed them in a plastic bag and kept them in my custody.  Reports of the incidents are attached to my **Verified Complaint as Exhibits F & G.**

41. The Department displayed the same kind of indifference in 1998 when a large chalk drawing of a penis appeared on the bulletin board of the Department. The drawing had small chalk marks that represent sperm coming from the tip. I am not aware that the Department investigated the incident or identified the member of the Department who made the offensive drawing.

42. During the summer of 1996, the Revere Police Department had a softball match against the Saugus Police Department. Sergeant Picardi was on the Revere Police team. A member of the Saugus team said that he heard that Revere had a lot of women on the force. Sergeant Griffin of the Revere Police agreed and added that "this one (referring to

Sergeant Picardi) is fucking the Spanish one (referring to me.)" This insensitive statement by one of my superiors in the Department was extremely distressing to me.

43. As a result of my experiences, I filed a complaint with the Massachusetts Commission Against Discrimination (MCAD). **Exhibit E.** Fellow officers, Terri Pechner-James and Kathy Fish also filed complaints with the MCAD. **[Exhibit T-Mayor Ambrosino and Chief Reardon's Supplemental Answers To Interrogatories]**

44. Prior to filing my complaint with the MCAD, I met with Mayor Ambrosino, I also met with Chief Reardon to complain about the "prolonged, severe, pervasive, hostile and abusive work environment" that I described in my MCAD complaint. **Verified complaint paragraph 134.**

45. I was seeking a leave of absence because of the stress caused by the hostility of my work environment. The Mayor offered me only leave without pay beginning March 16, 2001. He encouraged me to file a complaint with the MCAD. He later extended my leave from July 1, 2001 to September 30, 2001. **Exhibit K-Mayor's Extension of Unpaid Leave.** I did not return to the workplace until October 1, 2001. I remained in the workplace until September 10, 2002; during this time I was at the workplace but I did not perform the same duties that I had performed prior to my unpaid leave. I felt that I was demoted in duties, though not in pay.

46. I sought professional help in my effort to keep my job and to cope with the hostility of the environment in which I worked. At the North Suffolk Mental Health Association, I was treated by several professionals. The notes from the Association confirm that as late as April 7, 2003, I was suffering from "Chronic Depression and numbness", "insomnia"; "mood instability" and "eating instability". **Exhibit F-North Suffolk Mental health Association-11 items.**

47. The Notes from the Association will confirm that on April 14, 2003 that I complained of "crying spells, anger/ irritability." The Notes also confirm that I experienced "multiple

9

acts of hostility (racial slurs against Hispanic people, against Chelsea residents." The also reveal that I felt "belittled, mocked, and harassed due to [my] hearing disability."

48. The Notes also reveal that I "felt overwhelmed by being sent into dangerous situations alone. " This kind of treatment is commonly referred to as departmental betrayal.

49. The Notes also confirm that I witnessed routine police tragedies, mutilated bodies and children dying in a fire; these tragedies were "all made worse by [my] colleagues coping mechanism of "disrespectful" humor which was disrespectful to crime victims. Police work, even the tragedies, did not disable me. It was the persistent "disrespectful" attitude even when expressed as humor that made the environment of the Revere Police Department an impossible place in which to work.

50. The Association Notes of April 14, 2003 confirm that I was diagnosed with panic, anxiety and moderate case of Post Traumatic Stress Disorder. I received therapy and medication for my diagnosed conditions. **Exhibit F.**

51. I was also treated by doctors and psychotherapists at the Beth Israel Deaconess Medical Center/Healthcare Associates, 330 Brookline Avenue, Boston, MA 02215. I was treated by the Medical Center during 2000 and 2001. Their Notes are attached as **Exhibit G-Beth Israel Deaconess Medical Center-Notes 14 items.**

52. The Notes of Dr. Geoffrey s. Gilmartin, M.D. and Gila Kreigel, M.D. dated January 5, 2000 confirm that I was diagnosed with Panic Attacks; it also confirms that I was suffering from increased stress. The report confirmed that the doctors prescribed medication and discussed the "importance of maintenance of supportive network" to counteract the negative effect of my negative work environment.

53. Page 11 of **Exhibit G** confirms that my "psychiatric symptoms" affected my ability to gain weight.

54. Dr. Darlene Millman on page 14 of **Exhibit G** confirms on July 11, 2000, that my "insomnia" and "panic attacks" dated back to the time that I began work as a police officer. The report confirmed my statement "I don't want to go to work anymore." Her notes confirm my feeling of hopelessness and helplessness during this period. Her report also confirmed my hearing loss: "the left ear [having] greater loss than the right."

55. Dr. Millman's report also confirmed that I was experiencing a "Major depressive disorder, Panic disorder without agoraphoria. She also listed Job Stress as part of her diagnosis.

56. On March 23, 2001, Dr. Millman wrote me a summary of my treatment. She stated that I was diagnosed on July 2000 with a Major Depressive Disorder and that on February 12, 2001 I still met the criteria for Major Depressive Disorder and Panic Disorder without agoraphobia. **Exhibit G- Page 31.** She wrote this summary because I requested it in support of my request to Mayor Ambrosino for leave with pay. The Mayor denied my request.

57. On March 28, 2001, I visited with Dr. Jason Merola and Dr. Leonor Fernandez as part of a follow-up. Dr. Merola noted that my "insomnia, weight loss, anxiety and depressive symptoms" were continuing. He noted and I observed that my weight had fallen from 101.2 to 99.2. His notes reflect my experience of having difficulty at work and having difficulty sleeping through the night.

58. On April 3, 2001, my Social Worker, Elsie Parilla, L.I.C.S.W.described in her report my Presenting Problem as follows: "I am a police officer in the city of Revere and I have been harassed because of my poor hearing, my gender and race." **Exhibit G- Page 43**

59. Her report reflects my experiences that "a series of incidents have caused her quite a bit of distress which include the hanging of a set of panties on the clip board of the police

station where she works." Her report also correctly reflected that I was "the only [Latina] police officer that works there."

60. Her report included a reference to my experience with Lieutenant Ford when he stated "all Latinos were still considered cockroaches." She accurately reflected my feelings when I stated to her that I was "uncomfortable, felt alienated and started to feel that I was [not] being made part of the police force."

61. As a result of my experiences, it became impossible to continue to perform the essential duties on my job. Mayor Thomas Ambrosino offered me unpaid leave of absence. I was on unpaid leave of absence from March 2001 until October 2001. I suffered loss of revenue and severe financial distress followed. I lost my home during this period because of my inability to maintain mortgage payments. I was returned to the Department in October 2001 but I was not returned to the essential duties of my job as described in **Exhibit H-Police Officer Essential Tasks**.

62. On April 23, 2004, Chief Terrence Reardon, filed an Involuntary Retirement Application on my behalf. **Exhibit I-Involuntary Retirement Application**. The basis of this Employer filed application was that I was unable to perform the duties as stated in **Exhibit H** because of post traumatic stress disorder, and the anxiety, insomnia, and depression confirmed in the professional reports of my physicians and social workers.

63. On August 13, 2004 at 11:30 a.m. a panel of three doctors appointed by the Public Employee Retirement Administration Commission (PERAC) examined me at the Sancta Maria Nursing Facility, 799 Concord Avenue, Cambridge, MA.

64. The panel considered my testimony and the professional supporting information contained in Exhibits F & G, specifically the opinions of Dr. Jason Merola, Dr. Darlene Millman, and Dr. Christopher Harmon. These providers confirmed the causal connection between the hostile work environment of the Revere Police Department and the personal (emotional) injury that made me unable to perform the duties stated in **Exhibit H.**

65. The Medical Panel made a unanimous recommendation to PERAC. PERAC reviewed the findings of the medical panel certificate and on September 20, 2004, issued a decision that included the following findings:

> The psychiatric medical panel concluded that the patient met the criteria for a post traumatic stress disorder (PTSD).
>
> 1. The psychiatric medical panel concluded that the patient was mentally incapable of performing the essential duties of her job as a Police Officer as described in the current job description. The panel based this conclusion on the severity of the patient's psychiatric complaints.
>
> 2. The panel concluded that the said incapacity is likely to be permanent, and unlikely to respond to further rehabilitation efforts.
>
> 3. The panel concluded that the said incapacity is such as might be the natural and proximate result of the personal injury sustained or hazard undergone on account of which retirement benefit is claimed. The panel based this conclusion on the specific work related "gruesome" events that the patient experienced.

66. The gruesome events referred to by PERAC are the same tragedies that I have referred to in paragraph 49. They are a routine part of police work. The events were "all made worse by [my] colleagues coping mechanism of "disrespectful" humor- disrespectful to crime victims." It was the disrespect, the isolation, the sense of departmental betrayal that caused my personal (emotional) injury.

67. This personal (emotional) injury caused me to be unable to perform the essential duties of my job as a police officer. I lost my employment. I lost my career. I lost my identity and sense of self-worth. I lost the home I which I resided with my family during the time I was on unpaid leave.

68. The Post Traumatic Stress Disorder (PTSD) found by the psychiatric medical panel is a "personal injury." The Panel made its finding because the predominant contributing cause of this personal (emotional) injury is an event or series of events occurring within the Revere Police Department, the City of Revere and its authorized agents.

69. The City of Revere did not serve me with a notice of appeal of PERAC's decision.

70. I filed a verified complaint in the Suffolk Superior Court on September 30, 2003. PERAC made its decision-**Exhibit J**- on September 20, 2004. The Defendants removed this complaint to the Federal District Court on December 11, 2003.

Sworn under pains and penalties of perjury,

/s/ Sonia Fernandez
Sonia Fernandez