# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

### CIVIL ACTION NO. 03-12499 MLW

| | |
|---|---|
| TERRI L. PECHNER-JAMES | ) |
| and  SONIA FERNANDEZ | ) |
|     Plaintiffs | ) |
| | ) |
| VS. | ) |
| | ) |
| CITY OF REVERE, THOMAS | ) |
| AMBROSINO, MAYOR, CITY | ) |
| OF REVERE POLICE DEPT. | ) |
| TERRENCE REARDON, CHIEF | ) |
| OF POLICE, BERNARD FOSTER | ) |
| SALVATORE SANTORO, ROY | ) |
| COLANNINO, FREDERICK | ) |
| ROLAND, THOMAS DOHERTY | ) |
| JOHN NELSON, JAMES RUSSO | ) |
| MICHAEL MURPHY and | ) |
| STEVEN FORD | ) |
|     Defendants | ) |

## PLAINTIFF SONIA FERNANDEZ'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56(c)

### Introduction:

The Plaintiff filed her Verified Complaint in the Suffolk Superior Court, Case Number: 03-4685G. The Defendant removed this case to the Federal District Court on December 11, 2003. **Docket No. 1.** The Plaintiff seeks summary judgment on the four causes of action stated in her Verified Complaint.

### FACTS:

Plaintiff, Sonia Fernandez, was sworn in as a Permanent Full Time Police Officer on September 21, 1995. Her appointment became effective September 24, 1995. **[Exhibit B]** She was the first and only Latina officer ever hired by the Revere Police Department. She was one of seven female officers hired on the same date. A small number of those seven female officers remain in the Department. **[Attached Affidavit Paragraph 4.]**

Officer Fernandez worked over many years to accomplish her professional goals. She successfully graduated from Bunker Hill Community College with an Associate Degree

in science. **[Exhibit A].** She successfully completed the Police Academy and received an appointment as a Full Time Police Officer effective September 24, 1995. **[Exhibit B].** The Plaintiff sought opportunities to enhance her skills and expertise. Below is a list of the education and training opportunities successfully completed and the commendations received from community organizations: **[Exhibit C]**

> **C.1** Advanced 1997 Search and Seizure Clinic sponsored by the Commonwealth Police Service, Inc: Date of Completion: February 28, 1997

> **C.2.** Rape Instruction: sponsored by the Massachusetts Criminal Justice Training Council held at MCJTC, Tewksbury from May 19, 1997 to May 23, 1997.

> **C.3**. Letter of appreciation from ERA Tri-City Associates signed by Ignazio Amato dated October 9, 1997.

> **C.4**. Gang Conference: sponsored by the National Law Enforcement Institute of Boston, MA from September 9 and 10, 1998.

> **C 5**. Investigative Interviewer Training For Spanish-Speaking Professionals sponsored by the Office of the District Attorney from June-September 1998.Certificate of Completion and Letter of Appreciation.

> **C 6**. Certification of Completion: Basic American Sign Language Course by the Revere Commission of Handicapped Affairs dated December 18, 1998.

> **C.7** Letter of Appreciation from Bunker Hill Community College dated May 28, 1999 for being Featured Speaker at the Spring 99 Recognition Ceremony of the Revere Chance Project.

> **C.8.** Certificate of Completion of the Teen Dating Violence Awareness Training Program sponsored by the Massachusetts Department of Education dated November 1999.

> **C.9.** Certificate of  Completion of the Restorative Justice & Peacemaking Circles sponsored by the Chelsea/Revere Peacemaking Planning Committee & ROCA, Inc. from August 20-13, 2000.

> **C.10.** Panel member at training on Domestic Violence for care providers sponsored by Child Care Choices of Boston. Letter of Appreciation dated June 8, 2000.

> **C.11.** Letter of Appreciation from the Area Director of Department of Social Services dated May 10, 2000 for work with the Department's clients.

Sonia Fernandez was employed continuously from September 24, 1995 to March 15, 2001. She pursued her professional goals in spite of the hostile environment of the Revere Police Department.  She reported the hostile work environment and its effects on her to the Defendant, Mayor Ambrosino. She requested a paid leave of absence beginning March 15, 2001. The Mayor gave her an unpaid leave of absence for three months and later extended that unpaid leave to September 30, 2001. **[Exhibit K]**  The Mayor declined to take responsibility for the actions of the Police Department. He advised the Plaintiff to file a complaint with the Massachusetts Commission Against Discrimination (MCAD). The Plaintiff filed her complaint. **[Exhibit E]**.  The Plaintiff, at the end of her unpaid leave, returned to the workplace but not to patrol, radio dispatcher or the other duties described in **[Exhibit H.]**. She remained on the job in that demoted capacity until September 2002.

The Plaintiff experienced discrimination based on sex, race and disability. The hostility of the Department began almost as soon as she became an officer of the Revere Police Department. On or about September 21, 1995, Chief James Russo summoned the Plaintiff to his office. He confronted her with a letter from an anonymous source. The letter, according to the Chief, accused the Plaintiff of drug use and her family criminal activity.

The Plaintiff was alone, unrepresented and afraid during this interrogation. She did not want the interrogation and she did not want it recorded. She knew the allegations, even though untrue, could derail her new career. She experienced great distress in the face of this threat. **[Attached Affidavit Paragraphs 8-9].**  Chief Russo did not show the Plaintiff the letter or a copy of the interrogation. He referred the Plaintiff to Dr. Barry who was a consultant for the Revere Police Department. Dr. Barry did not substantiate the allegations of Chief Russo. The Plaintiff began her employment as scheduled. [Dr. Barry's records were requested from the Defendants; they were never provided].

The lack of support and the sense of departmental betrayal that the Plaintiff experienced with Chief  Russo, the highest ranking supervisor in the Department, was repeated on several occasions during the period of Plaintiff's employment. On February 23, 1997,

Chief Russo marginalized another female officer in the presence of the public and other members of the Department. **[Attached Affidavit Paragraph 13].**

The Citizens Police Academy is a Police public relations forum.  This forum is an occasion when the Chief of Police introduces members of the Department to the general public. Chief Russo introduced Sergeant Papasodora to the public but appeared to forget female officer, Mangino. His omission was obvious; it became necessary to remind the chief that he had overlooked Officer Mangino. The Chief responded to the reminder by noting that Officer Mangino and O'Hara were actually the first females hired. He then stated: "These are not the good old days when we did not have to hire females." **[Attached Affidavit 14-15].**  The Chief's conduct and remarks on this occasion confirmed the lack of departmental support and sense of departmental betrayal that she experienced during her interrogation by Chief Russo. **[Attached Affidavit Paragraph 7-10].**  The Chief's remarks were consistent with the Plaintiff's personal experience and the Chief's remarks in **Paragraph 69 of Plaintiff's Verified Complaint.** He described a meeting of four female officers as a "WIC meeting."

The lack of support and the unconcern about the Plaintiff's safety and well-being was practiced by other supervisors in the Department. Captain Roland called the Plaintiff from home to Shirley Avenue  in May 1996.  Shirley Avenue is a high crime area within the City of Revere. Captain Roland told her he needed a translator. The Plaintiff responded. At Shirley Avenue she discovered she had been called to a homicide scene. The Plaintiff was casually dressed, including a baseball cap and jeans.

Captain Roland's was indifferent to the plaintiff's safety. He placed her in a position of danger; he placed her at a homicide scene without the protection of knowledge, uniform and weapon. The Department had identified Officers Arcos and Colannino as Spanish speaking. Captain Roland did not summon them to the homicide scene. The Plaintiff's vulnerability was highlighted when one officer remarked that she looked like an undercover hooker. **[Attached Affidavit Paragraph 22].** The danger in which Captain Roland had placed the Plaintiff was underscored when Lieutenant Wallace and Sergeant

Picardi arrived at the homicide scene and admonished the Plaintiff about her attire and the noticeable absence of her weapon. **[Attached Affidavit Paragraph 23]**

The lack of support and the indifference to the Plaintiff's safety that was displayed by Chief Russo and Captain Roland were also present in the routine assignments the Plaintiff received. Captain Chaulk assigned the Plaintiff to "walking routes" at Northgate Shopping Center. The Plaintiff was frequently unaccompanied and without peer support.**[Verified Complaint Paragraph 7.]** One winter evening, Captain Chaulk ordered her to exit the cruiser and complete her patrol on foot. This order left the Plaintiff to complete her patrol unaccompanied and without access to departmental support.

The plaintiff also experienced hostile statements personally directed ant her and at people of color in general. Lieutenant Ford, on many occasions in 1996 and 1997 made hostile comments to the plaintiff about her personal appearance including her hair and weight. His hostile comments included references to her race and national origin.  In November 1998, Lieutenant Ford asked the Plaintiff in the presence of Officer Burke: "What are you? Spanish, Mexican, Cuban, you're all alike, a bunch of cockroaches."

This personal and racial insult was not Lieutenant Ford's only statement about people of Hispanic origin. At the end of roll-call on July 1, 2000, Lieutenant Ford commented that several of the people in custody were from the City of Chelsea. He characterized the arrestees as "sewer people**. [Attached Affidavit Paragraph 25].** The hostility of the environment was not limited to personal and racial insults aimed at the Plaintiff. The insults and hostility included the circulation of the offensive caricature of an African American attached to the Plaintiff's **[Verified Complaint as Exhibit H]** The caricature was made from a Department booking photograph of an African American. The photograph had been deliberately altered to add a spear, grass skirt, flies buzzing around the head and poorly fitting sandals. **[Attached Affidavit Paragraph 28]** There were no African American officers or personnel in the Department.

 Plaintiff experienced hostility not just from the statements of Lieutenant Ford and the actions of Captain Roland. Lieutenant Foster made direct and personal attacks on the

Plaintiff's hearing disability.  The Plaintiff has a hearing loss. This disability has been confirmed by medical authorities including Beth Israel Deaconess Medical Center. In a report dated July 11, 2000, the Center stated: "Additionally, the patient has decreased hearing in each ear which has been attributed to lead paint ingestion as a child. The left ear has greater hearing loss than the right." **[Attached Affidavit Paragraph 30.]**

Lieutenant Foster routinely disparaged the Plaintiff's hearing disability. He made remarks, used mock sign language and exaggerated facial gestures. On March 1, 2001, Plaintiff was answering the telephone in the radio room. Lieutenant Foster in an unprovoked remark stated: "Why don't you put the phone in your good ear."  This comment was similar to the statement he made on January 23, 2001 when he said to the Plaintiff: "Why don't you turn up those hearing aides?" [**Attached Affidavit Paragraphs 30, 31 and 32**]

Lieutenant Foster routinely disparaged the Plaintiff's hearing loss and her personal appearance.  On February 28, 2001, he entered the radio room where the Plaintiff was working as a dispatcher. In a tone that was hostile and personal in nature, he demanded that the Plaintiff "pick up" her hair. He continued in a hostile tone: "What do you think? You're special?" He further ordered the Plaintiff to get her hair off her shoulder or get it cut. **[Attached Affidavit Paragraph 33]**

The Plaintiff experienced as stressful her personal experiences with the Department and the Department's treatment of other female officers.  On January 7, 1999, the Plaintiff attended a meeting at the Revere Beachmont Station. The female patrol division requested the meeting. The Department's representatives were Captain Chaulk and Captain Roland. The purpose of the meeting was to bring the collective experiences of female officers to the attention of the Department. **[Attached Affidavit Paragraph 34]**

The meeting confirmed that other female officers were experiencing hostility and harassment from the supervisors at the Revere Police Department. On January 14, 1999, Captain Chaulk and Captain Roland prepared a written report of that meeting. **[Verified Complaint Exhibit D]** After the meeting recorded in Verified Complaint Exhibit D, the

Plaintiff learned that two cruisers, one assigned to former co-plaintiff, Terri Pechner-James, the other assigned to Lyn Curcio had been vandalized in the early hours of the morning. The cruisers were parked at the International House of Pancakes. All eight tires had been slashed. The vehicles were disabled and the assigned officers stranded. **[Attached Affidavit Paragraph 37]**

 The Plaintiff felt intimidated by the boldness, severity and violence of the attack. **[Attached Affidavit Paragraph 38]**   The Plaintiff never learned from the Department the name of the vandals, the true extent of the damage, the results of any investigation or any corrective action that was taken. The Department's appeared indifferent. The safety of the female officers appeared not to be a priority. The Department's response did not demonstrate to the Plaintiff the presence of support for female officers during times of attack and danger.  **[Attached Affidavit Paragraph 39.]**

The Plaintiff experienced departmental indifference again during the week of February 26, 2001. The Plaintiff observed a pair of women's leopard underwear on the bulletin board in the guardroom in full view of the general public and the members of the Department.  The underwear remained on display until March 2, 2001. The Plaintiff retrieved the articles and preserved them in a plastic bag. Reports of the incident are attached to Plaintiff's Verified Complaint **[Exhibits F & G]**  The Department's  response to this "underwear incident" was similar to its response to the "chalkboard incident" in 1998 when a large drawing of a penis appeared on the bulletin board. The drawing had small chalk marks that represent sperm coming from the tip. **[Attached Affidavit Paragraph 41]**  The Department remained indifferent.

Even the Plaintiff's personal relationships were not safe from the culture of disrespect and hostility that permeated the Department. The Revere Police Department and the Saugus Police Department often have softball matches during the summer months. Both Departments faced each other in Saugus for a game during the summer of 1996. A member of the Saugus Police Department said that he heard that Revere had lots of women on the force. Sergeant Griffin of the Revere Police Department agreed. He also

added that "this one (referring to Sergeant Picardi) is fucking the Spanish one (referring to the Plaintiff)." This display of insensitivity and disrespect by a supervisor of the Revere Police Department severely distressed the Plaintiff. **[Attached Affidavit Paragraph 42]**

The Plaintiff filed a complaint with the Massachusetts Commission Against Discrimination (MCAD) **[Exhibit E]** Defendant, Thomas Ambrosino acknowledged that former officers Terri Pechner-James and Kathy Fish also filed complaints with the MCAD. **[Exhibit T-Defendant, Mayor Thomas Ambrosino's Further Supplemental Answers to First Set of Interrogatories-Supplemental Answers No:4]** The Mayor admits that he "had spoken directly with Ms. Pechner-James and Ms. Fernandez both in the presence of their attorney, James Dilday." The Mayor also stated that he "informed the City Council of Plaintiff's complaint in Executive Session on April 30, 2001."

Interrogatory 4f, propounded to the Mayor, asked: What if anything you or other city officials did regarding each complaint? The Mayor failed to identify any action that he took regarding the complaints. He acknowledged receipt of Kathy Fish's complaint and the complaints of the Plaintiffs herein. The Mayor's could state no action except that he "had spoken directly with Ms Pechner-James and Ms. Fernandez both in the presence of their attorney James Dilday and independently, and told them that if the command staff found no merit to their allegations they would have to pursue their claims through the appropriate forum." The Mayor has clearly abdicated his responsibility and placed it in the hands of "the appropriate forum." The Mayor mentioned informing the City Council in Executive Session but does not mention that he requested any action by the City Council or that the City Council took or offered to take any action. **[Exhibit T]**

The Plaintiff sought professional help from the service providers in **[Exhibits F & G.]** The help was necessary to keep her employment and to cope with the hostility of the environment. The Notes from the North Suffolk Mental Health Association confirm that the Plaintiff was suffering from "Chronic Depression and Numbness", "insomnia," "mood instability" and "eating instability". **[Exhibit F-North Suffolk Mental Health**

**Association-11 items]**  The Notes from the Association confirm that on April 14, 2003, the Plaintiff was suffering from "crying spells, anger/irritability".

The Notes also confirm that the Plaintiff was affected by the "multiple acts of hostility (racial slurs against Hispanic people, against Chelsea residents)" that she experienced while she was employed at the Revere Police Department. The Notes also confirm the Plaintiff felt "belittled, mocked, and harassed due to her hearing disability." The Notes also confirm that after she left the Department she continued to need the medications for depression, anxiety and insomnia as part of her daily life. The Notes also confirm that the Plaintiff "felt overwhelmed by being sent into dangerous situations alone."  The sense of departmental betrayal is clear from the Notes.

The Notes also confirm that the Plaintiff witnessed tragedies that are routine in police work. These tragedies were "all made worse by [my] colleagues coping mechanism of "disrespectful" humor-disrespectful to crime victims. Police work, even the tragedies, did not disable the Plaintiff. It was the persistent "disrespectful" attitude even when expressed as humor that made the environment of the Revere Police Department a hostile and impossible place to work.  The Association Notes of April 14, 2003 confirm that the Plaintiff was diagnosed with panic, anxiety and a case of Post Traumatic Stress Disorder. The Plaintiff continues to receive therapy and medication for her diagnosed condition. **[Exhibit F.]**

Beth Israel Deaconess Medical Center/Healthcare Associates, 330 Brookline Avenue, Boston, MA 02215 also treated the Plaintiff.  They treated the Plaintiff at this in 2000 and 2001 while she was still working at the Revere Police Department. **[Exhibit G-Beth Israel Deaconess Medical Center Notes-14 items.]** The Notes of Dr. Geoffrey S. Gilmartin and Dr. Gila Kreigel dated January 5, 2000 confirm a diagnosis of Panic Attacks; it also confirms that she  was suffering from increased stress. The report confirms that the doctors prescribed medication and discussed the "importance of maintenance of supportive network" to counteract the negative effect of her work

environment. Page 11 of **Exhibit G** confirms that Plaintiff's "psychiatric symptoms" affected her ability to gain weight.

Dr. Darlene Millman on page 14 of  **Exhibit G** confirms in her notes of July 11, 2000 that the Plaintiff's "insomnia" and "panic attacks" dated back to the time that the Plaintiff began work as a police officer. The doctor notes the sense of hopelessness and helplessness that the Plaintiff experienced during this period.  On March 23, 2001, Dr. Millman wrote a summary of the Plaintiff's treatment for the Mayor. She confirmed that the Plaintiff met the criteria for Major Depressive Disorder and Panic Disorder**-[Exhibit G.-Page 31].**  On March 28, 2001, the Plaintiff visited Dr. Jason Merola and Dr. Leonor Fernandez as part of a follow-up. Dr. Merola noted that the Plaintiff's "insomnia, weight loss, anxiety and depressive symptoms" were continuing. He noted that the Plaintiff's weight had fallen from 101.2 to 99.2.

The Plaintiff's Social Worker, Elsie Parilla, L.I.C.S.W in her report dated April 3, 2001, included  the Plaintiff's description of her problem as follows: " a police officer in the City of Revere and I have been harassed because of my poor hearing, my gender and race." **[Exhibit G-page 43].**  Her report included the series of incidents including the hanging of panties on the bulletin board of the police station. The report also included a reference to the comments of Lieutenant Ford when he state "all Latinos were still considered cockroaches." The report reflected that the Plaintiff felt "uncomfortable , alienated and not part of the police force."

**Exhibits F & G** confirm the Plaintiff's experiences and the impact of the hostile work environment on the Plaintiff. These experiences made it impossible for the Plaintiff to perform the essential duties of her job as described in **[Exhibit H-Police Officer Essential  Tasks].**  On April 23, 2004, Chief Terrence Reardon filed an Involuntary Retirement Application for the Plaintiff. The basis of this employer filed application was that the Plaintiff was suffering from post traumatic stress disorder, anxiety, and depression as stated in professional reports. She was unable to perform the duties as stated in **Exhibit H**.

On August 13, 2004 at 11:30 a.m. a psychiatric panel of three doctors appointed by the Public Employee Retirement Administration Commission (PERAC) examined the Plaintiff at the Sancta Maria Nursing Facility, 799 Concord Avenue, Cambridge, MA. The panel considered the Plaintiff's testimony, the professional opinions of Dr. Merola, Dr. Millman and Dr. Harmon. These providers confirmed the causal connection between the hostile work environment of the Revere Police Department and the personal (emotional) injury that made the Plaintiff unable to perform the duties. [**Exhibit H.**]

On September 20, 2004, the Medical Panel issued a unanimous decision. The psychiatric medical panel concluded that the Plaintiff met the criteria for post traumatic stress disorder. (PTSD). It issued the findings stated below:

> 1. The psychiatric medical panel concluded that the patient was mentally incapable of performing the essential duties of her job as a Police Officer as described in the current job description. The panel based this conclusion on the severity of the patient's psychiatric complaints.

> 2. The panel concluded that the said incapacity is likely to be permanent, and unlikely to respond to further rehabilitation efforts.

> 3. The panel concluded that the said incapacity is such as might be the natural and proximate result of the personal injury sustained or hazard undergone on account of which retirement benefit is claimed. The panel based this conclusion on the specific work related "gruesome" events that the patient experienced

The gruesome events referred to by PERAC are the same tragedies that the Plaintiff referred to in Paragraphs 49 of the **Attached Affidavit**. The Plaintiff also describes these events in **Exhibits F & G**. Those events are a routine part of police work. Those events were "all made worse by colleagues coping mechanism of "disrespectful" humor. It was the disrespect, the isolation, the sense of departmental betrayal that caused the Plaintiff's personal injury, not the gruesome events themselves. The Panel made its findings because the predominant contributing cause of this personal (emotional) injury was an event or series of  events occurring within the Revere Police Department and the City of Revere.

**Argument:  1. The Mayor of Revere and the City Council are the policymakers of the municipality and are liable for the policy and practices that injured the Plaintiff.**

Determining who is a policymaker for a municipality, in this case the City of Revere, is a "legal question to be resolved by the trial judge before the case is submitted to the jury" Jett v Dallas Independent School District, 49 U.S. 701, 737. This same legal question must be resolved before the Court can render a decision on summary judgment. In making this determination, the Court should consider "the relevant legal materials including the state and local positive law, as well as the custom and usage having the force of law." Id at 737 citing City of St. Louis v Praprotnik, 485 U.S. 112 (1988).

The Court must decide whether the decisions of the policymakers caused the deprivation of rights by acquiescence in a longstanding practice or custom which constitutes the 'standard operating procedure' of the local governmental entity. A single decision of a policymaker may establish municipal policy binding the City. Pembauer v City of Cincinnati, 475 U.S. 469.  The question for this Court to decide is whether the decisions of the Mayor and the City Council of the City of Revere caused the deprivation of the Plaintiff's rights by their acquiescence in a longstanding practice or custom which constitutes 'standard operating procedure' for the City of Revere.

The leading case in this Circuit on the issue of municipal liability and its impact on policymakers is Gonsalves v City of New Bedford, 939 F. Supp. 915 (1996). This Court ruled in Gonsalves that policymaking can be shared between the Mayor and the New Bedford City Council. Id at 917.

It is undisputed that the City of Revere adopted a Plan B form of government. **[Exhibit L- M.G.L.c.43 § 56- 61]** It is also undisputed that the Plan B was in effect when the Plaintiff began her employment and when she was constructively discharged. **[Exhibit M-Mayor Thomas Ambrosino's Statement of Undisputed Facts and Attachments].** The City of New Bedford also has a Plan B charter. That form of government was in effect when events of Gonsalves, supra, occurred.  Mayor Thomas Ambrosino and the

City Council of the City of Revere have the same responsibilities under the Plan B
charter as the Mayor and the City Council in Gonsalves.

The Mayor of the City of Revere is an elected official, the Mayor of the City of New
Bedford is an elected official. The members of the Revere City Council are elected
officials; the members of the New Bedford City Council are also elected officials. The
Chief of Police, in both cities, is appointed by their respective Mayors and confirmed by
their respective City Councils.

M.G.L.c. 43 § 56 - 61 govern the Plan B charter. **[Exhibit L].** The relevant provisions
state the following:

> Section 58. There shall be a mayor, elected by and from the qualified voters of the
> city, who shall be the chief executive officer of the city.
> Section 59. The legislative powers of the city shall be vested in a city council.
> One of its members shall be elected by the council annually to be president.
 The Revere Regulations provide the following:

> 2:09:10  Mayor-Powers and duties generally.

> The Mayor shall have the general powers  and perform the duties as set forth in
> the charter and under the General Laws, or as may be prescribed by the provisions
> of this revision and other ordinances adopted by the city council.

The Massachusetts General Laws and the Revere Regulations recognize the Mayor of the
City of Revere as the "executive head and general directing authority" of the City,
including the police department. Mayor Ambrosino's position is similar to that of the
Mayor of New Bedford in Gonsalves. The Mayor in Gonsalves, "as the executive head
and general directing authority in control of the police department, had the power to
review whether these policies were being implemented and followed but did not exercise
this power." Id at 918.

 Mayor Ambrosino of the City of Revere had a Sexual Harassment Policy published
effective April 1, 1999. **[Exhibit W]**  It is clear from the facts stated earlier in the
memorandum that members of the Revere Police Department  were violating the

published policy. Below is a partial list of the provisions of the policy that were clearly being violated:

> I. Displaying sexual suggestive pictures, objects, cartoon or posters.**[See Paragraphs 62, 63, 64 of Plaintiff's Verified Complaint.]**
>
> M. Sexual epithets, jokes, written or oral references to sexual conduct, gossip regarding one's sex life; comments on an individual's body, comments about an individual's sexual activity, deficiencies or prowess. **[See Paragraphs 35, 36-47 of Plaintiffs Verified Complaint]**
>
> N. Language in another's presence or conduct even if not directed to daid individual-once it is known that she objects. **[See Paragraphs 52-64 and 70 -77 of Plaintiff's Verified complaint]**

Many of the violations identified above pertain to both Plaintiffs, however, it is clear that Mayor Ambrosino did not exercise his power in regard to either Plaintiff.  The Court in Gonsalves concluded that:

> The Mayor [of New Bedford] did not review whether investigations of alleged misconduct were being conducted thoroughly and impartially. Nor did the Mayor review whether Chief Benoit was reporting all violations to him.

This Court can draw the same conclusion about Mayor Ambrosino. He did not review whether investigations of alleged misconduct were being conducted thoroughly and impartially. Nor did he review whether Chief Reardon was reporting all violations to him. He specifically abdicated his responsibility for review and investigation to the "command staff" and "appropriate legal forum."   The "command staff" are his co-defendants in this case; they are the parties most likely to have violated the Policy. The Mayor's deliberate and intentional abdication of his statutory responsibilities create the "standard operating procedure" that rendered the municipality liable in Gonsalves.

Defendant, Thomas Ambrosino, in his Supplemental response (S.A.) to Interrogatory No:4 stated:

> I spoke with Captain Frederick Roland and other command staff, possibly Chief Colannino, to see if the complaints were being properly investigated. I also had spoken directly with Ms. Pechner-James and Ms. Fernandez, both in the presence of their attorney, James Dilday and independently, and told them that if the

command staff [of the Police Department] found no merit to their allegations they
would have to pursue their claims through the appropriate legal forum.

Mayor Ambrosino. in his supplemental answers concedes that like the Mayor in
<u>Gonsalves</u>, he did not :
> Review whether investigations of alleged misconduct were being conducted
> thoroughly and impartially. Id at 918.

The supplemental answer of the Mayor also confirms that Mayor Ambrosino, like the
Mayor in <u>Gonsalves</u> did not:
> Review whether [Chief Reardon] was reporting all violations of the Sexual
> Harassment Policy to him. Id at 918

The Mayor's supplemental answer also confirms that:
> It was the custom of the Revere City Council not to review matters
but to wait for a meeting in Executive Session with the Mayor and then take no action.
**[Exhibit T-Mayor Ambrosino's Further Supplemental answers to first Set of
Interrogatories.]**

The Chief of Police in his Supplemental Answers appears to have no mechanism for

investigation; he describes no method  for communicating the results of investigations to

the Mayor or the City Solicitor. Chief Reardon appears in his Supplemental Answers  to

have no mechanism for investigation of sexual harassment  and no mechanism for the

communication of the result of said investigations  to the Mayor or the Solicitor. The

Chief states in his Supplemental Answer to Interrogatory No: 21:

> I have no idea if any documents were provided to the Mayor, as opposed to the
> City Solicitor, and there would be no record of such in the ordinary course of
> business.

The Chief of Police in a Further S.A confirms:

> Further S.A. Further supplementing, I did not provide the Mayor with any
> documents concerning the Plaintiff's employment with the City of Revere.

The standard operating procedure of the Mayor and the City Council of Revere appears to

be the same as the standard operating procedure of the Mayor and the City Council of

New Bedford in <u>Gonsalves</u>.  Mayor Ambrosino of the City of Revere, by his own

admission, [**Exhibit T**] "did not review whether investigation of alleged misconduct were

being conducted thoroughly and impartially. Nor did [he] review whether Chief Reardon

was reporting all violations of duty to him. It was also the custom of the City Council not

15

to review these matters." Gonsalves at 918. As a result of this failure, the Plaintiff was disabled and Chief Reardon filed an Involuntary Retirement Application for the Plaintiff **[Exhibit I]** was unanimously approved by PERAC. **[Exhibit J]**

This Court can make the following findings:

1. The City of Revere, after April 1, 1999, had a Sexual Harassment Policy that required the Chief to cause thorough and impartial investigations to be conducted concerning alleged misconduct by employees of the Revere Police Department;

2. The City of Revere had a formal policy that required the Chief to report all violations of policy to the Mayor, who would decide whether disciplinary action should be taken, and if so, whether a hearing was required;

3. Mayor Ambrosino, as the executive head and general directing authority in control of the police department, had the power to review whether these policies were being implemented but did not exercise this power;

4. The City Council of the City of Revere had the power to investigate whether these policies were being properly implemented and followed. The Mayor and the City Council met in Executive Session but neither party chose to exercise their inherent powers. Gonsalves at 918.

The Supreme Judicial Court's holding of strict liability for employers in College Town, Div of Interco. Inc., v Massachusetts Commission Against Discrimination, 400 Mass 156, 508 N.E2d 587 (1987) is consistent with this Court's ruling in Gonsalves. The Mayor and the City Council are clearly the employers of the Chief of Police and the individual officers receive their letter of appointment from the Office of the Mayor. **[Exhibit B]** The Mayor and the City Council confer upon the Chief of Police his authority over the police department and its personnel. **Docket No: 97-Memorandum on Municipality**

## 2. The Plaintiff is entitled to summary judgment on all four counts of her complaint.

The Plaintiff used the identical Statement of Facts and relied on the same professional providers in both her administrative claims and her civil action. The administrative decision of PERAC **[Exhibit J]** established the issues of disability (personal) injury,

permanence, causation and loss of employment. The Plaintiff prepared and filed with this Court a brief that explored how res judicata and collateral estoppel apply to PERAC's administrative decision in federal court. The brief is entitled: Massachusetts Administrative Determinations In Federal Court: The Application of Res Judicata and Collateral Estoppel. **Docket No: 251.**  The legal issue that remains after the administrative decision is whether the findings of the administrative agency can also satisfy the requirements of the Plaintiff's causes of action.

The Plaintiff's first cause of action is: Hostile Work Environment/Sexual/Racial Harassment.  The Court, in <u>Brisette v Franklin County Sheriff's Office</u>, D. Mass. 2003, 235 F. Supp. 2d 63, stated that in weighing the evidence of hostile work environment the court must consider the environment as a whole. Acts of sexual harassment directed against others that were known to the Plaintiff, and the defendant's failure to discipline anyone for the acts or effectively to remedy them, may be considered part of the environment in which the Plaintiff worked.

The Plaintiff experienced in the Revere Police Department the stream of gender-based demeaning comments, attitudes and behavior that she described in her Verified Complaint. The Plaintiff's experience in the Revere Police Department is similar to the experiences of Brisette in the Franklin County Sheriff's Office. The comments made by Lieutenant Ford, Lieutenant Foster and the Chief Russo's interrogation of  the Plaintiff created an environment that caused the Plaintiff substantial emotional distress. The environment was so pervasive that it altered the terms and conditions of her employment so significantly that PERAC granted the Chief's request for the Plaintiff's Involuntary retirement in August 2004. See also <u>Manno v BJ's Wholesale Club</u>, D. Mass. 2001, 150 F. Supp.2d 325. The Plaintiff's involuntary disability retirement is an inmistakable alteration of the terms and conditions of her employment; she is entitled to summary judgment as a matter of law.

The second cause of action is Constructive Discharge. The leading case on Constructive Discharge is <u>Pennsylvania State Police v Suders</u>, 542 U.S. 129 (2004). The United States

Supreme Court held: To establish "constructive discharge" a plaintiff alleging sexual harassment must show that the abusive environment became so intolerable that her resignation qualified as a fitting response. The Plaintiff's Verified Complaint and her Affidavit attached hereto clearly demonstrate that the environment at the Revere Police department was so racially and sexually abusive that the Plaintiff requested a leave of absence. The Mayor extended the leave to September 30, 2001**.[Exhibit K].** The environment so disabled the Plaintiff that Chief Reardon filed an Involuntary Retirement Application for the Plaintiff and PERAC unanimously granted the Plaintiff disability retirement. **[Exhibit J].**

The Court in <u>Suders</u> provides the employer with an Ellerth/Faragher defense. That defense does not apply to these Defendants. The Plaintiff returned to the place of employment on October 1, 2001 but the Department did not return her to the essential duties of her job as described in **Exhibit H**. This action by the Department was a tangible job action; it was a demotion, not in pay but in duties; this action invalidates any Ellerth/Faragher defense that the Defendants may seek to assert. The Plaintiff was constructively discharged from her employment, the Defendants have no defense, the Plaintiff is entitled to summary judgment as a matter of law.

The Plaintiff's third count is Disparate Treatment. The Plaintiff states two bases for her claim of disparate treatment. The first is the Mayor's denial of her request for paid leave, the second is the Defendants' discrimination based on the Plaintiff's hearing disability. The Plaintiff requested paid leave because of her emotional injury. The Mayor denied her paid leave and gave her unpaid leave instead. He extended her unpaid leave. **[Exhibit K.]** The Mayor's decision, by the Defendants' own admission, was based on **[Exhibit U].** The document on which the Mayor relied is entitled: Atty Collins Treatise on the Chief's Guide to Injured on Duty. Chapter 2. This treatise recommends discrimination against psychiatric and emotional injuries; it recommends paid for physical injuries only.

The Mayor's position was in conflict with the current statute. The Massachusetts legislature in 1985 amended the definition of :"personal injury" that appears in M.G.L.c.

152 § 1(7A) to read in relevant part: "personal injuries shall include mental or emotional disabilities…". [M.G.L.c. 152 § 1(7A), as amended by St. 1985, c. 572 § 11, made effective January 1, 1986 by St. 1985 c. 572 § 68.] The Mayor's position was legally incorrect and he deprived the Plaintiff of the paid leave from March 15, 2001 to September 30, 2001.

The second basis for the Plaintiff's claim of disparate treatment is the Defendant's treatment of her hearing disability. The Plaintiff's hearing disability has been confirmed by Beth Israel Deaconess Medical Center. **[Exhibit D]** The Plaintiff is protected by the provisions of 42 U.S.C. § 12112 (a) and the Defendants had a duty pursuant to 42 U.S.C § 12112 b(5) to make reasonable accommodations for the Plaintiff. The Defendants "discriminate[d]" as the term is defined in 42 U.S.C. § 12112b(5)(A).  They did "not make reasonable accommodations to the known physical limitation" of the Plaintiff. The Defendants only response to the plaintiff's disability were taunts and hostile remarks from Lieutenant Foster. **[Attached Plaintiff's Affidavit paragraphs 30, 31, 32]**  The Plaintiff is entitled to summary judgment s a matter of law because the Defendants "discriminated" as defined by 42 U.S.C § 12112 (5)(A); the Plaintiff is also entitled to summary judgment as a matter of law because the Mayor deprived her of her paid leave in violation of M.G.L.c. 152 § 1(7A).

The fourth cause of action is Infliction of Emotional Distress.  The Restatement of Torts, 2d  describes this tort as follows: "An action in tort lies when a person's intentional conduct is considered so extreme that it causes another person severe emotional distress beyond that which a reasonable person would be expected to endure". Restatement 2nd Torts § 46.  The Plaintiff must show that the defendant intended to inflict emotional distress or that he knew, or should have known, that the Plaintiff's emotional distress would likely result. Agis v Howard Johnson Company, 371 Mass 140, 355 N.E.2d 315 (1976).

The actions of Lieutenant Ford, Lieutenant Foster and Chief Russo were intentional and clearly designed to cause the Plaintiff emotional distress. **Exhibits F & G** confirm that

the Plaintiff experienced severe emotional distress, required and received medication and therapy because of the hostile environment created by the Defendants. The Plaintiff is entitled to summary judgment as a matter of law. Lieutenant Foster knew or should have known that his repeated taunts about the Plaintiff's hearing would cause emotional distress; Lieutenant Ford knew or should have known that his repeated disparagement of Hispanic people would cause emotional distress; Chief Russo knew or should have known that the use of his position to accuse the Plaintiff of drug use and her family of criminal activity would cause severe emotional distress.

Conclusion:

The policymakers of the City of Revere, the Mayor and the City Council, are strictly liable to the Plaintiff for her personal (emotional) injury, her disability and her loss of employment. The Plaintiff experienced discrimination and hostility from supervisors upon whom the Mayor and the City Council had conferred authority. The holdings of College Town and Gonsalves to support summary judgment and strict liability for the policymakers. Docket No: 251 substantiates the Plaintiff's position that Massachusetts law precludes the Defendants from retrying the issues of disability, causation, permanence and loss of employment. The only issue that remained was whether the facts established administratively could meet the requirements of the four counts of the Plaintiff's complaint. This is a purely legal question, they can be resolved by the Court. Crain v Board of Comm'rs, 920 F2d 1302, 1405-06 (1990). See also Celotex v Catrett, 477 U.S. 317, 322-323 (1986); Anderson v Liberty Lobby, Inc. 477 U.S. 242, 249-250(1986). The answer to that question will prove that the Plaintiff is entitled to summary judgment as a matter of law.


Respectfully Submitted,

/s/James S. Dilday, Esq.
James S. Dilday, BBO# 124360
Dilday & Associates, LLC
27 School Street, Suite 400
Boston, MA 02108
(617) 227-3470

Dated: 1/23/08

**<u>Certificate of Service</u>**

I hereby certify that I have caused to be served a true copy of the foregoing document by electronic filing of same on the CM/ECF Filing System on this 23rd day of January, 2008.

<u>/s/ James S. Dilday</u>
James S. Dilday
