**Exhibit X- Plaintiff's Verified Complaint with Attachments**

**EXHIBIT 1- Plaintiff's Complaint with Attachments**

## COMMONWEALTH OF MASSACHUSETTS

Suffolk ,ss

Civil Action:  *03- 4685 G*

Terri Pechner-James
Sonia Fernandez

V

City of Revere, Thomas Ambrosino, Mayor
City of Revere, Police Department, Terrence Reardon, Chief
Bernard Foster, Salvatore Santoro, Roy Colannino, Frederick Roland,
Thomas Doherty, John Nelson, James Russo, Michael Murphy and Steven Ford

### VERIFIED COMPLAINT

#### PARTIES

Plaintiffs

A. The Plaintiff, Terri Pechner-James was at all relevant times and for all relevant purposes a Police Officer in the Revere Police Department and an employee of the City of Revere, Massachusetts.

B. The Plaintiff, Sonia Fernandez, is and for all relevant purposes remains an Police Officer in the Revere Police Department and an employee of the City of Revere, Massachusetts.

C. All parties to this action are subject to the jurisdiction of this Court.

Defendants

1. The Defendant, Thomas Ambrosino, is the Mayor of the City of Revere. The City of Revere was at all relevant times and for all relevant purposes the employer of the Plaintiffs; the Mayor and his predecessors were at all relevant times and for all relevant purposes supervisors of the Plaintiffs.

2. The Defendant, Terrence Reardon, is the Chief of the Revere Police Department He and his predecessors were at all relevant times and for all relevant purposes supervisors of the Plaintiffs.

3. The Defendants, Bernard Foster and Steven Ford , were at all relevant times a ranking officers (Lieutenants) in the Revere Police Department and a supervisors of the Plaintiffs.

4. The Defendant, Salvatore Santoro, was at all relevant times a ranking officer in the Revere Police Department and a supervisor of the Plaintiffs.

5. The Defendant, Roy Colannino, was at all relevant times a ranking officer in the Revere Police Department and a supervisor of the Plaintiffs.

6. The Defendant, Fredrick Roland, was at all relevant times a ranking officer in the Revere Police Department and supervisor of the Plaintiffs.

7. The Defendant, Thomas Doherty, was at all relevant times a ranking officer in the Revere Police Department and a supervisor of the Plaintiffs.

8. The Defendant, John Nelson, was at all relevant times a ranking officer in the Revere Police Department and a supervisor of the Plaintiffs.

9. The Defendant, James Russo, was a Chief of Police and at all relevant times a ranking officer in the Revere Police Department and a supervisor of the Plaintiffs.

10. The Defendant Michael Murphy, was at all relevant times a ranking officer in the Revere Police Department and a supervisor of the Plaintiffs.

### Satisfaction of Prerequisites
11. The Plaintiffs filed a complaint with the MCAD on or about March 12, 2001.    On or about February 28, 2003, the Plaintiffs served upon the Defendants a Notice of Claim pursuant to M.G.L.c. 258 § 4. The Plaintiffs have satisfied the prerequisites for filing this cause of action.

### Applicable Law:
12. Employers owe a duty to protect their employees from workplace harms including sexual harassment. The source of this duty is both the common law of agency which imposes obligations on employers, like the City of Revere, and the 1964 Civil Rights Act, which prohibits sexual harassment in employment. The duty is **nondelegable** because the duty is based on the special relationship between an employer and employee and because this special relationship is afforded statutory protection.   The Defendants willfully violated the statutory protections provided by M.G.L.c. 151B § 4;  M.G.L.c. 214 § 1; M.G.L.c. 12  § 11 *I* and the statutory protections provided by 42 U.S.C. § 2000 (e)-2 by discriminating against the Plaintiff with respect to compensation, terms, conditions, and privileges of employment. Such discrimination was based  on sex, race and national origin.  Plaintiffs have filed this cause of action pursuant to 42 U.S.C § 1983 and the General Laws of the Commonwealth of Massachusetts.

13. The Commonwealth of Massachusetts has stated the **nondelegable** nature of this duty,  emphasized its statutory protection and established the Commonwealth's policy of

strict liability for employer violation of these statutes in **College Town, Div. of Interco, Inc. v Massachusetts Commission Against Discrimination,** 508 N.E.2d 587, 400 Mass. 156 (1987) and several subsequent cases. Federal law has likewise established a policy of strict liability for similar violations of 42 U.S.C. § 2000 (e)-2. See **Burlington Indistries, Inc. v Ellerth,** 524 U.S. 742; **Faragher v City of Boca Raton**, 524 U.S. 775 (1990). See also **Suders v Easton** No. 01-3512 (April 16, 2003.) 3rd Circuit.)

**Background:**
14. Plaintiffs were sworn in as Revere Police Officers on September 21, 1995. They have held the title of patrol officer since that time. Plaintiffs were part of a group of seven female officers who were hired by the Revere Police Department at that time. Four of these officers have left the Department and three have filed complaints with the Massachusetts Commission Against Discrimination. Plaintiffs experienced a prolonged, severe, pervasive, hostile, and abusive work environment during their almost six years of employment. They also experienced discrimination based on their sex and race, in the case of Sonia Fernandez. They experienced intimidation, humiliation, and stigmatization. The conduct of the Defendants, all of whom were supervisors, posed formidable barriers to both Plaintiffs full participation in the workplace. These barriers were so formidable, the hostility of the work environment so prolonged, severe and pervasive that both Plaintiffs were diagnosed with Post Traumatic Stress Disorder and were constructively discharged from their employment. A Medical Panel of the Public Employee Retirement Administration Commission unanimously adjudicated, on July 28, 2003, that the Plaintiff, Terri Pechner-James, was emotionally disabled by Post Traumatic Stress Disorder and had been constructively discharged from her employment at the Revere Police Department A subsequent medical opinion, requested by the City of Revere, substantiated that Sonia Fernandez also suffers from Post Traumatic Stress Disorder and is incapable of returning to work at the Revere police Department.

15. The Defendants, City of Revere, and the Revere Police Department permitted the supervisors named in this complaint to create a hostile and intolerable work environment and to engage in racial and sexual discrimination and harassment toward the Plaintiffs, Terri Pechner-James and Sonia Fernandez. The Defendants are strictly liable to the Plaintiffs for damages because of the hostile environment they created and because they constructively discharged the Plaintiffs from their employment.

**FACTS: Terri Pechner-James**
The facts that give rise to the claim of Terri Pechner-James incorporate the paragraphs stated above and the events described below:

16. Plaintiff, Terri Pechner-James, was a competent police officer. She received several letters of commendation. She also received an Official Citation from the Massachusetts State Senate. The last day that the Plaintiff was able to work at the Revere Police Department was March 13, 2001.

### Lieutenant Bernard Foster

17. Lieutenant Foster was one of Plaintiff, Terri Pechner-James' supervisors. He was consistently hostile and punitive. He treated Plaintiff in a harsh and demeaning manner. He intentionally deprived her of full participation in the work of the Revere Police Department.

18. Lieutenant Foster routinely allowed male officers to watch television while working in the radio room. On or about July 5, 1997, he approached Plaintiff while she was working inside the radio room. He demanded that she turn off the television.

19. On or about August 24, 1997, Lieutenant Foster became extremely and inappropriately angry with the Plaintiff and screamed at her for several minutes. He called Plaintiff into the booking area and shut the door. He stated, "I have done a lot for you and you turn around and stab me in the back. I am putting you on walking route until further notice. I don't want to see your face inside this station and you are not to go inside the substation while on route. Do not bother to speak to me and you can disregard the invitation to my daughter's wedding."

20. Plaintiff asked Lieutenant Foster to tell her what she had done to offend him or how his reaction was related to her job performance. He did not respond. He stated: "I have nothing else to say to you. Go to your assignment and make sure you are there because I will be checking."

21. Lieutenant Foster's conduct clearly deprived the Plaintiff of her full participation in the work of the Revere Police Department. His decision was not based on the public interest. His order to the Plaintiff had no relationship to the bona fide occupational qualifications of the plaintiff or the requirements of the job. His conduct was personal not professional; it was demeaning and caused Plaintiff great emotional distress and made her physically ill.

22. On August 26, 1997, the Plaintiff was experiencing great emotional stress because of Lieutenant Foster's "punishment program" of excessive walking assignments and denial of opportunity to work, ride with and learn from experienced professionals. These kind of assignments are well-known within the Department as "punishment." She felt constantly humiliated, she became physically ill and was unable to perform her professional duties and was forced to leave work early.

23. During the next several weeks, Plaintiff tried to survive Lieutenant Foster's punishment program and perform her professional duties. Plaintiff survived by switching shifts with other officers and by taking her sick days in order to avoid Lieutenant Foster. She experienced headaches, sleeplessness, and loss of appetite. She was diagnosed with Irritable Bowel Syndrome.

24. Plaintiff attempted to seek a remedy from the clearly humiliating and hostile environment created by her supervisor, Lieutenant Foster. He learned of her efforts to seek assistance and redress and retaliated against her.

4

25. On or about September 2, 1997, Lieutenant Foster and Lieutenant Ford called Plaintiff into the guardroom of the Police Station. Lieutenant Foster asked the Plaintiff: "Who do you think you are jumping the chain of command and going to Captain Colannino?" Lieutenant Ford added: "Yes, and I can't stand your voice on the radio either." This statement was personal and not professional.

26. Lieutenant Foster also made several other humiliating remarks to the Plaintiff. He accused her of smoking marijuana during her vacation. Plaintiff confronted him and requested a drug test. Lieutenant Foster denied her request even though this was a serious allegation that could have caused her to lose her job. He also failed to otherwise substantiate this false and misleading allegation.

27. Captain Colannino, Foster's superior, failed to remedy Lieutenant Foster's punishment of the Plaintiff. Foster's punishment of the plaintiff was well known within the Department. It had become a department scandal. Lieutenant Foster's "punishment program" of excessive walking routes and menial assignments humiliated Plaintiff. Lieutenant Foster denied Plaintiff full participation in the work of the Revere Police Department.

28. Plaintiff's punishment continued through the end of September 1997, and beyond. On or about October 12, 1997, Plaintiff escaped Lieutenant Foster's "punishment" when she was transferred.

29. The transfer provided the Plaintiff with only temporary relief.

30. On or about August 4, 1999, the Plaintiff became sick on the job because of the stressful conditions created by Lieutenant Foster. She went to the City Nurse. Plaintiff continued to feel ill. She left ten minutes before the end of her shift. Lieutenant Foster called Plaintiff at home and ordered her back to the Station. When she arrived, he berated and demeaned her in the presence of the entire shift of mostly male officers.

31. On or about August 7, 1999, Lieutenant Foster made Plaintiff work inside as punishment. His decision was based on his anger at the Plaintiff and not on the bona fide qualifications of the Plaintiff or the public interest.

32. On or about August 12, 1999, several members of the Department approached Plaintiff and told her that Lieutenant Foster made the following statement in their presence: "Pechner is going to be assigned inside until further notice because she left early and that only certain people when assigned inside are going to be allowed to operate the radio."

33. On or about August 13, 1999, Plaintiff was working in the radio room. She experienced an act of disparate treatment. A male officer turned on the television. The Lieutenant on duty did not reprimand him or ask him to turn off the television. Lieutenant Foster had previously ordered the plaintiff not to watch the same television.

**Lieutenant Michael Murphy**

34. On or about June 26, 2001, Plaintiff asked Lieutenant Murphy for a vacation day so that she could spend a holiday with family. Lieutenant Murphy responded in a condescending and demeaning manner. He told Plaintiff that she should have been a secretary if she wanted to take off holidays.

**Lieutenant Salvatore Santoro**

35. Lieutenant Santoro played a pivotal role in creating the hostile environment experienced by Plaintiff and other female officers.

36. On or about December 11, 1998, Plaintiff was working the midnight to 8:00 a.m. shift. Plaintiff was assigned to the patrol car. During this period, the Department had arrested John Barker and Christopher Daley on outstanding warrants.

37. Lieutenant Santoro ordered the Plaintiff to return to the station. When Plaintiff arrived, Lieutenant Santoro ordered her to go to the cell block because someone wanted to talk to her.

38. Plaintiff went to the cell block. She saw John Barker who had just been arrested on an outstanding warrant. The plaintiff knew John Barker because they had attended school together. The Plaintiff talked to the prisoner.

39. During the conversation, John Barker told the Plaintiff that Lieutenant Santoro had asked him if he was having sex with the Plaintiff. The prisoner did not respond to Lieutenant Santoro.

40. The Plaintiff also learned that the other prisoner, Christopher Daley, overheard Lieutenant Santoro's remarks.

41. The Plaintiff, Terri Pechner-James, was emotionally devastated. She experienced his conduct as offensive and abusive. She became emotionally distraught and physically ill. This humiliating experience forced her to withdraw from her work environment. She went to the bathroom where she cried and became sick to her stomach. This remark by a supervisor was sexually and professionally inappropriate.

42. Plaintiff reported the incident to Captain Roland and Captain Chaulk. Lieutenant Santoro's conduct diminished the stature of the Plaintiff. It undermined her effectiveness. The rumor affected the prisoner to whom it was made. It affected the prisoner who overheard the remark. It affected members of the Revere Police Department who became aware of the rumor.

43. Lieutenant Santoro routinely subjected females in the Department to sexually offensive behavior. He made daily remarks about the length and size of his penis. He also made disparaging comments about the bodies of female officers in the Department.

44. On several occasions, Plaintiff and other female officers complained to Lieutenant Santoro about the sexually offensive remarks made by other male officers. Lieutenant Santoro did not take the complaint seriously and took no remedial action. His behavior contributed to the hostile work environment that the Plaintiff experienced.

45. On or about March 12, 2001, the Plaintiff was working the 4:00p.m. to 12:00a.m. shift. She was instructed to prepare warrants for the arrest of Christopher Daley. Shortly after Daley's arrest, he was placed in the cell block. He asked for a blanket. Plaintiff provided the blanket. She asked Daley if he remembered the conversation between John Barker and Lieutenant Santoro the last time he was at the station. The prisoner looked embarrassed and answered, "Yes." He then added that the Detective upstairs just asked him if he ever screwed the Plaintiff. The prisoner did not answer and then remarked: "What's up with this place, anyway? Why are these people so concerned with whom you have been with."

46. The incident confirmed the Plaintiff's earlier experience with Lieutenant Santoro. She returned to her post but she was emotionally disabled. She was too upset to perform her duties. She reported the incident to her supervisor. He authorized her to leave because she was physically, emotionally disabled, and unable to finish her shift.

47. Other ranking officers contributed to the climate of sexual innuendo and hostility that permeated the work environment in the Revere Police Department.

**Acting Chief Colannino and Captain Roland**
48. At all relevant times, Roy Colannino held the title of Captain and Acting Chief of Police of the Revere Police Department. Frederick Roland held the title of Captain in the Revere Police Department.

49. The Plaintiffs, Terri Pechner James and Sonia Fernandez, met with the mayor of the City of Revere. They met with Captain Roland. They complained that the prolonged, severe, pervasive, hostile, and abusive work environment had caused them injury. They requested leave of absence with pay. These Defendants offered the Plaintiffs leaves without pay. This decision constituted disparate treatment of Plaintiff. By this action, the Defendants constructively discharged the Plaintiffs.

50. The denial of leaves with pay was not an isolated act of disparate treatment. The Plaintiffs experienced for many years that these superior officers practiced a double standard on their dealings with the Plaintiffs and other female officers.

51. The Plaintiffs made their supervisors aware this environment posed a formidable barrier to their full participation in the work of the Revere Police Department. Their superiors officers took no remedial action. The response of these superior officers did

not discourage male officers and supervisory personnel from perpetuating a hostile and discriminating work environment. As a result of this failure of leadership, the Plaintiff experienced intimidation, humiliation, and stigmatization.

**Sergeant Thomas Doherty**

52. Other ranking officers practiced the double standard toward females that helped to create the hostile environment that the Plaintiff experienced. Sergeant Doherty was one of those ranking officers. The Plaintiff also knows from personal experience that Sergeant Doherty deliberately embarrassed female officers, screamed at them, made remarks about their abilities and conduct and did not treat them in the same manner he treated male officers.

53. Sergeant Doherty's double standard was well known as it pertains to the use of profanity. One officer at the January 7, 1999, meeting, reported that Sergeant Doherty was in the habit of saying: "Young lady, you will not use that kind of language in front of me. If you do, I will send you home. My wife and my daughter never use that kind of language and neither will you."

54. Sergeant Doherty did not make the same kind of remark, make the same kind of comparison with his son or father, or threaten male officers with dismissal for using profanity. The Plaintiffs and other female officers found Sergeant Doherty's double standard had a negative impact on the terms and conditions of their employment of the female officers.

55. On or about April 18, 1997, three female officers, Curcio, Fish, and Malatesta, colleagues of the Plaintiff, responded to a call regarding a loud group of male youths on Broadway and Revere. Some of the youths later came to the station to complain about Officer Curcio's use of profanity.

56. Sergeant summoned the three police officers who responded to the call. He then subjected them to a line-up. He paraded them past the front door of the office without explaining to them the purpose of the line-up. As each officer walked past the door, he would ask the youths: "Is that the one?" The youths finally identified Officer Curcio.

57. Sergeant Doherty then took Officer Curcio into the "Captain's Room." The youths were on the other side of the wall. They could hear everything that the Sergeant Doherty said to Officer Curcio. Sergeant Doherty did not speak to Officer Curcio in a normal tone of voice. The youths on the other side of the wall could hear everything he said.

58. Sergeant Doherty berated all three females within hearing distance of the youths. His attack on these three females in this manner constituted a form of public humiliation. This attack severely undermined these officers and their ability to deal effectively with the public. It destroyed any confidence or respect these youths may have had in these officers. The Plaintiffs know of no occasion in which Sergeant Doherty treated male officers in a similar manner for similar conduct.

59. At the time of the Super Bowl in 1998, Sergeant Doherty made several sexually offensive remarks in a loud and distinctly hostile manner. There was a female sports commentator who was involved in the game.

60. Sergeant Doherty made the following remarks about the commentator and the game. He said: "She was no fucking good and women should not be allowed to comment on sports events and this bitch probably gave sex or a blow job to someone for the job. Anyway, she was probably related to someone and that's how she got the job. There were several female officers present during Sergeant Doherty's tirade against the female sports commentator.

61. Sergeant Doherty's comments were loud, demeaning, deeply offensive, and humiliating to the female officers in the Department, including Plaintiff. Sergeant Doherty's loud, public, and unequivocal degradation of the female sports commentator reflected a misogynistic opinion of female professional abilities in general. As a superior officer of the Revere Police Department, Sergeant Doherty's negative opinion of female professional abilities, including the professional abilities of the Plaintiffs, heightened the hostility, humiliation, and degradation that permeated the workplace environment.

### Sergeant John Nelson
62. Sergeant John Nelson, another ranking officer and supervisor in the Revere Police Department also contributed to the pervasiveness of the hostile environment that the Plaintiff experienced.

63. On one occasion, Office Malatesta female was at the window talking to a member of the public. While she was talking, Sergeant Nelson held up a magazine centerfold of a naked woman and made loud comments about her breasts and crotch area. Sergeant Nelson's conduct was demeaning and humiliating, not just to Officer Malatesta, but to the other females of the Revere Police Department.

64. Sergeant Nelson's lewd and offensive conduct constituted a form of public humiliation and stigmatization. This kind of public humiliation stigmatized female police officers. It had a negative effect on the terms and conditions of their employment. It affected their effectiveness with the public and their status within the Department.

### Chief James Russo
65. Chief Russo's treatment of female officers gave permission to his male subordinates to treat female officers in a demeaning and humiliating manner. His comments and conduct stigmatized female officers, including the Plaintiff. His demeanor created the impression that female officers, including the Plaintiff, were less than capable, competent, members of the Department.

66. The Citizens Police Academy is a public relations forum in which the Chief and other ranking officers introduce subordinate officers to the general public. On or about February 23, 1997, Chief Russo held such a forum. The audience included several

9

officer and members of the public. Part of the program required that the Chief introduce Sergeant Papasodora and Officer Mangino-female-to the audience.

67. The Chief spoke at great length in praise of Sergeant Papasodora. He appeared to forget Officer Mangino. When he was made aware of the situation, he remarked that Officer Mangino and O'Hara were the first females he hired. He then continued: "These are not the good old days when we didn't have to hire females." This comment stigmatized the female officers. It clearly implied that female officers were not at welcome as male officers.

68. The Plaintiff and other female officers present experienced the Chief's remarks as demeaning and offensive. There were members of the public present at this meeting. They heard the remarks made by the Chief. The Chief's remarks and behavior did not communicate the same enthusiasm and support for the female officers' employment as it did for male officers' employment.

69. The Chief is the highest ranking officer in the Department. On one occasion, he saw four (4) female officers behind the station engaged in conversation. He walked by and commented: "What is this, a WIC meeting?" The obvious reference to the program for pregnant welfare mothers was not lost on the officers. This comment stigmatized the officers. It portrayed them, not as the competent, able police officers they were, but as females on welfare receiving public assistance.

### The Report & Underwear Incident

70. On or about January 7, 1999, the female officers, in response to their experiences in this hostile environment, requested a Department meeting. The subject of the meeting was sexual harassment, the Department policy on harassment, working conditions, and Department maternity policy. At the time the Department had no policy on sexual harassment or maternity leave and was in violation of M.G.L.c 151 § 3(a)(1)(2).

71. On or about January 14, 1999, Captain Chaulk and Captain Roland produced a report of the meeting. **(See Attached Department Report)** The report substantiated that the female officers were experiencing an environment of intimidation. It stated among other things that the female officers wanted a collective meeting because of the fear of reprisal and punishment from superior officers. The report also noted that the Department had taken no action to remedy the conditions that they had found abusive and offensive. The Report documented a fear of reprisal and punishment.

72. Despite the meeting on January 7, 1999 and the report and recommendations of January 14, 1999, the Revere Police Department took no action. It failed to remedy the hostile environment about which the female officers had complained.

73. The environment seemed to become more hostile as a result of the meeting and the subsequent report. The Plaintiffs and other females in the Department began to fear for their physical safety after an automobile assigned to females was vandalized in the parking lot that belonged to the local International House of Pancakes.

74. On or about February 26, 2001, a pair of women's underwear was hung on the bulletin board in the guard room of the Revere Police Department. **(See Attached Fist Report)** This room is accessible to members of the Department as well as the general public. The underwear was placed in prominent position where it was visible to both the general public and the members of the Department.

75. The underwear remained on display until March 2, 2001. No one, including the ranking officer in charge, removed the offending article for several days. **(See Attached Second Report)** This incident was consistent with the culture of degradation, humiliation, and hostility that the Plaintiffs and other females experienced during the period the were employed by the Revere Police Department.

76. The Revere Police Department did not respond promptly. It did not investigate. It took no remedial action. It had no policy for dealing with complaints for sexual harassment. It had no maternity leave policy.

77. The Plaintiffs experienced the "underwear incident" as retaliation against them and the females who complained. Retaliation creates fear. The Plaintiffs and other female officers found the incident offensive, demeaning and intimidating. It constituted a form of public humiliation that had a negative impact on the terms and conditions of the female officers and their effectiveness with the public.

78. The Plaintiff, Terri Pechner-James, was diagnosed with Post-Traumatic Stress Disorder. The Division of Administrative Law Appeals made a final adjudication and recommended consideration of her condition to a Medical Panel. The Regional Medical Panel of the Public Employee Retirement Administration Commission on July 28, 2003, unanimously confirmed this diagnosis. **(See Attached Medical Panel Decision).** She has been unable to work at the Revere Police Department since March 13, 2001. At the time of her constructive discharge in 2001, the Plaintiff was earning approximately $40,000 annually. She filed a request for benefits. Despite the diagnosis, Mayor Ambrosino denied Plaintiff's request for benefits pursuant to M.G.L.c 41 § 111F. Again in 2003, despite the unanimous decision of the Medical Panel on July 28, 2003, the City of Revere and its Retirement Board has continued to deny the Plaintiff, Terri Pechner-James, her disability retirement benefits. The Plaintiff has been unpaid since March 13, 2001.

79. The barriers created by the Defendants were so formidable that the Plaintiff, Terri Pechner-James, has been unable to work at the Revere Police Department since March 13, 2001. On March 12, 2001, the Plaintiff filed the requisite Complaint with the Massachusetts Commission Against Discrimination.

**Facts: Sonia Fernandez**
The facts that give rise to the claim of Sonia Fernandez incorporate the paragraphs stated above and events described in detail below:

80. Plaintiff, Sonia Fernandez, was sworn in as a Revere Police Officer on September 21, 1995. Plaintiff was one of seven female officers who were also hired at the same time. She has taken several courses and has improved her professional competence during her tenure.

81. During the years of her employment, Plaintiff experienced intimidation, humiliation, and stigmatization. The conduct of the Defendants posed a formidable barrier to the Plaintiff's full participation in the workplace.

82. The Defendants, City of Revere, Revere Police Department, and the supervisors and ranking officers created a hostile environment. The Defendants are strictly liable for the damage they caused the Plaintiff and for the Plaintiff's constructive discharge from her employment.

83. On or about May 1996, Captain Roland called Plaintiff at home and asked her to respond to the Shirley Avenue area. Plaintiff responded. The call involved a homicide. The Captain instructed Plaintiff not to wear her Police uniform or carry a firearm. He told her he only needed her to translate. Plaintiff arrived at the scene dressed in a baseball cap and wearing jeans. One of the Revere Police officers looked at her and asked her if she was working as an undercover hooker that night. Plaintiff was humiliated. Her supervisor had devalued her professional skills and abilities. Other officers at the scene commented on her diminished status.

84. On many occasions during 1996 and 1997, Lieutenant Ford routinely made personal and hostile comments about Plaintiff's physical appearance, hair, and weight. In addition to personal attacks, Plaintiff experienced hardship and stress because of the working conditions at the Revere Police Station. OSHA filed a formal report about the poor working conditions at the Revere Police Department. The report documented, among other things, the lack of a bathroom for females.

85. The Plaintiff experienced repeated emotional trauma as a result of her working environment. On June 24, 1997, Plaintiff went to the hospital. She was experiencing loss of appetite, sleeplessness, and crying spells. The hospital recommended she be excused from work for the next four days. Again, on or about November 11, 1997, the Plaintiff went to the hospital suffering from work-related stress. The hospital prescribed Valium and recommended counseling.

86. The Plaintiff is currently being counseled by the North Suffolk Counseling Services of Chelsea, Massachusetts. She is currently being treated for Post Traumatic Stress Disorder and Panic Disorder. She is also physically disabled and is unable to "perform the essential tasks of a Police Officer without posing a risk to herself, her fellow officers and/or the public at large." **(See Sonia Fernandez Medical Package including Medical Opinion addressed to Chief Reardon.)**

87. In the winter of 1997, the Plaintiff was placed on "walking routes more frequently than male members of the Department. On or about December 15, 1997, Captain Chaulk

assigned Plaintiff to a walking route at the Northgate Shopping Center. The Captain then sat in an unmarked cruiser to monitor Plaintiff's activities. On one occasion, that winter, the Captain ordered Plaintiff out of a cruiser and placed her on walking route without work related justification. The Plaintiff found the walking route "punishment" very upsetting. She repeatedly retreated to the ladies locker room to compose herself because of the physical and emotional strain of the job.

88. As a direct and proximate cause of the Defendant's conduct the Plaintiff was forced to withdraw from the Revere police Department. Prior to her withdrawal, she requested a leave of absence with pay. The Defendants offered the Plaintiff leave without pay. This decision constituted disparate treatment of Plaintiff. The Defendants constructively discharged the Plaintiff. Even though the Plaintiff returned to work temporarily, she was unable to return to her usual work in an environment free from sexual hostility.

89. On or about January 7, 1999, Plaintiff attended a meeting at the Revere Beachmont substation. The female patrol division requested the meeting. The purpose of the meeting was to discuss sexual harassment and the distress caused by such harassment within the Department.

90. Plaintiff, Sonia Fernandez, experienced with great distress the conduct of her supervisors and coworkers referring to Hispanics as "Spics" and African-Americans as "Niggers". The Defendant's attitude was clearly demonstrated by the following incident. In common circulation within the Revere Police Department, was a booking photograph of an African-American. The photograph had been altered to include a grass skirt, spear, flies emanating from his head and other offensive and stereotypical features.(**See Attached Booking Photograph.**) The Plaintiff experience stress, fatigue, loss of appetite and sleeplessness as a direct result of this of this offensive and discriminatory environment.

91. At the time of the meeting, the Department had no policy on sexual harassment, no maternity leave policy, and was in violation of M.G.L.c. 151B § 3(a)(1). On or about January 14, 1999, Captain Chaulk and Captain Roland produced a report of the meeting requested by the female patrol division. (**See Attached Department Reports**)

92. The report substantiated that the female officers were experiencing an environment of intimidation. It stated, among other things, that the female officers wanted a collective meeting because of the fear of reprisal and punishment from supervisors. The report also noted that the Department had taken no action to remedy the conditions that they found abusive and offensive. The Report documented a fear of reprisal and punishment.

93. Despite the meeting on January 7, 1999, the Revere Police Department took no action to remedy the hostile environment. On the contrary, the environment seemed to become more hostile. The Plaintiff and the other females in the Department began to fear for the physical safety after a cruiser assigned to females was vandalized in the parking lot belonging to a local International House of Pancakes.

94. On or about February 26, 2001, the Plaintiff saw a pair of women's underwear on the bulletin board in the guard room of the Revere Police Department. The room is accessible to members of the Department and the general public.

95. The Plaintiff saw the underwear on display until March 2, 2001. No ranking officer removed the offending article for several days. This incident and the conduct of the supervisors were consistent with the culture of degradation, humiliation and hostility that the Plaintiff was experiencing.

96. The "underwear incident" appeared to be an escalation of a 1998 incident when Plaintiff and other female officers observed a penis drawn on the chalk board located by the radio communication room.

97. The Plaintiff and the other females found these incidents offensive, demeaning, and intimidating. The hostile environment created a formidable barrier to the Plaintiff's full participation in the work of the Revere Police Department.

98. The Plaintiff's supervisor, Lieutenant Ford, made derogatory remarks about Plaintiff's race and national origin. On or about November 1998, Lieutenant Ford asked Plaintiff, in front of Officer Burke, "What are you? Spanish, Mexican, Cuban, you're all alike, a bunch of cockroaches." Plaintiff did not respond.

99. On or about July 1, 2000, the Plaintiff was present at a roll call. The officer in charge mentioned that several of the people arrested were from the City of Chelsea. Lieutenant Ford commented: "The sewage people." On or about October 12, 2000, Plaintiff filed a formal complaint against Lieutenant Ford based on his harassment of her.

100. On or about February 28, 2000, Lieutenant Foster walked into the radio room and angrily told Plaintiff to pick up her hair. He remarked "What do you think, you're special?" Plaintiff replied that her hair was up. Lieutenant Foster responded that Plaintiff should get it off her shoulders or get it cut. Plaintiff was hurt and humiliated by this remark because Lieutenant Foster did not make the same demand of white female officers. Lieutenant Foster made this remark in front of other male officers. The Plaintiff's hairstyle is not a bona fide personnel decision for Lieutenant Foster.

101. On or about February 29, 2000, Lieutenant Foster handed Plaintiff the schedule for March 2000. Plaintiff noticed that she was not scheduled to work the radio for the entire month of March. Lieutenant Foster did not assign the plaintiff to work the radio for two additional months. His decisions deprived the Plaintiff of valuable and necessary professional experience. They posed a formidable barrier to Plaintiff's full participation in the work of the Revere Police Department and were not bona fide personnel decisions.

102. Plaintiff has a hearing impairment. This impairment was known at the beginning of Plaintiff's employment. Lieutenant Foster routinely made disparaging remarks and mocking sign language gestures instead of providing reasonable accommodation to the

Plaintiff's disability. On or about March 1, 2001, the Plaintiff and other officers heard
Lieutenant Foster say to Plaintiff, "Why don't you put the phone in your good ear."

103. This was not the only occasion on which Lieutenant Foster made such a remark.
On or about January 23, 2001, Lieutenant Foster accused Plaintiff of not paying attention
and stated, "Why don't you turn up those hearing aides?" Disrespectful treatment was
practiced by the male officers and the supervisors took no remedial action. On or about
December 7, 2001, Plaintiff was assigned to dispatch. Officer Crevoiserat yelled at the
Plaintiff in an unprofessional manner using the Department's radio. His behavior was
overheard by several local merchants and members of the general public who were
listening on the scanner. On or about December 16, 2001, Maria Rizzo, a local business
owner thought Crevoiserat treated Plaintiff, Sonia Fernandez, in an unprofessional
manner. The owner of Lake's Towing Company also heard the exchange and was
scandalized by Crevoiserat's behavior. Sergeant Picardi was working a paid detail at the
time, he also heard the exchanges. He told the Plaintiff that Crevoiserat's behavior was a
disgrace and inquired whether and remedial action had been taken. No remedial action
was taken.

104. The Plaintiffs, Terri Pechner-James and Sonia Fernandez were attending the Police
Academy in 1995. On one occasion, Chief Russo called Plaintiff, Sonia Fernandez, into
his office and confronted her about an anonymous letter he received. The letter alleged
that the Plaintiff was suicidal, was on drugs, and that her family was known to the police.
The Plaintiff was intimidated by this meeting. The Chief increased Plaintiff's fear when
he asked to record their conversation. The Plaintiff reluctantly agreed because she was
afraid that she would not be allowed to finish her training and would lose the position that
she fought so hard to achieve.

105. The barriers created by the Defendants were so formidable that the Plaintiffs went
to see Mayor Thomas Ambrosino. The Plaintiff, Sonia Fernandez, also requested the paid
leave normally given to male officers injured on the job. The Mayor offered the Plaintiff
only an unpaid leave of absence. Three female officers, including the Plaintiff. Sonia
Fernandez, filed complaints with the MCAD based on facts arising out of the hostile
environment that existed in the Revere Police Department. The Plaintiff subsequently
returned to work but has been unable to work in the environment of the Revere Police
Department.

106. The Plaintiffs, Terri Pechner-James and Sonia Fernandez, suffered sexual
harassment and a hostile work environment as defined by M.G.L.c. 151B § 4 and were
deprived of full participation in the work of the Revere Police Department by the
Defendants acting in their supervisory capacities. The Plaintiffs suffered sexual
harassment and a hostile work environment, discrimination based on race and sex as
defined in M.G.L.c. 151B § 4 and were deprived of full participation in the work of the
Revere Police Department because of the actions of the Defendants. The Defendants,
because of their supervisory capacity, are strictly liable under Massachusetts and
Federal statutes for the injuries of both Plaintiffs, their lost wages and other damages.

107. The Plaintiffs, Terri Pechner-James and Sonia Fernandez, suffered intentional infliction of emotional distress and incurred medical and other expenses as a result. The Plaintiffs also suffered negligent infliction of emotional distress as demonstrated by physical manifestations and incurred and will continue to incur medical expenses. The Plaintiffs suffered intentional deprivation of employee benefits, were constructively discharged from her employment, suffered loss of income and benefits, and incurred medical and other expenses.

### Terri Pechner-James-Causes of Action

### COUNT 1-Hostile Work Environment/Sexual Harassment

The Plaintiff, Terri Pechner-James, restates and realleges paragraphs 12 through 79 and paragraphs 104 through 107 as though fully stated herein.

108. The Defendant, City of Revere, was the Plaintiff's employer. The other Defendants were all ranking officers of the Revere Police Department and supervisors of the Plaintiff, Terri Pechner-James.

109. Together, they created a hostile work environment, sexually harassed the Plaintiff and caused the Plaintiff to become emotionally disabled. Lieutenant Bernard Foster's punishment program, Lieutenant Michael Murphy's condescending and demeaning manner, Lieutenant Salvatore Santoro's loutish behavior and his devastating accusations that the Plaintiff had sexual relations with prisoners, Acting Chief Roy Colannino and Captain Frederick Roland's discriminatory actions, Sergeant Thomas Doherty's double standard coupled with his loud and public misogynistic commentaries, Sergeant John Nelson's use of pornographic materials, Chief Russo's demeaning and humiliating public comments and behavior all combine to create an environment in which women's underwear can be placed on the public bulletin board and remain there for several days.

110. This hostile work environment and the sexual harassment that the Plaintiff experienced caused her to seek medical and hospital attention on more than 50 separate occasions. The Division of Administrative Law Appeals made a final adjudication and recommended consideration by a Medical Panel. The Medical Panel of the Public Employee Retirement Administration Commission unanimously adjudicated the Plaintiff's emotional disability on July 28, 2003. **(See Exhibits A & B.)** The Medical Panel gave great weight to the physical injury, the hospital visits, the medical treatment and psychological traumas documented in the file she presented to them.

111. The Commonwealth of Massachusetts has recognized that employers, like the City of Revere, owe a duty to protect their employees from workplace harms, including sexual harassment. This is a nondelegable duty. The Defendants, City of Revere and its Police Department, breached their nondelegable duty to this Plaintiff. They violated the statutory protections and the **strict liability** policy established by the Commonwealth in **College Town, Div. of Interco, Inc. v Massachusetts Commission Against**

**Discrimination,** 508 N.E.2d 587, 400 Mass. 156 (1987), and established by Federal law.
See **Burlington Indistries, Inc. v Ellerth,** 524 U.S. 742; **Faragher v City of Boca
Raton**, 524 U.S. 775 (1990). See also **Suders v Easton** No. 01-3512 (April 16, 2003.) 3rd
Circuit

112. The Defendants are **strictly liable,** individually and severally, to the Plaintiff, Terri
Pechner-James pursuant to M.G.L.c. 151B § 4(1) because they violated the
Commonwealth's **strict liability policy** against hostile work environment/sexual
harassment and similar protections provided by Federal law as stated in 42 U.S.C §
2000(e)-2.

WHEREFORE, this Plaintiff seeks $5 Million Dollars in damages for having endured
more than seven (7) years of prolonged, severe, pervasive, hostile and abusive work
environment and the intimidation, humiliation, stigmatization experienced during this
period plus compensatory damages, medical and professional expenses, attorneys fees
and costs and other damages incurred as a consequence of Defendants violation of the
Commonwealth's policy of **strict liability**.

### COUNT II-Constructive Discharge

The Plaintiff, Terri Pechner-James, restates and realleges paragraphs 12 through 79 and
paragraphs 104 through 107 as though fully stated herein.

113. The Defendants were all ranking officers of the Revere Police Department and
supervisors of the Plaintiff. They created a hostile work environment, sexually harassed
the Plaintiff and constructively discharged the Plaintiff in violation of M.G.L.c. 151 §
4(1). and 42 U.S.C. § 2000(e)-2. The conditions that the Defendants created were so
intolerable that they altered the terms, conditions, and privileges of her employment.
Lieutenant Salvatore Santoro's hostile behavior and his devastating accusations that the
Plaintiff had sexual relations with prisoners, Acting Chief Roy Colannino and Captain
Frederick Roland's discriminatory actions, Sergeant Thomas Doherty's double standard
coupled with his loud and public misogynistic commentaries, Sergeant John Nelson's use
of pornographic materials are among the many conditions that made the Plaintiff's work
conditions intolerable. The last day the Plaintiff was able to work at the Revere Police
Department was March 13, 2001.

114. The Defendants, as a result of their hostility and harassment, caused the Plaintiff to
suffer emotional disability. On July 28, 2003, the Medical Panel of the Public Employee
Retirement Administration Commission held that the Plaintiff was emotionally disabled
from working as a public officer in the Revere Police Department. **(See Exhibits A&B)**

115. The Defendants are **strictly liable,** individually and severally, for damages to the
Plaintiff, Terri Pechner-James resulting from their constructive discharge of Plaintiff in
violation of M.G.L.c. 151B § 4(1) & (1)(C) and 42 U.S.C. § 2000(e)-2.

WHEREFORE, the Plaintiff seeks $150,000 in lost wages, $1, 500,000 in future wages and benefits, plus medical and professional expenses and attorneys fees and costs.

## COUNT III-Disparate Treatment

The Plaintiff, Terri Pechner-James, restates and realleges paragraphs 12 through 79 and paragraphs 104 through 107 as though fully stated herein.

116. The Plaintiff, Terri Pechner-James, met with the Mayor, the Chief of Police and Captain Roland and along with other female officers , complained that the prolonged, severe, pervasive, hostile and abusive work environment had cause her injury. This Plaintiff offered medical evidence of her condition and requested the same leave with pay as is done for male employees.

117. The Defendants denied the Plaintiff's request, despite a letter from Plaintiff's counsel advising the Defendants that this decision was an act of disparate treatment. The Defendants offered the Plaintiff leave without pay. The Plaintiff's position has since been vindicated. Her emotional disability has since been adjudicated by two of the Commonwealth's administrative agencies. **(See Exhibits A & B.)**

118. The Defendants discriminated against the Plaintiff, and their actions constituted a bar to the Plaintiff. They barred the Plaintiff from full participation in the compensation, the terms, the conditions and the privileges of employment in violation of M. G. L. c. 151B §1 & (1)( C) and 42 U.S.C § 2000(e)-2.

119. Despite the adjudication of both the Division of Administrative Appeals and the unanimous decision of the Medical Panel of the Public Employees Retirement Administration Commission, the Defendants continue to deny the Plaintiff her disability retirement benefits, her lost wages and other privileges of her employment and continues to treat the Plaintiff in a manner different that other disability retirement cases.

WHEREFORE, the Plaintiff seeks $ 1 Million Dollars in damages for Discrimination and $5 Million Dollars for Defendants continuing violation of M.G. L. c. 151B § 4 and 42 U.S.C. § 2000 (e)-2 in defiance of State administrative decisions. Plaintiff also seeks medical costs, attorneys fees and costs and punitive damages.

## COUNT IV- Infliction of Emotional Distress

The Plaintiff, Terri Pechner-James, restates and realleges paragraphs 12 through 79 and paragraphs 104 through 107 as though fully stated herein.

120. The Defendants have by their acts and failures enumerated herein caused severe emotional distress to the Plaintiff. The Defendants intended to inflict or knew or should have known that emotional distress was the likely result of Sergeant Doherty's misogynistic outburst while watching a football game, Sergeant Nelson's use of

pornography, and Lieutenant Santoro's blatantly offensive behavior and the common use of sexually offensive language.

121. The City of Revere, its Mayor and its Police Chief and its Retirement Board have continued the pervasive pattern of hostility that injured the Plaintiff. Despite the adjudication of the Department of Administrative Appeals and the unanimous decision of the Medical Panel of the Public Employee Retirement Administration Commission, the Defendants have refused to send the Plaintiff the notices required by law and they have failed to act in accordance with agency directives or otherwise discharge their duty to this Plaintiff.

122. Defendants conduct was extreme and outrageous. It shocks the conscience and violates the law. It was, and continues to be, beyond all possible bounds of human decency and utterly intolerable in a civilized community. Their present conduct displays the same callous disregard for the Plaintiff's emotional, physical and financial welfare that they began more than seven (7) years ago. By their conduct, the Defendants have intimidated, threatened and coerced the Plaintiff, caused her to develop Irritable Bowel Syndrome and other physical ailments relied upon by the Medical Panel. The emotional distress sustained by the Plaintiff was severe and of a nature that no reasonable person could be expected to endure.

WHEREFORE, the Plaintiff, Terri Pechner-James, seeks $2.5 Million Dollars for the emotional distress, the intimidation, the humiliation and the physical pain she has endured as a direct result of the Defendants conduct, both past and present and their continuing violations of M.G.L.c. 151B § 4A and 42 U.S.C. § 2000(e)-2. Plaintiff also seeks to recover miscellaneous expenses and damages that continue to accrue, punitive damages and any other remedy deemed just and proper by a Court sitting with or without a jury.

### Sonia Fernandez-Causes of Action

### COUNT 1-Hostile Work Environment/Sexual/Racial Harassment

The Plaintiff, Sonia Fernandez, restates and realleges paragraphs 48 through 51 and paragraphs 80 through 107 as though fully stated herein.

123. The Defendant, City of Revere and its Police Department were the Plaintiff's employer. The other Defendants were all employees of the City of Revere and ranking officers of the Revere Police Department and supervisors of the Plaintiff, Sonia Fernandez.

124. Together, they created a hostile work environment, sexually and racially harassed the Plaintiff and caused the Plaintiff to become emotionally disabled. The Plaintiff's emotional disability has been documented by her physician. The Defendants created a work environment in which Plaintiff's superior, Lieutenant Steven Ford, could make derogatory remarks about the Plaintiff's race and national origin with impunity.

125. On or about November 1998, Lieutenant Ford asked the Plaintiff, in the presence of another officer, "What are you? Spanish, Mexican, Cuban? You're all alike a bunch of cockroaches." On another occasion, he referred to people from Chelsea, Plaintiff's home town, as "sewerage people." This racially offensive and derogatory remark was not an isolated incident. Members of the Police Department routinely used the word "Spics" to describe Hispanics and "Niggers" to describe African-Americans.

126. **Exhibit G-Booking Photo** clearly demonstrates the racial climate and the culture of racial intolerance within the Revere Police Department. Exhibit G is an unflattering, racially offensive caricature of an African-American male. His booking photo has been altered to include a grass skirt, a spear, and flies emanating from his head. This caricature was widely disseminated within the Revere Police Department.

127. Defendant Lieutenant Bernard Foster, also subjected the Plaintiff to his "punishment program" which involved activities and assignments not related to the bona fide occupational qualifications of the Plaintiff. In addition, the Plaintiff has a hearing impediment. She was, however, capable of performing and she performed the essential functions of her position. Lieutenant Foster repeatedly mocked the Plaintiff's disability and imitated sign language gestures when communicating with Plaintiff. His conducted clearly violated M.G.L.c. 151B § 16.

128. The Plaintiff's worked in the same misogynistic environment as the CoPlaintiff. She experienced the same pornography, the blatantly offensive remarks and conduct directed at the females who worked in the Revere Police Department. In recent months, the Plaintiff became disabled, the Defendant, Revere Police Department ordered her back to work before she was physically able and before she had received medical authorization to return.

129. The Plaintiff has a peptic ulcer which has been aggravated by the stress created by the hostile work environment. She has received a diagnosis of Post Traumatic Stress Disorder and she continues to recover from her physical injury. She has received medical confirmation of her diagnosis and other supporting medical evidence is contained in her medical file which is attached as **Exhibit G.**

130. The Defendants are **strictly liable**, individually and severally, to the Plaintiff, Sonia Fernandez, pursuant to M.G.L.c. 151B § 4(1) because they violated the Commonwealth's **strict liability policy** against hostile work environment/sexual and racial harassment and Federal law as stated in 42 U.S.C. § 2000 (e)-2.

WHEREFORE, this Plaintiff seeks $5 Million Dollars in damages for having endured more than seven (7) years of prolonged, severe, pervasive, hostile and abusive work environment and the intimidation, humiliation, stigmatization experienced during this period plus compensatory damages, medical and professional expenses, attorneys fees and costs and other damages incurred as a consequence of Defendants violation of both State and Federal policies of **strict liability**.

## COUNT II-Constructive Discharge

The Plaintiff, Sonia Fernandez, restates and realleges paragraphs 48 through 51 and paragraphs 80 through 107 as though fully stated herein.

131. The Defendant, City of Revere, was the employer of the Plaintiff. The other Defendants were all ranking officers of the Revere Police Department and supervisors of the Plaintiff. They created a hostile work environment, sexually and racially harassed the Plaintiff and constructively discharged the Plaintiff in violation of M.G.L.c. 151 § 4(1) and 42 U.S.C. § 2000 (e)-2.  The conditions that the Defendants created were so intolerable that they altered the terms, conditions, and privileges of her employment. Lieutenant Salvatore Santoro's hostile behavior and his devastating accusations that the Plaintiff had sexual relations with prisoners, Acting Chief Roy Colannino and Captain Frederick Roland's discriminatory actions, Sergeant Thomas Doherty's double standard coupled with his loud and public misogynistic commentaries, Sergeant John Nelson's use of pornographic materials, the use of racial slurs and racial caricatures are among the many conditions that made the Plaintiff's work conditions intolerable.  In addition, the Plaintiff was required to return to work while she was medically and physically unable to do so.

132. The Defendants, as a result of their hostility and harassment, caused the Plaintiff to suffer emotional disability. Her condition was confirmed by the medical report included in **Exhibit G.**  The  medical report, requested by the City of Revere, confirms that the Plaintiff is incapable of working, as a police officer, in the Revere Police Department. The Defendants have constructively discharged the plaintiff from her employment with the Revere Police Department.

133.  The Defendants are **strictly liable**, individually and severally,  for damages to the Plaintiff,  Sonia Fernandez,  resulting from their constructive discharge of Plaintiff in violation of M.G.L.c. 151B § 4(1) & (1)(C) and 42 U.S.C. § 2000 (e)-2.

WHEREFORE, the Plaintiff seeks $150,000 in lost wages,  $1, 500,000 in future wages and benefits,  plus medical and professional expenses and attorneys fees and costs.

## COUNT III-Disparate Treatment

The Plaintiff, Sonia Fernandez, restates and realleges paragraphs 48 through 51 and paragraphs 80 through 107 as though fully stated herein.

134. The Plaintiff,  Sonia Fernandez, met with the Mayor, the Chief of Police and Captain Roland and along with other female officers , complained that the prolonged, severe, pervasive, hostile and abusive work environment had cause her injury. This Plaintiff offered medical evidence of her condition and requested the same leave with pay as is done for male employees.

135. The Defendants denied the Plaintiff's request, despite a letter from Plaintiff's counsel advising the Defendants that this decision was an act of disparate treatment. The Defendants offered the Plaintiff leave without pay. The Plaintiff's position has since been vindicated. Her emotional disability has since been recognized by a medical opinion requested by the City of Revere. **(See Exhibit G)**

136. The Defendants discriminated against the Plaintiff, and their actions constituted a bar to the Plaintiff. They barred the Plaintiff from full participation in the compensation, the terms, the conditions and the privileges of employment in violation of M. G. L. c. 151B §1 & (1)( C) and 42 U.S.C. § 2000 (e)-2.

137. Despite the Medical Opinion that states categorically that the Plaintiff is incapable of returning to work as a Revere Police Officer, the Defendants continue to insist that the Plaintiff return to work in violation of Union rules and medical advice. The Defendants continue to treat the Plaintiff in a manner different that other disability cases.

WHEREFORE, the Plaintiff seeks $ 1 Million Dollars in damages for Discrimination and $5 Million Dollars for Defendants continuing violation of M.G. L. c. 151B § 4 and 42 U.S.C. § 2000 (e)-2. and their continuing defiance of binding contracts and medical opinions. .

## COUNT IV- Infliction of Emotional Distress

The Plaintiff, Sonia Fernandez, restates and realleges paragraphs 48 through 51 and paragraphs 80 through 107 as though fully stated herein.

138. The Defendants have by their acts and failures enumerated herein caused severe emotional distress to the plaintiff. The Defendant intended to inflict or knew or should have known that emotional distress was the likely result of Sergeant Doherty's misogynistic outbursts, Sergeant Nelson's use of pornography, and Lieutenant Santoro's sexually offensive behavior, and the racial epithets and stereotyping that was commonplace in the Department.

139. The City of Revere, its Mayor and its Police Chief and its Retirement Board have continued the pervasive pattern of hostility that injured the Plaintiff. Despite the fact that the medical opinion they requested supports the Plaintiff's position, the Defendants continue to coerce, threaten and intimidate the Plaintiff into returning to a sexually and racially hostile environment. Her coerced return (on light duty) has created conflict with the Union membership, other officers and is unsupported by medical evidence.

140. The Defendants conduct was extreme and outrageous. It shocks the conscience and violates the law. It was beyond all possible bounds of human decency and was utterly intolerable in a civilized community. It exposed the Plaintiff to physical danger, financial risk and emotional peril. The Plaintiff has a peptic ulcer that has been aggravated by environment created by the Defendants. The Plaintiff's present physical and emotional

condition is a direct result of the hostile environment in which she has worked and the disparate treatment she has received from the Defendants over the seven (7) years that she has worked with the Revere Police Department. By their conduct, the Defendants have intimidated, threatened and coerced the Plaintiff in violation of M.G.L.c. 151B § 4A and 42 U.S.C. § 2000 (e)-2. This pattern of conduct continues unchanged.

WHEREFORE, the Plaintiff, Sonia Fernandez, seeks $2.5 Million Dollars for the emotional distress, the intimidation, the humiliation and the physical pain she has endured as a direct result of the Defendants negligent conduct, both past and present. Plaintiff also seeks to recover attorneys fees and costs, miscellaneous expenses and damages that continue to accrue, punitive damages and any other remedy deemed just and proper by a Court sitting with or without a jury.

PLAINTIFFS DEMAND TRIAL BY JURY ON ALL ISSUES SO TRIABLE

Terri Pechner-James
Sonia Fernandez
By their attorney,

James S. Dilday, Esq.


Carlton J. Dasent, Esq.
27 School Street, Suite 400
Boston, MA 02108
(617) 227-3470

## COMMONWEALTH OF MASSACHUSETTS

Suffolk ,ss                                          Civil Action:


Terri Pechner-James
Sonia Fernandez


V


City of Revere, Thomas Ambrosino, Mayor
City of Revere, Police Department, Terrence Reardon,
 Chief Bernard Foster, Salvatore Santoro, Roy Colannino,
Frederick Roland, Thomas Doherty, John Nelson,
James Russo, Michael Murphy and Steven Ford.


## AFFIDAVIT

I, Sonia Fernandez, upon oath swear and affirm as follows:

    1. I am a Plaintiff in the above-named action.
    2. I have read the Complaint in this action.
    3. The statements in the Complaint are true to the best of my knowledge and
    belief.

Date: September 30, 2003          Signature: Sonia Fernandez

# COMMONWEALTH OF MASSACHUSETTS

Suffolk ,ss                                              Civil Action:


Terri Pechner-James
Sonia Fernandez


V

City of Revere, Thomas Ambrosino, Mayor
City of Revere, Police Department, Terrence Reardon,
 Chief Bernard Foster, Salvatore Santoro, Roy Colannino,
Frederick Roland, Thomas Doherty, John Nelson,
James Russo, Michael Murphy and Steven Ford.



## **AFFIDAVIT**

I, Terri Pechner-James, upon oath swear and affirm as follows:

    1. I am a Plaintiff in the above-named action.
    2. I have read the Complaint in this action.
    3. The statements in the Complaint are true to the best of my knowledge and belief.

Date: 9-30-03                    Signature: _Terri James_

# COMMONWEALTH OF MASSACHUSETTS

Suffolk ,ss                                        Civil Action:


Terri Pechner-James
Sonia Fernandez


V


City of Revere, Thomas Ambrosino, Mayor
City of Revere, Police Department, Terrence Reardon,
Chief Bernard Foster, Salvatore Santoro, Roy Colannino,
Frederick Roland, Thomas Doherty, John Nelson,
James Russo, Michael Murphy and Steven Ford.


## LIST OF ATTACHMENTS

A. DALA adjudication and recommendation to Medical Panel dated 3-7-2003

B. Medical Panel Decision  dated 7-28-2003

C. Revere Police Department Sexual Harassment Report dated 12-21-1998

D. Revere Police Department Sexual Harassment Report dated 1-14-1999

E. Underwear Incident Report dated 2-26-2001

F. Underwear Incident Report dated  3-20-2001

G. Sonia Fernandez- Package of Medical Reports

H. Booking Photograph of African-American-Altered

# COMMONWEALTH OF MASSACHUSETTS

Suffolk ,ss                                          Civil Action:


Terri Pechner-James
Sonia Fernandez


V


City of Revere, Thomas Ambrosino, Mayor
City of Revere, Police Department, Terrence Reardon, Chief
Bernard Foster, Salvatore Santoro, Roy Colannino, Frederick Roland, Thomas Doherty,
John Nelson, James Russo, Michael Murphy.


## LIST OF ATTACHMENTS

A. DALA decision to allow convening of Medical Panel dated 3-7-2003

B.  Medical Panel Decision  dated 7-28-2003

C. Revere Police Department Sexual Harassment Report dated 12-21-1998

D. Revere Police Department Sexual Harassment Report dated 1-14-1999

E. Underwear Incident Report dated 2-26-2001

F. Underwear Incident Report dated  3-20-2001

G. Sonia Fernandez- Package of Medical Reports

H. Booking Photograph of African-American-Altered

# EXHIBIT A

THE COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss.                                Division of Administrative Law Appeals

Terri James,
        Petitioner

v.                                          Docket No. CR-02-1308

Revere Retirement Board,
        Respondent

Appearance for Petitioner:                  Carlton Dasent, Esquire
                                            Grayer & Dilday
                                            27 School Street
                                            Boston, MA 02108

Appearance for Respondent:                  Ira H. Zaleznik, Esquire
                                            Lawson & Weitzen, LLP
                                            88 Black Falcon Terminal, Suite 345
                                            Boston, MA 02210

Administrative Magistrate:                  Judithann Burke

## DECISION

Pursuant to M.G.L.c. 32 s. 16(4), the Petitioner, Terri James, is appealing from the

October 23, 2002 decision of the Respondent, Revere Retirement Board, denying the

involuntary accidental disability retirement application of her former supervisor, Revere

Police Chief Terence K. Reardon. The appeal was timely filed. (Exhibits 1, 6 and 7). A

hearing was held on February 4, 2003 at the offices of the Division of Administrative

Law Appeals (DALA), 133 Portland Street, Boston, MA.

At the hearing, forty-five (45) exhibits were marked. No testimony was taken. The

parties submitted their cases on the documents and argued their respective cases. One (1)

tape was made of the proceedings.

home from superior officers or from incidental meetings with officers against whom she had lodged complaints of harassment. These encounters occurred both on and off duty. (Exhibit 11).

5. On June 3, 2002, Dr. Keroack, who was still Ms. James' treating physician, reported to Revere Police Chief Terence K. Reardon that his patient had a real desire to return to work. The doctor noted further that his patient might be able to return in the next three (3) months. (Exhibit 5).

6. On July 17, 2002, Chief Reardon filed an Involuntary Accidental Disability Retirement application on behalf of Terri James on the basis that she was suffering from "significant emotional stress" and referenced a diagnosis of "post traumatic stress disorder". (Exhibits 1-4).

7. The Revere Retirement Board denied Chief Reardon's application on October 23, 2002 without having convened a Regional Medical Panel. (Exhibit 6).

8. By late 2002 and early 2003, Dr. Keroack noted that Terri James continue to experience a decline in her mental and physical health whenever the prospect of her return to work was discussed. (Exhibit 11).

9. On January 23, 2003 Dr. Keroack reported that she had begun to avoid being out in public, even to buy gasoline or groceries. The doctor noted that the Petitioner had also developed crippling anxiety and worries which have not abated and have led to increased insomnia and fatigue. He concluded at this time that the loss of her ability to perform her duties as a police officer resulted in a significant insult to Officer James' identity and

to total and permanent disability and the possibility of a causal connection, the threshold criteria have been met for the convening of a Regional Medical Panel to evaluate her claim, in accordance with Section 7.

The decision of the Revere Retirement Board is hereby reversed and this matter is remanded to said board for the purpose of convening a Regional Medical Panel of experts in psychiatry in order to evaluate Chief Reardon's application for Section 7 retirement.

So ordered.

Division of Administrative Law Appeals,
BY:

Judithann Burke,
Administrative Magistrate

DATED: 3 – 7 – 0 3

5

# EXHIBIT B

COMMONWEALTH OF MASSACHUSETTS | PUBLIC EMPLOYEE RETIREMENT ADMINISTRATION COMMISSION

JOSEPH F. CONNARTON, Executive Director

TO:         REVERE RETIREMENT BOARD

FROM:       MEDICAL PANEL UNIT

DATE:       July 28, 2003

RE:         REVIEW OF MEDICAL PANEL CERTIFICATE

Please be advised that P.E.R.A.C. has completed its review of the following Medical Panel Certificate(s) and found the Certificate(s) to be in order: **Drs. Sherry-Friedman-Dominiak**

## TERRI JAMES

**Your retirement board is encouraged to review the attached report(s) to determine if it is completed to your satisfaction.**

If upon review of the enclosed report, your board determines that additional information or clarification is required, the board may submit to PERAC in writing, a request which identifies the additional information which is desired. The board's request will then be forwarded by this office to the physicians.

Your retirement board may also choose to write directly to the medical panel for clarification. **PERAC must be provided with a copy of all correspondence between the board and the medical panel.**

If you should have any questions regarding the enclosed material, please do not hesitate to contact this office.

BL/kmh
Enclosure



COMM. OF MASS.
P.E.R.A.C.

**Commonwealth of Massachusetts**
**Public Employee Retirement Administration Commission**
5 Middlesex Avenue, 3rd Floor
Somerville, MA 02145
(617) 591-8956
Fax (617) 628-4414

2003 JUL 28  A 9: 52

RECEIVED

## APPLICANT INFORMATION

**PERAC ID:  2003237650    TYPE OF DISABILITY:    ACC (M)**

**SOCIAL SECURITY NUMBER:**          017565959

**MEMBER:**                                           Terri  James

**MEMBER ADDRESS:**                         1204 S.W. 28th Street

                                                         Cape Coral, FL 33914

**RETIREMENT BOARD:**                   **Revere Retirement Board**

**OCCUPATION:**                                **POLICE**

**EMPLOYER:**                                    **Chief Terrance Reardon**

**REGIONAL MEDICAL PANEL**
**PHYSICIAN:**                                    **Susannah Sherry, M.D. — PSYCHI**
                                                         **Mark Friedman, M.D. — INTERN**
                                                         **George Dominiak, M.D. — PSYCHI**

**MEDICAL PANEL SPECIALTY:**      **PSYCHI**

**EXAMINATION LOCATION:**          **575 Mount Auburn Street**
                                                         **Suite 201**
                                                         **Cambridge, MA 02138**

**DATE:**                                            **Friday, June 13, 2003**

**TIME:**                                            **02:30 PM**

COMMONWEALTH OF MASSACHUSETTS
PUBLIC EMPLOYEE RETIREMENT ADMINISTRATION COMMISSION
## REGIONAL MEDICAL PANEL CERTIFICATE

COMM. OF MASS.
P.E.R.A.C.

**MEMBER:**   Terri James                  **S.S. #:** 017565959
**PERAC ID:**   2003237650            **TYPE OF DISABILITY: ACC**

2003 JUL 28  A 9:52

The member's retirement board will provide you with all information relating to the member's claimed disability and the current job description. This information is critical to your ability to perform a comprehensive medical evaluation and assess the member's ability to perform the essential duties of his/her job. If this information has not been received, please contact the PERAC Medical Panel Unit.

---

**DID THE MEDICAL PANEL REVIEW THE MEMBER'S JOB DESCRIPTION?**

YES ☑   NO ☐

**DID THE MEDICAL PANEL RECEIVE AND REVIEW MEDICAL RECORDS IDENTIFIED ON THE TRANSMITTAL OF BACKGROUND INFORMATION TO A REGIONAL MEDICAL PANEL FORM PRIOR TO RENDERING A MEDICAL OPINION IN THIS CASE?**

YES ☑   NO ☐

**PLEASE LIST ANY RECORDS NOT LISTED ON THE TRANSMITTAL OF BACKGROUND INFORMATION TO A REGIONAL MEDICAL PANEL FORM, WHICH THE PANEL REVIEWED.**

**1. IS THE MEMBER MENTALLY OR PHYSICALLY INCAPABLE OF PERFORMING THE ESSENTIAL DUTIES OF HIS OR HER JOB AS DESCRIBED IN THE CURRENT JOB DESCRIPTION?**

YES ☑   NO ☐

Please continue ONLY if you answered yes to question #1.

**2. IS SAID INCAPACITY LIKELY TO BE PERMANENT?**

YES ☑   NO ☐

**PERMANENCY:**   A disability is permanent if it will continue for an indefinite period of time which is likely never to end even though recovery at some remote, unknown time is possible. If the medical panel is unable to determine when the applicant will no longer be disabled, they must consider the disability to be permanent. However, if the recovery is reasonably certain after a fairly definite time, the disability cannot be classified as permanent. It is imperative that the medical panel make its determination based on the actual examination of the applicant and other available medical tests or medical records which have been provided. It is *not* the physician's task to look into employment possibilities that may become available to an applicant at some future point in time.

COMMONWEALTH OF MASSACHUSETTS COMM. OF MASS.
PER A C
PUBLIC EMPLOYEE RETIREMENT ADMINISTRATION COMMISSION

## CERTIFICATE FOR ACCIDENTAL DISABILITY

**MEMBER:** Terri James                                              2003 JUL 28  A 9: 52
**PERAC ID:** 2003237650        **S.S. #:** 017565959        **TYPE OF DISABILITY:** ACC

**PLEASE CONSIDER POINTS A AND B BEFORE RESPONDING TO QUESTION #3.
POINTS A AND B SHOULD ALSO BE DISCUSSED IN YOUR NARRATIVE.** RECEIVED

**A.** Whether there is any other event or condition in the member/applicant's medical history, or in any other evidence provided to the panel, other than the personal injury sustained or hazard undergone upon which the disability retirement is claimed, that might have contributed to or resulted in the disability claimed.

**B.** Whether it is more likely than not that the disability was caused by the condition or event described in (A) rather than the personal injury sustained or hazard undergone which is the basis for the disability claim, and the basis for your conclusion.

**3. IS SAID INCAPACITY SUCH AS MIGHT BE THE NATURAL AND PROXIMATE RESULT OF THE PERSONAL INJURY SUSTAINED OR HAZARD UNDERGONE ON ACCOUNT OF WHICH RETIREMENT IS CLAIMED?***

YES ☑        NO ☐

**Aggravation of a Pre-Existing Condition Standard: If the acceleration of a pre-existing condition or injury is as a result of an accident or hazard undergone, in the performance of the applicant's duties, causation would be established. However, if the disability is due to the natural progression of the pre-existing condition, or was not aggravated by the alleged injury sustained or hazard undergone, causation would not be established.**

***PLEASE NOTE:** When constructing your response to the question of causality (#3) in accidental disability narrative reports, your opinion must be stated in terms of medical possibility and not in terms of medical certainty.

COMM. OF MASS.
P.E.R.A.C.

## COMMONWEALTH OF MASSACHUSETTS
## PUBLIC EMPLOYEE RETIREMENT ADMINISTRATION COMMISSION

## CERTIFICATION OF MEDICAL PANEL FINDINGS
2003 JUL 28  A  9: 52

**MEMBER:**   Terri James

**PERAC ID:**   2003237650

**S.S. #:**  017565959

**TYPE OF DISABILITY: ACC**

RECEIVED

---

### MAJORITY OPINION

*In the case of a joint examination, all three physicians must sign if they are in agreement with the majority opinion.*

I hereby certify that I have examined the member named on this certificate, and that the findings stated in this certificate and narrative express my professional medical opinion which was arrived at in an independent manner and free of undue influence.

_____ **M.D.**

_____ **M.D.**

_____ **M.D.**

---

### MINORITY OPINION

*To be completed only if a joint examination is conducted by all three physicians.*
*The dissenting physician MUST also complete the Medical Panel Certification Minority Report.*

I hereby certify that I have examined the member along with the other members of the medical panel and that I respectfully disagree with the Majority findings.

_____ **M.D.**

---

### APPLICANT PHYSICIAN AND/OR EMPLOYER'S PHYSICIAN

I hereby certify that I was present at the examination conducted by the Regional Medical Panel Physician(s).  I understand that I have a right to submit a written opinion to the Retirement Board.

_____ **M.D.**

_____ **M.D.**

COMM. OF MASS.
P.E.R.A.C.

### GEORGE M. DOMINIAK, M.D.
**300 Mount Auburn Street**
**Suite 307**
**Cambridge, MA 02138**

2003 JUL 28  A 9: 52

### (617) 686-7299

| | | |
|---|---|---|
| **APPLICANT:** | Terri James | RECEIVED |
| **PERAC NO.:** | 2003237650 | |
| **EXAM DATE:** | Friday, June 13, 2003, 02:30 PM | |
| **IN ATTENDANCE:** | Ms. James, Attorney Carlton Dasent, Panel MD's | |

**HISTORY OF ILLNESS:** Ms. James is a 30 y.o. Police Officer serving Revere, MA for approximately 6 years between 1995 and 2001. She is applying for Accidental Disability Retirement on the basis of Posttraumatic Stress Disorder (PTSD), Depression and Anxiety related symptoms such as Irritable Bowel Syndrome, migraine headaches and panic attacks.

Ms. James had no past psychiatric history prior to working as a police officer. She reports persistent abusive behavior by her superiors and fellow officers. She alleges discrimination and threatening behavior. She felt demeaned and that her privacy was threatened. As an example she related the story of a prisoner who was someone Ms James knew as a friend from the past. He was allegedly questioned openly about having ever had a sexual relationship with Ms. James and about graphic details regarding sexual behaviors with her. She felt this was crude, abusive, humiliating, invading her privacy, hurtful. She alleges there was no basis for the questioning. Numerous examples were provided during the interview such as finding a bullet hole in her bumper and having tires slashed.

As a result of these kind of experiences she reports she had developed sleep disturbance (insomnia and nightmares), anxiety, fear of retaliation from other police officers, genuine concern for her safety leading her to move to another state, panic attacks, anxiety, uncontrolled crying, depressed mood and hopelessness. She wanted to try to return to work but felt she could not. In 2001, she attended a police sponsored treatment program "On-site Academy" for 1 solid week and 4 additional days later. EMDR (a treatment used to control symptoms of PTSD) was attempted during that time.

Ms. James also described developing loss of appetite, and problems with gastrointestinal discomfort and control. She was evaluated in 1998 at the MGH GI Clinic and followed at the MGH Revere Health Care Center. Irritable Bowel Syndrome was diagnosed. Her PCP, Dr. Wald diagnosed Major Depression and anxiety (office note 05/30/00) and prescribed Zoloft and Trazodone for depression, anxiety and insomnia. She had been seeing Susan Rudman, EdD in psychotherapy since 03/21/01 and Dr. Eric Keroack (gynecologist and counselor) for medication management.

COMM. OF MASS.
_ P.E.R.A.C.

2003 JUL 28 A 9: 52

RECEIVED

In sum, Ms. James feels she could not perform safely as a police officer because of anxiety and depression and in particular because she could not trust that she would be given adequate back-up when needed.

**CURRENT SYMPTOMS:** Ms. James reports ongoing anxiety symptoms with sleep disturbance and fearfulness for her safety and the safety of her family. She avoids police related activities or TV programs, crowds or open public places. Since her move she has continued contact with her previous psychiatric providers by phone essentially weekly and infrequently in person when she returns locally. She has not been able to find providers in her new location as of yet. Her medication regimen includes Xanax 2 mg daily for anxiety and sleep and Lexapro (she could not recall the dose) for depression and anxiety. She also takes medication for migraine and irritable bowel. She denied alcohol use.

**PAST MEDICAL HISTORY:** Non-contributory other than mentioned above with the addition of a history of hypothyroidism.

**MEDICAL RECORD REVIEW:** All available medical records and a job description were reviewed by the members of the Panel. Documents from Dr. Keroack 06/03/02 and 02/18/03 describe the diagnoses of "complex" PTSD, panic symptoms with an initially attempted return to work date of September 2002. She was not able to return after meeting with the Chief. Dr. Keroack's letter of 02/18/03 labeled her work experience as "repetitive trauma of harassment" leading to the interview with our panel. Therapist Rudman's records describe the same clinical picture.

**EXAMINATION:** Ms. James presented as pleasant attractive and cooperative. She showed some lability (shifting) of affect, anxiety and some tearfulness. Her symptoms were described as above. There were no signs of psychosis, mania or obvious intellectual impairment.

**RELEVANT PERSONAL AND FAMILY HISTORY:** Non contributory.

**DIAGNOSES:** Ms. James meets the DSM IVTR criteria for Anxiety Disorder NOS with features of PTSD and features of panic disorder.

**PROGNOSIS:** As compared to the reported clinical history, Ms. James has already shown significant remission in depressive symptoms. The anxiety symptoms as they relate to her work experiences including sleep disturbance, irrational fears, avoidance and emotional numbing, will likely persist and may exacerbate in the context of a police environment. It is impossible to accurately opine regarding prognosis for these symptoms. Living in a new community and not entering this kind of work or activity would be essential in healing.

**CONCLUSIONS:**

COMM. OF MASS.

1.  DISABILITY: It is the unanimous opinion of our Panel that Ms. James is mentally A.C.
    incapable of performing the essential duties of her job as described in the current job
    description on the basis of Anxiety Disorder NOS with features of PTSD and panic
    disorder. The symptoms would interfere with her capacity to react safely in JUL 28 A 9 53
    emergency situations and in her ability to trust her fellow officers.

2.  PERMANENCE: The incapacity mentioned above is likely to be permanent in that
    the anxiety symptoms mentioned in the Prognosis section above are likely to persist
    for an indefinite period of time even with continued treatment.

3.  CAUSALITY: The said incapacity is such as might be the natural and proximate VED
    result of the personal (emotional) injury sustained or hazard undergone on account of
    which retirement is claimed. There are no other likely causative factors apparent in
    Ms. James' clinical history to substantiate an alternate etiology for the anxiety
    disorder.

George M. Dominiak, M.D.
Panel Chair

COMM. OF MASS.
P.E.R.A.C.

2003 JUL 28  A  9: 53

Member Name:    TERRI JAMES

PERAC ID:       2003237650

Date:           06/13/03

RECEIVED

I have reviewed the attached report and agree with the opinions expressed therein.

Panel Physicians:

Mark Friedman, M.D.

Susannah Sherry, M.D.

George Dominiak, M.D.

# EXHIBIT C

# REVERE POLICE DEPARTMENT

## 21, DECEMBER1998

TO: CHIEF JAMES V. RUSSO
FM: CAPT. FRED v. ROLAND/CAPT. CHAULK
SUB: MEETING; SEXUAL HARASSMENT/PREGNANCY POLICY

SIR;

FOR YOUR INFORMATION ON THURSDAY 17, DECEMBER OFFICER O'HARA
REQUESTED OF CAPT.CHAULK THAT CAPT CHAULK AND MY SELF ATTEND A
MEETING WITH OFFICER O'HARA AND OFFICERS CAREY AND CALLAHAN FROM
THE PATROLMAN'S UNION. THE SUBJECT OF THE MEETING WAS FOR THE
OFFICERS TO LIST SOME COMPLAINTS THAT THE FEMALE OFFICERS EMPLOYED
BY THE POLICE DEPARTMENT HAVE.

CAPT. COLANNINO WAS INFORMED OF THE REQUEST AND A MEETING WAS
SCHEDULED AT THE BEACHMONT SUBSTATION FOR FRIDAY 18, DECEMBER AT
16:00.

ON FRIDAY 18, DECEMBER AT 16:00 THE MEETING WAS HELD. PRESENT
WERE CAPT. CHAULK, CAPT. ROLAND, P.O. O'HARA, P.O. CAREY AND P.O.
CALLAHAN. THE FOLLOWING SUBJECTS WERE DISCUSSED.

1) THAT THE DEPARTMENT HAS NO POLICY REGARDING PREGNANT
OFFICERS.

> A) THAT A PREGNANT FEMALE OFFICER IS BEING DIRECTED TO
> SEARCH FEMALE PRISONERS. (THIS CONSTITUTES A HEALTH
> HAZARD)

> B) THAT PRISONERS ARE ROUTINELY BAILED FROM THE RADIO
> ROOM. INSTEAD OF THE BOOKING ROOM OR THE GUARD ROOM.
> (THIS CONSTITUTES A HEALTH AND SAFETY HAZARD)

> C) THAT THE AIR QUALITY IN THE STATION IS VERY BAD AND COULD
> CONSTITUTE A HEALTH HAZARD TO A PREGNANT OFFICER OR TO
> HER CHILD.

2) THAT THE DEPARTMENT HAS NO SEXUAL HARASSMENT POLICY.

   A) MALE OFFICERS ROUTINELY ENGAGE IN INSULTING AND SEXIST TALK AND COMMENTS AND THE OFFICERS IN CHARGE (LIEUTENANTS AND SERGEANTS), DO NOTHING TO STOP THEM.

   B) THAT THE DEPARTMENT ROUTINELY DISPATCHES MALE OFFICERS TO BACK UP FEMALE OFFICERS EVEN THOUGH THE MALE BACK UP MAY NOT BE THE CLOSEST. please note the complaint is not that male officers are sent but rather they are sent instead of female officers who would normally be sent because of their proximity or their sector assignment.

   C) THAT CERTAIN DUTY SUPERVISORS ALWAYS CALL A FEMALE OFFICER TO THE STATION WHENEVER A FEMALE PRISONER IS BEING BOOKED OR TRANSPORTED, (even if the transport is to the hospital)

   D) A CERTAIN SUPERVISORS SINGLES OUT FEMALE OFFICERS AND MAKES DEROGATORY COMMENTS ABOUT FOUL LANGUAGE AND LECTURES THE FEMALE OFFICERS ABOUT SUCH CONDUCT. THIS SUPERVISOR DOES NOTHING TO STOP MALE OFFICERS FROM USING PROFANITY AND FOUL LANGUAGE (WHETHER IT IS DIRECTED AT THE FEMALE OFFICERS OR JUST IN GENERAL).

3) THE POLICE DEPARTMENT HAS NOT PROVIDED THE FEMALE OFFICERS WITH A BATHROOM THAT IS TO BE USED EXCLUSIVELY BY THE FEMALE OFFICERS. (THE FACILITY PROVIDED IS ROUTINELY USED BY MALE OFFICERS AND MEMBERS OF THE PUBLIC.)

4) FEMALE OFFICERS ARE AS A MATTER OF POLICY REQUIRED TO PERFORM MATRON DUTIES AND THAT MGL 47 sec18 REQUIRES THAT A MATRON PERFORM THESE DUTIES.

copy: Capt. Colannino
      Capt. Chaulk
      P.O. Callahan
      P.O. Carey
      P.O. O'Hara

# EXHIBIT D

```
 1                                          14, JANUARY 1999
 2    TO:  CHIEF JAMES RUSSO
 3    FM:  CAPT. ROLAND & CAPT. CHAULK
 4    SUB: SEXUAL HARASSMENT COMPLAINTS

 5    SIR:

 6    ON JANUARY 7, 1999 CAPTAINS ROLAND AND CHAULK ATTENDED A MEETING
 7    REQUESTED BY ALL OF THE FEMALE OFFICERS EMPLOYED BY THE REVERE
 8    POLICE   DEPARTMENT.    THE   SUBJECT   OF   THE   MEETING   WAS   SEXUAL
 9    HARASSMENT,    THE  DEPARTMENTS  POLICY  ON  HARASSMENT,    WORKING
10    CONDITIONS AND DEPARTMENT MATERNITY POLICY.

11    THE  MEETING  WAS  HELD  AT  THE  BEACHMONT  SUBSTATION  AT  16:00  ON
12    THURSDAY JANUARY 7, 1999.

13    PRESENT AT THE MEETING WERE:
14                               CAPT. ROLAND
15                               CAPT. CHAULK
16                               P.O.  CALLAHAN    UNION REP.
17                               P.O.  CAREY
18                               P.O.  MALVAROSA
19                               P.O.  CURCIO
20                               P.O.  PECHNER
21                               P.O.  FISH
22                               P.O.  MALATESTA
23                               P.O.  MANGINO
24                               P.O.  DOWNING
25                               P.O.  FERNANDEZ
26                               P.O.  O'HARA
27                               P.O.  LaVITA

28    AT  THE  START  OF  THE  MEETING  THE  ABOVE  OFFICERS  INFORMED  US  THAT
29    THEY  HAD  MEETINGS  AMONG  THEMSELVES  AND  THE  ISSUES  THAT  WERE  THE
30    SUBJECT  OF  THIS  MEETING  WERE  THE  ONES  THEY  CONSIDERED  THE  MOST
31    URGENT.

32    AS  AN  OVER  VIEW  IN  THE  NEXT  PARAGRAPHS  WE  WILL  OUTLINE  PROBLEM
33    AREAS  AND  THEN  WILL  DEAL  WITH  SPECIFIC  COMPLAINTS  IN  EACH  AREA  BOTH
34    P.O.s AND OFFICERS.

35    GENERALLY, TWO OF THE THREE SHIFTS HAVE LITTLE OR NO PROBLEMS.

36    SHIFT ONE (1) THE COMPLAINTS ARE MANY AND VARIED.

37    ON SHIFT TWO (2) THERE WAS ONLY ONE COMPLAINT.

38    ON SHIFT THREE (3) THERE ARE TWO COMPLAINTS.

39    THERE WERE SOME COMPLAINTS ABOUT THE CHIEF OF POLICE.
```

40  CAPTAINS ROLAND AND CHAULK OFFERED TO LEAVE THE BUILDING SO THAT
41  THE FEMALE OFFICERS COULD WRITE ANY COMPLAINTS THEY MIGHT HAVE
42  REGARDING ANY OF THE FOUR CAPTAINS AT THIS TIME THERE ARE NONE.


43  SHIFT ONE (1): (THE SO CALLED "TERROR SHIFT"

44      LT. SANTORO; THE LIEUTENANT  MAKES SEXUALLY ORIENTED REMARKS
45  TO AND ABOUT FEMALE OFFICERS.  HE COMMENTS ON THEIR BODIES AND
46  MAKES DISPARAGING REMARKS.  THE LIEUTENANT TALKS ABOUT HIS PRIVATE
47  PARTS.  ONE FEMALE STATED THAT SHE "DID NOT WANT TO HEAR ABOUT
48  SANTORO'S DICK ANY MORE".  WHEN FEMALE OFFICERS GO TO THE
49  LIEUTENANT WITH COMPLAINTS HE DOES NOT ADDRESS THE COMPLAINT, AND
50  THEN THE FEMALE BECOMES AN OBJECT OF RIDICULE FROM BOTH THE
51  LIEUTENANT AND THE PARTY COMPLAINED ABOUT.  THE LIEUTENANT ALLOWS
52  MALE OFFICERS TO MAKE LOUD EMBARRASSING AND DISPARAGING REMARKS
53  ABOUT FEMALE OFFICERS AND FEMALES IN GENERAL.  HE DOES NOTHING TO
54  STOP THEM OR TO CORRECT THE BEHAVIOR.

55      THE LIEUTENANT ON FINDING OUT THAT A FEMALE OFFICER KNEW A
56  PRISONER ASKED THE PRISONER IF HE HAD EVER "FUCKED" OFFICER
57  PECHNER.  WHEN CONFRONTED THE LIEUTENANT DENIED THE ALLEGATION.
58  THE OFFICER CAN SEE NO REASON WHY THE PRISONER WOULD MAKE UP A
59  STORY LIKE THAT.

60      SGT. GOODWIN;  THE SERGEANT BELITTLES AND EMBARRASSES FEMALE
61  OFFICERS IN PUBLIC AND IN FRONT OF OTHER OFFICERS.  HE WILL
62  RIDICULE THEIR PERFORMANCE AND TELL THE PUBLIC (ANY ONE WITHIN EAR
63  SHOT) THAT THE FEMALE SCREWED UP AND THAT IF HE WEREN'T PRESENT THE
64  JOB WOULD NOT GET DONE PROPERLY.

65      IN ONE CASE THE SERGEANT WENT ON A CALL AT WALGREENS AND
66  PUSHED HIS WAY INTO A CROWD ORDERING FEMALE AND MALE OFFICERS TO DO
67  DIFFERENT THINGS.   THEN HE FOUND A SMALL BAG OF GRASS ON THE
68  GROUND.  HE THEN HELD UP THE BAG OF GRASS AND TOLD THE CROWD (ALL
69  TEENAGERS) THAT HIS OFFICERS HAD SCREWED UP (AT THAT TIME THE ONLY
70  OFFICERS PRESENT WERE FEMALE).

71      HE CONSTANTLY GOES ON CALLS WITH THE FEMALES AND TAKES OVER
72  THE CALL.  HE TAKES ACTIONS WITH OUT EXPLAINING AND IN MANY CASES
73  WITHOUT THE KNOWLEDGE OF THE OFFICERS.  HE THEN TELLS THE OFFICER
74  TO RETURN TO THE STATION AND MAKE OUT THE REPORT STATING THAT HE
75  (SGT. GOODWIN) DID THIS OR SAID THAT TO THE SUBJECT OF THE CALL.
76  GOODWIN INSISTS THAT THE OFFICER MAKE THE REPORT STATING WHAT HE
77  TELLS THEM EVEN THOUGH THE OFFICER HAS NO FIRST HAND KNOWLEDGE OF
78  THE ACTION HE IS TELLING THEM TO REPORT.

79      IF A FEMALE OFFICER PROTESTS ANY ACTION TAKEN BY GOODWIN.  HE
80  WILL QUESTION HER ABILITY AND RANT AND RAVE ABOUT CRYING AND/OR
81  SCREAMING FEMALES.


2

82      ON NEW YEARS EVE 1998/1999 OFFICERS LAVITA AND CURCIO
83  RESPONDED TO AND CLEARED FROM A REPORT OF A BREAK AT PETERS ROAST
84  BEEF (THERE WAS NO VISIBLE DAMAGE AND NO BREAK).  AFTER THEY HAD
85  CLEARED SGT. GOODWIN (ON THE RADIO) QUESTIONED OFFICERS LAVITA AND
86  CURCIO ABOUT CONDITIONS AT PETER'S ROAST BEEF WHEN THEY RESPONDED
87  THAT THERE WAS NO DAMAGE AND NO BREAK. HE CAME BACK ON THE AIR AND
88  TOLD THEM THAT HE HAD THE OWNER ON THE PHONE AND WANTED TO KNOW IF
89  THE WINDOWS WERE SMASHED OUT OF THE BUILDING.   LAVITA/CURCIO
90  RESPONDED AGAIN THAT AS THEY SAID THE FIRST TIME THERE WAS NO
91  DAMAGE.  GOODWIN THEN TRANSMITTED TO LAVITA "DON'T YELL AT ME ON
92  THE RADIO".
93  LAVITA DID NOT RESPOND.
94  GOODWIN THEN TOLD LAVITA TO REPORT TO THE STATION.  ON ARRIVAL AT
95  THE STATION GOODWIN, INSTEAD OF TAKING LAVITA ASIDE TO DISCUSS THE
96  MATTER, ORDERED BOTH CALL TAKERS TO LEAVE THE RADIO ROOM.  HE THEN
97  PUSHED THE PLAY BACK BUTTON ON THE PHONE RECORDER AND WHILE HAVING
98  LAVITA LISTEN TO IT LECTURED HER ABOUT YELLING AT HIM ON THE RADIO.
99  LAVITA AFTER LISTENING TO THE TAPE OBSERVED THAT THERE WAS NO
100 YELLING FROM HER DURING HER RADIO TRANSMISSIONS.  AFTER LAVITA'S
101 RESPONSE PERHAPS BECAUSE OF IT GOODWIN PROCEEDED TO QUESTION
102 LAVITA'S PERFORMANCE FOR THE WHOLE SHIFT. IN SPITE OF THE FACT THAT
103 ALL THROUGH THE SHIFT OTHER SECTORS (STAFFED BY MALE OFFICERS) HAD
104 TO BE CALLED REPEATEDLY TO BE DISPATCHED FOR CALLS IF THEY
105 RESPONDED AT ALL.  (THIS IS NOT A COMPLAINT ABOUT MALE OFFICERS BUT
106 ABOUT GOODWIN'S DOUBLE STANDARD).

107     GOODWIN NEVER STOPS MALE OFFICERS FROM INSULTING FEMALE
108 OFFICERS OR FROM MAKING DISPARAGING AND EVEN OBSCENE REMARKS ABOUT
109 THE PERFORMANCE OF ONE FEMALE OFFICER IN FRONT OF ANOTHER FEMALE
110 OFFICER.

111     GOODWIN CONSTANTLY DISPATCHES MALE OFFICERS INTO FEMALE
112 OFFICERS SECTORS TO TAKE CALLS THAT SHOULD BE GIVEN TO THE SECTOR
113 CAR.  HE BACKS UP FEMALE OFFICERS WITH MALE OFFICERS EVEN IF HE HAS
114 TO REACH ACROSS THE CITY TO DO IT.  IN DOING THIS HE CAUSES CERTAIN
115 MALE OFFICERS TO COMPLAIN ABOUT HAVING TO TAKE FEMALE' CALLS OR
116 BACKING THEM UP.

117     GOODWIN'S ACTIONS ARE GENERALLY SELF SERVING AND HIS ATTITUDE
118 IS ARROGANT, CONFRONTATIONAL AND DEMEANING.

119     *** THE AUTHORS NOTE ALL COMPLAINTS ABOUT SGT. GOODWIN THAT
120         ARE NOT GENDER DRIVEN ARE COMPLAINTS MADE BY MALE OFFICERS
121         AS WELL.

122     SGT. DOHERTY; DOHERTY HAS A DOUBLE STANDARD WHEN DEALING WITH
123 FEMALE OFFICERS.  HE EMBARRASSES THEM, SCREAMS AT THEM (AT THE TOP
124 OF HIS VOICE, MAKES REMARKS ABOUT THEIR ABILITIES AND CONDUCT BUT
125 DOES NOT QUESTION OR REMARK ON THE SAME CONDUCT FROM MALE OFFICERS.
126

127    DOHERTY CONSTANTLY BERATES AND THREATENS TO RELIEVE FEMALE
128  OFFICERS FOR PROFANE LANGUAGE IN HIS PRESENCE "YOUNG LADY YOU WILL
129  NOT USE THAT KIND OF LANGUAGE IN FRONT OF ME, IF YOU DO I WILL SEND
130  YOU HOME.".    "MY WIFE AND MY DAUGHTERS NEVER USE THAT KIND OF
131  LANGUAGE AND NEITHER WILL YOU.".   AND OTHER SUCH COMMENTS.
132  THESE COMMENTS ARE MADE IN FRONT OF MALE OFFICERS AND THE PUBLIC.
133  DOHERTY HAS NEVER REPRIMANDED OR CAUTIONED A MALE OFFICER ABOUT THE
134  USE OF FOUL LANGUAGE. HE HAS REPRIMANDED FEMALE OFFICERS FOR THEIR
135  LANGUAGE WHILE A MALE OFFICER WAS PRESENT AND USING EVEN WORSE
136  LANGUAGE. (HE NEVER STOPPED THE OFFICER)
137
138    ON APRIL 18, 1997 THERE WAS A CALL OF A LOUD GROUP (YOUTHS) ON
139  BROADWAY. OFFICER CURCIO WAS ONE OF THE RESPONDING OFFICERS.  IN
140  THE COURSE OF THE CALL OFFICER CURCIO STATED TO THE YOUTHS THAT "IF
141  THEY THOUGHT SHE WAS GOING TO PUT UP WITH THIS SHIT FOR THE REST OF
142  THE SUMMER THEY WERE OUT OF THEIR FUCKING MINDS".    SUBSEQUENTLY
143  SOME OF THE YOUTHS CAME TO THE STATION AND COMPLAINED TO SGT.
144  DOHERTY ABOUT THE "FEMALE" OFFICERS USE OF PROFANITY.  SGT DOHERTY
145  THEN HAD OFFICER K. LAVITA (FISH), MALATESTA AND THEN CURCIO WALK
146  PAST THE FRONT DOOR WHILE HE (DOHERTY) ASKED THE CIVILIANS "IS THAT
147  THE ONE, IS THAT THE ONE?" UNTIL OFFICER CURCIO WAS IDENTIFIED.
148  DOHERTY THEN TOOK OFF. CURCIO INTO THE "CAPTAINS ROOM", HE NEVER
149  ASKED HER TO EXPLAIN WHAT HAD HAPPENED, NEVER TOLD HER WHAT THE
150  IMPROMPTU LINE UP WAS FOR.   HE JUST STARTED SCREAMING AT THE
151  OFFICER ABOUT HER USE OF FOUL LANGUAGE AND THAT HE WOULD NOT
152  TOLERATE IT, HE WENT ON AND ON RANTING AND YELLING.  DOHERTY KNEW
153  FULL WELL THAT THE CIVILIAN COMPLAINANTS WERE ON THE OTHER SIDE OF
154  A WALL THAT WAS PAPER THIN AND THAT EVERY WORD COULD BE HEARD.
155  CURCIO WAS NEVER ALLOWED TO SPEAK OR TO DEFEND HER SELF.
156  ALL THREE OF THE FEMALE OFFICERS WERE HELD UP TO PUBLIC
157  EMBARRASSMENT AND THEY ARE CONVINCED THAT SGT. DOHERTY HAS NEVER
158  AND WOULD NEVER DO THE SAME THING TO MALE OFFICERS.

159    AT THE TIME OF THE SUPER BOWL LAST YEAR SGT. DOHERTY WAS
160  WATCHING IT ON TELEVISION AND WENT INTO A TIRADE ABOUT A FEMALE
161  SPORTS COMMENTATOR "SHE WAS NO FUCKING GOOD AND WOMEN SHOULD NOT BE
162  ALLOWED TO COMMENT OF SPORTS EVENTS AND THAT THIS BITCH PROBABLY
163  GAVE SEX OR A BLOW JOB TO SOMEONE FOR THE JOB" OR ANYWAY SHE WAS
164  PROBABLY RELATED TO SOMEONE AND THAT'S HOW SHE GOT THE JOB"  THIS
165  WAS ALL SAID AT THE TOP OF HIS VOICE.   THERE WERE TWO FEMALE
166  OFFICERS ASSIGNED IN THE STATION AT THE TIME.  THEY WERE FORCED TO
167  LISTEN TO THIS TIRADE.
168
169    OFFICER PAUL CREVOISERAT;  OFFICER CREVOISERAT ENGAGES IN
170  DEMEANING AND INSULTING TALK WITH AND ABOUT THE FEMALE OFFICERS ON
171  A REGULAR BASIS.

172    CREVOISERAT ON A DAILY BASIS, BEFORE AND AFTER ROLL CALL,
173  CONDUCTS A TIRADE ABOUT HOW USELESS FEMALES ARE AND FEMALE OFFICERS
174  IN PARTICULAR.  WHY DOES HE (CREVOISERAT) HAVE TO ALWAYS BACK UP
175  THE FEMALES, CANT THEY DO THEIR OWN WORK. THE TIRADE ALSO INCLUDES
176  A SECTION ON HOW BAD THE CITY OF REVERE, REVERE

4

177 POLITICIANS, (SPECIFIC AND IN GENERAL), ALL OFFICERS OF RANK,
178 (PRESENT COMPANY EXCLUDED WHEN A SUPERIOR OFFICER IS PRESENT), ARE.

179      **NO OFFICER OF RANK ON THE SHIFT EVER STOPS THE TIRADE.**

180      THE FEMALE OFFICERS ALSO FEEL THAT (ALTHOUGH THEY CANNOT PROVE
181 IT) CREVOISERAT IS THE PERSON BEHIND FEMALE OFFICERS NAMES BEING
182 REMOVED (HE SEEMS TO BE A CONSISTENT BENEFICIARY OF THE REMOVALS)
183 FROM THE DETAIL LIST AND THAT HE MAY WELL BE IF NOT THE AUTHOR AT
184 LEAST ONE OF THE INSTIGATORS OF THE HARASSING FLYERS AND ANONYMOUS
185 LETTERS BEING CIRCULATED AGAINST OFFICER MANGINO.

186 THE ONLY OFFICER OF RANK ON SHIFT ONE WHO HAS EVER SAID ANYTHING TO
187 HALT THE VERBAL ABUSE OF THE FEMALE OFFICERS IS SGT. RUGGIERO.  ALL
188 OTHERS SEEMINGLY ENCOURAGE BY SILENCE.

189      SHIFT 2:
190      OFFICER BURNS MADE DISPARAGING REMARKS ABOUT THE
191 PARENTAGE OF OFFICER PECHNER'S CHILDREN.
192 OFFICER PECHNER CONFRONTED OFFICER BURNS AND BURNS APOLOGIZED.
193 THERE HAVE BEEN NO OTHER INCIDENTS.

194      SGT. NELSON:
195      AT ONE TIME WHILE OFFICER MALATESTA WAS ON THE WINDOW TALKING
196 TO SOMEONE SGT. NELSON HELD UP A MAGAZINE CENTERFOLD OF A NAKED
197 WOMAN AND WAS MAKING COMMENTS ABOUT HER BREASTS AND CROTCH.
198 OFFICER MALATESTA BROUGHT THIS BEHAVIOR TO THE ATTENTION OF LT.
199 MURPHY.  LT. MURPHY TOLD THE SERGEANT THAT HE MUST REMOVE THE
200 PORNOGRAPHIC MATERIAL FROM THE STATION OR DESTROY IT IMMEDIATELY.
201 HE TOLD THE SERGEANT THAT PORNOGRAPHIC MATERIAL IS NOT ALLOWED IN
202 THE POLICE STATION.
203 .THERE HAVE BEEN NO REPEATS OF THIS TYPE ACTIVITY BY THE SERGEANT.

204      SERGEANT PAPASODORA;
205      THE SERGEANT CALLS A FEMALE OFFICER TO THE STATION TO ATTEND
206 FEMALE PRISONERS WHILE THEY ARE BEING BOOKED AND THE FEMALE
207 OFFICERS ARE CALLED TO THE STATION FOR ANY THING THAT MAY PERTAIN
208 TO .THE FEMALE PRISONERS (TELEPHONE CALLS, FEEDING, ETC.) ALSO ALL
209 FEMALE PRISONER TRANSPORT IS DONE BY FEMALE OFFICERS.

210 SHIFT 3:
211      LT. FORD:
212      ON TWO (2) OCCASIONS LT. FORD HAS MADE RACIST REMARKS
213 REGARDING OR ABOUT HISPANICS.  THESE REMARKS ARE NOT SPECIFIC BUT
214 ARE CALLOUS AND SAID IN THE HEARING OF OFFICER FERNANDEZ SHE FINDS
215 IT EMBARRASSING.

216      ON ANOTHER OCCASION AT ROLL CALL THE LIEUTENANT (FORD) SINGLED
217 OUT OFFICERS FERNANDEZ AND FISH AND THREATENED THAT IF THEY DID NOT
218 PRODUCE TICKETS (PARKING) THEY WOULD FIND THEM SELVES ASSIGNED
219 INSIDE.  (THE COMPLAINT  IS NOT ABOUT HAVING TO WRITE TICKETS OR
220 BEING THREATENED WITH PUNISHMENT.  RATHER THAT THE TWO FEMALES WERE

221    SINGLED OUT.)   (HOW MANY TICKETS DO MALE OFFICERS PRODUCE?)

222    SHIFTS 1 & 2:
223         BOTH NIGHT SHIFTS ALMOST (EXCLUSIVELY) USE FEMALE OFFICERS FOR
224    TRANSPORT OF FEMALE PRISONERS TO COURT OR TO THE STATION.    (MALE
225    OFFICERS ARE NOT USED EXCLUSIVELY FOR THE TRANSPORT OF MALE
226    PRISONERS.)

227    CHIEF RUSSO:
228         DURING A SESSION AT THE FIRST CITIZENS POLICE ACADEMY WHILE
229    INTRODUCING SGT. PAPASODORA AND OFFICER MANGINO TO THE CLASS THE
230    CHIEF SPOKE AT LENGTH IN PRAISE OF THE SERGEANT ACTUALLY FORGETTING
231    OFFICER MANGINO WHO WAS STANDING NEXT TO HIM.
232    WHEN THE CHIEF REALIZED HIS ERROR HE APOLOGIZED AND TOLD THE CLASS,
233    (HALF OF THEM FEMALES), THAT OFFICER MANGINO AND OFFICER O'HARA
234    WERE THE FIRST FEMALES HIRED HE HIRED.   THE CHIEF THEN SAID "THESE
235    ARE NOT THE GOOD OLD DAYS WHEN WE DIDN'T HAVE TO HIRE FEMALES".

236         ON ONE OCCASION WHEN FOUR (4) FEMALE OFFICERS WERE BEHIND THE
237    STATION HAVING A CONVERSATION THE CHIEF WALKED BY AND MADE A
238    COMMENT "WHAT IS THIS A WIC MEETING".   DOES THE CHIEF THINK THAT
239    THEY BELONG ON WELFARE?

240         ON ANOTHER OCCASION WHEN OFFICER LAVITA WAS (ON HER OWN TIME
241    SHE WAS GUARDING BALLOTS) BEING TRAINED BY OFFICER MANGINO
242    FOR LEAPS WHEN THE CHIEF CAME BY AND PUT HIS HEAD IN THE OFFICE
243    OFFICER LAVITA ASKED
244    "ISN'T THIS A GOOD USE OF MY TIME?" THE CHIEF REPLIED "I THOUGHT
245    YOU WOULD BE CROCHETING".

246         ALL OF THE FEMALE OFFICERS FOUND THE CHIEF'S PAST PRACTICE OF
247    HAVING THEM GO TO LUNCH WITH THEM OR HIS RIDING IN THE CRUISER TO
248    BE INTIMIDATING AND THEY HOPE THAT THE PRACTICE WILL NOT RESUME.

249    GENERAL:
250         ALL OF THE OFFICERS PRESENT AT THIS MEETING EXPRESSED CONCERN
251    FOR OFFICER DOWNING'S HEALTH.   BEING ASSIGNED TO THE RADIO ROOM
252    DURING HER PREGNANCY.

253         ALL OFFICERS EXPRESSED CONCERN THAT THE DEPARTMENT HAS NO
254    PREGNANCY OR FAMILY LEAVE POLICY.

255         ALL OF THEM STATED THAT THEY KNOW THAT THESE CONCERNS WERE
256    RAISED BY THEIR UNION REPRESENTATIVES IN THE PAST WITH NO ACTION
257    BEING TAKEN BY THE CHIEF OF POLICE.

258         **THE FEMALE OFFICERS WANTED THIS MEETING TO INCLUDE ALL OF THEM**
259    **AS THEY FEAR REPRISAL OR PUNISHMENT WHEN THE SUPERIOR OFFICERS**
260    **COMPLAINED ABOUT HEAR THEIR COMPLAINT. THEY ALSO HAVE WAITED THIS**
261    **LONG IN HOPES THAT THESE SITUATIONS WOULD RESOLVE THEMSELVES.**

262    CONCLUSION: CAPTAINS ROLAND AND CHAULK FEEL THAT THE FEMALE
263 OFFICERS HAVE LEGITIMATE COMPLAINTS AND THAT THE POLICE DEPARTMENT
264 MUST MOVE IMMEDIATELY TO CORRECT THIS ERRANT BEHAVIOR ON THE PART
265 OF PATROL OFFICERS AND OFFICERS OF RANK.

266    CAPTAINS ROLAND AND CHAULK MAKE THE FOLLOWING RECOMMENDATIONS.

267    1) THE MANAGEMENT OF PLATOON ONE BE SPLIT UP IMMEDIATELY.

268       A.   SGT. GOODWIN: COUNSELED, RETRAINED **(AND REMOVED
269            FROM HIS PRESENT ASSIGNMENT AND GIVEN AN ASSIGNMENT
270            WHERE HE DOES NOT COMMAND LINE OFFICERS).

271       B.   LT SANTORO: COUNSELED AND RETRAINED.

272       C.   SGT. DOHERTY COUNSELED: RETRAINED, **(TRANSFERRED AND
273            MONITORED).

274       D.   ALL OTHER RANKING OFFICERS: COUNSELED AND RETRAINED,
275            DOING NOTHING MAKES YOU A PART OF THE PROBLEM.
276            ALL SERGEANTS WHO HAVE NOT ATTENDED STATE MANDATED
277            SERGEANTS TRAINING BE SO ASSIGNED IMMEDIATELY.

278       E.   OFFICER CREVOISERAT: COUNSELED, **(TRANSFERRED),
279            TRAINED AND POSSIBLY EVALUATED BY DR. BARRY OR
280            SOMEONE OF THE SAME COMPETENCE.

281       F.   SGT. PAPASODORA: COUNSELED.

282       G.   LT. FORD: COUNSELED

283    3) ALL OFFICERS BE GIVEN HARASSMENT TRAINING (RETRAIN SUPERIOR
284       OFFICERS).

285    4) HARASSMENT AND SENSITIVITY TRAINING BE MADE A PART OF THE
286       REGULAR YEARLY TRAINING AND SHOULD BE MANDATORY.

287    5) CAPTAINS ROLAND AND CHAULK TO CONDUCT COUNSELING SESSIONS
288       WITH ALL OF THE PERSONS MENTIONED IN THIS REPORT.  THIS
289       COUNSELING TO BE ACCOMPLISHED IMMEDIATELY.

290    6) **(TRANSFERS RECOMMENDED ABOVE TO BE ACCOMPLISHED WITHOUT
291       DELAY).

292          ** These recommendations are Capt. Roland's.
293          Capt. Chaulk recommends that transfers be held
294          in abeyance while counseling and (re)training
295          are evaluated.
296 copy: Capt. Colaninno
297       P.O.  Callahan
298       P.O.  Carey
299             file

# EXHIBIT E

REVERE POLICE DEPARTMENT

COMMENTS

ON THE ABOVE DATE AND TIME I OBSERVED A PAIR OF LEOPARD
UNDERWEAR (FEMALE TYPE). THE UNDERWEAR WAS HANGING UP ON THE
WALL. THE UNDERWEAR WAS HANGING UP IN PLAIN VIEW RIGHT
WERE THE PUBLIC COULD SEE THEM. THERE WAS ALSO A PAPER
RIGHT ALONG SIDE OF THE UNDERWEAR WITH WRITING ON IT.
THE WRITING STATED "LANGONE'S JEALOUS".

date

**EXHIBIT F**

FM: LT. B. R. FOSTER

TO: Chief Colannino

DATE: March 20, 2001

On the morning of March 2, 2001 while conducting roll call, I observed female undergarments hanging from the bulletin board in the Guard room. A note stating these belong to Jeff Langone was attached to the undergarments. I removed the garment and placed them in the trash. I worked the proceeding two day's and did notice that the garment was not placed on the bulletin board. It is my opinion that they were placed there sometime after 16:00 hours on March 1, 2001.

Respectfully Submitted,

Lt. Bernard R. Foster

# EXHIBIT G



# ALLIANCE
# MEDICAL GROUP, PC
An Integrated Medical Practice

*Specializing in the diagnosis*
*& treatment of:*

- Adult Medical Problems
- Auto & Work Related Injury
- Low Back Pain
- Neck Pain
- Headaches
- Arm, Hand & Leg Pain
- Shoulder Pain
- Sports Injury

James G. Guerrini, M.D.
*Board Certified Family Practitioner*
*Medical Director*

Joseph E. Kornfeld, D.C., D.A.B.C.
*Chiropractic Physician*
*Board Certified Chiropractic Neurolog*

Gerald Nastasia, Jr., D.C., D.A.B.C
*Chiropractic Physician*
*Board Certified Chiropractic Orthoped*

Chief Terrance Reardon
Revere Police Department
Pleasant Street
Revere, MA 02151
Secure fax # 781-285-8325

June 19, 2003

Re: Officer Sonia Fernandez

Dear Chief Reardon,

I am writing to you in response to the letter date June 18, 2003 from Gilbert A. Barrett, Jr., Executive Vice President of Meditrol Inc. regarding Officer Fernandez.

The following narrative addresses the questions outlined by Mr. Barrett in this letter regarding Officer Fernandez' care and status.

Officer Fernandez reports she still has daily pain, although she notes it has lessened somewhat. She rates the pain at a 5 to 7 on a scale of 1 to 10. I objectified her current level of disability through the use of the Oswestry Low Back Pain Scale. Her results correlated to a moderate to severe disability in performing activities of daily living. I find this to be consistent with her clinical presentation.

On examination, her lumbar flexion at 90 degrees causes pain, and extension is painful at 5-10 degrees. She has persistent tenderness over the left SI joint and left paravertebral muscles. There is tenderness over the iliotibial band of her left upper leg.

It is my opinion that her symptoms are the direct causal result of injuries sustained in the occupational injury of September 10, 2002, when she sustained a fall down the bleachers of a shooting range. Her initial diagnoses were traumatic lumbosacral strain and severe left thigh contusion/hematoma. A lumbar spine MRI revealed an annular tear at L4-5 and L5-S1 with small posterior disc protrusion causing minimal right and mild left L5 neural foraminal stenosis and mild right L4 foraminal stenosis. These findings are consistent with the mechanism of her injury. Additionally, she likely also has left sacroiliac joint dysfunction as a result of these injuries.

I, along with our physical therapist Stacy Bierly MSPT, feel that Officer Fernandez has reached the maximum therapeutic benefit from skilled physical therapy and conservative care.

However, given her above persistent symptoms and clinical findings, it is my opinion that she is not ready to return to full duty at this point. I have recommended referral to interventional pain management as she may benefit from epidural injections and/or SI injections.

As far as return to restricted duty, while she is immediately able to perform sedentary work (i.e. light duty), I am concerned about her ability to safely and adequately defend herself, or others, if confronted with a potentially dangerous situation. I would not recommend she perform any duty requiring her to wear her gun belt, as the weight of this belt could aggravate her symptoms.

I am not able to provide an opinion on her prognosis to return to full duty at this time without assessing her response to interventional pain management. Currently, she is not able to perform the essential tasks of a Police Officer without posing a risk to herself, her fellow officers and/or the public at large.

I hope this information is helpful to you, and I remain grateful to you for entrusting the care of your injured officers to us at Alliance Medical Group.

Sincerely,

James G. Guerrini, M.D.

Cc: Gilbert A. Barrett, Jr., Executive Vice President of Meditrol Inc, via fax

# ALLIANCE MEDICAL GROUP, P.C.
### 385 Broadway
### Suite 405
### Revere, MA  02151
### Phone:  781-289-6117
### Fax:  781-289-2841

Sonia Fernandez (Chart# 00211009)

Procedure: #108
Date: 03/27/03
Time: 11:56AM

**Pre-Operative Diagnosis**

| ICD9 Code | Description |
|-----------|-------------|
| 846.0 | Lumbosacral sprain joint/ligament |
| 724.2 | Low back pain |

**Procedure Codes**

| Code | Description |
|------|-------------|
| 20550 | Injection, Tendon Sheath, Ligament, Trigger Points/ganglion Cyst |

Narrative:

The risks and benefits of the procedure were reviewed with the patient. Informed consent was given and a signed informed consent sheet placed in the patient's chart.

The trigger point in the left lumbar paravertebral muscle was identified and marked with a skin marking pencil.

The area was prepped and draped in the usual sterile fashion.
Topical anesthetic spray was used.

1% Xylocaine without epinephrine mixed with 0.5% sodium bicarb as a buffer to decrease burning was used for this injection.

A 5 cc syringe with a 25 gauge, 1 1/2 inch needle was used for this procedure. After aspiration returned no blood, the trigger point was injected in a fan-like fashion with 2.5 cc of the mixture.

Ice was applied, and the patient observed, for 20 minutes.
The patient tolerated the procedure well.
The patient was instructed to apply ice to the area 15 minutes/hour for the next 24 hours.
The patient was warned and understands that their symptoms may worsen for the next 2 days. The patient was advised to watch for signs/symptoms of infection, especially redness and tenderness at the site.
The patient is to call with any problems or questions.

ALLIANCE MEDICAL GROUP, P.C.
Sonia Fernandez (#00211009)
Procedure#:  108 03/27/03

Follow-up in 1 week.

James Guerrini, M.D.

OFFICE NOTE
Sonia Fernandez (Chart# 00211009)
Visit Date:04/03/03

Subjective: The patient is here for a follow-up visit.
She noticed some improvement from the injection. She is sore at the injection site. No S&S of infection.
This morning she has 7 out of 10 pain mainly in the left lower back.

**Allergies**

| No | Allergen | Description |
|----|----------|-------------|
| 1  | NSAIDs   | Due to Peptic Ulcer Disease |

Objective: No S&S of infection at injection site.
There remain several trigger points present in the left paralumbar muscles.

**Diagnosis**

| No | Diagnosis | ICD9 | Dx Date | Stop Date | Comments |
|----|-----------|------|---------|-----------|----------|
| 1 | Low back pain | 724.2 | 02-03-03 | Current | |
| 2 | Lumbosacral sprain joint/ligament | 846.0 | 02-03-03 | Current | |
| 3 | Pain in Limb | 729.5 | 02-03-03 | Current | |

Plan: Discussed with patient.
Recommend additional trigger point injections to help relieve pain and hopefully restore function.
She will schedule these for next week.


James Guerrini, M.D.

ALLIANCE MEDICAL GROUP, P.C.
Sonia Fernandez (#00211009)
Procedure#: 111 04/10/03

Follow-up in 1 week.
Continue PT as directed.
If continues to improve, consider return to restricted duty (half-time initially) in the next 2 weeks.

James Guerrini, M.D.

ALLIANCE MEDICAL GROUP, P.C.
385 Broadway
Suite 405
Revere, MA 02151
Phone: 781-289-6117
Fax: 781-289-2841

Sonia Fernandez (Chart# 00211009)

Procedure: #111
Date: 04/10/03
Time: 12:25PM

**Pre-Operative Diagnosis**
ICD9 Code      Description
724.2          Low back pain

**Procedure Codes**
Code           Description
20552          Injection, single or multiple
               trigger points, one or two
               muscle group

Narrative:

She noted some relief from the last injection.
She still has alot of pain in her left lower back and thigh. She is making slow progress. I feel another TPI is indicated.

Informed consent is in the patient's chart.

The trigger point in the left paravertebral muscle was identified and marked with a skin marking pencil.

The area was prepped and draped in the usual sterile fashion.
Topical anesthetic spray was used.

1% Xylocaine without epinephrine mixed with 0.5% sodium bicarb as a buffer to decrease burning was used for this injection.

A 5 cc syringe with a 25 gauge, 1 1/2 inch needle was used for this procedure. After aspiration returned no blood, the trigger point was injected in a fan-like fashion with 2.5 cc of the mixture.

Ice was applied, and the patient observed, for 20 minutes.
The patient tolerated the procedure well.
The patient was instructed to apply ice to the area 15 minutes/hour for the next 24 hours.
The patient was warned and understands that their symptoms may worsen for the next 2 days. The patient was advised to watch for signs/symptoms of infection, especially redness and tenderness at the site.
The patient is to call with any problems or questions.

OFFICE NOTE
Sonia Fernandez (Chart# 00211009)
Visit Date:04/14/03

Subjective: The patient is here for an urgent office visit.
She states her back has been killing her the past 2 days. She has had a hard time sitting or walking and has
had increased pain into her thigh. She feels as if the bones in her back are coming apart.

**Allergies**

| No | Allergen | Description |
|----|----------|-------------|
| 1 | NSAIDs | Due to Peptic Ulcer Disease |

Objective: No S&S of infection at the injection site.
Tender over the left SI joint and left paravertebral muscles with myospasm.

**Diagnosis**

| No | Diagnosis | ICD9 | Dx Date | Stop Date | Comments |
|----|-----------|------|---------|-----------|----------|
| 1 | Low back pain | 724.2 | 02-03-03 | Current | |
| 2 | Lumbosacral sprain joint/ligament | 846.0 | 02-03-03 | Current | |
| 3 | Pain in Limb | 729.5 | 02-03-03 | Current | |

Assessment: Flare of LBP, likely SI joint dysfunction and facet pain.
Plan: Discussed with patient.
Will cautiously try Celebrex for pain relief and inflammation.
She will take 200mg qd with food, but d/c if she develops any GI side effects.
If symptoms do not improve, will refer to the Pain Clinic.
F/U as directed.

James Guerrini, M.D.

**OFFICE NOTE**
Sonia Fernandez (Chart# 00211009)
Visit Date:05/29/03

Subjective: The patient is here for a follow-up visit.
She reports she still has daily pain, although she notes it has lessened somewhat. She rates the pain at a 5 on a scale of 1 to 10.
Lumbar flexion at 90 degrees causes pain, and extension is painful at 5-10 degrees.
She still has tenderness over the left SI joint and left paravertebral muscles. ?of an increase in lumbar lordosis. There is tenderness over the ITB on the left.

I had a lengthy discussion with her.
I, along with PT, feel she has reached the maximum therapeutic benefit from skilled physical therapy. However, given her above persistent symptoms and clinical findings, I do not think she is ready to return to full duty at this point. I have recommended she consider referral to interventional pain managment. She may benefit from epidural injections and/or SI injections.
She would like to consider this and she will let me know.
I will see her back in 1 week to discuss her options.

**Allergies**

| No | Allergen | Description |
|----|----------|-------------|
| 1 | NSAIDs | Due to Peptic Ulcer Disease |

**Diagnosis**

| No | Diagnosis | ICD9 | Dx Date | Stop Date | Comments |
|----|-----------|------|---------|-----------|----------|
| 1 | Low back pain | 724.2 | 02-03-03 | Current | |
| 2 | Lumbosacral sprain joint/ligament | 846.0 | 02-03-03 | Current | |
| 3 | Pain In Limb | 729.5 | 02-03-03 | Current | |

James Guerrini, M.D.

OFFICE NOTE
Sonia Fernandez (Chart# 00211009)
Visit Date:06/10/03

Subjective: The patient is here for a return visit.
She is still experiencing low back pain on a daily basis (see last note).
We discussed this at length and she is open to an evaluation at the Pain Clinic, as she might be a candidate for
epidural injection therapy.
We will arrange this for her and see her back after that evaluation or sooner with any problems or questions.

**Allergies**

| No | Allergen | Description |
|----|----------|-------------|
| 1  | NSAIDs   | Due to Peptic Ulcer Disease |

**Diagnosis**

| No | Diagnosis | ICD9 | Dx Date | Stop Date | Comments |
|----|-----------|------|---------|-----------|----------|
| 1 | Low back pain | 724.2 | 02-03-03 | Current | |
| 2 | Lumbosacral sprain joint/ligament | 846.0 | 02-03-03 | Current | |
| 3 | Pain in Limb | 729.5 | 02-03-03 | Current | |

James Guerrini, M.D.

# EXHIBIT H

Case 9:18-cv-80176-BB   Document 396-2   Entered on FLSD Docket 02/28/2020   Page 71 of 72



66439
66396





66439

66396